UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RODERICK ARNOLD, *et al.*, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CARGILL, INCORPORATED,

Defendant.

Civil File No. 01-2086 DWF/AJB

**CARGILL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, DISQUALIFY, AND IMPOSE ADDITIONAL SANCTIONS**

**ORAL ARGUMENT REQUESTED**

"Toss the records. Get rid of them."

Former Cargill EEO Manager Bill Douglas testified that this was the exact instruction he received from Plaintiffs' lead counsel, Lawrence Schaefer, on July 22, 2002, just days after Mr. Schaefer learned that Cargill intended to subpoena Mr. Douglas as the suspected source of privileged and confidential Cargill documents leaked to Plaintiffs' counsel. Mr. Douglas thereupon gathered all the Cargill documents Mr. Schaefer had returned to him and deposited them in the trash, destroying any independent record of the contents of the confidential and privileged documents he had disclosed to Mr. Schaefer. As Mr. Douglas summarized, "[t]he city provides trash receptacles, and I just tossed them in there."

This remarkable testimony, obtained only after overcoming Plaintiffs' prolonged, strenuous objections, indisputably establishes that Plaintiffs' counsel wrongfully solicited, received, reviewed, retained, and transferred Cargill's confidential and privileged documents, and that Plaintiffs' counsel bears responsibility for the subsequent destruction of those documents. Cargill has the right, however, to a trial free from even the *risk* that confidential and privileged information is being unfairly used against it. According to Mr. Douglas, Plaintiffs' counsel solicited, reviewed, and then participated in the destruction of Cargill's confidential and

privileged information in order to advance a sweeping class action against Cargill and, thus, their own pecuniary gain. In writing, Plaintiffs' counsel expressly solicited "any documents" and "anything" Mr. Douglas had or could obtain from Cargill, then failed to take appropriate measures to prevent the disclosure of Cargill's confidential and privileged information, knowingly reviewed such information once received, and returned the material to Mr. Douglas despite believing he had no right to possess it in the first place, thus enabling its destruction.

Plaintiffs' counsel are employing similar tactics with many non-parties and unrepresented persons in this action. Virtually from the time Plaintiffs' counsel first conceived the idea for this action, they have been initiating uninvited contact with current employees, soliciting current and former employees to participate in this action, advising unrepresented persons that they "had to" retain Plaintiffs' counsel, inducing unrepresented persons to sign declarations drafted entirely by Plaintiffs' counsel. The transgressions involving Mr. Douglas are the most serious, but they are typical, not unique.

Cargill, in this motion, seeks to protect its rights and interests, including the right to have its confidences and privileges respected; to protect its employees from unregulated and uninvited contact and solicitation by adverse counsel; and to avoid being the unfair target of legal actions manufactured by law firms for their own pecuniary gain.[1] With the case tainted from the very

---

[1] Cargill presents this motion as and urges the Court to use its inherent power to impose a variety of sanctions, including dismissal of the Complaint. See, e.g., In re Potash Litig. ,1993 WL 543013 at *16-19 (D. Minn. Dec. 8, 1993), amended, 1994 WL 2255 (D. Minn. Jan. 4, 1994) (disqualifying certain plaintiffs' counsel and dismissing complaints prepared by them because of the possibility counsel had induced the disclosure of defendant's privileged information from a former employee) (attached as Ex. A to the accompanying Declaration of Michael Iwan ("Iwan Decl.")); see also, e.g., Chambers v. Nasco, 501 U.S. 32, 36 (1991) (holding that a court has inherent power to dismiss lawsuit for conduct that abuses the judicial process, including the filing of false and frivolous pleadings, where the plaintiff and counsel were implicated in the behavior); Pope v. Federal Express, 974 F.2d 982, 985 (8th Cir. 1992) (upholding dismissal of suit for use of manufactured document as within the inherent power of the court, and monetary sanctions as within Rule 11 authority). Cargill believes that the conduct of Plaintiffs' counsel has so compromised this action as to render it unsalvageable.

outset by the breach of Cargill's confidences and privileges and further compromised by Plaintiffs' counsel's subsequent conduct, the Court should disqualify Plaintiffs' counsel, dismiss the Complaint, impose monetary sanctions, and award Cargill the costs and fees incurred in defending this action to date.

## I. PROCEDURAL HISTORY

On July 15, 2002, counsel for Cargill received an envelope from Plaintiffs' counsel, Sprenger & Lang, containing approximately 450 pages of clearly confidential and privileged Cargill documents, which Sprenger & Lang said had inadvertently come into their possession. See Declaration of Lawrence P. Schaefer in Proceedings Regarding Deposition of R. Bill Douglas ("Schaefer Decl.") ¶ 18 (attached as Ex. B to accompanying Declaration of Michael Iwan ("Iwan Decl.")). Upon review of the materials, Cargill suspected Mr. Douglas as the source of the privilege breach. Sometime between July 15 and 18, 2002, in a phone conversation with Cargill's counsel, Mr. Schaefer refused to reveal where he had gotten Cargill's privileged documents. See Affidavit of Janice M. Symchych ("Symchych Aff.") ¶ 5. Ms. Symchych told Mr. Schaefer that she believed she knew his source and intended to seek full legal recourse for the privilege breach.[2] See id.

On August 14, 2002, Cargill noticed Mr. Douglas' deposition and also served interrogatories on Sprenger & Lang seeking a complete account of how the documents came into their possession. See Ex. D to Iwan Decl. On August 30, 2002, Sprenger & Lang wrote the Court objecting to this discovery, the first salvo in a protracted fight to resist Cargill's legitimate inquiry into this matter. See Ex. E to Iwan Decl. Cargill attempted repeatedly to obtain, via

[2] Mr. Douglas testified that, within a week of Ms. Symchych's call to Mr. Schaefer, Mr. Schaefer alerted Mr. Douglas to the prospect of a forthcoming subpoena and told him to "toss the records." See Deposition of R. Bill Douglas ("Douglas Depo.") at 104-05, 378-81 (excerpts and exhibits thereto attached as Ex. C to Iwan Decl.).

subpoena, information regarding Mr. Douglas' interactions with Plaintiffs' counsel, but was rebuked with an assertion of attorney-client privilege and work product, which necessitated the filing of a motion to compel. See Cargill's Motion to Overcome Attorney-Client Privilege and Work Product Claims of Bill Douglas and Others and to Amend Pretrial Schedule (Apr. 18, 2003). Ultimately, on June 27, 2003, the Court ordered Mr. Douglas to appear for two days of deposition and to answer all Cargill's inquiries regarding his interaction with Sprenger & Lang, regardless of any claim of attorney-client privilege by Sprenger & Lang. See Arnold v. Cargill, Inc., Civ. No. 01-2086 (DWF/AJB), slip op. (D. Minn. June 27, 2003) (Boylan, M.J.) [hereinafter "June 27, 2003, Order"]. On July 11, 2003, Cargill re-noticed Mr. Douglas' deposition, the first day of which took place on September 18, 2003. See Exs. C, F to Iwan Decl.

Mr. Douglas' testimony that day raised several troubling and unanticipated issues, most notably, that Sprenger & Lang had instructed Mr. Douglas to destroy copies of confidential and privileged documents in his possession before Cargill could subpoena them. See Douglas Depo. at 104-05. After confirming Mr. Douglas' testimony on this point and considering it over a break, Cargill suspended Mr. Douglas' deposition. There were a number of reasons behind Cargill's decision. First, Mr. Douglas' testimony contradicted prior representations and sworn declarations made to the Court by Sprenger & Lang. Second, Cargill believed that Mr. Douglas' testimony fairly established a basis for seeking discovery directly from Sprenger & Lang as a prelude to a motion for disqualification. Third, there were possible criminal consequences of the admissions being made by Mr. Douglas, an unrepresented party.

On September 23, 2003, Cargill wrote the Court to apprise it of Mr. Douglas' remarkable testimony and to ask for guidance. See Ex. G to Iwan Decl. The Court expressed great concern over the implications of Mr. Douglas' testimony, and further acknowledged Cargill's right to

conduct additional discovery as a prelude for a possible motion to disqualify and/or dismiss the action. See Ex. H to Iwan Decl. On October 10, 2003, Cargill served subpoenas for documents and testimony on Sprenger & Lang in order to obtain information that could only be in their possession, such as how Cargill's confidential and privileged documents were handled internally by Sprenger & Lang once received. See Ex. I to Iwan Decl. Sprenger & Lang moved to quash these subpoenas on October 16, 2003. See Plaintiffs' Combined Memorandum in Support of Motion to Quash Subpoenas *Duces Tecum* and *Ad Testificandum*, for a Protective Order, and in Opposition to Defendant's Motion for Stay (Oct. 16, 2003).

On November 26, 2003, the Court ordered Sprenger & Lang to respond to the document requests propounded on them via subpoena. The Court also ordered Cargill to complete Mr. Douglas' deposition after receiving the production from Sprenger & Lang and at that point for Cargill to determine whether the evidence warranted additional discovery, a motion for sanctions, or some other response. See Arnold v. Cargill, Inc., Civ. No. 01-2086 (DWF/AJB), slip op. (D. Minn. Nov. 26, 2003) (Boylan, M.J.).

On January 14, 2004, Sprenger & Lang provided partial responses to Cargill's document requests; however, Sprenger & Lang refused to produce a significant number of documents Cargill had requested on attorney-client privilege and work product grounds. See Ex. J to Iwan Decl. Cargill asked Sprenger & Lang in writing to reconsider their position, and on March 29, 2004, Sprenger & Lang produced most of the documents previously withheld. See Ex. K to Iwan Decl. In the meantime, Cargill had re-noticed the second day of Mr. Douglas' deposition for March 10, 2004. See Ex. L to Iwan Decl. Shortly before that date, Mr. Douglas advised Cargill that he had scheduling problems due to his wife's medical condition. See Ex. M to Iwan Decl. The parties and Mr. Douglas worked cooperatively over the next several weeks to find an

accommodation that would fit everyone's schedule. See id. Ultimately, after arranging to provide temporary home health care, Cargill was able to complete Mr. Douglas' deposition on May 10, 2004. See id.

## II. FACTUAL BACKGROUND

Mr. Douglas was a Cargill executive for many years, including service as Cargill's Corporate EEO Director and as manager of Human Resources for Cargill's entire Food Sector. Mr. Douglas retired from Cargill in 1998. After his retirement, at the specific request of Sprenger & Lang, Mr. Douglas, who is African American himself, helped Sprenger & Lang commence this action and recruit plaintiffs for it. Magistrate Judge Boylan has found that "Douglas has actively participated in Arnold's preparation of this litigation by identifying names of potential plaintiffs, providing Sprenger & Lang with 2000 pages of privileged, internal Cargill documents, and reviewing and commenting on the complaint before it was filed." June 27, 2003, Order at 3. Magistrate Judge Boylan's June 27, 2003, Order concludes:

> In Douglas' capacity as an EEO professional, Douglas was privy to Cargill's strategy and methods for defending a discrimination suit. The danger of Douglas disclosing Cargill's privileged information to Sprenger & Lang necessitates an inquiry into his relationship with plaintiff's counsel. Therefore, this Court will overcome attorney client privilege and allow Cargill to depose Douglas regarding his relationship with Sprenger & Lang. Although disqualification of counsel is a drastic measure that should be used only when absolutely necessary, Cargill has a right to depose Douglas to determine whether evidence exists to pursue such a remedy.

Id. In his deposition, Mr. Douglas confirmed the substance of the Court's findings and revealed additional details about his relationship with Sprenger & Lang that support imposition of the "drastic measures" contemplated by Magistrate Judge Boylan. Other evidence in the record confirms that Sprenger & Lang's inclination to test the boundaries of responsible advocacy and professional conduct is not limited to their dealings with Mr. Douglas.

**A. Plaintiffs' Counsel Solicited Assistance And Information From Cargill's Former EEO Manager, Which Directly Led To A Breach Of Cargill's Confidences And Privileges.**

Mr. Douglas possessed a large amount of Cargill privileged and confidential information, including "extensive knowledge of Cargill's litigation strategy" from his 22 years of working with Cargill's Law Department and Cargill's outside counsel at Dorsey & Whitney. See Douglas Depo. at 17-22, 45, 116, 201-02, 216-17. Sprenger & Lang approached Mr. Douglas in July 2000 for the purpose of soliciting information regarding employment practices at Cargill, precisely because they knew him to be a former, highly-placed human resources executive at Cargill. See Douglas Depo. Ex. 4 at 2 (Notes of B. Douglas) ("It was Larry Schaefer who solicited my knowledge/experience regarding systemic discrimination at Cargill and not I who retained Sprenger & Lang for advice regarding 'systemic discrimination' at Cargill and a consulting opportunity!"); Douglas Depo. Ex. 10 (Notes of Sprenger & Lang Attorney L. Schaefer) ("Bill Douglas – file is w/Berkley -> contact him for leads"), Douglas Depo. Ex. 11 at 1 (Notes of Sprenger & Lang Paralegal F. Wilderson re: July 6, 2000, telephone call with B. Douglas) ("How'd you get my name?"). The information solicited by Sprenger & Lang ultimately included privileged and confidential matters. See Douglas Depo. at 99-100.

Sprenger & Lang ingratiated themselves with Mr. Douglas by suggesting he might be able to participate in any recovery or settlement of this action, long after they knew that Mr. Douglas' release of claims precluded such participation. See id. at 82-83, 89. As early as 1998, Sprenger & Lang knew Mr. Douglas had signed a general release of claims upon his retirement from Cargill. See id. at 52; Schaefer Decl. ¶¶ 3, 14. Moreover, Mr. Douglas was never within the putative class Sprenger & Lang identified in the Complaint, because he held a position above salary grade 15. See generally Complaint; see also Douglas Depo. at 90-92, 287-88.

Sprenger & Lang's dealings with Mr. Douglas confirm they viewed him not as a potential class member, but rather as a source of sensitive information about Cargill that could be leveraged in litigation. Indeed, in the telephone call Sprenger & Lang initiated with Mr. Douglas on July 6, 2000, (as reflected in notes from Sprenger & Lang's own files) Mr. Douglas confirmed that he had exactly the information Sprenger & Lang hoped to find: "I need to get assurances that anything I say will remain confidential. *I have docs from case Paul Sprenger filed –[Foster] lawsuit brought against Cargill. There's a lot that Paul Sprenger missed.* I could give you names, but I have to ask – in absolute terms – that I not be identified with having provided this information. . . . *But, I know much. It's all probably the same now as it was then*." Douglas Depo. Ex. 10 at 1 (emphasis added).

Had they been interested in Mr. Douglas for anything other than his inside knowledge of Cargill, Sprenger & Lang would have taken appropriate safeguards to insure that Mr. Douglas would not disclose Cargill's confidential and privileged information. As it turns out, however, Sprenger & Lang never advised Mr. Douglas of the impropriety or consequences of disclosing Cargill's confidential and privileged information and, in fact, encouraged him to disclose *all* information in his possession about Cargill. See Douglas Depo. at 335-36, 39-40, 99. In the course of a November 27, 2000, telephone interview with Mr. Douglas, Sprenger & Lang attorney David Schulman learned that "Bill has a box of documents from his days at Cargill . . . , and *we agreed that he would pass on to us anything that he thinks might be of interest*." Douglas Depo. Ex. 13. Sprenger & Lang attorney Sara L. Madsen similarly wrote Mr. Douglas on February 2, 2001, stating how happy Sprenger & Lang would be to review "*any documents, either pertaining to you personally or to Cargill generally.*" Douglas Depo. Ex. 7. In neither of

these instances, or in any other written document for that matter, is there any indication provided to Mr. Douglas that privileged documents were to be excluded.[3]

Mr. Douglas, in fact, had to "raise[] the question" with Sprenger & Lang about whether he should produce "some [Cargill] documents here, some of which have confidential and privileged written on them," to which Sprenger & Lang responded by telling Mr. Douglas to "just send them, we'll go through." Douglas Depo. at 39-40. Following this instruction, Mr. Douglas produced everything he had, and he personally met with Sprenger & Lang four to six times to go over the documents. Douglas Depo. at 39-40, 42, 99-100. According to Mr. Douglas, Sprenger & Lang *never* suggested it was improper for him to give them "privileged or confidential information from inside Cargill," id. at 50-51, 336-37, 341-42, 345-46, and the written words of Sprenger & Lang attorneys Madsen and Schulman, above, corroborate Mr. Douglas' testimony. It is undisputed, moreover, that Sprenger & Lang never cautioned Mr. Douglas in writing against disclosing confidential and privileged information regarding Cargill; in fact, in their written correspondence with Mr. Douglas even after this initial disclosure, Sprenger & Lang continued to encourage Mr. Douglas to provide them "any and all" other documents he had in his possession relating to Cargill. See Douglas Depo. Ex. 7.

[3] Sprenger & Lang also was seemingly unconcerned about any confidentiality agreement(s) Mr. Douglas might have had with Cargill, or at least they were unconcerned as it related to them. Mr. Douglas did sign a confidentiality agreement in the course of his duties as a human resources manager with Cargill, and Mr. Schaefer further conceded in his Declaration that Mr. Douglas "conveyed a form document to me that he [Mr. Douglas] thought might be similar to the form [confidentiality agreement] he signed," Schaefer Decl. ¶ 9. Unbelievably, particularly for a firm with alleged "expertise" in employment matters, id. ¶ 4, Mr. Schaefer apparently relied on Mr. Douglas that Mr. Douglas' subsequent severance agreement entirely invalidated any other written agreement he had to maintain the confidentiality of Cargill information, see id. ¶¶ 8, 9. It is hard to understand how any reasonable legal analysis could have led to the conclusion that an employer would intend a severance agreement to release a soon-to-be former employee from any duty to maintain the confidentiality of its confidential, proprietary, and trade secret information. Rather, it is much more likely that, Sprenger & Lang put their interest in getting information out of Mr. Douglas to use in putting together a class action against Cargill ahead of their duty to provide reasonable legal advice to their purported "client," which itself implicates troubling conflict of interest concerns under Minn. R. Prof. Conduct 1.7.

### B. Plaintiffs' Counsel Improperly Reviewed And Retained Copies Of Confidential And Privileged Documents Received From Mr. Douglas And Then Returned The Originals To Mr. Douglas, Rather Than Cargill.

Mr. Douglas produced an untold number of confidential and privileged Cargill documents to Sprenger & Lang and other information regarding his dealings on legal matters and with attorneys in Cargill's Law Department in late 2000. See Douglas Depo. at 39-40, 42-46, 99-100. Even after recognizing the confidential and privileged nature of the material, Sprenger & Lang continued to sort through the documents to further the litigation they were planning against Cargill. See Schaefer Decl. ¶¶ 11-12. Mr. Douglas eventually had to demand the return of these documents from Sprenger & Lang and does not feel he got them all back even then. See Douglas Depo. at 46-48. Moreover, unbeknownst to Mr. Douglas, Sprenger & Lang made and retained a copy of at least some of these same confidential and privileged documents for their own use. See Schaefer Decl. ¶ 16, Douglas Depo. at 48-49.

Sprenger & Lang returned confidential and privileged documents to Mr. Douglas, even though they now concede Mr. Douglas should not have had them in the first place and even though the appropriate course of action would have been to return the documents to the privilege holder, Cargill. See Schaefer Decl. ¶ 13, 18. Questioning by Plaintiffs' counsel Susan M. Coler on the second day of Mr. Douglas' deposition is particularly revealing on this point:

> MS. COLER: --Mr. Douglas. My question is what precise words do you recall, or do you claim Mr. Schaefer said to you with regard to what you should do with those records?
>
> MR. DOUGLAS: Toss the records. Get rid of them.
>
> MS. COLER: *Okay. Is it possible that Mr. Schaefer said to you words to the effect that you should not have had those records in your possession*?
>
> MR. DOUGLAS: No.

Douglas Depo. at 379-80 (emphasis added).

### C. Plaintiffs' Counsel Facilitated The Destruction Of Evidence That Would Have Revealed The True Scope Of The Breach They Induced And Further Attempted To Conceal Their Involvement By Failing In Their Duty Of Candor To Mr. Douglas And This Court.

Approximately 18 months after they received Cargill's documents from Mr. Douglas, Sprenger & Lang delivered a small number of these confidential and privileged documents to Cargill, see Schaefer Decl. ¶ 18, and then promptly had a discussion with Mr. Douglas about the status of the documents in question, see Douglas Depo. at 378-80, following which Mr. Douglas proceeded to dispose of all the Cargill records he had in his possession at that time, see id. at 259, 271-72, 278-81. Mr. Douglas testified that Sprenger & Lang recommended that he destroy Cargill's privileged and confidential documents before Cargill could subpoena them. See id. at 104-05, 259, 378-81. As Mr. Douglas subsequently wrote in a document entitled "Larry Schaefer Chronology of Events":

> Monday, 7/22/02, INFORMED ME A SUBPOENA AND ATTACHMENT FOR DOC PRODUCTION FROM CARGILL TO DEPOSE ME WAS FORTHCOMING. SAID I SHOULD TOSS RECORDS OR DOCUMENTS BEFORE. CALL HIS OFFICE, ETC. WITH QUESTIONS OR FOR ASSISTANCE.

Douglas Depo. Ex. 4. Indeed, it is undisputed that, prior to receiving a subpoena from Cargill, Mr. Douglas discarded all the documents returned to him by Sprenger & Lang, further fragmenting the record of confidentiality and privilege breaches inculpating Sprenger & Lang. See Douglas Depo. at 271-72, 280-81, 380-81.

In February 2003, after concluding that Sprenger & Lang intended to pin all blame for the breach of Cargill's confidences and privileges on him and leave him "in the wind, twisting," Mr. Douglas severed all ties with Sprenger & Lang. See id. at 92-93, 250-51. In notes of one of their last telephone conversation, on February 24, 2003, Mr. Schaefer himself wrote that Mr. Douglas "doesn't believe me" and "has a trust problem w/me." Douglas Depo. Ex. 8.

Notwithstanding this exchange, on March 18, 2003, as Mr. Douglas' deposition seemed imminent, Mr. Schaefer wrote Mr. Douglas an extensive letter regarding his potential deposition testimony and, once again, suggested that Mr. Douglas stood to gain from any recovery or settlement in this action. See Douglas Depo. Ex. 9. Mr. Schaefer listed for Mr. Douglas questions he anticipated Cargill would ask and suggested how Mr. Douglas, now an unrepresented party, might want to respond. See id. at 2-5. Even at this late date, Mr. Schaefer continued to hold out to Mr. Douglas the financial inducement of participating in any recovery or settlement in this action. See id. at 2 ("It is our position that you are a potential class member in this action who, despite having signed a release, may be eligible and elect to participate in class-wide relief should this be awarded by judgment or settlement."). This is particularly remarkable because Mr. Schaefer knew both that Mr. Douglas had been outside the proposed class definition from the outset of this litigation and, in any event, this Court had ruled that individuals who had signed and not rescinded a release of claims upon the termination of their employment from Cargill – like Ronald Garrus and Mr. Douglas – could not participate in this action. See Arnold v. Cargill, Inc., Civ. No. 01-2086 (DWF/AJB), slip op. (D. Minn. May 16, 2002) (Frank, J.). Nonetheless, much as he had done in securing Mr. Douglas' cooperation in the first instance, Mr. Schaefer used the prospect of pecuniary gain to attempt to ingratiate himself with Mr. Douglas, an unrepresented, non-legally trained third party. Taking such a legally untenable position conflicted with both Mr. Schaefer's general duty of candor and truthfulness and his obligations toward unrepresented parties. See Minn. R. Prof. Conduct 4.1 & 4.3. This time, however, Mr. Douglas, saw through this ploy as "more BS" from Mr. Schaefer and rejected his entreaties. Douglas Depo. at 287.

**D. Plaintiffs' Counsel Promised The Court Complete Candor And Full Disclosure But Instead Misled The Court And Concealed Material Facts.**

On May 2, 2003, Mr. Schaefer submitted a Declaration promising to provide information "to allow a full evaluation of the nature of [Sprenger & Lang's] communications [with Mr. Douglas] and the circumstances surrounding the firm's coming into possession of certain documents." Schaefer Decl. ¶ 2. A "full evaluation" requires disclosure of all relevant information, whether favorable or not to the declarant. On the contrary, rather than exhibiting the "candor" towards the Court he promised (and which is required under Minn. R. Prof. Conduct 3.3), Mr. Schaefer omitted key details in his Declaration about his relationship with Mr. Douglas, as it related to this action. Mr. Schaefer also repeated many of the assertions in his March 18, 2003, letter that Mr. Douglas would later emphatically and unequivocally deny. In so doing, Mr. Schaefer provided a very distorted picture of Mr. Douglas' involvement in this case.

Mr. Schaefer acknowledged that he had one limited interaction with Mr. Douglas in early 1998 to review Mr. Douglas' Release and Settlement Agreement with Cargill. See Schaefer Decl. ¶ 3. This consultation had nothing to do with discrimination issues at Cargill; rather, it involved whether Mr. Douglas could provide "personal coaching" services to Cargill employees in light of his recent retirement from and severance agreement with Cargill.[4] See id.; Douglas Depo. at 26-27. Mr. Schaefer then jumped ahead to September 2000, picking up the story of his subsequent interactions with Mr. Douglas in mid-stream, averring that "Douglas sought advice from S&L in September 2000" when "Douglas met with me to discuss the issue of whether systemic discrimination against salaried African American employees was occurring at Cargill,

[4] During his initial consultation with Mr. Schaefer in 1998, Mr. Douglas inquired whether a basis existed to "reopen[]" or "undo" his Release and Settlement Agreement with Cargill. Douglas Depo. at 26. Mr. Schaefer apparently saw no grounds for doing so then; however, when soliciting Mr. Douglas' assistance with this action in late 2000, and particularly when trying to sway Mr. Douglas in March 2003 prior to his deposition, Mr. Schaefer clearly attempted to lead Mr. Douglas into thinking that grounds existed for challenging his release after all. See id. at 82-83, 89; Douglas Depo. Ex. 9 at 2.

and had been occurring in the past." Schaefer Decl. ¶¶ 4, 7. The statements obviously imply that Mr. Douglas initiated the contact with Sprenger & Lang at that time for the purpose of seeking advice. Of course, it is now known that, based on their single meeting in early 1998, *Mr. Schaefer* remembered Mr. Douglas as a former, highly placed human resources executive at Cargill and *Mr. Schaefer* decided Sprenger & Lang should "contact him for leads." Douglas Depo. Ex. 10; see also Douglas Depo. Ex. 4 at 2. This true course of events is confirmed by documents produced out of Sprenger & Lang's own files, which ultimately were disclosed only upon Court order, including notes from a July 6, 2000, telephone call to Mr. Douglas, which documented his initial reaction as one of complete surprise: "How'd you get my name?" Douglas Depo. Ex. 11 at 1.

Mr. Schaefer assured the Court in his Declaration that he "emphatically and unequivocally" told Douglas not to transfer any confidential Cargill documents, effectively assuring the Court that any transfer by Mr. Douglas to Sprenger & Lang of confidential documents was by Mr. Douglas' mistake or misconduct, rather than by Sprenger & Lang's request or agreement. Notwithstanding his profession of candor, Mr. Schaefer conveniently omitted: (1) Mr. Schulman's report, before the transfer of documents, that he and Mr. Douglas "agreed that he would pass on to us anything that he thinks might be of interest"; (2) Mr. Schaefer's own acceptance, retention, and review of documents after learning that Mr. Douglas had in fact delivered confidential documents to Sprenger & Lang; and (3) Ms. Madsen's request to Mr. Douglas for "any documents," even after Mr. Schaefer had taken possession of confidential and privileged Cargill documents from Mr. Douglas and purportedly reproached Mr. Douglas for transferring such documents. Mr. Schaefer's Declaration to the contrary, Mr.

Douglas denied ever having been explicitly instructed not to provide confidential or privileged materials.[5] See Douglas Depo. at 35-36.

Further, Mr. Douglas denied that Mr. Schaefer had admonished him for having "made reference to a comment by Fred Budde, Cargill in-house employment counsel." Compare Schaefer Decl. ¶ 20 with Douglas Depo. at 51. In fact, Mr. Douglas testified, and the documents produced by Sprenger & Lang confirm, that Mr. Schaefer and Mr. Douglas had at least one extensive conversation about Mr. Budde and other in-house attorneys at Cargill and particularly how they were likely to investigate and respond to this litigation, based on Mr. Douglas' prior dealings with them on legal matters. See Douglas Depo. at 212, 351-54; Douglas Depo. Ex. 15 (L. Schaefer notes of Mar. 28, 2001, conversation with B. Douglas).

---

[5] Towards the end of the second day of his deposition, Mr. Douglas remarked that parts of Paragraph 5 of Mr. Schaefer's Declaration "ring true, or familiar." See Douglas Depo. at 335. Of course, this Paragraph of Mr. Schaefer's Declaration had been reviewed with Mr. Douglas during the first day of his deposition, see, e.g., id. at 95-96, Mr. Douglas watched the videotape of the first day of his deposition before appearing for day two, see id. at 247, and Mr. Douglas had been questioned earlier in the second day of his deposition about his disclosure of "privileged and confidential" documents, see, e.g., id. at 278-81. In light of all the preceding discussion, it is not at all surprising that parts of Paragraph 5 of Mr. Schaefer's Declaration might have sounded familiar to Mr. Douglas by that time. This is particularly so because only seconds later, when asked "Are you providing documents to Sprenger & Lang contrary to their explicit and adamant instructions that you do so for some reason we don't understand, or are you complying with their instructions?" Mr. Douglas answered:

> A: I put it this way. I brought some documents.
>
> Q: Right.
>
> A: And – there. And after several months, more than is indicated in this paragraph preceding this one, whatever it was, 5, I had to initiate contact to try and get them back. So you draw your own conclusion.
>
> Q: Right.
>
> A: No, I, I – this, this didn't happen to me. And there was no admonishment or anything resembling that about me having provided documents that I had been told previously shouldn't be provided.
>
> Q: Okay.
>
> A: On the contrary. I was invited to bring all the documents, including those that were privileged to Sprenger & Lang's office and help and/or assist, and a space or place to sort through them.

Id. at 336-37.

Mr. Douglas' testimony and Sprenger & Lang's own documents also belie Mr. Schaefer's claim that he did not know the reason that Mr. Douglas decided to sever his relationship with Sprenger & Lang. See discussion, supra, II.C. For Mr. Schaefer thereafter to suggest to this Court that he had no idea why Mr. Douglas severed the relationship with Sprenger & Lang, see Schaefer Decl. ¶ 23, is misleading and indicative of an effort to conceal the misdeeds Mr. Douglas' testimony later would reveal.

Finally, the suggestion made by Mr. Schaefer that he discouraged Mr. Douglas from thinking he stood to profit from any recovery in this action, see id. ¶ 10, is, in a word, incredible. Mr. Douglas testified about being led to believe he would benefit, and Mr. Schaefer continued to hold out this inducement to Mr. Douglas even as late as March 18, 2003, in the letter he wrote to Mr. Douglas. See Douglas Depo. Ex. 9 at 2.

### E. Tactics Employed By Sprenger & Lang With Other Non-Parties And Unrepresented Persons Corroborate Mr. Douglas' Account Of Sprenger & Lang's Active Misappropriation And Misuse of Cargill's Confidential And Privileged Information.

Lest the Court think that Sprenger & Lang's cultivation and exploitation of its relationship with Mr. Douglas was an isolated, if odious, incident, the record contains examples of similar tactics being employed with other non-parties and unrepresented persons, which both corroborate Mr. Douglas' testimony and demonstrate a disturbing pattern of conduct by Plaintiffs' counsel.

Mr. Schaefer's Declaration for example mischaracterizes (or at least grossly understates) the nature of Mr. Douglas' interactions with current and former African American employees of Cargill regarding this lawsuit. Mr. Schaefer described Mr. Douglas as having "on occasion provided names of current or former African-American employees whom Sprenger & Lang could contact in conducting its investigation" and also having "contacted potential witnesses

and/or class members to discuss their experiences at Cargill." Schaefer Decl. ¶ 22. In fact, with the full knowledge and approval of Sprenger & Lang, Mr. Douglas actively solicited individuals to participate as plaintiffs in this action, even going so far as to discuss the details of the retainer agreement they would be asked to sign and to convince individuals that they somehow had been the victims of discrimination. See Douglas Depo. Ex. 5 (E-mails from B. Douglas to Sprenger & Lang). Over a several month period in late-2000, Mr. Douglas reported the results of his contacts to attorneys at Sprenger & Lang, who used them as pretense for direct communications with these individuals.[6] See id.; see also Douglas Depo. at 72, 77-79, 186, 199-201.

Tellingly, Mr. Douglas recounted his telephone call to Catherine Page, a former employee of a Cargill subsidiary, Cargill Steel & Wire. See Douglas Depo. at 200-01. Ms. Page initially did not express any feelings of having been subjected to overt discrimination and only expressed a sense of possibly not been fairly compensated *after* Mr. Douglas raised the subject with her. See id. Mr. Douglas, it turns out, had a particularly strong interest in seeking to convince Ms. Page to join the litigation, as he explained in a follow-up e-mail to Sprenger & Lang, because he knew from dealing with Cargill's outside counsel in the Foster case that Cargill would seek to exclude from a class action any subsidiary not represented by a named plaintiff. See id. at 200-01; see also Douglas Depo. Ex. 5; Douglas Depo. Ex. 7 ("Della [Dickson – who later became a named plaintiff], I don't think she's aware of how poorly she's been treated. When she does become aware she'll be very angry.").

[6] Of course, it is well established that a lawyer may not do through agents that which the lawyer ethically is precluded from doing directly. See Midwest Motor Sports v. Arctic Cat Sales, Inc., 347 F.3d 693, 698 (8th Cir. 2003) (holding that a lawyer shall be deemed responsible for the conduct of others "if the lawyer orders or ratifies the conduct"). In particular, Minn. R. Prof. Conduct 7.3 prohibits direct contact with prospective clients, when a significant motive for doing so is pecuniary gain. By orchestrating and encouraging Mr. Douglas' efforts to solicit plaintiffs for this action, which it now appears Sprenger & Lang were ginning up for their own pecuniary gain, Plaintiffs' counsel have acted inconsistently with the laws precluding attorney solicitation.

Similar to their approach with Mr. Douglas, Plaintiff's counsel themselves contacted current and former employees of Cargill to solicit their participation in this lawsuit, either directly or under the guise of seeking "information about their experiences at Cargill." In 2001, for example, "Larry" from Sprenger & Lang telephoned John Chavers, then a management-level human resources professional at Cargill (who also happens to be African American), to inform him of this action and ask him to meet in person at Sprenger & Lang's offices. See Deposition of John Chavers at 86-90 (attached as Ex. N to Iwan Decl.). This communication with a management-level employee appears to have occurred at a time that Sprenger & Lang knew Cargill was represented by counsel and thus was improper under Rule 4.2. See also Midwest Motor Sports, 347 F.3d at 697-98. A similar contact seems to have been made in the past three months with a supervisory employee in Ohio. See Affidavit of Arjen Hoogeboom ¶ 2 & Ex. A.

In several cases, Sprenger & Lang convinced individuals they contacted to sign declarations, drafted by Sprenger & Lang, which contained allegations that several declarants later admitted were entirely unfamiliar to them. See, e.g., Deposition of Glenn Ford at 126 ("Q: Now, in your declaration, and that's Exhibit l so if you can pull that out, and if you look specifically at Paragraph 13 . . . it mentions that, 'Cargill went through two types of review during my tenure. The first type was called management by objectives.' Is that management by objectives a phrase that you're familiar with? A: No it's not.") (attached as Ex. O to Iwan Decl.); Deposition of Candy Smith at 82-83, 128 (stating that, notwithstanding directly contrary allegations in her declaration, she never applied for Assistant to the Office Manager, nor was this position even available until after she left Cargill) (attached as Ex. P to Iwan Decl.).

When these declarants subsequently were subpoenaed by Cargill for deposition, Sprenger & Lang again contacted them with an offer of legal representation. See, e.g., Deposition of

Marcia Harrison at 33 (stating that shortly after receiving her deposition subpoena, a paralegal from Sprenger & Lang called her and "told me that they would be able to represent me if I wanted them to") (attached as Ex. Q to Iwan Decl.). In some cases, Sprenger & Lang purported to represent these declarants even in the face of apparently contrary assertions by the declarants themselves. See, e.g., Deposition of Angela Reid at 8 (stating that she had just met the attorney from Sprenger & Lang appearing at her deposition that very morning and that, while he was assisting her in the deposition, she "ha[d]n't retained him") (attached as Ex. R to Iwan Decl.).

Sprenger & Lang even went so far as to advise at least one unrepresented person, former Cargill employee Candy Smith (f/k/a Candace Joyner), that she "would have to" retain Sprenger & Lang as counsel to represent her in a deposition noticed by Cargill. Smith Depo. at 41. Ms. Smith testified that she was first contacted via telephone by a paralegal at Sprenger & Lang in the fall of 2003. See id. at 9. She testified that she was called nine more times by this same Sprenger & Lang paralegal during the following months, to talk about her experiences at Cargill, to draft the declaration that she eventually signed, and to confirm the logistics of her deposition. See id. at 19-31. Ms. Smith testified that she was then called the day before her deposition by Sprenger & Lang lawyer Teresa Patton. See id. at 36. Ms. Smith testified that she had never asked for Sprenger & Lang to represent her, see id. at 31, 40, and that she had never asked anyone at Sprenger & Lang for legal advice, see id. at 37. But she described her conversation with Patton the day before her deposition as follows:

> THE WITNESS: I remember. I spoke to Teresa yesterday.
>
> Q. Yes?
>
> A. And she mentioned that she would – that I would have to retain her as an attorney.
>
> * * *

> Q. I just want to summarize that I understand what your testimony has been, and that is that prior to yesterday you had never asked anybody at Sprenger and Lang to represent you in this deposition but that yesterday Miss Patton told you that you would have to retain Sprenger and Lang as your attorneys, correct?
>
> A. Correct.

Id. at 40-41.[7]

Ms. Patton defended the deposition, but she did not ask the witness any questions regarding her testimony that Sprenger & Lang had forced her to retain them. Ms. Smith's testimony stands completely unchallenged.[8]

## III. ARGUMENT

### A. Courts Staunchly Defend The Integrity Of The Judicial Process Against Any Risk That Confidential And Privileged Material Has Been Misappropriated By An Adversary In Litigation.

Courts respond very seriously to even the "risk" that improperly obtained confidential and privileged information might be used against a party in litigation. See, e.g., In re Potash

---

[7] A week before Patton told Smith that she had to retain Sprenger & Lang, that office sent Smith a package of materials to review for her deposition along with a cover letter that was marked as "attorney/client privileged." Patton conceded on the record at the deposition, however, that there was no such attorney/client relationship when the letter was sent and consented to have the letter marked as an exhibit. See Smith Depo. at 33-38. More significantly, in early 2003, Ms. Smith reported to a co-worker that "Sprenger & Lang contacted her and other African American employees in an attempt to reel them in and be part of the class action lawsuit." Affidavit of Harriet Harrington ¶ 3. Ms. Smith reportedly told Sprenger & Lang that "she was not interested in being a part of the lawsuit . . . that Cargill treated her like a queen and she would not say anything bad about Cargill." Id. Ms. Smith further reported to this co-worker that "she wanted Sprenger & Lang's phone calls to stop." Id.

[8] Finally, Sprenger & Lang has permitted an attorney in their Washington, D.C., office, Latif Doman, to defend depositions and represent deponents in this case notwithstanding the fact that, to Defendant's knowledge, Mr. Doman is neither admitted in the District of Minnesota (either generally or *pro hac vice* for this case) or in any of the jurisdictions in which the depositions occurred. See Ex. S to Iwan Decl. Specifically, Mr. Doman defended the depositions of Lois Cephus (in Kansas), Raymond Fowler (in Kansas), and Angela Reid (in North Carolina). See Deposition of Lois Cephus at 1 (attached as Ex. T to Iwan Decl.), Deposition of Raymond Fowler at 1 (attached as Ex. U to Iwan Decl.), and Reid Depo. at 1. Despite not being authorized to do so, Mr. Doman nonetheless interposed countless and lengthy speaking objections on the record, instructed the deponents he claimed to represent not to answer questions posed by Cargill's counsel, and conducted his own examination of the deponent. See, e.g., Cephus Depo. at 35-37 (instructing witness not to answer and then instructing witness, "Tell him you don't remember."), 115-118 (interposing numerous objections); Fowler Depo. at 126 (conducting examination).

Antitrust Litig., 1993 WL 543013 at *16-18; Marvin Lumber & Cedar Co. v. Norton Co., 113 F.R.D. 588, 591 (D. Minn. 1986).[9] A party who seeks to cultivate relationships with former, highly placed employees of a litigation adversary, therefore, "walks a very fine line" and does so at his own significant risk. Biocore Med. Tech., Inc. v. Khosrowashahi, 181 F.R.D. 660, 673-75 (D. Kan. 1998), aff'd, 348 F.3d 1163 (10th Cir. 2003); see also FleetBoston Robertson Stephens, Inc. v. Innovex, 172 F.Supp.2d 1190, 1195 (D. Minn. 2001) (expressing concern about the propriety, under Minn. R. Prof. Conduct 4.2, of contacts with high level former employees of an adversary in litigation); Olson v. Snap Products, Inc., 183 F.R.D. 539, 544-45 (D. Minn. 1998) (same); Camden v. State of Maryland, 910 F. Supp. 1115, 1116, 1123 (D. Md. 1996) (ordering disqualification because plaintiff's counsel "knew or should have known the [defendant's former affirmative action director] was extensively exposed to confidential information of [the defendant], including regular contact with [the defendant's attorneys]; they made no effort to protect those confidences; and they eventually came into possession of privileged conversations and documents").

Among other things, a party who elects (or permits his counsel) to conduct activities right up to the very edge of that very fine line enjoys absolutely no benefit of the doubt or second chance if it appears that such activities have contributed to the improper disclosure of confidential and privileged information. As one federal court explained, while considering a situation in which the defense lawyers were tampering with a source on the plaintiffs' side:

---

[9] See also Wyatt v. Hanan, 871 F. Supp. 415, 419 (M.D. Ala. 1994); W.R. Grace & Co. v. Gracecare, Inc., 152 F.R.D. 61, 65 n.5 (D. Md. 1993); Valassis v. Samelson, 143 F.R.D. 118, 124 (E.D. Mich. 1992); Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc., 1989 WL 31514 at *4 (S.D. N.Y. Mar. 28, 1989) (attached as Ex. V to Iwan Decl.); Williams v. Trans World Airlines, Inc., 588 F. Supp. 1037, 1045 (W.D. Mo. 1984) (disqualifying plaintiffs' counsel when defendant's former in-house paralegal hired plaintiffs' counsel and joined plaintiffs' suit because risk of disclosure of confidential information "threatens the integrity of the trial process").

> Defendant's oft-repeated contention that there was no breach of plaintiff's confidences . . . rings hollow, however, in light of [the source's] own admission that, as a lay person, he did not know what information or communications were protected by the attorney-client privilege . . . Moreover, given their undeniable interest in preserving any tactical advantage they may have garnered, the court does not find availing [defendant's] assertions that no confidential and/or privileged information was consciously on unconsciously revealed to them during their interview [with the source on plaintiff's side].

MMR/Wallace Power & Industrial, Inc. v. Thames Assocs., 764 F. Supp. 712, 726-27 (D. Conn. 1991); accord Biocore Med. Tech., Inc., 181 F.R.D. at 675 (remarking that "'self-serving protestations' [of counsel] do not help assuage the fears of . . . the Court that [the former employee] indeed revealed confidential information").

This Court took a similar position in the Potash case when it dismissed the complaints of several plaintiffs out of concern that such complaints might have been tainted by confidential and privileged information improperly obtained by plaintiffs' counsel from a former employee of one of the defendants. Potash, 1993 WL 543013 at *16-19. Specifically, plaintiffs' counsel had cultivated a relationship with one of the defendants' former in-house lawyers to: (1) develop names of potential plaintiffs; (2) review and comment on the first draft of the complaint; and (3) identify individuals at the defendants who had knowledge relevant to the litigation. Potash, 1993 WL 543013 at *16-19. As a consequence, the Court disqualified any plaintiffs' counsel who had direct contact with the information supplied by the former in-house counsel and struck those complaints that the former in-house counsel had helped to draft. See id. at *16, 18. In so ordering, the court stressed the harm to the integrity of the judicial process caused by even the appearance of unauthorized disclosure of confidential and privileged information by a former employee to opposing counsel, noting that litigants have the right to a trial "free from even the *risk*" that such information might be used against them and "any doubts must be resolved in

favor" of the party whose confidences and privileges may have been breached. Id.; see also Rentclub, Inc. v. Transamerica Rental Fin. Corp., 811 F. Supp. 651, 655 (M.D. Fla. 1992) (ordering disqualification based on the "reasonable possibility that [counsel] has improperly induced [a former employee] to disclose . . . confidential matters pertinent to a prior litigation that was "substantially related" to the present action), aff'd, 43 F.3d 1439 (11th Cir. 1995).

This Court applied a similar rationale in Schubot v. Rochester Methodist Hosp., Civil No. 3-94-942, slip op. at 7 (D. Minn. May 3, 1996) [hereinafter "Schubot Opinion"] (adopting Report and Recommendation of United States Magistrate Judge Ann D. Montgomery of March 14, 1996) [hereinafter "Schubot Report"]) (both attached as Ex. W to Iwan Decl.), when it adopted the magistrate judge's recommendation that "dismissal of the case and the imposition of large monetary sanctions would be entirely appropriate" responses to the procurement, use, and subsequent concealment by the plaintiff and his counsel of medical records belonging to the defendant. Rejecting the plaintiff's contention that he had obviated any harm to the defendant by voluntarily dismissing his lawsuit (analogous to Sprenger & Lang's "no harm, no foul" claim that they would have brought this case with or without Mr. Douglas), the magistrate judge observed that not only may this case "never have been filed if Plaintiff had not taken the records . . ., even if a case would have been filed, Plaintiff's conduct greatly increased Defendants' costs in defending against Plaintiff's claims."[10] Schubot Report at 10.

More generally, principles governing attorney disqualification for violations of ethical duties and infringements of confidentiality rights and the law of spoliation in this Circuit further

---

[10] As Mr. Schaefer attempted in his Declaration, "Plaintiff [Schubot] also attempt[ed] to argue that records were, in reality, not that important, as they did not shed light on central issues in the case," Schubot Opinion at 4, a distinction the Schubot court found entirely unconvincing. As the Schubot court noted, "[w]hether, in hindsight, the documents were neither inculpatory nor exculpatory does not subtract from the magnitude of the intolerable acts committed by Plaintiff and his counsel." Id.

support Cargill's motion on the basis of the current record. Disqualification does not require a demonstration that confidential information has actually been misused. See EZ Painter Corp. v. Padco, Inc., 746 F.2d 1459, 1462 (Fed.Cir.1984) (applying Eighth Circuit law to disqualify law firm that hired associates, even though "[i]t is clear that neither [of the associates] were assigned, while at the Schroeder firm, to work on this litigation"). It is sufficient to prove that the potential for misuse was present and that the lawyers failed to take prompt and adequate measures (such as the immediate creation of an "ethics wall") to prevent the misuse. See id. Similarly, Rule 4.4, Minn. R .Prof. Conduct, provides that "[i]n representing a client, a lawyer shall not . . .use methods of obtaining evidence that violate the legal rights of [a third party]." Such legal rights include the right not to have privileged documents obtained by adverse counsel from the privilege holder's employee or former employee who is not authorized to make disclosures. See Restatement of the Law Governing Lawyers § 102 (2000); ABA Formal Op. 91-359. It is undisputed that Sprenger & Lang solicited, received, reviewed, and retained confidential and privileged material from Mr. Douglas and there is no evidence that they took any measures, let alone prompt and adequate ones, to avoid this very result.

Similarly, it cannot be denied that Mr. Douglas destroyed documents, well after the commencement of this action and after Sprenger & Lang had been informed by Cargill's counsel that a subpoena to Mr. Douglas would be forthcoming. The intentional destruction of documents after the commencement of litigation supports the inference that evidence destroyed was unfavorable to the party responsible for its destruction. See, e.g., Stevenson v. Union Pacific R.R. Co., 354 F.3d 739, 746 (8th Cir. 2004) (collecting cases under federal and state law); Evans v. Robbins, 897 F.2d 966, 970 (8th Cir. 1990). Mr. Douglas has testified on two separate occasions (as further documented in writing and confirmed by his own actions) that Mr. Schaefer

instructed him to destroy documents knowing they were about to become the topic of a subpoena from Cargill. At a minimum, by returning these documents to Mr. Douglas, rather than Cargill as he should have done, Mr. Schaefer created a set of circumstances under which the documents could have been and were destroyed. Thus, it is reasonable for this Court to assume, since Mr. Douglas can now only provide categorical descriptions of the documents he destroyed, to infer that they were damaging to Mr. Douglas, Plaintiffs, and Plaintiffs' counsel for the very reasons identified by Mr. Schaefer in his Declaration – *i.e.*, they were confidential and privileged documents of Cargill that Mr. Douglas should not have possessed and Sprenger & Lang should not have solicited, received, reviewed, copied, and retained.

### B. Plaintiffs And Their Counsel Have Irremediably Tainted These Proceedings By Inducing, Exploiting, and Attempting To Conceal A Breach Of Cargill Confidences And Privileges.

#### 1. Plaintiffs' Counsel's solicited improper assistance from Mr. Douglas and induced a breach of Cargill's confidences and privileges.

Sprenger & Lang sought out Mr. Douglas precisely because they expected him to have sensitive and pertinent information about Cargill. Mr. Douglas then proceeded to deliver exactly what Sprenger & Lang had hoped, including documents that everybody knew then and has conceded since were confidential and privileged. Sprenger & Lang received, reviewed, and retained copies of this material; returned at least some of the originals to Mr. Douglas; and then instructed him to destroy everything they had returned to him. Neither Cargill nor the Court should be expected to wade through the Complaint and all the proceedings in this case to date to determine which parts have been influenced by Mr. Douglas' improper disclosures, nor should Cargill be forced to continue to defend itself against an action so obviously tainted.

Just this month, on facts very similar to those here, another federal court ruled that the improper review of a defendant's privileged material by a plaintiff's attorney in a putative

discrimination class action necessitated the disqualification of that attorney and his entire firm. See Lewis v. Capital One Servs., Inc., No. 3:04CV186, slip op. at 4 (E.D. Va. June 10, 2004) (attached as Ex. X to Iwan Decl.). Coincidentally, the plaintiff was a former executive in the defendant's human resources department who, after her termination, retained knowledge and possession of "privileged legal advice from in-house counsel regarding a wide range of issues, including issues that directly underlie both her individual and class charge of gender discrimination," including documents marked attorney-client privileged. Id. at 1-2. Based on an admission by the plaintiff's counsel that "one of the associates in the firm reviewed at least one of the documents that clearly contained privileged material," and after reviewing relevant authority from across the country, the court disqualified the entire firm. Id. at 3, 5-7. The court determined that an admitted privilege breach does not provide an occasion for "hair-splitting nicety" over how many privileged documents were actually reviewed, whether some of the documents were merely confidential and not privileged, or whether the Court could identify specifically all the privileged information that had been disclosed and how it had been used. Id. at 4, 14. In particular, the court found the plaintiff's failure to cooperate in discovery efforts designed to elicit the true nature and scope of the privilege breach not only prevented the revelation of the "full extent of Plaintiff's taint," id. at 7, but also showed "that the conflict here is actual and not conjectural," id. at 4, and left the court with "no choice but to disqualify Plaintiff's Counsel," id. at 15. See also Coburn v. DaimlerChrysler Servs. North America, L.L.C., 2003 WL 22425007 at *6-7 (N.D. Ill. Oct. 23, 2003) (disqualifying attorney exposed to the defendant's confidential information where attorney simply relied on oral instruction to non-legally trained class member not to provide confidential information and thereafter tested the limits of the ethical rules by "continu[ing] to speak with her, obtain[ing] documents from her and

agreeing to represent her," concluding that "[i]nstead of aggressively seeking to secure a new client, [the attorney] should have acted conservatively; he should have ceased all contacts and immediately sought guidance from this Court") (attached as Ex. Z to Iwan Decl.).

Mr. Schaefer purportedly issued numerous prophylactic instructions to and regarding Mr. Douglas, yet nobody, including Mr. Schaefer himself, acted consistently with these instructions. Mr. Douglas produced confidential and privileged documents, Mr. Schaefer reviewed these documents, and Sprenger & Lang copied and retained them. Schaefer Decl. ¶ 12. On February 2, 2001, even after these supposed instructions and admonishments, Sprenger & Lang attorney Sara L. Madsen encouraged Mr. Douglas in writing that "[i]f you have *any* documents, either pertaining to you personally or to Cargill generally, please contact us. *We would be happy to review any documents you might have* and will make arrangements necessary to that end, including copying or mailing costs." Douglas Depo. Ex. 7 (emphasis added). By requesting "any documents," which would include and already had included Cargill's privileged documents, this letter plainly violated Cargill's rights and thereby violated Rule 4.4.[11] Notably, neither Mr. Douglas nor Sprenger & Lang has produced anything in writing memorializing any instruction to Mr. Douglas not to produce confidential and privileged information.

**2. Plaintiffs' Counsel further violated Cargill's rights by conducting their own "privilege review" of the material improperly disclosed and then intentionally concealing the breach from Cargill.**

Even if Mr. Schaefer were believed about his purported instructions, he has offered no explanation of why he conducted his own privilege review of Cargill documents. The

---

[11] Rules 5.1 and 5.2 of the Minnesota Rules of Professional Conduct make Mr. Schaefer responsible for the conduct of his staff, including the content of Ms. Madsen's letter, and for his own failure ever to disavow it to Mr. Douglas. <u>See</u> Minn. R. Prof. Conduct 5.3(b), (c) (describing the responsibilities of a partner or supervising lawyer in a firm).

propositions that a lawyer may improperly obtain documents belonging to an adverse party and that the party should then trust the adverse lawyer to separate the confidential documents from others are obviously insupportable.

Public policy protecting a party's expectations of confidentiality clearly provides that an adverse lawyer cannot conduct his own private, secret privilege review of the party's documents. For example, under Rule 1.10(b), Minn. R. Prof. Conduct, a law firm will be disqualified if it hires an attorney who has significant confidential information of a party adverse to the hiring firm's client, unless the party consents. Even an ethics wall will not cure this conflict. Lennartson v. Anoka-Hennepin Ind. Sch. Dist. No. 11, 662 N.W.2d 125 (Minn. 2003) (disqualifying large law firm from continued representation of defendant, notwithstanding ethics wall it erected upon hiring associate from plaintiff's law firm who had conducted a single deposition and reviewed plaintiff's file). The public policy reason for Rule 1.10(b) and Lennartson is that the lateral attorney's former client should not have to trust adverse counsel and the lateral not to communicate confidential information.

The intrusion and danger to confidentiality is far greater here, where no ethics wall separated Mr. Schaefer from Cargill's privileged documents and Mr. Schaefer admits that he reviewed those documents sufficiently to segregate those he concluded were privileged. Adverse counsel cannot assign to himself the responsibility for determining the propriety and efficacy of the methods by which he will conduct a secret privilege review, nor is adverse counsel permitted to conceal from an opposing party the fact that its confidences and privileges have been breached. See Richards v. Jain, 168 F.Supp.2d 1195, 1201 n.3 (W.D. Wash. 2001) (requiring return of privileged materials to the privilege holder even if there is no pending litigation); see also ABA Comm. on Ethics & Prof. Responsibility, Formal Op. 94-382 (1994) ("A lawyer who

receives on an unauthorized basis materials of an adverse party that she knows to be privileged or confidential should . . . notify her adversary's lawyer that she has such materials . . . .").

Sprenger & Lang's return of documents to Mr. Douglas, rather than Cargill, which contributed to Mr. Douglas's destruction of those documents, violated Cargill's rights. Mr. Schaefer acknowledges that in 2002, when he belatedly inquired, the Office of Lawyers Professional Responsibility "told me that our ethical obligation could be interpreted to include returning the documents to the potential privilege holder." Schaefer Decl. ¶ 18. Mr. Schaefer does not adequately explain, however, why he waited until 2002 to investigate his ethical obligations, when he knowingly possessed had possession of the documents in question in 2000. Mr. Schaefer suggests a distinction because "active litigation had commenced" by 2002 while in 2000 it was just under consideration; however, Mr. Schaefer does not even attempt to explain why commencement of litigation would purportedly create the right of Cargill to its confidential and privileged documents and mere contemplation would deny Cargill any such right. Id. ¶ 13 (explaining that he did not return Cargill's documents because "no litigation had commenced"). Certainly the application of Rule 4.4 does not depend on whether litigation has commenced; rather, it is the content of the documents that is determinative.

The only other reason offered by Mr. Schaefer for the belated, reckless, and apparently incomplete return of documents to Mr. Douglas, rather than Cargill, merely compounds the misconduct. Mr. Schaefer has averred that "producing the documents to Cargill at that time would have unnecessarily exposed Douglas, a firm client, to whatever response Cargill might choose to make, which we viewed as contrary to our obligations under Rule 1.6 of the Minnesota Rules of Professional Conduct." Schaefer Decl. ¶ 13. Again, Mr. Schaefer's explanation for wrongdoing does not excuse the conduct. In fact, this very argument, that that Rule 1.6

somehow authorizes a lawyer to violate a third party's rights to its documents, was specifically and emphatically rejected by the Court in Schubot. See Schubot Report at 11, 13 (rejecting the argument that counsel was impossibly caught between competing ethical obligations because "to the extent that any actual dilemma existed, it was entirely self-induced").

**3. Plaintiffs' Counsel Should Be Held Responsible for the Destruction of Cargill's Documents by Douglas.**

Mr. Douglas has testified unequivocally and emphatically that Mr. Schaefer instructed him to destroy Cargill's documents. Mr. Douglas's testimony and the circumstances surrounding the return of documents to Mr. Douglas dictate that Sprenger & Lang should be held responsible for destruction of Cargill's documents, even if Mr. Schaefer claims – in his untested Declaration – that he told Mr. Douglas to preserve the documents. Mr. Schaefer's Declaration describes at length his purported instructions to Mr. Douglas and others when Sprenger & Lang returned Cargill's documents to Mr. Douglas, but conspicuously absent is any averment that Mr. Schaefer instructed Mr. Douglas, directly or indirectly, not to destroy documents.[12]

Minn. R. Prof. Conduct 3.4(a) provides that "[a] lawyer shall not . . . obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any

---

[12] To date, Plaintiffs' counsel has attempted to sidestep these serious allegations only rhetorically – wondering aloud why Mr. Schaefer would have instructed Mr. Douglas to destroy documents when Plaintiffs' counsel already had turned over (or at least planned to turn over) to Cargill everything they had received from Mr. Douglas. Simply posing such a question concedes, of course, that Plaintiffs' counsel copied and retained material – privileged, confidential, or otherwise – Mr. Douglas shared with them, in direct contradiction to the purportedly explicit instructions issued by Mr. Schaefer. More importantly, however, the question simply ignores Mr. Douglas' unequivocal and emphatic testimony that Mr. Schaefer instructed him to destroy documents. Unless the Court flatly rejects this testimony (bearing in mind that Mr. Douglas is a former client of Sprenger & Lang, a person Plaintiffs' counsel sought out and intimately involved in this litigation, someone who detests Cargill, and someone who has nothing to gain by making these statements against his own interest), then the most plausible answer to Plaintiffs' counsel's question is that Mr. Schaefer instructed Mr. Douglas to toss all his records precisely because he knew that Mr. Douglas had even more significant documents in his possession than those Sprenger & Lang intended to produce.

such act." Per Mr. Douglas, Mr. Schaefer violated this rule. Even if the Court were uncertain whether to believe Mr. Douglas or Mr. Schaefer, the actions of Mr. Schaefer and others show that Mr. Schaefer's instructions regarding Cargill's documents either were not given or were so inadequately given that everyone disregarded them.

Obviously, the concealment or destruction of documents relevant to litigation, whether contemplated or pending, is an extremely serious matter even beyond the ethical rules applicable to lawyers. Minn. Stat. § 609.63, subd. 1 (5), (6) and (7), for example, makes such document destruction with wrongful intent a felony. In terms of civil penalties, when documents have been destroyed, courts have imposed heavy sanctions, including dismissals, sanctions, referrals to disciplinary agencies, adverse jury instructions, and orders excluding material evidence. See, e.g., Capellupo v. FMC Corp., 126 F.R.D. 545, 552 (D. Minn. 1989); Levy v. Remington Arms Co., Inc., 836 F.2d 1104, 1112 (8th Cir. 1988); Fischer v. Rheem Mf'g Co., et al., 2004 WL 1088328 at *2 (D. Minn. May 13, 2004) (awarding sanctions for allowing best and most complete record of evidence to be destroyed) (attached as Ex. Y to Iwan Decl.); Synanon Church v. United States, 579 F. Supp. 967, 974-76 (D.D.C. 1984) (finding destruction and concealment of materials perceived to be damaging was "fraud on the court" by plaintiff; case dismissed and defendant awarded its costs, and court retained jurisdiction to consider further sanctions against plaintiff and attorneys), aff'd, 820 F.2d 421 (D.C. Cir. 1987).

## IV. CONCLUSION

The misconduct of Plaintiffs' counsel in this case is serious: wrongful solicitation, receipt, review, retention, and transfer of Defendant's confidential documents; responsibility for destruction of the documents; filing with the Court a misleading Declaration. While Plaintiffs' counsel and their former client, Mr. Douglas, continue to argue between themselves about whether Mr. Douglas disclosed thousands or just hundreds of pages of confidential and

privileged Cargill material, whether Plaintiffs' counsel returned all or just some of these documents, and whether Plaintiffs' counsel told Mr. Douglas to destroy the documents or simply that he should never have had them in the first place, Cargill, the only truly blameless party, bears the extraordinary cost and hardship of this undeniably tainted litigation.

Plaintiffs' counsel have engaged in intentional conduct harming the integrity of the judicial process, impairing Cargill's rights, and violating the Rules of Professional Conduct. Neither Cargill nor the Court will ever truly know the extent to which the improper disclosure of Cargill's confidential and privileged information has influenced the conduct of this case – Plaintiffs' counsel assured this by instructing or allowing Mr. Douglas to destroy all record of his disclosures to them. Plaintiffs' counsel's inducement, exploitation, and concealment of this breach, however, undeniably have impacted this case and must be dealt with accordingly. Courts here and elsewhere have responded in a necessarily decisive fashion to the inducement, exploitation, and concealment of a confidentiality and privilege breach by a litigation adversary, including, disqualifying counsel, dismissing the complaint, imposing monetary sanctions, and awarding costs and fees to the aggrieved party. Respectfully, just such relief is required here.

Dated: June 17, 2004

DORSEY & WHITNEY LLP

s/Paul B. Klaas

Paul B. Klaas (#56327)
William J. Wernz (#11599X)
Michael Iwan (#28628X)
50 South Sixth Street, Suite 1500
Minneapolis, MN 55502-1498
Telephone: (612) 340-2600

Attorneys for Defendant
CARGILL, INCORPORATED