United States District Court, D. Minnesota, Third Division.

In Re Potash Antitrust Litigation.

**Civ. No. 3-93-197, No. MDL 981.**

Dec. 8, 1993.

Samuel Heins and W. Joseph Bruckner, Heins, Schatz & Paquin, Jerry S. Cohen and Michael Hausfeld, Cohen, Milstein, Hausfeld & Toll, H. Laddie Montague and Howard Langer, Berger & Montague, Dan Harris, Sachnoff & Weaver, Jack Chestnut, Chestnut & Brooks, John Cochrane, Cochrane & Bresnahan, Michael Freed, Much, Shelist, Freed, Denenberg & Ament, Wood Foster, Siegel, Brill, Gruepner & Duffy, Sara Madsen, Reinhardt and Anderson, for plaintiffs.

APPEARING FOR DEFENDANTS

*1 Michael Jaffe, James Mercurio, Gerald Zingone, and Jerome Pederson, for Potash Corp. of Saskatchewan and Potash Corp. of Saskatchewan Sales, Ltd.
Stephen Marshall, for New Mexico Potash Corp. and Eddy Potash, inc.
Victor Friedman, Leon Goodrich, and Bradley Clary, for Potash Corp. of America.
David Gustman, Leon Goodrich, and Bradley Clary, for Noranda Minerals, Inc. and Central Canada Potash Co.
Doug Rosenthal, Leon Goodrich, and Bradley Clary, for Kalium Chemicals, Ltd. and Kalium Canada, Ltd.
Marc Gary, Kerry Edwards, Gordon Busdicker and John French, for IMC Fertilizer Group, Inc.
Wayne Cross and Carol Peterson, for Mississippi Chemical Corp.
Gerald Connell, for Cominco, Ltd. and Cominco American Inc.

MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

Introduction

Plaintiffs, fertilizer producers located in the United States, commenced, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § § 15 and 26 (1988), this action against Defendants, [FN1] all of which are producers of potash, [FN2] seeking injunctive relief, damages, and attorneys' fees, for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Before the Court are (1) Defendants' Joint Motion to Disqualify Plaintiffs' Counsel and Dismiss Their Complaints, [FN3] (2) Certain Defendants' Joint Motion, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), to Dismiss, and (3) Defendant Kalium Chemicals, Ltd. and Kalium Canada, Ltd.'s (collectively "Kalium") Motion, pursuant to Fed.R.Civ.P. 12(b)(6), to Dismiss. [FN4]

Background

*Parties, Procedural History, and Claims Alleged*

Plaintiffs in *Potash* are Blomkest Fertilizer, Inc., a Minnesota corporation with its principal place of business in Blomkest, Minnesota; Cobden Grain & Feed, a sole proprietorship with its principal place of business in Sleepy Eye, Minnesota; Hahnaman Albrecht, Inc., an Illinois corporation with its principal place of business in Dixon, Illinois; Laing-Gro Fertilizers, Inc., a New York corporation with its principal place of business in Eden, New York; John Peterson, d/b/a/ Almelund Feed & Grain, a sole proprietorship with its principal place of business in Almelund, Minnesota; and Clearbrook Ag Service, Inc., a Minnesota corporation with its principal place of business in Clearbrook, Minnesota.

Plaintiffs in *Tolley's* are Tolley's, Inc., a Virginia corporation with its principal place of business in Pamplin, Virginia, and James River Farm Service, Inc., a Virginia corporation with its principal place of business in Cartersville, Virginia.

Plaintiff in *Reamford* is Reamford Liquid Fertilizer, Inc., a Virginia corporation with its principal place of business in Amelia, Virginia.

Each of the Plaintiffs in *Potash, Reamford,* and *Tolley's* has purchased potash directly from one or more of the Defendants during the time period relevant to this action.

The Defendants in *Potash, Reamford,* and *Tolley's* are (1) Potash Corporation *of* Saskatchewan,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Incorporated, ("PCS, Inc."), a Saskatchewan corporation with its principal place of business in Saskatoon, Saskatchewan, Canada; [FN5] (2) Potash Corporation of Saskatchewan Sales Limited ("PCS Sales"), a Saskatchewan corporation with its principal place of business in Arlington Heights, Illinois; [FN6] (3) Potash Company of America, Inc. ("PC America"), a Canadian corporation with its principal place of business in Darien, Connecticut; (4) IMC Fertilizer Group, Inc. ("IMC"), a Delaware corporation with its principal place of business in Northbrook, Illinois; (5) Kalium Chemicals, Ltd., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois; (6) Kalium Canada, Ltd., a Saskatchewan corporation with its principal place of business in Regina, Saskatchewan, Canada; (7) Noranda Minerals Inc. ("Noranda"), an Ontario corporation with its principal place in Toronto, Canada; (8) Central Canada Potash Co. ("Central"), a Saskatchewan corporation with its principal place of business in Colonsay, Saskatchewan, Canada; (9) Noranda Sales Corporation, Ltd. ("Noranda Sales"), an Ontario corporation with its principal place of business in Toronto, Canada; (10) Cominco, Ltd. ("Cominco"), a British Columbia corporation with its principal place of business in Vancouver, British Columbia, Canada; (11) Cominco American Incorporated ("Comincan"), a Washington corporation with its principal place of business at in Spokane, Washington; [FN7] (12) Mississippi Chemical Corp. ("Mississippi"), a Mississippi corporation with its principal place of business in Yazoo City, Mississippi; (13) Eddy Potash, Inc. ("Eddy"), a Delaware corporation with its principal place of business in Carlsbad, New Mexico; and (14) New Mexico Potash Corporation ("New Mexico"), a New Mexico corporation with its principal place in Hobbs, New Mexico. [FN8]

***2** On April 1, 1993 the first of twelve complaints was filed in this Court, alleging that Defendants violated Section 1 of the Sherman Act by engaging in a conspiracy to fix the sale price of potash. On May 19, 1993 this Court issued Pretrial Order No. 1, directing the parties to file an Amended Consolidated Class Action Complaint ("*Potash Complaint* ") consolidating the separate actions filed in this Court; the *Potash Complaint* was filed on June 3, 1993.

Plaintiffs in *Potash, Tolley's,* and *Reamford* are alleging a class action on behalf of themselves and, pursuant to Fed.R.Civ.P. 23, the following class:

> All purchasers of potash in the United States (excluding federal, state and local governmental entities and political subdivisions and defendants and coconspirators, and other producers of potash, their respective parents, subsidiaries and affiliates) that purchased potash from any defendant, or their parent, subsidiary or affiliate thereof, at any time during the period from April 1987 to the present.

*Potash Complaint,* ¶ 33; *see Reamford,* ¶ 26; *see Tolley's,* ¶ 27. For purposes of the motions before the Court, the following facts, taken from the *Potash Complaint* (with citations to similar allegations in *Tolley's* and *Reamford* ), are *assumed* to be true.

Beginning at least as early as April 1987, and continuing to the present, defendants and co-conspirators engaged in a continuing combination and conspiracy to, *inter alia,* fix the price of potash, and thereby effect an unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Potash Complaint,* ¶ ¶ 42-43; *Tolley's,* ¶ ¶ 36-37; *Reamford,* ¶ ¶ 35-36.

In order to effect their price-fixing conspiracy, Defendants engaged in the following acts. Beginning in April 1987, PCS, Inc., IMC, Cominco, Noranda and PC America discussed and agreed to raise prices of potash sold in the United States. Pursuant to their agreement, those same defendants raised their list prices and eliminated most discounting on potash sold in the United States. These actions caused potash prices to jump approximately $10 per ton, from roughly $40 per ton to roughly $50 per ton. *Potash Complaint,* ¶ 45; *Tolley's,* ¶ 39; *Reamford,* ¶ 38. Thereafter, in the fall of 1987, the Canadian Defendants, [FN9] through Crown PCS, requested the American Defendants [FN10] to join the conspiracy. The Canadian Defendants' proposal called for all Defendants to establish a minimum "floor" price of $75 per ton on potash sales in the United States. The American Defendants accepted the proposal and joined the conspiracy. *Potash Complaint,* ¶ 46; *Tolley's,* ¶ 40; *Reamford,* ¶ 39.

In mid-January 1988, in furtherance of the enlarged conspiracy, Crown PCS announced a new list price of $80 per ton. This new price (which reflected the elimination of a temporary, refundable $35 per ton surcharge which had been imposed in September 1987) effectively raised Crown PCS' prices about $19 per ton. Soon thereafter, the other Canadian Defendants matched Crown PCS' prices, while the American Defendants posted new list prices ranging from about $85 per ton to $92 per ton. *Potash Complaint,* ¶ 47; *Tolley's,* ¶ 41; *Reamford,* ¶ 40.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

***3** In or about June 1988, Defendants again agreed to raise their list prices for potash. In an effort to conceal the collusive nature of the price increase, the defendants further agreed to stagger their respective price increase announcements. In early June 1988, and pursuant to this latest agreement, Crown PCS announced a new list price of $84 per ton, effective July 1, 1988 through December 31, 1988. Soon thereafter, but at different times, the other Defendants, in accordance with the conspiracy, announced comparable list price increases. *Potash Complaint,* ¶ ¶ 48-49; *Tolley's,* ¶ 42-43; *Reamford,* ¶ ¶ 41-42.

Plaintiffs further allege that from 1989 to the present, Defendants have continued to discuss and agree upon, i.e., conspire to fix, prices and levels of supply of potash sold in the United States. As a result of Defendants' ongoing conspiracy, potash prices have remained at artificially high levels despite excess supply. *Potash Complaint,* ¶ 50; *Tolley's,* ¶ 44; *Reamford,* ¶ 43.

Plaintiffs also allege that throughout the period of their allegedly unlawful conduct, Defendants have attempted to hide their conspiracy and its effects by engaging in acts of fraudulent concealment, including (1) "secretly and conspiratorially" discussing and agreeing upon the prices to be charged to customers, (2) using means of communication which they believed to be safe from detection and avoiding means of communication which they believed to be subject to detection, and (3) agreeing to stagger and staggering their price increases and announcement thereof in order to conceal their unlawful price agreements. *Potash Complaint,* ¶ 52; *Tolley's,* ¶ 45; *Reamford,* ¶ 44. Plaintiffs allege that neither they nor any potential members of the class had "knowledge of such unlawful conduct or of facts which might have led to the discovery thereof with the exercise of due diligence until some time shortly before filing this Complaint"; hence, Defendants' affirmative acts of concealment have tolled the running of any statute of limitation. *Potash Complaint,* ¶ 53; *Tolley's,* ¶ 45; *Reamford,* ¶ 44.

Plaintiffs allege that the Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § § 15 (authorizing civil actions for monetary damages to redress violations of Sherman Act) and 26 (authorizing civil actions for injunctive relief), and 28 U.S.C. § 1336. Venue as to each defendant is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § § 1391(b) and (c). Defendants do not contest either jurisdiction or venue.

*Facts Relevant to Keith Barton's Involvement in Litigation*

Keith Barton is a Canadian lawyer; he was admitted to the bar of Saskatchewan in July of 1965 and practiced with a law firm in Saskatchewan. On August 1, 1978, he joined Crown PCS, a corporation owned by the Province of Saskatchewan. In 1979, Barton was appointed Vice President and General Counsel for Crown PCS, i.e., he was the senior lawyer working for Crown PCS. As General Counsel, Barton was "principle legal counsel to the corporation and as such, [was] involved in all significant transactions, negotiations, documentation, and agreements undertaken by [Crown] PCS its subsidiaries ... [and] responsible for all corporate matters and securities work, including major acquisitions, dispositions, and taxation." Position Description, Vice President and Legal Counsel, Hampton Aff., Exh. B. In addition, Barton was a member of Crown PCS' Executive Committee and of the Boards of Crown PCS' subsidiaries, he participated in the "development of Corporate policies, philosophies, and objectives", *id.,* and he served as corporate Secretary for Crown PCS. Finally, as General Counsel, Barton's role included

> ***4** 1. Provid[ing] legal counsel and guidance to the Corporation to ensure maximum protection of legal rights. [and]
>
> 2. Supervis[ing] all legal matters and represent[ing] the Corporation in all suits or claims.

*Id.* at 3 (identifying "Specific Accountabilities"). Barton was appointed to Crown PCS's Board of Directors in February, 1983.

Barton denies that he ever worked for PCS Sales or any of the other subsidiary corporations. Barton Aff., ¶ 7.

In April of 1987, C.E. Childers became Crown PCS' President. Following Childers' arrival, Childers and Barton were actively involved in resolving a "dumping" investigation that had been commenced by the United States Department of Commerce; the investigation sought to discover whether Canadian potash producers had been charging their United States customers less than cost for potash sold. A Suspension Agreement relating to the dumping investigation was signed on January 7, 1988; it was signed by all Canadian potash producers.

Barton resigned his employment on March 28, 1988;

he left Crown PCS at the end of July, 1988. Barton stated that he left Crown PCS because "I was unhappy and concerned about the course of conduct" undertaken by Childers on behalf of Crown PCS. Barton Aff., ¶ 20. Following his resignation, Barton became involved in a dispute with Crown PCS over his right to severance pay; eventually, he filed a lawsuit in the Court of Queen's Bench of Saskatchewan, claiming damages for constructive dismissal or wrongful dismissal. *Id.* ¶ 21. Barton and Crown PCS settled the lawsuit via Minutes of Settlement entered into on August 4, 1989; the terms of the settlement are confidential. *Id.*

Following the Saskatchewan legislature's enactment of the "Potash Corporation of Saskatchewan Reorganization Act of September 12, 1989" (the "Potash Act"), all of the assets and liabilities of Crown PCS and one of its subsidiaries, Potash Corporation of Saskatchewan Mining, Limited ("PCS Mining"), were transferred to PCS, Inc. In exchange for their assets, Crown PCS and PCS Mining received 100% of the shares of PCS, Inc. Bruckner Aff., Exh. C. Crown PCS continued in existence, eventually changing its name to CIC. Pursuant to the Sales Agreement between Crown PCS and PCS, Inc., the management personnel of Crown PCS were retained by PCS, Inc.

1. Post-Separation Contacts with CIC and its Counsel

Following his separation from Crown PCS, Barton undertook to bring to light certain acts and statements made by and to Childers between April of 1987, when Childers arrived at Crown PCS, and July of 1988, when Barton left Crown PCS; Barton believed that those acts and statements reflected antitrust violations by the Canadian potash industry. In June of 1990, Barton contacted one of Crown PCS' Directors, Bud Estey, Barton Dep., at 27. Barton met with Estey in Regina, Saskatchewan; they discussed Barton's knowledge about anti-competitive activity at Crown PCS and Childers' role in that activity. *Id.* at 28-29. On June 25, 1990 Barton sent Estey a letter, in which he detailed certain events as well as statements made by Childers, all of which purportedly addressed the formation of a conspiracy to set and control the price of potash sold in North America. *See* Bruckner Aff., Exh. D.

***5** Barton also contacted CIC [FN11] and its Canadian counsel, Borden & Ellis, and brought the same information to them. Eventually, Borden and Ellis [FN12] prepared, with Barton's assistance, a "Memorandum of Evidence" dated March 11, 1992 (the "Memorandum"); the Memorandum contains a brief discussion of the Canadian potash industry, but seven of the ten pages discuss the conversations, acts, and events which Barton witnessed or participated in when he was General Counsel at Crown PCS--all of which purportedly concern agreements and discussions by Canadian and American potash producers to set and control the price of potash. After the Memorandum was prepared, Barton sent a copy of it, as well as a binder of other information, to Ching. Barton Aff., ¶ 22.

On November 4, 1992, Newbould, on behalf of CIC, sent Barton the following letter:

> This letter will confirm that CIC Mineral Interest Corporation (formerly known as Potash Corporation of Saskatchewan) has no objection to you speaking to the Competition Bureau of Canada or its representatives or to the Department of Justice in the United States with regard to the matter referred to in the memorandum of evidence dated March 11, 1992 prepared by us with you and to the contents of your binder of material given to Mr. Ching of Crown Management Board of Saskatchewan. This is not to be taken as a waiver of any position that CIC Mineral Interest Corporation may wish to take in any legal proceedings against it that your evidence might be privileged in view of your previous position as a legal advisor to Potash Corporation of Saskatchewan. It is however, a release of you personally to disclose these matters to the investigating authorities mentioned.
>
> This will also confirm that a copy of the memorandum of March 11, 1992 and a copy of the binder of Green Market Reports that you provided to us have already been provided by us to the Competition Bureau of Canada. We have not given to the Competition Bureau of Canada a copy of your binder that you gave to us and to Mr. Ching.

Barton Aff., Exh. C.

Following Barton's receipt of Newbould's letter, his Canadian counsel, Gary C.W. Semenchuck of Hleck, Kanuka & Thuringer ("Hleck Firm"), sent Newbould a letter requesting that CIC provide Barton with a general waiver of any privilege so that Barton could contact potential plaintiffs' counsel about an antitrust action against members of the potash industry. In a letter dated December 3, 1992, Newbould responded:

> With respect to the more general release that Mr. Barton has requested, I reiterate my earlier comments ... CIC Mineral Interest Corporation is

> not prepared to waive any privilege that it may have in connection with Mr. Barton's desire to speak to and assist potential plaintiffs against members of the potash industry.

Newbould Aff., Exh. C. [FN13] On January 19, 1993 Semenchuck sent a letter to Newbould asserting that CIC could not assert a privilege against Barton because (1) no such privilege existed as to the pricing conspiracy, and (2) CIC waived any privilege when it unilaterally disclosed the Memorandum and other materials to Canadian officials. Bruckner Aff., Exh. F, at 2.

***6** On December 21, 1992 the Hleck Firm issued Barton an opinion letter ("Hleck Opinion") concerning whether

> your ethical obligations as a member of the Law Society of Saskatchewan would prevent you from working in the future as a consultant for plaintiffs and law firms bringing damage actions against your former employer [Crown PCS] which is now called CIC Mineral Interest Corporation ... and other potash producers.

Barton Aff., Exh. F. The Hleck Opinion opined that (1) assuming that the actions Barton was "required to take" as General Counsel for Crown PCS during the conspiracy "would be sufficient to allow a court to find that you were a co-conspirator" in the conspiracy, "Canadian law and the Saskatchewan Code of Professional Conduct for lawyers strips away the solicitor-client privilege which might otherwise seal your knowledge of the conspiracy and removes the duty on your part to keep silent about the scheme," *id.* at 4; and (2) CIC, by disclosing Barton's "revelation" to "third parties"--Canadian and American government authorities--waived its right to enforce against Barton any alleged solicitor-client duty of confidentiality. *Id.* at 5.

2. Post-Separation Contacts With Private Law Firms

Concurrent with his efforts to provide information to CIC, Barton explored the possibility of assisting private United States law firms with litigation against certain members of the potash industry. In late June of 1992, Barton made contact with Fredric C. Tausend of the Preston, Thorgenson ("Preston Firm") law firm in Seattle, Washington. Barton Dep., at 22, 29; Barton Notes, Pederson Aff., Exh. No. 11, at 371-72. Over the next few months, Barton travelled to Seattle and sent correspondence to the Preston Firm detailing both his knowledge of the potash industry and information concerning an antitrust conspiracy. Eventually, Barton and the Preston Firm ceased their discussions. Barton Dep., at 30-31.

Thereafter, Barton was put in contact with attorney Joel Davidow of the Dickstein, Shapiro & Warren ("Dickstein Firm") law firm in Washington, D.C. Barton Dep., at 32; Barton Aff., ¶ 27. In September of 1992 Barton met with Davidow and another attorney at the Preston Firm's offices in Seattle; Barton provided Davidow with a report that he had prepared and some corroborating materials. Barton Dep., at 33. Davidow and the Dickstein Firm reviewed the materials and had various discussions with Barton between September of 1992 and February of 1993. Barton Dep., at 35. Barton also provided Davidow with additional materials relating to anti-competitive activity. *Id.* Throughout Barton's contact with Davidow, there was an ongoing concern by some members of the Dickstein Firm about whether it was appropriate for Barton to be involved in any litigation and whether he could be paid for such involvement. Barton Dep., at 37; Davidow Dep., at 192-95; however, the Dickstein Firm never provided Barton with any opinion on those issues. [FN14]

***7** Eventually, Davidow informed Barton that he would be contacted by Cohen, Milstein, Hausfeld & Toll ("Cohen Firm"), a law firm located in Washington, D.C. In February of 1993 Michael Hausfeld of the Cohen Firm contacted Barton; thereafter, Barton flew to Washington, D.C. to meet with Hausfeld and other firm members. Barton Aff., ¶ 27; Barton Dep., at 40. On March 1, 1993 Barton met with members of the Cohen Firm at the Hay-Adams Hotel in Washington, D.C. Barton Dep., at 41. During that meeting, Barton and the Cohen Firm executed an agreement ("Agreement") that Barton would serve as a "consultant" to the Cohen Firm in connection with an antitrust action against members of the potash industry. Cohen Aff., Exh. A. The terms of the Agreement provided that Barton would "not be expected to provide you with information with respect to the activities of my former employer, CIC Mineral Interests Corporation, except that which relates to price-fixing or other anti- competitive activity...." *Id.* In consideration for his services, Barton was to receive $180,000, payable in five installments, [FN15] air fare, and travel costs. *Id.*

The next day, Barton provided the Cohen Firm with two packages of materials, which the Cohen Firm photocopied. [FN16] Barton Dep., at 45. Thereafter, Barton engaged in the following acts in furtherance of the Agreement:

> (1) engaged in telephone discussions, did research, and developed names of potential defendants;

(2) reviewed the first draft of the Complaint and made comments on it to the Cohen Firm over the telephone; [FN17]

(3) attended a meeting in Washington, D.C. on July 29, 1993, which was attended by several of Plaintiffs' counsel, including co-lead counsel, Heins, Schatz & Paquin ("Heins Firm"), Berger & Montague ("Berger Firm"), and the Cohen Firm; [FN18]

(4) identified persons who were involved in and/or had knowledge of the conspiracy; and

(5) handed over to the Cohen Firm a copy of the Memorandum.

Barton Dep., at 47-51; Barton Aff., ¶ 31. Barton's direct involvement with Plaintiffs' counsel ceased, at least temporarily, on July 26, 1993, when Barton was served with papers in connection with an action PCS, Inc. and PCS Sales had commenced against him; [FN19] PCS, Inc. and PCS Sales sought a preliminary injunction restraining Barton from disclosing any information to Plaintiffs' counsel. On August 2, 1993 Barton consented to entry of an interlocutory injunction prohibiting disclosures of certain confidential information.

3. Disclosure of Current Controversy

On August 18, 1993 a status conference was held before the undersigned; in connection therewith, counsel for Defendants first raised the issue of the impropriety of Barton's actions and disclosures. At the status conference, Defendants advised the Court of their intention to seek disqualification of Plaintiffs' counsel and dismissal of the Complaints, on the ground that the litigation resulted from Barton's breach of his ethical duties to his former employer/client. These motions followed.

Discussion
Motion to Disqualify Counsel and Dismiss Complaints
I. What Law Governs the Analysis

***8** Defendants contend that the ethical standards applicable to the instant motion are "federal standards developed under federal law." (Mem.Supp.Mot. to Disq. and Dismiss., at 16 n. 14.) Conversely, Plaintiffs take two positions: (1) Canadian law controls because "what is involved here is a duty of confidence owed by a Canadian lawyer to a Canadian corporation," (Mem.Opp'n Mot. to Disq. and Dismiss, at 14); and (2) pursuant to D.Minn.R. 83.6(d), the Minnesota Rules of Professional Conduct govern this Court's analysis of Barton's conduct. *Id.* at 23.

Whether Barton's conduct in this matter violated any rules of professional conduct will be determined by examining the current version of the Code of Professional Conduct of the Law Society of Saskatchewan ("Law Code"), and interpretations of that Code and similar Codes by Canadian courts. [FN20] The professional conduct of attorneys licensed to practice in the federal district court is governed, pursuant to D.Minn.R. 83.6(d), by the Minnesota Rules of Professional Conduct, [FN21] *see Bieter Co. v. Blomquist,* 132 F.R.D. 220, 223 (D.Minn.1990); however, Barton is not licensed to practice before this Court. Moreover, Defendants' entire argument is premised on their assertion that Barton violated his ethical obligations and that those violations have come to taint this litigation. It seems clear to the Court, therefore, that the relative propriety of Barton's conduct must be judged under the principles of conduct to which he was bound. However, because this Court bears the responsibility for the supervision of the members of its bar in litigation before it, *Coffelt v. Shell,* 577 F.2d 30, 32 (8th Cir.1978), the appropriate remedy in this case for any violations by Barton will be determined under the factors applied by courts of this Circuit. *See United States v. Agosto,* 675 F.2d 965, 969 (8th Cir., *cert. denied,* 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982).

*A. The Law Code*

The Law Code provides a series of "Rules," along with accompanying "Commentary" and "Notes." Each Rule is to be interpreted in the light of the related Commentary and Notes. Law Code, at vii. The Rules in Chapter IV ("Confidential Information") and Chapter V ("Impartiality and Conflict of Interest Between Clients") are raised by Barton's acts and disclosures.

1. Law Code Chapter IV

The Rule in *Chapter IV* provides:

> The lawyer has a duty to hold in strict confidence all information concerning the business and affairs of the client acquired in the course of the professional relationship, and shall not divulge such information unless the disclosure is expressly or impliedly authorized by the client, required by law or otherwise permitted or required by this Code.

Law Code, at 12. Commentary No. 4 to the Rule provides:

> The lawyer owes a duty of secrecy to every client

without exception, regardless of whether it be a continuing or casual client. The duty survives the professional relationship and continues indefinitely after the lawyer has ceased to act for the client, whether or not differences have arisen between them.

***9** *Id.* Commentary No. 5 provides, in pertinent part:

The fiduciary relationship between lawyer and client forbids the lawyer to use any confidential information covered by the ethical rule for the benefit of the lawyer or a third person, or to the disadvantage of the client.

*Id.*, at 13.

Commentary No. 11 provides:

Disclosure of information necessary to prevent a crime will be justified if the lawyer has reasonable grounds for believing that a crime is likely to be committed and will be mandatory when the anticipated crime is one involving violence against the person.

*Id.*, at 14.

2. Law Code Chapter V

The Rule in *Chapter V* provides:

The lawyer shall not advise or represent both sides of a dispute and, save after adequate disclosure to and with the consent of the clients or prospective clients concerned, shall not act or continue to act in a matter where there is or is likely to be a conflicting interest.

Law Code, at 16. Commentary No. 8 to the Rule states:

A lawyer who has acted for a client in a matter should not thereafter act against the client (or persons who were involved in or associated with the client in that matter) in the same or any related matter, or take a position where the lawyer might be tempted or appear to be tempted to breach the Rule relating to confidential information. It is not, however, improper for the lawyer to act against a former client in a fresh and independent matter wholly unrelated to any work the lawyer has previously done for that person.

*Id.* at 17-18. As to the ethical duties set forth in Chapter V, the lawyer has the burden of showing good faith and that adequate disclosure was made in the matter and that the client's consent was obtained. *Id.* at 18.

II. To What Entity Do Barton's Ethical Duties Run

As a general rule, only the former client may move for disqualification. *Bieter Co. v. Blomquist,* 132 F.R.D. 220, 224 (D.Minn. 199) (citing *In re Yarn Processing Patent Validity Litig.,* 530 F.2d 83, 88 (5th Cir.1976)). The Law Code defines "client" as "a person [FN22] on whose behalf a lawyer renders or undertakes to render professional services." Law Code, at vii. Barton left his employment with Crown PCS in 1988; thus, he could not have rendered any professional services to PCS, Inc. after it acquired the assets of Crown PCS in 1989. The threshold issue, therefore, is one of "standing," not as a matter of constitutional law, but rather as a matter of determining whether PCS, Inc. may bring Barton's alleged disclosures to the attention of this Court. Determining this issue is necessary because Plaintiffs claim that only Crown PCS/CIC, and not either PCS, Inc. or PCS Sales, was Barton's client; hence, Barton had no duty to maintain either of the latter's confidences or avoid engaging in activity giving rise to a conflict of interest vis a vis PCS, Inc. or PCS Sales.

Determining which entity is Barton's former "client" turns on the nature and effect of the 1989 corporate transaction between PCS, Inc. and Crown PCS. Plaintiffs claim that Crown PCS' transfer of substantially all its assets and liabilities to PCS, Inc. was a mere "reorganization"; such a transaction did not have the effect of shifting Barton's ethical duties to PCS, Inc.--including any limits on Barton's ability to use and disclose information he obtained while representing Crown PCS.

***10** Defendants respond that under the reorganization plan, Crown PCS and PCS Mining transferred substantially all their assets to PCS, Inc., said assets generally described as "all property and assets owned at closing by [Crown PCS] ... of every kind and description, wheresoever situate, both real and personal and tangible and intangible, without limitation to the generality of the foregoing...." PCS Sale Agreement, at 2, Hampton Aff., Exh. A. In exchange for the described assets, PCS, Inc. assumed all of the liabilities of Crown PCS and PCS Mining, and Crown PCS and PCS Mining became the beneficial owners of 100% of the outstanding shares of PCS, Inc. Under Canadian and United States law, Defendants contend, the transaction between Crown PCS and PCS, Inc. was a "de facto merger"; thus, for all practical purposes, PCS, Inc. is Crown PCS under a different name. [FN23]

In support of their respective positions, the parties have provided the Affidavits of two Canadian attorneys, Gary Semenchuck for Plaintiffs, *see*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Bruckner Aff., Exh. J, and Donald McKercher, for Defendants, [FN24] *see* McKercher Aff., both of whom opine on how Canadian law would view the 1989 transaction. Semenchuck asserts that the transaction did not alter Barton's relationship with Crown PCS/CIC because (1) the PCS Sales Agreements, *cited in* Hampton Aff., Exhs. A and B, do not provide that Barton's duty of loyalty or confidence would transfer from Crown PCS to PCS, Inc., and (2) in the time since the transaction, CIC--formerly Crown PCS--has asserted a right to claim the privilege and object to any disclosures. Semenchuck Aff., ¶ 10. Neither Plaintiffs nor Semenchuck, however, has cited to the Court any authority supporting his opinions.

McKercher opines that under Canadian and English law, the privilege concerning confidential communications between a solicitor and client may be asserted by the client's "successor in title." McKercher Aff., ¶ ¶ 14-17. McKercher further opines that in matters dealing with legal ethics, "substance must take precedence over form." *Id.* ¶ 19. Accordingly, he continues, since Crown PCS became, for all intents and purposes, PCS, Inc. upon the 1989 privatization, PCS, Inc. should have standing to hold Barton to his ethical duties. *Id.* ¶ 19.

The Court concludes that the privilege Barton owed to Crown PCS passed to PCS, Inc. upon the privatization of Crown PCS. [FN25] A reading of (1) the Potash Act, (2) the Sales Agreements governing the transaction between Crown PCS and PCS, Inc., and (3) the Prospectus issued for the post-privatization sale by the Province of Saskatchewan of thirty-seven percent of the common shares of PCS, Inc., reveals that the transaction between Crown PCS and PCS, Inc. was not a "mere transfer of assets"; rather, the transaction was the means by which the Province of Saskatchewan created a private, share capital version of Crown PCS, as it existed prior to the 1989 transaction.

***11** The Potash Act specifically terms PCS, Inc. as the "purchaser corporation," Potash Act, § 2(1)(q); it further provides that Crown PCS was empowered to "enter into transactions that provide, directly or indirectly, for the sale, assignment, transfer or other disposition of all or substantially all of the [assets of Crown PCS] and the assets of [Crown] PCS subsidiaries to the *purchaser corporation* on any terms and conditions" approved by the Lieutenant Governor of Saskatchewan. *Id.* § 3(1) (emphasis added). The Potash Act, therefore, specifically provides that PCS, Inc. must be *the* purchaser of all or substantially all assets of Crown PCS. [FN26]

More importantly, the Potash Act also provides:

> With respect to a transaction mentioned in section 3, for the purposes of the Subsurface Mineral Regulations, 1960 ... where the *purchaser corporation* has acquired all or substantially all of the [Crown] PCS assets or assets of a [Crown] PCS subsidiary, the *purchaser corporation* is deemed to be:
> (a) the *same corporation as;* and
> (b) *a continuation of each of;*
> [Crown] PCS or the [Crown] PCS subsidiary, as the case may be, on those terms and conditions that the Lieutenant Governor in Council may prescribe.

*Id.* § 6(3) (emphasis added). This provision strongly indicates that the enacting legislature intended that upon the sale to PCS, Inc. of all or substantially all of the assets of Crown PCS, PCS, Inc. would be the same corporation as Crown PCS, except for the nature of its ownership. *See also* Prospectus, Hampton Aff., Exh. C, at 4. Therefore, although the 1989 transaction between Crown PCS and PCS, Inc. was accomplished pursuant to formal agreements having the appearance and form of an "assets for stock" transaction, the Potash Act provided that the transaction, was, in reality, a mere change in identity and form.

In sum, PCS, Inc. succeeded to all that Crown PCS had or was. Accordingly, pursuant to the Act, and the "successor in title" doctrine, [FN27] the obligations Barton owed Crown PCS as its former counsel became obligations owed to PCS, Inc. PCS, Inc., therefore, has standing to seek disqualification based upon Barton's alleged violations of his ethical duties. [FN28]

III. Does the "Crime/Fraud" Exception Apply to the Claimed Disclosures

Even though Barton's ethical duties of loyalty and confidence shifted to PCS, Inc. as a consequence of the Potash Act and the 1989 transaction between Crown PCS and PCS, Inc., the actions and claimed disclosures identified herein would be consistent with those ethical obligations if the allegedly confidential communications at issue are excepted from the ethical rules by what Plaintiffs have termed the "crime/fraud exception" to Chapter IV of the Law Code. The communications are excepted, Plaintiffs claim, because each related to an ongoing conspiracy to violate the antitrust laws.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Defendants respond that the crime/fraud exception does not apply to the communications Barton disclosed in the Memorandum and other documents and communications. Defendants further respond that the crime/fraud exception does not apply to Barton's duties to avoid conflicts of interest under Chapter V of the Law Code.

***12** The Rule in Chapter IV does not expressly state that there is a general crime/fraud exception to the duties contained in Chapter IV. To establish that such an exception applies, Plaintiffs principally rely on the Supreme Court of Canada's decision in *Descoteaux v. Mierzwinski* [1982] 141 D.L.R. (3d) 590, 1 S.C.R. 860, and Note 9 to Chapter IV of the Law Code: "There is no duty or privilege where a client conspires with or deceives his lawyer." [FN29] Law Code, at 15 (citing *The Queen v. Cox* [1885] L.R. 14 Q.B.D. 153 (C.C.R.). *See generally,* Hleck Opinion, at 1-4 (discussing exception).

Although plaintiffs argue at great length about the applicability of the crime fraud exception, when examined closely, the Court concludes that the exception does not apply here. First, Canadian courts' discussions of that exception indicate that it is narrow, applying only where communications to a solicitor "are criminal in themselves, or intended to further any criminal purpose," i.e., a client communication "made for the purposes of obtaining legal advice to facilitate the commission of a crime." *Descoteaux,* at 609 (citing *R. v. Cox and Railton* [1884] 14 Q.B.D. 153, 167). Thus, client communications for the purpose of advising a client "how to carry through a fraud" or "plan, execute, or stifle an actual fraud" are not subject to any duty of confidentiality. *Regina v. Bennett* [1963] 41 C.R. 227, 231 (B.C.S.C.) (quoting *O'Rourke v. Darbishire* [1920] A.C. 581, 613 (Sumner, L.J.); *id.* at 621-22 (Parmoor, L.J.)). Communications of this sort, however, must be distinguished from (a) client communications which relate to criminal or fraudulent acts that may have taken place in the past or (b) communications which may or may not amount to a crime or a fraud, even where a crime or fraud has been alleged against the client. *Regina,* 41 C.R. at 229-30, 232.

Here, almost all of the statements identified in the Memorandum and elsewhere as "evidence" of anti-competitive conduct concern (1) statements about what Childers had done or said (in the past) in connection with his alleged desire to increase prices, *see* Memorandum, at 3 (detailing comments Childers made on June 22, 1987), (2) what others told Barton Childers had said, *see id.* at 4 (detailing statements made to Barton by attorney's from PCS, Inc.'s American counsel, Arent Fox), or (3) statements by Childers about what other people had said or done. *Id.* at 7 (detailing a statement by Childers about a telephone call between Provincial officials and executives of IMC). In addition, Barton's few reports of actual conversations between himself and Childers reveal that Childers' statements in those conversations related to whether certain conduct could be seen as anti-competitive, not to how the anti- competitive conduct could be furthered. *See id.* at 8 (Childers stated that he was concerned about statements made to him by a PC America executive). Similarly, certain of Barton's statements indicate that those conversations concerned past statements which might or might not reveal anti-competitive activity. *Id.* at 9 (Barton details to Childers his concerns about certain statements Childers made and Childers replies that "he guessed he shouldn't have said that").

***13** In addition, the only use to which the allegedly confidential communications have been put relates to a *civil* antitrust action against members of the potash industry. No crime has been charged or alleged against PCS, Inc. or Crown PCS. Furthermore, this Court is unable to conclude that any of the alleged statements was either an "element of a crime" or "criminal in purpose;" and yet, that is what they must have been in order to be excepted from the Rule in Chapter IV of the Law Code. [FN30] Law Code, Ch. IV, n. 10. Similarly, the statements cannot be said to have been "made with a view to obtaining legal advice to facilitate the commission of a crime." *Descoteaux,* 141 D.L.R. (3d) at 609.

In summary, when reviewed against the backdrop of the Rule in Chapter IV of the Law Code and the crime/fraud exception applied thereto, the statements detailed in the Memorandum and elsewhere were not statements (a) concerning an element of a crime or a fraud, (b) used to facilitate a crime or fraud, or (c) criminal or fraudulent in purpose. As such, communications Barton heard in his role as solicitor [FN31] were "information concerning the business and affairs of the client acquired in the course of the professional relationship," Law Code, Ch. IV, Rule, and Barton had a continuing duty to hold those statements in strict confidence. [FN32]

Equally unavailing is Plaintiffs' reliance on the "public interest" exception that is discussed at pages 3-4 of the Hleck Opinion. None of the cases cited in support of that exception, particularly *Initial Services, Ltd. v. Putterill* [1967] 3 All E.R. 145,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*Glover v. Bell Canada* [1980] 42 N.R. 475 (Ont.Ct.App.), *aff'd,* and *Steintron Int'l Elec. Ltd. v. Vorberg* [1986] 10 C.P.R. (3d) 393 (B.C.S.C.), involved employees who served as *counsel* for the employer; as a result, the Court is not convinced that the public "interest" behind the decisions in *Putterill, Glover,* and *Steintron* also supports applying the public interest exception to Barton's ethical duties.

IV. Ethical Duties Violated

Properly viewed, Barton's actions can be described as follows: he took information that he had acquired during his employment as General Counsel at Crown PCS and sought out American counsel with an eye towards using that information to promote litigation against the potash industry and obtain a financial benefit for himself. [FN33] Through the Agreement he reached with Plaintiffs' counsel, Barton provided Plaintiffs' counsel with confidential information about his former client, obtaining for himself a significant financial benefit: $180,000.

Having determined that Barton had an ethical obligation to maintain the confidence of the communications, actions, and disclosures of which he became aware as a result of serving as General Counsel to Crown PCS, a review of the Memorandum and other documents, as well as of relevant deposition testimony, compels a conclusion that Barton engaged in conduct that violated his ethical duties under Chapter IV of the Law Code. First, Barton violated the clear language of the Rule in Chapter IV of the Law Code by failing to hold in strict confidence all information concerning the business and affairs of his client acquired in the course of the professional relationship. [FN34] Barton's actions also breached Commentary No. 5 to the Rule in Chapter IV.

***14** Barton's conduct also violated the Rule in Chapter V of the Law Code. The Law Code adopts the Supreme Court of Canada's analysis of conflict of interest violations in *MacDonald Estate v. Martin* [1990] 77 D.L.R. (4th) 249 (Can.), as "the standard which will be used by the courts in determining whether a lawyer ought to be disqualified as a result of a conflicting interest." Law Code, Ch. V, n. 8. In *Martin,* the question before the Canadian Supreme Court was whether a law firm should be disqualified from representing the plaintiff because a junior member of the law firm had previously worked for the defendant's former solicitor. *Id.* at 249. The trial court ruled in favor of disqualification, but the Manitoba Court of Appeal reversed. On appeal, the Canadian Supreme Court determined that the Rule and Commentary in Chapter V of the Code of Conduct adopted by the Law Society of Manitoba--which is identical to Chapter V in the Law Code--supplied the basic rule upon which alleged conflicts of interest should be determined. *Id.* at 256-57.

The *Martin* court reasoned that in determining whether a conflict of interest required disqualification under Chapter V, two questions must be answered: (1) did the lawyer receive confidential information attributable to a solicitor- client relationship relevant to the matter at hand; and (2) is there a risk that it will be used to the prejudice of the client? *Id.* at 267. If the first question is answered in the affirmative, the second question answers itself: "A lawyer who has relevant confidential information cannot act against his client or former client. In such a case the disqualification is automatic. No assurances or undertakings not to use the information will avail." [FN35] *Id.* at 268.

Applying the *Martin* analysis to this case, Barton did receive confidential information attributable to his solicitor-client relationship with Crown PCS and that information is relevant to the antitrust claims alleged against PCS, Inc. and the other defendants. Following, the second question must also be answered in the affirmative; indeed, the issue here is *not* whether there is a "risk" of disclosure; disclosures of confidential information have occurred. Because the *Martin* test supports a conclusion that Barton operated under a conflict of interest in violation of the Rule in Chapter V of the Law Code, Barton most likely would be disqualified had this action arisen in Canada and had Barton been acting as a solicitor for plaintiffs in a Canadian court. [FN36] Moreover, given the importance Canadian courts have attached to a lawyer fulfilling his or her ethical duties, [FN37] the fact that Barton is acting as a "consultant" in an action venued in the United States is immaterial to this Court's conclusion that he violated his duties under Chapter V.

Barton also violated the Rule in Chapter V by taking a position where he was tempted to--and did--breach the Rule relating to confidential information. Law Code, Ch. V, Commentary No. 8. As reasoned above, that Barton is serving as a "consultant" to, and not as a lawyer for, Plaintiffs makes no difference; the risk that Barton would divulge confidences through his role as consultant is just as real.

***15** Finally, Chapter V states that "[t]he *Martin* decision concerned the situation where a lawyer

moved from a firm acting on one side of a file to a firm acting on the other side. There are other instances where concerns about acting against a former client's interests arise." Law Code, ch. V, n. 8. One of the decisions cited as an example of such a situation is *Sheppard v. Frind* [1941] S.C.R. 531 (S.S.C.). In *Sheppard,* plaintiff was the former client of the defendant, a solicitor. Following a dispute over a bill of costs, the solicitor-client relationship ended. Thereafter, the solicitor contacted his former client's estranged wife and "incited her and improperly encouraged her to prosecute an action in which he [the solicitor] had no legal interest, thus stirring up a litigation against the former client." *Id.* at 535.

Although *Sheppard* was decided upon an action brought by the former client for damages and not a motion for disqualification, the Law Code's reliance on the decision as an example of improper conduct is instructive. Leaving aside Barton's disclosures to government officials and CIC, his efforts to find counsel interested in his information, the primary value of which was to "stir up" or further a private antitrust suit against members of the potash industry--including his former client--is the same sort of conduct found improper in *Sheppard* and Chapter V.

In summary, Barton's ethical duties as a lawyer of the Law Society of Saskatchewan prohibited him from (1) divulging confidential information he acquired during the course of representing Crown PCS, and (2) engaging in conduct creating either a conflict of interest or a risk that confidences would be disclosed to the prejudice of his former client. Upon PCS, Inc. purchasing Crown PCS' assets in 1989, Barton owed these duties to PCS, Inc. By subsequently disclosing the statements and acts detailed in the Memorandum and other papers as well as by communicating with Plaintiffs' counsel in his role as a hired "consultant," Barton divulged information that was "confidential information" under the Law Code. By engaging in that conduct, Barton breached both his duty of confidence under Chapter IV of the Law Code and his duty under Chapter V of the Law Code to avoid acting in a manner detrimental to his former client. [FN38] It is immaterial that Barton is not serving as counsel to Plaintiffs; nothing in the Law Code exempts a lawyer from his ethical obligations based solely on the manner in which he or some party characterizes the lawyer's involvement in litigation against that lawyer's former client. Moreover, the substance of Barton's involvement controls over any labels used to characterize his relationship with this litigation. *See* *Fund of Funds v. Arthur Andersen & Co.,* 567 F.2d 225, 235 (2d Cir.1977).

V. Remedying the Ethical Violations

Having concluded that Barton violated his ethical duties under the Law Code, the Court must determine the appropriate remedy to apply here, given that Barton's violations have occurred in connection with the prosecution of this case. Defendants urge the Court to both disqualify all Plaintiffs' counsel and dismiss the Complaints.

*A. Disqualification of Counsel*

***16** Disqualification is an ethical, not a legal matter, and is in the public's, as well as the client's, interest. *Arkansas v. Dean Foods Prod. Co.,* 605 F.2d 380, 385 (8th Cir.1979), *overruled on other grounds,* *Firestone Tire & Rubber Co. v. Risjord,* 612 F.2d 377 (8th Cir.1980), *vacated and remanded,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). Among the factors to be considered in determining whether attorney conduct warrants disqualification are the Court's duty to maintain public confidence in the legal profession and its duty to insure the integrity of the judicial proceedings. *United States v. Agosto,* 675 F.2d 965, 969 (8th Cir.1982). In addition, Defendants, particularly, PCS, Inc., have an interest in a trial free from even the *risk* that confidential information has been unfairly used against it. [FN39] *Williams v. Transworld Air Lines, Inc.,* 588 F.Supp. 1037, 1046 (W.D.Mo.1984). Given these factors, disqualification is appropriate where an attorney's conduct threatens to work a continuing taint on the litigation and trial. *In re Wirebound Boxes Antitrust Litig.,* 724 F.Supp. 648, 653 (D.Minn.1989). Finally, where a question of disqualification is before the Court, any doubt must be resolved in favor of disqualification. *Coffelt v. Shell,* 577 F.2d 30, 32 (8th Cir.1978) (citation omitted).

Were Barton an attorney admitted to practice in this Court and thus subject to the Court's inherent jurisdiction to supervise the members of its bar, his actions would warrant disqualification. In this case, Plaintiffs' co-lead counsel and other counsel did not themselves divulge confidential information learned as a result of an attorney-client relationship; however, they did engage the services of, and associate with, an attorney who did. The question, here, therefore, is whether the relationship between Barton and Plaintiffs' counsel warrants their disqualification. The following statement in *Ackerman v. National Property Analysts, Inc.,* 1993

WL 258679 (S.D.N.Y. July 2, 1993) is instructive:

> the Court recognizes the need to prohibit plaintiffs from obtaining an advantage that they would not otherwise have achieved but for [the former counsel's] disclosures. Disqualification of a party's chosen counsel, however, is a severe remedy which should only be done in cases where counsel's conduct will probably "taint the underlying trial."

slip op., at 6 (citing Morin v. Trupin, 728 F.Supp. 952, 957 (S.D.N.Y.1989)).

Plaintiffs' counsel contend that none of them should be disqualified because they acted in good faith by relying on the Hleck Opinion and Joel Davidow's statements to Jerry Cohen. Plaintiffs further contend that in no event should a disqualification order extend to (1) those plaintiffs' counsel who have had no contact with Barton and acquired no information from him, [FN40] or (2) defendants other than PCS, Inc. and PCS Sales.

Under the facts and circumstances of this case, the Court concludes that counsel having direct contact with Barton must be disqualified to protect the Defendants' interest in litigation free from Barton's ethical violations. The evidence is conclusive that Plaintiffs' co-lead counsel (the Cohen Firm, the Heins Firm, and the Berger Firm) and other Plaintiffs' counsel in this category, had direct contact with Barton, either prior to engaging Barton's services, or thereafter, or both. In doing so, those counsel knowingly formally affiliated themselves with either (a) the former counsel of a defendant in this action, or (b) counsel who had affiliated themselves with a former counsel of a defendant. Establishing contact with Barton alone created a risk that confidential information would be disclosed; however, Plaintiffs' co-lead counsel went much further when they agreed to hire Barton as a "consultant," and, thereafter, met with Barton, reviewed his information, and had Barton review the factual allegations in the *Potash Complaint*. These actions, even if done in good faith (assuming that the Hleck Opinion and Joel Davidow's opinion could establish "good faith") were done knowingly. Those counsel cannot remove from their cognition or strategy the information Barton wrongfully communicated to them; certainly, the Court is unable to conclude that such a purge is likely to occur, even if counsel were to attempt it. Accordingly, the benefits of that relationship would, if permitted, continue to both provide those counsel with an unfair advantage and taint these proceedings.

***17** What is more, Plaintiffs' co-lead counsel (at least) were aware that Barton's activities raised the question whether he was improperly disclosing confidential information; the issue was discussed prior to retaining Barton. As a result, counsel accepted the risk that a court would reject the Hleck Opinion and conclude that Barton's acts and disclosures were improper. Based upon an analysis of the record before the Court, the following counsel will be disqualified from any further involvement in this case and from having any contact with Plaintiffs in matters relating to this case: Cohen, Milstein, Hausfeld & Toll; Heins, Schatz & Paquin; Berger & Montague; Fine, Kaplan & Black; Chestnut & Brooks; Levin, Fishbein, Sedran & Berman; and the law firms represented by John Wilson and Allen Buckalew, if different from the firms mentioned above. [FN41]

Other counsel had no direct contact with Barton, but they (1) reviewed the Memorandum and/or other materials prepared by Barton that contain or relate to improperly disclosed confidences, or (2) admitted that they knew information which may have originated with Barton. As to these counsel, the Court is unable to conclude that they could expunge from their minds the confidential information contained in the material they reviewed. The Court also is unable to conclude that continued participation by these counsel would not further taint these proceedings. Because any doubts must be resolved in favor of disqualification, the following counsel will be disqualified: Kohn, Nast & Graf; Siegel, Brill, Gruepner & Duffy; Much, Shelist, Freed, Denenberg & Ament; Cochrane & Bresnahan; [FN42] and Brown & Wood.

Because the Court's concern in a disqualification motion is with removing the taint that may attach to the judicial process, there are instances in which improper disclosures of confidential information do not warrant disqualifying counsel. In this case, the Court concludes that it would be improper to disqualify any Plaintiffs' counsel which have not been shown to have had any direct or indirect contact with Barton or his materials. As to this class of counsel, the record demonstrates that their sole exposure to Barton's improper disclosures was limited, at most, to reviewing the allegations in the Complaints and materials submitted in connection with the instant motions. [FN43] In many cases, counsel were not even aware of Barton's existence or his relationship with this litigation. Defendants have failed to direct the Court to any authority holding that disqualification is appropriate where counsel's connection with both the divulging lawyer and co-

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

counsel was so tenuous. Accordingly, counsel not identified above will not be disqualified. [FN44]

In summary, it is proper to disqualify counsel where they knowingly associate with a lawyer who divulges confidential information in a manner prejudicial to his former counsel, or where counsel know enough to improperly benefit from those disclosures, even though they have no direct contact with the divulging lawyer. As to both classes of counsel, disqualification is required in order to inoculate the litigation against a continuing taint. However, where counsel are exposed to disclosed confidences only through documents created during the course of the instant litigation, and thereby become unknowing recipients of confidential information, a court's concern for the integrity of the judicial process and desire to protect the former client are outweighed by the plaintiff's right to select counsel of its choice. If Defendants subsequently believe that confidential information is being or may be disclosed, they may seek protection under the relevant rules of privilege.

*B. Dismissal of Complaints*

***18** Determining the proper remedy for any taint staining the Complaints in *Potash, Tolley's,* and *Reamford* is an easier undertaking. Notwithstanding Plaintiffs' assertion that they acquired information about the actions of the potash industry from independent sources and had, by the end of January of 1993, uncovered "substantial evidence of a price fixing conspiracy," (*see* Mem.Opp'n Mot. to Disq. and Dismiss, at 10); Cohen Aff. ¶ ¶ 3-5, the record is conclusive that certain factual allegations contained in the Complaints, especially those concerning (a) the alleged agreements between the Canadian defendants and United States defendants, and (b) Defendants' attempts to disguise the conspiracy, are virtually identical to factual assertions made by Barton in the Memorandum. Indeed, Plaintiffs' counsel admitted that their conspiracy claims could not have been stated in the same way without information from Barton. Montague Dep., at 194; Oct. 25, 1993 Hrg.Tr., at 49. In addition, it is undisputed that Barton reviewed a draft of the original complaint in this action. [FN45] In short, nothing Plaintiffs have offered is sufficient to controvert Defendants' assertion that Barton played a substantial role in preparing the Complaints filed in *Potash* and *Tolley's* and *Reamford* (both of which are substantially identical to the *Potash Complaint* ). Unless, the Complaints are dismissed, therefore, the Court cannot be assured that the taint from Barton's violations will be removed from subsequent litigation.

If, as Plaintiffs contend, there is sufficient independent information to support an antitrust action against the Defendants, nothing will prevent Plaintiffs and any remaining counsel from bringing those claims via new complaints. The Plaintiffs in *Potash, Tolley's,* and *Reamford,* therefore, will be given thirty (30) days in which to file Amended Complaints which satisfy the provisions of Fed.R.Civ.P. 11, and which are based on facts and information independent from Barton's ethical violations. If Plaintiffs fail to file Amended Complaints in *Potash, Tolley's,* or *Reamford* prior to the expiration of 30 days, the claims in that matter will be dismissed without prejudice. [FN46]

Defendants' and Kalium's Motion to Dismiss

Having determined that the Complaints must be refiled, the Court declines to pass on the various Motions to Dismiss on the merits. However, the Court notes (for purposes of influencing Defendants' and Kalium's future conduct), that those motions were not supported by existing law and would, therefore, have been denied. The Court, however, reserves judgment on the legal sufficiency of any subsequently alleged conspiracy claim, should such a claim be subjected to a Motion to Dismiss.

Conclusion

Based upon the foregoing, and the records, files, and proceedings herein, including the briefs and arguments of counsel, IT IS ORDERED that:

1. Defendants' Joint Motion to Disqualify Plaintiffs' Counsel and Dismiss Complaints (Doc. No. 48) is GRANTED as to the disqualification of certain Plaintiffs' counsel, as identified herein, and is, in all other respects, DENIED. The following counsel are disqualified from any further involvement in this case and from having any contact with Plaintiffs in matters relating to this case: Cohen, Milstein, Hausfeld & Toll; Heins, Schatz & Paquin; Berger & Montague; Fine, Kaplan & Black; Chestnut & Brooks; Levin, Fishbein, Sedran & Berman; Kohn, Nast & Graf; Siegel, Brill, Gruepner & Duffy; Much, Shelist, Freed, Denenberg & Ament; Cochrane & Bresnahan; Brown & Wood; and the law firms represented by John Wilson and Allen Buckalew, if different from the firms mentioned above.

***19** Plaintiffs have thirty (30) days from the date of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

this order to file Amended Complaints in *Potash,* 3-93-197, *Tolley's,* 3-93-556, and *Reamford,* 3-93- 555. Any counsel filing Amended Complaints in any of the aforelisted actions shall also file, concurrent with the Amended Complaint, an Affidavit stating that counsel had

(a) no contact, direct or indirect, with Keith Barton;

(b) no contact, direct or indirect, with any materials or documents containing or describing disclosures made by Keith Barton;

(c) no discussions with any person concerning Keith Barton or any of his disclosures; and

(d) no role in any arrangement to retain Barton as a consultant in this matter.

If Plaintiffs in *Potash, Tolley's,* or *Reamford* fail to file Amended Complaints within 30 days of the date of this Order, their claims against Defendants will be DISMISSED WITHOUT PREJUDICE;

2. the Joint Motion of Certain Defendants to Dismiss (Doc. No. 45) is DENIED as moot; and

3. the Kalium Defendants' Motions to Dismiss (1) the First Amended Consolidated Class Action Complaint in *Potash,* 3-93-197 (Doc. No. 46), (2) the Complaint in *Reamford,* 3-93-555 (Doc. No. 53), and (3) the Amended Complaint in *Tolley's,* 3-93-556 (Doc. No. 6) are DENIED as moot. [FN47]

FN1. The defendants in these cases are New Mexico Potash Corporation, Eddy Potash, Inc., Mississippi Chemical Corp., Potash Corporation of Saskatchewan, Inc., Potash Corporation of Saskatchewan Sales, Ltd., Kalium Chemicals, Ltd., Kalium Canada, Ltd., Noranda, Inc., Noranda Minerals, Inc., Noranda Sales Corporation, Ltd., Central Canada Potash Co., IMC Fertilizer Group, Inc., Potash Company of American, Inc., Cominco, Ltd. and Cominco American Incorporated. Hereinafter, "Defendants" means all the defendants; where individual defendants are discussed, they will be identified separately.

FN2. "Potash," a mineral typically mined from land deposits, is widely used in the United States, primarily for agricultural purposes. It is one of the three basic raw materials (along with phosphate rock and nitrogen) used for fertilizer production. The predominant form of potash is "muriate of potash," also known as "potassium chloride." Muriate of potash is available in three different particle sizes--standard, coarse, and granular. Additional forms of potash include sulfate of potash, manure salts, soluble and chemical grades of muriate of potash and sulfate of potash-magnesium. Muriate of potash constitutes nearly all of the potash consumed in the United States.

FN3. Defendants base their motion to disqualify Plaintiffs' counsel and dismiss their Complaints on Plaintiffs' counsels' contacts with Keith Barton, a Canadian lawyer and former employee of one of the defendants to this action. *See infra* pp. 9-19.

FN4. The instant action, *In re Potash Antitrust Litigation,* Civ. No. 3-93-197 [hereinafter *Potash* ], is the result of the consolidation of 12 separate actions that were filed in this Court. Complaints containing substantially similar allegations and claims were filed in *Reamford Liquid Fertilizer, Inc. v. Potash Corporation of Saskatchewan, et al.* C.A. No. 1:93-3049 (N.D.Ill.1993) [hereinafter *Reamford* ], and *Tolley's, Inc. and James River Farm Service, Inc. v. Potash Corporation of Saskatchewan, et al.,* Civil Action No. 93-0040-L (W.D.Va.1993) [hereinafter *Tolley's* ].

On August 19, 1993, the Judicial Panel on Multidistrict litigation transferred to this Court, and consolidated for purposes of discovery and trial, the 12 separate actions subsequently consolidated in *Potash,* as well as *Reamford* and *Tolley's;* the multidistrict litigations bears MDL Docket No. 981. The Clerk of Court has assigned *Reamford* Civ. No. 3- 93-555; *Tolley's* has been assigned Civ. No. 3-93-556.

The Defendants' "Joint Motion to Disqualify Plaintiffs' Counsel and to Dismiss Their Complaints" (Doc. No. 48) applies to all cases that, as of the October 25, 1993 hearing on the Motions considered herein, had been consolidated under MDL Docket No. 981, i.e, *Potash, Reamford,* and *Tolley's.*

The "Joint Motion of Certain Defendants' to Dismiss" (Doc. No. 45), on its face extends only to the First Amended Consolidated Class Action Complaint in *Potash;* however, pursuant to a Stipulation filed on

November 1, 1993 (Doc. No. 114), the parties in *Tolley's* agreed that the Joint Motion of Certain Defendants' to Dismiss will apply with equal force to *Tolley's;* hence, the disposition of that motion will apply with equal force to *Tolley's.* No such stipulation was filed with regard to *Reamford.*

Kalium has filed Motions, pursuant to Fed.R.Civ.P. 12(b)(6), to Dismiss (1) the First Amended Consolidated Class Action Complaint in *Potash* (Doc. No. 46), (2) the Amended Complaint in *Reamford* (Doc. No. 6), and (3) the Complaint in *Tolley's* (Doc. No. 53). On November 1, 1993, Kalium and the plaintiffs in *Tolley's* stipulated that all memoranda filed in connection with Kalium's Motion to Dismiss in *Potash* would apply to Kalium's Motion to Dismiss in *Tolley's.* (*See Potash* Doc. No. 114). The Stipulation did not extend to Kalium's Motion to Dismiss in *Reamford.*

A fourth action, *Coleman v. New Mexico Potash, et al.,* CV 93-3992 (CBM) [hereinafter *Coleman* ], was filed in the United States District Court for the Central District of California. On September 22, 1993, the Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order transferring this action to this Court. No stipulation has been entered with regard to *Coleman;* as a result, *Coleman* is not before the Court at this time.

FN5. In November 1989, it acquired all the assets and liabilities of Potash Corporation of Saskatchewan ("Crown PCS"); thereafter, Crown PCS changed its name to CIC Mineral Interests Corporation ("CIC"). At all relevant times, PCS, Inc. or Crown PCS were engaged in the business of producing and selling potash.

FN6. PCS Sales is a wholly-owned subsidiary of PCS, Inc.; at all relevant times, it has engaged in the business of selling potash.

FN7. Comincan is a wholly owned subsidiary of Cominco.

FN8. Plaintiffs also allege that various individuals, partnerships, corporations and associations, including subsidiaries and affiliates of Defendants and other manufacturers of potash, not named as defendants in this Complaint, have participated as co-conspirators in the violations alleged and have performed acts and made statements in furtherance thereof.

FN9. Plaintiffs refer to PCS, Inc., PCS Sales, PC America, IMC Kalium, Noranda, Central, Noranda Sales, Cominco and Comincan collectively as the "Canadian Defendants."

FN10. Plaintiffs refer to Mississippi, Eddy, and New Mexico collectively as the "American Defendants."

FN11. On December 16, 1991 Barton sent a letter to CIC's President, Don Ching, apparently as a follow-up to an earlier conversation. Newbould Aff., Exh. A. In that letter, Barton proposed to "undertake a review and analysis of the legal and persuasive options the Government might consider in developing its potash strategy." The letter also made reference to "activities in the industry since 1987 with which I [Barton] am familiar," *id.;* however, Barton did not specifically refer to any antitrust violations.

FN12. Borden & Ellis attorneys Frank Newbould and Paul T. Knudsen assisted Barton in preparing the Memorandum of Evidence.

FN13. In his Affidavit, Newbould states that CIC's refusal to waive any privilege with respect to a private antitrust action "should not be construed, nor were they intended to be, a positive assertion that the rights and privileges resulting from Mr. Barton's representing Crown PCS before the privatization enured to the benefit of CIC Mineral." Newbould Aff., ¶ 6.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN14. On December 21, 1992 Semenchuck sent a copy of the Hleck Opinion to Davidow. Bruckner Aff., Exh. G. In his Affidavit, attorney Jerry S. Cohen states that Davidow expressed to him "his strong concurrence" with the Hleck Opinion and that Davidow believed Barton's disclosures were proper under United States law, Cohen Aff., ¶ 8; however, neither Davidow nor the Dickstein Firm ever took a formal position in that regard.

FN15. The Agreement called for Barton to receive $15,000 on March 1, 1993, $30,000 on April 1, 1993, $45,000 on July 1, 1993, $45,000 on October 1, 1993 and $45,000 on January 1, 1994; all payments were to be in U.S. Dollars. Cohen Aff., Exh. A.

FN16. Defendants have represented to the Court that the materials the Cohen Firm obtained from Barton are contained in Exh. 12 to the Pederson Affidavit in Support of Defendants' Memorandum in Support of Defendants' Motion to Disqualify Plaintiffs' Counsel and Dismiss Complaints. Those documents include (1) an analysis of the potash industry, (2) a recitation of certain statements made by Childers to Barton or to which Barton was a witness, (3) witnesses to the alleged anti-competitive activity, and (4) the June 25, 1990 letter to Estey.

FN17. In his Affidavit, Jerry S. Cohen asserts that Barton's comments on the Complaint addressed only the factual accuracy of the allegations therein and did not involve any legal advice. Cohen Aff., ¶ 19. Cohen further asserts that Barton did not review any other pleadings or discovery materials. *Id.* ¶¶ 19-20. Barton also stated that he played no role in generating discovery requests. Barton Dep., at 49.

FN18. At that meeting, Barton and Plaintiffs' counsel discussed the potash industry, the companies and individuals involved in the potash industry and potentially, in the conspiracy, and potential sources of third-party discovery. Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories to All Plaintiffs, at 5, Pederson, Aff., Exh. No. 8.

FN19. *Potash Corporation of Saskatchewan, Inc. and Potash Corporation of Saskatchewan Sales, Ltd. v. Keith Barton,* No. C934178 (S.C.B.C.1993).

FN20. The Law Code applied here appears as Exh. C to the Affidavit of Donald S. McKercher. Pederson Reply Aff., Exh. No. 4. It was adopted by The Benchers of the Law Society of Saskatchewan on September 26, 1991, and took effect on October 1, 1991. Because Barton's acts occurred between 1988 and 1993, they are subject to both the Law Code and the version of the Code of Professional Conduct of the Law Society of Saskatchewan in effect between 1984 and 1991. *See* McKercher Aff., Exh. B. However, because the relevant provisions of the two codes are substantially identical, the Court's analysis will be limited to the Law Code.

FN21. Defendants support their assertion by citing two Fifth Circuit decisions, *In re Dresser Indus, Inc.,* 972 F.2d 540 (5th Cir.1992), and *In re American Airlines, Inc.,* 972 F.2d 605 (5th Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262 (1993), and an Eleventh Circuit decision, *In re Finkelstein,* 901 F.2d 1560 (11th Cir.1990). Although those decisions contain the language cited by Defendants, nothing therein alters the Court's conclusion that the ethical standards to which Barton must be held are those rules of conduct Barton pledged to follow, i.e., the Law Code.

FN22. Under the Law Code, "person" includes a "corporation or other legal entity, an association, partnership or other organization, the Crown in right of Canada or a province and the government or a state or any political subdivision thereof." Law Code, at vii.

FN23. The defendants contend that the

transaction between Crown PCS and PCS, Inc. was a "de facto" merger under the majority American view stated in *Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1291 (8th Cir.1983). Assuming that this doctrine generally would be pertinent to the matters before the Court, the nature and effect of the privatization and reorganization of Crown PCS must be determined by reference to the statute giving rise to the transaction; thus, whether the transaction would be considered a "de facto merger" or a mere transfer of assets in the majority of American courts is not dispositive.

FN24. Defendants have also submitted the Affidavit of a Saskatchewan lawyer, Gerald Lorne Gerrand, Pederson Reply Aff., Exh. No. 1; he opines that Barton's actions violate Chapter IV of the Code of Professional Conduct of the Law Society of Saskatchewan. Gerrand's opinion does aid in determining the effect of the 1989 transaction because Gerrand simply *assumes* that:

the duty of Keith Barton to observe the confidentiality of the knowledge of the business and legal affairs that he acquired during his period of service as in-house counsel to Crown PCS continue with respect to [PCS, Inc.] and that the solicitor and client privilege that the solicitor client privilege that clothed the relationship continues for the benefit of [PCS, Inc.].

Gerrand Aff., ¶ 10.

Defendants have likewise submitted the Affidavit of PCS, Inc.'s current general counsel, John L.M. Hampton. *See* Pederson Reply Aff., Exh. No. 2. Hampton states:

The company that began doing business as PCS, Inc. on November 8, 1989 was a complete and uninterrupted continuation of the company that had done business as Crown PCS until the previous day. There was complete continuity of management, personnel, physical location and business operations: the officers and management personnel were the same, the employees were the same, the assets and liabilities were virtually the same and the corporate logo was the same. In short, the business of Crown PCS was continued in its entirety by PCS, Inc.

Hampton Aff., ¶ 13. Hampton further states that Crown PCS, now CIC, maintained its corporate existence only for the purpose of selling its shares in PCS, Inc. to the public. *Id.*, ¶ 16. Currently, he continues, CIC holds approximately ten percent of the outstanding shares of PCS, Inc.; however, CIC is engaging in no ongoing activity or business operations. *Id.* Although the Court accepts the facts as stated in Hampton's Affidavit, Hampton does not offer any legal basis for his opinions; hence, McKercher's Affidavit remains Defendant's sole authority for their assertions.

FN25. Determining the effect of the 1989 transaction was made more difficult by the failure of the parties to provide this Court with copies of any of the authorities they relied upon, the statute that gave rise to the 1989 transaction, or the decisions cited by the Canadian affiants each side used to support their respective positions. Although neither side apparently contemplated that this Court would choose to discern for itself the utility and meaning of *legal* decisions issued by Canadian *courts,* it has done so.

FN26. Section 6(1) of the Act provides that after Crown PCS conveyed all or substantially all of its assets to PCS, Inc., it or one of its subsidiaries could convey all or any remaining assets to any person or entity for any consideration, subject to the approval of the Lieutenant Governor.

FN27. Both parties argued over the extent to which certain "successor in title" cases establish that PCS, Inc. succeeded to Barton's ethical obligations to Crown PCS. Those decisions, particularly *Minet v. Morgan* [1873] L.R. 8 Ch. 367, and *IBM Canada, Ltd. v. Xerox of Canada, Ltd.* [1978] 1 F.C. 513, support a conclusion that when a company purchases assets which later become the subject of litigation, any duties of confidence a solicitor would owe to the seller if it still owned the assets are owed to the buyer. Accordingly, since the assets PCS, Inc. purchased from Crown PCS (which reasonably may be described as "the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

business" of Crown PCS) are the subject of litigation in these action, Barton owed to PCS, Inc. the duties of confidence and loyalty he previously owed to Crown PCS as a result of acting as its solicitor in relation to its business operations.

FN28. Having determined that PCS, Inc. has standing to assert that Barton breached his ethical duties and that those breaches have tainted this litigation, it is unnecessary to determine whether (1) Barton also owed similar duties to PCS Sales, or (2) CIC expressly or implied waived any rights it may have had to enforce Barton's duties of confidentiality and loyalty. Had such determinations been necessary, however, the record before the Court would compel answering both questions in the negative.

FN29. Plaintiffs also contend that the crime/fraud exception excepts the identified communications from the solicitor-client privilege existing under the rules of evidence. That issue is not before the Court. Moreover, a solicitor's duty of confidence to his client is broader than the evidentiary attorney-client privilege. Law Code, Ch. IV, n. 10. Accordingly, what is held to be non-privileged for purposes of the solicitor-client privilege if introduced in court may yet fall within the scope of the solicitor's duty of confidence to a former client.

FN30. Commentary No. 10 to Chapter IV provides that
"[d]isclosure of information necessary to prevent a crime will be justified if the lawyer has reasonable grounds for believing that a crime is likely to be committed...." This exception to the duty of confidence has no application here; the "crime," if any was committed, had been committed in 1987 and 1988.

FN31. As will be discussed *infra,* any communications or information Barton received while serving in a role other than General Counsel may not support a determination that Barton violated his ethical duties.

FN32. Plaintiffs also contend that the statements were not privileged because "[t]here is no duty or privilege where a client conspires with or deceives his lawyer." *See* Law Code, Ch. IV, n. 9. Apparently, Plaintiffs claim that Barton was a co-conspirator with Crown PCS to fix potash prices. The record does not support a determination that Barton was a co-conspirator and there is no evidence that Barton was deceived by what his client was doing.

FN33. That Barton may have properly provided information to CIC, and through it to the Canadian and United States authorities, does not also mean that he could make his information available to the private bar without restriction on, or concern for, his ethical duties to his former client.

FN34. Certain disclosures in the Memorandum relate to communications Barton heard during executive and Board meetings, *see* Memorandum, at 2-3, 9. It is unclear whether Barton attended those meetings as General Counsel of Crown PCS or merely as a Vice President or Secretary. If Barton witnessed any communications while serving in a capacity other than as General Counsel, the communications would not be subject to a duty of confidence. Although some of the communications disclosed by Barton likely fall outside the duty of confidence, the vast majority of the disclosures in the Memorandum fall within the category of communications covered by Chapter IV of the Law Code.

FN35. *Martin* offered two reasons for concluding that disqualification should be automatic: (1) "The lawyer cannot compartmentalize his or her mind so as to screen out what has been gleaned from the client and what was acquired elsewhere," 77 D.L.R. (4th), at 268; and (2) "[m]oreover, the former client would feel at a disadvantage. Questions put in cross-

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

examination about personal matters, for example, would create the uneasy feeling that they had their genesis in the previous relationship." *Id.* Barton's relationship with Plaintiffs' counsel raises both of these concerns in spades.

FN36. In *Martin,* the Supreme Court stated that:

courts, which have inherent jurisdiction to remove from the record solicitors who have a conflict of interest, are not bound to apply a code of ethics. Their jurisdiction stems from the fact that lawyers are officers of the court and their conduct in legal proceedings which may affect the administration of justice is subject to this supervisory jurisdiction. None the less, an expression of a professional standard in a code of ethics relating to a matter before the court should be considered an important statement of public policy. The statement in c. V should therefore be accepted as the expression by the profession in Canada that it wishes to impose a very high standard on a lawyer who finds himself in a position where confidential information may be used against a former client.

77 D.L.R. (4th), at 256-57. This excerpt from *Martin* indicates that Canadian courts are not bound to apply the rules of professional conduct when determining whether disqualification is proper, but courts do look to the rules as authority for what is appropriate conduct by an attorney. This approach is similar to that followed by this Court.

FN37. The following statement best describes the important role served by enforcing a lawyer's duty of confidence and loyalty:

Nothing is more important to the preservation of this relationship [between the legal profession and the public] than the confidentiality of information passing between a solicitor and his or her client. The legal profession has distinguished itself from other professions by the sanctity with which these communications are treated ... This tradition assumes particular importance when a client bares his or her soul in civil or criminal litigation. Clients do this in the justifiable belief that nothing they say will be used against them and to the advantage of the adversary. Loss of this confidence would deliver a serious blow to the integrity of the profession and to the public's confidence in the administration of justice.

*Martin,* 77 D.L.R. (4th), at 255-56.

FN38. Notwithstanding Plaintiffs' arguments, the Court concludes that if Barton was subject to this Court's supervisory powers, it would conclude that Barton had violated the ethical duties established under Rules 1.6 and 1.9 of the Minnesota Rules of Professional Conduct.

FN39. Of course, the counter-balance to this concern is the recognition that disqualification motions are often brought for purely strategic purposes having little connection to a party's concern with ethical behavior. *See Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 609 (8th Cir.1977) (citation omitted), *overruled on other grounds, Firestone Tire & Rubber Co. v. Risjord,* 612 F.2d 377 (8th Cir.1980), *vacated and remanded,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981).

FN40. Whether disqualification should extend to counsel that had no contact with Barton is also raised by (1) the separate responsive memorandum filed by Cochrane & Bresnahan, P.A., and the Affidavit of John A. Cochrane, and (2) the numerous affidavits of Plaintiffs' counsel which were submitted to Defendants in connection with certain discovery requests. *See* Pederson Aff., Exh. Nos. 15-16.

FN41. The decision herein is not specifically grounded on the "vicarious disqualification" doctrine discussed in *Perry v. Jeep Eagle Corp.,* 1989 WL 118750 (S.D.Ind.1989), at 5. Nonetheless, the principle supporting that doctrine, to wit: lawyers should not be permitted to gain advantage over an adversary by receiving disclosures of confidential information from some person who had a previous relationship with the adversary, supports the conclusions reached

herein. *See e.g., Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037, 1042-43 (W.D.Mo.1984). Moreover, that principle applies with equal force to counsel who have access to such information, actual or potential, as a result of a co- counsel relationship. *See e.g., Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266 (7th Cir.1983).

FN42. At ¶ 6 of his Affidavit in support of Cochrane & Bresnahan's Memorandum in Opposition to the instant motions, John A. Cochrane states that "[a]t no time has ... Affiant seen any material produced by Mr. Barton." Contradicting this assertion is Samuel D. Heins' deposition testimony that on June 17, 1993 he forwarded to Cochrane a copy of the Memorandum. Heins Dep., at 30; Heins Dep., Exh. 5. Heins' testimony concerning the June 17, 1993 letter indicates that someone at Cochrane & Bresnahan likely saw and reviewed the Memorandum; knowledge of its contents must be imputed to the rest of the firm. Accordingly, the Court is unable to conclude that Cochrane and Bresnahan's continued participation will not taint the proceedings.

FN43. Defendants' unauthorized strategy of warning certain Plaintiffs' counsel that reviewing any of the materials submitted in connection with this motion would taint them, was ineffective to actually taint any counsel.

FN44. The law firms of Greenfield & Rifkin, and Chimicles, Burt & Jacobsen are plaintiffs counsel in *Coleman.* Although that action has not been consolidated with *Potash,* the record demonstrates that neither firm should be disqualified.

FN45. That original complaint moved to the final stages and was filed after Barton was engaged as a "consultant" alone indicates that the primary complaint likely was influenced by Barton's disclosures, or review and comments, or both. Defendants are entitled to some reasonable degree of certainty that the basic pleadings do not result from the hostile use of confidential information.

FN46. The Court rejects as unworkable Plaintiffs' assertion that their claims against defendants other than PCS, Inc. and PCS Sales should not be dismissed. The allegations in the Complaints are too interwoven and fused for the Court to make any meaningful distinctions between and among any of the Defendants.

FN47. The Court assumes that no further orders will be necessary to prevent the dissemination of any information or materials relating to Keith Barton's duties of confidentiality and loyalty or to any communications or information falling within those duties.

1993 WL 543013 (D.Minn.), 1994-1 Trade Cases P 70,644

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works