EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| RODERICK ARNOLD, et al.,<br><br>On behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>*Defendant.* | CIVIL ACTION NO. 01-CV-2086 (DWF/AJB)<br><br>CLASS ACTION<br><br>**DECLARATION OF LAWRENCE P. SCHAEFER IN PROCEEDINGS REGARDING DEPOSITION OF R. BILL DOUGLAS**<br><br>**FILED UNDER SEAL** |

Lawrence P. Schaefer declares that the following is true and correct:

1. I am a partner at Sprenger & Lang, PLLC ("S&L"). We represent the plaintiffs and putative class in the above-captioned case.

2. This Declaration and the attached documents are provided to this Court solely for the limited purpose of opposing Cargill's Motion to Overcome Attorney-Client Privilege and Work Product Claims of R. Bill Douglas ("Douglas") and others. It is also being provided to Douglas. This Declaration does not waive any privilege associated with attorney-client communications in this case, and will not be disclosed to anyone else, in any form, unless ordered by an appropriate authority. The information in this Declaration is being provided to the Court to allow a full evaluation of the nature of these communications and the circumstances surrounding the firm's coming into possession of certain documents described herein. The intent, however, is to preserve the

confidentiality of this attorney-client relationship and all communications associated with this relationship that do not relate to these documents.

3. On February 2, 1998, Ray Bill Douglas ("Douglas"), a former employee of Cargill, retained S&L to advise him about whether some proposed consulting could be interpreted to conflict in any way with the terms of a Release and Settlement Agreement he had signed in January 1998. Douglas had been a senior manager in the Human Resource function at Cargill, and had terminated his employment involuntarily, pursuant to this Release and Settlement Agreement. This initial consultation involved one substantive meeting with me. Douglas executed a Retainer Agreement and paid an initial consultation fee.

4. On September 15, 2000, Douglas met with me to discuss the issue of whether systemic discrimination against salaried African American employees was occurring at Cargill, and had been occurring in the past. Douglas believed that he had been a victim of this discrimination, and knew many current and former employees who shared this belief with regard to both their individual employment and the existence of a pattern of bias. Douglas was aware that S&L had previously represented a class of African American professional employees in successful litigation involving Cargill, so he knew of the firm's expertise in this area. I asked Douglas at the beginning of this discussion whether all of his communications with S&L regarding this issue were for the purpose of seeking the firm's legal advice, and he stated that it was expressly for that purpose. Douglas and I both understood that the attorney-client privilege would apply to these communications.

5. At the outset of my interactions with Douglas on this issue, I told him emphatically and unequivocally that, given his prior senior management position at Cargill and his exposure to confidential and attorney-client privileged communications, he could not disclose to me or anyone at S&L any written or oral communications that could be considered to fall within Cargill's attorney-client or work product privileges. Apart from inadvertently providing the documents I describe herein, Douglas has never communicated anything to S&L that could be considered attorney-client privileged or work product communications.

6. S&L frequently is asked to investigate alleged systemic discrimination at companies, as the firm has a national reputation in this area. Before, around, and after the time of Douglas' September contact with S&L, numerous current or former Cargill employees had approached the firm concerning alleged systemic discrimination issues at the company. We actively investigated several discrimination and other similar complaints involving Cargill. S&L successfully prosecuted a race and gender discrimination class action, *Foster, et al. v. Cargill, Inc.*, Civ. No. 3-82-1829 (D. Minn.), which resulted in a Consent Decree that expired in 1989. In 1998, the firm filed a contract-based claim for an unpaid bonus award on behalf of former Cargill Vice President Jeffrey A.Z. Hilligoss, which I successfully tried to a jury in Hennepin County District Court in July 2000. S&L initiated administrative litigation on behalf of Gail Berkeley, Carol Hawley, and all salaried female employees at Cargill in July 2000. A true copy of the EEOC charge filed on behalf of Berkeley is attached to this Declaration as Exhibit A. This potential class action was ultimately resolved through individual settlements.

7. Also, African-American Cargill employees contact S&L on an ongoing basis seeking legal advice concerning discrimination. Before the September 15, 2000, meeting I had with Douglas, S&L had already had substantial contact with current and former Cargill employees, at least one of whom became a named plaintiff in this case. S&L was aware of all of the Cargill practices that plaintiffs have identified as at issue in this litigation before Douglas ever sought advice from S&L in September 2000.

8. In approximately November and December 2000 and during the course of the firm's investigation of the alleged pattern of race discrimination at Cargill, Douglas delivered to S&L about 2,000 pages of documents associated with his employment at Cargill. These documents rightfully came into Douglas' possession during his Cargill employment. He provided these documents to S&L because he thought some of them might be relevant to the ongoing investigation. In addition to Douglas' legal right to consult with counsel about confidential matters, I believed he could produce these documents to the firm because his Release and Settlement Agreement, which expressly "supersedes all prior agreements between the parties hereto," required only that he not disclose the facts of or the terms of his settlement to anyone. A true copy of this Release and Settlement Agreement is attached to this Declaration as Exhibit B. This release did not obligate Douglas to maintain the confidentiality of any Cargill documents in his possession; the only terms relating to confidentiality addressed the terms and conditions of his settlement.

9. At that time, and before Douglas shared any documents with the firm, I asked him whether he believed he might have signed any document in the nature of a confidentiality agreement during his employment at Cargill. He told me that he very well

may have, but had no executed document in his possession. He conveyed a form document to me that he thought might be similar to the form he signed, but did not know what contractual obligations applied. He was clear, however, that the relevant clause in the Release and Settlement Agreement should control. In addition to Douglas' legal right to consult with counsel about confidential matters, particularly when those matters involved discriminatory conduct, I believed no contractual agreement prevented Douglas from sharing the documents with S&L for the express and limited purpose of allowing the firm to provide informed legal advice to Douglas and other clients about the possible existence of a pattern of race bias at Cargill.

10. At the outset of Douglas' interactions with S&L related to the pattern of race bias he believed existed at Cargill, I told him that, if his release proved to be effective, he likely would not be able to reap any individual pecuniary gain from the litigation. Douglas understood this from the beginning, but nonetheless sought to assist in the litigation S&L had initiated because he had a very strong desire to see real change at Cargill, and to foster true equal employment opportunity at the company. I have at times advised Douglas that there could be a legal basis for challenging the release. Douglas has never indicated that he would seek this potential relief. He has never been compensated by S&L for any of the time or expense he has devoted to these matters.

11. The paralegal assigned to this case and I reviewed and began to organize the documents provided by Douglas shortly after their production in November 2000. In this initial review, I noticed that a number of these documents were designated as "Privileged and Confidential," and/or otherwise appeared to originate from, or be directed to, internal or outside legal counsel for Cargill. I immediately segregated these documents from the

others produced, and did not review them substantively in any manner, except that I noted the date of the documents and the designation or the indication on the face of the document that legal counsel authored or received the document. The dates I noticed on these documents were all well before 1992.

12. Once all of these documents were segregated, I instructed the paralegal to return them to Douglas, and to be sure that no one at the firm reviewed them and that we retained no copies. These originals were returned to Douglas in approximately December 2000. I also talked to Douglas before the originals were returned. I informed him that we were returning these documents and asked him why they were produced to the firm, given our previous instruction about not providing privileged information. Douglas explained that he had never intended to violate this instruction by providing these documents, but that he simply produced all documents in his possession that related to his prior employment without reviewing them against this instruction. He promised that this would not occur again in the future, and that he had no intention of ever sharing these documents with anyone else.

13. I did not return these documents to Cargill at the time for two reasons. First, the firm was at the beginning stages of investigating the alleged pattern or race discrimination at Cargill, and no litigation had commenced. At that time it was more likely than not that no litigation would be commenced, as S&L investigates far more claims of systemic discrimination than we ultimately agree to prosecute. Second, producing the documents to Cargill at that time would have unnecessarily exposed Douglas, a firm client, to whatever response Cargill might choose to make, which we viewed as contrary to our obligations under Rule 1.6 of the Minnesota Rules of

Professional Conduct. Furthermore, exposing Douglas to this risk seemed particularly inappropriate because, apart from being labeled "Privileged and Confidential" and/or appearing to originate from in-house or outside counsel, we had no knowledge that the documents inadvertently provided did, in fact, constitute attorney-client privileged communications. Moreover, the dates of the documents suggested that almost all of them dated back more than ten years, obviously far predating any applicable limitations period should litigation be commenced.

14. S&L filed the above-captioned putative class action race discrimination case in November 2001. Douglas was not a named plaintiff in this case because he had executed a Release that, if considered effective, could bar his right to any recovery. He has nonetheless continued to seek advice from the firm about the ongoing investigation and case because he expects to be a testifying witness and has provided information relevant to the discrimination issues being litigated.

15. The issue of these inadvertently produced documents did not resurface until June 2002, when S&L was completing a due diligence search to make sure it had collected all documents in the firm's possession that might be responsive to Cargill's initial document request in this litigation. In June 2002, Susan Coler, a partner at the firm assigned to this case, examined a box containing Cargill documents that had been presumed to be duplicates of old documents already reviewed. Finding that the initial documents inside were labeled "Privileged and Confidential," Coler did not review them further, except to note this designation. She forwarded the box directly to me, the senior attorney assigned to the file, with a question about how to proceed.

16. Upon noting the designation on these documents, I inquired of S&L employees and attorneys who had worked on this matter, and learned that, contrary to my instructions, a case clerk had made a copy of all of the documents Douglas provided shortly after their initial production in November 2000.

17. These copies were not destroyed or returned to Douglas in December 2000 because the paralegal assigned to the case was not aware they existed. She had never looked in the banker's box, until June 2002, when Coler asked the paralegal to search for and locate all possible documents in S&L's possession in order to respond to Cargill's document requests. At that time, she did not examine the documents, but merely gave the box to Coler. Upon inquiry, I have confirmed that no one has substantively reviewed any of these documents.

18. After learning about the inadvertent retention of these documents, I investigated the firm's obligations with regard to these documents now that active litigation had commenced. This investigation included a consultation with the Minnesota Lawyers Board of Professional Responsibility. An attorney employed at the Board, in an advisory opinion, told me that our ethical obligation could be interpreted to include returning the documents to the potential privilege holder. The next day I sent all of the documents along with a letter to Cargill's counsel. A true copy of the letter is attached to this Declaration as Exhibit C.

19. At no time have I, or anyone at Sprenger & Lang, ever reviewed any of these documents in any substantive manner. We currently retain no copies of these documents, and have no intention of referring to them in any manner in this litigation.

20. Apart from inadvertently providing these documents to S&L, Douglas has never shared with the firm any communications he ever was involved in with any Cargill counsel, either in-house or outside counsel. On one occasion, in my office, Douglas made reference to a comment by Fred Budde, Cargill in-house employment counsel, and I immediately reminded him that Mr. Budde's (or any legal counsel's) comments should not be shared with anyone at S&L. The comment Douglas conveyed was very cryptic and I do not recall its content, but I nevertheless reminded him of the ground-rules for our relationship that we had established at the outset.

21. Douglas has attended group meetings with Cargill clients seeking legal advice. At these meetings, no communications occurred until it was confirmed that all participants in the meeting were S&L clients seeking legal advice from the firm regarding Cargill's discriminatory practices. The attorney-client privileged nature of the meeting was then orally confirmed (for the benefit of the group attending in person and the occasional telephone participant) before any discussions or presentations occurred. Douglas rarely said anything in the meetings he attended. At these meetings, S&L counsel communicated about the lawsuit with its clients, including conveying thoughts and opinions that reflect the firm's legal advice and work product.

22. Douglas has on occasion provided names of current or former African-American employees whom S&L could contact in conducting its investigation of alleged systemic discrimination at Cargill. It is a standard practice for S&L to ask anyone involved in a case for names of other persons who might have knowledge relevant to the investigation and for contact information he or she may have concerning any individual so identified. Douglas also has contacted potential witnesses and/or class members to

discuss their experiences at Cargill and has communicated to S&L the general content of those discussions.

23. Douglas terminated his attorney-client relationship with S&L in February 2003. He has not communicated the reason for this decision to S&L.

24. S&L was class counsel in *Foster, et al v. Cargill*, Civ. No. 3-82-1829 (D. Minn.), a class action case alleging race and gender discrimination. This matter was successfully prosecuted and resulted in a Consent Decree that expired after four and a half years, on August 31, 1989. A true and correct copy of excerpts from the Consent Decree is attached as Exhibit D. These excerpts establish that S&L, as *Foster* class counsel, had the right to request, review, and inspect a number of categories of information pursuant to the Decree, including, but not limited to, written reports detailing Cargill's recruiting, promotion and retention efforts relating to African-Americans and women, and the statistical analysis of the impact of these efforts. While S&L has never substantively reviewed the allegedly privileged documents provided by Douglas, Cargill has described them as principally relating to the draft statistical analysis required under the Decree.

25. On May 1, 2003, Cargill produced a privilege log corresponding to vast numbers of documents it has withheld from production. The privilege log, which is 114 pages long, contains only eight references to Bill Douglas, and only three of the referenced documents even fall within the liability period. The log of redacted documents, which is 12 pages long, contains only two entries referencing Douglas, both before 1995. A summary of these references to Douglas is contained in Exhibit H. Also, S&L has searched its database containing approximately 80,000 documents produced by

Cargill for documents referencing both Bill Douglas and Cargill counsel, Fred Budde, in texts other than mere lists of employees. The search yielded six documents relating to Douglas' negotiation of his termination from Cargill, and five documents dated 1992 or 1993, well outside the liability period in this case.

26. Attached to this declaration as Exhibit E is a true copy of an email produced by Cargill dated December 20, 1996 – a little over sixteen months into the liability period. The email is apparently authored by Nancy Siska, who at the time held a senior human resource position over Cargill's North American operations. In this email, Siska refers to the "Bill Douglas situation," and the need to manage the situation effectively from an "EEO perspective."

27. In this litigation, Cargill claims to have "inadvertently" produced to S&L scores of documents it now claims are protected by the attorney-client privilege. True copies of three letters describing these documents are attached as Exhibit F.

28. Attached to this declaration as Exhibit G is a true and correct copy of *Ransom v. Advance Circuits, Inc.*, No. 4-96-1073 ADM/AJB (D. Minn. Jan. 22, 1999).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of May, 2003, at Minneapolis, MN.

Lawrence P. Schaefer



20571