UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

---

RODERICK ARNOLD, et al.,

EXHIBIT C-1

On behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

Civil Action No. 01-CV-2086 DWF/AJB

CARGILL, INCORPORATED,

Defendant.

---

VIDEO DEPOSITION OF

**RAY BILL DOUGLAS**

VOLUME I

Taken September 18, 2003
Commencing at 9:08 a.m.

COPY

REPORTED BY: JANICE L. YOUNG, RPR

PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402
(612) 339-0545

09:29:06 A. Yeah.
09:29:07 THE WITNESS: What's Tim's last name, Dennis?
09:29:11 MS. COLER: Thomas.
09:29:12 BY MR. KLAAS:
09:29:12 Q. Tim Thomas?
09:29:12 A. Thomas. He just got back I think from a European assignment, Geneva.
09:29:22 Q. Now, during your -- you worked at Cargill for 22 years, correct?
09:29:26 A. Yeah. Sometimes it seems, it felt like a lifetime.
09:29:30 Q. And in essentially management or executive positions throughout?
09:29:37 A. You can call it that.
09:29:38 Q. Well, you were manager of corporate EEO for ten years, correct, '75 to --
09:29:48 A. Approximately. Well, not from '75. From about '77, until the time I went into the last job I held, so whenever that is. That's about nine, a little less than ten years, whatever. Close.
09:29:58 Q. Was it roughly 1985 that you became HR manager for the food sector?
09:30:04 A. It was '85, '86, yeah, thereabouts.
09:30:06 Q. And then you served in that position until your retirement in '97?

09:30:12 A. That is correct.
09:30:12 Q. During that period, you worked with I guess a
09:30:18 number of the Cargill lawyers, correct?
09:30:20 A. Correct.
09:30:21 Q. Other than Mr. Hunter and Mr. Thomas, who did you
09:30:24 work with?
09:30:25 A. I didn't work with them.
09:30:25 MS. COLER: Objection, vague in terms of what
09:30:27 you mean by worked with.
09:30:28 THE WITNESS: I didn't work with them.
09:30:31 BY MR. KLAAS:
09:30:31 Q. You didn't work with those two?
09:30:33 A. No.
09:30:34 Q. Which are the lawyers that you did work with?
09:30:40 MS. COLER: Same objection.
09:30:40 BY MR. KLAAS:
09:30:40 Q. Go ahead, that's all right.
09:30:41 MS. COLER: As long as you understand the
09:30:42 question, you can answer it, Mr. Douglas.
09:30:44 THE WITNESS: I worked with Dennis.
09:30:46 BY MR. KLAAS:
09:30:47 Q. Dennis Orke?
09:30:48 A. Yeah, and Mr. Budde and Joe, Joseph Liesch. There
09:31:02 were a bunch of them. On a regular basis, that
09:31:06 would be on a regular, on a routine, as much as it

09:31:13 was a routine, those three probably. There may --
09:31:15 there are others, I'm sure, but I had contact with
09:31:20 others from time to time on occasion to discuss
09:31:26 something that they were involved in that was
09:31:31 human resources or EEO-related.
09:31:36 Q. Did you work ever with, do you recall working with
09:31:39 Felix Ricco?
09:31:41 A. Yeah. He wasn't in the law department when I was
09:31:44 there. He was in industrial relations. Yeah, and
09:31:47 people from IR. Now there is a law department.
09:31:50 THE WITNESS: Is that right? Dennis? Is
09:31:54 that right? Felix and -- CRS is kicking in again.
09:32:00 What's the guy's name. Yeah.
09:32:08 BY MR. KLAAS:
09:32:08 Q. Do you recall working with Al --
09:32:10 A. Harold.
09:32:11 Q. Harold Kern?
09:32:12 A. Kern, yeah. Al Sufka, yeah, I'm sure I have.
09:32:17 Q. Gretchen Banks?
09:32:20 A. She wasn't in industrial relations when I was
09:32:22 there.
09:32:23 Q. Do you recall working with her while you were at
09:32:25 Cargill?
09:32:25 A. I'm sure I have.
09:32:26 Q. Any of the other Cargill lawyers you recall

09:32:29 working with from time to time or regularly?
09:32:32 MS. COLER: Objection, multiple.
09:32:35 THE WITNESS: Bill Britt.
09:32:37 BY MR. KLAAS:
09:32:37 Q. Huh?
09:32:39 A. Bill Britt, when he was in the law department, but
09:32:42 he's been out for awhile.
09:32:44 Q. Bill Britt was most active on the Foster
09:32:47 litigations, I recall, with you.
09:32:50 A. Correct.
09:32:55 Q. Is there any way that you can estimate for us in
09:33:00 your work as HR manager for the food sector how
09:33:05 often you would have worked with Cargill lawyers?
09:33:09 I mean, every hour, every day? Any way you can
09:33:13 verbalize for us?
09:33:14 A. More often than I would have cared to. No
09:33:19 offense. But I would say weekly, for whatever
09:33:28 reason, daily. It wasn't daily, but it was more
09:33:34 than once a week.
09:33:45 Q. And without asking for specific names or anything,
09:33:50 can you tell us the types of matters that you were
09:33:52 consulting with the Cargill lawyers about during
09:33:55 that period? Just general.
09:33:59 A. Employment law, EEO-related matters, issues,
09:34:09 ranging from administrative complaints to wage and

09:34:21 hour law-related concerns or issues that we may
09:34:25 have had. You know, it runs the gamut. It would
09:34:29 fall into employment law, EEO law. Rarely did I
09:34:34 get involved in the industrial relations end of
09:34:36 it, only if it spilled over into other areas
09:34:39 outside of industrial relations but within the
09:34:44 framework of human resources.
09:34:53 Q. Did you speak with Cargill lawyers routinely about
09:34:57 issues involving either discrimination claims or
09:35:01 as to race or gender or age or anything of that
09:35:03 nature?
09:35:05 A. Yeah.
09:35:05 Q. Specifically as to race?
09:35:08 A. Yes.
09:35:09 Q. Routinely?
09:35:10 A. Gender, handicap, age, all the protected
09:35:18 categories.
09:35:25 Q. In working with the Cargill lawyers, did you
09:35:32 routinely write to them or send them e-mails?
09:35:35 Well, I suppose a little early for e-mails in the
09:35:38 early days, but I mean or talk with them or call
09:35:40 them on the phone or meet with them? How did
09:35:43 you --
09:35:44 A. We were beyond Morse code, and telephone calls,
09:35:48 and I think we had e-mail. Well, we had wire, we

09:35:50 had a wire system.
09:35:56 THE WITNESS: Right, Dennis?
09:35:56 BY MR. KLAAS:
09:35:56 Q. So was most --
09:35:57 A. It was fun.
09:35:58 Q. -- of your communication then telephone meetings?
09:36:02 A. It was everything. It was face-to-face, it was telephone, it was written, it was electronic, it was oftentimes more than I cared to have.
09:36:30 Q. Other than saying hello to Mr. Orke this morning, when was the last time you spoke with any lawyers from Cargill? You mentioned Mr. Hunter and Mr. Thomas. Were they the last lawyers from Cargill you've spoken with before today?
09:36:50 A. Yes.
09:36:51 Q. And did you speak with either of them about either this lawsuit or the claims being made in this lawsuit?
09:36:57 A. No.
09:36:59 Q. Who, other than Mr. Hunter and Mr. Thomas, in the Cargill law department have you spoken with since you left Cargill?
09:37:16 A. The last person I spoke to in the Cargill law department would have been Fred Budde, on an official basis. That was right after my, you

09:43:27 had initially gone and met with Larry.
09:43:35 Q. Larry Schaefer?
09:43:36 A. Correct.
09:43:38 Q. All right, and what do you recall of that
09:43:41 conversation with Mr. Schaefer about any duties
09:43:43 you may have to maintain the confidentiality of
09:43:46 information you received as an employee at
09:43:52 Cargill?
09:43:52 A. Well, as far as confidentiality, my question, the
09:43:55 reason -- I saw him immediately, well, immediately
09:43:58 is about a month. There was some hangups or
09:44:01 mixups with getting to see him regarding his
09:44:04 secretary at that time. But my purpose was to
09:44:09 get, one, to get to see if that could be reopened.
09:44:14 Okay? Because I had learned some things after I
09:44:18 retired that clearly I wanted to undo in my
09:44:24 agreement. Two, the question I asked was whether
09:44:28 or not the agreement precluded me from being
09:44:40 self-employed as a coach, personal coach, as far
09:44:47 as Cargill employees were concerned.
09:44:56 Q. All right, and what advice did you receive?
09:45:00 A. I was given -- he just, you know -- well, my
09:45:04 recollection was the advice was there were, you
09:45:09 know, there were areas that I needed to -- I don't
09:45:13 know. He jotted down something in some language

09:45:19 that I think essentially said I couldn't -- I
09:45:30 don't know what it was. I couldn't, you know,
09:45:42 shouldn't use the position I was in, or something
09:45:49 to that effect, to, had been in, I should say, had
09:45:54 been in at Cargill during my employment, to get or
09:45:58 solicit or leverage business with individuals
09:46:03 currently employed at Cargill. This is -- I
09:46:08 think, I'm not sure. There was something that I
09:46:15 had jotted down, and I can't recall exactly what
09:46:17 it was, but it was along those lines, as far as I
09:46:21 can recall.

09:46:21 Q. Uh-huh, and is that a piece of paper that you
09:46:25 still have --

09:46:25 A. No.

09:46:26 Q. -- the thing you jotted down?

09:46:27 A. No. If I do, I can't retrieve it. I'll put it
09:46:31 that way.

09:46:31 Q. Was it handwritten, written by you?

09:46:34 A. Right.

09:46:35 Q. Did Mr. Schaefer write anything for you or send
09:46:40 you any written advice?

09:46:41 A. No, not that I recall.

09:46:58 Q. Did Mr. Schaefer or any other lawyer at
09:47:03 Sprenger Lang advise you of any risk to yourself,
09:47:08 either legally or financially, if you breached any

09:59:09 Q. And then you had a later conversation with Mr. Schaefer, as I understand it, at the end of 2000. Can you recollect that conversation for us?
09:59:25 A. Oh, the conversation that revolved around at that point employees --
09:59:43 Q. Well, you mentioned he was going to defend you if you came into problems with your contract.
09:59:48 A. Yeah, employees, there had been, I don't know, a handful of employees that had contacted Sprenger & Lang and who were then contemplating a lawsuit, that has obviously emerged, against Cargill on the basis of racial discrimination, and at a meeting that I attended, the issue, I raised the issue of participation in something like this as to it being consistent with the agreement I'd signed with Cargill, and that was in, yeah, that was in probably the fall of 2000. All right.
10:01:08 Q. All right, and during that meeting, or really any other meeting with Sprenger & Lang, do you recall them saying, Mr. Douglas, you better never disclose to me any confidential information from Cargill or you're in big trouble, or words to that effect?
10:01:25 A. No.
10:01:27 Q. Did they ever instruct you with regard to whether

10:01:29 you should be disclosing confidential communications to them? Did the topic ever come up?

10:01:36 A. Would you say that again?

10:01:38 Q. Did Sprenger & Lang or Mr. Schaefer or anybody at Sprenger & Lang ever discuss with you whether you should be disclosing to them confidential information that you learned while you were at Cargill?

10:01:50 MS. COLER: Objection, vague.

10:01:52 THE WITNESS: Not that I can, no, not that I can recall, you know, per se. No, not that I can recall.

10:02:02 BY MR. KLAAS:

10:02:03 Q. During your interaction with Sprenger & Lang, and in particular Mr. Schaefer, but others as well at Sprenger & Lang, did they seek information from you about your experiences at Cargill or your knowledge of the inside workings of Cargill?

10:02:19 A. Yes.

10:02:56 Q. At some point, Mr. Douglas, there are roughly 2,000 pages of documents from Cargill or that you received when you were at Cargill that you delivered to Sprenger & Lang, as I understand it. Without regard to how many specific pages there

10:06:21 A. It was after I had initially talked with Larry.
10:06:36 Possibly in the year, sometime later in the year
10:06:39 in 2000 or 2001.
10:06:44 Q. And what was the -- she was following up then from
10:06:47 your conversation with Mr. --
10:06:49 A. Yeah. We had meetings in terms of, you know, what
10:06:51 does this mean, what does that mean, how does this
10:06:54 happen. Give me, you know, point to point to
10:06:58 point, you know, how this works, that kind of
10:07:01 thing.
10:07:01 Q. And this is a conversation you're describing with
10:07:04 Ms. Madsen or with Mr. Schaefer?
10:07:05 A. Or with both.
10:07:11 Q. And, I'm sorry, I initially misunderstood the
10:07:14 document situation. Are you sitting there with
10:07:16 the documents going through them with Mr. Schaefer
10:07:18 and Ms. Madsen?
10:07:22 A. As it pertained to, I think, my recollection, as
10:07:39 it pertained to the Cargill leadership development
10:07:51 program, it could have been something else, but I
10:07:53 think that was it, that was -- there are a group
10:08:00 of documents maybe this high, whatever, that I
10:08:03 brought personally initially; and then, and I
10:08:07 raised the question about, I said I've got some
10:08:10 documents here, some of which have confidential

10:08:13 and privileged written on them, and I was going
10:08:18 through them and I said I'm sorting these out, or
10:08:25 trying to, and I was looking for some guidance,
10:08:26 and he said, well, we can do that and not -- okay,
10:08:30 and just send them, we'll go through; and that's
10:08:34 how I ended up sending that whole, whatever number
10:08:37 of documents were that they received.
10:08:41 Q. All right, so these are documents at your home?
10:08:44 A. These are documents that were at my home, correct.
10:08:47 Q. All right. Now, how did they physically get
10:08:51 transported from your home then to Sprenger &
10:08:53 Lang?
10:08:54 A. I took them initially for a meeting to go over
10:08:57 those four or five key areas, and I think I
10:09:03 brought some another time, and then a courier from
10:09:08 their office came and picked up some once or
10:09:15 twice.
10:09:16 Q. All right, and then you went through the documents
10:09:18 with Mr. Schaefer and Ms. Madsen, or do you
10:09:20 recollect?
10:09:21 A. I --
10:09:24 MS. COLER: Objection, mischaracterizes his
10:09:26 prior testimony.
10:09:28 BY MR. KLAAS:
10:09:28 Q. I'm just asking.

10:11:12 the questions. So if I have a problem with how
10:11:15 Mr. Klaas is wording a question, I will object to
10:11:18 that. Just so you know that is what I am doing.
10:11:28 BY MR. KLAAS:
10:11:28 Q. Now, so how many meetings do you recollect going
10:11:34 over these documents with Mr. Schaefer and
10:11:38 Ms. Madsen? Can you estimate for us?
10:11:42 MS. COLER: Objection, vague in terms of what
10:11:44 these documents are.
10:11:48 THE WITNESS: Well, I would say anywhere from
10:11:55 four to six meetings.
10:11:57 BY MR. KLAAS:
10:11:58 Q. And is that the three of you are
10:12:00 meeting--Ms. Madsen, Mr. Schaefer, and you?
10:12:03 A. In a couple of cases, it was three of us, and the
10:12:08 majority of them it was just Larry and I.
10:12:14 Q. And during the -- there are, I gather, like at
10:12:23 least three deliveries of documents to Sprenger &
10:12:25 Lang from your house? There is the initial one
10:12:28 you described.
10:12:29 A. Yeah, I brought with me initially, and then I
10:12:32 brought some more, and then some were picked up.
10:12:57 Q. And in these documents, I take it some were
10:13:01 confidential, some were from the law department,
10:13:03 just whatever you had?

10:13:04 MS. COLER: Objection, vague in terms of what
10:13:07 these items --
10:13:08 THE WITNESS: Well, they were what they were,
10:13:10 and my understanding is you have a copy of them
10:13:12 all, so that's what it was.
10:13:14 BY MR. KLAAS:
10:13:14 Q. And did you go over them all with Mr. Schaefer?
10:13:16 A. No, no. The documents that I recall most clearly
10:13:29 presently were involved with the key areas or the
10:13:36 key programs that he wanted to know more about.
10:13:39 One was, like I indicated, CLDP, the Cargill
10:13:46 leadership development program; the KEIS
10:13:49 initiative; oh, PMP; the selection grid; and there
10:14:01 may have been another one, but those, I think that
10:14:03 was the bulk of it, the crux of it.
10:14:08 Q. Did you give to Sprenger & Lang all the documents
10:14:10 you had about those programs?
10:14:12 A. To the extent I had documents, yes, and I think I
10:14:24 had some documents that were relatively current on
10:14:29 CDL, on the Cargill leadership development
10:14:34 program, I believe, that had been, that I received
10:14:42 by courier from Cargill.
10:14:44 I went in the hospital in about November of
10:14:49 '96, it was '96, '97, yeah, November of '96, and
10:14:56 had knee surgery, had some radical knee surgery

10:15:00 that I still haven't recovered from, and I was off
10:15:03 from that period. I was in the hospital for about
10:15:06 ten days, and then came home and I was off until I
10:15:11 returned in February, I think it was the first
10:15:14 half of February, somewhere around the first part
10:15:17 or first half of February. So during that time, I
10:15:21 was home, I had a computer, I had a cell phone, I
10:15:30 had -- I was laid up. I have a fax machine and
10:15:36 whatever, and they would courier stuff to me or
10:15:40 have the courier bring stuff to me, Cargill, that
10:15:43 is, and so I was doing work, okay, during this
10:15:46 time. And during that time, I had essentially set
10:15:55 up an office at home.
10:16:01 Q. Okay, and --
10:16:02 A. And so I had -- I think we were doing something
10:16:08 with the Cargill leadership development process,
10:16:17 and whatever else that was going on at that time.
10:16:20 In fact, I had gotten on a conference call on any
10:16:25 number of things, one of which was with Dennis and
10:16:28 others regarding an issue we had with, whatever it
10:16:37 was, at the rice mill, the compliance review in
10:16:43 Greenville.
10:16:43 So from that period -- my point is this:
10:16:47 From that period till I went back to work, and
10:16:50 that was about in the middle of February, I had

10:16:52 documents everywhere in my house. Okay? From
10:16:57 just back and forth, and the courier would come
10:17:00 and I would send stuff, and so it would come two,
10:17:03 three times a day during this timeframe. In part,
10:17:08 that's how I accumulated the documents and the
10:17:12 good ones that I ended up with having.
10:17:15 Q. And you're dealing with Mr. Orke and others in the
10:17:19 law department during that period?
10:17:20 MS. COLER: Objection, assumes facts not in
10:17:22 evidence.
10:17:22 THE WITNESS: I'm sure I did. Well, Dennis
10:17:25 on the one, yeah, on the one for sure, on the
10:17:28 conference call that we had an ongoing involvement
10:17:35 with an issue, yes, and I'm sure there would have
10:17:39 been, there probably would have been others, but
10:17:44 as well, the majority of the interaction I had was
10:17:49 typical of what I would have had had I been at
10:17:54 work. It was with I guess nonlawyers, but some
10:17:59 lawyers as well.
10:18:01 BY MR. KLAAS:
10:18:01 Q. Now, and you gave all those documents eventually
10:18:04 to Sprenger & Lang, although it came in a series
10:18:07 of deliveries, I take it.
10:18:09 MS. COLER: Objection, assumes facts not in
10:18:12 evidence.

10:18:12 BY MR. KLAAS:
10:18:12 Q. Well, is that right or not?
10:18:14 A. Yes, to the best of my knowledge, yes.
10:18:16 Q. And at some point -- well, you've described you had four to six meetings, I guess, with Mr. Schaefer and maybe others at Sprenger & Lang. Were the documents that you delivered being gone over at all four or six of those meetings?
10:18:32 MS. COLER: Objection, vague in terms of timeframe. Documents were produced at different times.
10:18:41 THE WITNESS: Documents were the selection grid, the Cargill leadership development thing, the KEIS thing, were the key concerns or areas that they wanted to get a better handle on.
10:19:10 BY MR. KLAAS:
10:19:10 Q. Sure.
10:19:11 A. All right, and a good part of the time, meeting time, was spent on those programs, those, in those areas.
10:19:34 Q. How did the -- did the documents ever get back to you? I mean, did you have -- did they come back to you from Sprenger & Lang?
10:19:42 A. Eventually, yeah, I got some documents back.
10:19:48 Q. Did you get back everything you'd sent over?

10:23:08 A. Were the originals.
10:23:09 Q. Right.
10:23:10 A. Is that what you're saying?
10:23:12 Q. Yes. I'm asking you --
10:23:13 A. To the best of my knowledge, yes.
10:23:26 Q. All right. At the time of, when the documents
10:23:31 were returned to you by Sprenger & Lang, at your
10:23:35 request, I gather, do you recollect Mr. Schaefer
10:23:41 scolding you for giving him privileged or
10:23:45 confidential information from inside Cargill?
10:23:48 MS. COLER: Objection, assumes facts not in
10:23:51 evidence and vague as to timeframe.
10:23:53 THE WITNESS: Scolding me? No, he -- no.
10:23:56 BY MR. KLAAS:
10:23:57 Q. Did any conversation of that nature occur?
10:24:00 MS. COLER: Objection, vague.
10:24:00 BY MR. KLAAS:
10:24:01 Q. Where Mr. Schaefer criticized you or suggested it
10:24:05 was improper or --
10:24:06 A. Admonished me.
10:24:08 Q. Admonished, to use your word --
10:24:10 A. No.
10:24:10 Q. -- where that topic came up, you never should have
10:24:13 done that?
10:24:13 A. No. Well, let me think. No, not that I can

10:24:40 recall.
10:24:40 Q. Do you remember at some point discussing,
10:24:44 particularly with Mr. Schaefer, comments or
10:24:50 conversations or advice that you had received from
10:24:54 Fred Budde at Cargill?
10:24:56 MS. COLER: Objection, assumes facts not in
10:25:00 evidence.
10:25:00 THE WITNESS: In other words, did I discuss
10:25:04 with him any conversation or facts or what have
10:25:10 you I --
10:25:11 BY MR. KLAAS:
10:25:12 Q. Did you reference any comment in Mr. Schaefer's
10:25:14 presence --
10:25:15 A. Regarding Fred Budde.
10:25:17 Q. From Fred Budde, yeah, where something was said by
10:25:20 Fred Budde you told Mr. Schaefer about. Do you
10:25:23 remember anything like that?
10:25:39 A. I don't recall that I did. What would have been
10:25:45 the nature of it, I can't recall.
10:25:49 Q. Well, do you ever recollect Mr. Schaefer scolding,
10:25:54 admonishing, instructing you, don't ever tell me
10:25:59 anything that anybody at the Cargill law
10:26:01 department ever told you, or words to that effect?
10:26:08 A. No.
10:26:10 Q. All right. Do you recollect either of your own,

10:26:26 in your own mind now or from notes that you may
10:26:29 have written down or anything you've got with you,
10:26:31 when it is you first spoke with anybody from
10:26:34 Sprenger & Lang, Mr. Schaefer, anybody else,
10:26:37 about, you know, after your retirement? I know
10:26:42 you had some contact with them during the Foster
10:26:46 litigation, but what I want to know is after your
10:26:47 retirement from Cargill, do you know when is the
10:26:50 first time you spoke with somebody from Sprenger &
10:26:57 Lang?
10:26:58 A. Yeah. I spoke with -- you mean regarding this
10:27:02 litigation?
10:27:04 Q. Really about anything.
10:27:06 A. It was in January or February of '98.
10:27:16 Q. And you've described a conversation with
10:27:21 Mr. Schaefer about whether you could become a
10:27:24 personal coach and not to leverage your position
10:27:26 or solicit business on that basis. Is that it,
10:27:29 was that that conversation?
10:27:31 A. That that's conversation, and the conversation is
10:27:35 with regard to, or the review, his review of the
10:27:39 agreement between Cargill and myself and whether
10:27:43 that could be reopened.
10:27:46 Q. Okay.
10:27:46 A. Okay.

11:09:38 fold, I didn't recruit her.
11:09:42 Q. Are there people on here that you would say you brought into the fold or recruited for this lawsuit or for Sprenger & Lang?
11:10:38 A. To recruit, I don't know. I may have with -- I don't know with whom. I did refer Rod Arnold to Sprenger & Lang, so if that's recruiting, I recruited him.
11:11:02 Q. Okay.
11:11:05 A. Nii-Akwei, I don't think so.
11:11:11 Q. All right.
11:11:16 A. Sean Allen, I talked with, and like I say, I was surprised he was here, so if I did try to recruit him, it didn't work, something else did. Virginia Douglas. These other people, for the most part -- Dawn Collins, no. Louis Darden, no. Virginia Douglas, no relation, that I know of. Valerie Mason-Robinson, I know the name, but no, I don't think so. There was some people I talked to who chose not to get involved, but I would say Rod Arnold is the closest on that list, to be responsive to your question.
11:12:07 Q. Are there people on this list that you do know the story about? You don't know the facts about Sean Wright, I understand, but are there people that

11:16:55 she got involved because of that or not, I don't know.
11:16:58 Q. When you say you talked with her, you talked with her about this lawsuit or Sprenger & Lang?
11:17:02 A. Right, right.
11:17:03 Q. On the phone?
11:17:04 A. Yes.
11:17:04 Q. Was she at any of these meetings?
11:17:07 A. No.
11:17:08 MS. COLER: Objection, foundation.
11:17:10 THE WITNESS: Not that I was at, put it that way. I don't know whether she was beyond that, I don't know.
11:17:16 BY MR. KLAAS:
11:17:16 Q. Yes. And what did you -- tell us about your conversation with Clintonia Simmons about, you know, this lawsuit or Sprenger & Lang.
11:17:24 A. Well, I was trying to reach, I got a hold of her, I was trying to reach a guy by the name of, I can't think of his name, Wright, and who had worked at Memphis, and somebody among the group at that time had indicated that Clintonia may know where he is, and I called her and asked her if she, had she seen Ron Wright, is the person, and she hadn't, evidently, or she said she hadn't, but

she knew somebody who may have and was going to ask him; and then I got, then she, I think, got back to me or I got back to her, and she gave me somebody else's name to contact, and she at the time was aware of this action being in motion, as it were, or formulating, and I may have given her Larry's number or name, I'm not sure, but I think we did talk about it.

Q. All right.

A. Tausha Tate, Tausha Tate worked in Memphis, if I'm not mistaken, and I'm not sure if I talked to her or not. I did talk to her, but I don't know if it was before or after the fact.

Q. Okay. Emily Tyler?

A. Not that I know of.

Q. Jacqueline Williams?

A. Not that I can --

Q. Cheryl Willis, you indicated you spoke to --

A. Right, Cheryl is here.

Q. -- as I recall. Do you recollect your conversation with her? About this lawsuit or about the Sprenger Lang.

A. Yeah, I know we talked about this lawsuit and she getting involved in it, and evidently she chose to. I think she was -- she may have been or may

not have been, but yeah, we talked about it.
Q. How about Steve Wint?
A. No.
Q. And Sean Wright you've spoken with and --
A. Sean Wright, yeah.
Q. -- you've talked to us about.
A. Sean Wright was doing this from when I got --
Q. Were any of these folks that you spoke with, that became plaintiffs, are they, did they ever become clients of yours or were you ever their coach, post-retirement from Cargill?
A. I never got paid, if -- so whether I was their coach or not. Yeah, I talked with some. I would get, I would get a phone call at least one, two, three, maybe as many as a half a dozen a week for different reasons after I retired, people just wanted to know what I'm doing, how's retirement, others, hey, I'm running into this or that or whatever, kind of just an event, some people called to get, you know, counsel.

When, it was interesting, when I retired, a group of black employees of Cargill decided to give me a retirement party, which I really didn't want, all right, at that time, and they did, and there was people that came from a lot of places

11:24:28 lawsuit, to your knowledge?

11:24:32 A. Not since it was filed and I'm -- yeah, no, 11:24:36 evidently not.

11:24:37 Q. What do you mean evidently not?

11:24:39 A. Well, at the time that this thing was being in 11:24:46 process or was being developed or was in process, 11:24:54 the parameters hadn't been defined in terms of the 11:24:58 scope of who would be involved or who would be, 11:25:01 you know, included in terms of level; and in 11:25:07 talking with, I believe it was with, yeah, with 11:25:10 Larry, at one time it was indicated that even 11:25:19 though we -- that the majority of the people that 11:25:27 were in salary classes below the B, band level, it 11:25:32 would be possible to include people above or into 11:25:36 the bands, but turned out it didn't, and so I 11:25:40 would have been left out. But had it been, I was 11:25:43 led to believe that even though I had an 11:25:46 agreement, I may have had claims, okay, legitimate 11:25:50 claims that could have been brought under this 11:25:53 action, if it was broad enough to include me. 11:25:56 Evidently it turned out not to be, because it's 11:26:00 cut off at salary class, what is it, 15? Yeah.

11:26:03 Q. Uh-huh. You were too high.

11:26:08 A. I won't say, I won't agree to that. I was in --

11:26:12 Q. C.

11:26:13 A. C, all right. Never too high.
11:26:16 Q. And any other, you know, financial arrangement with regard to your services to the Sprenger & Lang firm in terms of getting ready for the --
11:26:26 A. The only thing I got --
11:26:28 MS. COLER: Objection, wait, objection, leading, assumes facts not in evidence.
11:26:31 BY MR. KLAAS:
11:26:31 Q. For the lawsuit.
11:26:32 A. Only thing I got were lunches, coffee. You know, I don't know if you guys are buying lunch or not, but I got, we got, I had -- the meetings I had with Larry in their offices were, you know, were lunch, we didn't have a meeting, or coffee or rolls or whatever. That's the extent of it.
11:26:53 Q. All right, and any discussion at all about any future, you know, income or remuneration?
11:27:00 A. They'll -- you know, it was, it was -- I've raised it. Well, you know -- no, not specifically. No specific reaction, put it that way. I raised it in terms of my involvement, and I think Larry said something to the effect that it would depend on a lot of things, and it was just kind of left hanging, that we'd have to see at the conclusion of this thing.

11:35:31 BY MR. KLAAS:
11:35:31 Q. Fall of 2001.
11:35:34 A. Okay. It would have been after that, and I tell
11:35:52 you when I really became fully conscious of it is
11:35:56 in the early part of or the middle of 2002.
11:36:03 Q. All right, and when you became conscious of the
11:36:06 fact that you were not included in the class, did
11:36:09 you speak with Mr. Schaefer or anybody at
11:36:13 Sprenger & Lang?
11:36:31 A. I've got to think.
11:36:35 Q. You know what, let me back up, Mr. Douglas. Are
11:36:38 you remembering a moment or something that caused
11:36:40 you to become aware that you weren't in the class
11:36:42 that you place in mid-2002, or is it just a time
11:36:47 or is it an event you remember?
11:36:49 A. Well, in -- I know at one time, and it wasn't said
11:36:59 in a definitive way, but it was said in the sense,
11:37:05 and by Larry, that even though I had an agreement,
11:37:10 that I may still have standing to be a part of
11:37:14 this lawsuit. Okay?
11:37:15 Q. Uh-huh.
11:37:18 A. When I found out about exactly the fact that I
11:37:22 wasn't isn't as clear to me until, I would say, in
11:37:32 towards the middle of '02, whatever, summer of
11:37:45 '02, when, and I don't recall, and it may have

11:38:06 been in a conversation I had with someone. Okay.
11:38:18 This is '03, right?
11:38:21 Q. Someone from Sprenger & Lang or someone else?
11:38:23 A. No, no, someone else.
11:38:26 Q. Who?
11:38:28 A. Duane Reed.
11:38:30 Q. Duane Reed. Does Duane Reed go by
11:38:38 WWWwide48@aol.com?
11:38:42 A. Yeah, worldwide, he was worldwide before there was
11:38:47 a Worldwide Web, yeah.
11:38:49 Q. That's Duane Reed?
11:38:51 A. Yeah.
11:38:51 Q. So Duane Reed tells you you're not in the class --
11:38:54 A. No, he didn't tell me that, no, no, no.
11:38:57 Q. -- or somehow you discover that in the middle of
11:38:59 2002.
11:39:00 A. We were talking about this thing, I think, or
11:39:03 something, and the website is what it was, I
11:39:07 think, and I think this was -- I don't know if
11:39:15 this was on the website or not, but I looked at
11:39:20 it; and clearly, when I looked at the website or I
11:39:26 had a copy of it or whatever, or he had a copy of
11:39:28 it, it was not, you know -- I wasn't part of the
11:39:31 class and he wasn't part of the class.
11:39:34 Q. Did you talk with Mr. Schaefer then or anybody at

11:39:38 Sprenger & Lang about that?
11:39:41 A. I mentioned it to somebody. I don't know if it
11:39:46 was Larry, or there was a guy I used to talk to, I
11:39:54 don't know if I mentioned it to Larry or to -- I
11:39:57 mentioned it to somebody, or Doug.
11:40:00 Q. At Sprenger & Lang?
11:40:02 A. Yeah.
11:40:02 Q. What did they say?
11:40:04 A. Yeah, they said, yeah, that's -- I think it was
11:40:08 Larry, I can't be sure, but they said yes, that's
11:40:12 right, you're not.
11:40:13 Q. What did you say?
11:40:15 A. A class, a putative class.
11:40:17 Q. What did you say?
11:40:19 A. No. I said -- I shouldn't repeat it. Okay?
11:40:22 Q. You can repeat it.
11:40:25 A. No. You're going to make me a bad person. I used
11:40:29 some expletives and just said that this, you know,
11:40:36 whatever, it's bullshit, so, but it was done and
11:40:42 whatever, and understanding why he probably cut it
11:40:58 off where he did, because there is not that many
11:41:01 people in the band C. But was it a promise? No.
11:41:06 Early on, but it was held out as something that
11:41:11 conceivably could include people in the band, or
11:41:14 anyway, in my case, me, but it turned out it

11:41:18 didn't.

11:41:18 Q. Now, did you attend any meetings at Sprenger & Lang after you discovered that you were not in the class, or were those meetings before?

11:41:31 A. The meetings, no, all the meetings that I attended, to the best of my knowledge, were meetings leading up to and right before this was originally filed. Yeah, I have not met with Larry since or met at Sprenger & Lang even before this was filed.

11:42:01 Q. Now, there was --

11:42:03 A. I would say at the end of 2/01 was the --

11:42:09 Q. Was the last meeting?

11:42:10 A. Yeah, physically at, yeah.

11:42:13 Q. Now, we're told that you terminated the relationship with Sprenger & Lang on February the 24th, 2003. Whether that's the exact date or not, do you recollect?

11:42:24 MS. COLER: I'll object as a leading question.

11:42:26 THE WITNESS: Yeah, it's in that neighborhood, yeah. I'd have to double check it, but right about then, that's officially. I pretty much cut it off before that.

11:42:38 BY MR. KLAAS:

11:42:38 Q. Why?

11:42:51 A. There were a number of things that I didn't particularly like that had occurred, one of which is the turning over of all these documents. Larry gave me a call and said, you know, I am compelled or whatever by the court or whomever to turn over these documents to Cargill, and I'm just giving you a heads-up or letting you know. This is in, this is in '02, this is right around June, July, July I think, early part. And about a week or so later, I got another call saying that in all likelihood, I'd be receiving a subpoena, what is the thing with the duces, whatever it is, and, you know, and they may contact you, contact us, and hung up, see. So that was kind of where it was left.

11:43:57 I thought it was a shitty way to deal with this, with me, and in terms of how this had all evolved. I was, my impression was, I was left kind of just to twist in the wind, and I got the impression from his tone that he was going to distance himself or at least distance me from this, from him on this. So I said fine, okay, that's the way it is, that's the way it is; and from that point on, I pretty much was out of it.