EXHIBIT C-2

seen this before?
A. Not that I recall.
Q. Okay. I won't ask you, because I think Mr. Schaefer said he'd sent you a copy, but if you don't recall, you don't recall.
MS. COLER: I'm going to object as leading the witness, assuming facts not in evidence. Counsel is testifying.
MR. KLAAS: Fine.
BY MR. KLAAS:
Q. I want to ask you about just a couple of references in this, Mr. Douglas, and --
A. What para -- 5?
Q. Yeah, 5 would be fine. In paragraph 5, Mr. Schaefer states that "At the outset of my interactions with Douglas on this issue, I told him emphatically and unequivocally that, given his prior senior management position at Cargill and his exposure to confidential and attorney-client privileged communications, he could not disclose to me or anyone at [Sprenger & Lang] any written or oral communications that could be considered to fall within Cargill's attorney-client or work product privileges." Do you see that, where I've read that?

11:47:33 A. Uh-huh.
11:47:34 Q. Do you have any recollection that would support
11:47:35 that declaration, or is that not true?
11:47:38 MS. COLER: Objection, assumes facts not in
11:47:41 evidence.
11:47:54 THE WITNESS: Well, my only response to that
11:47:59 is, and there may have been some language or some
11:48:02 conversation in this regard, but there were
11:48:07 documents that clearly I had gone over with Larry,
11:48:14 that Cargill leadership development stuff and
11:48:18 other stuff, whether it was confidential or not, I
11:48:21 can't recall, but to have had all these documents
11:48:25 and to have made copies of them, you draw your own
11:48:28 conclusions.
11:48:29 BY MR. KLAAS:
11:48:29 Q. All right. Let me ask you, in paragraph 12,
11:48:32 Mr. Douglas, it's a couple pages further along,
11:48:37 it's paragraph 12. Mr. Schaefer states,
11:48:41 "These --" do you see that? Do you have it?
11:48:46 A. Yeah.
11:48:48 Q. About the third sentence in, he says he's talking
11:48:51 with you in December of 2000. Do you see that?
11:48:54 He says, "These originals were returned to Douglas
11:48:57 in approximately December 2000." Do you see that?
11:49:01 Paragraph 12.

11:51:49 back and looked to see what documents I actually
11:51:52 had. I wasn't sure at that time. And I think I
11:51:56 knew I had something on CDLP (sic), because it was
11:52:00 something I had worked on during the time I was
11:52:02 recovering from my knee surgery, and I thought it
11:52:05 was still there, but I found that and I found some
11:52:09 other things. In a subsequent -- then I think I
11:52:14 took those over and we had a meeting and we went
11:52:17 over those, and I say, I've got some more
11:52:20 documents, I'm going through them. Some of this
11:52:22 stuff is confidential, some of this stuff is --
11:52:25 they said, oh, no, we'll just send them over,
11:52:28 because it was a lot, and we'll sort them out, and
11:52:31 I did. Okay?
11:52:32 BY MR. KLAAS:
11:52:32 Q. Yeah.
11:52:33 A. The wheat from the chaff, I mean the confidential
11:52:35 from whatever, and so the documents that I had,
11:52:42 the privileged or confidential documents and the
11:52:44 other documents, I just sent over, and those that
11:52:48 I didn't, yeah, sent over and/or took over,
11:52:52 because I was going through them on a piecemeal,
11:52:54 case-by-case, and asked for I think from Larry for
11:52:59 some direction on what would be or what wouldn't
11:53:03 be appropriate. I think it was Larry. Or if it

11:53:11 wasn't Larry, it was Sara or Larry, and at one
11:53:14 point or at some point, they said, well, just send
11:53:18 them over, and so I brought some over and then
11:53:21 some were picked up.
11:53:24 Q. All right. When you received your subpoena to
11:53:29 come here and join us today, there was a list of
11:53:36 documents that you were required to bring along
11:53:38 with you. Do you have any documents at your house
11:53:42 currently from Cargill?
11:53:46 A. From Cargill?
11:53:47 Q. Yes, that you received while you were an employee
11:53:50 at Cargill.
11:53:55 A. I may have a few, yeah, that -- I mean, in terms
11:54:02 of -- I've submitted the documents I had per the,
11:54:11 what was it I got, the subpoena I got from the
11:54:14 court, the court's, was it order?
11:54:17 Q. Yes.
11:54:20 A. Back in whatever that was. I subsequently
11:54:24 submitted this, whenever it was, the other
11:54:29 privileged and confidential communications that I
11:54:31 had with Sprenger & Lang.
11:54:35 Q. All right. We should break for lunch. I want to
11:54:40 make sure that we have an opportunity to discuss
11:54:42 with the Judge the notes that you have with you.
11:54:47 So can you -- do you want to do that right now or,

13:08:30 Q. Okay, and it concludes with "At present me thinks--no me knows--Larry is full of shit and playing cat & mouse because of concern for documents returned to me by his office," correct?

13:08:42 A. Correct. I'd gotten different -- my interaction with Larry, or with that office, was primarily through Doug. For whatever reason, Larry and I had ceased talking directly with each other, and Doug was the intermediary as far as our communication was concerned.

13:09:07 Q. Uh-huh, and who is Doug?

13:09:09 A. Doug, I don't know what Doug's last name is.

13:09:11 Q. He's a lawyer at Sprenger & Lang?

13:09:13 A. I don't think he's a lawyer. He's a paralegal.

13:09:17 Q. All right, and then there is some references at the top that appear to be dated July 11th and 12th --

13:09:27 A. Right.

13:09:27 Q. -- of 2002?

13:09:29 A. Right.

13:09:29 Q. It starts, "Called and informed me?"

13:09:32 A. Yup.

13:09:32 Q. Who's that?

13:09:33 A. Larry.

13:09:34 Q. That he's sending documents to --

13:09:36 A. To Cargill.
13:09:39 Q. And then there is an entry, Monday, July 22, '02, "Informed me a subpoena --
13:09:46 A. Yeah.
13:09:46 Q. -- and attachment."
13:09:48 A. Yup.
13:09:49 Q. That's Larry again?
13:09:50 A. Yup.
13:09:51 Q. "For doc production from Cargill to depose me was forthcoming."
13:09:54 A. Yup.
13:09:54 Q. "Said I should toss records or documents before." That's Mr. Schaefer?
13:09:58 A. That's correct.
13:09:59 Q. "Call his office, etc., with questions or for assistance," correct?
13:10:04 A. When I receive the subpoena.
13:10:09 Q. So Mr. Schaefer called you on July 22nd and instructed you to toss records or documents before a subpoena was served. Is that right?
13:10:17 MS. COLER: Objection, leading.
13:10:23 THE WITNESS: Yes.
13:10:30 BY MR. KLAAS:
13:10:30 Q. All right.
13:10:32 A. There was a --

13:26:26 at that time.

13:26:27 Q. And you were the, you and Bill Britt, as I
13:26:29 understood it, were the point people for Cargill
13:26:31 during that?

13:26:32 MS. COLER: Objection, leading, assumes facts
13:26:34 not in evidence, vague.

13:26:37 THE WITNESS: Well, yeah. Bill Britt and
13:26:38 I -- Bill Britt was, yes, Bill Britt was the
13:26:41 lawyer in the law department who worked in the
13:26:42 employment law or EEO area, and I was the EEO
13:26:46 manager, and we were able to work with the Dorsey
13:26:53 lawyer, the lead attorney was Hobbins, Bob
13:26:57 Hobbins.

13:26:57 BY MR. KLAAS:

13:26:58 Q. And Ron Brown?

13:26:59 A. And Ron, yeah, right.

13:27:01 Q. Now, let me ask you, during those years yourself,
13:27:05 Mr. Douglas, as corporate EEO manager, would
13:27:08 you -- I mean, you're the point person then for
13:27:11 Cargill's EEO and affirmative action efforts?

13:27:15 MS. COLER: Objection, vague.

13:27:16 THE WITNESS: When you say point person --

13:27:18 BY MR. KLAAS:

13:27:18 Q. Yeah.

13:27:20 A. My responsibility was to carry out those things

15:34:18 think it was Nancy that pretty much shot down the
15:34:21 proposal that she had brought forward, and whether
15:34:27 it was -- I don't think it was a final proposal,
15:34:29 it was just a first draft or a second draft, but
15:34:35 it was, it was something that pretty much knocked
15:34:39 all the air out of her sails; and from that period
15:34:44 on, she just kind of did her little job and was
15:34:48 looking for a way, for another place to be, and
15:34:51 ended up leaving and went to work for
15:34:53 General Mills, where she is now.
15:34:57 Q. When you say, at the end of this e-mail of
15:35:00 November 2, 2000, that you are beginning to
15:35:06 exhaust the list of potentials.
15:35:08 A. Of potentials, yup.
15:35:09 Q. Those are potential plaintiffs for the lawsuit?
15:35:12 A. Yes.
15:35:13 Q. Was there an actual list, or is this just a list
15:35:16 of people that you have in mind or --
15:35:17 A. Well, these are people that, you know, I'd talk to
15:35:20 X, and he'd tell me about W, and W would tell me
15:35:23 about, well, not WW, but X, Y, Z, you know, I'm
15:35:29 talking variables here, so you know, from building
15:35:32 to post, I'm like a pinball. You know, did you
15:35:35 talk to so-and-so. Did you talk to Ron Wright,
15:35:38 you know, Ron Wright really got a raw deal, and so

15:56:16 this whole thing. But he went from sugar to shit
15:56:20 in a course, overnight. He couldn't do anything
15:56:23 wrong for about a week, and then he couldn't do
15:56:26 anything right for the rest of the time he was in
15:56:28 the division. What happened, I don't know, but
15:56:33 that's what happened.

15:56:35 John Graves ended up out in California, and I
15:56:39 talked with John, and he just said he was going to
15:56:43 do something else.

15:56:45 James Bady is still there. He's working, the
15:56:49 last I talked to him, he's working in flour
15:56:53 milling as a business analyst or consultant
15:56:57 from -- they call it SPD?

15:57:01 Q. Uh-huh.

15:57:01 A. Strategic -- SBD, isn't it?

15:57:05 MS. COLER: Yes, B.

15:57:06 THE WITNESS: Business development or
15:57:08 whatever.

15:57:11 BY MR. KLAAS:

15:57:11 Q. When you say that on page 100310, Deposition
15:57:16 Exhibit 5, that James Norton has "no interest in
15:57:19 participating in the party," what is it you're
15:57:21 referring to?

15:57:23 A. That as a class member or in the party in terms of
15:57:27 being a named plaintiff or relating any of what he

15:57:33 experienced to Sprenger Lang.
15:57:39 Q. The next page in Deposition Exhibit No. 5,
15:57:42 Mr. Douglas, it's 100311, appears to me to be an
15:57:48 e-mail from you to Mr. Schaefer, copied to
15:57:52 Mr. Reed, dated December 15, 2000, at 1:15 p.m.
15:57:58 Do you see that?
15:57:58 A. What's the number?
15:58:00 Q. RBD 100311.
15:58:04 MS. COLER: It's the one you've got up there.
15:58:06 THE WITNESS: This?
15:58:08 MS. COLER: Yeah.
15:58:08 BY MR. KLAAS:
15:58:09 Q. It's one of the shorter ones. About Catherine
15:58:13 Page?
15:58:13 A. Yup.
15:58:17 Q. Now, I take it your recount -- and take a second
15:58:21 to look that over, take as long as you want to
15:58:23 look it over, but what I want to ask you about is
15:58:25 your recollection of your conversations or
15:58:28 conversation with Ms. Page.
15:58:48 A. Right. What about it?
15:58:51 Q. Well, first, I get what you say is, quote, "While
15:58:54 not expressing any feelings of having been
15:58:56 subjected to overt employment discrimination, she
15:58:59 did express a sense she was possibly not fairly

15:59:02 compensated when I broached the pay issue with
15:59:05 her," close quote. Do you see that sentence?
15:59:09 A. Yup.
15:59:10 Q. So is that an accurate reflection of the way your
15:59:14 conversation with her went?
15:59:27 A. Yes, yeah.
15:59:28 Q. And then again, she's, you think, "a good
15:59:31 candidate to join the 'party.'" And this is the
15:59:35 lawsuit, as a named plaintiff?
15:59:38 A. That's correct, that is correct.
15:59:40 Q. Now, you indicate that "she is significant --" do
15:59:43 you see at the end here?
15:59:44 A. Right, right, right, yeah.
15:59:46 Q. "She is significant because of her employment in
15:59:49 Cargill Steel & Wire, which is a part of
15:59:51 North Star Steel, a subsidiary of Cargill. If she
15:59:54 joins the 'party' it would bring North Star into
15:59:56 the action, which was not the case in Foster,"
15:59:59 close quote?
15:59:59 A. That is correct.
16:00:00 Q. What is it you're talking about here?
16:00:02 A. I'm saying that in the Foster lawsuit, the
16:00:05 subsidiaries of Cargill were not included in the
16:00:15 action, in the litigation, in the complaint, nor
16:00:21 were they considered technically in the consent

16:00:22 decree.

16:00:23 Q. Because they weren't members of the class or because the --

16:00:27 A. No. They were subsidiaries. Cargill -- is Hobbins still here?

16:00:32 Q. Yes.

16:00:33 A. Ask him. He argued that the four people, the named plaintiffs who brought the action, the Foster action, were all employed in Cargill, Inc., businesses. Okay? And that subsidiaries had, at that time, had their own, I believe, boards of directors and were operated independent, to a greater degree, independent of Cargill, Inc., than Cargill, Inc., okay, nonsubsidiary product lines. And on that basis, the subsidiaries of Cargill, Incorporated, i.e., CIS, North Star Steel, and whatever others that may have been subsidiaries at that time, I can't think of what, of the other ones, there were some, were not a part of the litigation.

16:01:51 In other words, those employees that, the putative class, was not, those employees, those black employees, and there were women in those businesses, were exempt from the terms of the consent decree, I believe.

16:23:32 record. That's not a fact-finding, and I think
16:23:34 counsel is testifying to a certain extent.
16:23:36 BY MR. KLAAS:
16:23:36 Q. Was he right about that?
16:23:38 A. That I have what?
16:23:39 Q. Was the Judge right that you have extensive
16:23:41 knowledge of Cargill's litigation strategy?
16:23:44 A. I wish the Judge would pay me on that basis.
16:23:47 Q. Uh-huh.
16:23:50 A. I have extensive -- I don't know what extensive
16:23:53 means. I have knowledge of Cargill's litigation
16:23:57 theory, basis Foster, and basis EEO-related
16:24:02 actions that I participated in. That doesn't mean
16:24:05 all of them, but those that I participated in.
16:24:07 Yes, that is correct.
16:24:08 Q. And is that what then informs your thinking all
16:24:13 along, contrary to many others, that Cargill has
16:24:15 elected to fight?
16:24:22 A. Yeah. Well, that wasn't -- you know, Foster is a
16:24:27 one-time event, but just based on charge responses
16:24:31 and where we've had other problems with things
16:24:33 possibly going to litigation, where there was an
16:24:38 opportunity to settle short of the next step, you
16:24:44 know, there have been cases, but they have been
16:24:47 few and far between. Cargill has moved to not,

16:24:55 chosen not to settle these and to move forward
16:25:11 with the litigation.
16:25:13 Q. In the second paragraph, and, you know, take a moment to look it over, if you want to, it appears to me you're identifying audiences where Cargill --
16:25:26 A. Right.
16:25:26 Q. -- is likely to be tender.
16:25:28 A. Right.
16:25:28 Q. And I'm looking at --
16:25:30 MS. COLER: I'm sorry, I didn't hear your sentence.
16:25:32 BY MR. KLAAS:
16:25:33 Q. It appears to me you're identifying audiences where Cargill is likely to be tender in your October 23, 2001, e-mail.
16:25:40 A. Correct.
16:25:40 Q. Can you describe your thinking there? I mean, we can read the words, but what is your thinking there?
16:25:46 A. My thinking there is that if you go to Cargill's website, if you look at the issues of Cargill News that I get, which is I guess every other month, increasingly Cargill is becoming a value-added ingredient supplier to major beverage and food

RECEIVED MAY 2 1 2004



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

---

Arnold, et al.,

Plaintiffs,

vs. Court No. 01-2086 DWF/AJB

Cargill, Inc.,

Defendant.

---

VIDEOTAPED DEPOSITION OF
R. BILL DOUGLAS

VOLUME II (Pgs. 234-388)

Taken May 10, 2004

Commencing at 9:46 AM

COPY

REPORTED BY: ELIZABETH J. GANGL, RPR

PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER, 527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402-1331
612/339-0545 * 1/800/545-9668 * Fax: 612/337-5575

recall when I received it, but since my situation with my, with my wife, this has been the last thing on my -- hasn't even been on the list, so ...

Q. Did you ever watch the videotape?

A. Part of it.

Q. Okay.

A. I don't think I'm going to get an academy award, but it's interesting.

Q. Yes, yeah. The other catch-up question I wanted to ask you before we get into further substantive questioning is whether you have found any additional documents that were responsive to the subpoena? I know you were thinking about that and there was some --

A. Well, I looked -- I lost the, I had a portfolio, leather one, a black one when I was here last?

Q. Um-hum.

A. And I think I shared any documents that were relevant at the time with you then.

Q. Yes.

A. And for whatever reason, I had some other documents in it that were unrelated to this that I was trying to locate, and I have not been able to find my portfolio. So I think I even asked you or

Q. -- take a look at that and I want to ask you, it appears to be report of a telephone conference with you --

MS. COLER: I'm going to object to counsel is testifying. You can ask him if he recognizes the handwriting. Otherwise --

A. I don't recognize --

MR. KLAAS: Your objection is stated and be quiet.

BY MR. KLAAS:

Q. What do you have to say?

A. Well, I don't recognize the handwriting.

Q. No.

A. It's not mine.

Q. I'm told it's Larry Schaefer's.

A. I don't know whose it is.

Q. But why don't you take a look at that document and then we'll determine whether you can help us.

MS. COLER: Same objection, assumes facts not in evidence.

A. What am I looking for?

Q. I want to ask you if you recall having a conversation with Mr. Schaefer on or about February 24th of 2003 in which you told Mr. Schaefer

that you believe he had breached your trust?
A. Yes.
Q. And do you recollect why you felt that way as of February of 2003?
A. Well, it relates back to the handling of those documents, the, the -- and the way that he came at me when, when I believe you or Dorsey had, the court or someone, had requested that he produce those documents, or those documents got into production for the, for the record.
Q. Um-hum.
A. And that's in my, I think, earlier deposition. The phone conversation, the initial phone conversation, when we finished it was like, you know, good luck and call me if, you know, they contact you kind of thing, and just kind of left me in the, in the wind twisting.
Q. Um-hum.
A. As it says here.
Q. Yeah. Okay. Now --
A. Well, that doesn't relate to -- our conversation, yeah, this is a conversation. I told him essentially the same thing. And I also talked to Duane about this as well. So I mean it's, yeah, and, and looking at these words, yeah, that sounds like

were less than the documents that you delivered to Sprenger & Lang?

A. No. Not that I recall.

Q. Okay. Earlier in this page of your notes, the portion of Exhibit 4 that's before you, Mr. Douglas, there is a reference dated July 22nd of 2002 in which Mr. Schaefer informed you that a subject and attachment for document production from Cargill to depose you was forthcoming and said you should toss records or documents before that. Did you do that? Did you toss some records or documents before --

A. Yes.

Q. -- the subpoena arrived?

A. Yep.

MS. COLER: I'm going to object that you're assuming facts not in evidence the way you're -- the document speaks for itself.

Q. Did you, can you give us some idea as to how many documents or records you tossed after July, this conversation on July 22nd of 2002?

A. How many? No. There were several. There were two -- no, I can't tell you exactly how many, but I would say there were several that I did, I just tossed.

him what I felt about what had happened and how it happened and that it was bullshit.

Q. Um-hum.

A. You know, and it was just, you know, it was one of those things, and what he, you know, to the extent he talked to Larry about it or what he said to Larry after that, I don't know. I mean he didn't tell me.

Q. Do you, did Mr. Reed participate at all in the --

A. No.

Q. -- tossing the documents --

A. No.

Q. -- or know that that was going on?

A. No.

Q. All right.

A. Well, he may have known it was going on but he didn't, no, you know, he didn't toss one and I tossed one, that kind of thing.

Q. Right.

A. No.

Q. Okay. How physically did you toss the records? I mean just throw them in the trash or just shred them or what happened?

A. The city provides trash receptacles, and I

just tossed them in there.
Q. Um-hum.
A. And there weren't that many more. I mean there was some, but it, the number I tossed were not the same number that I had -- they had, okay? Somewhere, somehow some documents didn't get back to me.
Q. Did you toss everything that Sprenger & Lang returned to you?
A. For the most part my recollection is yeah.
Q. But as to particular documents or types of documents or categories or subjects, you just can't tell us what was in there?
A. No -- well, no, no. But from what he told me, he made a copy of everything and gave you, I guess Dorsey, a copy of everything that he had that I had given.
Q. Um-hum. Do you know whether documents concerning CDLP or pay ranges or selection grids or PMP were in, among the group of documents that you tossed?
A. I can't say.
Q. Okay.
A. With any certainty.
Q. And do you know whether the documents --

instructions and that whole career development stuff.

Q. Um-hum.

A. There was something else. I can't -- I don't know if, if you mention it or if I run across it, it'll jog my memory. There was something else, too. But there were four, three, four, half a dozen maybe -- there wasn't half a dozen, less than a half a dozen -- key programs or initiatives going on that we initially sat down and talked about, and KEIS and the selection grid, PMP. I think the ranges, salary classes.

Q. Okay. Well, what I'm trying to figure out is you indicated earlier that you had a bunch of documents at home, some were privileged, some weren't, you spoke with Mr. Schaefer --

A. Right.

Q. -- he said bring them down, they'd go through them?

A. Right. Well, yeah, and I said I got, you know, I got a lot of stuff here that, that, some of which is privileged, some of which is, you know, is not, and I said I need to sort through this. And this is after the first meeting we had with, discussing the documents that I was talking about, the key documents, whatever you want to call them,

the first set. And I guess, I don't know, I wasn't, this wasn't a, this was at a time that it wasn't on my, you know, top priority list, and I don't know if I wasn't going fast enough or whatever, but I had a lot of documents and I, then I came down, I had some in the back of my truck, and there were some folks there that went and got them and, out of my truck while I was there talking with Larry, meeting with Larry, and that was the second set. And then a courier came out and got some more at least once, maybe even more than that, but I know at least once.

Q. All right, and then --

A. Or maybe twice. Or whatever.

Q. All right. So did you ultimately deliver privileged documents to Sprenger & Lang?

A. Yes.

MS. COLER: Objection to the extent it calls for --

Q. And did --

MS. COLER: Let me make my objections. Objection to the extent it calls for a legal conversation at to what constitutes privileged documents. Foundation.

Q. Did Sprenger & Lang return the privileged documents to you?

MS. COLER: Same objection.
A. Let me put it this way. I provided Sprenger & Lang documents that had "privileged" and "confidential" written on them.
Q. Right. And did Sprenger & Lang return those documents to you?
A. Some of them.
Q. And some of them did they fail to return them to you?
A. Well, I don't know. I mean, like I said before, I would put it in these terms. I provided a group of documents that if you measured them were this big (indicating), okay?
Q. Like a foot?
A. And what I got back it was, okay (indicating) a lesser amount. Maybe they compressed them. I don't know. But they weren't the same volume, the two different sets.
Q. And so to your knowledge did Sprenger & Lang return all the privileged documents or the documents marked privileged and confidential or don't you know?
A. I can't, I can't say. They returned, I'm sure they returned some of them. You know, some of that stuff was like, you know, old charges of, responses to charges of discrimination.

Q. Right.
A. Some was correspondence with the law department.
Q. All right. And do you know whether all of the correspondence with the law department at Cargill was returned to you?
A. I can't say.
Q. And do you know whether you tossed some of the correspondence --
A. I'm sure I did.
Q. -- with the law department?
A. Right.
Q. That got tossed?
A. That with whatever else I had in there.
Q. Okay. So at least some of the documents are privileged, or marked privileged and confidential are delivered to Sprenger & Lang, returned to you and then tossed?
A. Right.
Q. Okay. When -- now this deposition itself has been scheduled several times, I guess, to everyone's dismay.
A. Right.
Q. Do you recollect receiving a letter from Mr. Schaefer about the deposition itself and

Q. Did you show this letter to anybody?
A. Not to my knowledge.
Q. Okay. In the paragraph, and you're on the correct page I see, in the paragraph just below the reference to February 24, 2003?
A. Um-hum.
Q. Why don't you take just a second and read that paragraph?
A. "In addition to the consultation"?
Q. Yes, that paragraph, sir.
A. (Examining document.) This is more BS. Yeah.
Q. The BS is in the last sentence?
A. Yeah, exactly.
Q. When -- do you know Ron Garrus, or of Ron Garrus?
A. Ron Garrus. Yeah, he worked at -- I don't know him. I know of him. I know he may have been at a little thing that they gave for me at my retirement. But, no, I -- other than that I don't know him personally.
Q. The last sentence of that paragraph states, quote, "It is our position that you are a potential class member in this case who, despite having signed a release, may be eligible" --

A. Right.
Q. -- "and elect to participate in class-wide relief should this be awarded by judgment or settlement," close quote.
A. Right.
Q. Now how did you learn that that was BS?
MS. COLER: Objection, assumes facts not in evidence. Calls for a legal conclusion.
A. How did I? Okay. Well, I'm not a lawyer, thank God. I'm a lot of things, and -- no offense to anyone here who happens to be a lawyer per se. In the complaint it's drawn at salary class 15, if I'm not mistaken. I was in a salary band which is above salary class 15, and it dawned on me that unless I could find a way to get into salary class 15 I wasn't a part of this, this action, I wasn't in the choir. I don't know what -- what was the date that the complaint was in, filed? Because there were a lot of drafts to that complaint floating around that I looked at at different times, but when -- I don't know when it was filed, the date. That's a question I have. It would have, it would have, and I didn't know, I didn't know what the final complaint was until I went on the, their Web site, the Cargill, what they developed, the Cargill litigation Web site.

privileges," close quote. Now do you recollect any such statement from Mr. Schaefer to you?

A. Well, I'll put it this way. The words ring true, or familiar, but I didn't hear them in the form of any kind of a declaration as this is stated, if you get my drift. (Examining document.) Well, I put it this way. I, this was talked about, but it wasn't as definitively declared as it's stated in this item, paragraph 5.

Q. All right. There's another reference to this topic, and let me, let me just show that to you and then I'll ask you globally what you remember. It's at, it's in paragraph 12, it's on page 6 of Mr. Schaefer's declaration. In paragraph 12 you'll see he's discussing the return of the documents that you sent over to Sprenger & Lang, and that paragraph concludes, quote, "I informed him," that is Mr. Schaefer informed you, "that we were returning these documents and asked him why they were produced to the firm, given our previous instruction about not providing privileged information. Douglas explained that he had never intended to violate this instruction by providing these documents, but that he simply produced all documents in his possession that related to his prior employment without reviewing him

against this instruction. He promised that this would not happen in the future, and he had no intention of ever sharing these documents with anyone else," close quote. Do you see that reference?

A. Yes.

Q. Now did that happen?

A. Well, let me take this, deal with this piecemeal. One, the documents, any documents that were returned to me were not returned to me by December 2001. Number two, the next sentence, no, I don't recall any of that, Douglas never intended to, no, no, that's not so.

Q. Let me make sure. The sentence --

A. No, I'm just saying "Douglas explained that he had never intended to violate this instruction by providing these documents, but that he simply produced all documents in his possession that related to his prior employment without reviewing them against this instruction."

Q. I guess what I am asking you --

A. No.

Q. Are you providing documents to Sprenger & Lang contrary to their explicit and adamant instructions that you do so for some reason we don't understand, or are you complying with their

instructions?
A. Well, I put it --
MS. COLER: Objection, assumes facts not in evidence.
A. I put it this way. I brought some documents.
Q. Right.
A. And -- there. And after several months, more than is indicated in this paragraph preceding this one, whatever it was, 5, I had to initiate contact to try and get them back. So you draw your own conclusion.
Q. Right.
A. No, I, I -- this, this didn't happen to me. And there was no admonishment or anything resembling that about me having provided documents that I had been told previously shouldn't be provided.
Q. Okay.
A. On the contrary. I was invited to bring all the documents, including those that were privileged, to Sprenger & Lang's office and help and/or assist, and a space or place to sort through them.
Q. In paragraph 20, which is at the top of page 9, there's reference then to an oral communication. I want to ask you about that also, Mr. Douglas. Do you see paragraph 20, "Apart from inadvertently

still at Cargill is when I initially heard about it, and I also heard about it after that, and at one of the meetings or more than one of the meetings, and from the individuals that were at meetings at Sprenger & Lang.
Q. You heard about it from Duane Reed or others?
A. Duane, Beverly, those two for sure maybe. Other folks as well. I'm not sure.
Q. Um-hum. Is this a statement that you heard Mr. McMillan make?
A. No. Secondhand, thirdhand. I did not attend that meeting.
Q. Do you know anybody who did?
A. Beverly and Duane did.
Q. Did they say so?
A. Yeah.
Q. This document, Exhibit 13, the interview summary of November 27, 2000, concludes with a paragraph again about the documents. It says, quote, "Bill has a box of documents from his days at Cargill."
A. Um-hum.
Q. "He said that he needed to start looking through them. I encouraged him to do so, and we agreed that he would pass on to us anything that he

thinks might be of interest." Do you see that?
A. Right.
Q. Did Mr. Shulman tell you make sure you separate out those privileged documents and don't bring them to us?
MS. COLER: Objection, leading, assumes facts not in evidence.
A. Not to my recollection. No, not to my recall he did not.
(Douglas Deposition Exhibit No. 14 marked for identification.)
Q. Mr. Douglas, this is Deposition Exhibit 14, again a document given to us by Sprenger & Lang. Why don't you take a moment, it's short, and read it over.
A. (Examining document.) Okay, my mother-in-law. Okay. Okay. So this is in December. Okay.
Q. Now this appears on its face to be an e-mail message from Patty Jones to Larry Schaefer and Sara Madsen dated December 22, 2000. Do you see that at the top?
A. Right.
Q. And I think this is where I got the impression that you may have had some documents at

brought home, those documents that I had at home over, accumulated at home over time for the most part, and that was, yeah, and that was it. And the documents that I finally selected to, or chose to pull out of there were the grid, CDL, the Cargill leadership development thing, the KEIS selection grid, pay grade sheet, PMP, there may have been something else. Yeah. Those, those were the first of the initial documents that, or documents relating to those, those things that I, that I pulled.

Q. All right. Well, here ultimately is what I want to know, Mr. Douglas. We've been told by Mr. Schaefer and others that privileged Cargill documents were delivered to Sprenger & Lang, they blame you, they say it was contrary to instructions, and that they criticized your behavior. Now my question is is that true or not true?

MS. COLER: I'm going to object as assuming facts not in evidence, and counsel is testifying and the records say what they say.

MR. KLAAS: Well, that's what they say.

MS. COLER: Assumes facts not in evidence.

THE WITNESS: That I brought

documents --
BY MR. KLAAS:
Q. It's all your fault.
A. -- privileged documents to their door against their wishes, and after having done that was admonished or criticized for having done so?
Q. That's what they say. Is that true or not true?
A. Well, not to me it isn't true, no.
(Douglas Deposition Exhibit No. 15 marked for identification.)
Q. Mr. Douglas, this is Deposition Exhibit No. 15.
A. Yep.
Q. A document provided to us by Sprenger & Lang. Would you take a moment and take a look at it? It's author, I'm told, is Mr. Schaefer.
A. Yeah, we were talking about Steve Euller is now the general counsel, that's what he said. And I didn't know that at the time. Is Steve Euller the general counsel now at Cargill?
Q. He is.
A. Okay. And that was a surprise. What's it say on top?
MS. COLER: I'm sorry, is there a

you.
A. Go ahead, I'm sorry.
Q. Is it your testimony, Mr. Douglas, that you claim that Mr. Schaefer told you to toss documents after he had already told you that Sprenger & Lang had produced them to Cargill?
MR. KLAAS: Object to the form of that question.
Q. You can answer.
A. Yes. To the best of my knowledge, yes.
Q. And can you tell us, to the best of your recollection, Mr. Douglas, what you claim are the precise words that Mr. Schaefer said to you with regard to what you should do with documents?
A. He just said that, that, that the documents had been turned over to Cargill that I had provided him, that he had no choice, somebody inadvertently -- how in the hell are you going to inadvertently copy three or two boxes of records? You got to be sleepwalking or on drugs or both. And that, as a result of that, they had a, that Sprenger and Dorsey -- Sprenger & Lang had retained copies of all these documents, inadvertently copied and voila, they had to be, you know, when they found out about it, I guess this board of responsibility or somebody was

contacted or whatever, and/or Cargill had made a request or found out, and that they had to be turned over. Now I don't know when they were turned over.

Q. But you knew they had been turned over before Mr. Schaefer called you, is that correct?

A. Well, yeah, and I say that here. He gave me a heads-up that he would be sending or had sent, I guess it would be sending to Cargill, but the decision that, and I may have been wrong there, they may have already gone, I don't know, and Dorsey and Sprenger & Lang would know that. But, like I said, the deal was a done deal. When I got the news, by the time I got the news it was a, it was a done deal, and then I got the other call, the subsequent call about having to be deposed and.

Q. I'm going to stop you right there --

A. Yeah.

Q. -- Mr. Douglas. My question is what precise words do you recall, or do you claim Mr. Schaefer said to you with regard to what you should do with those records?

A. Toss the records. Get rid of them.

Q. Okay. Is it possible that Mr. Schaefer said to you words to the effect that you should not have had those records in your possession?

A. No.
Q. Now you testified that the documents you tossed were old documents, Mr. Douglas. How old were they?
MR. KLAAS: Object as mischaracterization.
A. Well --
Q. Have I mischaracterized your testimony?
A. I don't know. I've forgotten what I've said.
Q. All right. Were they old documents that you tossed?
A. So I'm either lying or just have a bad memory, or a little of both. But to the best of my knowledge, they, they were documents that, that at that time, and I don't know if I got any, at that time, by that time I guess all the documents I had gotten back I had, were it, and I don't think I got any after, after that. I don't know if they were, I don't know what old is, but they were the documents that were in, in the, I know the second set and the, and the, whatever, the third set. I think I had identified three sets of records. They were the records I had gotten back from Sprenger & Lang.
Q. Okay. So any of the documents you had tossed were records you had gotten back?

A. For the most part, right.
Q. All of them? Did you have any documents that you hadn't gotten back from Sprenger & Lang?
A. Well, if I gave them to him, and didn't get them back, I can't have them.
Q. Okay. And you don't recall the nature or the age of any of those documents, is that correct?
A. No. (Shakes head.)
Q. That's correct?
A. Yes, that is correct. No, I don't.
MS. COLER: I'm finished. And Mr. Schaefer has a few questions for you.
MR. KLAAS: Local rules are one lawyer per witness, but I won't insist on it on this occasion.
MS. COLER: Thank you.
MR. KLAAS: Nonprecedentially.
THE WITNESS: Which president?
MR. KLAAS: Precedent.
THE WITNESS: Oh, precedent. I thought you said presidential and I'd say, really, George Bush? 41 or just the current one?

EXAMINATION

BY MR. SCHAEFER:
Q. Mr. Douglas, when did you stop being the