EXHIBIT P



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

RODERICK ARNOLD, NII-AKWEI ACQUAYE, SEAN ALLEN, HOLLIS BRANHAM, TOYA BROWN, DAWN COLLINS, LOUIS DARDEN, DELLA DICKSON, VIRGINIA DOUGLAS, RONALD GARRUS, MARGO HARVEY, CHENETA HUGHEY, JACQUELINE JENKINS, KEITH LEWIS, VALERIE MASON-ROBINSON, MICHAEL MITCHELL, PHYLLIS REECE, TONYA ROSS, CHARLES SCOTT, CLINTONIA SIMMONS, TAUSHA TATE, EMILY TYLER, JACQUELINE WILLIAMS, CHERYL WILLIS, SEAN WRIGHT, )

Plaintiffs, )

)

vs. )Civil File No.

)01-CV-2086

)(DWF/AJB)

CARGILL, INCORPORATED )

Defendants. )

The deposition of CANDY SMITH, taken in the above-entitled cause before Diane Hromek, Certified Shorthand Reporter in the State of Illinois and Notary Public within the county of DuPage, at Marriott Suites O'Hare, 6155 North River Road, Rosemont, IL 60018, on April 2, 2004, at 9:00 o'clock a.m.

PRESENT:

SPRENGER & LANG PLLC
BY: MS. TERESA PATTON
325 Ridgewood Avenue
Minneapolis, MN 55403
Telephone: 612-871-8910
Fax: 612-871-9270
Appeared on behalf of the plaintiffs.

DORSEY & WHITNEY LLP
BY: MR. DAVID LAUTH, #014552X
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: 612-340-2600
Fax: 612-340-2868
Appeared on behalf of the defendant.

A. No.

Q. Okay.

When did you first have any communication with anyone from Sprenger and Lang about this lawsuit or about potential claims against Cargill?

A. Last year.

Q. Do you recall when last year?

A. No.

Q. Spring, summer, fall?

A. Fall.

Q. And what was that communication, phone call? Face to face meeting?

A. Phone call.

Q. And did you call someone at Sprenger and Lang or did they call you?

A. I was contacted by Sprenger and Lang.

Q. Who was it that called you?

A. Laurie Bulheim.

Q. Laurie, what was the last name?

A. Bulheim.

Q. Okay.

Up until yesterday, when you made arrangements to have Sprenger and Lang represent you, did you have any other communications with Sprenger and

covered everything that you can remember that was said by you or Laurie during this first phone call so my question is what else Laurie said to you and what else you said to her during this first phone call.

A. Again, she mentioned that Cargill was in some kind -- was in a disriminatory lawsuit and if I would be willing to answer any questions since I had been an employee of Cargill.

Q. All right.

And I'm not trying to repeat things that we have already talked about, I just want to make sure that you have told me everything that you can remember during that first phone call. Is there anything else that you haven't told us already?

A. No.

Q. When was the next time that you had any communication with anybody from Sprenger and Lang?

A. I was contacted in the fall. She may have contacted me maybe three or four weeks later.

Q. And the "she" again is Laurie?

A. Laurie Bulheim.

Q. And was that another time when she called you on the phone?

A. Yes.

Q. All right. What was said during that conversation?

A. To go over information about me being an employee. Again, my duties, and just to make sure to recap everything that I mentioned on the first phone call.

Q. Did she explain why she wanted to do that?

A. Yes.

Q. What was the explanation?

A. To have it documented.

Q. To put into a written statement?

A. Yes.

Q. This second phone call that we are now talking about, I assume that, again, was just you and Laurie on the phone?

A. Yes.

Q. Do you remember how long that conversation took?

A. That may have taken maybe another 45 minutes to an hour.

Q. And part of that was her going over the information that you had mentioned to her in your first phone call?

A. Yes.

Q. What else did you and Laurie talk about?
A. My duties as a receptionist, promotions, other African-Americans that may have been upset within their jobs.
Q. And did you identify it by name, any other African-Americans who you felt were upset in their jobs?
A. Yes.
Q. Who did you identify?
A. Emily Tyler, Kennedy Jones.
Q. Anyone else?
A. I can't recall the other names at the moment.
Q. You think you did mention other names but you can't recall who they were?
A. Yes.
Q. During this second phone call that you had with Laurie, was there any discussion about the possibility of you joining the lawsuit?
A. No.
Q. Was there any discussion about the possibility of you retaining Sprenger and Lang as your lawyers?
A. No.
Q. Now, you said that the conversation was, perhaps, 45 minutes to an hour. Do you recall what else you talked about during that time?

A. Some of the managers that I had interviewed with, what happened in the interview.

Other people that were promoted, maybe what their positions were at that time before their promotion.

Q. Other people who had been promoted?

A. Yes.

Q. And do you remember who, by name, you talked about?

A. One individual, Laurie Keever.

Q. Do you remember anyone else you mentioned by name?

A. Pam Bednarz.

Q. Anyone else?

A. I can't recall right now.

Q. Anything else you recall talking about in this second conversation that we haven't discussed now?

A. I can't recall.

Q. If I back up a minute to the first phone call that you had?

MS. PATTON: David, was there an answer? Because I didn't hear anything. I wasn't typing.

MR. LAUTH: Nothing she recalls.

MS. PATTON: Okay.

You know what, I don't know what we are going to do because, obviously, I have to be able to hear my client if I am going to defend her deposition, so I don't know if we are going to have to meet again with an extension phone with her or not, but I hear dead silence. Maybe there is a better speaker phone.

MR. LAUTH: Can you hear me okay?

MS. PATTON: I can hear you fine, but I just can't hear Candace.

MR. LAUTH: Okay. Well, I can get it maybe a couple inches closer to her, and maybe ask her to speak up, I guess.

MS. PATTON: Can we go off the record a second?

(Discussion off the record.)

BY MR. LAUTH: Can we go back on the record.

Q. If we go back to that first phone call that you talked about with Laurie, what was your understanding at the end of the phone call as to what might happen next as far as any communications with you and Sprenger and Lang? Did she tell you that she was going to call you back three or four weeks later?

A. Yes, she did.

Q. Okay.

Now, if we fast forward back to the second phone conversation that we have been talking about, first of all, is there anything else you recall that was said? I think I asked you that and you said no, you have told us everything you can remember?

A. That I can recall, right now.

Q. Okay.

How was it left at the end of that phone call as to whether there would be any further contact between you and Sprenger and Lang?

A. Can you repeat the question?

Q. Sure. I am trying to understand how the phone call ended. Did you expect that there would be some future contact and, if so, what did you expect to happen?

A. I expected that there would be some future contact that she, the information that Laurie and I had discussed. It was going to be drafted into a document. I was going to review the document and make sure that there were any -- if my education was like the wrong education or like she said, wrong school, I would make a change on the document and after that sign my name out and send it back to her.

Q. Okay.

Did, at some point then, you receive a written draft of a statement for you to sign?
A. Yes.
Q. When did you receive that?
A. That may have been after -- after the second phone call.
Q. And did you make any changes to that draft statement before you signed it?
A. Yes.
Q. What changes did you make?
A. I graduated with my bachelors from Concordia University in River Forest, and I think it was like Concordia in New York or something like that. That was wrong.
I graduated with my Associates from Triton College, from River Grove, Illinois, and I think that was a mistake with that.
Q. Do you recall changing anything in the draft statement other than the details of your education?
A. No, I believe everything else was fine.
Q. Have you ever met face-to-face with anybody from Sprenger and Lang?
A. No.
Q. When was the first time that you had any

additional phone contact after the two calls with Laurie that you have told us about?

A. I can't recall.

Q. Let's try it this way: Prior to the time that -- the topic came up of scheduling this deposition?

A. Uh-huh.

Q. Prior to that, did you have any further contact from anybody at Sprenger and Lang after the two phone calls we have discussed?

A. Maybe around December or January.

Q. What happened then?

A. I was contacted by Laurie and she said that I would have to give my deposition.

Q. Okay.

What did she say about that?

A. She said I would have to give my deposition.

Q. And that was in December or January?

A. I'm not sure. It could have been December or January.

Q. Did she explain why you would have to give a deposition?

A. I don't -- I can't recall that.

Q. How long did this third phone call with Laurie take?

A. Maybe about five minutes -- five or ten minutes.

Q. Was anything else discussed other than the fact that you would have to give a deposition?

A. No.

Q. And when was the next time you had any communication with anybody from Sprenger and Lang?

A. Maybe sometime in February.

Q. And what happened then?

A. Laurie mentioned that I was going to be subpoenaed.

Q. This was another phone call from Laurie to you?

A. Yes.

Q. Okay.

How long did this one take?

A. Maybe five or ten minutes.

Q. And was anything else discussed other than the fact that you would be subpoenaed?

A. No. I just had to be present to receive the subpoena.

Q. During these phone calls in December or January and then this one in February you have talked about, was there any discussion about the possibility of you joining the lawsuit as a plaintiff?

A. No.
Q. Was there any discussion about the possibility of you retaining Sprenger and Lang as your lawyers?
A. No.
Q. All right. After the phone call with Laurie in February, when was the next time you had any contact with anybody from Sprenger and Lang?
A. Probably in March.
Q. What happened then?
A. Wanted to make sure if I had been served my subpoena.
Q. Was that Laurie calling you again?
A. Yes.
Q. How long did that conversation take?
A. Maybe five minutes.
Q. Anything else discussed other than the question about whether you had been served?
A. No.
Q. When was the next communication you had with Sprenger and Lang?
A. Maybe the second week in March.
Q. What happened then?
A. I never received a subpoena.
Q. Okay?

And did Laurie call you?
A. Yes.
Q. What was said during that conversation?
A. That Cargill is serving me a subpoena and I need to be present to receive the subpoena.
Q. Anything else said during that conversation that you recall?
A. No.
Q. When was the next contact you had with anybody from Sprenger and Lang?
A. Maybe the third week in March.
Q. Okay. What happened then?
A. That I was going to be receiving something in the mail.
Q. Was this a phone call from Laurie to you again?
A. Yes.
Q. Another short one?
A. Very short.
Q. Anything else discussed?
A. No.
Q. And when was the next contact you had with Sprenger and Lang?
A. This week.
Q. And today being Friday, when was it?

A. Monday.

Q. Okay.

What was that contact?

A. I would have to be present to receive the subpoena and I am going to -- gave me a phone number of someone to contact named Teresa, and this gentleman would be dropping off the package to my job.

Q. And this contact on Monday, that was another phone call from Laurie?

A. Yes.

Q. And any further contact from Sprenger and Lang?

MS. PATTON: Again, I would just like to point out, Candy, that he, Mr. Lauth, is not asking about the content of any of our conversations, but it's okay to tell him when and if we talked.

MR. LAUTH: Please.

BY MR. LAUTH:

Q. Any further communications with Sprenger and Lang after this phone call from Laurie on Monday?

A. Yes.

Q. And when was that?

A. Got another call on Tuesday.

Q. Also from Laurie?

A. Yes.

Q. And what was that conversation?
A. "Did you receive the subpoena?"
Q. Okay. Anything else said during that conversation?
A. "Review the information."
Q. What information?
A. My declaration.
Q. That's what Laurie told you?
A. Right.
Q. Okay.
Anything else said during that conversation?
A. Nothing said.
Q. And what was your next contact with Sprenger and Lang?
A. Next contact, Wednesday.
Q. What happened then?
A. She mentioned to me that I was going to be contacted by Teresa.
Q. Had you asked Laurie whether Sprenger and Lang could represent you in connection with this deposition?
A. No.
Q. But Laurie said what about Teresa?
A. That Teresa would be contacting me at the time

Q. Is that what you received from Sprenger and Lang?

A. Right.

Q. On Monday?

A. Right.

Q. May I see it, please?

MS. PATTON: Hang on a minute.

Candy, would you -- we can go off the record or not, David, it doesn't matter, but I would like to talk to Candy, and I would like her to pick up the phone. I just want to know what is in that package, obviously.

MR. LAUTH: Okay.

For the record, I will certainly allow you an opportunity to talk to her in private, but I think the record is clear that it is something that we are entitled to, so let's go off the record.

MS. PATTON: I may well agree with you, I just want to know what is in there.

MR. LAUTH: Okay, let's go off the record. And I will step out for a minute.

MS. PATTON: Okay -- Thanks.

(Discussion off the record.)

BY MR. LAUTH:

Q. On the record, Teresa, just for the record, I am handing her back, without having looked at it, a cover letter, because it's marked "attorney-client privilege."

MS. PATTON: Oh, geez.

Candy, take that and put it in your handbag or whatever because he is not entitled to have that.

Thank you, David.

BY MR. LAUTH:

Q. For the record, though, may I just know who wrote that letter?

MS. PATTON: Yes.

You can answer that. You can tell him who wrote it and the date.

THE WITNESS: Patty Jones, and that is on March the 24th.

MR. LAUTH: Okay.

BY MR. LAUTH:

Q. You know, Teresa, I have handed it to her to be careful about this because I don't want to intrude where there may have been privileged conversations, but according to her testimony she was not a client of your

firm on March 24th. I think it's probably inappropriate to have the letter marked as "attorney-client privilege."

MS. PATTON: Okay. She wouldn't have retained us for the purpose, she hadn't retained us for the purpose of that deposition that happened yesterday, April 1st, but at the point at which she sought legal advice with regard to her situation at Cargill even if she hasn't formally retained us, so --

MR. LAUTH: Okay, let me clarify something because she has never testified to that.

BY MR. LAUTH:

Q. Miss Smith, prior to yesterday you never had an understanding that Sprenger and Lang were your lawyers, correct? That's where we started out this morning that you said it was yesterday that you reached an agreement with them to represent you?

A. Yes.

Q. Okay. So prior to yesterday you never considered Sprenger and Lang to be your lawyers, did you?

MS. PATTON: Well, that's not the question. The question was was she ever seeking legal advice from us.

MR. LAUTH: I will get there.

MS. PATTON: But don't -- I mean -- I don't want you to answer that question, Candy, because --

MR. LAUTH: Well, let me ask this, then: Prior to yesterday you never spoke with a lawyer at Sprenger and Lang, did you?

MS. PATTON: You can answer that, but it's irrelevant, David. As you know, any representative of our office can generate privilege.

MR. LAUTH: But go ahead.

THE WITNESS: No.

BY MR. LAUTH:

Q. Yesterday was the first time you spoke to a lawyer?

A. Correct.

Q. And you have told me everything that you recall about all of the phone conversations that you had with Laurie prior to yesterday's call, haven't you?

A. Yes.

Q. During any of the conversations that you had with Laurie, you never asked her or anyone else at Sprenger and Lang to provide you with legal advice, did you?

MS. PATTON: Well, you didn't ask her that question before.

MR. LAUTH: I am asking her right now.

BY MR. LAUTH:

Q. In all of those conversations that you had with Laurie, and you have told us everything that you can recall about what was said in all those conversations, you never asked Laurie or Sprenger and Lang to provide you with legal advice, did you?

A. No.

MR. LAUTH: Teresa, with that record, I don't know how you could have sent her a letter last week that is marked as "attorney-client privileged"?

MS. PATTON: Well, okay.

Would you mind deferring this question and I will get the letter itself and is there something else you could ask Candy about?

MR. LAUTH: Well, there are other things I could ask her about.

MS. PATTON: If you wouldn't mind moving on? I need to see the letter.

MR. LAUTH: Okay.

MS. PATTON: Because it might have been -- anyway, I just need to see the letter. I am going to get it right now.

MR. LAUTH: Okay.

MS. PATTON: What's the date, again? What's the date of that letter?

THE WITNESS: March the 24th.

MS. PATTON: Thank you, thank you.

MR. LAUTH: Okay.

MS. PATTON: Well -- David, I have it.

Yeah, you can go ahead and mark that.

MR. LAUTH: Okay -- thank you.

Off the record.

(Discussion off the record.)

MR. LAUTH: Back on the record.

Will you mark that as No. 3, please.

(Deposition Exhibit No. 3 was marked as requested.)

MR. LAUTH: Back on.

For the record, Teresa, we have marked as Exhibit 3, as Smith Exhibit 3, the originals that she just gave me from the Fed Ex package, and the first two pages are the March 24th letter which you told her she can go ahead and give to us.

Then there is a March 18th letter from Ryan Mick of our office with a copy of the deposition

Q. So you received that, but you didn't bring it with you this morning?
A. No.
Q. Yes, you received it? You did receive that "Preparing the witness for a deposition"?
A. Yes.
Q. But you did not bring it with you this morning?
A. No.
Q. Okay.
Prior to yesterday, had you asked anyone at Sprenger and Lang that they would represent you in connection with this deposition?
A. No.
Q. Did someone at Sprenger and Lang tell you that they would represent you in connection with this deposition?
MS. PATTON: Prior to yesterday, you mean?
MR. LAUTH: Yes. I am just wondering how it happened that they are representing you if you never asked to have that happen?
MS. PATTON: You can answer it.
THE WITNESS: Okay.
MS. PATTON: Candy, if you remember.
THE WITNESS: I remember.

I spoke to Teresa yesterday.

BY MR. LAUTH:

Q. Yes?

A. And she mentioned that she would -- that I would have to retain her as an attorney.

Q. Okay.

But you had -- you had not asked anybody prior to yesterday to have Teresa represent you, right?

MS. PATTON: Can you answer the prior question, Candace?

THE WITNESS: Yes.

MR. LAUTH: Can we have it read back, please?

MS. PATTON: Diane, would you mind reading it back?

(Question read as requested.)

BY MR. LAUTH:

Q. I just want to summarize that I understand what your testimony has been, and that is that prior to yesterday you had never asked anybody at Sprenger and Lang to represent you in this deposition but that yesterday Miss Patton told you that you would have to retain Sprenger and Lang as your attorneys, correct?

A. Correct.

Q. Is there any agreement that you are paying

Q. So you did nothing further to pursue a position in sales?
A. No, I did not.
Q. Okay.
Anything else that you ever did while you worked at Cargill to pursue a different job opening within the company?
A. No, I thought one time I thought I was going to be maybe like office assistant with Harriet, but that never came.
Q. Meaning that no opening ever became available?
A. Right, because I had started looking for a job, another job.
Q. Outside the company?
A. Correct.
Q. Okay.
A. And nothing ever happened.
Q. So, when you talk about the position as an assistant to Harriet, am I understanding correctly that you hoped that there might be such a job open but it never happened?
A. Correct.
Q. Okay, so nobody else was hired for a job like that, either, while you were at the company?

A. No.
Q. Okay.
A. It was --
Q. Okay.
With respect to the two jobs that we talked about, No. 1, the Computer Help Desk job, and No. 2, the HR job, did you feel that your race had anything at all to do with the fact that someone else was selected for those positions?
A. Kind of sort of like.
Q. Okay, kind of sort of like.
Explain to me what you mean by that.
A. Being a receptionist I noticed a lot of different things that happened within the organization, and there was a lot of different promotions going on and I never saw any people of, African Americans, in those positions.
Q. What promotions are you talking about now?
A. Just different promotions that had happened within Cargill.
Q. Are you saying that during the time you were with the company that you are not aware of any African-Americans's being promoted?
A. Maybe one.

record.)

MR. LAUTH: Maybe you can start off and speak up, please.

MS. PATTON: Really bad.

Diane, would you read it back, Diane, please?

(Question read as requested.)

MR. LAUTH: Back on the record.

THE WITNESS: Can you rephrase the question?

MR. LAUTH: Sure.

BY MR. LAUTH:

Q. I thought I understood from your testimony -- your testimony earlier this morning that up until the time you left Cargill there was no job opening for a position of Assistant to the Office Manager, isn't that what you told us?

A. I don't remember.

Q. In any event, up until the time you left, you didn't really submit any formal application for a job of Assistant to the Office Manager, did you?

A. No.

My manager, Harriet Harrington, at that time, mentioned to me about the Office Assistant

more work, less work, or the same amount as Emily?
A. Correct.
Q. Do you know whether Emily Tyler had started with Cargill in that position or a different position?
A. She started, I believe, in --
Q. Could you speak up?
A. She started as, I believe, like in a regular position.
Q. A which?
A. Just in like a regular accounting position.
Q. So she was then promoted to that management position?
A. Right. I believe someone quit or she worked under that person in that accounting position.
Q. And then, to your understanding, she was interested in that promotion and she obtained that promotion?
A. Right.
Q. Are there other African American employees who worked in the Chicago office while you were there that you know of who received promotions during the time they worked with Cargill?
A. Not that I can recall.
Q. You say toward the end of Paragraph 17 that