# EXHIBIT 1

**SPRENGER & LANG**

A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

PATTY JONES
MINNEAPOLIS OFFICE
E-Mail: pjones@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

February 19, 2004

RECEIVED
FEB 23 2004

Holly S.A. Eng, Esq.
DORSEY & WHITNEY, LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498

**Re:** ***Arnold, et al. v. Cargill, Inc.*, No. 01-CV-2086 DWF/AJB**

Dear Holly:

Enclosed please find copies of declarations of the following individuals responsive to Defendant's Requests for Production of Documents:

Lois E. Cephus
Michael K. Collier
Audrey S. Dixon
Glenn Ford
Raymond E. Fowler
Laverne H. Gosby
Marcia Harrison
Michelle E. Hill
Angela Y. Reid
Jacqueline T. Sharp
Candy Smith
John Selman

Sincerely,

Patty Jones
Patty Jones
Legal Assistant

:mbk
Enclosures

58802

# EXHIBIT 2

FC

DORSEY
DORSEY & WHITNEY LLP

**HOLLY S. A. ENG**
**(612) 343-2164**
**FAX (612) 340-2777**
**eng.holly@dorsey.com**

February 25, 2004

**VIA FAX & MAIL**
**TIME SENSITIVE**
Ms. Patty Jones
Sprenger & Lang, PLLC
325 Ridgewood Avenue
Minneapolis, MN 55403

***Re:*** ***Arnold, et al. vs. Cargill, Incorporated***
***Civil File No. 01-CV-2086***

Dear Ms. Jones:

On Monday, February 23, 2004, we received your correspondence dated February 19, 2004, enclosing copies of twelve declarations.

By close of business on ***Thursday, February 26, 2004***, please confirm that these are the only declarations / statements in your possession. Also, by close of business on ***Thursday, February 26, 2004***, please let me know whether Sprenger & Lang represents any of the twelve individuals for whom you produced declarations (Lois E. Cephus, Michael K. Collier, Audrey S. Dixon, Glenn Ford, Raymond E. Fowler, Laverne H. Gosby, Marcia Harrison, Michelle E. Hill, Angela Y. Reid, Jacqueline T. Sharp, Candy Smith, and John Selman). Finally, by close of business on ***Thursday, February 26, 2004***, please provide me with the addresses for each of the above-named individuals.

Sincerely,

Holly S. A. Eng

bcc: D. Orke, Esq.
P. Klaas, Esq.
M. Raphan, Esq.
D. Lauth, Esq.
M. Iwan, Esq.
E. Nelson, Esq.
R. Mick, Esq.

# EXHIBIT 3

# SPRENGER & LANG

A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

LAWRENCE P. SCHAEFER
MINNEAPOLIS OFFICE
E-Mail: lschaefer@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

February 26, 2004

RECEIVED
FEB 27 2004

**VIA FACSIMILE AND U.S. MAIL**

Holly S.A. Eng, Esq.
DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402

**Re:** ***Arnold, et al. v. Cargill, Inc.***
**No. 01-CV-2086 (DWF/AJB)**

Dear Holly:

I received your letter to Patty Jones, dated February 25, 2004. We are reviewing our obligation to provide supplemental information regarding the recently produced declarations in accordance with previously served discovery requests and will be responding to the requests in your letter when this review is completed.

Very truly yours,

Lawrence P. Schaefer

:mbk

58896

# EXHIBIT 4

SPRENGER & LANG
A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

PATTY JONES
MINNEAPOLIS OFFICE
E-Mail: pjones@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

April 16, 2004

Holly S.A. Eng, Esq.
DORSEY & WHITNEY, LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498

**Re:** ***Arnold, et al. v. Cargill, Inc.*, No. 01-CV-2086 DWF/AJB**

Dear Holly:

Enclosed please find copies of declarations of the following individuals responsive to Defendant's Requests for Production of Documents:

Vance Dupree
Sabrina Jenkins
Errol Josephs
Herman King
Jason Lewis
Mohamed Omer
Jerry Summers
Glenn Taylor

Sincerely,

Patty Jones
Patty Jones
Legal Assistant

:mbk
Enclosures

58802v2

# EXHIBIT 5

FC

DORSEY
DORSEY & WHITNEY LLP

**HOLLY S. A. ENG**
**(612) 343-2164**
**FAX (612) 340-2777**
**eng.holly@dorsey.com**

April 20, 2004

**VIA FAX & MAIL**
Lawrence P. Schaefer, Esq.
Susan M. Coler, Esq.
Ms. Patty Jones
Sprenger & Lang, PLLC
325 Ridgewood Avenue
Minneapolis, MN 55403

***Re: Arnold, et al. vs. Cargill, Incorporated***
***Civil File No. 01-CV-2086***

Dear Counsel:

We were very surprised yesterday to receive Ms. Jones' correspondence to us dated April 16, 2004, enclosing eight declarations.

As you are well aware, discovery closed in this matter more than a month ago. The belated production of this set of declarations – a set that includes two declarations that were executed within the discovery period and all of which obviously were being constructed during the discovery period – is improper and objectionable. This is particularly true given the fact that I expressly asked you by letter dated February 25, 2004, to confirm immediately whether the declarations that you served upon us at that time (a little over two weeks before the close of discovery) were the only ones that Plaintiffs' possessed. Plaintiffs did nothing to indicate that there were any others or would be any others and, rather, allowed us to rely upon these misrepresentations by omission, to proceed with discovery, and to utilize the remainder of our designated depositions on the select group of declarants that Plaintiffs chose to reveal to us at that time.

As was the case with the initial batch of declarations, we have no doubt that this set of declarations – which are so weak on their face – would be proven to be completely frivolous and factually defective if Cargill had been provided with the opportunity to take the declarants' depositions. Given Plaintiffs' posturing and game playing, however, Cargill has been denied that opportunity.

DORSEY



Please note that we will be raising this issue with the Magistrate Judge during the next telephone conference. Under the circumstances, we intend to ask the Court to bar Plaintiffs from using the declarations that we received only yesterday – along with any other declarations that Plaintiffs may, for whatever reason, currently be withholding from production – in any manner in this case.

Sincerely,

Holly S. A. Eng

bcc: D. Orke, Esq.
P. Klaas, Esq.
M. Raphan, Esq.
D. Lauth, Esq.
M. Iwan, Esq.
E. Nelson, Esq.
R. Mick, Esq.

# EXHIBIT 6

SPRENGER & LANG
A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

LAWRENCE P. SCHAEFER
MINNEAPOLIS OFFICE
E-Mail: lschaefer@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

April 20, 2004

**VIA FACSIMILE AND U.S. MAIL**

Holly S.A. Eng, Esq.
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402

**Re:** ***Arnold et al. v. Cargill, Inc.***

Dear Holly:

In response to your letter of today, with its strident and absurd allegations of "posturing and game playing" among other things, please be advised that we have produced to you executed declarations in the normal course of supplementing our discovery responses, in accordance with our obligations under the Federal Rules of Civil Procedure. We will continue to do so as we secure additional executed declarations. Cargill has the same right to secure declarations from witnesses as the plaintiffs, and this process can occur at any time in this action, through class certification and beyond. I therefore have no idea what "issue" you intend to raise with Magistrate Judge Boylan during the next telephone conference, or how plaintiffs' timely supplementation of discovery responses could give rise to the relief you apparently intend to seek.

Very truly yours,

Lawrence P. Schaefer

:mbk

59588

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

RODERICK ARNOLD, NII-AKWEI ACQUAYE, SEAN ALLEN, HOLLIS BRANHAM, TOYA BROWN, DAWN COLLINS, LOUIS DARDEN, DELLA DICKSON, VIRGINIA DOUGLAS, RONALD GARRUS, MARGO HARVEY, CHENETA HUGHEY, JACQUELINE JENKINS, KEITH LEWIS, VALERIE MASON-ROBINSON, MICHAEL MITCHELL, PHYLLIS REECE, TONYA ROSS, CHARLES SCOTT, CLINTONIA SIMMONS, TAUSHA TATE, EMILY TYLER, JACQUELINE WILLIAMS, CHERYL WILLIS, SEAN WRIGHT,

Plaintiffs,

v.

CARGILL, INCORPORATED,

Defendant.

**Case No. 01-CV-2086 (DWF/AJB)**

**CARGILL'S INTERROGATORIES TO PLAINTIFFS (SET I)**

**TO: The named Plaintiffs, and their attorneys Lawrence Schaefer, and Susan M. Coler, Sprenger & Lang PLLC, 325 Ridgewood Avenue, Minneapolis, Minnesota 55403.**

**PLEASE TAKE NOTICE** that pursuant to Rule 33 of the Federal Rules of Civil Procedure, each Plaintiff is requested to provide to Defendant Cargill, Incorporated ("Cargill") answers to the following Interrogatories within thirty (30) days from the date of service of this document.

**DEFINITIONS AND INSTRUCTIONS**

As used throughout these Interrogatories:

1. As used herein, the term "document" or "documents" includes the original or drafts of any kind of written, printed, recorded, or graphic material or sound reproduction, however produced or reproduced, whether sent or received or neither, and all copies thereof

12. As used herein, "Defendant" or "Cargill" means not only Cargill, Incorporated, but also its officers, employees, and representatives.

13. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, you are obligated to amend your answers to these Interrogatories if you obtain information upon the basis of which:

(a) you know your response was incorrect when made; or

(b) you know that the response, though correct when made, is no longer true, and the circumstances are such that a failure to amend your response would be in substance a knowing concealment.

**Objection will be made at the time of trial to any attempt to introduce evidence that is directly sought by these Interrogatories and to which no disclosure has been made.**

**INTERROGATORIES DIRECTED TO EACH NAMED PLAINTIFF AND TO BE SEPARATELY ANSWERED FOR EACH NAMED PLAINTIFF**

**INTERROGATORY NO. 1**: Identify each person with knowledge of any of the facts or allegations regarding your individual claims, the individual claims of any other named Plaintiff, and the individual claims of any putative class member as defined in the Complaint, and state the information known to each person identified.

**INTERROGATORY NO. 2**: Identify any African Americans (including you) who you believe were discriminated against by Cargill during their employment with Cargill, including discrimination in promotion and/or advancement, discrimination that deterred African Americans from applying for promotion and/or advancement, discrimination in compensation, and discrimination in termination, constructive termination, layoff, and/or position elimination. Separately with respect to each such person:

(a) Identify how the individual was allegedly discriminated against;

compensation, and discrimination in termination, constructive termination, layoff, and/or position elimination. Separately for each policy, describe how the policy promotes or promoted discrimination.

**INTERROGATORY NO. 18**: Identify any audio or video recordings, or other electronic records or transcripts thereof, which relate in any way to the allegations in your Complaint.

**INTERROGATORY NO. 19**: Identify all persons you or your counsel have contacted regarding becoming a named Plaintiff in this suit or a potential class member.

**INTERROGATORY NO. 20**: Identify by case name, court file number and court all class action suits in which Plaintiffs' counsel have been involved, and all actions in which Plaintiffs' counsel have participated in an attempt to certify a class.

Dated: April 1, 2002

DORSEY & WHITNEY LLP

By Clarissa W. Cook

Janice M. Symchych #10811X
Mark Ginder #1016794
Melissa Raphan #182795
Holly S. A. Eng #238028
Clarissa W. Cook #0278749
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Attorneys for Defendant
CARGILL, INCORPORATED

# EXHIBIT 8

SPRENGER & LANG
A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

PATTY JONES
MINNEAPOLIS OFFICE
E-Mail: pjones@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

May 14, 2004

RECEIVED
MAY 17 2004

Holly S.A. Eng, Esq.
DORSEY & WHITNEY, LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498

**Re:** ***Arnold, et al. v. Cargill, Inc.,*** **No. 01-CV-2086 DWF/AJB**

Dear Holly:

Enclosed please find copies of declarations of the following individuals responsive to Defendant's Requests for Production of Documents:

Dewayne B. Harris
Claudia Vence
Eimile A. Walker

Sincerely,

Patty Jones

Patty Jones
Legal Assistant

:mbk
Enclosures

58802v3

# EXHIBIT 9

SPRENGER & LANG
A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

RECEIVED
JUN 09 2004

WRITER'S ADDRESS:

PATTY JONES
MINNEAPOLIS OFFICE
E-Mail: pjones@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

June 8, 2004

Holly S.A. Eng, Esq.
DORSEY & WHITNEY, LLP
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498

**Re:** ***Arnold, et al. v. Cargill, Inc.,*** **No. 01-CV-2086 DWF/AJB**

Dear Holly:

Enclosed please find copies of declarations of the following individuals responsive to Defendant's Requests for Production of Documents:

Marvin Christy
Joey Halton
Shelly H. Longmire
Harold E. Rose, Jr.
S. Bruce Williams

Sincerely,

Patty Jones

Patty Jones
Legal Assistant

:mbk
Enclosures

58802v3

# EXHIBIT 10

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Daron HILL, on behalf of himself and others similarly situated, Plaintiff,
v.
AMOCO OIL COMPANY, Defendant.

**No. 97 C 7501.**

March 19, 2001.

*MEMORANDUM OPINION AND ORDER*

GOTTSCHALL, J.

Background

***1** Plaintiff Daron Hill brought a purported class action against defendant Amoco Oil Company, alleging violations of 42 U.S.C. § § 1981, 1982, and 2000a. Hill alleges that Amoco has a policy and practice of requiring African-Americans, but not Caucasians, to prepay at gasoline pumps at Amoco owned and operated gas stations in the Chicago area. Hill seeks to certify a class under Federal Rule 23(b)(2) consisting of "all African-American persons who have purchased gas at or will in the future seek to purchase gas at Amoco- owned service stations in the Illinois counties of Cook, Lake, DuPage, McHenry, Will and Kane." (Pl.'s Mtn. for Class Cert. at 1). Hill also moves for certification of a subclass under Federal Rule 23(b)(3), seeking monetary damages and consisting of "all class members who were required to prepay." (Pl.'s Mtn. for Class Cert. at 1). Amoco opposed the motion for class certification and also moved for summary judgment on Hill's claims.

The pending motions for class certification and summary judgment hinge on whether certain evidence submitted by the plaintiff is properly considered in deciding the motions. Thus, a brief discussion of the course of discovery and the nature of the evidence produced is in order. Hill filed his original complaint in this action on October 24, 1997. In the course of discovery, Amoco submitted to Hill a number of interrogatories and document requests. Among the discovery requests were the following:

Interrogatory No. 2: Identify all instances, occasions, and/or occurrences of alleged discrimination that Hill has reason to believe that others have experienced in connection with the prepayment of gasoline at any Amoco gasoline stations.

Interrogatory No. 7: Identify any communications related to this litigation that you have had with other potential class members.

Document Request No. 2: Any and all documents relating to whether any person of which you are aware suffered purported discrimination regarding the prepayment of gasoline at any Amoco gasoline station.

Document Request No. 4: Any and all affidavits, witness statements and/or interview notes regarding facts or evidence in support of your claims.

Document Request No. 14: Any and all documents relating or referring to the identity of members of the purported class or subclass.

(Def.'s Mtn. to Strike, Exhs. 2, 3). Hill responded on October 26, 1999. In response to the interrogatories, Hill did not identify any other individuals who were allegedly subject to Amoco's discriminatory prepayment practices. In response to the document requests, Hill stated that no such documents were known to him and that he did not have such documents in his possession. Hill never supplemented these responses.

On July 24, 2000, Amoco moved for summary judgment, relying chiefly on Hill's lack of evidence of a pattern or practice of discrimination. Amoco noted that Hill produced no evidence of any alleged acts of discrimination other than his own personal account of two events that he experienced. The next day, Hill moved for class certification. In connection with that motion, Hill attached several documents as Appendix D to the motion. Included in Appendix D are 1) handwritten lists of several names, addresses, and phone numbers; 2) three signed witness statements describing alleged incidents of discrimination by Amoco; and 3) an internal document from the office of Hill's attorneys describing a phone call from another person who claimed to have been subjected to discrimination at an Amoco station. (Pl.'s Mtn. for Class Cert., App. D). Amoco subsequently moved to strike Appendix

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

D, arguing that the materials should have been produced in discovery and that, in any event, the materials are inadmissible. In response, Hill's attorneys did not deny that they had the Appendix D materials prior to their discovery responses. In fact, they admitted that the materials in Appendix D should have been produced. (Pl.'s Resp. to Mtn. to Strike at 2). Despite a number of excuses, including internal staff changes, Hill's attorneys essentially asked the court to excuse their "oversight." (Pl.'s Resp. at 2). Hill then submitted to the court a videotape, labeled "Hill v. Amoco Oil Company, 97 C 7501, Judge Gottschall." The videotape appears to be a composite tape, including portions of other tape recordings of alleged incidents of prepayment discrimination at Amoco stations.

*2 On the same day that Amoco moved to strike the materials constituting Appendix D, Hill responded to Amoco's motion for summary judgment. In his response, Hill relied on, among other things, the videotape and ten affidavits of potential witnesses and class members. The affidavits were signed, and purported to be sworn, but were not notarized nor made under penalty of perjury. (Pl .'s Resp. to Summ. J., Exhs. E-N). [FN1] Amoco moved to strike the videotape and the affidavits. Hill then submitted a motion to substitute new Exhibits E-N: ten signed affidavits that were identical to the earlier affidavits, except that they were now made under penalty of perjury. Hill also submitted a motion that paragraphs 60-74 of his statement of additional material facts (submitted in connection with the motion for summary judgment) be deemed admitted by Amoco for Amoco's failure to provide citations to the record in its response to Hill's additional facts.

FN1. These ten witnesses do not include the three who submitted the handwritten witness statements found in Appendix D to Hill's motion for class certification. Nine of the ten were identified in the handwritten lists of names found in Appendix D, but one (Sylvia Clay) was not identified until Hill filed his response to Amoco's motion for summary judgment.

## Analysis

Before discussing the pending motions for class certification and summary judgment, the court will first address the preliminary evidentiary matters.

### I. Defendant's Motions to Strike and for Discovery Sanctions

Amoco's motion to strike and for discovery sanctions is directed at the materials in Appendix D to the plaintiff's motion for class certification. Amoco's second motion to strike is directed at the videotape and Exhibits E-N (the ten affidavits) attached to plaintiff's statement of additional facts. In these motions, Amoco essentially makes the following five arguments: 1) that the materials in Appendix D should be stricken because they were not produced before discovery was closed, even though they were in Hill's possession at that time; 2) that the materials in Appendix D are inadmissible hearsay, and lack foundation and authentication, 3) that the names and addresses of the witnesses who submitted the affidavits found in Exhibits E-N were not disclosed to Amoco prior to the close of discovery, denying Amoco the opportunity to depose the witnesses; 4) that the affidavits are unsworn and not made under penalty of perjury; 5) that the videotape is inadmissible because it cannot be authenticated, it is not an original or an accurate duplicate under the best evidence rule, and because it is hearsay not within an exception.

With respect to the discovery violations (Amoco's first and third arguments), the court certainly understands Amoco's frustration with plaintiff's counsel. In response to specific discovery requests, Hill's counsel identified no other potential class members, despite having compiled the lists in Appendix D. After Amoco's counsel again requested the information during depositions, Hill's counsel still failed to produce the names. Then, after discovery had closed and Amoco's counsel had drafted and submitted a motion for summary judgment, the names were finally produced. Now Hill's counsel simply claims that the names were "out of sight, ... out of mind." (Pl.'s Resp. to Mtn. to Strike at 2). Counsel's failure to produce the information has prejudiced Amoco, at least insofar as Amoco's counsel expended time and effort (and Amoco's money) in briefing motions that would have been unnecessary had Hill's counsel produced the documents. Nonetheless, the court does not find that the drastic remedy of striking Appendix D and Exhibits E-N is necessary. Such a sanction would effectively end Hill's chances of success on class certification and on the merits of his claim. In the apparent absence of subjective bad faith, [FN2] and particularly given the seriousness of the allegations in this case and the public importance of an appropriate resolution, the court is reluctant to order a sanction having that effect. Rather, a more appropriate remedy would be to award Amoco attorneys' fees and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

expenses, as requested by Amoco in the motions to strike. *See* Fed.R.Civ.P. 26, 37(c). Thus, the court will award Amoco the actual attorneys' fees and expenses incurred in bringing the two motions to strike. The fees and expenses are to be paid by plaintiff's counsel. Amoco's fee petition must be filed on or before March 30, 2001. In addition, the court will grant Amoco leave to conduct additional discovery for 90 days, limited in scope to discovery concerning the materials contained in Appendix D, Exhibits E-N, and the videotape. This additional discovery period will begin immediately following payment by plaintiff's counsel of the attorneys' fees and expenses sanction.

FN2. There is nothing in the record to suggest that Hill's attorneys were actively hiding the Appendix D documents from Amoco, rather than simply acting negligently by failing to produce the documents despite repeated, specific requests for them.

*3 Amoco's second argument is that the Appendix D materials are inadmissible. Given that Hill has now produced signed statements by ten individuals describing incidents of alleged discrimination, the additional probative value of the handwritten lists and the handwritten, signed statements (not made under penalty of perjury) found in Appendix D is limited. The court declines to rule on the admissibility of the Appendix D materials, and will not consider them in deciding the remaining motions.

Amoco's fourth argument attacks the validity of the affidavits in Exhibits E- N. Hill originally submitted signed affidavits that purported to be sworn statements, but were not notarized. Following Amoco's motion to strike, Hill submitted new affidavits. Each of these new affidavits begins, "I, [name], under penalty of perjury, state that the following facts contained in this affidavit are true and correct, are within my personal knowledge and if called upon to testify in Court to the following, I would do so." (Mtn. to Subst. Exhs. E-N). The new affidavits clearly subject the affiants to the penalty of perjury and comport with the requirements of 28 U.S.C. § 1746. Thus, even though the new affidavits were not sworn before a public official, they may be considered in deciding the motions for class certification and summary judgment. *See* *Eddings v. LeFevour*, No. 98 C 7968, 2000 WL 1466610, at *7 (N.D.Ill. Sep. 29, 2000) (citing *DeBruyne v. Equitable Life Assur. Soc'y*, 920 F.2d 457, 471 (7th Cir.1990)). Hill's motion to substitute Exhibits E-N is granted and, therefore, Amoco's fourth argument fails.

Finally, Amoco's fifth argument addresses the admissibility of the videotape. The court anticipates that Hill may, at trial, have trouble authenticating the composite recording. At this stage in the proceedings, however, the court declines to address the authenticity and admissibility of the videotape. As will become apparent, the determination of whether or not the composite videotape is admissible will have no bearing on the court's resolution of the pending motions for class certification and summary judgment. The court, therefore, will not consider the tape in deciding those motions.

II. Defendant's Motion for Summary Judgment

Having addressed the evidentiary disputes, the court now turns to Amoco's motion for summary judgment. [FN3] Amoco's motion for summary judgment was filed before it had access to the materials in Appendix D to Hill's motion for class certification, Exhibits E-N of Hill's statement of additional facts, and the videotape. As a result, most of Amoco's arguments in favor of summary judgment revolve around the inability of Hill to produce evidence of multiple acts of discrimination, as necessary to show a "pattern or practice" of discrimination at Amoco stations. The court has determined that Amoco should be given the opportunity to depose the witnesses identified in Appendix D and Exhibits E-N and to develop the record with respect to the alleged incidents of discrimination described by the witnesses and depicted in the composite videotape. Therefore, Amoco's pending motion for summary judgment is denied without prejudice. At the close of the additional discovery Amoco may submit a new motion for summary judgment. [FN4]

FN3. In some cases, it is appropriate to consider a motion for summary judgment prior to resolving a motion for class certification. *See* *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir.1995). Here, the court finds that it is in the interest of judicial economy to resolve the motion for summary judgment before facing the question of class certification. Because the motion for summary judgment is denied without prejudice, it makes little difference whether a class is certified before or after the summary judgment motion is resolved.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN4. Because the court has authorized additional discovery and denied Amoco's motion for summary judgment without prejudice, Hill's motion that paragraphs 60-74 of his statement of additional facts be deemed admitted is rendered moot. Hill's motion is therefore denied, and the parties are instructed to submit new Local Rule 56.1 statements in the event that Amoco files a new motion for summary judgment.

III. Plaintiff's Motion for Class Certification

*4 Hill has moved the court to certify a class of "all African-American persons who have purchased gas at or will in the future seek to purchase gas at Amoco-owned service stations in the Illinois counties of Cook, Lake, DuPage, McHenry, Will and Kane." (Pl.'s Mtn. for Class Cert. at 1). This class would be certified under Rule 23(b)(2) for the purpose of obtaining injunctive relief. Hill also seeks to certify a subclass consisting of "all class members who were required to prepay." This subclass would be certified under Rule 23(b)(3) for the purpose of seeking monetary damages for Amoco's allegedly discriminatory practices. *See* Fed.R.Civ.P. 23(c)(4); *Lemon v. International Union of Operat. Eng'rs, Local No. 139*, 216 F.3d 577, 581-82 (7th Cir.2000) (approving of divided class certification where plaintiffs seek both injunctive and non- incidental monetary damages).

The prerequisites for certification of a class action are set forth in Federal Rule 23. A class may be certified only if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

Once the prerequisites are met, a party may maintain a class action for injunctive relief under Rule 23(b)(2) so long as "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). In order to maintain a Rule 23(b)(3) class action for damages, however, the court must find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

A. Rule 23(a) Prerequisites

Numerosity

The numerosity requirement is easily met for both the 12(b)(2) class and the 12(b)(3) subclass. In making the numerosity determination, the court need not determine the exact number of class members. Rather, where it is general knowledge or common sense that the proposed class would be large, the court may assume that joinder would be impracticable. *See Rivera v. Grossinger Autoplex, Inc.*, No. 00 C 442, 2000 WL 1280904, at *3 (N.D.Ill. Sep. 1, 2000). It is general knowledge that a very large number of African-Americans have purchased, or will purchase, gasoline at the Amoco stations in the Chicago area. It is also generally known that a large number of them (along with a large number of Amoco customers of any race) have prepaid for gasoline. Prepayment requirements for certain pumps at certain times is a common practice in the Chicago area. Thus, the court finds that it is general or common knowledge that many African-Americans have prepaid for gasoline at Amoco stations in the Chicago area. In any event, Hill has produced the affidavits of ten African-Americans who are prepared to testify that they were required to prepay at Amoco stations. Presumably, there are many more who have similarly prepaid--whether the result of discrimination or not. Hence, the numerosity requirement is satisfied. [FN5]

FN5. Amoco objects to this conclusion, arguing that Hill has not shown that there are a large number of African-Americans who were actually discriminated against by being forced to prepay when Caucasians were not. Amoco essentially complains that the class definitions are too broad, and that the broad definitions may ensure numerosity, but at the same time destroy commonality and typicality. These arguments are really addressing the commonality and typicality requirements, and will be discussed in connection with those requirements.

Commonality

*5 The requirement of commonality is met where

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

there is a question of law or fact common to the resolution of the class members' claims. *See* Rivera, 2000 WL 1280904, at *3. Where the party opposing the class has engaged in some standardized conduct directed at the class members, this requirement is usually met. *See* Keele v.. Wexler, 149 F.3d 589, 594 (7th Cir.1998). In suits alleging a pattern or practice of unlawful racial discrimination, this requirement is often satisfied, because the question of whether the defendant engaged in a pattern or uniform practice of discrimination will be common to all of the class members. *See generally* General Telephone Co. v. Falcon, 457 U.S. 147, 157 (1982). The mere fact that the complaint alleges racial discrimination, however, does not ensure class certification. *See id.* The court concludes that both the proposed 12(b)(2) class and the proposed 12(b)(3) subclass satisfy the commonality requirement. For the claims of each class, the court will need to address the question of whether there is a pattern or practice at Amoco-owned stations of requiring African-Americans, but not Caucasians, to prepay for gasoline. Thus, there is at least one common question, and the commonality requirement is met. Amoco's argument that the broad class definitions destroy commonality is unavailing. Both classes will include African-Americans who were not actually discriminated against (because, for instance, a class member prepaid at a time when *every* customer was, in fact, required to prepay). This means only that there are some individual questions respecting liability. While that is certainly relevant for the predominance inquiry, discussed below, it does not destroy the commonality required under 23(a). In order to meet the 23(a) commonality prerequisite, a plaintiff must show only that there is one or more common question of law or fact. *See* Sledge v. Sands, 182 F.R.D. 255, 258 (N.D.Ill.1998).

Typicality

The typicality requirement is met if the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." Keele, 149 F.3d at 595 (internal quotation marks and citation omitted). Amoco argues that Hill's proposed classes do not satisfy the typicality requirement because the class definitions are so broad that they include African-Americans who were not, in fact, discriminated against. Specifically, Amoco argues that Hill has not come forward with "significant proof," in the form of affidavits or other evidence, to establish that Hill's claim is typical of those of the class members. (Def.'s Resp. to Mtn. for Class Cert. at 8) (relying on General Telephone, 457 U.S. at 147 and cases interpreting it). Amoco's interpretation of Hill's burden of proof, however, would require the court to delve too deeply into the merits of each individual class member's claim before a certification decision could be made. [FN6] It is enough that Hill has presented some evidence tending to show that some of the other potential class members were discriminated against in a nearly identical fashion. The new Exhibits E-N, although filed in connection with the motion for summary judgment, are sufficient to meet this requirement. Judging by the record currently before the court, it appears as though Hill's claim is typical of the claims of the other potential class members.

FN6. The circumstances of this case are markedly different from those in *General Telephone.* In *General Telephone,* the plaintiff was denied a promotion and sought to represent a class of individuals who were either denied a promotion *or never hired* by the same employer. There, the discrimination the named plaintiff complained of was not typical of the claims of the entire class he sought to represent. *See* General Telephone, 457 U.S. at 159 n. 15. Here, the nature of the discrimination alleged as to the class members is nearly identical to the discrimination allegedly suffered by Hill. The only individual differences will be with respect to whether or not such discrimination actually happened. *See generally* Meiresonne v. Marriott Corp., 124 F.R.D. 619, 623 (N.D.Ill.1989) (drawing a similar distinction).

Adequate Representation

***6** The final prerequisite under Rule 23(a) is that the representative will fairly and adequately represent the interests of the class. This requirement is comprised of two separate inquiries: 1) Is the plaintiff's attorney qualified, experienced, and able to conduct the proposed litigation?, 2) Does the plaintiff have interests antagonistic to those of the purported class members? *See generally* Amchem Products, Inc. v. Windsor, 521 U.S. 591, 626 n. 20 (1997). Amoco makes two arguments with respect to the adequacy requirement, both dealing with only the first of the two inquiries. First Amoco argues that Hill did not move for class certification until nearly three years after the original complaint was filed, demonstrating that he is an inadequate representative. (Def.'s Resp.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

to Mtn. for Class Cert. at 11) (citing *Nagel v. ADM Investor Servs.,* 217 F.3d 436, 443 (7th Cir.2000), *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 704 (7th Cir.1993), and *Williams v. Joliet Correctional Ctr.,* No. 92 C 4699, 1993 WL 427737, at *2 (N.D.Ill. Oct. 20, 1993)). The court refuses to deny class certification because of this delay under the circumstances of this case. Defendant Amoco requested, and was granted, a stay of discovery that lasted for nearly 18 months while the parties litigated a dispositive motion to dismiss. Moreover, Amoco points to no prejudice to the class members caused by Hill's delay in moving for cetification.

Second, Amoco argues that Hill failed to adequately investigate the potential claims of the purported class members. The evidence in the record, however, undermines Amoco's contention. Exhibits E-N demonstrate that Hill has found other potential class members and obtained descriptions of other alleged incidents of discrimination. [FN7] Given the discovery oversights of Hill's counsel, however, the court is somewhat concerned with the adequacy of Hill's representation of the interests of the other class members. At this stage of the litigation, the court is satisfied that Hill is an adequate representative. But Plaintiff's counsel is reminded of the court's continuing duty to evaluate the adequacy of the class representation by the named plaintiff and his counsel. *See* In re *General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1124 (7th Cir.1979). Should the court later determine that plaintiff's counsel is inadequately representing the class members' interests, the class will be de-certified.

FN7. In fairness to Amoco, it made this adequacy argument before Exhibits E-N were filed in response to Amoco's motion for summary judgment. With his motion for class certification, Hill attached only the Appendix D materials. Nonetheless, the record at this point indicates that Hill has performed an adequate investigation into the claims of some other potential class members.

B. Rule 23(b)(2) Class

Having met the prerequisites, the Rule 23(b)(2) class will be certified if Amoco has acted on grounds generally applicable to the class, making injunctive relief appropriate. That requirement is easily met in this case. Hill alleges that Amoco engages in a pattern or practice of discriminating against African-Americans, and seeks an injunction to prevent such discrimination. This is a textbook example of an action appropriate for classwide resolution under Federal Rule 23(b)(2). Thus, the court hereby certifies Hill's 23(b)(2) class. [FN8]

FN8. The court notes that the proposed class definition is not limited by reference to a time period. For a 23(b)(2) class, seeking prospective relief, such a limitation is generally unnecessary. *See Anderson v. Cornejo,* Nos. 97 C 7556, 99 C 3786, 2000 WL 286902, at * 10 (N.D.Ill. Mar. 10, 2000) (citing *McCarthy v. Madigan,* 503 U.S. 140, 153 n. 5 (1992)).

C. Rule 23(b)(3) Subclass

*7 The requirements for maintaining a class action for damages under Rule 23(b)(3) are more strenuous. In addition to the Rule 23(a) prerequisites, a plaintiff seeking to certify a class action for damages under Rule 23(b)(3) must show that common questions will predominate and that a class action is superior to other methods of adjudication. Fed.R.Civ.P. 23(b)(3). Thus, the court will certify Hill's purported subclass only if these additional requirements are met.

Predominance and Superiority

Amoco points to a number of individual questions that will need to be resolved in order for individual class members to establish Amoco's liability under Title VII. At the very least, members of the Rule 23(b)(3) class will be required to show: 1) that they did not prepay out of a personal preference for prepaying, 2) that the station attendant was at least aware of his/her race, and 3) that similarly-situated Caucasians were not required to prepay. These, and potentially other individual inquiries, would be especially fact intensive. For example, each purported class member would have to show that at least one Caucasian used the same pump, or another prepay-only pump, at the same station and at approximately the same time and was not required to prepay. Thus, the court will be forced to address several specific questions of fact regarding each individual incident of alleged discrimination.

Hill recognizes that some individual fact questions will need to be resolved if the Rule 23(b)(3) subclass is certified. Nonetheless, Hill argues that the common question of whether Amoco maintained a pattern or practice of discrimination would predominate over

the individual questions. The court disagrees. Hill relies on *Wilson v.. Tinicum Township,* No. Civ. A. 92-6617, 1993 WL 280205 (E.D.Pa. Jul. 20, 1993) for the proposition that where a plaintiff is alleging that the defendant is engaged in a presumptively invalid procedure, a common question necessarily predominates. (Pl.'s Reply at 9). In *Wilson,* the plaintiff sought to certify a Rule 23(b)(3) class of individuals who had been stopped by police in a certain township as a result of a custom or policy of stopping travelers on a certain interstate for pretextual traffic violations in order to gain consent to search, or in order to improperly search, the stopped vehicles.

*Wilson* is readily distinguishable. In *Wilson,* the only individual question identified by the defendants in opposition to class certification was the question of damages. The *Wilson* court, in rejecting the defendants' argument, noted that it "is settled law that individual proof of damages does not preclude certification of a class under Rule 23(b)(3) where common issues of liability predominate." *Wilson,* 1993 WL 280205, at *8. Common questions predominated because the fact of being stopped as a result of the policy of pretextual stops was the only fact that plaintiffs relied upon for the liability inquiry. As the court put it, "the liability which the plaintiffs seek to establish is based on the operation itself rather than on the circumstances surrounding each individual stop or arrest." *Id.* In contrast, the individual questions that must be resolved with respect to each prepay incident in this case will determine not only the extent of damages, but also liability itself. If an African-American was required to prepay at an Amoco owned and operated station, she will be a member of the damages subclass. But if all other customers, including Caucasians, were also required to prepay at that pump or station, then that class member has not demonstrated that Amoco discriminated against her. Thus, she has not shown liability in her individual case. *See Rutstein v. Avis Rent-A-Car Systems, Inc.,* 211 F.3d 1228, 1235 (11th Cir.2000); *see also Anderson v. Cornejo,* No. 97 C 7556, 2000 WL 1769636, at *1 (N.D.Ill. Oct. 12, 2000) (distinguishing *Wilson* on similar grounds). Where, as here, individual questions bearing on liability predominate over common questions, certification of a Rule 23(b)(3) class is inappropriate. *See id.* at 1235-36 ("[S]erious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability *vel non,* turn upon highly individualized facts.") (quoting *McCarthy v. Kleindienst,* 741 F.2d 1406, 1415 (D.C.Cir.1984)) (alteration in original).

***8** More analogous to the present case is *Rutstein,* decided by the Eleventh Circuit. In *Rutstein,* the plaintiff alleged that defendant Avis had a policy of denying corporate accounts to businesses owned or operated by Jewish people or people with Jewish accents or names. Plaintiff sought to certify a Rule 23(b)(3) class alleging discrimination in violation of 42 U.S.C. § 1981. The court found that the resolution of individual questions would predominate over the common question of whether Avis engaged in a pattern or practice of discrimination. The court stated: "Whether Avis maintains a policy or practice of discrimination may be relevant in a given case, but it certainly cannot establish that the company intentionally discriminated against every member of the putative class." *Rutstein,* 211 F.3d at 1235. Individual questions, similar to the ones in the present case, predominated in *Rutstein*--whether the individual plaintiff met the financial criteria for a corporate account; whether the plaintiff would be using the vehicles in a manner that justified the cost to Avis; and so on. *See id; see also Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1006 (11th Cir.1997).

Hill has not shown that common questions of law or fact will predominate over the individual questions that must be addressed in order to establish liability in individual cases. Certification of the subclass under Rule 23(b)(3) is therefore inappropriate. Maintenance of a class action for damages in this case would be untenable because multiple individual questions, respecting not only damages but also liability, would need to be resolved in each of hundreds or thousands of individual cases. Hill's motion for class certification is denied as to the Rule 23(b)(3) subclass.

## Conclusion

For the foregoing reasons: 1) Plaintiff's motion to respond to certain matters is granted; 2) Plaintiff's motion to substitute exhibits E-N to plaintiff's statement of additional material facts is granted; 3) Defendant's motion to strike Appendix D to plaintiff's motion for class certification is denied; 4) Defendant's motion to strike exhibits to plaintiff's statement of additional material facts is denied; 5) Defendant's motion for discovery sanctions is granted only to the extent of appropriate attorneys' fees, expenses, and additional discovery, described above; 6) Defendant's motion for summary judgment is denied without prejudice; 7) Plaintiff's motion that paragraphs 60- 74 of plaintiff's statement of additional material facts be deemed admitted is denied as moot; 8) Plaintiff's motion for class

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

certification is granted as to the Rule 23(b)(2) class, but denied as to the Rule 23(b)(3) subclass.

2001 WL 293628, 2001 WL 293628 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT 11

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RODERICK ARNOLD, et al.,

Plaintiffs,

v.

CARGILL, INCORPORATED,

Defendant.

Civil File No. 01-CV-2086 (DWF/AJB)

**AFFIDAVIT OF ROBERT BOARDMAN**

STATE OF KANSAS )
) SS:
COUNTY OF SEDGWICK )

**Robert Boardman,** being duly sworn, declares and states as follows:

1. I am the Facility Superintendent for the Cargill Grain and Oilseed crush plant and refinery in Wichita, Kansas. In this role I am accessible to all of the plant employees.

2. In approximately early April 2004, an African American employee in the crush plant told me that he had received several phone calls at home from an attorney located in Washington, D.C. He told me that the attorney had given him a website address which he then provided to me. I looked at the website which was the website for the Plaintiffs' attorneys in this case. He asked me whether he should speak to the attorneys and I explained that it was his choice. This employee later told me that he had spoken to the attorney who had proceeded to question him about his employment experience at the Cargill.

3. Sine I spoke to that employee I have heard that the same attorneys have contacted two more African American employees at the same location.

**FURTHER AFFIANT SAITH NOT.**

Robert Boardman

**Robert Boardman**

Subscribed and sworn to before me
this 21st day of June, 2004

Shannon Mackey

Notary Public

NOTARY PUBLIC, State of Kansas
SHANNON MACKEY
My Commission Expires 5/16/2007

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RODERICK ARNOLD, et al.,

Plaintiffs,

v.

CARGILL, INCORPORATED,

Defendant.

Civil File No. 01-CV-2086 (DWF/AJB)

**AFFIDAVIT OF BRENT GERMAN**

STATE OF KANSAS )
) SS:
COUNTY OF SEDGWICK )

**Brent German,** being duly sworn, declares and states as follows:

1. I am the Refinery Superintendent for the Cargill Grain and Oilseed in Wichita, Kansas. In this role I am accessible to all of the refinery employees.

2. Last week an African American employee in the refinery told me that he had received a phone call at home from an attorney. Initially, he did not know why he had been contacted and seemed concerned. He later told me that he had spoken to the attorney who had asked him if he wanted to join a discrimination suit against Cargill. He asked me if he should speak with the attorney and I explained that it was his choice.

3. A few days later another African American employee approached me to let me know that he had been contacted by an attorney. He went on to explain that an attorney had called him at home to ask him questions about Cargill, including a question about the composition of the workforce by race. He also asked me if he should speak to the attorney and I explained that it was his choice.

**FURTHER AFFIANT SAITH NOT.**

Brent German

Subscribed and sworn to before me
this 21st day of June, 2004

Shannon Mackey
Notary Public

NOTARY PUBLIC, State of Kansas
SHANNON MACKEY
My Commission Expires 05/14/2007

# EXHIBIT 13

*Arnold, et al. v. Cargill*
Court File No. 01-CV-2086 (D. Minn.) (DWF/AJB)

## DECLARATION OF GLENN FORD

I, Glenn Ford, declare that the following is true and correct:

1. I am a 52-year-old African American male. I attended TCOIC in Minneapolis, Minnesota for printing from 1969 to 1970. I attended Hennepin Technical College in Eden Prairie from 1989 to 1990.

2. Cargill had a program where they came to my school to recruit. I believe a man named Sam Grant (black) and a woman named Shirley Wilson (white) from personnel recruited me. Cargill hired me in December 1969 as a temporary worker in the mail room and the stock room. When I finished school, I was given a full time job running a printer. I believe I was hired so that they could meet a quota for having a black person in the Printing Department. I felt they did not want me there when I first started. Cargill had never had a black man running the press before.

3. I stayed at Cargill until November 1996. When I left, I was running the biggest press there (two color GTO) and my job title was Printer VII. For a very long time, I was the only one who knew how to use that machine. It seemed that we were never really promoted in the printing department, just that the machinery would advance and we would have to learn new technology.

4. I left in 1996 after 27 years of service. I left because I felt that even with my many years of dedicated service, I was not getting the respect I deserved. The manager of the printing department, Andy Byrnes (white), who I had helped train, was always avoiding me. I felt that after he became manager, Mr. Byrnes did not give me any

respect. I just got to the point where I could not take it anymore, so I gave Cargill my two weeks notice.

5. Cargill seems to discriminate in hiring black workers. During my time at Cargill, I believe that there were only two other blacks hired. One of them only showed up a few times and when he wouldn't show up, they would all ask if I knew where he was, just because we were both black. I had heard of a few other blacks applying for positions, but no other black was hired. After I left, I heard from friends who still worked there, that a few blacks had been hired. However, those blacks were all "high yellow," not dark-skinned like I am.

Compensation

6. Throughout my tenure at Cargill, I believe that I was consistently making less than the whites in the department. I started making $2.25 an hour, which was less than my white peers. I know that because a white guy, Perry Ames, started about a month before I did doing the same thing that I did and he made more than me. I was never paid as much as Mr. Ames, even after taking more classes and having more experience. I felt I always was given more responsibility in the printing department, but that I was never paid more for my extra duties. When I left, Wayne Franke (white) took over my position. I am pretty sure that he received a big increase over what I had been making. When I left I was making $12 to $13 an hour.

7. I complained about my salary in both 1995 and 1996. At the time, I had to do full color work, whereas the other guys did not. Mr. Ames was running a smaller machine than I was, yet he was making more than me. So, I asked for a raise. I was told

I would have to prove myself. This was after I had received awards for some of my press work.

8. I felt that Cargill did not pay me fairly because I was black. Mr. Ames and Mr. Franke made as much or more than I did, with less experience. Also, Mr. Franke was frequently allowed to work overtime, because he wasn't that productive during the day, whereas I worked hard and got my job done in eight hours usually.

Training

9. When I first started at Cargill in the Printing Department, I was walked over to the machine and left there with no instruction. Two weeks later, Cargill hired Brad, a white "hippy" boy with a long beard who stunk. I was expected to train him, even though no one trained me. Whenever I had questions, I was told "Didn't you go to school for that?"

10. Then, when I decided to go to classes again in 1989, Mr. Byrnes told me that Cargill did not have machines like the one I was seeking training for, so he didn't think that Cargill would pay for the training. I said I wanted to go to the training anyway, even if I had to pay for it myself. It turned out that Mr. Byrnes had just purchased a press similar to the one I was taking training on, so I did end up being reimbursed. When the service man asked Mr. Byrnes who he should show how to run the machine, Mr. Byrnes replied in a negative tone, "I guess Glenn will." Then, I was asked to show Mr. Franke how to run the machine. However, I had to leave the next day for a funeral and no one had run the machine in my absence.

Assignments/Transfers

11. I felt that whites got better assignments than blacks. As I mentioned, I had to do more work than the other guys in printing during 1991 to 1996 because I had to do full color process work and no one else did. Also, when projects were assigned, I had to do my job without any help. Yet, when Mr. Franke was assigned a project, he had others helping him.

12. In addition to my experience, I had a few black friends who worked in Cargill's corporate office. Those employees told me that they had to work later than their white peers. They also said they had to do projects on their own, and other white workers were allowed to complete similar projects in groups. Still, both the black individual and the white group had the same deadline on the similar projects.

Performance Evaluations

13. Cargill went through two types of reviews during my tenure. The first type was called Management By Objectives ("MBO"). Then, it switched to the Performance Management Program ("PMP"). I believe under either system, both my manager and I filled out forms and then compared them. My reviews were usually exceeds expectations. However, my manager usually wrote something negative on my review like that I was on the phone a lot. I felt that management, especially Mr. Byrnes, wrote those things just to prevent me from getting raises.

Work Environment

14. When I first started at Cargill, I was made to feel like I was different and like I did not belong. For example, Cargill used to give tours to groups of Midwest farmers. The tour leader would say, "Yes, we got one," referring to me. It was

apparently a big deal because many of the farmers had never seen a black person before. I was just trying to do was my job. Yet, I was being pointed out and looked over just because I was black.

15. After the tours, I went to personnel during my lunch hour, and spoke to Cindy Jones (black), who would understand what I was going through. However, Ms. Wilson would call my supervisor, Bill Mainie, and ask why I was in personnel and was there anything wrong. This offended me. I even spoke my immediate supervisor, Ed Holler about the tours, but it made no difference.

16. At some point, Cargill developed a "diversity program." Cargill wanted all the blacks to have an interview with Human Resources to see why blacks were upset or why blacks were leaving. I refused to go to such an interview. I didn't see any point. Also, I felt that it was not two sided. Cargill was asking for information but not providing blacks with information or a solution. One of my supervisors in the print shop even commented, "We hire them, but they don't stay."

17. Some of the other black Cargill employees talked about the need for diversity. However, we did not see any effort by management to hire more blacks. Even after the *Foster* case, more blacks weren't hired. The only difference was that there were ads to hire black employees.

18. I was aware of negative racial comments while I worked at Cargill. One day, I went into the restroom only to find "Fuck you Glenn" written on the bathroom stall. I immediately became upset and went to my supervisor. They had someone clean the bathroom, but nothing else was done. Regularly, I heard negative comments about blacks. Donn Linscheild (white) was married to a black woman and people who didn't

know that made negative comments about blacks in his presence. In addition, I lived in North Minneapolis, so whenever there was a shooting or something else bad on the news from that area, people at Cargill asked me if it was my neighbor or if I knew the person.

19. I believe I was the first and maybe only black to make it to the 25 year club. For all of my hard work and dedication, I only received acknowledgement from my department. This was despite the fact that all my white co-workers who reached landmark dates were acknowledged in some greater way.

Conclusion

20. After 27 years of enduring discrimination, I knew I had to leave. I always felt that I had to work harder, faster and better than the whites. Even then I was not rewarded as the whites were. I never felt I was compensated properly. My years of hard work and service were never acknowledged. I was always treated differently than white employees. By differently, I mean I was treated with less respect than the white employees. Unlike most employees, I knew how to run every machine in the printing shop. I was at the ceiling, the top that I could go as a printer, but I was never shown any respect or appreciation for all my years of service and hard work.

21. It took me awhile to get over my work experience at Cargill. I had loved my job. Yet, the environment had bothered me. I did not enjoy being put on display for tours, having people make comments about my race, or making less money all because I was black.



56179

I declare under penalty of perjury the foregoing is true and correct and executed this 29 day of January, 2004 at Minneapolis, Minnesota.
{city, state}

Glenn Ford



56179