ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

RODERICK ARNOLD,
NII-AKWEI ACQUAYE,
SEAN ALLEN,
HOLLIS BRANHAM,
TOYA BROWN,
DAWN COLLINS,
LOUIS DARDEN,
DELLA DICKSON,
VIRGINIA DOUGLAS,
CHENETA HUGHEY,
JACQUELINE JENKINS,
KEITH LEWIS,
VIVIAN LITTLE,
VALERIE MASON-ROBINSON,
ANTHONY McDOWELL,
MICHAEL MITCHELL,
PHYLLIS REECE,
TONYA ROSS,
CHARLES SCOTT,
CLINTONIA SIMMONS,
TAUSHA TATE,

CIVIL ACTION NO.
01-CV-2086 (DWF/AJB)

CLASS ACTION

INJUNCTIVE RELIEF SOUGHT

JURY TRIAL DEMANDED

| | |
|---|---|
| EMILY TYLER, | ) |
| JACQUELINE WILLIAMS, | ) |
| CHERYL WILLIS, | ) |
| STEVE WINT, and | ) |
| SEAN WRIGHT, | ) |
| On behalf of themselves and all others similarly situated, | ) |
| *Plaintiffs,* | ) |
| v. | ) |
| CARGILL, INCORPORATED, | ) |
| *Defendant.* | |

## FIRST AMENDED COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, bring this class action against Cargill, Incorporated ("Cargill") under 42 U.S.C. § 1981 and under the Minnesota Human Rights Act, Minn. Stat. § 363.01 *et seq.*, prohibiting discrimination in employment on the basis of race. In support of the claims for damages and other legal and equitable relief, plaintiffs allege:

## I.

## INTRODUCTION

1. This is a suit by current and former Cargill African American managers and professional employees alleging that Cargill has discriminated against them in terms of advancement, compensation and termination in violation of federal and state civil rights laws.

2. Cargill has effected this discrimination against its African American employees by creating and maintaining centralized, company-wide systems that are designed and implemented to favor employees who "look and talk" like Cargill's white executives. These systems include the "Key Employee Identification System" and its successor, the Leadership and Talent Management Program, used to identify high potential employees; the "Selection Grid Process," used in connection with promotions; and the performance appraisal system, known as the "Performance Management Process" ("PMP") and its predecessor "Management by Objectives" ("MBO"). Cargill also has allowed to flourish an atmosphere and culture of hostility toward providing equal employment opportunities for African Americans within the company, and failed to take effective action to correct this extensive pattern and practice of systemic discrimination.

3. Plaintiffs bring this case as a class action under Rule 23 of the Federal and Minnesota Rules of Civil Procedure. They seek to represent a class of former, current and future African American employees of Cargill in managerial and professional salaried positions who have suffered from race discrimination between the earliest date permitted by law and the present. Plaintiffs claim that Cargill has engaged in a pattern and practice of racial discrimination that is manifested in various ways, including limiting or denying opportunities for African Americans to advance in the company on an equal basis with non-African Americans, compensating them less than similarly-situated non-African American employees, terminating African American employees for conduct for which non-African Americans are not disciplined or terminated, and selecting African American employees for layoff or position elimination when less qualified non-African American employees are advanced and retained.

## II.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because plaintiffs allege claims in violation of a federal statute, 42 U.S.C. § 1981, which gives all persons within the United States equal rights to make and enforce contracts.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c). A substantial number of the events or omissions giving rise to plaintiffs' claims arose in Minnesota. Defendant is a corporation that is headquartered and does business in Minnesota and is subject to personal jurisdiction in this district.

6. This action also alleges a claim under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §363.01 *et seq.* The Court has supplemental jurisdiction over this claim under 28 U.S.C. § 1367.

## III.

## THE PARTIES

### A. Defendant

7. Cargill is incorporated in Delaware. Its headquarters and principal place of business are in Hennepin County, Minnesota, at 15407 McGinty Road, Wayzata, Minnesota 55391. This lawsuit includes each of Cargill's subsidiaries and affiliated companies, all of which are subject to Cargill management and control.

8. Cargill is one of the world's largest privately held companies. It is an international marketer, processor and distributor of agricultural, food, financial and industrial products and services. The company employs approximately 97,000 employees in 59 countries. Cargill's six key business areas are commodity trading, processing of agricultural commodities,

production of agricultural products, production of industrial products, transportation and financial services. Cargill's reported sales surpassed 50 billion dollars in 2002. Current company assets exceed 18 billion dollars and its net worth is approximately 8.1 billion dollars.

**B. Plaintiffs**

**1. General Allegations as to All Plaintiffs**

9. Plaintiffs are African Americans who are current or former employees of Cargill. Each is or was a salaried employee.

10. As a result of Cargill's systemic pattern and practice of race discrimination and/or its implementation of employment policies and practices resulting in a disparate impact on African American employees, each of the plaintiffs has experienced discrimination in one or more aspects of his or her employment, including advancement, compensation and/or termination.

**2. Specific Allegations as to Individual Plaintiffs**

11. Plaintiff Roderick Arnold has worked at Cargill since 1985. He currently holds a grade 12 Maintenance Manager position in the Rail Fleet Department. He was previously a grade 12 Rail Fleet Manager. Arnold has worked for Cargill in the Oilseeds Division in Kansas City and West Fargo, North Dakota and in the Corn Milling Division in Dayton, Ohio, Cedar Rapids, Iowa and Minneapolis. He has a Bachelor of Business Administration degree in Transportation Logistics Management from Kent State University.

12. Plaintiff Nii-Akwei Acquaye worked at Cargill beginning in May 1997. He was a grade 12 Business Development Manager within the Business Development Group in Cargill's Food Systems Design Platform prior to his constructive discharge in March 2002. He is currently working on a USAID-funded project in Bangladesh. He has a Bachelor of Science

degree in Chemical Engineering from Hampton University and an MBA in Strategy and Marketing from the University of Minnesota Carlson School of Business.

13. Plaintiff Sean Allen has worked at Cargill since June 22, 1992. He is currently a grade 9 Territory Manager and a Business Development Manager for Bonaire in the Salt Business Unit. He previously worked as a Commodity Merchant and Marketing Representative in the Corn Milling Division in Dayton, Ohio, until a May 1998 transfer to the Salt Business Unit. Allen has a Bachelor of Arts degree in Economics from Morehouse College.

14. Plaintiff Hollis Branham began working for Cargill in April 2000 as a salaried non-exempt Chemical Analyst for the Fertilizer Division. He worked in that capacity until he was laid off in October 2001. On February 4, 2002 Branham returned to Cargill. He is currently a Logistics Coordinator in the Fertilizer Division with exempt status. Branham graduated from Florida A&M University with a Bachelor of Science degree in Chemistry and is certified with the American Chemical Society.

15. Plaintiff Toya Brown started working at Cargill as a paid intern. She then received a position in the Cargill Grain Division as a Commodities Merchant in June 1997. In March 2001, Cargill constructively discharged Brown. She has a Bachelor of Science Degree in Agribusiness from Florida A&M University.

16. Plaintiff Dawn Collins worked at Cargill from July 1992 until Cargill constructively discharged her on September 15, 1999. At the time of her discharge, Collins was a grade 9 Diversity and Retention Specialist. She previously had worked as a Staff Accountant in the Financial Markets Group and a Corporate Auditor in the Worldwide Audit Department. She has a Bachelor of Arts degree in Accounting from California State University, Dominguez Hills.

17. Plaintiff Louis Darden worked at Cargill for over 23 years, until Cargill fired him without warning on May 15, 2001 from his grade 13 Maintenance Manager position at Excel, a wholly owned Cargill subsidiary. He has a Bachelor of Science degree in Mechanical Engineering from George Washington University and has taken post-graduate classes in Business Administration at Jacksonville State University.

18. Plaintiff Della Dickson has worked at Cargill since 1980. She is currently a grade 11 Project Manager in North American Transportation and Logistics. Over her twenty-plus years at Cargill, she has worked in the Flour Milling, Salt, and Oilseed Processing Divisions. She has a Bachelor of Arts degree in Business Management from Dallas Baptist University and an MBA degree concentrating in Finance from the University of St. Thomas.

19. Plaintiff Virginia Douglas began working at Cargill in 1990 as a Teletypist in Cargill Investor Services ("CIS"), and later moved into various positions in the CIS Treasury and Corporate Accounting Departments. In January 2000, she became the Regulatory Accounting Supervisor at a grade level 6. She held that position until Cargill constructively discharged her in December 2000. Douglas holds an Associate of Arts degree in Business Administration and a Bachelor of Arts degree in Accounting from Robert Morris College.

20. Plaintiff Cheneta Hughey joined Cargill as a Staff Accountant in the Seed Division in July 1996. Cargill terminated her in December 1997. Hughey has a Bachelor of Science degree in Accounting from North Carolina A&T State University, where Cargill recruited her to join the company.

21. Plaintiff Jacqueline Jenkins worked at Cargill as a Grain Merchant in the Grain Marketing Division from July 1988 until May 1995, and in Cargill Marketing and the Oilseeds Division from 1995 until August 1997, when Cargill constructively discharged her. She has a

Bachelor of Science degree in Agricultural Economics from Fort Valley State College and a Master of Science degree in Agribusiness Management and Marketing from the University of Kentucky.

22. Plaintiff Keith Lewis worked at Cargill for nearly nine years in various Cargill divisions, including Cargill Investor Services, the Corporate Global Financial Systems department, and Cargill Carriers, a division of Cargill Marine & Terminal, until Cargill constructively discharged him in July 1999. He has a Bachelor of Science degree in Computer Sciences from Bradley University and an MBA in Information Systems and Finance from Keller Graduate School of Management.

23. Plaintiff Vivian Little began working at Cargill in October 1997 as an Administrative Assistant with both the Financial Markets and Sales and Marketing divisions in Chicago, Illinois. In April 2002, Little transferred to the Financial Controls Group in Corporate Accounting to work as an Accounting Clerk. Little is completing a degree in accounting at the DePaul University School of New Learning. Cargill constructively discharged Little and she left the company on March 10, 2003.

24. Plaintiff Valerie Mason-Robinson worked at Cargill as a Sales Representative in the Salt Division from 1996 until July 1998, when Cargill constructively discharged her. She earned a Bachelor of Science degree in Chemical Engineering from the Illinois Institute of Technology.

25. Plaintiff Anthony "Chris" McDowell began working for Cargill in November 1997 at the Cargill Oil Seeds Plant in Fayetteville, North Carolina. McDowell worked in a salaried non-exempt Crew Leader/Shift Supervisor position from December 2000 to January 2002. Cargill constructively discharged McDowell. He left the company on December 2, 2002.

Prior to joining Cargill, McDowell served six and one half years in the United States Army, attending "NCO" (Non-Commissioned Officer) school, a Primary Leadership Course, and receiving a number of achievement awards. His last position in the Army was E4 Specialist.

26. Plaintiff Michael Mitchell began his employment at Cargill in October 1999 as a grade 7 Maintenance Supervisor. He moved to the position of grade 9 Technical Services Representative in the Quality Department of the Phosphoric Acid Plant in Cargill's Fertilizer Division in November 2000. Cargill constructively discharged him in July 2001. He received a Bachelor of Science degree in Electrical Engineering from North Carolina State University and recently entered the MBA Executive Program at the University of North Carolina.

27. Plaintiff Phyllis Reece began working as a Production Supervisor in Cargill's Grain Division in Louisiana as an intern in 1992. In May 1993, Reece accepted a position as a Production Supervisor, again with the Grain Division in Louisiana. She transferred to Cargill's Chesapeake, Virginia plant in 1996 where she was a Maintenance Supervisor until Cargill constructively discharged her in January 1999. She has a Bachelor of Science degree in Computer Integrated Manufacturing Technology from Alcorn State University.

28. Plaintiff Tonya Ross worked at Cargill from December 1991 until June 2001. She began her Cargill career as High Fructose Coordinator in the Corn Milling Division in Dayton, Ohio, and then obtained a promotion to Corn Syrup Coordinator. During restructuring in 1997, Cargill demoted her back to her former position as High Fructose Coordinator. In March 1999 Ross became a grade 5 or 6 Inventory Planner. She attended Wright State University, majoring in Business Management.

29. Plaintiff Charles Scott worked at Cargill as a Sales Representative in the Steel and Wire Division and as a Merchant in Ferrous International from 1991 until Cargill terminated him

effective December 31, 1997. He has a Bachelor of Science degree in Business Management from Tennessee State University.

30. Plaintiff Clintonia Simmons began at Cargill in May 1988 as a Sales Representative in the Corn Milling Division, and became a Product Manager in 1993. When Cargill eliminated her Product Manager position in 1998, she accepted a Senior Territory position. Simmons worked in that capacity until she left Cargill in July 1998. She holds a Bachelor of Arts degree in Marketing from Memphis State University.

31. Plaintiff Tausha Tate worked from June 1998 to April 2000 as a Production Manager in Cargill Oilseeds Division at the Corn Plant in Memphis, Tennessee. She has a Bachelor of Science degree in Chemical Engineering with a minor in Operational Management from the Illinois Institute of Technology.

32. Plaintiff Emily Tyler has a Bachelor of Science degree in Accounting from Chicago State University and is a Certified Public Accountant. She worked at Cargill from 1992 until Cargill constructively discharged her in August 2000 from her position as a grade 10 Third Party Disbursements Manager.

33. Plaintiff Jacqueline Williams worked at Cargill from 1993 until May 2002. She began in the Grain Division IT Department and transferred to the IT Department in the Fertilizer Division in April 1996. In July 2001 she took a sabbatical from her IT Technical Analyst position to teach at Florida A&M University. When Williams completed her teaching in May 2002, Cargill informed her that she no longer had a position in the Fertilizer Division. She received a Bachelor of Science degree in Computer and Information Systems from Florida A&M University.

34. Plaintiff Cheryl Willis began working at Cargill in 1986 as an Applications Programmer in the Corporate IT Department and in a position in IT Education. In 1997, Willis moved into a position as IT Business Consultant, but Cargill later demoted her to her previous position in IT Education. Cargill laid her off on April 30, 2001. She has a Bachelor of Arts degree in Computer Science from Spelman College.

35. Plaintiff Steve Wint has worked at Cargill since March 17, 2000. He is currently a grade 4 salaried non-exempt Forklift Driver with Cargill Salt's Port of Tampa facility. Wint's work experiences prior to Cargill include nearly two years at Texaco-Motiva where he held supervisory duties and over fourteen years at Smith Barney where his last position was Assistant Manager Machine Operator.

36. Plaintiff Sean Wright worked for Cargill as a Merchant in the Grain Division from May 1997 until Cargill fired him on July 12, 2000. He has a Bachelor of Science degree in Agricultural Business from Florida A&M University.

## IV.

## PATTERN AND PRACTICE ALLEGATIONS

### A. Cargill Has a History of Discrimination Against African American Employees

37. Cargill has engaged in a pattern and practice of purposeful race discrimination throughout the limitations period and before. In the early 1980s, Cargill's management ranks were almost exclusively white. Many of these managers expressed pervasive hostility toward African Americans generally, and toward affirmative action in particular, resulting in a failure to hire qualified African Americans and systemic discrimination against those few who were hired.

38. In 1982, two Cargill employees, James Foster and Avril Adams, commenced a class action in this court on behalf of women and African American applicants, employees and

former employees at Cargill. This case was entitled *Foster, et al. v. Cargill, Inc.*, Civ. No. 3-82-1829 (D. Minn.). After several years of litigation, Cargill and the plaintiffs agreed to resolve the *Foster* litigation through a class action settlement. The parties entered into a Consent Decree requiring Cargill to engage in affirmative conduct to assure equal employment opportunities for women and African American applicants, exempt employees, and terminated exempt employees. The court certified two classes, one of which constituted all incumbent exempt African American employees and applicants as of the date of the final approval of the Consent Decree through the expiration of the Consent Decree, and all African American exempt employees terminated (constructively or otherwise) at any time from January 21, 1981, through the date of preliminary approval of the Consent Decree. By its terms, the *Foster* Consent Decree expired after four and a half years, on August 31, 1989.

**B. Cargill's Racial Bias Emanates from Its High Level Executives Who Pay Lip Service to Equal Employment Opportunity but Do Not Support It**

39. Cargill has acknowledged the need for top-level commitment to correct problems caused by systemic discrimination and has taken steps to create the *appearance* that it was making efforts to correct such problems. Cargill CEO Whitney MacMillan issued an Equal Employment Opportunity statement which purported to affirm Cargill's commitment to equal employment opportunity. The statement promised that responsibility for equal employment begins at the CEO level and that a newly formed "EEO Committee" and the Corporate EEO Manager would centrally control and monitor all aspects of the employment relationship to ensure that fair opportunity existed throughout the company. He further stated that Cargill would formally evaluate managers and supervisors for their contributions to Cargill's affirmative action objectives. CEO MacMillan also promised that Cargill would systematically conduct

internal EEO audits to review the statistical impact of personnel decisions to ensure that minorities had full and equal access to opportunity at Cargill.

40. On January 12, 1995, Cargill's President of North American Operations and Chairman of the North American Human Resource Committee, Warren Staley, the current company CEO, issued a similar memorandum to division presidents and department managers. The memorandum recognized Cargill's need to effectively monitor "promotions for females and blacks in the production and sales families," and admitted that "Applicant Flow Data has been ignored by some Divisions." The memorandum stated:

> At a minimum, all divisions should be using the PMP/MBO process at least annually for each employee and review promotions using a grid analysis and general workforce availability review. However, leadership requires more. You need to review your internal procedures for positive programs that equalize promotion opportunities for those who may encounter social or cultural barriers . . . and eliminate stereotypes and preconceived notions on the basis of race, gender or national origin.

41. Such pronouncements have proven hollow. Any steps taken in their furtherance have failed to receive company-wide implementation and have not produced any lasting results. A pattern of bias even worse than the one that gave rise to the *Foster* litigation became evident at Cargill in the 1990s.

42. The pronouncements have not resulted in improved EEO opportunities because managers know, based on senior executives' own words, that they do not want Cargill to change and are paying only lip service to EEO principles. For instance, then-CEO MacMillan told an audience of Cargill managers and recruiters at the corporate office center in 1992 or 1993 that the principal goal of Cargill's recruitment and advancement systems was to "find and advance people who look and talk like me."

43. James Howard, a Cargill Executive Vice President and member of the Board of Directors, told K. Rashid Nuri, a Cargill African American manager in Nigeria, that Cargill's executive management trusts only "Americans, Dutch, English and reluctantly, the French" to run the company and would never provide real opportunity for employees of African descent to advance to senior management. By letter dated October 19, 1991, Nuri reported this statement to then-CEO MacMillan, but received no response or explanation.

44. Sometime in the mid-1990s, Scott Van Orsdel, the white Manager of Compliance and Standards, and acting supervisor of Cargill's Workforce Diversity Department, told Yvonne Blaine, Cargill's Workforce Diversity Manager, and Diversity Specialists Nicolle Strait and Colleen Leahy that all decisions regarding Cargill's EEO policy and practices "would be made by middle-aged white males and not by minorities or women."

45. This well-known bias of Cargill senior executives has ensured that all Cargill programs have the effect urged by CEO MacMillan – only those who look and talk like him prosper at Cargill.

46. Thus, Cargill's almost exclusively white managers have known throughout the 1990s that they can exercise their virtually unfettered subjective discretion to make advancement, compensation, and termination decisions in a racially biased manner without risk of repercussion. They have known that Cargill truly does not value diversity, and that real change and opportunity for African Americans is not a priority. This knowledge produces alarming racial disparities through, among other things, the operation of three systems at Cargill described below.

## C. Three Company-Wide Evaluative Processes Both Cause and Are Used to Justify a Pattern of Discrimination at Cargill

47. The biased attitude of Cargill's almost exclusively white management has resulted in the discriminatory design, implementation and manipulation of three company-wide evaluative systems that are critical to success as a Cargill employee – the Key Employee Identification System and its successor, the Leadership and Talent Management Program, Selection Grid Process, and Performance Management Process. Cargill's discriminatory use of these three systems has had a devastating effect upon the advancement, compensation and ongoing employment of African American salaried employees.

48. The human resources function at Cargill corporate headquarters implements, enforces, and coordinates the company's policies and practices. These discriminatory policies and practices apply throughout Cargill's operating structure, including thirteen business "platforms" and business units, similar to divisions, within each platform.

### 1. The Key Employee Identification System

49. Known by its acronym "KEIS," the Key Employee Identification System is a secretive career advancement mechanism that limits African American employees' access to career development opportunities. (The successor program to KEIS had the same discriminatory effect and was called the Leadership and Talent Management Program. Together they shall be referenced as "KEIS" for purposes of this complaint.) Cargill conceals the workings of KEIS from its employees, who do not know how Cargill rates them or how these ratings affect their career progression. Cargill executive and senior management have used this system for about a decade purportedly to identify employees with "high potential," who are then groomed for rapid career advancement. For employees so designated, career development and progression planning resources are abundant. Conversely, employees not rated under the system or deemed

lacking in "high potential" have little to no chance for substantial career advancement. Cargill management meets at least bi-annually to conduct comprehensive succession planning based principally on employees' KEIS ratings. This system applies company-wide and has directly impeded the career progression of the named plaintiffs and the proposed class.

50. The KEIS criteria for designating employees as having "high potential" are almost entirely subjective. Under this system, managers are asked to select employees they consider to have "high potential"; give them numerical ratings on certain subjective "behavior traits," such as "communication" or "initiative"; and grade their readiness for promotion (i.e., whether the employee has achieved his or her potential, should be able to advance one more level or salary grade, or has potential for at least two more levels of advancement). Cargill does not share these ratings and designations with anyone but mid-to-upper level and executive management at Cargill. However, the ratings and designations often are the principal considerations when determining promotions, employee raises and payment of bonus or incentive income.

51. Cargill makes no meaningful effort to foster diversity through this system or to prevent bias from infecting this subjective process. Cargill does not effectively train its predominately white managers on how to rate employees under this system or how to detect discrimination in the process. As a result, Cargill does not select African American employees as high potential employees in numbers commensurate with their performance and objective accomplishments.

52. The effect of this biased, subjective potential rating system is exacerbated because Cargill does not require internal posting of all salaried positions, to allow open and competitive applications. Cargill almost never posts openings at salary grade 12 and above, thereby shielding

open positions from a competitive candidate screening process. This is contrary to numerous recommendations to corporate headquarters proposing a comprehensive posting system for all open positions. Nor does Cargill follow or require any designated screening or competitive candidate selection process for open promotions. As a result, Cargill allows its overwhelmingly white management to preselect favored employees for promotions, often citing or relying on KEIS ratings, without consequence or effective internal corporate review. This discretion increases for progressively higher positions in the corporate hierarchy.

53. KEIS also directly affects the management training and mentoring offered to employees. Cargill management operated a career and skills development program known as the "Cargill Leadership Development Program," or by its acronym "CLDP," as well as an "Executive Education" program through the Minnesota Management Institute and the executive education programs of many of the major college and universities around the world. The CLDP, which began in 1991, allowed Cargill management to select a group of approximately 30-50 salaried employees who then participated in a yearlong program that involved training sessions lasting 2-4 days every four to six weeks. The program applied company-wide and was designed to accelerate leadership skills and career development for the selected employees.

54. Cargill gives employee KEIS ratings great weight when determining whom to select for CLDP and related program participation. As a result, very few African American employees have ever been selected to participate in this program. For instance, in the first five years of the program, from 1992 through 1997, 151 Cargill managers participated in the program. Only three, or less than 2%, are African American, and they failed to realize the same benefits from the program as similarly situated non-African American participants.

55. Cargill has long enforced a company-wide policy to "promote from within" whenever possible. Therefore, as African American employees increase in number in entry-level positions at Cargill, the number of African American employees in higher-grade positions should correspondingly increase. This has not occurred. There is only one African American officer-level employee at the company, Frank Sims, a Corporate Vice President of Transportation with twenty-eight years of experience. The KEIS system at Cargill creates and perpetuates this pattern of race discrimination.

**2. The Selection Grid Process**

56. Originally designed pursuant to the *Foster* Consent Decree to guide fair promotion decisions, Cargill uses the "Selection Grid Process" to provide a seemingly objective imprimatur on wholly subjective, pre-determined and discriminatory promotion and termination decisions.

57. Under the *Foster* Consent Decree, the Selection Grid Process required all Cargill managers to determine the "core competencies" and objective qualifications for all open non-entry level promotions in five job families (accounting, data processing, merchandising, production and sales), and to evaluate all candidates in the light of these qualifications *in advance* of filling any open position. To the extent a minority and/or female employee was as qualified for a promotion as other candidates under the mandated grid analysis, the Consent Decree required Cargill to select that minority or female employee for the position.

58. After the Decree expired, Cargill managers have continued to use the Selection Grid Process and have expanded its application far beyond the five job families. However, they have perverted its use to facilitate rather than eradicate discrimination.

59. Among other abuses, Cargill has permitted its managers to use the Selection Grid Process *after* preselecting candidates for open promotions, thereby allowing them to justify, after the fact, discriminatory promotion and layoff decisions that were entirely subjective and directly contrary to equal employment opportunity law. Cargill management has actively concealed its improper use of this system to the present time.

**3. Performance Management Process (PMP)**

60. Cargill's company-wide PMP and previous MBO systems governing performance appraisals have design flaws that enable managers to use the system in a biased manner. Cargill often uses unfair performance appraisals to prevent advancement of African Americans, to explain pay inequities, and to justify discriminatory terminations.

61. One component of Cargill's PMP rates employees on numerous "behavioral competencies" such as "incentive," "leadership" and "communication." The behavioral competencies are almost entirely subjective and not linked to any specific tasks, making them more vulnerable to discriminatory manipulation. Managers rate African American employees disproportionately poorly on the subjective behavioral competencies.

62. Another component of the system requires managers and supervisors to design "Key Result Areas" or KRAs to reflect the critical areas of responsibility for the employee. Cargill policy requires each manager or supervisor to meet with every employee the manager supervises at the start of the fiscal year (June 1st), and design KRAs to serve as objective measurements of the employee's performance in the following year. Then, periodic evaluations of the employee are supposed to occur based on his or her progress against the agreed-upon goals. However, supervisors and managers regularly violate these requirements in relation to African American employees. Some African American employees are not regularly reviewed.

Others are not informed of their KRAs until after the performance review is complete and the rating period has ended. This has been the pattern for the named plaintiffs and the larger class. The oversight of the PMP process is so lax that managers can, and often do, manipulate the ratings at will if they are unhappy with the resulting employee rating. As a result of this unfettered discretion, African American employees are generally rated less favorably than similarly performing non-African American employees. This affects annual compensation, advancement, training, and mentoring, thus perpetuating the discriminatory pattern.

### D. Infected by Executive/Managerial Bias, the Three Evaluative Processes Produce a Pattern and Practice of Discrimination in Advancement, Compensation and Termination Decisions

63. The experiences of the named plaintiffs in terms of advancement, compensation and termination reflect the devastating impact of these systems on African American managers and professional employees at Cargill, and depict the larger pattern that affects the class. African American salaried employees consistently are rated lower than similarly situated non-African American peers in the PMP/MBO process, despite equal or better objective performance. African American employees in general, and even those limited number of African American employees who are recognized as exceeding expectations in the PMP/MBO system, fare even worse under entirely subjective systems like KEIS. African American employees either are not rated at all, or are identified as having lower potential for advancement than lesser performing and similarly situated non-African American peers. As a result, Cargill denies African American employees the opportunities in succession planning that accompany the KEIS ratings, making those employees less competitive for job openings at the same level as similarly situated non-African American employees. Also, through manipulation of the Selection Grid Process, Cargill unfairly denies promotions to African American employees and/or justifies their terminations. All of

these systems negatively impact African American employees' compensation in comparison to their non-African American peers.

**1. Advancement**

64. Numerous African American employees have applied for advancement opportunities and/or promotions for which they were qualified, only to be rejected. Still others were deterred from applying because, based upon Cargill's treatment of minorities, they believed that such applications were futile. Cargill managers are frequently permitted to "preselect" candidates before posting positions, and to publish the preselection in the posting, thus expressly deterring qualified African American candidates from applying. Other plaintiffs and class members were not even permitted to be candidates for promotions that were never posted and were filled through non-competitive favoritism. This pattern is not seen among non-African Americans at Cargill.

65. As recently as last year, Cargill internally published a summary of "exit interviews" for valued employees who left Cargill between December 1, 1999 and May 31, 2000. This survey acknowledged the existence of an "old fashioned work environment" throughout Cargill, where promotions were based on personal relationships with managers and not on merit. The result is that qualified African American employees do not advance at a rate commensurate with their skills or objective accomplishments, and fall dramatically behind similarly situated, less qualified non-African American employees. A description of the advancement experiences of several plaintiffs demonstrates ways in which these systems at Cargill unfairly deprive African American employees of advancement opportunities.

66. Rod Arnold participated in the CLDP program in 1993-1994, and was rated under the KEIS system in this time period, although he does not know his specific ratings. He received

three promotions between 1985 and 1996, the last being to a grade 12 Rail Fleet Manager in the North American Corn Milling Division. Since then, he has not been competitive for any promotions, despite his excellent objective performance. This leads to the conclusion that Cargill now considers Arnold "appropriately placed" and thus not promotable, or has not even rated him under this system since 1996. Arnold was passed over for three promotions last year, all of which went to less qualified white males. Peter Cleary was awarded a grade 13 Rail Fleet Manager position, Jeff Greavu was awarded a grade 13 General Transportation Manager position, and Richard Dolski received a grade 13 Supply Chain Manager position. Cargill failed to post two of these jobs, and did not even bother to interview Arnold although he expressed his interest in each position. After a department consolidation in January 2001, Arnold was demoted to a grade 11 Maintenance Manager position. He was permitted to retain his grade 12 designation after this demotion, but his ability to receive salary increases or promotions has been severely restricted. Despite his extensive experience and successful track record as a manager, Arnold was not considered for any other position in lieu of demotion.

67. Cargill has repeatedly passed over Sean Allen for promotions in favor of less qualified white employees. Allen transferred to a Territory Manager position in the Salt Business Unit in May 1998 because Mike Schmit, the white male Director of Sales, told him he had management potential and that management positions would be available to him after 18-24 months. Allen still has not been promoted to a Regional Sales Manager position despite three years of successful performance as a Territory Manager. Although Allen met all of the objective qualifications for a recently available promotion, Cargill passed over him in favor of Dennis Warnke, a white male with limited sales experience. When Allen questioned him about this, Schmit explained that Warnke had scored higher on the Selection Grid Process used to award the

position. Schmit promised to "work with" Allen to ensure better scores on future grid tests, but would not provide him with any of the paperwork for the grid process or explain how Warnke could have scored more highly despite his inferior qualifications.

68. When Clintonia Simmons told the hiring manager she was interested in a new Commercial Manager position for which she was qualified, she learned that pre-selection had already occurred for the job. The manager told her words to the effect that "they already had someone in mind for the position." Simmons did not get the position.

69. Steve Wint has seen his Caucasian peers promoted into positions that were not posted or were posted after the position was already filled. Wint was interested in a promotion to Shift Coordinator that went to Alan McDorman, a Caucasian employee who started nine months after Wint. The Shift Coordinator position requires a skilled employee who is cross-trained in a variety of jobs. Steve Wint is cross-trained, but McDorman is not. Despite Wint's seniority over McDorman, and the fact that he is cross-trained, he was not even offered a chance to apply for the position.

70. Cargill has repeatedly denied promotions to Della Dickson despite her twenty-plus year tenure and her MBA degree in finance. Shortly after receiving her MBA in 1994, Dickson was rated under the KEIS system and was selected for an executive education program and active mentoring. Cargill assigned Frederic W. Corrigan, currently an Executive Vice President at Cargill and then President of Cargill's Fertilizer Division as her mentor. Corrigan paid little attention to Dickson, and did nothing to guide her in seeking greater opportunities and advancement at Cargill. When Dickson recently requested the opportunity to participate in the CLDP process, her immediate manager, Doug Montgomery, told her she was not "competitive" for this program, with no further explanation. This has devastated Dickson's ability to advance at Cargill. In 1997, Dickson made a

lateral transfer to her current grade 10 Project Manager position. Since then, Cargill has failed to consider her for numerous promotions for which she expressed interest and for which she was qualified. For instance, in December 2000, Dickson learned that Cargill white managers Dan Ruiter, Dave Schimke and Wayne Teddy placed a less qualified white employee, Karen Morgan, into a position that was entirely consistent with Dickson's repeated requests for promotion opportunities. In the spring of 1998 she was the only member of her team to express an interest in a grade 13 Rate Management Team Leader position. Cargill never even interviewed her, and awarded the position to a white male with little experience, whom Dickson had to train for almost every aspect of the job. Dickson received her first negative performance evaluation in twenty years in July 2000, after she complained to her boss Steve Ward about being repeatedly passed over for promotions and having to work in a hostile work environment. Even before this negative review, Dickson frequently exceeded objective criteria for the position she held, yet generally was rated only as "meets expectations" in the PMP process.

71. Cheryl Willis has been denied numerous promotions that have instead been awarded to less qualified white peers or subordinates. She had the highest score under the Selection Grid Process for a Senior IT Consultant position in February 2001 for which she applied after being laid off. Her managers supported her candidacy for the position. Nonetheless, a representative from the Cargill Human Resources Department informed them that they could not offer Willis the position, and they should not worry about her because she "should have no problem finding a position outside of Cargill." Cargill then claimed Willis "was not qualified for the promotion" and gave it to a white employee.

72. Jacqueline Jenkins witnessed her non-African American peers advance past her into management during her nine year Cargill career. Jenkins refused to sign some of her performance

evaluations because she felt they had been written so as to prevent her from being promoted to a management position. These evaluations also disregarded her objective performance accomplishments such as meeting her financial targets. When she was constructively discharged in August 1997, she explained in a memorandum to Veronica Phillips, General Manager of Cargill's Oilseeds Division, and Bruce Weinard, Manager of Cargill Marketing, that she had been a victim of the PMP/MBO process and could no longer tolerate this system: "I am convinced that subjectivity is disguised as 'manager's discretion' and is far too great a part of the evaluation formula which I can no longer embrace."

73. Even a program allegedly designed to enhance advancement opportunities for African American employees has been remarkably ineffectual. In the early 1990s, James Haymaker, a Cargill Senior Manager, implemented and operated an internal company-wide system at Cargill known as the "General Manager Program." One express purpose of the program was to identify and cultivate African American management candidates. The program selected persons with high potential for a four-year sequence of work experience, training and mentoring. At the conclusion of the program, Cargill would place graduates in a General Manager or equivalent position. At least eleven African American candidates have participated in the program over the years. Despite their selection into the program, these candidates still encountered the pattern of race discrimination that exists throughout Cargill and creates a glass ceiling for advancement. Cargill neither placed these participants into a General Manager position at Cargill, nor did it even place any of them into management positions with direct profit and loss responsibility. Numerous similarly situated non-African American program participants were assigned to General Manager positions and advanced rapidly to more senior management.

**2. Compensation**

74. Cargill not only prevents African Americans from advancing, it also pays them less than non-African American employees performing similar work in the positions to which African Americans are confined. Cargill used twenty-three salary grades, each of which had a corresponding range of pay for base salary. The job positions assigned to each grade are determined through the Hay point administration process. Decisions regarding salary grade levels, ranges, and job positions assigned to the salary grades are determined through the human resource function at corporate headquarters. The KEIS and PMP rating systems have a direct discriminatory impact on compensation, as these ratings are considered when making salary adjustments, annual pay increases, and bonus, incentive and deferred income decisions. The compensation experiences of plaintiffs demonstrate systemic racial discrimination.

75. At one or more points in their careers at Cargill, plaintiffs, including Rod Arnold, Michael Mitchell, Clintonia Simmons, Sean Allen, Della Dickson, Louis Darden, Virginia Douglas, Toya Brown, Jacqueline Williams, Emily Tyler, Jacqueline Jenkins, Phyllis Reece, Vivian Little, Anthony McDowell and Steve Wint have learned that they were earning less pay than their peers and/or subordinates although they had at least comparable qualifications and performance.

76. Plaintiffs also have found that even when Cargill recognized their entitlement to higher pay, unlike their white peers, they had to challenge the company and complain about delays in awarding earned raises before they would receive increased compensation. Plaintiffs who had this experience include Rod Arnold, Clintonia Simmons, Sean Allen, Jacqueline Jenkins and Charles Scott.

### 3. Termination

77. Through these and other discriminatory acts, Cargill actually or constructively terminated many African American employees. Sometimes these terminations were prefaced by demotions and/or subjection to disparate discipline. Cargill company-wide policy prohibits termination of any employee with four years of service without prior approval by corporate committees comprised of senior executives. Furthermore, the EEO Committee is to review the termination of any minority employee with less than 30 months of service. Cargill management freely and without consequence ignored these policies when terminating the plaintiffs and members of the proposed class. Examples of plaintiffs' termination experiences demonstrate how Cargill's pattern and practice of race discrimination resulted in their unlawful separation from employment.

78. Cargill abused both the PMP and Selection Grid Process to achieve Sean Wright's termination. In 1999, Cargill gave him an overall "below expectations" review, despite meeting or exceeding all objective criteria for his position. This review occurred amidst a Selection Grid Process to determine whom to retain in Wright's department. Wright was one of eight Merchants required to compete for four new Customer Solution Specialist (CSS) positions in his newly restructured department. The top four candidates for the four open CSS positions came down to Wright and three white co-workers. Instead of placing Wright into one of the four open positions, his white manager, Jim Reif, bypassed him in favor of a less qualified white employee, Michelle Phillips. Reif told Wright this selection was based on the Selection Grid Process, but would not answer any of Wright's questions about his scores. Cargill then terminated Wright, telling him that his scores prevented him from being a candidate for any other Cargill position.

79. Louis Darden, a twenty-three year exemplary Cargill employee, was abruptly terminated on May 15, 2001, based on alleged misconduct for actions taken at the direction of his Plant Manager. Cargill did not terminate the Plant Manager who is white.

80. When Phyllis Reece asked Cargill manager John Mooneyham for a more challenging position, he gave her an alleged "promotion" to a job in Chesapeake, Virginia, which came with more job responsibilities but without a pay increase. Reece complained when Cargill left her to handle two jobs for a year and a half following the transfer of the Superintendent of Maintenance. Cargill managers then asked her to resign. When she filed a grievance, her managers gave her poor performance reviews, began documenting meetings with her, and assigned her additional tasks. Ultimately, they fired her.

81. Cheryl Willis was laid off during a downsizing of her department in April 2001. To justify retaining one of two less qualified non-African Americans to take over a position held by Willis, her white manager, John Ringquist, manipulated the Selection Grid Process by adding a master's degree to the requirements. Willis had performed the position extremely well even though she did not have a master's degree. Manager/customer, Joel Way, told Willis that he talked with Ringquist about Willis' strengths for the position, but Ringquist did not seem interested in his opinion.

82. In October 1997, white manager John Holbeck gave staff accountant Cheneta Hughey a negative PMP review, claiming that numerous areas needed immediate improvement. None of these areas had been brought to Hughey's attention previously, and she had always achieved and closed the books assigned to her on time and accurately, usually without help or guidance from Holbeck. Holbeck falsely accused Hughey of not following Generally Accepted Accounting Procedures and thus causing a "mistake" in her books. He immediately placed

Hughey on a 30-day "Performance Improvement Plan." When the 30 days ended, he terminated her without any detailed explanation of why her performance warranted termination.

83. Tausha Tate had no reasonable choice but to resign from her Production Manager position at Cargill. She had been put on probation unfairly and Cargill had failed to respond to her repeated requests for assistance in developing her management and production skills. She knew Cargill would fire her if she did not leave, and she could do nothing about it. She currently works as an Operation Associate IV for Kimberly Clark, where she has received excellent performance reviews.

84. Toya Brown knew by March of 2001 that Cargill was not going to give her opportunities for advancement and that she had no reasonable choice but to leave after four years in the same job, same grade and same location. This was so, even though she worked long hours when that was needed, particularly during harvest season, had favorable performance reviews, and was often asked to train new merchants for the Houston office.

85. In each of these and other examples, Cargill has manifested a continuing and company-wide pattern and practice of discrimination against black employees in the areas of advancement, compensation and termination. Among other things, Cargill allows its managers to exploit and manipulate the KEIS, Selection Grid and PMP processes to the detriment of African American employees and with no effective external review or controls.

### E. Cargill's EEO and HR Functions Have Failed to Protect Class Members from the Impact of Cargill's Racial Bias and Hostility

86. While Cargill manages its overall human resource functions through its Corporate Human Resource Department and through various claimed EEO and diversity initiatives, over the years that Department and those centralized initiatives have failed to adequately and

effectively monitor, identify and remedy the impact of Cargill's discriminatory patterns and practices on its African American employees.

87. While giving lip service to EEO and diversity initiatives, Cargill's lack of real commitment to those programs demonstrates that racial animus pervades the company starting at the top. For example, in October 1998 Cargill appointed Dawn Collins to the newly created position of "Diversity and Retention Specialist." In this position, Collins was responsible for creating, promoting and overseeing programs designed, in part, to ensure that Cargill developed and maintained a diverse workforce. Collins met with disturbing overt resistance to and lack of support for her efforts, which included recruitment at historically black colleges, an internship program for students at colleges that participated in the United Negro College Fund, and a pilot program designed to improve Cargill's compliance with the affirmative action plans some departments were required to file with the government. Also, efforts by Cargill's EEO Department to fulfill its responsibility for coordinating the recruitment and company-wide placement of qualified minority candidates have repeatedly met overt resistance. As a result, such recruitment efforts have waned significantly in recent years.

88. Cargill's EEO and HR functions also failed to prevent the company from retaliating against African American employees who challenged unfair treatment or tried to enhance EEO opportunities. For example, manager James Norton's efforts to recruit employees through a national black MBA program were met with overt resistance that turned into negative performance evaluations and an invitation to look for work elsewhere. Other African American employees, like Della Dickson, Phyllis Reece and Jacqueline Williams, who challenged unfair treatment experienced similar adverse repercussions. Cargill's corporate Human Resources,

EEO and diversity functions failed to protect them in the same way it has failed to protect them from discriminatory processes such as KEIS, the System Grid Process and the PMP.

**F. The Effect of Cargill's Pattern and Practice of Discrimination**

89. Cargill's pattern and practice of discrimination has resulted in a workplace where African American managers and professional employees over many years have experienced and will continue to experience systemic discrimination in advancement, compensation and termination, absent company-wide injunctive and declaratory relief to remedy the effects of past and ongoing discrimination and to ensure a discrimination-free workplace for African American employees in the future.

90. Plaintiffs and the class have suffered economic losses as a result of Cargill's discriminatory treatment of them in the areas of advancement, compensation and termination. They are entitled to relief in the form of back pay, front pay and other compensatory damages.

91. As a result of their discriminatory treatment, these individuals, and those similarly situated, also have suffered emotional harm for which compensatory damages are appropriate. Among other things, Cargill's conduct has caused emotional distress, and has affected the dignity, pride, reputation and self-esteem of plaintiffs and potential class members.

**G. Summary of Cargill's Discriminatory Employment Practices**

92. In short, Cargill has adopted and maintained a systemic and company-wide pattern and practice of race discrimination that has adversely affected its current and former African American employees in the areas of advancement, compensation and termination. As set forth above, these discriminatory patterns and practices include, but are not limited to, the following:

a. Implementing and manipulating the KEIS program and its progeny in a manner detrimental to the equal employment opportunities of African American employees;

b. Implementing and manipulating the Selection Grid Process to deprive African American employees of advancement and employment opportunities;

c. Implementing and manipulating the PMP/MBO process to deprive African American employees of advancement, compensation and employment opportunities;

d. Implementing and manipulating the CLDP program in a manner detrimental to the equal employment opportunities of African American employees;

e. Denying African American employees promotional opportunities because of their race;

f. Paying African American employees less compensation because of their race;

g. Terminating African American employees because of their race;

h. Failing to monitor the effect of the discriminatory use of the KEIS, Selection Grid and PMP/MBO processes;

i. Failing to monitor the effect of advancement, compensation and termination decisions at Cargill on African American employees;

j. Failing to ensure that Cargill decisions about advancement, compensation and ongoing employment were based on non-discriminatory factors; and

k. Failing to follow policies designed to ensure review of termination decisions for discriminatory motivation.

93. On information and belief, the employment practices above also are responsible for a statistically significant adverse impact on African Americans regardless of the motivation for those practices.

## V.

## CLASS ACTION ALLEGATIONS

94. Plaintiffs bring this class action under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), and Minnesota Rule of Civil Procedure 23.01 and 23.02(b) and (c), on behalf

of the following ascertainable class: all past, present, or future African American employees of Cargill who, at any time during the liability period, satisfied the following conditions:

- worked at Cargill or any subsidiary or affiliated company;
- was stationed within the United States;
- was a salaried employee;
- has not signed an effective and enforceable release of all of his or her claims; and
- was, is, or may in the future be adversely affected by Cargill's continuing pattern or practice of discrimination in advancement, compensation and termination and/or by the adverse impact of the employment practices identified in ¶ 92.

95. The race discrimination claims under Title VII and the MHRA warrant the creation of the Class because both the threshold requirements of Fed. R. Civ. P. 23(a) and Minn. R. Civ. P. 23.01 and the additional requirements of Fed. R. Civ. P. 23(b)(2) and (3) and Minn. R. Civ. P. 23.02(b) and (c) are present in this case.

96. **Numerosity.** The actual number of class members is unknown at this time, but plaintiffs estimate that the class consists of over 1,500 current and former employees. It is impracticable to bring all or even a substantial percentage of them before the Court through joinder.

97. **Commonality.** Questions of law and fact are common to the class. The employment practices by which Cargill discriminates on the basis of race, such as KEIS and the System Grid and PMP processes have an effect on all class members to their common detriment. Questions common to all the class members include the questions whether Cargill engaged in a pattern and practice of discrimination with regard to each of the types of conduct set out above in paragraph 92; whether those employment practices have had a statistically significant adverse

impact on African American employees at Cargill regardless of motivation; whether Cargill engaged in a pattern and practice of discrimination against plaintiffs with malice and/or with callous indifference to the federal rights of the plaintiffs and the class; and whether Cargill's implementation of employment practices that had a disparate impact on African American employees was done with deliberate disregard of the rights of plaintiffs and the class under the MHRA.

98. **Typicality.** The claims of the individual plaintiff class representatives are typical of those of the class. Each is a member of the same protected class and each has worked at Cargill in the United States during the liability period. Plaintiffs have worked at many levels of Cargill's workforce, but all within the grade levels included in the proposed class. All of the plaintiffs challenge the same discriminatory courses of conduct engaged in by Cargill, and those courses of conduct have negatively affected all African American employees, regardless of differences in their job duties, pay, or other circumstances of their employment. The interests of the plaintiffs are therefore aligned with those of the class.

99. **Adequacy of representation.** Plaintiffs will fairly and adequately represent and protect the interests of the class. They are broadly representative of African American employees and former employees of Cargill and are committed to achieving appropriate relief for the entire class. Moreover, they have retained counsel with extensive and successful experience representing plaintiffs in employment and civil rights class action litigation. Plaintiffs, through their counsel, have the financial resources to prosecute this case vigorously on behalf of the entire class.

100. **Injunctive relief.** Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) and Minn. R. Civ. P. 23.02(b) because Cargill has acted in a manner that justifies injunctive

relief for the class as a whole. Plaintiffs and the class ask the Court to order Cargill to cease and desist its discriminatory practices and to order changes in Cargill's policies and practices concerning advancement, compensation and termination of employees including the KEIS, Selection Grid and PMP processes, and effective monitoring and enforcement of equal employment opportunities for African American employees.

101. **Predominance of common claims.** Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) and Minn. R. Civ. P. 23.02(c) because the common issues raised by plaintiffs' claims, some of which are identified above, predominate over purely individual issues. A class action is the best means of addressing the issues raised by the claims. Inasmuch as all members of the class allege that they were subjected to the same company-wide pattern and practice of race discrimination and/or experienced the same adverse impact from Cargill's employment practices, requiring each class member to pursue his or her claim individually would entail needless duplication and would waste the resources of both the parties and the Court. Moreover, for two reasons, few individuals have filed lawsuits and few would file lawsuits if the class action did not proceed. First, while Cargill has substantial resources to defend any litigation, few class members could afford to pursue individual litigation because the cost of litigation is sufficiently great, and the monetary relief to be achieved sufficiently small per capita. Second, Cargill's history of retaliation against class members who speak out against racial discrimination has discouraged, and will discourage, many current employees from bringing a lawsuit.

**COUNT ONE:**

**VIOLATION OF 42 U.S.C. § 1981**

102. All Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

103. All Plaintiffs and the other potential class members they seek to represent are members of a protected class of African Americans.

104. Cargill has denied plaintiffs and the class they seek to represent of equal rights in the enjoyment of benefits, privileges, terms and conditions, and in the termination of their employment relationship on the basis of their race in violation of 42 U.S.C. § 1981. As set out in ¶ 92, Cargill's discrimination is manifest in various ways, including limiting or denying opportunities for African Americans to advance in the company on an equal basis with non-African Americans, compensating them less than similarly-situated non-African American employees, and terminating African American employees for conduct for which non-African Americans are not disciplined or terminated and through selecting African American employees for layoff or position elimination when less qualified non-African American employees are advanced and retained.

105. Cargill has been motivated by discriminatory animus in its treatment of African American employees, as demonstrated, among other things, by the directly discriminatory remarks of top executives, substantial evidence that Cargill is and has been aware of the inequities and has chosen not to address them or has taken entirely inadequate remedial measures; evidence that Cargill has developed and implemented or manipulated systems for the purpose of perpetuating these inequities; and on information and belief, by the level of statistical disparity in the treatment of African Americans as compared to non-African Americans in the areas of advancement, compensation and termination.

106. Cargill has therefore engaged in a continuous pattern and practice of discrimination in violation of 42 U.S.C. § 1981 and continuing throughout the liability period to the present. This conduct represents a continuing violation of the rights of the plaintiffs and the class.

**COUNT TWO:**

**DISPARATE IMPACT DISCRIMINATION**

**UNDER MINN. STAT. § 363.03, Subd. 11**

107. Plaintiffs Rod Arnold, Nii-Akwei Acquaye, Della Dickson, Jacqueline Williams and Cheryl Willis repeat and reallege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

108. Plaintiffs Rod Arnold, Nii-Akwei Acquaye, Della Dickson, Jacqueline Williams and Cheryl Willis and the other potential class members they seek to represent are members of a protected class of African Americans.

109. On information and belief, Cargill engaged in employment practices responsible for a statistically significant adverse impact on African Americans. These practices as set out in ¶ 92 include but are not limited to the "Key Employee Identification System," used to identify high potential employees; the "Selection Grid Process," used in connection with promotions and terminations; and the performance appraisal system, known as the "Performance Management Process" (PMP) and its predecessor "Management by Objectives" ("MBO") used in connection with decisions about advancement, compensation and termination.

110. These policies and practices are not manifestly related to the jobs of the class and they do not further any important business purposes.

111. Even if Cargill could demonstrate that these policies and practices are manifestly related to the jobs of the class or could show that they significantly further an important business

purpose, comparably effective practices would cause a significantly lesser adverse impact on the identified protected class.

112. Cargill has therefore engaged in a continuous pattern and practice of disparate impact discrimination in violation of Minn. Stat. § 363.03, subd. 11 and continuing throughout the liability period to the present. This conduct represents a continuing violation of the rights of the plaintiffs and the class.

## PUNITIVE DAMAGES

113. Cargill's actions constituting discrimination against African American employees in violation of 42 U.S.C. § 1981 have been and continue to be conducted with malice and/or with callous indifference to the federal rights of the plaintiffs and the class. Also, clear and convincing evidence exists of defendant's deliberate disregard of the rights of plaintiffs and the class under Minnesota law. Evidence on which plaintiffs and the class claim punitive damages includes but is not limited to: Cargill's awareness of its obligations under 42 U.S.C. § 1981 and the MHRA, based, among other things, on its prior *Foster* Consent Decree, prior discrimination claims brought against it, and the lip service it gives to valuing diversity and providing equal opportunity for its employees; Cargill's malicious, reckless and/or callous failure to adequately and effectively monitor, identify and remedy the impact of Cargill's discriminatory animus on its African American employees, particularly as that racial bias and hostility has been facilitated through KEIS and the Selection Grid and PMP processes; Cargill's deliberate indifference to the impact of its systems on the advancement, compensation and termination of African American employees; Cargill's deliberate and insidious use of sham policies and procedures to discriminate against African American employees; and evidence of retaliation against employees who participate in EEO and diversity activities and/or who complain about racism at Cargill.

114. Punitive damages are therefore proper under § 1981 and the MHRA in an amount to be determined by the jury based on its determination of the amount needed to punish the defendant for its misconduct and to serve as an example or warning to others not to engage in such conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully pray:

A. That the practices of defendant complained of herein be determined and adjudged to be violative of the rights of plaintiffs and the class under 42 U.S.C. § 1981, and of the Minnesota Human Rights Act, Minn. Stat. § 363.01 *et seq.*;

B. That a permanent prohibitory injunction be issued prohibiting the defendant, its officers, agents, employees and successors, from engaging in the discriminatory employment practices complained of herein.

C. That a permanent mandatory injunction be issued requiring that the defendant adopt employment practices in accord and conformity with the requirements of 42 U.S.C. § 1981 and the Minnesota Human Rights Act, Minn. Stat. § 363.01 *et seq.*, and further requiring that the defendant adopt and initiate an effective affirmative action program designed to ensure equal treatment of all their African American employees and prospective employees.

D. That an injunction be issued to restore plaintiffs and the class to the positions and compensation at Cargill that they would have achieved absent discrimination;

E. That judgment be entered in favor of plaintiffs and the class, and against the defendant, for back pay (including interest or an appropriate inflation factor) and front pay in amounts owing to plaintiffs and the class, including compensatory damages in an amount equal to three times the actual damages proven at trial, punitive damages, and damages for past and

future emotional distress, harm to reputation, self-esteem and other emotional injuries, in amounts to be determined at trial.

F. That plaintiffs and the class be granted attorneys' fees and the costs and expenses of this action;

G. That the Court retain jurisdiction until such time as the Court is satisfied that the defendant has remedied the practices complained of herein and are determined to be in full compliance with the law; and

H. That any other further and appropriate relief available under the law be awarded as this Court finds appropriate.

**JURY DEMAND**

Pursuant to the Seventh Amendment to the United States Constitution, 42 U.S.C. § 1981, and Fed. R. Civ. P. 38 and 39, plaintiffs request and/or demand trial by jury with respect to all issues triable and/or triable as of right by jury.

Dated: May 7, 2003

**SPRENGER & LANG, PLLC**

By: ______________________

Lawrence Schaefer (MN No. 195583)
Susan M. Coler (MN No. 217621)
Teresa K. Patton (MN No. 205679)
Sprenger & Lang, PLLC
325 Ridgewood Avenue
Minneapolis, MN 55403
(612) 871-8910

Michael D. Lieder (DC Bar No. 444273)
Steven M. Sprenger (MO Bar No. 43994)
Sprenger & Lang, PLLC
1614 20th Street, N.W.
Washington, DC 20009-1001
(202) 265-8010