UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| RODERICK ARNOLD, et al.,<br><br>On behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>*Defendant.* | CIVIL ACTION NO. 01-CV-2086 (DWF/AJB)<br><br>CLASS ACTION<br><br>**DECLARATION OF LORI BUCHHEIM** |

Lori Buchheim declares that the following is true and correct:

1. I am a law clerk at the law firm of Sprenger & Lang, PLLC.

2. When I started working for Sprenger & Lang ("S&L"), I received extensive training on how to conduct witness interviews. One of the things stressed during this training was that S&L cannot solicit plaintiffs, and, therefore, I could not ask anyone if they wanted to be a plaintiff or join the case. Specifically, I was instructed that all discussions about representation or joining any case must be initiated by the witness. If a witness initiates that type of discussion, I am to immediately pass the call to an attorney or take the witness' phone number and have an attorney call the witness back. I cannot and did not solicit clients or engage in discussions with witnesses about whether or not they could or would be represented by S&L or whether they could join any case.

3. I was instructed that at the beginning of each call with a witness, I must identify myself by name and job title (i.e., "law clerk") and identify the name of the law

firm ("Sprenger & Lang"). I also must immediately ask the witness for his or her current and past job titles. I am not allowed to contact or talk to any current or former managers.

4. After the initial training, I sat in on approximately five interviews conducted by an experienced paralegal. That same paralegal monitored all or parts of my initial interviews, and an attorney reviewed my first set of interview notes. Among other things, my interviews were monitored to make sure that I did not say anything inappropriate.

5. After conducting each witness interview, I asked the witness if s/he would be willing to sign a declaration. I usually had to explain what a declaration was – a sworn statement. I also informed witnesses that I would be using the information provided to me during the interview to draft the declaration. I have never told any witness that he or she "had to" sign anything.

6. After an interview where a witness agreed to sign a declaration, I drafted a declaration from my interview notes. Then, I sent (by mail or sometimes e-mail) the witness a copy of the draft declaration. In my correspondence with each witness relating to the draft of the declaration, I said that the witness should be comfortable with everything stated in the declaration and that s/he should change any language s/he was not comfortable with or would not normally use. When I received a declaration back from a witness, I made any corrections and returned it to the witness for his/her further review. We repeated this process until the witness was satisfied and comfortable with the declaration.

7. I interviewed Glenn Ford on July 30, 2003. I used a list of topics that I wanted to cover. On that list are several Cargill-related acronyms, including "PMP" and "MBO," which are acronyms used by Cargill to describe types of performance reviews.

From what I discovered during my interviews, most employees know the acronyms, but may not know what the acronyms stand for. When drafting the declarations, as I did in Mr. Ford's declaration, I used the full words and then used the acronym. Mr. Ford may not have been able to discuss "Management by Objectives" in his deposition, but during our interview, he specifically used the acronyms "MBO" and "PMP" when he discussed his Cargill performance reviews.

8. I interviewed Candy Smith on August 6, 2003. Ms. Smith and I discussed her work experiences at Cargill. I never asked her about becoming a plaintiff, and she never expressed interest in joining the class action. She agreed to sign a declaration. At no time did she express to me that she wished I would stop calling her. Ms. Smith actually called me months after signing her declaration requesting a case update.

9. On March 2, 2004, I attempted to contact Anthony Skipper at what I understood was his home phone number. A woman representing herself as his wife answered the phone. I told her my name, the firm's name and asked if I could speak to Mr. Skipper. She said he was not home and asked if she could take a message. I explained that S&L represented a group of African American employees and former employees of Cargill in a race discrimination case against Cargill. I said I wanted to speak with Mr. Skipper about his work experiences at Cargill. She said that I should try back on Wednesday at 4:30 pm. I said, "Thank you," and ended the phone call. I did not ask for Mr. Skipper's work number because it is the policy not to call current employees while at work. I did not mention his job title or grade level, nor did I ever ask her for anyone else's phone number. Due to other matters, I did not call Mr. Skipper back.

10. Not all witness contacts are initiated by S&L. I received at least five calls from people who initiated contact with S&L either from viewing our case-related website or from finding information about the case from somewhere else.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2 day of August, 2004, at Minneapolis, MN.

Lori Buchheim