UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | | |
|---|---|---|
| RODERICK ARNOLD, et al.,<br><br>On behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>*Defendant.* | ) | CIVIL ACTION NO. 01-CV-2086 (DWF/AJB)<br><br>CLASS ACTION<br><br>**DECLARATION OF LAWRENCE P. SCHAEFER IN PROCEEDINGS REGARDING DEPOSITION OF R. BILL DOUGLAS**<br><br>**FILED UNDER SEAL** |

Lawrence P. Schaefer declares that the following is true and correct:

1. I am a partner at Sprenger & Lang, PLLC ("S&L"). We represent the plaintiffs and putative class in the above-captioned case.

2. This Declaration and the attached documents are provided to this Court solely for the limited purpose of opposing Cargill's Motion to Overcome Attorney-Client Privilege and Work Product Claims of R. Bill Douglas ("Douglas") and others. It is also being provided to Douglas. This Declaration does not waive any privilege associated with attorney-client communications in this case, and will not be disclosed to anyone else, in any form, unless ordered by an appropriate authority. The information in this Declaration is being provided to the Court to allow a full evaluation of the nature of these communications and the circumstances surrounding the firm's coming into possession of certain documents described herein. The intent, however, is to preserve the

**EXHIBIT 1**

confidentiality of this attorney-client relationship and all communications associated with this relationship that do not relate to these documents.

3. On February 2, 1998, Ray Bill Douglas ("Douglas"), a former employee of Cargill, retained S&L to advise him about whether some proposed consulting could be interpreted to conflict in any way with the terms of a Release and Settlement Agreement he had signed in January 1998. Douglas had been a senior manager in the Human Resource function at Cargill, and had terminated his employment involuntarily, pursuant to this Release and Settlement Agreement. This initial consultation involved one substantive meeting with me. Douglas executed a Retainer Agreement and paid an initial consultation fee.

4. On September 15, 2000, Douglas met with me to discuss the issue of whether systemic discrimination against salaried African American employees was occurring at Cargill, and had been occurring in the past. Douglas believed that he had been a victim of this discrimination, and knew many current and former employees who shared this belief with regard to both their individual employment and the existence of a pattern of bias. Douglas was aware that S&L had previously represented a class of African American professional employees in successful litigation involving Cargill, so he knew of the firm's expertise in this area. I asked Douglas at the beginning of this discussion whether all of his communications with S&L regarding this issue were for the purpose of seeking the firm's legal advice, and he stated that it was expressly for that purpose. Douglas and I both understood that the attorney-client privilege would apply to these communications.

5. At the outset of my interactions with Douglas on this issue, I told him emphatically and unequivocally that, given his prior senior management position at Cargill and his exposure to confidential and attorney-client privileged communications, he could not disclose to me or anyone at S&L any written or oral communications that could be considered to fall within Cargill's attorney-client or work product privileges. Apart from inadvertently providing the documents I describe herein, Douglas has never communicated anything to S&L that could be considered attorney-client privileged or work product communications.

6. S&L frequently is asked to investigate alleged systemic discrimination at companies, as the firm has a national reputation in this area. Before, around, and after the time of Douglas' September contact with S&L, numerous current or former Cargill employees had approached the firm concerning alleged systemic discrimination issues at the company. We actively investigated several discrimination and other similar complaints involving Cargill. S&L successfully prosecuted a race and gender discrimination class action, *Foster, et al. v. Cargill, Inc.*, Civ. No. 3-82-1829 (D. Minn.), which resulted in a Consent Decree that expired in 1989. In 1998, the firm filed a contract-based claim for an unpaid bonus award on behalf of former Cargill Vice President Jeffrey A.Z. Hilligoss, which I successfully tried to a jury in Hennepin County District Court in July 2000. S&L initiated administrative litigation on behalf of Gail Berkeley, Carol Hawley, and all salaried female employees at Cargill in July 2000. A true copy of the EEOC charge filed on behalf of Berkeley is attached to this Declaration as Exhibit A. This potential class action was ultimately resolved through individual settlements.

7. Also, African-American Cargill employees contact S&L on an ongoing basis seeking legal advice concerning discrimination. Before the September 15, 2000, meeting I had with Douglas, S&L had already had substantial contact with current and former Cargill employees, at least one of whom became a named plaintiff in this case. S&L was aware of all of the Cargill practices that plaintiffs have identified as at issue in this litigation before Douglas ever sought advice from S&L in September 2000.

8. In approximately November and December 2000 and during the course of the firm's investigation of the alleged pattern of race discrimination at Cargill, Douglas delivered to S&L about 2,000 pages of documents associated with his employment at Cargill. These documents rightfully came into Douglas' possession during his Cargill employment. He provided these documents to S&L because he thought some of them might be relevant to the ongoing investigation. In addition to Douglas' legal right to consult with counsel about confidential matters, I believed he could produce these documents to the firm because his Release and Settlement Agreement, which expressly "supersedes all prior agreements between the parties hereto," required only that he not disclose the facts of or the terms of his settlement to anyone. A true copy of this Release and Settlement Agreement is attached to this Declaration as Exhibit B. This release did not obligate Douglas to maintain the confidentiality of any Cargill documents in his possession; the only terms relating to confidentiality addressed the terms and conditions of his settlement.

9. At that time, and before Douglas shared any documents with the firm, I asked him whether he believed he might have signed any document in the nature of a confidentiality agreement during his employment at Cargill. He told me that he very well

may have, but had no executed document in his possession. He conveyed a form document to me that he thought might be similar to the form he signed, but did not know what contractual obligations applied. He was clear, however, that the relevant clause in the Release and Settlement Agreement should control. In addition to Douglas' legal right to consult with counsel about confidential matters, particularly when those matters involved discriminatory conduct, I believed no contractual agreement prevented Douglas from sharing the documents with S&L for the express and limited purpose of allowing the firm to provide informed legal advice to Douglas and other clients about the possible existence of a pattern of race bias at Cargill.

10. At the outset of Douglas' interactions with S&L related to the pattern of race bias he believed existed at Cargill, I told him that, if his release proved to be effective, he likely would not be able to reap any individual pecuniary gain from the litigation. Douglas understood this from the beginning, but nonetheless sought to assist in the litigation S&L had initiated because he had a very strong desire to see real change at Cargill, and to foster true equal employment opportunity at the company. I have at times advised Douglas that there could be a legal basis for challenging the release. Douglas has never indicated that he would seek this potential relief. He has never been compensated by S&L for any of the time or expense he has devoted to these matters.

11. The paralegal assigned to this case and I reviewed and began to organize the documents provided by Douglas shortly after their production in November 2000. In this initial review, I noticed that a number of these documents were designated as "Privileged and Confidential," and/or otherwise appeared to originate from, or be directed to, internal or outside legal counsel for Cargill. I immediately segregated these documents from the

others produced, and did not review them substantively in any manner, except that I noted the date of the documents and the designation or the indication on the face of the document that legal counsel authored or received the document. The dates I noticed on these documents were all well before 1992.

12. Once all of these documents were segregated, I instructed the paralegal to return them to Douglas, and to be sure that no one at the firm reviewed them and that we retained no copies. These originals were returned to Douglas in approximately December 2000. I also talked to Douglas before the originals were returned. I informed him that we were returning these documents and asked him why they were produced to the firm, given our previous instruction about not providing privileged information. Douglas explained that he had never intended to violate this instruction by providing these documents, but that he simply produced all documents in his possession that related to his prior employment without reviewing them against this instruction. He promised that this would not occur again in the future, and that he had no intention of ever sharing these documents with anyone else.

13. I did not return these documents to Cargill at the time for two reasons. First, the firm was at the beginning stages of investigating the alleged pattern or race discrimination at Cargill, and no litigation had commenced. At that time it was more likely than not that no litigation would be commenced, as S&L investigates far more claims of systemic discrimination than we ultimately agree to prosecute. Second, producing the documents to Cargill at that time would have unnecessarily exposed Douglas, a firm client, to whatever response Cargill might choose to make, which we viewed as contrary to our obligations under Rule 1.6 of the Minnesota Rules of

Professional Conduct. Furthermore, exposing Douglas to this risk seemed particularly inappropriate because, apart from being labeled "Privileged and Confidential" and/or appearing to originate from in-house or outside counsel, we had no knowledge that the documents inadvertently provided did, in fact, constitute attorney-client privileged communications. Moreover, the dates of the documents suggested that almost all of them dated back more than ten years, obviously far predating any applicable limitations period should litigation be commenced.

14. S&L filed the above-captioned putative class action race discrimination case in November 2001. Douglas was not a named plaintiff in this case because he had executed a Release that, if considered effective, could bar his right to any recovery. He has nonetheless continued to seek advice from the firm about the ongoing investigation and case because he expects to be a testifying witness and has provided information relevant to the discrimination issues being litigated.

15. The issue of these inadvertently produced documents did not resurface until June 2002, when S&L was completing a due diligence search to make sure it had collected all documents in the firm's possession that might be responsive to Cargill's initial document request in this litigation. In June 2002, Susan Coler, a partner at the firm assigned to this case, examined a box containing Cargill documents that had been presumed to be duplicates of old documents already reviewed. Finding that the initial documents inside were labeled "Privileged and Confidential," Coler did not review them further, except to note this designation. She forwarded the box directly to me, the senior attorney assigned to the file, with a question about how to proceed.

16. Upon noting the designation on these documents, I inquired of S&L employees and attorneys who had worked on this matter, and learned that, contrary to my instructions, a case clerk had made a copy of all of the documents Douglas provided shortly after their initial production in November 2000.

17. These copies were not destroyed or returned to Douglas in December 2000 because the paralegal assigned to the case was not aware they existed. She had never looked in the banker's box, until June 2002, when Coler asked the paralegal to search for and locate all possible documents in S&L's possession in order to respond to Cargill's document requests. At that time, she did not examine the documents, but merely gave the box to Coler. Upon inquiry, I have confirmed that no one has substantively reviewed any of these documents.

18. After learning about the inadvertent retention of these documents, I investigated the firm's obligations with regard to these documents now that active litigation had commenced. This investigation included a consultation with the Minnesota Lawyers Board of Professional Responsibility. An attorney employed at the Board, in an advisory opinion, told me that our ethical obligation could be interpreted to include returning the documents to the potential privilege holder. The next day I sent all of the documents along with a letter to Cargill's counsel. A true copy of the letter is attached to this Declaration as Exhibit C.

19. At no time have I, or anyone at Sprenger & Lang, ever reviewed any of these documents in any substantive manner. We currently retain no copies of these documents, and have no intention of referring to them in any manner in this litigation.

20. Apart from inadvertently providing these documents to S&L, Douglas has never shared with the firm any communications he ever was involved in with any Cargill counsel, either in-house or outside counsel. On one occasion, in my office, Douglas made reference to a comment by Fred Budde, Cargill in-house employment counsel, and I immediately reminded him that Mr. Budde's (or any legal counsel's) comments should not be shared with anyone at S&L. The comment Douglas conveyed was very cryptic and I do not recall its content, but I nevertheless reminded him of the ground-rules for our relationship that we had established at the outset.

21. Douglas has attended group meetings with Cargill clients seeking legal advice. At these meetings, no communications occurred until it was confirmed that all participants in the meeting were S&L clients seeking legal advice from the firm regarding Cargill's discriminatory practices. The attorney-client privileged nature of the meeting was then orally confirmed (for the benefit of the group attending in person and the occasional telephone participant) before any discussions or presentations occurred. Douglas rarely said anything in the meetings he attended. At these meetings, S&L counsel communicated about the lawsuit with its clients, including conveying thoughts and opinions that reflect the firm's legal advice and work product.

22. Douglas has on occasion provided names of current or former African-American employees whom S&L could contact in conducting its investigation of alleged systemic discrimination at Cargill. It is a standard practice for S&L to ask anyone involved in a case for names of other persons who might have knowledge relevant to the investigation and for contact information he or she may have concerning any individual so identified. Douglas also has contacted potential witnesses and/or class members to

discuss their experiences at Cargill and has communicated to S&L the general content of those discussions.

23. Douglas terminated his attorney-client relationship with S&L in February 2003. He has not communicated the reason for this decision to S&L.

24. S&L was class counsel in *Foster, et al v. Cargill*, Civ. No. 3-82-1829 (D. Minn.), a class action case alleging race and gender discrimination. This matter was successfully prosecuted and resulted in a Consent Decree that expired after four and a half years, on August 31, 1989. A true and correct copy of excerpts from the Consent Decree is attached as Exhibit D. These excerpts establish that S&L, as *Foster* class counsel, had the right to request, review, and inspect a number of categories of information pursuant to the Decree, including, but not limited to, written reports detailing Cargill's recruiting, promotion and retention efforts relating to African-Americans and women, and the statistical analysis of the impact of these efforts. While S&L has never substantively reviewed the allegedly privileged documents provided by Douglas, Cargill has described them as principally relating to the draft statistical analysis required under the Decree.

25. On May 1, 2003, Cargill produced a privilege log corresponding to vast numbers of documents it has withheld from production. The privilege log, which is 114 pages long, contains only eight references to Bill Douglas, and only three of the referenced documents even fall within the liability period. The log of redacted documents, which is 12 pages long, contains only two entries referencing Douglas, both before 1995. A summary of these references to Douglas is contained in Exhibit H. Also, S&L has searched its database containing approximately 80,000 documents produced by

Cargill for documents referencing both Bill Douglas and Cargill counsel, Fred Budde, in texts other than mere lists of employees. The search yielded six documents relating to Douglas' negotiation of his termination from Cargill, and five documents dated 1992 or 1993, well outside the liability period in this case.

26. Attached to this declaration as Exhibit E is a true copy of an email produced by Cargill dated December 20, 1996 – a little over sixteen months into the liability period. The email is apparently authored by Nancy Siska, who at the time held a senior human resource position over Cargill's North American operations. In this email, Siska refers to the "Bill Douglas situation," and the need to manage the situation effectively from an "EEO perspective."

27. In this litigation, Cargill claims to have "inadvertently" produced to S&L scores of documents it now claims are protected by the attorney-client privilege. True copies of three letters describing these documents are attached as Exhibit F.

28. Attached to this declaration as Exhibit G is a true and correct copy of *Ransom v. Advance Circuits, Inc.*, No. 4-96-1073 ADM/AJB (D. Minn. Jan. 22, 1999).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of May, 2003, at Minneapolis, MN.

Lawrence P. Schaefer



20571

# CHARGE OF DISCRIMINATION

s form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this completing this form.

AGENCY

[ ] FEPA

[X] EEOC

CHARGE NUMBER

Minnesota Department of Human Rights

State or local Agency, if any

and EEOC

| | | | |
|---|---|---|---|
| AME(Indicate Mr., Ms., Mrs.) s. Gail Berkley | | HOME TELEPHONE (Include Area Code) (612)929-1378 or (612) 382-9043 | S.S. No. 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 |
| TREET ADDRESS 508 Warden Avenue | CITY, STATE AND ZIP CODE Edina, MN 55436 | | DATE OF BIRTH 04/14/59 |

AMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT GENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| | | | |
|---|---|---|---|
| AME ARGILL, INC. | NUMBER OF EMPLOYEES, MEMBERS 1000+ | TELEPHONE (Include Area Code) | |
| TREET ADDRESS 5407 McGinty Rd. | CITY, STATE AND ZIP CODE Wayzata, MN 55391 | | COUNTY Hennepin |
| IAME | | TELEPHONE NUMBER (Include Area Code) | |
| TREET ADDRESS | CITY, STATE AND ZIP CODE | | COUNTY |

AUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] AGE

[ ] RETALIATION [ ] NATIONAL ORIGIN [ ] DISABILITY [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE

EARLIEST (ADEA/EPA) 3/98 LATEST (ALL) 5/22/00

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am a 41 year-old female. I have been an employee at Cargill, Inc. for 17 years, attaining level 11, Supervisor in March 1996 and the position of Manager, level 12, of UNIX Technical Services in the Information Technology ("IT") Department in March 1998. I supervised 17-23 employees. Mr. Alistair Jacques transferred from the Cargill Food sector and became VP in charge of IT Operations in April 1998. Jacques took multiple steps to remove me and other females (Carla Hawley, Cheri Powell, Joan Stewart and Gayl Bunes) from IT management positions, replacing me, Bunes and Hawley with younger, less experienced white males.

In May 1998, Jacques brought Jim Smale, a less experienced, and I believe less qualified white male to fill the vacant management position directly above me. I would have sought transfer/promotion to the management position, but the job description as posted required 5 years experience as a manager. Jacques put Smale in the management position despite the fact that Smale did not possess the minimum 5 years experience as a manager, in violation of Cargill personnel practices. I, however, trained Smale upon his request, in many areas for this higher management position, since I had been in that department and worked alongside the former manager.

Smale then joined Jacques' campaign to push me out of IT. My department was to be merged with a 5-person department led by Dean Schrom, a white male Senior Technical Analyst, in a technical position the equivalent of two management levels beneath me. Smale told me that the management position over the merged department would be posted, that I would be a candidate for the job and that I would be identified as the incumbent. There was no job posting. Cargill instead apparently applied a procedure known as a "selection grid process" to fill the position. Two female co-workers, Amy Berger and Joann Schrantz, were told that Dean Schrom was picked for the position long before the selection grid process began. On September 30, 1999, Jim Smale and Nancy Parten of Human Resources called me into a meeting and announced that Dean Schrom had been selected as Manager over the new department. I asked why the job had not been posted; why the

(cont. on page 2)

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 7/7/00

7/7/00
Date

Charging Party (Signature)

EEOC FORM 5 (Test 10/94)

**EXHIBIT 2**

selection was made through the grid selection process. Smale told me that he didn't want to deal with a group of other applicants. Ms. Parten was silent. On 10/1/99, Smale and subsequently Mr. Jacques issued a notice that Schrom was named Manager of UNIX Technical Services (my former position). My name had been completely eliminated from the organization chart the accompanied the notice. Again, I was expected to train in another, less-experienced male, Dean Schrom.

Jacques and Smale were non-cooperative in my efforts to find other employment for me at Cargill. I pursued a Vendor Relationship manager position under Jay Singleton from October through mid-December 1999. Singleton did not respond to my inquiries until December 7, 1999 when he advised that he no longer had any open positions. In October 1999, I called the Human Resource manager at North Star Steel, a division of Cargill, to ask about job opportunities. My calls were never returned.

I applied for two positions under Mark Middendorf: the Global Firewall Team Manager position and EC Infrastructure Project Manager. I made it very clear to Mr. Middendorf, hiring manager, and Lisa Plummer, Human Resource representative, that I needed to interview prior to December 17, 1999. On 12/15/99, Middendorf told me that he would not accept my application for both positions, that I must choose only one. I chose the Global Firewall Manager position. However, I was not even offered an interview for this position.

Smale would not discuss my job search until December 7, 1999. He suggested I take an entry-level supervisory position in NATLS. I was at a job level 12. This job was at level 11 and reported to an outside consultant. I was eventually forced to accept a job that appeared to have been dreamed up by Alistair Jacques and Steve Morton. The job had no position overview, no accountabilities, no Criteria Statement. I was told I had to decide on the job by 12/17/99. In September 1999, I had applied for a three-month leave under the Family Medical Leave Act (FMLA) to travel to China to adopt an infant. My FMLA leave comenced on January 14, 2000. The actions or non-actions on the part of Smale, Jacques, Middendorf, Morton and others following my application for and approval of FMLA seem to have been defined not only by my gender by also by my legal right to request and receive leave to care for a child.

I felt pressured into accepting whatever position they offered. They established an absolute deadline to accept or decline the undefined job position. The prior negative experiences with Jacques and Smale failing to assist in helping me find comparable work, and the fear that without accepting whatever position was offered, the next step was discussing a severance package, made me believe I had no real choice and I agreed to accept the non-descript job on December 17,1999.

Upon my return to work from Family Medical Leave on May 1, 2000, the Jacques/Morton created job remained a position without a job description, nor any assigned tasks. On May 22, 2000, I resigned rather than continue to work in this discriminatory environment.

## STATEMENT OF CLASS-WIDE DISCRIMINATION ON THE BASIS OF SEX

Women as a class have been discriminated against at Cargill. The number of female employees in senior and executive management positions is shocking: I believe that only 1 of 30 elected officers is female; only 1 of 37 members of the Management Committee is female; only 1 of 102 managers of the business unit is female. Of the 3 female management employees in IT at the time Alistair Jacques took over, none remain. Each of us was replaced by a younger, less experienced white male. I believe this gender discrimination extends beyond Cargill's Information Technology Department.

Cargill utilizes three separate, inconsistent and highly subjective criteria systems to discriminate based on gender: (1) the Key Employee Identification System (KEIS), that allows Cargill managers and executives to identify certain employees with alleged high potential, and to favor those employees in all aspect of the employment relationship; (2) a "Selection Grid Process" used to justify the placement of Schrom into my position, a selection device used when managers don't want to post positions; and, (3) the Cargill Performance Appraisal System. Each of these systems allows Cargill to subjectively define a male employee as superior to a female employee, and perpetuate the advancement in job position, responsibility, training, and accompanying wage increases.

I therefore seek to represent the following class of female professional employees at Cargill:

All female professional employees employed at Cargill from March 1, 1998 through the date of resolution of this complaint who sought and were denied promotions to higher positions that were instead awarded to a male employee, and/or all female professional employees who suffered any adverse employment action, including lower performance reviews, lower wages, less training, or less favorable work assignments, than similarly situated male employees.

**BILL DOUGLAS**

**Telephone interview**
**July 6, 2000**
**Fawn Wilderson**

How is this going to be handled? How'd you get my name? I have a waiver with Cargill and signed it.

I need to get assurances that anything I say will remain confidential.

I have docs from case Paul Sprenger filed – lawsuit brought against Cargill. There's a lot that Paul Sprenger missed.

I could give you names, but I have to ask - in absolute terms - that I not be identified with having provided this information.

I am a little paranoid.

I would prefer to do this other than on the phone. You could be anybody. That leaves me open to liability. But, I know much. It's all probably the same now as it was then.

[Would you like to come to office?]
Let me think. What's the telephone number there?

[I gave him the number.]

You work for Larry? You're Frank's daughter?? Let me call you in two minutes
[He called right back].

Duane would be one for you to contact. I referredd him to Larry.

[He started making a list].

Della Dikson, not married. – Totally under paid in terms of base and incentive compensation.

John Chavers, 22 years, black, now at North Star Steel in Saint Paul. I'll get home phones for you.

Frank Sims – in a high, high place. He probably won't want to get involved.

Cornell Slade

Tommy Williams

**EXHIBIT 3**

Toni Green

John Culmer

Randy Thompson - He's been around a long time. Salt Division.

Cheryl Hunter

Ron Hunter – attorney for Cargill, no relation to Cheryl.

There's another black female at Cargill, too. I'll get his name.

There's a big issue with women – expecially, women of color especially

Let's see – give me a day - No later than Mon. I'll get those telephone numbers for you.

Beverly Franklin – in St. Paul.
really got messed over – now with an insurance company in St. Paul. Has a tale of woe which is symbolic of the culture.

Della, I don't think she's aware of how poorly she's been treated. When she does become aware she'll be very angry.

Michael Jones

Ron Wright

Bill Douglas

**Berkley Call Log**

| Date | Time | Name | Referred by | Action |
| --- | --- | --- | --- | --- |

**EXHIBIT 4**

REDACTED

SUB 0128

7/6/2000

| | | | | |
|---|---|---|---|---|
| " | 11:45 | Bill Douglas | S&L | Wife asked me to call back in a few mins. |
| " | 12:00 | Bill Douglas | S&L | Interview |
| " | 12:21 | Bill Douglas | S&L | called S&L; requested return call |
| " | 7:50 | Bill Douglas | S&L | LM/AM |

REDACTED

REDACTED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| RODERICK ARNOLD, et al.,<br><br>On behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>*Defendant.* | CIVIL ACTION NO. 01-CV-2086 (DWF/AJB)<br><br>CLASS ACTION<br><br>**SUPPLEMENTAL DECLARATION OF LAWRENCE P. SCHAEFER**<br><br>**FILED UNDER SEAL** |

Lawrence P. Schaefer declares that the following is true and correct:

1. I am a partner at the law firm of Sprenger & Lang, PLLC, which represents the plaintiffs and putative class in the above-captioned case;

2. I asked Bill Douglas to review a draft of the Complaint in this case. I made the same request of every Sprenger & Lang client who believed they had experienced race discrimination at Cargill, including each of the named plaintiffs. I have a professional obligation to be sure that the allegations in a complaint are provable, and I asked to have these individuals review the Complaint to fulfill that obligation.

3. I believe Bill Douglas called me and conveyed some minor suggested edits to the Complaint – but I don't recall anything specific. Whatever the nature of these edits, Douglas had no more or less a role in drafting or editing the Complaint than the

**EXHIBIT 5**

numerous other clients from whom I sought input. I don't believe Douglas ever sent me an "annotated" draft Complaint with his suggested edits.

4. I never told Bill Douglas to destroy documents that might be responsive to a subpoena, as he describes in the July 22, 2002 entry in the "Chronology" he brought to his deposition. He testified that he prepared this chronology within a month of his deposition, so it would have been over a year after this conversation. I believe I had a telephone conversation with Douglas on or around July 22, 2002. In this conversation, I informed him that Sprenger & Lang had returned to Cargill documents he had provided to the firm in our earlier investigation, because these documents were marked "privileged." I explained to him in this conversation that the firm had mistakenly kept a copy of these documents, but had never reviewed them and did not retain any other copies. I believe I tried to explain to Douglas how the firm had consulted with the Minnesota Board of Professional Responsibility about its obligations regarding these documents. I recall Douglas being extremely and increasingly angry in this conversation. I apologized for the firm mistakenly retaining these documents, and I'm sure I told Douglas to contact me in the future if he had any questions.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16 day of October, 2003, at Minneapolis, MN.

Lawrence P. Schaefer



56135

FLB/lbj/dcw 12-30-97 (103637)

# RELEASE AND SETTLEMENT AGREEMENT

## Release of Claims and Covenant Not to Sue

This Settlement Agreement, Release of Claims and Covenant Not to Sue (hereinafter referred to as "Agreement") is made and entered into this 2nd day of JAN, 1997 98, by and between CARGILL, INCORPORATED (hereinafter referred to as "Cargill") and R. BILL DOUGLAS (hereinafter referred to as "Douglas").

WITNESSETH:

WHEREAS, Douglas is employed by the Food Sector of Cargill at its Minnetonka Office Center; and,

WHEREAS, Douglas has requested, and will be granted, a retirement under the Cargill, Incorporated and Associated Companies Salaried Employee Pension Plan.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises herein contained, it is agreed as follows:

1. Release of Claims.

Douglas hereby releases and discharges Cargill, its subsidiaries, successors and assigns and all other persons, firms or corporations who are or may be liable, from any and all claims of any kind or character which Douglas has or might have against them, and especially because of all damages, lawsuits or injuries to persons or property, or both, whether developed or undeveloped, arising from or related to any events occurring prior to the date of this Agreement, or otherwise anticipated or contemplated by this Agreement, including, without limitation, Douglas' employment with Cargill and Douglas' retirement from employment with Cargill, whether arising

**EXHIBIT 6**

under the Age Discrimination in Employment Act, 29 U.S.C. §621 et. seq., or any other statute or common law theory of recovery, and Douglas hereby acknowledges full settlement and satisfaction of all claims of whatever kind or character which Douglas may have against Cargill, its subsidiaries and assigns, and all persons, firms or corporations who are or might be liable by reason of the above-mentioned damages, losses or injuries. Douglas hereby releases all of these persons and entities from all claims, injuries, losses or damages, known or unknown, suspected or unsuspected. Nothing herein will release Cargill, its subsidiaries and assigns from any right to indemnity pursuant to said Corporation's By-Laws or Articles of Incorporation or policies of liability insurance for actions taken within the scope of Douglas's business duties and obligations in good faith.

2. Covenant Not to Sue.

Douglas further agrees that he will not institute nor authorize any other party, either governmental or otherwise, to institute any administrative or legal proceedings, including, but not limited to, proceedings before the Minnesota Human Rights Commission, the Equal Employment Opportunity Commission, the courts of any state or the courts of the United States, specifically including but not limited to any proceedings arising under or based on the Minnesota Human Rights Act, Minnesota Age Discrimination Law, and the Age Discrimination in Employment Act, 29 U.S.C. §621 et. seq. against Cargill, its subsidiaries, successors and assigns, and all persons, firms or corporations who are or may be liable for any and all claims of any kind or character which Douglas might have against them with respect to any events occurring

prior to the date of this Release, including, without limitation, any and all claims Douglas might have based on his age arising from or related to Douglas's employment with Cargill, his retirement from employment with Cargill and the terms of this Agreement.

3. Retirement.

Douglas agrees and represents that he will retire from his employment with Cargill at 4:30 p.m. on December 31, 1997.

4. Consideration - Payment Schedule.

Cargill agrees that for and in consideration of the terms and conditions stated herein it will pay Douglas a monthly pension in the amount of $5,000.00 for the life of Douglas. Douglas understands that to the extent his pension payment from Cargill exceeds his actual vested, accrued benefit under the Cargill, Incorporated and Associated Companies Employees Salaried Pension Plan, said excess amount will be paid from the general assets of Cargill. Said monthly pension payment will cease as of Douglas' death. Further, Cargill agrees to pay a bonus equal to 7/12 of the bonus otherwise payable to Douglas for fiscal year 1997-98. It is understood that this is not a guarantee of a bonus payment since all bonus payments are contingent upon Cargill and employee performances. In addition to the above, Douglas is entitled to the following as a Cargill retiree: (a) Retiree Health Insurance coverage on the same basis as any other retiree of like age and service with a January 1, 1998 retirement date; (b) payment of cash options under Cargill's Cash Option Plan as per the Plan Document; (c) payment of any and all unpaid deferrals under the Cargill Stock Appreciation Rights Plan; (d) the ability to convert his Executive Life Insurance Policy to

a personal policy as per the policy provisions; (e) payment of all vested and earned amounts under the Cargill Partnership Plan as per the Plan provisions.

5. Confidentiality.

Douglas represents and agrees that he will keep the terms, amount and facts of this Agreement completely confidential and that he will not hereafter disclose any information concerning this Agreement to anyone, including, but by no means limited to, any past, present or prospective employee or applicant for employment of Cargill. A breach of this section shall result in a forfeiture of any remaining supplemental pension payment.

6. Consultation.

Prior to signing this Agreement, Cargill specifically advises Douglas to consult with an attorney for the purpose of reviewing this Agreement and advising him of his rights and obligations thereunder. Douglas understands that he has 21 calendar days to review this Agreement from his date of receipt of same.

7. Rescission.

Douglas represents that he understands that, to the extent that this Agreement covers the release of any claims of discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C.§621 et. seq. based upon events occurring in the course of Douglas' employment with Cargill, he has the right to rescind this Agreement within seven (7) calendar days of his signing it. To the extent that this Agreement covers the release of any claims of discrimination in violation of the Minnesota Human Rights Act, Minn. Stat. §363.01, et seq., or the Minnesota Age

FLB/lbj/dcw 12-30-97 (103637)

Discrimination Law, Minn. Stat. §181.81, et seq., he has the right to rescind the Agreement within 15 calendar days of his signing it. Said rescission may be delivered in person or by certified mail, return receipt requested to:

F.L. Budde
Cargill, Incorporated
PO Box 5624
Minneapolis MN 55440-5624

8. Merger

This Agreement is merged with and supersedes all prior agreements between the parties hereto.

CARGILL, INCORPORATED

By: R. Kent Morby

Title: Vice President

R. BILL DOUGLAS

R. Bill Douglas

State of Minnesota :
: ss.
County of Hennepin :

Subscribed and sworn to before me this 2nd day of January, 1998

Jean M Washa
Notary Public

Jean M. Washa
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2000

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| RODERICK ARNOLD, et al.,<br><br>On behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>*Defendant.* | CIVIL ACTION NO. 01-CV-2086 (DWF/AJB)<br><br>CLASS ACTION<br><br>**DECLARATION OF SUSAN M. COLER IN SUPPORT OF MOTION TO QUASH SUBPOENAS *DUCES TECUM* AND *AD TESTIFICANDUM*, FOR A PROTECTIVE ORDER, AND IN OPPOSITION TO DEFENDANT'S MOTION FOR STAY**<br><br>**FILED UNDER SEAL** |

Susan M. Coler declares that the following is true and correct:

1. I am a partner at the law firm of Sprenger & Lang, PLLC, which represents the plaintiffs and putative class in the above-captioned case.

2. Attached to this declaration are true and correct copies of the following:

| | |
|---|---|
| Exhibit 1 | Declaration of Lawrence P. Schaefer in Proceedings Regarding Deposition of R. Bill Douglas, and Exhibits C, E and H to the declaration (previously been filed with the Court) |
| Exhibit 2 | September 27, 2002 letter from Matthew E. Klein to the Honorable Arthur J. Boylan |
| Exhibit 3 | September 20, 2001 letter from Lawrence Schaefer to Jan Symchych, with copy of front of envelope |
| Exhibit 4 | Excerpts from the deposition of John Chavers |
| Exhibit 5 | Excerpts from the deposition of Duane Reed |
| Exhibit 6 | Subpoena served on Bill Douglas on March 4, 2003 |

**EXHIBIT 7**

| | |
|---|---|
| Exhibit 7 | Retainer Agreement signed by Ray Bill Douglas with copy of check for consultation fee |
| Exhibit 8 | Subpoena *duces tecum* and *ad testificandum* served on Lawrence Schaefer |
| Exhibit 9 | Subpoena *duces tecum* and *ad testificandum* served on Teresa Patton |
| Exhibit 10 | Subpoena *duces tecum* and *ad testificandum* served on Patricia Jones |
| Exhibit 11 | Subpoena *duces tecum* and *ad testificandum* served on Sarah Madsen |
| Exhibit 12 | Subpoena *duces tecum* and *ad testificandum* served on David Shulman |
| Exhibit 13 | June 6, 2003 Order |

3. The effective filing date of the initial Complaint in this case is August 22, 2001. In an Order dated July 15, 2002, Judge Frank ruled that Minnesota's six-year statute of limitations applies to plaintiffs' claims under 42 U.S.C. § 1981, making the liability period extend from August 22, 1995, through the present.

4. In the spring of 2003, to expedite the resolution of disputes about the more than eleven hundred documents Cargill withheld as privileged, the plaintiffs agreed to identify a smaller group of documents it deemed more important for review by Special Master Peter Thompson. Cargill's original privilege log in this case contains only eight references to Bill Douglas, and only three of the referenced documents fall within the liability period. Plaintiffs deemed none of these documents significant enough to be included in their identification of a smaller group of documents withheld on privilege grounds for review by Special Master Peter Thompson. When Cargill provided a more detailed privilege log of documents reviewed by Special Master Thompson, only two

documents listed Douglas as a recipient. In document #1219, C7447631, found privileged by the Special Master, Douglas was one of forty-one recipients. The special master found the other document, #144, C560385-87, not privileged.

5. In response to various discovery requests, S&L has produced to Cargill a complete set of the documents Douglas provided to S&L. Documents with Bates Numbers P0001-1033 were produced in response to Cargill's Requests for Production of Documents (Set I). This production consisted of documents responsive to Cargill's requests for documents relevant to "any fact or legal theory asserted in the complaint" within the time frame from 1995 to the present. A document with Bates Numbers P2026-2029 was produced in response to Cargill's Requests for Production of Documents (Set VI) seeking documents relating to the report of K. Rashid Nuri. The bulk of the documents from Douglas was provided to Cargill in response to Requests for Production of Documents (Set III) essentially seeking all of the documents provided to S&L by Bill Douglas. The Douglas documents that were *non-responsive* to defendant's prior document requests, that is, not related to any fact or legal theory asserted in the complaint within the time frame from 1995 to the present, were provided to Cargill in this response. Cargill copied and Bates numbered these documents, which are numbered SLRBD 100000-103054. The 200 to 300 inadvertently provided and allegedly privileged documents were returned to Cargill on June 12, 2002.

6. On October 7, 2003, Cargill served subpoenas *ad testificandum* and *duces tecum* on Lawrence Schaefer, Teresa Patton, and Patricia Jones, Sarah Madsen, and David Shulman. Schaefer and Patton are attorneys at S&L, Jones is a paralegal currently employed by S&L, and Madsen and Shulman are attorneys who no longer work for the

firm. All of their depositions are scheduled *prior to* November 17, 2003, the date Cargill noticed the second day of the Bill Douglas deposition. The subpoenas *duces tecum* served on Schaefer, Patton and Jones include the same Exhibit A itemizing fourteen requests. The subpoenas *duces tecum* served on Madsen and Shulman include the same Exhibit A itemizing 8 requests.

7. On August 4, 2003, plaintiffs served documents on Cargill in response to the Court's order requiring them to produce "any documents that Douglas produced to S&L, as well as documents listed in his privilege log." Plaintiffs have fully complied with this order.

8. Plaintiffs have marked in excess of 640 documents in depositions thus far, and of those documents, *a total of two,* marked as Deposition Exhibits 485 and 563, used documents provided by Bill Douglas. Neither of these exhibits bears any privileged or confidential designations. In responding to discovery requests, Cargill produced documents identical to Deposition Exhibit 485. These were produced at Bates Number C303585-589. Cargill also produced documents essentially the same as Deposition Exhibit 563, except that the documents, found at Bates Numbers C144604-605 and 144529-555, reflect the same workshop starting a day later and with different participants than reflected in Deposition Exhibit 563.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of October 2003, at Minneapolis, MN.

Susan M. Coler

# SPRENGER & LANG

A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:
LAWRENCE P. SCHAEFER
MINNEAPOLIS OFFICE
e-mail: lschaefer@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

September 20, 2001

Janice M. Symchych, Esq.
Dorsey & Whitney
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402-1498

***Re: Cargill***

Dear Jan:

On August 31st, my office received the enclosed document in an envelope labeled "confidential". The envelope was addressed to me and had no return address. I was out of the office until recently so I did not open the envelope or review the content of the document until last week. Upon a cursory review, it was apparent that the document is labeled privileged and work product, and that it was drafted for a Cargill management audience. Accordingly, I have not reviewed the document in any substantive manner and I am returning the only copy to you directly.

Please feel free to contact me directly if this letter raises questions.

Very truly yours,

[signature]

Lawrence P. Schaefer

LPS:caw
Enclosure

**EXHIBIT 8**

Letter was opened by Larry and sent on to J. Sywonchych after Clients had been contacted to ensure that they had not sent what was contained in the envelope. Larry was the only person to have seen the contents of the envelope.

RECEIVED
AUG 3 1 2001

Lawrence Shaefer
Sprenger & Lang
325 Ridgewood Avenue
Minneapolis, MN 55403

CONFIDENTIAL

55403+3592

**SPRENGER & LANG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

LAWRENCE P. SCHAEFER
MINNEAPOLIS OFFICE
E-Mail: lschaefer@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

July 12, 2002

**DELIVERY VIA MESSENGER**

Janice M. Symchych, Esq.
DORSEY & WHITNEY, LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498

***Re:*** *Arnold et al. v. Cargill*

Dear Jan:

Enclosed are the originals of Cargill documents which have inadvertently come into the firm's possession and appear to be designated as privileged. I have not reviewed these documents substantively, apart from noting the designation. For several of these documents, I also noticed the recipients and the date in the course of segregating them from other documents which the firm received. After due inquiry, I am confident that no other Sprenger & Lang employee has reviewed these documents substantively, apart from handling them in the course of segregating them and transmitting them to you by this letter. The firm has not made or retained any copies of any of these documents. Please call me directly if this letter or these enclosures raise questions.

Very truly yours,

Lawrence P. Schaefer

:mbk
Enclosures

**EXHIBIT 9**