Issued by the

# United States District Court

## DISTRICT OF MINNESOTA

Roderick Arnold, et al.

v.

Cargill, Incorporated

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER:[1] 01-CV-2086 (DWF/AJB)

TO: **Bill Douglas, 1343 Washburn Avenue N., Minneapolis, MN 55411**

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| **Dorsey & Whitney LLP**<br>**50 South Sixth Street, Suite 1500**<br>**Minneapolis, MN 55402** | **March 21, 2003 at 9:00 a.m.** |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**See attached Exhibit A**

| PLACE | DATE AND TIME |
|---|---|
| **Dorsey & Whitney LLP**<br>**50 South Sixth Street, Suite 1500**<br>**Minneapolis, MN 55402** | **March 14, 2003 at 1:30 p.m.** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| [signature]<br>*Attorney for Defendant Cargill, Incorporated* | 3/3/03 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Matthew E. Klein (#258957), Dorsey & Whitney LLP, Suite 1500, 50 South Sixth Street, Minneapolis, MN 55402. Telephone: 612-340-5666.

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

**EXHIBIT 10**

## PROOF OF SERVICE

| DATE | PLACE |
|---|---|
| SERVED | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on

DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less that 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only under specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of all the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# EXHIBIT A

## DEFINITIONS AND INSTRUCTIONS

For purpose of these Requests, the following words shall have the meanings ascribed to them below:

1. As used herein, the term "document" or "documents" includes, the original or drafts of any kind of written, printed, recorded, or graphic material or sound reproduction, however produced or reproduced, whether sent or received or neither, and all copies thereof, which are different in any way from the original (whether by notation, indication of copies sent or received, or otherwise) regardless of whether designated "confidential," "privileged," or otherwise, and including, but not limited to, any correspondence, paper, book, account, drawing, agreement, calendar, diary, contract, memorandum, telegram, report, record, audio tape, video tape, transcript, study, note, intra-office communication, inter-office communication, electronic mail ("e-mail") communication, computer program, computer file, check, check stub, or note of any conference.

2. "You" or "your" means you, Bill Douglas, and all representatives or other persons acting, or purporting to act, on your behalf.

3. "Representative" means agents, attorneys, and all other persons acting, or purporting to act, on behalf of the designated person.

4. As used herein, "Cargill" means not only Cargill, Inc., but also its officers, employees, and representatives.

5. As used herein, "Sprenger & Lang PLLP" means the law firm itself and its partners, employees, agents, and representatives.

6. "Diary" means a record of events, transactions, observations, activities, reflections, or feelings kept on a daily or frequent basis, including but not limited to notes of such events, transactions, observations, activities, reflections, or feelings.

7. As used herein, "the Litigation" means the litigation captioned *Arnold, et al. v. Cargill, Incorporated*, filed in the United States District Court for the District of Minnesota and assigned Case Number 01-CV-2086.

7. The singular form of a word shall refer to the plural as well, and words used in the masculine gender also include the feminine.

8. If any privilege is claimed with respect to any document requested, please state:

(a) the nature of the document (e.g., letter, memorandum, report, etc.);

(b) the date it bears, or, if undated, the date it was written or created;

(c) its author(s);

(d) the identity of each of its recipients;

(e) its general subject matter;

(f) its present or last known location and/or custodian; and

(g) the privilege claimed and the basis therefore.

9. Unless otherwise specified, the pertinent time frame for these Requests is from January 1, 1995 through the present.

**REQUEST NO. 1:** Any and all documents you provided to Sprenger & Lang PLLP relating in any way to Cargill or your employment with Cargill.

**REQUEST NO. 2:** Any and all documents you received from Sprenger & Lang PLLP relating in any way to Cargill or your employment with Cargill, including, without limitation, any documents prepared by Sprenger & Lang PLLP on your behalf.

**REQUEST NO. 3:** Any and all documents in your possession prepared by Cargill; by any employee, agent, or representative of Cargill (including you acting in such capacity); or for Cargill by you or any other employee, agent, or representative of Cargill.

**REQUEST NO. 4:** Any correspondence, notes, or other documents you or your representatives sent, mailed, delivered, or otherwise provided to or received from any government body, agency, or other person containing, referencing, or commenting upon the Litigation, Cargill, your employment experience at Cargill, or the employment experience of any of Cargill's employees, including, without limitation, any correspondence between you and any current or former employee of Cargill. This request specifically includes e-mail communications, whether currently printed in hard copy or maintained in an electronic format.

**REQUEST NO. 5:** All memoranda, correspondence, notes or other documents that in any way relate to the Litigation, your employment with Cargill, or the employment experience of any of Cargill's employees, including, but not limited to, audio tapes, video tapes, diaries, logs, letters, correspondence, notes or calendars that you or your representatives have made that reference, summarize, describe, or memorialize your employment or any conversations, warnings, or other statements involving you and any current or former officers, employees, or representatives of Cargill.

**REQUEST NO. 6:** All calendars from January 1, 1999 to the present reflecting dates of any meetings with Sprenger & Lang PLLP or current or former employees of Cargill.

**REQUEST NO. 7:** To the extent that you had any relationship with Sprenger & Lang PLLP other than an attorney-client relationship, all documents describing or reflecting that relationship, including, without limitation, documents reflecting any payments made to you by Sprenger & Lang PLLP or offers from Sprenger & Lang PLLP to make payments to you.

**REQUEST NO. 8:** All documents reflecting the date on which your attorney-client relationship with Sprenger & Lang PLLP ended.

**CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**

This document is intended by me, the client, to be subject to my privilege to maintain strict confidentiality with my attorneys.

**INITIAL CONSULTATION RETAINER AGREEMENT**

1. I, Ray Bill Douglas, hereby retain the law firm of SPRENGER & LANG to advise me with regard to potential claims against Cargill, Inc. arising out of my employment, termination of employment or application for employment, on the following terms:

2. I agree to pay to Sprenger & Lang its initial consultation fee of three hundred dollars ($300.00).

3. I understand that I am retaining Sprenger & Lang solely for an initial consultation. Should my employment circumstances require negotiation and/or prosecution of any actual claims against Cargill, Inc., I understand that Sprenger & Lang and I will have to renegotiate the terms of their representation, if any.

4. I understand and acknowledge that Sprenger & Lang has made no promises, guarantees or representations of successful resolution of any claim or the favorable outcome of any legal action that may be filed.

5. The interpretation and enforcement of this Retainer Agreement are governed by the laws of the State of Minnesota.

DATED: February 2, 1998

Ray Bill Douglas [signature]
**Ray Bill Douglas**

1343 Washburn Avenue North
**Address**
Minneapolis, Minnesota 55411-2040
**City/State/Zip Code**

477 - 38 2183
**Social Security Number**

We accept employment on the terms and conditions as set forth above.

SPRENGER & LANG

DATED: 2/2/98

By: Laurence [signature]

Rev. 11-13-97

**EXHIBIT 11**

RAY B. DOUGLAS
LIC. D-242-730-089-086
1343 WASHBURN AVE., N. 588-0462
MINNEAPOLIS, MN 55411

17-1/910 301
0007516122

No. 7554

DATE 2/2/98

Pay to the order of Sprenger & Lang co. $ 300 00/100

Three Hundred 00/00 DOLLARS

Security features included. Details on back.

NORWEST BANKS

Norwest Bank Minnesota, N.A.
Olson Highway Office
615 North Seventh Street
Minneapolis, MN 55479

MEMO

Ray B. Douglas

⑆091000019⑆ 0007516122⑈07554

© DELUXE TOP-STUB

ANTIQUE

**Arnold, et al. v. Cargill, Inc.**

**Summary of Cargill Privilege Log and Privilege/Redaction Log re: R. Bill Douglas**

*Cargill Privilege Log*

| Cargill Log No. | Begdoc# | Enddoc# | Production Status | Date | Author | Recipients | Description | Privilege |
|---|---|---|---|---|---|---|---|---|
| 163 | C118610 | C118618 | Withheld | 09/15/1997 | Douglas, R. Bill | Budde, Frederick<br>Hinnenkamp, Cheryl<br>Hull, Pamela<br>Liesch, Joseph<br>Orke, Dennis | Memorandum requesting legal advice regarding OFCCP audit response | Attorney Client<br>Work Product |
| 559 | C323356 | C323360 | Withheld | 08/30/1994 | Peterson, Barbara | Douglas, Bill<br>Price, Pete<br>Handfield, Lynda | E-mails reflecting information requested by and gathered at direction of counsel for purpose of providing legal advice in anticipation of litigation regarding OFCCP audit response | Attorney Client<br>Work Product |
| 800 | C405024 | C405024 | Inadvertently produced (not returned) | 05/07/1997 | Hott, Paul<br>Carleton, Norma | Douglas, Bill<br>Liesch, Joseph | E-mail providing information for purpose of obtaining legal advice regarding employee leave | Attorney Client |
| 801 | C406687 | C406688 | Withheld | 12/08/1994 | Liesch, Joseph | Douglas, Bill<br>Handfield<br>Hoffman, Laurel<br>Peterson, Barbara | Memorandum providing legal advice regarding discrimination charge and directing investigation in anticipation of litigation | Attorney Client |



EXHIBIT 12

52390

**Arnold, et al. v. Cargill, Inc.**

**Summary of Cargill Privilege Log and Privilege/Redaction Log re: R. Bill Douglas**

| Cargill Log No. | Begdoc# | Enddoc# | Production Status | Date | Author | Recipients | Description | Privilege |
|---|---|---|---|---|---|---|---|---|
| 848 | C439906 | C439906 | Withheld | 03/06/1997 | Hull, Pamela | Ricco, Felix<br>Alexander, Roy<br>Cory, Alex<br>Douglas, Bill<br>Shoemaker, Guy | Memorandum seeking legal review/advice regarding planned RIF | Attorney Client |
| 1017 | C638599<br>C639481 | C638600<br>C639482 | Withheld | 03/30/1992 | Hepworth, H. Jed | Price, Pete<br>Douglas, R. Bill<br>Linder, Doug | Multiple copies of memorandum from counsel providing legal advice regarding modification to employee relocation agreement | Attorney Client |
| 1018 | C638601 | C638601 | Withheld | 04/15/1992 | Hepworth, H. Jed | Douglas, R. Bill<br>Lindner, Doug<br>Price, Pete | E-mails to/from counsel discussing legal advice regarding modification to employee relocation agreement | Attorney Client |
| 1019 | C638602 | C638602 | Withheld | 04/08/1992 | Linder, Doug<br>Hepworth, H. Jed | Douglas, R. Bill<br>Hepworth, H. Jed | E-mails to/from counsel discussing legal advice regarding modification to employee relocation agreement | Attorney Client |

Arnold, et al. v. Cargill, Inc.

Summary of Cargill Privilege Log and Privilege/Redaction Log re: R. Bill Douglas

| *Cargill Privilege/Redaction Log* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Cargill Log No.** | **Begdoc#** | **Enddoc#** | **Production Status** | **Date** | **Author** | **Recipients** | **Description** | **Privilege** |
| 68 | C322845 | C322845 | Produced w/ Redactions | 06/01/1992 | Peterson, Barbara<br>Smith, Susan | Chavers, J<br>Delaney, N<br>Douglas, B<br>Foster, N<br>Gordon, G<br>Houdesh, L<br>Kelley, J<br>Newman, C<br>Palladi, V<br>Pirkle, B<br>Schimke, D<br>Watkin, J<br>Peterson, Barbara<br>Smith, Susan | Handwritten information relating to OFCCP audit regarding diversity training gathered at request of legal counsel in anticipation of litigation | Work Product |
| 119 | C641356 | C641357 | Produced w/ Redactions | 06/07/1994 | Douglas, Bill | Price, Pete<br>Adkins, Gordon<br>Micek, Ernie<br>Urbanic, Mike | Memorandum reflecting legal advice regarding employee separation issue | Attorney Client |



52390

*Arnold, et al. v. Cargill*
Court File No. 01-CV-2086 (D. Minn.) (DWF/AJB)

**DECLARATION OF JOHN SMITH**

I, John Smith, declare that the following is true and correct:

1. I am a 37-year-old African American male. I live in Riverview, Florida.

2. I received my Associates Degree in Business and Automotive and Diesel from the International Technical School in Tampa, Florida.

3. I began my employment with Cargill on March 13, 2000 as one of the original hires for the Tampa, Florida Salt facility. Corey Montgomery (African American) and I were stacking things before the building even went up. In 2001, I became the 2nd Shift Coordinator. I held that job until May of 2002 when Mike Anderson (Caucasian), took over as Plant Manager. Since May of 2002, I have been the 1st Shift Coordinator.

4. Since I started with Cargill, compensation has always been a sore spot for me. When I began my employment, I started at $12.00 an hour. I later found out that the newly hired white employees were starting at $13.00 [$13.50 JCS] an hour. I asked Dan Ramseyer (Caucasian), Production Coordinator, who checked with Diane Placek [Gaskins JCS] (Caucasian), our HR person in Tampa. They told me that no one else made more money than Corey Montgomery or me.

5. However, one year later, I was talking with Scott Dixon (Caucasian), Forklift Driver, and he told me that someone was making more than him per hour, and ~~both Scott and~~ [JCS] this person were making more than me. I couldn't believe it! I found this out on a ~~Friday~~ [Saturday JCS]. On Monday I asked Dan Ramseyer about it. He confirmed it was true. I asked him how this could be? How could I get paid less, when I train everyone, have more

EXHIBIT 13

experience, and I have excellent reviews? In my conversation with Ramseyer, I indicated by pointing at my arm that there was only one reason this was happening to me. It was due to my race and the color of my skin. Ramseyer did not have a response for me and he wanted to wait for Mike Anderson (Caucasian), Plant Manager, to arrive at the facility. When Mike Anderson got in, he and Ramseyer called Jim Crawford (Caucasian), Manager. After that conversation, Mike Anderson told me that he was going to give me a $1.00 raise per hour, but the other guys wouldn't get a raise. I said That not fair For The other workers. JCS

6. I always believed that as this facility grew, I would grow with it. I began to see this was not going to happen for me because I am African American. Dan Ramseyer does inventory and runs sheets. I do this as well when they are off work. JCS and am not paid for it. I worked in the office on light duty after having surgery for a work-related injury, and I learned the JD Edwards system for bills and checks. When Diane Placek Gaskins JCS went on vacation, I took over that duty. I fix things throughout the plant, sweep floors; I do it all and am not paid for it. Before Jim Crawford left the plant, he said I was going to move to the office to handle inventory and production schedules, but that never happened. In approximately August of 2002, I asked Mike Anderson about the possibility of doing the office duties previously mentioned. He said, "We don't have time to do any of that".

7. Job openings are not posted in Tampa. The only position ever posted in our facility happened when Corey Montgomery vacated his 3rd Shift Coordinator position. That is the first time in three years a position has ever been posted.

8. Rafeall Boyd (African American) trained Corey Montgomery and me in when we first got to the facility. He showed us how to drive the forklift and trucks, and how to operate the payloader. When Shift Coordinator positions came up, management at

Tampa completely overlooked him, no interview or anything. The Shift Coordinator positions were filled by: Corey Montgomery, Allan McDorman (Caucasian), and me. It is my belief that Rafeall should have been offered a Shift Coordinator job before McDorman because Rafeall is definitely more qualified than Allan McDorman. Rafeall, Corey and I started the facility and I feel we should have been the first three Shift Coordinators.

9. African Americans at the Tampa Salt facility are given the more labor-intensive jobs. They are in the Dome driving the payloader, shoveling salt and working the bagging room while white employees drive the forklift and trucks.

10. In the Tampa Salt facility, I am given more work and not compensated for it. When I was the 2nd Shift Coordinator, I ran the shift with three temporary employees that I had to train. In addition to training them, I had to load trucks, deal with the drivers, fix equipment and fix anything that went wrong in the Dome. I was doing all of this without a higher title or additional pay. At times I stayed at work all night because McDorman, 3rd Shift Coordinator, did not know how to ~~do his job,~~ Bill out the Bol's, and Load Trucks JCS so I had to stay and help him. Basically, I feel I am doing ~~the work equal to Dan Ramseyer without his title or pay~~ more work Then other white workers/and office work and not get paid for it. In addition, newly hired white employees are brought in making more than I do.

11. In the Tampa Salt facility there is a point system (demerits really) in place to deal with employees that do not call in and do not show for their shift ("no call-no shows") and for employees that are late. It is my belief that the point system is biased against African Americans. It is stated in the policy that assigning points is at the manager's discretion. I told Nancy Siska and Noreen Fitzgerald that this system should be

eliminated because of the different treatment I had seen of the African American employees.

12. There was a white temporary employee at our facility that was having a problem with his paycheck. He thought it should have been more, and he was upset. He did not come to work the next day [handwritten: or call in. JCS]. He should have gotten 10 points. He did the same thing the next day. Again, he should have gotten another 10 points. Everything in the handbook warranted termination for this white employee. However, Mike Anderson, Plant Manager, went to his house and brought him back to work with 0 points! It is my belief this would not have happened with an African American employee.

13. Warren McMath and Vernon Davis are two African American employees that I believe were unfairly terminated at the Tampa Salt facility. Warren worked on my shift and I was the one that trained him in. At the plant we work a lot of weekends. Most times we will not know until the last minute when Mike Anderson ~~calls us in~~ [handwritten: ~~would~~ or Danny Ramseyer would place a note on the door telling us we must work. JCS]. Warren really wanted to take a weekend trip to see his Grandma who had become ill. He had already put it off once. At the last minute, we were ~~called in to~~ [handwritten: told we had to JCS] work. Warren had left for Miami that Friday after his shift to see his Grandma. Mike Anderson fired Warren when he returned on Monday. It's not like Warren was even scheduled to work the weekends!

14. Vernon Davis had accumulated a lot of points. Management told him they would let him keep his job if he went a couple of months without getting any points. They told him they would take some points away if he could do this. However, they watched him so closely that if he breathed wrong he got points. He damaged equipment and that led to his termination. In contrast, there was a white employee named Rob that worked the 3rd

shift and he did not like it. Rob said he would not go in to work and would wait to get fired. Mike Anderson would not fire him though. I think if Rob had been African American he would have been fired, no question.

15. It is my belief that valuing differences and diversity have never been heard of at the Port of Tampa facility. The working environment there has not been friendly. Numerous African Americans have been subjected to racist comments. No one has ever had to apologize. No one has been disciplined to my knowledge for using racial slurs.

16. Mike Anderson ~~and~~ said That JCS Mick Bernie (Caucasian), Kansas Plant Manager, were discussing the employees at the Tampa Salt facility. Mick Bernie said, "Otis [Jones] (African American) hadn't learned anything that he could see since the day he started." Mike Anderson replied "I can fire a person if they don't have any maintenance skills", and "I can get ~~a~~ any old JCS monkey to drive the payloader." I was Standing There when said That And Danny was Also In the Tampa Salt facility it is all African Americans that drive the payloader: Corey Montgomery, Vernon Davis, Otis Jones, Steve Wint, Rafeall Boyd and myself. I took Mike Anderson's comment to mean that he was calling Black employees "monkeys."

17. Otis Jones was in the payloader working in the Dome when Mike Anderson referred to him as a "village idiot." Another time Mike Anderson said to Otis, "You don't rotate a flat tire, you get rid of it."

18. During one of our regular meetings, Otis Jones told Mike Anderson he had something personal he wanted to talk to him about. Mike Anderson asked him to put it in writing, so Otis Jones wrote up the incidents involving the "village idiot" and "flat tire" statements. Otis Jones even said in the meeting, "Mike, I just don't think you like me.

You call me a 'flat tire' and refer to me as a 'village idiot'. I think you are discriminating against us."

19. After Otis Jones spoke with Mike Anderson, I knew Mike Anderson would come and talk with me. He did 2 days later. He told me that Otis Jones had brought up the "monkey" statement and asked me what I thought about it. I told him that black people have been trying to get away from that for years. Whether he meant it or not, it is too late. I also told him he represents Cargill. He never apologized. I could not believe it! I told Nancy Siska and Noreen Fitzgerald all about this. They just shook their heads and asked me if I thought this was racist. I told them "Definitely. Yes." I told them to pull up any website dealing with race and racism, and they will find the monkey and the black guy equation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12 of July, 2004, at Tampa Fl.
(Day) (Month) (City & State)

John Smith

**SPRENGER & LANG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

SUSAN M. COLER
MINNEAPOLIS OFFICE
E-Mail: scoler@sprengerlang.com
Website: www.Sprengerlang.com

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

September 25, 2003

**DELIVERY BY MESSENGER**

Magistrate Judge Arthur J. Boylan
UNITED STATES DISTRICT COURT
638 Warren E. Burger Federal Building
316 North Robert Street,
St. Paul, MN 55101

**CONFIDENTIAL**
**ATTORNEYS' AND COURT'S**
**EYES ONLY**

**Re:** ***Arnold et al. v. Cargill;***
**Court File No. 01-CV-2086 (DWF/AJB)**

Dear Magistrate Judge Boylan:

Cargill's request for an "emergency meeting" and independent investigation regarding concerns supposedly raised by the deposition testimony of R. Bill Douglas is without procedural, factual, or legal support. If Cargill believes it has a basis for dismissing this case or disqualifying Sprenger & Lang, it should file the appropriate dispositive motion before Judge Frank, and the matter can be thoroughly briefed. In the meantime, discovery should continue.

Cargill's call for "emergency" measures and its declaration that Sprenger & Lang is likely to be disqualified from this case are efforts to poison the well and delay the forward movement of this litigation. Cargill's "proclamations" are particularly suspect for two reasons. First, Cargill has yet to make a showing that the purported attorney-client privileged documents Sprenger & Lang returned to Cargill are actually privileged, let alone that review of the documents could prejudice Cargill in any way. Second, Cargill's letter patently misrepresents Douglas' testimony.

Viewed fairly, and in context, the actual record is consistent with Sprenger & Lang's recounting of the material facts surrounding the inadvertently produced documents and does not justify Cargill's accusations of wrongdoing. Cargill's premature request forces plaintiffs to set out those facts below and identify Cargill's distortions of the record. This would give Cargill an unfair advantage if it were permitted to depose Douglas for another day. The Court therefore should terminate Douglas' deposition.

**EXHIBIT 14**

**A. Cargill Has Not Established a Basis for the Emergency Measures It Requests, Let Alone for Disqualification of Sprenger & Lang**

**1. Cargill has not shown that any of the subject documents are protected by attorney-client privilege.**

Any determination whether a breach of privilege has occurred warranting disqualification requires that the documents that Douglas provided to Sprenger & Lang in fact be privileged.

While Sprenger & Lang was still deciding whether to offer representation to Rod Arnold and other current and former Cargill employees, it received several boxes of documents from Douglas. About 200-300 pages were discovered by Sprenger & Lang and segregated as possibly privileged. Through the sworn declaration of Lawrence P. Schaefer, Sprenger & Lang has described how it promptly returned the segregated documents, un-reviewed, to Douglas. Exh. E to Cargill letter at ¶¶ 11-12. Sprenger & Lang also has described how, inadvertently, copies of those documents were made, put into a box, and forgotten for over a year, until plaintiffs were reviewing every possible document in order to respond to Cargill's document production requests. *Id.* at ¶¶ 15-17. When Sprenger & Lang rediscovered the documents in 2002, it promptly returned to Cargill all of the possibly privileged documents ("Douglas documents"). *Id.* at ¶ 18. Again, the documents were un-reviewed. *Id.*

This does not mean, however, that the documents actually were privileged. In its examination of documents Cargill withheld from discovery, Special Master Peter Thompson found documents not privileged even when privilege markings appeared on the face of the documents. The same may be true here.

**2. Cargill has not shown that review of any of the subject documents would be prejudicial.**

A critical factor in evaluating an alleged breach of privilege as a basis for disqualification is whether review of documents, even if it did occur, would be prejudicial to the defendant. If there is no prejudice, there is no basis for disqualification. *See In Re Meador,* 968 S.W.2d 346, 351-52 (Tex. 1998) (extent to which attorney reviews and digests privileged information and the extent to which disclosure would prejudice movant's claims or defenses must be considered in evaluating disqualification motion).

Accordingly, even if any of the documents can be characterized as privileged, Cargill must demonstrate that their disclosure would be prejudicial. Cargill's letters and briefing on the issue of the Douglas documents has been remarkably bereft of any specifics about the nature of the documents it claims Sprenger & Lang reviewed.

The privilege log produced by Cargill in this case supposedly identified all relevant documents withheld on privilege grounds and dating back to the beginning of the discovery period, January 1, 1992. However, Cargill has not identified any of the thousands of pages in

its privilege log as among the Douglas documents. This is consistent with Lawrence Schaefer's declaration to this Court where he noted that the dates on the face of documents returned to Cargill were "well before 1992." *Id.* at ¶11. The likely dating of these documents before the discovery period in this case and well before the filing of this lawsuit, along with Cargill's failure to disclose the contents of those documents to the Court, casts substantial doubt on their materiality to this litigation. Therefore the existence of prejudice is unlikely, even assuming that the documents were substantively reviewed, which they were not.

If any action is taken as a result of Cargill's letter to this Court, it should be an order requiring production of the Douglas documents for *in camera* review by Judge Frank. Cargill should not be allowed to persist in its inflammatory accusations without demonstrating the possibility of prejudice based on the actual documents at issue.

**3. Cargill has no evidence to contradict Sprenger & Lang's representation that it never reviewed any of the Douglas documents.**

The Schaefer declaration states that the Douglas documents were reviewed only to the extent necessary to segregate and return the originals to Douglas and the inadvertently kept copies to Cargill. Exh. E at ¶¶ 11-12, 15-19. As discussed below at § 5, nothing in the Douglas deposition contradicts Sprenger & Lang's representation about how it handled the Douglas documents. Cargill attempts to create some inference of malfeasance by pointing out differences in memory between Douglas and Schaefer as to how the documents were returned to Douglas. 9/23/03 Letter at 4. However, it makes no material difference whether the review and segregation of the documents occurred after Douglas demanded their return or on the timeline Sprenger & Lang was following in its document review process. What is significant is that Douglas testified that Sprenger & Lang told him they had returned all of his documents, which is consistent with the Schaefer declaration at ¶ 12. Tr. at 43. In short, Cargill has offered no evidence contradicting Sprenger & Lang's assertion that it thought it had returned the documents to Douglas, that it never substantively reviewed any of the Douglas documents, that it currently retains no copies of them, and has no intention of referring to them in any manner in this litigation. Exh. E at ¶ 19.

**4. Cargill has no evidence to contradict Sprenger & Lang's representation that Schaefer instructed Douglas not to provide the firm with attorney-client privileged documents or information.**

In its letter at page three, Cargill claims that Douglas' testimony contradicts the statement in the Schaefer declaration that Douglas was told not to disclose "any written or oral communications that could be considered to fall within Cargill's attorney-client or work product privileges." Exh. E, p. 3, ¶ 5. Douglas' responses to Cargill questions about what Sprenger & Lang told him are equivocal at best:

*Mr. Klaas*: Did Sprenger & Lang or Mr. Schaefer or anybody at Sprenger & Lang ever discuss with you whether you should be disclosing to them confidential information that you learned while you were at Cargill?

*Ms. Coler*: Objection, vague.

*Mr. Douglas*: Not that I can, no, not that I can recall, you know, per se, not that I can recall.

Tr. at 31-32; *see also* Tr. at 90-91 (asked whether conversation recounted in Schaefer Dec. at ¶ 12 occurred, Douglas responded "No, not – I can't recall). Despite a "vagueness" objection, Cargill only asked Douglas about "confidential information" (and not attorney-client information) and did not inquire further as to what Douglas meant when he used the phrase "not that I can recall, you know, *per se*." *Id.* This waffling response hardly contradicts the Schaefer declaration.

Later in the deposition, Cargill specifically asked Douglas whether he had "any recollection that would support Schaefer's statement in paragraph 5 of his declaration that he had instructed Douglas not to disclose privileged information or documents. Douglas responded "Well, my only response to that is, and there may have been some language or some conversation in this regard, but there were documents that clearly I had gone over with Larry that Cargill leadership development stuff and icky, [sic] stuff, whether it was confidential or not, I can't recall, . . ." Tr. at 89-90.

The above testimony certainly does not contradict Schaefer's statements that he told Douglas not to disclose attorney-client privileged information and documents to Sprenger & Lang. In fact, despite Douglas' general inability to recall what he was told, Douglas confirmed that "there may have been some language or some conversation in this regard." Tr. at 89-90.

**5. Douglas did not testify that he discussed attorney-client privileged documents with Sprenger & Lang.**

When Douglas testified about what documents he reviewed with Sprenger & Lang, he never referenced any attorney-client privileged documents:

*Mr. Klaas*: And in these documents, I take it some were confidential, some were from the law department, just whatever you had?

*Ms. Coler*: Objection, vague in terms of what these items –

*Mr. Douglas:* Well, they were what they were, and my understanding is that you have a copy of them all, so that's what it was.

*Mr. Klaas*: And did you go over them all with Mr. Schaefer?

> *Mr. Douglas:* No, no. The documents that I recall most clearly presently were involved with the key areas or the key programs that he wanted to know more about. One was, like I indicated, CLP. The Cargill development program, the KIES initiative, oh PMP, the selection grid, and there may have been others, but those, I think that was the bulk of it, the crux of it.

Tr. at 38-39; *see also* Tr. at 41-42 (confirming that he did not discuss with Sprenger & Lang all documents provided to the firm, but only those relating to KEIS, selection grids, CLDP and PMP).

Despite this testimony, Cargill represents to this Court that Douglas testified that he personally met with Schaefer 4-6 times to go over confidential documents "some from the law department." 9/23/03 Letter at 4. This outright misrepresentation of Douglas' testimony demonstrates the overreaching that pervades Cargill's letter request. Douglas consistently testified that the documents he went through with Sprenger & Lang were documents related to specific areas about which questions had been raised, such as the Cargill Leadership Development Program, KEIS, selection grid, and PMP. Tr. at 35-39, 41, 92-93. Douglas also recalled "a letter or a note from Rashid, and some other things that I thought were important or relevant in terms of giving them an overview of Cargill." Tr. at 36-37. Douglas did not indicate that any of the documents actually discussed with the firm had any privilege markings or were, in fact, privileged. At his deposition, Cargill did not show Douglas any purportedly privileged documents for the purpose of inquiring whether he had discussed them with Sprenger & Lang.

Accordingly, in terms of documents, nothing in Douglas' deposition contradicts Schaefer's declaration that, aside from inadvertently providing documents with privilege markings, Douglas has never communicated anything to the firm that could be considered attorney-client privileged or work product communications. Exh. E, ¶ 5.

**6. Douglas did not testify that he disclosed any attorney-client communications with Cargill counsel to Sprenger & Lang.**

Asked whether he had discussed with Schaefer conversations or advice received from Cargill counsel Fred Budde, Douglas responded in a manner consistent with the Schaefer Declaration at ¶ 5. Douglas said "I don't recall that I did. What would have been the nature of it, I can't recall." Tr. at 46-47.

Moreover, the deposition record does not support Cargill's assertion that Douglas has extensive knowledge of Cargill's litigation strategy from his 22 years of working with Cargill's Law Department and Cargill's outside counsel at Dorsey & Whitney. 9/23/03 Letter at 2. Cargill cites the transcript at pages 190-92 for this proposition. There, Douglas discussed the fact that subsidiaries of Cargill were not included in the *Foster* litigation. This is a fact of public record, obviously known to Sprenger & Lang. Cargill's citation to pages 203-206 of the deposition is similarly unavailing in proving Douglas' purported knowledge of Cargill litigation

strategy. In that portion of the deposition, Douglas merely discussed his conversations with Sprenger & Lang about whether Cargill was likely to settle before the filing of the complaint, the fact that Cargill valued its privacy, and conclusions that could be drawn from Cargill's website about who Cargill's customers were. All of these matters are readily known about Cargill as well. Douglas' testimony does not indicate any specialized knowledge, let alone any communication of privileged information to Sprenger & Lang, even if Douglas was privy to it.

**7. Douglas did not testify that Sprenger & Lang suggested that he would be remunerated for any "services."**

Cargill's inference in its letter at page four that Douglas was promised remuneration in exchange for providing information to Sprenger & Lang in this matter is false and not supported by Douglas' testimony. When Douglas was specifically asked whether he had any financial arrangement with Sprenger & Lang concerning his work on this lawsuit, his testimony was unequivocal:

> *Mr. Klaas:* All right, have you received anything of value from Sprenger & Lang since your retirement from Cargill?
>
> *Ms. Coler:* Objection, broad, vague.
>
> *Mr. Douglas:* No, other than, well, lunches or coffee or whatever, same thing I've gotten here.

Tr. at 29-30.

> *Mr. Klaas:* All right. Do you have any sort of financial arrangements with Sprenger & Lang?
>
> *Mr. Douglas:* No.

Tr. at 75; *see also* Tr. at 77 (Douglas identifies "lunches, coffee" as the extent of anything of value he received from S&L).

When Douglas was asked about whether he had any expectation of financial remuneration or income in the future from his involvement in the lawsuit, he stated that Schaefer stated "something to the effect that it would depend on a lot of things, and it was just left kind of hanging, that we'd have to see at the conclusion of this thing." Tr. at 76-78. This testimony was in the context of testimony consistent with Douglas' understanding, and Schaefer's declaration, that there was a time when Douglas could have been a part of the proposed class in this case, if his release could be successfully challenged and if the class was defined to include employees above salary class 15, which ultimately never occurred. *Id.*, Exh. E at ¶ 10. Given Douglas' unequivocal testimony, Cargill again misrepresents the record when it suggests that there was

any agreement, express or implied, that Douglas would be paid for any assistance he provided to Sprenger & Lang.

Cargill infers some discrepancy between Sprenger & Lang's statements that Douglas sought advice from the firm about systemic discrimination issues at Cargill and Douglas' statements that he did not *retain* Sprenger & Lang for advice regarding "systemic discrimination." 9/23/03 Letter at 2-3. Again, this is a distinction without a difference. First, Douglas does not dispute that he retained Sprenger & Lang as his counsel in 1998 and did not fire them until February of 2003. Tr. at 8. Accordingly, Sprenger & Lang was Douglas' counsel when he voluntarily attended meetings and participated in discussions about systemic discrimination at Cargill in 2000. Tr. at 31, 216. Douglas testified:

> There had been a handful of employees that had contacted Sprenger & Lang and who were then contemplating a lawsuit, that is obviously emerged, against Cargill on the basis of racial discrimination, and at a meeting that I attended, the issue, I raised the issue of participation in something like this as to it being consistent with the agreement I'd signed with Cargill, and that was in, yeah, that was in probably the fall of 2000.

Tr. at 31.

Sprenger & Lang has not stated that Douglas retained Sprenger & Lang specifically for purposes of this lawsuit, but rather has stated that Douglas sought advice regarding systemic discrimination at Cargill. *See* Exh. C to Cargill letter (subjects for which Douglas sought advice include systemic discrimination issues at Cargill); Exh. E at ¶ 4 ("Douglas met with [Schaefer] to discuss the issue of whether systemic discrimination against salaried African American employees was occurring at Cargill"). This statement is consistent with Douglas' testimony.

**8. Cargill's assertion that Sprenger & Lang solicited Douglas to provide attorney-client privileged documents from Cargill is unsupported by the record.**

Cargill alleges that Sprenger & Lang specifically solicited attorney-client privileged documents from Douglas, for the assumed purpose of using these documents in this litigation. As with all of Cargill's allegations, Cargill is overreaching. In support of its accusation, Cargill offers a letter to Douglas, an established client who has already been instructed not to provide privileged documents or information, Exh. F. The letter asks for specific types of documents and states the firm would facilitate the arrangements necessary to review the documents. *Id.* The absence of a specific admonition not to produce privileged documents in a letter to an established client cannot be construed as a deliberate solicitation of such documents.

Douglas' testimony related to this issue is confusing at best. Tr. at 35, 92-93. He mentions conversations with various people from Sprenger & Lang. He references offers by Sprenger & Lang to go through documents in response to questions about how to sort them out.

He mentions stating that some of the documents were privileged. and confidential. However, it cannot be concluded from the context that Sprenger & Lang's invitation to go through documents always occurred in the context of a conversation where privileged documents were discussed. Douglas' testimony at page 92 only references "stuff" that is "confidential." It can be concluded from the context that the Sprenger & Lang staff assumed that Douglas was concerned about organizing non-privileged documents and would remove privileged documents before sending the rest to Sprenger & Lang. Again, it is overreaching to conclude that an invitation to allow Sprenger & Lang to sort the documents constituted solicitation of privileged documents. At no time did Douglas ever testify that Sprenger & Lang asked him to provide attorney-client privileged documents.

Furthermore, Sprenger & Lang's conduct in this case refutes any conclusion that it solicited privileged documents. As discussed above, Sprenger & Lang directed Douglas not to provide the firm with privileged documents and information. It is Sprenger & Lang who returned the Douglas documents to Cargill on July 12, 2002, thus precipitating this entire dispute. *See* Exh. A. If Sprenger & Lang actively had been seeking these documents from Douglas to use in this litigation, it makes no sense that the firm would return them to Cargill and never use or refer to them in this litigation.

**9. Douglas' testimony that Schaefer instructed him to destroy documents makes no sense and is belied by undisputed facts.**

Undisputed facts belie Douglas' testimony that Schaefer allegedly advised him to destroy documents, as reflected in a "chronology" prepared a year after the purported conversation. First, the telephone conference when Douglas claims Schaefer gave him this advice allegedly occurred on Monday, July 22, 2002, according to Douglas' chronology. Exh. G. This date is ten days after Schaefer had already delivered to Dorsey & Whitney all of the allegedly privileged documents that gave rise to this dispute. *See* attached Exhibit A; Douglas Dep. Exh. 4. It makes no sense that Schaefer would advise a witness to destroy documents Schaefer had just disclosed to Cargill. Because the documents had already been provided to Cargill, destruction of the documents could achieve no possible advantage for Sprenger & Lang, the plaintiffs, putative class, or Douglas. Sprenger & Lang, of course, did not retain any copies of these documents as was stated in the July 12, 2002, letter (Exh. A), and perhaps Douglas misinterpreted Sprenger & Lang's failure to retain any copies as a suggestion that he do the same. Whatever the source of Douglas' confusion, however, Schaefer never instructed Douglas to destroy any documents in response to a subpoena.

Furthermore, Douglas' recollection that this conversation took place in relation to a "forthcoming subpoena" further demonstrates its falsity. Douglas was not served a subpoena until March 4, 2003, over *eight months* after this alleged conversation, and after Douglas had terminated his relationship with Sprenger & Lang. *See a*ttached Exhibit B.

There is thus no reasonable basis for what Cargill describes as the "most disturbing" allegation of wrongdoing stemming from Douglas' testimony.

**10. Douglas' testimony must be evaluated in its proper context.**

Bill Douglas is an obviously angry witness, who began his deposition testimony by stating that he was suffering from "CRS Syndrome" or "can't remember shit." Tr. at 12. He fired Sprenger & Lang as his counsel after Sprenger & Lang returned documents Douglas improperly provided to the firm. Despite Douglas' anger toward Schaefer and Sprenger & Lang, Cargill has not established and will not be able to establish that Douglas shared any attorney-client privileged information with Schaefer or Sprenger & Lang. Cargill has not established that Douglas reviewed any of the allegedly privileged documents with Sprenger & Lang, and, most tellingly, when Cargill counsel asked Douglas if he ever shared any comments made by Fred Budde with Larry Schaefer, Douglas said he had not. Tr. at 46-47. These undisputed facts alone will preclude any finding of prejudice necessary even to contemplate disqualification.

**B. The Court Should Terminate Douglas' Deposition**

Cargill has chosen to raise these issues after deposing Douglas for one day, obviously concluding that this testimony provides a basis for seeking the relief it requests. Because Cargill filed this request for "emergency" action, the plaintiffs are being forced to disclose their positions on the issues raised and to articulate the deficiencies in Cargill's arguments. Cargill should not be allowed to benefit from this premature request by being allowed to continue its deposition of Douglas at a later date and using what it has learned in this exchange to shape Douglas' testimony differently. Under these circumstances and on fairness grounds, plaintiffs ask the Court to terminate Douglas' deposition.

In conclusion, there is no basis for the emergency conference or relief Cargill seeks. Plaintiffs respectfully ask the Court to direct Cargill to follow the usual methods for resolving issues such as those raised here by filing a dispositive motion before Judge Frank.

Very truly yours,

Susan M. Coler

Susan M. Coler

:mbk
cc: Paul B. Klaas, Esq. (*Via messenger*)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**THIRD DIVISION**

Roderick Arnold, et al.,

Plaintiffs,

v.

Cargill, Incorporated,

Defendants.

Civil No. 01-2086 DWF/AJB

**ORDER ON MOTION FOR STAY OF DISCOVERY, MOTIONS FOR PROTECTIVE ORDERS AND MOTION TO QUASH SUBPOENAS**

This matter is before the Court, Magistrate Judge Arthur J. Boylan, on defendant Cargill's motion to stay discovery [Docket No. 156], pending an investigation regarding disclosure of privileged documents, and defendant's motion for protective order [Docket No. 159], essentially seeking a stay of discovery until the motion to stay discovery is decided. In response to defendant's affirmative investigative efforts, plaintiffs move to quash subpoenas *duces tecum* and *ad testificandum* [Docket No. 161-1] which have been served upon five individuals. Plaintiff further moves for a protective order [Docket No. 161-2] requiring defendant to prepare a privilege log. Hearing was held on October 28, 2003, at the U.S. Courthouse, 316 No. Robert St., St. Paul, Minnesota 55101. Susan M. Coler, Esq., appeared on behalf of the plaintiffs. Paul B. Klaas, Esq., appeared on behalf of the defendant.

Based upon the file, affidavits, declarations, exhibits, and memorandums and arguments of counsel, **IT IS HEREBY ORDERED** that:

1. Defendant Cargill, Incorporated's Motion for Stay is **denied** [Docket No. 156];
2. Defendant Cargill's Motion for Protective Order is **denied** [Docket No. 159];



FILED NOV 26 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

**EXHIBIT 15**

3. Plaintiffs' Motion to Quash Subpoenas is **granted in part and denied in part** [Docket No. 161-1]. Plaintiffs shall respond to document production demands pursuant to the subpoenas *duces tecum* which have been served. To the extent that the subpoenas demand appearances to testify at deposition, the subpoenas are quashed. With respect to documents, plaintiffs are not required to make duplicate productions or to produce materials which have previously been provided to the defendant. Plaintiffs shall prepare and produce a log of documents with respect to which privilege may properly be asserted.

4. Plaintiff's Motion of a Protective Order is **granted** [Docket No. 161-2]. To the extent that defendant seeks to elicit testimony from Mr. Douglas with respect to a particular privileged document, and seeks to preserve the privilege with respect to that document, the document shall be identified by reference number and shall be described in a privilege log in the manner provided in the Order Appointing Special Master dated June 6, 2003.

Dated: November 26, 2003

Arthur J. Boylan
United States Magistrate Judge

**MEMORANDUM**

Mr. R. Bill Douglas is a former management employee of defendant Cargill, Inc. who worked cooperatively with plaintiffs' counsel, Sprenger & Lang, in the early stages of this putative class-action employment litigation, but is not himself a plaintiff in the case. Mr.

Douglas's employment at Cargill included the position of corporate EEO Director, and he also served as a manager in a human resources section. In the course of his employment, Mr. Douglas came into possession of numerous documents pertaining to company employment practices and programs, including confidential Cargill materials that are entitled to attorney–client privilege protections. Douglas's cooperative efforts included his providing many or all of the documents in his possession for review by plaintiffs' counsel. In so doing, Mr. Douglas placed Cargill's privileged documents into the custody of counsel for the plaintiffs, though class counsel contend that Douglas was told that he should not deliver privileged documents. Plaintiffs further assert that those documents were not examined by them and were subsequently returned to Mr. Douglas.

Pursuant to Order dated June 27, 2003, Cargill was allowed to depose Mr. Douglas for two days for the purpose of determining the nature and scope of privileged matters that may have been disclosed to plaintiffs' counsel and to determine whether Douglas had shared information regarding Cargill's litigation strategy. Defendant deposed Mr. Douglas for one full day on September 18, 2003, thereby obtaining testimony upon which the present motion to stay discovery is based. Specifically, defendant contends that the witness acknowledged his extensive familiarity with defendant's litigation strategy as a result of 22 years of employment at Cargill and that he provided a substantial amount of privileged information to class counsel, at their request. It is argued that Mr. Douglas's testimony directly contradicts the representations and declarations of plaintiffs' attorney, Larry Schaefer, with respect to his association with Douglas, the attorney's instructions in regard to disclosure of Cargill's privileged materials, the possibility of compensation to Mr. Douglas, and whether Schaeffer had instructed Douglas to destroy

documents which would be subject to an anticipated *subpoena duces tecum*.

Upon receipt of Mr. Douglas's testimony the defendant requested an emergency conference and sought guidance from the Court as to the appropriate action to take in response to the recently acquired information. The Court received written arguments from both sides and thereafter issued a letter advising the parties that neither an emergency hearing nor guidance from the Court were appropriate in light of the currently existing record. Although the Court noted the seriousness of the allegations regarding the conduct of plaintiffs' counsel, it was further stated that important facts remained in dispute and that each side would have to make an independent assessment of the situation. Finally, the Court rejected plaintiffs' contention that Mr. Douglas's deposition should be terminated and not be allowed to proceed for a second day. Though the Court has authorized the defendant to conduct limited discovery on the subject at hand and has acknowledged that defendant is not barred from moving for disqualification of plaintiffs' counsel or dismissal of the action based upon ethics violations, the Court has neither disapproved nor endorsed any particular course of action and has not promoted the notion that a stay of discovery while an investigation took place would be necessary or appropriate.

Meanwhile, defendant has proceeded with its investigation into the improper disclosure and receipt of privileged information by serving subpoenas *duces tecum* and *ad testificandum* on Sprenger & Lang attorneys Larry Schaefer and Teresa Patton, former S&L attorneys Sarah Madsen and David Shulman, and S&L paralegal Patricia Jones. The deposition of Mr. Douglas has not been resumed. Cargill insists that the Sprenger & Lang depositions can proceed in an expeditious manner and will not significantly delay discovery in the primary case. Plaintiffs oppose any stay of discovery and further respond to Cargill's investigation by moving

to quash the five subpoenas *duces tecum* and *ad testificandum* which have been served. Plaintiffs also move for a order requiring defendant to prepare and produce a log of the privileged documents that were once in the possession of Sprenger & Lang for purposes of referencing privileged documents in deposition without revealing their content.

It appears to be beyond dispute that Sprenger & Lang attorneys came into possession of defendant Cargill's privileged materials through the receipt of documents from R. Bill Douglas, and at some point S&L lawyers came to the realization that they had possession of the privileged documents. The circumstances under which the documents were obtained and returned, and whether plaintiff attorneys actually examined the substance of the materials, is, of course, the subject of defendant's investigative efforts. The Court permitted limited investigative efforts in its June 27, 2003, Order by allowing an extended deposition of Mr. Douglas. After using half its allotted deposition time, defendant determined that sufficient information had been obtained to justify a stay of discovery for further investigation and that perhaps sufficient grounds for disqualification of plaintiffs' counsel had already been elicited through Mr. Douglas's testimony. The Court does not share defendant's present view on the conclusive nature of the evidence. As noted on multiple previous occasions, the Court fully appreciates the potential seriousness of the alleged ethical violations and the implications of Mr. Douglas' testimony. However, the Court has also observed that critical facts are in dispute and no compelling additional evidence has come to light since the parties were advised of the Court's position on this matter by letter on October 3, 2003. The Court does not suggest that the present motion to stay discovery is procedurally improper in any way. The Court merely determines that in the absence of an adequate showing of actual or appropiately inferred prejudice to defendant's

litigation posture and strategy in the underlying case, there is not sufficient justification to halt primary discovery in the case while the investigatory sidebar takes place. The Court certainly acknowledges defendant's interest in a trial free from even the risk that confidential information has been unfairly used against it. In re Potash Antitrust Litigation, 1993 WL 543013, *16 (D. Minn). However, the Court must also respect the notion that disqualification of counsel is a severe remedy which should only be done in cases where the offending attorney's conduct will likely taint the underlying trial. Id. Whatever the ethical violations that may or may not have occurred, defendant's have some distance to go to establish sufficient grounds for disqualification, particularly where the source of privileged materials, Mr. Douglas, is not a attorney and his knowledge of confidential information cannot necessarily be imputed to the plaintiffs' lawyers.

Despite the Court's refusal to stay case discovery, the gravity of the possible ethic violations is duly considered and defendants are not precluded from continuing its investigation. In this regard the plaintiff's are required to respond to defendant's document subpoena as provided in the above Order. Furthermore, defendant is permitted to seek written discovery through interrogatories addressing the receipt of the Douglas documents, the return of privileged materials, and the content of discussions which may have taken place between Mr. Douglas and plaintiff counsel involving the substance of privileged information, if any such discussions took place. The Court is not inclined to permit the depositions of plaintiffs' former and present counsel and staff, particularly where defendants have not yet made full use of their opportunity to depose Mr. Douglas and have not availed themselves of alternative means of discovery.