# Chavers

COPY



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

-----------------------------------

Civil File No. 01-CV-2086 (DWF/AJB)

RODERICK ARNOLD, NII-AKWEI ACQUAYE, SEAN ALLEN, HOLLIS BRANHAM, TOYA BROWN, DAWN COLLINS, LOUIS DARDEN, DELLA DICKSON, VIRGINIA DOUGLAS, CHENETE HUGHEY, JACQUELINE JENKINS, KEITH LEWIS, ANTHONY MCDOWELL, VALERIE MASON-ROBINSON, MICHAEL MITCHELL, PHYLLIS REECE, TONYA ROSS, CHARLES SCOTT, CLINTONIA SIMMONS, TAUSHA TATE, EMILY TYLER, JACQUELINE WILLIAMS, CHERYL WILLIS, STEVE WINT, SEAN WRIGHT, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

CARGILL, INCORPORATED,

Defendant.

-----------------------------------

DEPOSITION OF
JOHN CHAVERS

Taken October 9, 2003
Commencing at 9:06 a.m.

REPORTED BY: DEBORAH A. MAVES, RPR

PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402-1331
(612) 339-0545

Deposition of JOHN CHAVERS, taken on the 9th day of October 2003, commencing at 9:06 a.m., at the law firm of DORSEY & WHITNEY, 50 South Sixth Street, Suite 2100, Minneapolis, Minnesota, before Deborah A. Maves, Registered Professional Reporter and Notary Public of and for the State of Minnesota.

**********

APPEARANCES

On Behalf of the Plaintiffs:

SUSAN M. COLER, ESQ.
SPRENGER & LANG, PLLC
325 Ridgewood Avenue
Minneapolis, MN 55403
(612) 871-8910

On Behalf of the Defendant:

HOLLY S.A. ENG, ESQ.
DORSEY & WHITNEY, LLP
50 South Sixth Street
Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2600

NOTE: The original transcript will be filed with Holly S. A. Eng, Esq., pursuant to the applicable Rules of Civil Procedure.

INDEX

PAGE

EXAMINATION BY:

Ms. Eng ........................................ 3
Afternoon Session .............................. 108
Ms. Coler ...................................... 121

OBJECTIONS:
By Ms. Coler: 7, 9, 19, 20, 21, 29, 30, 38, 41, 50, 52, 53, 54, 55, 56, 58, 59, 72, 75, 79, 84, 85, 86, 87, 88, 90, 91, 92, 95, 97, 104, 106
By Ms. Eng: 88

WITNESS INSTRUCTED: 88, 90, 92, 93, 95

EXHIBITS MARKED AND REFERRED TO:
(Bates numbers in parentheses)

1 1993 Annual Objectives, Performance Review, and Career Planning (C 103371-3374) ............... 55

2 1994 Annual Objectives, Performance Review, and Career Planning (C 103375-3378) ............... 55

3 Annual Objectives, Performance Review, and Career Planning (C 103379-3382) ............... 55

4 The Multi-Cultural Awareness Council (C 562233-2234) ............................... 71

(Original exhibits attached to original transcript. Copies attached to transcript copies.)

84

Q. Have you sought personal legal advice from Sprenger & Lang?
**A. Personal meaning for what?**
Q. For you?
**A. I have not retained them.**
Q. When you say you've consulted with them, what do you mean by that?
MS. COLER: I'm going to object to the extent that it would require you to disclose attorney-client privileges, conversations that we've had. So you can tell her generally, but not the details of any conversations.
MS. ENG: And I would just note for the record that I have a right to at least explore whether or not there's an attorney-client privilege or an attorney-client relationship.
BY MS. ENG:
Q. So when you say that you have consulted with them, what do you mean by that?
**A. I've, I've asked questions about this case and I've participated in a meeting or two pertaining to this case.**
Q. When did you first consult with Sprenger & Lang about this case?
**A. A couple of years ago maybe, early 2001,**

85

**somewhere in there.**
Q. And when you say you've participated in a meeting or two, when did those meetings occur, that meeting or those meetings? Do you remember if it was more than one meeting?
**A. I think it was two meetings.**
Q. When did those meetings occur?
**A. I don't recall the dates.**
Q. What year?
**A. They may have both occurred in 2001, but if not, one in 2001, maybe the other in 2002.**
Q. When you say you asked questions about this case, did you ask about how you could participate in the case or whether you could be a class member in this litigation?
MS. COLER: I'm going to object as calls for attorney-client privilege information.
**A. Not to my recollection, no.**
Q. Were your questions more curiosity?
**A. I suppose we can call them that.**
Q. Were you seeking legal advice from them?
MS. COLER: I'm going to object to the extent it calls for a legal conclusion as to what would constitute legal advice, but you can answer to the extent you understand.

86

**A. I suppose I was.**
Q. How did you first learn that Sprenger & Lang -- well, strike that.
How did you first come in contact with Sprenger & Lang?
**A. I believe I was contacted.**
Q. By someone at Sprenger & Lang?
**A. Yes.**
Q. By whom?
**A. Larry. I don't know Larry's last name.**
Q. Do you recall when you were contacted by Larry?
**A. That would have had to have been in 2001.**
Q. At that point in time, prior to the contact by Larry, did you know that there was any litigation underway against Cargill by Sprenger & Lang?
**A. I don't recall if I knew at that time or not.**
Q. And the litigation was filed, the complaint was filed in November of 2001. Do you know if this telephone call occurred before or after November of 2001?
**A. I presume it to be before November.**
Q. So when Mr. Schaefer called, what did he say?
MS. COLER: I'm going to object to the extent it calls for legal attorney-client privilege information.

87

Q. At that point in time had you ever spoken with Mr. Schaefer before?
**A. No.**
Q. Did you know who he was when he called?
**A. Not until he identified himself.**
Q. Until he introduced himself?
**A. Yes.**
Q. And what did he say to you when he introduced himself?
MS. ENG: There's no privilege, Susan, there's no relationship.
MS. COLER: He can tell you what he said on the first introductory.
BY MS. ENG:
Q. What did Mr. Schaefer say when he called you?
**A. He asked me if I worked for the company and so on. Basically just explained what was going on.**
Q. What did he say? What do you remember about that conversation?
MS. COLER: I need to talk to Mr. Chavers before he can answer that question. I'm going to instruct you not to answer until we've consulted.
Q. At any time during that conversation did Mr. Schaefer -- or did you ask Mr. Schaefer to represent you?

**A. I don't recall. I'm serious, I don't recall.**
Q. At any time during that conversation did you ask Mr. Schaefer for any legal advice?
**A. Yes.**
Q. Did Mr. Schaefer ask you to participate in this lawsuit?
MS. COLER: I'm going to object again in terms of time frame.
Q. During this initial conversation when he contacted you and introduced himself, did he ask you to participate in this lawsuit?
MS. COLER: Objection, vague in terms of participation. And also I'm going to instruct you not to answer. I think I need to be sure that you're clear on when attorney-client privilege would have attached in that conversation. So I'm going to instruct him not to answer and I need to talk to him about it. Let's go.
MS. ENG: And I'll just note my objections for the record. I do think this is an inappropriate conversation.
(Witness conferring with counsel out of the room.)
MS. COLER: You can ask him the question now.
MS. ENG: Let the record reflect that Ms.



Coler and Mr. Chavers had a conversation outside the hearing of counsel and you've now returned.
BY MS. ENG:
Q. Are you ready to answer my questions?
**A. I hope so.**
Q. When Mr. Schaefer called and introduced himself, what did he next say to you?
**A. It's hard to recall specifically what he might have said to me. He invited me to speak with him at his office so I said I would.**
Q. Did Mr. Schaefer tell you how he'd gotten your name?
**A. I don't recall.**
Q. Or why he specifically wanted to talk with you?
**A. I made presumptions.**
Q. What were your presumptions?
**A. That apparently there was something going on that involved African-American people.**
Q. Did Mr. Schaefer tell you what that something was?
**A. He said that he would talk to me about it when we visited.**
Q. Did he tell you to bring any information with you, bring any documents?
**A. I don't recall.**



Q. Did he say anything else in that conversation?
**A. Nothing other than a date and a time and a place.**
Q. And did you subsequently meet with Mr. Schaefer?
**A. Yes.**
Q. What date?
**A. I don't recall.**
Q. What time or place?
**A. I believe it was a Saturday, it was at their offices, Sprenger & Lang offices.**
Q. Where were you when Mr. Schaefer called you?
**A. I don't recall.**
Q. Do you recall if you were at work?
**A. No, I know I wasn't at work.**
Q. Home?
**A. I was either at home or I might have been out, received the call on my cell phone.**
Q. At the time that you hung up the phone, did you consider Mr. Schaefer to be your attorney?
MS. COLER: Objection to the extent it calls for a legal conclusion and vague.
**A. Not at that time.**
Q. This meeting that took place on a Saturday, were there other people in attendance?
**A. No.**



Q. Who was present?
**A. Larry and myself.**
Q. How long did you meet with Mr. Schaefer on that date?
**A. I don't recall how long the meeting lasted.**
Q. During that discussion did Mr. Schaefer explain to you why he'd called you?
**A. Yes.**
Q. What did he say?
MS. COLER: I'm going to object to the extent if this falls into the category of conversations you believe to be privileged with Mr. Schaefer, I'm going to instruct you not to answer.
**A. I've been instructed not to answer.**
Q. The instruction as I understood it is if you believed it to be privileged, his description of why are you here.
**A. Is that what you meant?**
Q. That's what I meant, that's what I asked.
**A. I didn't hear that.**
MS. COLER: What is the question on the table?
MS. ENG: Can you go back and read the question, please.
(Pending question read back.)

MS. COLER: And I'm going to instruct you not to answer if you believed that that question and your response were part of a confidential privileged communication with Mr. Schaefer.
THE WITNESS: Which I did.
BY MS. ENG:
Q. So are you taking Ms. Coler's instruction not to answer that question?
A. **I believe I just did answer it.**
MS. COLER: You can say yes.
A. **Yes.**
Q. So is it your testimony that at the time that you went to Mr. Schaefer's office you believed yourself to be a client of Mr. Schaefer?
MS. COLER: Same objection, calls for a legal conclusion as to what constitutes client and I think it's confusing in terms of client versus attorney-client privilege.
A. **It really is. I was just following up.**
Q. And as I understand your telephone conversation, it was left as I want to talk to you, I'm not going to tell you why, but come to my office and let's talk?
MS. COLER: Objection, mischaracterizes his prior testimony.
A. **That's not necessarily so.**



Q. But Mr. Schaefer didn't explain to you during your telephone conversation why exactly he wanted to talk with you?
A. **He intimated some things, yes.**
Q. What did he say?
A. **I don't recall.**
Q. What did he intimate?
MS. COLER: I'm going to object. If that falls into a portion of any conversation with Mr. Schaefer that you believe was attorney-client privilege, you do not have to answer that question.
A. **I felt that this was attorney-client privilege.**
Q. You said you attended more than one meeting. When did you meet with anyone from Sprenger & Lang again?
A. **I don't recall what the date was.**
Q. Where did you meet?
A. **The meeting was at Sprenger & Lang.**
Q. Was anyone else present?
A. **Yes.**
Q. Who was present?
A. **Other current and former employees of Cargill.**
Q. How many people were present?
A. **I don't recall how many.**
Q. Was Mr. Douglas present?



A. **Yes.**
Q. Was Mr. Reed present?
A. **Mr. --**
Q. Duane Reed?
A. **Mr. Reed was present, yes.**
Q. How about Della Dickson, was she present?
A. **Yes.**
Q. Who else was present?
A. **Willie Harris; Charles Scott; Cheryl Willis; Jackie -- I can't remember Jackie's last name.**
Q. Jackie Williams, Jackie Jenkins?
A. **No, I think it was Jackie Williams that I'm referring to. There were some people that I'm not as familiar with. Sean Allen maybe I think it was. Sean, I think his name is Sean. There were some people there that I don't know their names.**
Q. Approximately how many people would you say were in attendance?
A. **Fifteen.**
Q. And this also was on a Saturday?
A. **I don't recall what day of the week it was.**
Q. Who was present from Sprenger & Lang at this meeting?
A. **Larry; and there were others, but I don't recall who they were.**



Q. Why did you attend this meeting?
A. **I was inquisitive.**
Q. What do you remember about the meeting?
MS. COLER: I'm going to object to the extent it calls for attorney-client privilege information, I'll instruct you not to answer.
MS. ENG: I'll just note for the record that, one, the court has already determined that Mr. Douglas does not have a protectible interest and has allowed us to talk with Mr. Douglas about any meetings that he attended. When I deposed Duane Reed, Larry Schaefer allowed me to talk with Mr. Reed about the meeting in question, I assume it to be the meeting since Mr. Reed has only said that he attended one meeting, and acknowledged that there wasn't a protectible interest there. There is no protectible interest when you have nonprivileged participants in this meeting.
MS. COLER: All right, you can answer the question.
THE WITNESS: Would you restate the question, please.
BY MS. ENG:
Q. I believe the question was what do you recall about the meeting, the conversations at the meeting?
A. **It was a general discussion where people were**

120

**some old stuff at home.**

Q. What sorts of business files did you review?

A. **My electronic files, things that are still in the computer. I went through the paper files in my drawers. Same thing at home.**

Q. And what types of things did you look at with respect to your electronic file?

A. **My PMPs, correspondence, Word documents.**

Q. And what about your paper files?

A. **The same thing. I had, I had a couple of PMPs in my paper file, and I went through correspondence, back years of correspondence.**

Q. Correspondence between you and the company?

A. **Well, correspondence. I keep a file that I just label "correspondence," you know, and I just went through to see if I could find anything that would be related to this in any way.**

Q. And did you?

A. **Nothing other than the PMPs, no.**

Q. And what about this file that you keep at home, what does it contain?

A. **Old junk, you know, maybe information that we may have used in the past from different programs that the company and so on that I thought might have been interesting for future reference.**

121

Q. Did you find anything in your file at home that you thought was relevant to your deposition today?

A. **Nothing relevant to the deposition today, no.**

Q. Other than speaking -- I'm just going to assume you spoke with somebody at Sprenger & Lang about the deposition -- did you speak with anybody else about the deposition today?

A. **I informed my boss I had to be here.**

Q. Anyone else?

A. **My assistant, my personnel coordinator. My wife.**

Q. Anyone else?

A. **No.**

Q. Have you spoken with Sprenger & Lang about any of the matters, the charge matters or litigation matters that you've handled for Cargill?

A. **No.**

MS. ENG: All right, I want to reserve my right to review the transcript and to determine what if any action we might take with respect to the privilege issue. And other than that, I believe I'm done.

MS. COLER: I have just a few questions for Mr. Chavers.

EXAMINATION

BY MS. COLER:

122

Q. Mr. Chavers, did anybody at Sprenger & Lang ever ask you to share any Cargill attorney-client privilege communications with anybody at Sprenger & Lang?

A. **No.**

Q. Did anybody at Sprenger & Lang, Mr. Chavers, ever ask you to share or provide any Cargill attorney-client privilege documents to S & L?

A. **No.**

Q. Was it your understanding, Mr. Chavers, that you should not share any Cargill attorney-client privilege communications or documents with S & L?

A. **Yes.**

Q. And in his first meeting with you, Mr. Chavers, did Mr. Schaefer instruct you not to share any attorney-client privilege communications or documents with Sprenger & Lang?

A. **I don't totally recall, but I believe that that might have happened.**

MS. COLER: That is all the questions that I have.

MS. ENG: I have no other questions.

MS. COLER: We'll read and sign.

(Deposition concluded at 1:20 p.m.)

123

REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of JOHN CHAVERS on the 9th day of October 2003, in Minneapolis, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was reserved.

WITNESS MY HAND AND SEAL THIS 9th of October 2003.

---------------------------------------
Deborah A. Maves
Notary Public, Washington County, Minnesota
My commission expires 1-31-2005