# Douglas

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

---

RODERICK ARNOLD, et al.,

On behalf of themselves and all others similarly situated,

Plaintiffs,

vs. Civil Action No. 01-CV-2086 DWF/AJB

CARGILL, INCORPORATED,

Defendant.

---

VIDEO DEPOSITION OF

**RAY BILL DOUGLAS**

VOLUME I

Taken September 18, 2003
Commencing at 9:08 a.m.

COPY

REPORTED BY: JANICE L. YOUNG, RPR

PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402
(612) 339-0545

The video deposition of RAY BILL DOULGAS, taken under the Rules of Civil Procedure for the District Courts of the State of Minnesota, on September 18, 2003, commencing at 9:08 a.m., taken at 50 South Sixth Street, Minneapolis, Minnesota, before Janice L. Young, RPR, a Notary Public in and for the State of Minnesota.

A P P E A R A N C E S

On Behalf of the Plaintiffs:

SUSAN M. COLER, ESQ.
LAWRENCE SCHAEFER, ESQ.
Sprenger & Lang
325 Ridgewood Avenue
Minneapolis, Minnesota 55403

On Behalf of the Defendant:

PAUL B. KLAAS, ESQ.
MICHAEL IWAN, ESQ.
Dorsey & Whitney, LLP
Suite 1500
50 South Sixth Street
Minneapolis, Minnesota 55402-1498

DENNIS J. ORKE, ESQ.
Senior Attorney, Cargill Law
15407 McGinty Road West
Wayzata, Minnesota 55391

VIDEO TECHNICIAN: Dave Young, Wallin Video

NOTE: The original transcript will be delivered to Paul B. Klaas, Esq., pursuant to the applicable Rules of Civil Procedure.

INDEX


RAY BILL DOUGLAS VOLUME I PAGE

EXAMINATION BY:

Mr. Klaas 4

EXHIBITS:
(Bates numbers in parentheses.)

1 Magistrate Judge Boylan's 6/27/03 Order 55

2 5/7/02 Amended Complaint 58

3 5/2/03 Declaration of Lawrence Schaefer in Proceedings Re. Deposition of R. Bill Douglas 94

4 Notes and Deposition Cheat Sheet and 2/25/02 Staley Memo and 7/11/03 Iwan Letter to Douglas 102

5 Index and E-Mails for Which Privilege is Claimed (RBD 100297-100328) 143

6 Index and Letters for Which Privilege is Claimed (RBD 100290-100294, SL RBD 103061-103069) 143

7 2/2/01 Madsen Letter to Douglas 203


(Original exhibits attached to original transcript; copies to counsel.)

**12**

09:20:26 Sprenger & Lang?
09:20:28 A. Correct.
09:20:40 Q. Can you tell us the last time you spoke with any
09:20:46 employee, African American employee or former
09:20:49 employee of Cargill?
09:21:08 A. Current or former, huh?
09:21:11 Q. Yes, sir.
09:21:20 A. Week ago, less than a week ago, somewhere around a
09:21:23 week.
09:21:24 Q. And who do you have in mind?
09:21:34 A. It would have been, it probably would have been
09:21:41 Randy Thompson.
09:21:49 Q. All right. Any other African American former
09:21:53 employees or current employees of Cargill that
09:21:56 you've spoken with this year?
09:21:59 A. In the last -- African Americans?
09:22:03 Q. (Mr. Klaas nods his head.)
09:22:04 A. Yeah, a bunch. In the last year?
09:22:07 Q. During 2003, say.
09:22:11 A. Calendar year 2003, not 12 months from now.
09:22:16 Q. Yes, sir. Randy Thompson. Anybody else?
09:22:20 A. Yeah, I've spoken with just about all of them.
09:22:24 You're talking about calendar year 2003. Yeah,
09:22:26 all. There is not that many.
09:22:29 Q. How many since the termination of your

**13**

09:22:31 relationship with Sprenger & Lang, how many, can
09:22:35 you identify any former or current
09:22:37 African American employees of Cargill that you've
09:22:40 spoken with, other than Randy Thompson?
09:22:48 A. Oh, yeah. I'd say all. I mean, those that are
09:23:05 here, that are I guess wherever in Cargill that
09:23:13 I've had in the past year or the past portion of
09:23:18 this year. Duane Reed, Cornell Moore or Cornell
09:23:28 Slade, Ron Hunter, Tim. I don't know. Give me
09:23:43 some names, if they're African American. I've
09:23:48 also spoken to some Caucasian former employees of
09:23:56 Cargill, so.
09:23:59 Q. Like who?
09:24:01 A. John Kevin Massee, this -- there was someone else.
09:24:23 But as far as African American employees of
09:24:25 Cargill are concerned, I would say all that are
09:24:37 here. Mike Jones, Frank Simms, and I'm sure there
09:24:57 are others. I just can't think of the names right
09:25:05 now.
09:25:05 Q. Okay, and the most recent former employee of
09:25:11 Cargill you've spoken with is Randy Thompson. Is
09:25:14 that right?
09:25:14 A. Yeah. He just got married or he's celebrating his
09:25:19 marriage --
09:25:19 Q. And --

**14**

09:25:20 A. -- this month.
09:25:21 Q. Any discussion with Mr. Thompson about either this
09:25:26 lawsuit or the claims being made in this lawsuit?
09:25:30 A. No.
09:25:31 Q. Since the termination of your relationship with
09:25:34 Sprenger & Lang earlier this year, have you spoken
09:25:37 with any employee or former employee of Cargill
09:25:41 concerning this lawsuit or the claims being made
09:25:42 in this lawsuit?
09:25:43 A. I'm sure I have.
09:25:45 Q. With whom have you discussed that?
09:25:47 A. I don't know, I couldn't tell you, but I'm sure I
09:25:52 have.
09:25:52 Q. I'm trying to figure out why you're saying you're
09:25:55 sure you have.
09:25:56 A. Well, you know, anybody that worked or works at
09:26:00 Cargill, you know, with this lawsuit -- you say in
09:26:02 the past year. Is that your question again?
09:26:04 Q. No. Since you terminated your relationship with
09:26:08 Sprenger & Lang.
09:26:10 A. With Sprenger. Yeah, as far as that's concerned
09:26:14 too, but yeah, same, the usual suspects, the same
09:26:19 suspects, as it were.
09:26:23 Q. And can you recollect any conversation you had
09:26:25 with Randy Thompson about this lawsuit or the

**15**

09:26:27 claims being made in this lawsuit? Again, and let
09:26:30 me say always since you terminated your
09:26:32 relationship with Sprenger & Lang.
09:26:36 A. The specifics of it, no. I don't know what, you
09:26:47 know, just I guess have I heard anything or what's
09:26:53 going on or something along those lines, would
09:27:03 have been the gist of that conversation, to my
09:27:06 recollection.
09:27:07 Q. Let me ask you a more general question maybe. Do
09:27:09 you recollect the specifics of any conversation
09:27:12 you've had about this lawsuit or the allegations
09:27:15 made in this lawsuit since you terminated your
09:27:18 relationship with Sprenger & Lang?
09:27:23 A. I suffer a little from CRS, and so --
09:27:28 Q. What is CRS?
09:27:29 A. Can't remember shit sometimes. Okay? And
09:27:34 sometimes it will come to me. I'll file that
09:27:36 away, and if it comes to me, I'll try and respond
09:27:40 to it. Give me the question again.
09:27:49 Q. Yeah, and again, I maybe should have said at the
09:27:52 beginning, all we're entitled to is your best
09:27:54 recollection, and if something occurs to you, let
09:27:57 us know.
09:27:57 A. All right. I just thought of another person I
09:28:04 talked to. Cheryl, what's her name, Fraser was

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003

16

09:28:05 her maiden name, works in the salt division. I
09:28:06 didn't talk to her. She sent me an e-mail saying
09:28:10 that her parents or a notice celebrating their
09:28:13 50th anniversary. I know her family. So, I mean,
09:28:16 it's that kind of thing. So if I answer a
09:28:19 question like that and it doesn't come to mind at
09:28:23 the time that you ask the question and I tell you
09:28:26 later that I talked to somebody or something, it's
09:28:31 because I didn't at the time recollect it, but, I
09:28:34 mean, that's the way it is, that happens when you
09:28:36 get old.
09:28:37 Q. Sure. Well, it happens to everybody.
09:28:39 A. You have it too, huh?
09:28:40 Q. Yeah, everybody's got it.
09:28:42 A. Is that right?
09:28:42 Q. Yeah.
09:28:42 A. I never had it like this before. Okay?
09:28:44 Q. The nice thing about it, though, is why don't you
09:28:48 just interrupt us whenever anything occurs to you
09:28:50 that you remember something from an earlier
09:28:50 question, just --
09:28:51 A. Dr. Strangelove. Okay.
09:28:54 Q. Whenever. Now, Ron Hunter is a lawyer at Cargill?
09:29:00 A. He was the last I -- yeah, and so is Tim.
09:29:05 Q. Tim, you say?

17

09:29:06 A. Yeah.
09:29:07 THE WITNESS: What's Tim's last name, Dennis?
09:29:11 MS. COLER: Thomas.
09:29:12 BY MR. KLAAS:
09:29:12 Q. Tim Thomas?
09:29:12 A. Thomas. He just got back I think from a European
09:29:17 assignment, Geneva.
09:29:22 Q. Now, during your -- you worked at Cargill for 22
09:29:25 years, correct?
09:29:26 A. Yeah. Sometimes it seems, it felt like a
09:29:29 lifetime.
09:29:30 Q. And in essentially management or executive
09:29:34 positions throughout?
09:29:37 A. You can call it that.
09:29:38 Q. Well, you were manager of corporate EEO for ten
09:29:43 years, correct, '75 to --
09:29:48 A. Approximately. Well, not from '75. From about
09:29:51 '77, until the time I went into the last job I
09:29:53 held, so whenever that is. That's about nine, a
09:29:56 little less than ten years, whatever. Close.
09:29:58 Q. Was it roughly 1985 that you became HR manager for
09:30:03 the food sector?
09:30:04 A. It was '85, '86, yeah, thereabouts.
09:30:06 Q. And then you served in that position until your
09:30:09 retirement in '97?

18

09:30:12 A. That is correct.
09:30:12 Q. During that period, you worked with I guess a
09:30:18 number of the Cargill lawyers, correct?
09:30:20 A. Correct.
09:30:21 Q. Other than Mr. Hunter and Mr. Thomas, who did you
09:30:24 work with?
09:30:25 A. I didn't work with them.
09:30:25 MS. COLER: Objection, vague in terms of what
09:30:27 you mean by worked with.
09:30:28 THE WITNESS: I didn't work with them.
09:30:31 BY MR. KLAAS:
09:30:31 Q. You didn't work with those two?
09:30:33 A. No.
09:30:34 Q. Which are the lawyers that you did work with?
09:30:40 MS. COLER: Same objection.
09:30:40 BY MR. KLAAS:
09:30:40 Q. Go ahead, that's all right.
09:30:41 MS. COLER: As long as you understand the
09:30:42 question, you can answer it, Mr. Douglas.
09:30:44 THE WITNESS: I worked with Dennis.
09:30:46 BY MR. KLAAS:
09:30:47 Q. Dennis Orke?
09:30:48 A. Yeah, and Mr. Budde and Joe, Joseph Liesch. There
09:31:02 were a bunch of them. On a regular basis, that
09:31:06 would be on a regular, on a routine, as much as it

19

09:31:13 was a routine, those three probably. There may --
09:31:15 there are others, I'm sure, but I had contact with
09:31:20 others from time to time on occasion to discuss
09:31:26 something that they were involved in that was
09:31:31 human resources or EEO-related.
09:31:36 Q. Did you work ever with, do you recall working with
09:31:39 Felix Ricco?
09:31:41 A. Yeah. He wasn't in the law department when I was
09:31:44 there. He was in industrial relations. Yeah, and
09:31:47 people from IR. Now there is a law department.
09:31:50 THE WITNESS: Is that right? Dennis? Is
09:31:54 that right? Felix and -- CRS is kicking in again.
09:32:00 What's the guy's name. Yeah.
09:32:08 BY MR. KLAAS:
09:32:08 Q. Do you recall working with Al --
09:32:10 A. Harold.
09:32:11 Q. Harold Kern?
09:32:12 A. Kern, yeah. Al Sufka, yeah, I'm sure I have.
09:32:17 Q. Gretchen Banks?
09:32:20 A. She wasn't in industrial relations when I was
09:32:22 there.
09:32:23 Q. Do you recall working with her while you were at
09:32:25 Cargill?
09:32:25 A. I'm sure I have.
09:32:26 Q. Any of the other Cargill lawyers you recall

09:47:11 of your duties to Cargill?
09:47:12 MS. COLER: Objection, assumes facts not in
09:47:18 evidence.
09:47:25 THE WITNESS: Yeah, I raised the issue in
09:47:28 terms of getting involved in this class action
09:47:34 lawsuit, but that was another time, and that was
09:47:39 in Larry's office when this thing had gathered
09:47:47 some mass, and the question was essentially, given
09:47:56 the agreement that he had reviewed and seen, I
09:47:59 kept a copy of, was my involvement in this thing
09:48:02 consistent with the language in the agreement.
09:48:07 BY MR. KLAAS:
09:48:07 Q. That was your question?
09:48:09 A. Correct.
09:48:09 Q. What was the answer from Mr. Schaefer?
09:48:16 A. It was a lawyer's answer, so it was muddled, in my
09:48:24 mind, but essentially, I think my recollection was
09:48:25 there may be some areas that are touchy, but
09:48:29 overall, okay, at that point, my involvement was
09:48:34 not in conflict with the agreement.
09:48:37 Q. When is this conversation that you're recalling
09:48:40 now? I take it it's not the first conversation
09:48:43 you had with Mr. Schaefer?
09:48:44 A. No.
09:48:44 Q. When is the conversation you're describing for us



09:48:47 now, Mr. Douglas?
09:48:54 A. It would have been, that would have been -- I
09:49:12 retired in '98. That would have been probably the
09:49:22 latter part of 2000. Yeah, somewhere in there.
09:49:37 Q. Did you ever have any discussion with Mr. Schaefer
09:49:43 or anybody else at Sprenger & Lang about whether
09:49:50 they or someone would protect you if you suffered
09:49:53 financial loss as a result of your involvement in
09:49:55 this lawsuit?
09:49:56 A. Correct.
09:49:57 Q. And what was the arrangement?
09:50:00 MS. COLER: Objection, states facts not in
09:50:02 evidence.
09:50:02 THE WITNESS: That if it came to that, Larry
09:50:05 at Sprenger Lang would defend that action.
09:50:13 BY MR. KLAAS:
09:50:13 Q. And for free, I take it.
09:50:19 A. Yeah.
09:50:38 Q. In addition to advising you that -- well, was that
09:50:43 the extent of your advice, that you shouldn't use
09:50:46 your position to solicit or leverage current
09:50:50 employees of Cargill into becoming clients of
09:50:53 yours?
09:50:54 MS. COLER: Objection, vague in terms of
09:50:55 timeframe that you're referencing in terms of the



09:50:58 advice.
09:50:59 THE WITNESS: That was, that was, yeah, that
09:51:05 was at my first visit with him, and my question
09:51:09 was whether or not there was a problem, given the
09:51:16 agreement, for me to be a coach, a paid coach, as
09:51:29 it were, in the business of personal coaching, and
09:51:34 the reason I asked the question was I guess
09:51:39 throughout my employment at Cargill, for good
09:51:43 reason, for no reason, maybe for bad reason, and
09:51:46 other reasons that we'll probably get into, I have
09:51:53 been someone that, I guess because of my tenure,
09:51:59 whatever, that other black employees, other
09:52:01 African American employees, whatever you choose to
09:52:05 call them, have come to for any number of things,
09:52:08 counsel, advice, what have you, questions.
09:52:12 They've also been, in the past, they were also
09:52:13 directed or sent to me by their Caucasian
09:52:20 managers.
09:52:21 So over the course of the time I was at
09:52:26 Cargill, the way it worked there, I was like the,
09:52:34 I don't know, I guess you'd call it had an
09:52:39 avuncular role for all the black employees in
09:52:42 Cargill, which was not necessarily of my choosing,
09:52:49 but that's what evolved, or how it evolved; and
09:52:56 after, well, even before I retired, when I was,



09:52:59 the last year I was there, which was pretty much
09:53:04 inactive, I was routinely contacted and asked, you
09:53:10 know, what about this, do you think I should do
09:53:12 that, blah blah blah, any number of issues that I
09:53:15 would deal with normally or I had dealt with in
09:53:18 the past normally that had been brought to me by
09:53:23 black employees were continuing to be asked, and I
09:53:27 continued even, well, to this day, even after I
09:53:30 retired just, what, five, six years. So, yeah, I
09:53:34 was going to see if I could leverage that into a
09:53:37 little extra cash.
09:53:38 BY MR. KLAAS:
09:53:38 Q. Did you ever do that?
09:53:40 A. Yeah.
09:53:41 Q. And are you doing that now?
09:53:43 A. I do it when, I do a lot of things, but I do it
09:53:48 when someone asks for the, I guess for my advice
09:53:58 or for my counsel, yeah. But I've also done it
09:54:01 with others outside of Cargill. I work with a
09:54:05 couple people who have search firms and clients
09:54:11 that they want briefed or talked to or counseled
09:54:20 or what have you.
09:54:23 Q. Have you charged like for your --
09:54:26 A. I charge. I've not always gotten paid.
09:54:28 Q. Do you call it coaching?

09:54:29 A. Yeah, coaching, yeah, personal coach. I, at
09:54:33 Cargill, went through, I don't know, two
09:54:35 and-a-half, we were on a coach binge, and I worked
09:54:40 for half, I worked for about another ten
09:54:43 businesses one time within the food sector, and
09:54:45 each of them eventually got into coaching was the
09:54:50 flavor of the month, and it caught on and
09:54:54 everybody, everybody being the businesses, started
09:54:57 some kind of coaching. So I've been through all
09:55:01 kinds of training and etc., etc., etc. Okay? And
09:55:08 that's how I guess in part how it evolved.
09:55:11 But as far as African American employees are
09:55:20 concerned, it's just racial. Okay? People did
09:55:24 not feel, for the most part, and this is
09:55:28 unfortunate, they could go to white coworkers or
09:55:36 bosses or friends or acquaintances, what have you,
09:55:40 and express themselves or express concerns they
09:55:42 had, what have you, freely without some, you know,
09:55:47 reprisal, so I ended up being a repository for a
09:55:52 lot of stuff I could live without. Put it that
09:55:55 way.
09:55:55 I mean, this is above and beyond. All right?
09:55:59 This is above and beyond my normal job
09:56:02 responsibility. I had people come in and talk to
09:56:05 me in the middle of the day, I had to ask them to



09:56:07 leave because I had other work that I was assigned
09:56:10 to do and had deadlines to meet that I couldn't
09:56:15 get done if people wanted to talk about their own
09:56:17 problems, and trying to balance that at times was
09:56:19 a little difficult, but I tried to be
09:56:21 accommodating, understanding that in many cases in
09:56:31 Cargill, black employees have very little access
09:56:39 to counsel that they, to put it clearly, believe
09:56:46 in or can feel comfortable with.
09:56:50 Q. Since your retirement from Cargill, have you
09:56:56 served as a personal coach for African American
09:57:01 employees at Cargill, either current or former?
09:57:05 A. Yes.
09:57:06 Q. And been paid by them for it?
09:57:09 A. I'm still waiting. The check is in the mail, kind
09:57:13 of thing. No, I haven't been paid. I mean, a
09:57:21 lunch or a drink or something like that, but other
09:57:23 than that, no. Okay?
09:57:26 Q. So you're serving as an avuncular friend,
09:57:30 basically, but not for --
09:57:32 A. Not by choice, but yes.
09:57:33 Q. Yes, I understand.
09:57:35 A. But I've -- yeah.
09:57:37 Q. Have you received any income for, well, from
09:57:43 Cargill employees since your retirement or from



09:57:46 Cargill?
09:57:47 A. Just maybe golf bets or something, but no.
09:58:07 Q. All right, and have you received any money or
09:58:13 anything of value from Sprenger & Lang since your
09:58:16 retirement from Cargill?
09:58:19 MS. COLER: Objection, broad, vague.
09:58:23 THE WITNESS: No, other than, well, lunches
09:58:27 or coffee or whatever, same thing I've gotten
09:58:29 here. I don't know if you guys are going to buy
09:58:31 lunch or not. But I've got a question. Is
09:58:34 somebody going to pay for my parking? I parked
09:58:36 over in this Gavidae building. I didn't know what
09:58:39 it was. It's about $100 a day, isn't it?
09:58:43 BY MR. KLAAS:
09:58:43 Q. I don't think it's that much.
09:58:45 A. It's up there.
09:58:45 Q. But we'll pick up your parking, sir.
09:58:52 A. All right.
09:58:52 Q. Let me ask you, you've described for us at least
09:58:56 two different conversations you had with
09:58:58 Mr. Schaefer. One at the very outset where he's
09:59:00 suggesting you not leverage your prior position to
09:59:03 solicit employees for coaching clients, basically,
09:59:08 correct?
09:59:08 A. Right.



09:59:09 Q. And then you had a later conversation with
09:59:18 Mr. Schaefer, as I understand it, at the end of
09:59:21 2000. Can you recollect that conversation for us?
09:59:25 A. Oh, the conversation that revolved around at that
09:59:42 point employees --
09:59:43 Q. Well, you mentioned he was going to defend you if
09:59:47 you came into problems with your contract.
09:59:48 A. Yeah, employees, there had been, I don't know, a
09:59:51 handful of employees that had contacted Sprenger &
09:59:58 Lang and who were then contemplating a lawsuit,
10:00:09 that has obviously emerged, against Cargill on the
10:00:15 basis of racial discrimination, and at a meeting
10:00:23 that I attended, the issue, I raised the issue of
10:00:38 participation in something like this as to it
10:00:45 being consistent with the agreement I'd signed
10:00:48 with Cargill, and that was in, yeah, that was in
10:01:01 probably the fall of 2000. All right.
10:01:08 Q. All right, and during that meeting, or really any
10:01:12 other meeting with Sprenger & Lang, do you recall
10:01:14 them saying, Mr. Douglas, you better never
10:01:16 disclose to me any confidential information from
10:01:20 Cargill or you're in big trouble, or words to that
10:01:24 effect?
10:01:25 A. No.
10:01:27 Q. Did they ever instruct you with regard to whether

36

10:01:29 you should be disclosing confidential
10:01:31 communications to them? Did the topic ever come
10:01:36 up?
10:01:36 A. Would you say that again?
10:01:38 Q. Did Sprenger & Lang or Mr. Schaefer or anybody at
10:01:41 Sprenger & Lang ever discuss with you whether you
10:01:43 should be disclosing to them confidential
10:01:46 information that you learned while you were at
10:01:49 Cargill?
10:01:50 MS. COLER: Objection, vague.
10:01:52 THE WITNESS: Not that I can, no, not that I
10:01:54 can recall, you know, per se. No, not that I can
10:02:00 recall.
10:02:02 BY MR. KLAAS:
10:02:03 Q. During your interaction with Sprenger & Lang, and
10:02:08 in particular Mr. Schaefer, but others as well at
10:02:11 Sprenger & Lang, did they seek information from
10:02:14 you about your experiences at Cargill or your
10:02:16 knowledge of the inside workings of Cargill?
10:02:19 A. Yes.
10:02:56 Q. At some point, Mr. Douglas, there are roughly
10:03:08 2,000 pages of documents from Cargill or that you
10:03:11 received when you were at Cargill that you
10:03:13 delivered to Sprenger & Lang, as I understand it.
10:03:15 Without regard to how many specific pages there

37

10:03:18 are, do you know what I'm talking about?
10:03:19 A. No, I did not -- well, that ended up at Sprenger &
10:03:26 Lang. How it got there was a little different.
10:03:30 Q. Oh, okay.
10:03:31 A. Some I brought, that's true, but some were
10:03:38 transported by courier from Sprenger & Lang to my
10:03:42 home and back to their office.
10:03:48 Q. All right. I don't know all the particulars, so
10:03:50 let me ask you about --
10:03:51 A. Well, you asked the question about transported, so
10:03:54 I --
10:03:55 Q. No. I gave you my understanding, and I was wrong.
10:03:57 A. And I'm going to give you mine.
10:03:58 Q. And you know and I don't, so let me ask you. We
10:04:03 received from Sprenger & Lang about 2,000
10:04:07 documents that they told us came from you. Now,
10:04:10 what I need to know I guess is what is your
10:04:13 recollection of how documents from Cargill got to
10:04:19 Sprenger & Lang, if you were involved in any way.
10:04:25 Why don't you just describe for us what you know,
10:04:27 sir, about that.
10:04:29 A. I, in talking with Larry, and Sprenger & Lang, I
10:04:38 guess Larry is the person over there, mentioned I
10:04:45 had some documents or some questions about --
10:04:48 there were four or five items or programs that

38

10:04:54 they were interested in knowing more about. One
10:04:56 had to do with the Cargill leadership development
10:05:02 program; KEIS, which is the KEIS, it's an acronym;
10:05:07 selection grids; and there was something else.
10:05:15 There was three, yeah, there was three, four,
10:05:18 five, whatever. And I said, well, I've got some
10:05:25 documents that may have some information about
10:05:28 those above and beyond which I have off the top of
10:05:31 my head. So that's how the whole issue of
10:05:34 documents in my possession got revealed.
10:05:43 Q. All right, so was this mentioned to you in a
10:05:48 conversation with Mr. Schaefer or in a letter
10:05:51 or -- in other words, you came to know that there
10:05:54 were these programs they were interested in, is
10:05:56 that right, or a conversation?
10:05:57 A. It was a conversation.
10:05:58 Q. With Mr. Schaefer?
10:06:05 A. Yes.
10:06:06 Q. Did you ever speak with a paralegal at Sprenger &
10:06:10 Lang named Sara Madsen?
10:06:12 A. Yeah.
10:06:12 MS. COLER: Objection, assumes facts not in
10:06:15 evidence.
10:06:15 BY MR. KLAAS:
10:06:15 Q. And when did you speak with Ms. Madsen?

39

10:06:21 A. It was after I had initially talked with Larry.
10:06:36 Possibly in the year, sometime later in the year
10:06:39 in 2000 or 2001.
10:06:44 Q. And what was the -- she was following up then from
10:06:47 your conversation with Mr. --
10:06:49 A. Yeah. We had meetings in terms of, you know, what
10:06:51 does this mean, what does that mean, how does this
10:06:54 happen. Give me, you know, point to point to
10:06:58 point, you know, how this works, that kind of
10:07:01 thing.
10:07:01 Q. And this is a conversation you're describing with
10:07:04 Ms. Madsen or with Mr. Schaefer?
10:07:05 A. Or with both.
10:07:11 Q. And, I'm sorry, I initially misunderstood the
10:07:14 document situation. Are you sitting there with
10:07:16 the documents going through them with Mr. Schaefer
10:07:18 and Ms. Madsen?
10:07:22 A. As it pertained to, I think, my recollection, as
10:07:39 it pertained to the Cargill leadership development
10:07:51 program, it could have been something else, but I
10:07:53 think that was it, that was -- there are a group
10:08:00 of documents maybe this high, whatever, that I
10:08:03 brought personally initially; and then, and I
10:08:07 raised the question about, I said I've got some
10:08:10 documents here, some of which have confidential

# Deposition of: Ray Bill Douglas Vol. I
# Date: September 18, 2003



10:08:13 and privileged written on them, and I was going
10:08:18 through them and I said I'm sorting these out, or
10:08:25 trying to, and I was looking for some guidance,
10:08:26 and he said, well, we can do that and not -- okay,
10:08:30 and just send them, we'll go through; and that's
10:08:34 how I ended up sending that whole, whatever number
10:08:37 of documents were that they received.
10:08:41 Q. All right, so these are documents at your home?
10:08:44 A. These are documents that were at my home, correct.
10:08:47 Q. All right. Now, how did they physically get
10:08:51 transported from your home then to Sprenger &
10:08:53 Lang?
10:08:54 A. I took them initially for a meeting to go over
10:08:57 those four or five key areas, and I think I
10:09:03 brought some another time, and then a courier from
10:09:08 their office came and picked up some once or
10:09:15 twice.
10:09:16 Q. All right, and then you went through the documents
10:09:18 with Mr. Schaefer and Ms. Madsen, or do you
10:09:20 recollect?
10:09:21 A. I --
10:09:24 MS. COLER: Objection, mischaracterizes his
10:09:26 prior testimony.
10:09:28 BY MR. KLAAS:
10:09:28 Q. I'm just asking.



10:09:29 A. So this is just like ships in the night?
10:09:31 Q. We're both just talking.
10:09:33 A. Is that right?
10:09:33 MS. COLER: Just for the record --
10:09:35 BY MR. KLAAS:
10:09:35 Q. Just go ahead, and you can just tell us what
10:09:38 happened. I mean, did you then go through the
10:09:40 documents with Mr. Schaefer and Ms. Madsen, or do
10:09:42 you recollect?
10:09:45 A. Went through, went through the, initially went
10:09:52 through the documents that I had brought, and I
10:09:58 think there was a Cargill leadership development
10:10:02 document in there, there was a KEIS. I don't know
10:10:16 if there was a KEIS or not. I may have put
10:10:19 something together to explain KEIS at that time.
10:10:29 There was a selection, there could have been,
10:10:32 there was a selection grid in there, I think; and
10:10:41 there were some, oh, there was some documents that
10:10:52 were mine, one was a letter from or a note from
10:10:56 Rashid, and some other things that I at that time
10:11:02 thought were important and/or relevant in terms of
10:11:04 giving them an overview of Cargill.
10:11:06 MS. COLER: Mr. Douglas, just so you
10:11:08 understand my function here, my obligation is to
10:11:10 make sure that there is a clear record in terms of



10:11:12 the questions. So if I have a problem with how
10:11:15 Mr. Klaas is wording a question, I will object to
10:11:18 that. Just so you know that is what I am doing.
10:11:28 BY MR. KLAAS:
10:11:28 Q. Now, so how many meetings do you recollect going
10:11:34 over these documents with Mr. Schaefer and
10:11:38 Ms. Madsen? Can you estimate for us?
10:11:42 MS. COLER: Objection, vague in terms of what
10:11:44 these documents are.
10:11:48 THE WITNESS: Well, I would say anywhere from
10:11:55 four to six meetings.
10:11:57 BY MR. KLAAS:
10:11:58 Q. And is that the three of you are
10:12:00 meeting--Ms. Madsen, Mr. Schaefer, and you?
10:12:03 A. In a couple of cases, it was three of us, and the
10:12:08 majority of them it was just Larry and I.
10:12:14 Q. And during the -- there are, I gather, like at
10:12:23 least three deliveries of documents to Sprenger &
10:12:25 Lang from your house? There is the initial one
10:12:28 you described.
10:12:29 A. Yeah, I brought with me initially, and then I
10:12:32 brought some more, and then some were picked up.
10:12:57 Q. And in these documents, I take it some were
10:13:01 confidential, some were from the law department,
10:13:03 just whatever you had?



10:13:04 MS. COLER: Objection, vague in terms of what
10:13:07 these items --
10:13:08 THE WITNESS: Well, they were what they were,
10:13:10 and my understanding is you have a copy of them
10:13:12 all, so that's what it was.
10:13:14 BY MR. KLAAS:
10:13:14 Q. And did you go over them all with Mr. Schaefer?
10:13:16 A. No, no. The documents that I recall most clearly
10:13:29 presently were involved with the key areas or the
10:13:36 key programs that he wanted to know more about.
10:13:39 One was, like I indicated, CLDP, the Cargill
10:13:46 leadership development program; the KEIS
10:13:49 initiative; oh, PMP; the selection grid; and there
10:14:01 may have been another one, but those, I think that
10:14:03 was the bulk of it, the crux of it.
10:14:08 Q. Did you give to Sprenger & Lang all the documents
10:14:10 you had about those programs?
10:14:12 A. To the extent I had documents, yes, and I think I
10:14:24 had some documents that were relatively current on
10:14:29 CDL, on the Cargill leadership development
10:14:34 program, I believe, that had been, that I received
10:14:42 by courier from Cargill.
10:14:44 I went in the hospital in about November of
10:14:49 '96, it was '96, '97, yeah, November of '96, and
10:14:56 had knee surgery, had some radical knee surgery

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003



10:15:00 that I still haven't recovered from, and I was off
10:15:03 from that period. I was in the hospital for about
10:15:06 ten days, and then came home and I was off until I
10:15:11 returned in February, I think it was the first
10:15:14 half of February, somewhere around the first part
10:15:17 or first half of February. So during that time, I
10:15:21 was home, I had a computer, I had a cell phone, I
10:15:30 had -- I was laid up. I have a fax machine and
10:15:36 whatever, and they would courier stuff to me or
10:15:40 have the courier bring stuff to me, Cargill, that
10:15:43 is, and so I was doing work, okay, during this
10:15:46 time. And during that time, I had essentially set
10:15:55 up an office at home.
10:16:01 Q. Okay, and --
10:16:02 A. And so I had -- I think we were doing something
10:16:08 with the Cargill leadership development process,
10:16:17 and whatever else that was going on at that time.
10:16:20 In fact, I had gotten on a conference call on any
10:16:25 number of things, one of which was with Dennis and
10:16:28 others regarding an issue we had with, whatever it
10:16:37 was, at the rice mill, the compliance review in
10:16:43 Greenville.
10:16:43 So from that period -- my point is this:
10:16:47 From that period till I went back to work, and
10:16:50 that was about in the middle of February, I had



10:16:52 documents everywhere in my house. Okay? From
10:16:57 just back and forth, and the courier would come
10:17:00 and I would send stuff, and so it would come two,
10:17:03 three times a day during this timeframe. In part,
10:17:08 that's how I accumulated the documents and the
10:17:12 good ones that I ended up with having.
10:17:15 Q. And you're dealing with Mr. Orke and others in the
10:17:19 law department during that period?
10:17:20 MS. COLER: Objection, assumes facts not in
10:17:22 evidence.
10:17:22 THE WITNESS: I'm sure I did. Well, Dennis
10:17:25 on the one, yeah, on the one for sure, on the
10:17:28 conference call that we had an ongoing involvement
10:17:35 with an issue, yes, and I'm sure there would have
10:17:39 been, there probably would have been others, but
10:17:44 as well, the majority of the interaction I had was
10:17:49 typical of what I would have had had I been at
10:17:54 work. It was with I guess nonlawyers, but some
10:17:59 lawyers as well.
10:18:01 BY MR. KLAAS:
10:18:01 Q. Now, and you gave all those documents eventually
10:18:04 to Sprenger & Lang, although it came in a series
10:18:07 of deliveries, I take it.
10:18:09 MS. COLER: Objection, assumes facts not in
10:18:12 evidence.



10:18:12 BY MR. KLAAS:
10:18:12 Q. Well, is that right or not?
10:18:14 A. Yes, to the best of my knowledge, yes.
10:18:16 Q. And at some point -- well, you've described you
10:18:20 had four to six meetings, I guess, with
10:18:23 Mr. Schaefer and maybe others at Sprenger & Lang.
10:18:27 Were the documents that you delivered being gone
10:18:30 over at all four or six of those meetings?
10:18:32 MS. COLER: Objection, vague in terms of
10:18:34 timeframe. Documents were produced at different
10:18:40 times.
10:18:41 THE WITNESS: Documents were the selection
10:18:53 grid, the Cargill leadership development thing,
10:18:58 the KEIS thing, were the key concerns or areas
10:19:06 that they wanted to get a better handle on.
10:19:10 BY MR. KLAAS:
10:19:10 Q. Sure.
10:19:11 A. All right, and a good part of the time, meeting
10:19:19 time, was spent on those programs, those, in those
10:19:33 areas.
10:19:34 Q. How did the -- did the documents ever get back to
10:19:38 you? I mean, did you have -- did they come back
10:19:41 to you from Sprenger & Lang?
10:19:42 A. Eventually, yeah, I got some documents back.
10:19:48 Q. Did you get back everything you'd sent over?



10:19:49 A. I didn't feel I did.
10:19:52 Q. Did you tell anybody that?
10:19:54 A. Yes.
10:19:54 Q. Who did you tell?
10:19:56 A. I believe I told Larry, or I told Larry and/or
10:20:01 Patty.
10:20:02 Q. Patty Jones?
10:20:05 A. I don't know what Patty, what Patty's last name
10:20:09 is, but whatever Patty is at his office. I didn't
10:20:15 know who it was.
10:20:19 Q. And which --
10:20:20 A. I have no idea which one, but there was a Patty,
10:20:23 Patty somebody.
10:20:24 Q. Right, and you mentioned to them that you didn't
10:20:26 get back everything you'd sent over to Sprenger &
10:20:28 Lang?
10:20:29 A. One, I had a call to get the documents back. Two,
10:20:34 when I got them back, I asked are there any more,
10:20:36 is this all of them, and I think that's when I
10:20:38 talked to Patty, and Patty was the one who had, I
10:20:45 guess, sent them over or put them together, sent
10:20:48 them back to me.
10:20:51 Q. Did you notice any particular type or category of
10:20:55 documents that had not been returned to you?
10:20:58 A. No, no, not -- no.

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003

48

10:21:01 Q. Was there any explanation from Patty or anybody at
10:21:04 Sprenger & Lang as to why all the documents had
10:21:06 not come back?
10:21:07 MS. COLER: Objection, assumes facts not in
10:21:10 evidence.
10:21:10 THE WITNESS: Well, I asked if they were all
10:21:12 back. It didn't, it didn't appear to me that they
10:21:20 were, but I can't say with any certainty that, you
10:21:24 know, there were X number and X minus some number
10:21:30 came back. But she indicated to me that was all
10:21:32 of them that she had and that was it, so I said
10:21:37 fine.
10:21:37 BY MR. KLAAS:
10:21:38 Q. Now, why did you ask for them back?
10:21:40 A. Because they'd been there for awhile, and I had
10:21:44 expected to receive them, to get them back, and
10:21:50 they weren't forthcoming, so I called and said,
10:21:53 hey, where are these documents that you have.
10:21:58 Q. Now, after the documents are returned to you, do
10:22:03 you continue to have meetings with Mr. Schaefer
10:22:06 and his colleagues at Sprenger & Lang about the
10:22:10 documents? In other words, did you know that they
10:22:14 made copies?
10:22:16 A. No.
10:22:16 Q. Okay, so were all the conversations that you had

49

10:22:19 with Mr. Schaefer and his colleagues at Sprenger &
10:22:23 Lang about the documents before they were returned
10:22:27 to you?
10:22:27 A. Do that again.
10:22:29 Q. Maybe I'm unclear. In other words, if you're
10:22:31 sitting in a room --
10:22:32 A. Yeah.
10:22:32 Q. -- with Mr. Schaefer and Ms. Madsen or Patty or
10:22:37 anybody else at Sprenger & Lang, and you're all
10:22:39 looking at these documents that you had from
10:22:41 Cargill, I'm just trying to figure out if you were
10:22:43 aware that they had copied everything and had it
10:22:48 sitting there.
10:22:48 A. No, my answer is no, I wasn't aware they had
10:22:50 copied them.
10:22:50 Q. All right, so is the documents that you went over
10:22:52 with Mr. Schaefer and his colleagues, physically,
10:22:55 the documents that you gave to them, those pieces
10:22:58 of paper?
10:22:59 MS. COLER: Objection, broad and --
10:23:00 THE WITNESS: To the best of my knowledge,
10:23:02 yes. Are you saying are the documents I went over
10:23:06 were the documents I brought.
10:23:07 BY MR. KLAAS:
10:23:07 Q. Right.

50

10:23:08 A. Were the originals.
10:23:09 Q. Right.
10:23:10 A. Is that what you're saying?
10:23:12 Q. Yes. I'm asking you --
10:23:13 A. To the best of my knowledge, yes.
10:23:26 Q. All right. At the time of, when the documents
10:23:31 were returned to you by Sprenger & Lang, at your
10:23:35 request, I gather, do you recollect Mr. Schaefer
10:23:41 scolding you for giving him privileged or
10:23:45 confidential information from inside Cargill?
10:23:48 MS. COLER: Objection, assumes facts not in
10:23:51 evidence and vague as to timeframe.
10:23:53 THE WITNESS: Scolding me? No, he -- no.
10:23:56 BY MR. KLAAS:
10:23:57 Q. Did any conversation of that nature occur?
10:24:00 MS. COLER: Objection, vague.
10:24:00 BY MR. KLAAS:
10:24:01 Q. Where Mr. Schaefer criticized you or suggested it
10:24:05 was improper or --
10:24:06 A. Admonished me.
10:24:08 Q. Admonished, to use your word --
10:24:10 A. No.
10:24:10 Q. -- where that topic came up, you never should have
10:24:13 done that?
10:24:13 A. No. Well, let me think. No, not that I can

51

10:24:40 recall.
10:24:40 Q. Do you remember at some point discussing,
10:24:44 particularly with Mr. Schaefer, comments or
10:24:50 conversations or advice that you had received from
10:24:54 Fred Budde at Cargill?
10:24:56 MS. COLER: Objection, assumes facts not in
10:25:00 evidence.
10:25:00 THE WITNESS: In other words, did I discuss
10:25:04 with him any conversation or facts or what have
10:25:10 you I --
10:25:11 BY MR. KLAAS:
10:25:12 Q. Did you reference any comment in Mr. Schaefer's
10:25:14 presence --
10:25:15 A. Regarding Fred Budde.
10:25:17 Q. From Fred Budde, yeah, where something was said by
10:25:20 Fred Budde you told Mr. Schaefer about. Do you
10:25:23 remember anything like that?
10:25:39 A. I don't recall that I did. What would have been
10:25:45 the nature of it, I can't recall.
10:25:49 Q. Well, do you ever recollect Mr. Schaefer scolding,
10:25:54 admonishing, instructing you, don't ever tell me
10:25:59 anything that anybody at the Cargill law
10:26:01 department ever told you, or words to that effect?
10:26:08 A. No.
10:26:10 Q. All right. Do you recollect either of your own,

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003

52

10:26:26 in your own mind now or from notes that you may
10:26:29 have written down or anything you've got with you,
10:26:31 when it is you first spoke with anybody from
10:26:34 Sprenger & Lang, Mr. Schaefer, anybody else,
10:26:37 about, you know, after your retirement? I know
10:26:42 you had some contact with them during the Foster
10:26:46 litigation, but what I want to know is after your
10:26:47 retirement from Cargill, do you know when is the
10:26:50 first time you spoke with somebody from Sprenger &
10:26:57 Lang?
10:26:58 A. Yeah. I spoke with -- you mean regarding this
10:27:02 litigation?
10:27:04 Q. Really about anything.
10:27:06 A. It was in January or February of '98.
10:27:16 Q. And you've described a conversation with
10:27:21 Mr. Schaefer about whether you could become a
10:27:24 personal coach and not to leverage your position
10:27:26 or solicit business on that basis. Is that it,
10:27:29 was that that conversation?
10:27:31 A. That that's conversation, and the conversation is
10:27:35 with regard to, or the review, his review of the
10:27:39 agreement between Cargill and myself and whether
10:27:43 that could be reopened.
10:27:46 Q. Okay.
10:27:46 A. Okay.

53

10:27:46 Q. And did you and Sprenger & Lang enter into any
10:27:51 sort of written relationship, written agreement?
10:27:56 A. No, not that I -- did I sign anything?
10:28:00 Q. Yes, or were you given anything in writing that
10:28:02 was describing the nature of the relationship that
10:28:05 you were having?
10:28:06 A. No.
10:28:08 Q. All right. Some of the information we've
10:28:31 received, Mr. Douglas, indicates that the actual
10:28:35 complaint in this case was something that you
10:28:37 reviewed and commented on. Is that true?
10:28:48 A. The actual -- what do you mean? You say the --
10:28:50 Q. In other words, you're aware the lawsuit starts
10:28:53 with an actual written complaint, it's called,
10:28:56 long document describing what the claims are and
10:28:57 listing the --
10:28:58 A. Administrative complaint?
10:28:59 Q. No. Actual in-court complaint, federal
10:29:02 litigation.
10:29:03 A. Okay, yeah. Yeah, a lawsuit.
10:29:07 Q. Yes.
10:29:08 A. All right. Now, did I what?
10:29:10 Q. Did you actually comment upon and annotate --
10:29:14 A. I commented, and whether I annotated or not, I may
10:29:22 have, but I did comment on it.

54

10:29:23 Q. And you had a copy of the draft complaint that --
10:29:28 A. I believe I did, yes.
10:29:29 Q. Do you recollect whether -- I mean, a lot of
10:29:32 people write notes in the margins and things like
10:29:34 that. Did you ever do that with the copy you had?
10:29:37 A. I may have.
10:29:38 Q. Do you have that?
10:29:38 A. Larry has.
10:29:39 Q. Larry has your annotated copy?
10:29:41 A. Right. If I commented or had annotated, I guess
10:29:45 that's the word, or commented verbally, most of it
10:29:49 was -- well, it could have been either one. He
10:29:51 would have gotten it.
10:29:52 Q. And you recollect that occurring?
10:29:55 A. Yes.
10:30:06 MR. KLAAS: Well, I don't have that from
10:30:08 Sprenger & Lang, and I'd ask that it be produced,
10:30:11 and how about if we take, how about if we take a
10:30:15 short break at this point?
10:30:19 MS. COLER: Well, let me put on the record,
10:30:20 we've produced to you everything we have from him.
10:30:20 We do not have a copy of an annotated complaint.
10:30:24 MR. KLAAS: Okay.
10:30:24 MR. SCHAEFER: And he hasn't testified that
10:30:26 there was one either. He said we either discussed

55

10:30:26 it or there may have been some annotating of the
10:30:26 complaint.
10:30:28 MR. KLAAS: The record is what the record is.
10:30:30 Let's take five. Thank you, Mr. Douglas.
10:30:32 VIDEO TECHNICIAN: We're going off the
10:30:33 record. The time now is 10:30.
10:30:36 (Brief recess taken.)
10:41:53 (Douglas Deposition Exhibit No. 1 marked for
10:41:55 identification.)
10:42:32 VIDEO TECHNICIAN: We are back on the record.
10:42:33 This is tape 2 of the continuing deposition of Ray
10:42:37 Bill Douglas. Today's date is September 18, 2003.
10:42:41 The time is 10:42.
10:42:44 BY MR. KLAAS:
10:42:45 Q. Mr. Douglas, during our break, I provided to you a
10:42:49 copy of a document that's been marked now as
10:42:52 Douglas Deposition Exhibit No. 1, which is a copy
10:42:57 of a memorandum and order from United States
10:43:02 Magistrate Judge Boylan. It's dated June 27,
10:43:06 2003. Have you seen this order before?
10:43:18 A. I don't know if I have or not. I've seen so many
10:43:22 of these things, that they've begun to -- no, I
10:43:28 don't know. I may have.
10:43:29 Q. All right.
10:43:30 A. But I see it now.

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003



10:43:33 Q. What I want to ask you about is actually just one
10:43:38 paragraph of the order. It's on page 3 of
10:43:42 Magistrate Judge Boylan's order, it's right in the
10:43:46 middle of the page, and it says, quote, "Douglas
10:43:49 has actively participated in Arnold's preparation
10:43:53 of this litigation by identifying names of
10:43:55 potential plaintiffs, providing Sprenger & Lang
10:43:59 with 2,000 pages of privileged, internal Cargill
10:44:02 documents and reviewing and commenting on the
10:44:05 complaint before it was filed," close quote. Do
10:44:09 you see that paragraph, Mr. Douglas?
10:44:11 A. Yes, I do.
10:44:13 Q. Is it accurate?
10:44:14 MS. COLER: Objection, multiple question.
10:44:19 THE WITNESS: For the most part, yes.
10:44:22 BY MR. KLAAS:
10:44:22 Q. Is there anything inaccurate in it?
10:44:29 A. Actively participated, you know. I responded to
10:44:39 things I was asked to respond to. I mean, did I
10:44:42 initiate it? No, but I responded when asked.
10:44:48 Names of potential plaintiffs, possibly, but I
10:44:57 also referred people as well who had an interest
10:45:00 in the case, as opposed to going out and
10:45:03 identifying.
10:45:07 Q. All right.



10:45:07 A. Or as well I provided Sprenger Lang with pages of
10:45:11 privileged, whatever number, reviewing and
10:45:12 commenting on the complaint before, yes, I did.
10:45:16 Q. All right.
10:45:17 MS. COLER: I'm going to object -- never
10:45:22 mind.
10:45:22 BY MR. KLAAS:
10:45:22 Q. And when you say that you didn't actively
10:45:26 participate, what you're saying is you were
10:45:28 responding to inquiries.
10:45:29 A. To that extent, yeah. I didn't, yeah, I didn't
10:45:33 write here's the draft complaint, Larry, why don't
10:45:36 you submit this, but I did respond and comment on
10:45:43 drafts that I was asked to comment or respond to.
10:45:49 Q. All right. Other than these three activities
10:45:52 identified by the Judge, that is, identifying
10:45:58 plaintiffs, providing Sprenger & Lang with
10:46:01 documents, and commenting on the complaint, is
10:46:05 there any other general types of activities that
10:46:08 you've engaged in with regard to this lawsuit?
10:46:17 Was that clear to you, sir, that question?
10:46:19 A. Yeah. In other words, did I do anything else in
10:46:22 addition to this?
10:46:24 Q. Yeah.
10:46:24 A. In this litigation.



10:46:26 Q. Yeah.
10:46:36 A. Not -- maybe I have, I don't know. There is not
10:46:39 much left to do, is there? I don't know if I
10:46:45 have, but not that I can recall that would be in
10:46:49 addition to this. I may have, but I don't know
10:46:53 what it would have been.
10:46:54 (Douglas Deposition Exhibit No. 2 marked for
10:46:54 identification.)
10:46:54 BY MR. KLAAS:
10:46:54 Q. All right. Let me show you a copy of the current
10:47:00 version of the complaint in this case,
10:47:01 Mr. Douglas.
10:47:02 A. You want this back?
10:47:03 Q. No, you can hold onto that, actually, if that's
10:47:06 all right. Well, it will stick with the court
10:47:08 reporter and becomes a very official document.
10:47:10 A. But you're not going to give me your documents,
10:47:13 huh?
10:47:13 Q. You'll get a copy when you get the transcript.
10:47:16 A. Okay.
10:47:17 Q. That's the current version of the complaint.
10:47:21 A. All right.
10:47:21 Q. And what I guess --
10:47:23 A. Is this what's on the website?
10:47:25 Q. I don't know what's on the website. This is the



10:47:27 Exhibit No. 2, which is the first amended
10:47:34 complaint in this lawsuit dated May 7, 2003. So
10:47:39 this is an amended version of presumably the
10:47:42 initial complaints that you were looking at.
10:47:44 A. Well, then I -- of this year?
10:47:48 Q. Right.
10:47:49 A. Okay.
10:47:49 Q. What I need to understand I guess first is if you
10:47:53 could just look at that list of plaintiffs and
10:47:57 tell us which of them you identified as potential
10:48:02 plaintiffs in this case.
10:48:03 MS. COLER: Objection, leading and assumes
10:48:05 facts not in evidence.
10:48:08 THE WITNESS: I talked with Rod Arnold.
10:48:14 Nii-Akwei. Sean, I had spoken to. Whether -- I
10:48:24 don't know what prompted him to join this, but it
10:48:27 wasn't me.
10:48:28 BY MR. KLAAS:
10:48:29 Q. Sean Allen?
10:48:30 A. Yeah. Clintonia, Toni, I had spoken with as well.
10:48:51 Q. Who is that, sir?
10:48:53 A. Clintonia Simmons, second from the bottom.
10:49:08 All right. I've spoken with all these people, but
10:49:14 as far as they joining the lawsuit and/or getting
10:49:24 involved in this lawsuit, that's up for grabs.

60

10:49:30 Rod, I had talked to. He, at the time I talked to
10:49:35 him, was looking for an attorney. Nii-Akwei, I
10:49:38 talked with in more of a coaching role. He was
10:49:44 trying to address or deal with some issues that he
10:49:47 was having at the time with his immediate
10:49:54 supervisor, boss, and I was real surprised that he
10:49:58 joined this. Anyway, Sean similar kind of thing,
10:50:02 Sean used to be in the corn milling originally; he
10:50:04 went to salt. Other people on here, Della is
10:50:13 here, I see Della, and I've spoken, I spoke with
10:50:18 Della; and some of these other people, Keith is
10:50:25 here as well, Keith Lewis.
10:50:28 Q. You spoke with him?
10:50:30 A. I spoke with -- yeah, I've spoken with most --
10:50:33 well, not most, but with, yeah, but I'm not, you
10:50:36 know, I'm not Nat Turner, they're not following me
10:50:40 into, you know, this lawsuit because they're doing
10:50:43 it because I'm saying you should do this. I'm not
10:50:49 leading this insurrection, as it were. But I've
10:50:54 spoken to Keith Lewis and the other people I
10:50:55 named, Della and those before. Some of these
10:51:03 people I don't know. Charles I know, Clintonia I
10:51:12 know, and Tausha I know.
10:51:18 So did I make them do it? No. These are all
10:51:23 adults. I did, in those cases where I indicated,

61

10:51:30 speak with them, talk to them; and in Nii-Akwei's
10:51:36 case, I was really surprised he joined this, but
10:51:39 he did, evidently.
10:51:42 Q. When -- and I understand what you're saying,
10:51:44 they're making their own choice here, obviously.
10:51:47 A. Right.
10:51:48 Q. I guess the question I want to ask you, though, is
10:51:53 did you put --
10:51:56 A. There is some more people on the second page.
10:51:57 Q. Yes, go on. Yes, there is more people on the
10:52:00 second page.
10:52:00 A. I didn't know that.
10:52:00 Q. Why don't you go ahead and look at that.
10:52:04 A. All right. Cheryl Willis, I spoke to. Sean
10:52:08 Wright, I've spoken with, but I mean -- well, as
10:52:20 regards to this was after the fact. Well, Sean
10:52:22 was one of the original people that got this ball
10:52:30 rolling, because it was he who came back from
10:52:33 vacation and found out he didn't have a job.
10:52:37 Q. When you say that Sean Wright was one of the
10:52:40 original people that got this ball rolling, who
10:52:43 are the others among these named plaintiffs that
10:52:46 you would identify as being among the original
10:52:48 people that got this ball rolling?
10:52:51 A. The troublemakers?

62

10:52:54 Q. No. Just the original people that got this ball
10:52:56 rolling.
10:53:01 A. It -- I don't know. I would say Sean, when I say
10:53:04 got this ball rolling, Sean clearly felt that he
10:53:11 had been wronged and took great exception to it.
10:53:17 It was contemporaneous and it was how this
10:53:25 happened with some other people at the time
10:53:30 feeling same way, and I think from there it just
10:53:38 kind of, you know, mushroomed or grew into what
10:53:44 it's become.
10:53:55 For the -- give you a little background, for
10:53:58 the record. These people are all
10:54:01 African Americans, obviously, but in the context
10:54:06 of day-to-day working at Cargill, although they
10:54:11 may not work together, what have you, and some of
10:54:15 them are not even here in Minneapolis, but those
10:54:18 that are here in Minneapolis would tend to
10:54:21 socialize with each other and eat lunch at work
10:54:25 together or whatever, take breaks together, or
10:54:29 have occasion to not only come in contact with
10:54:32 each other on the job, but socially, away from it,
10:54:37 and their commonality obviously is working for
10:54:41 Cargill.
10:54:42 In this kind of context, when a Sean or
10:54:49 another black person, African American, has bitten

63

10:54:53 the dust, that's been around, it spreads like
10:54:57 wildfire. Okay? And that in great part is what's
10:55:04 happened in this case. There were -- I don't know
10:55:07 who else was involved initially, but for sure I
10:55:13 know Juicy, as they call him, or Sean, was the one
10:55:19 that was the spark that ignited this.
10:55:22 Q. Sean Wright?
10:55:24 A. Right. In the sense that he took exception to
10:55:28 what had happened to him and let it be known.
10:55:33 Q. To you, among others?
10:55:35 A. Well, to the world, to everybody, well, that he
10:55:38 would have come in contact with, and others. See,
10:55:41 I can tell you and you say, oh, wow, did you hear,
10:55:45 and I haven't talked to Dennis or seen Dennis, I
10:55:48 maybe don't know Dennis that well, but you do, and
10:55:51 we all work for Cargill and we're all black.
10:55:53 Okay, can you pretend? That takes a lot of
10:55:56 pretending. And so you're talking to a friend
10:55:59 who's in Jacksonville and says, oh, yeah, did you
10:56:02 hear about Sean? Say, no, what happened? Well,
10:56:05 you know, Sean was discriminated against and he
10:56:07 was fired. Oh, really? Well, so was so-and-so, a
10:56:11 similar thing just happened to him. And that's
10:56:14 how this kind of stuff gets going the way it does.
10:56:20 And Cargill, having the relatively small black

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003



employee population, everybody knows everybody.
So that kind of thing, you know, there is an old adage in Cargill, a secret's not a secret unless you can tell someone, and this is an example of that; and I don't know if he wanted to keep it a secret, but there was a lot of consternation about the way he was handled. Whether it was right or wrong, I don't know the facts, per se, but there are some people who are normally pretty objective who even took exception to the way it was handled, so I think that added fuel to it.

Q. And were there others in this group that you would identify as --

A. Troublemakers, key troublemakers?

Q. No. As the original people that got the ball rolling?

A. Those are the key troublemakers.

MS. COLER: Objection, foundation.

THE WITNESS: No. I think, I would say Sean early on, I think Della was -- I don't know if Della was involved directly or not, but Della was another one. Sean Wright, Rod, and Rod was looking for an attorney; and that, to my knowledge, that would be, that would be, based on



my limited knowledge, those people were the ones that, at the time I got involved with this, that were -- well, I can't say that either, because I don't think Rod had fully at that time. I shouldn't say that, because he still works there. That's got to be really hard or difficult.
But I can say with certainty that Sean Wright had been terminated, so he definitely was one leading the charge, and I think he had a lot of sympathizers; and then the question was asked, you know, have other people been or other people feel that they've been discriminated against, even though they may still be employed. And at that time there were, I think there were some other actions contemporaneous with this, with Sean's termination, about reorganizations or rifts or whatever, if not at the exact same time, immediately thereafter or close enough thereafter. I know I talked with somebody who had ended up without a job and who was a float unsold. Okay? And worked with him to get, to give him some help on strategies he could employ to try and catch on somewhere at Cargill.

BY MR. KLAAS:

Q. With regard to the folks that you've mentioned,



did you urge them to contact Sprenger & Lang or did they ask you how to get involved, or what -- you know, give us an example of your activities here.

A. Well, in the case of Rod Arnold, somebody said Rod had had a problem or was catching hell unduly, and I contacted him, and he said in fact, I'm looking for an attorney as we speak, so I gave him Larry's name. Nii-Akwei, I developed a relationship with two Africans. He's from, I think it's Ghana, I think, Nii-Akwei, and there is another Nikwei who left, but I just, you know, I don't know how it would be, he called me or I called him, I can't recall, and he was going through an issue he had with his boss at the time, and we didn't talk about a lawsuit or anything else, and he ended up, I went to a meeting one Saturday, yeah, it was a Saturday meeting, and there he was.

Q. Meeting at Sprenger & Lang?

A. Right.

Q. All right, so you had nothing to do with him getting in touch with Sprenger & Lang?

A. Not directly, no. I don't think I did. Not to the same extent that it was with Rod, no.

Q. When you say not directly, do you have some



indirect meetings in mind or --

A. Well, I mean, I talked to him, and evidently that didn't work out, because he ended up at one of these meetings. There are a lot of people whose names aren't on here who were at these meetings, some of them joined and some of them didn't, but those meetings were well-attended, and I'm not going to get into names, you can ask me all day, because some of them are still working at Cargill and I'm sure it wouldn't be to their benefit for me to name them.
But as I indicated earlier, once something like this gets going, word travels fast, it's a small social circle and, as I said, there is a meeting, come down and see for yourself, and people did; and I think Nii-Akwei did initially. I don't know if Sean was out of town.

Q. Sean Allen?

A. Yeah. But the rest of these, some of these people I don't even know. But one reason or one way -- Louis Darden, I do know. Louis has been around for a long time and whatever. But through the grapevine, I guess as they say, everybody got plugged in one way or another, and there are people that attended that meeting or attended

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003

68

11:03:27 those meetings, one or two or three of them,
11:03:31 whatever, who clearly worked there who chose not
11:03:34 to join the fray.
11:03:37 Q. So Nii-Akwei, for example, you know, you maybe
11:03:44 counseled really in your position as HR manager?
11:03:48 A. Well, when I was employed, Nii-Akwei worked for
11:03:52 Cargill Foods. Nii-Akwei was hired, there was an
11:03:55 issue early on about his right to work in the
11:03:58 United States, he having a legal, what the hell
11:04:03 was it, I can't even remember anymore, whatever, a
11:04:06 legal right to work in the United States, and his
11:04:17 manager came to me--I can't think of his manager's
11:04:21 name at the time, he's no longer there. It was
11:04:25 Mike somebody--and he came and was really upset
11:04:30 and that Nii-Akwei had, he thought, lied to him
11:04:37 about his ability as far as a right to work in the
11:04:42 United States, because he had somehow or other, as
11:04:48 the manager had checked it out and it didn't check
11:04:52 out; and we investigated further, and it was a
11:04:55 mix-up in the name, so it turned out it was all
11:04:59 right. So that's how I initially -- so I got to
11:05:02 meet him early on. Like I said, there was another
11:05:05 Ghanaian that he had gone to school with, I
11:05:07 believe his name was Nikwei, because I was
11:05:10 confused because the names are essentially the

69

11:05:13 same, except for the last name, and we had gone
11:05:17 out, had drinks, whatever, so I got acquainted
11:05:19 with him, and we talked about Africa and what they
11:05:22 were doing and blah blah blah, so I got to know
11:05:25 him well; and he's, you know, he's a nice, young
11:05:30 man, he's very cordial, and we developed a
11:05:35 relationship. And I worked, did work, human
11:05:38 resource work for Cargill Foods, which is part of
11:05:42 the food sector, so I got to know him reasonably
11:05:45 well, and we were not officed that far apart, so
11:05:48 we saw each other every day and would have
11:05:50 occasion to talk.
11:05:55 So that's -- and it just -- and that's how
11:05:58 most of my relationships with people in Cargill,
11:06:06 African Americans, and others, for that matter,
11:06:10 but mostly African Americans, kind of developed
11:06:13 and evolved, okay, through either working in one
11:06:16 of the businesses I worked in and/or working in
11:06:19 the office center and being in close proximity and
11:06:22 seeing each other, and there are not that many
11:06:30 blacks at Cargill in the, at the office center,
11:06:33 relative to the total population. You know,
11:06:39 you're not walking down the streets of Chicago or
11:06:42 Detroit. So, you know, when you see another black
11:06:47 face, it's, you know, we acknowledge each other.

70

11:06:48 I used to go off to lunch, we'd go to
11:06:51 Leeann Chin's or whatever, with a group from my
11:06:54 department or wherever, and I would be the only
11:06:56 black person, and there would be another black
11:06:58 person in the restaurant and the person would nod
11:07:00 to me and I'd nod back, and they'd say, well, why
11:07:02 do you do that, people observed it. I said just,
11:07:03 you know, in Minnesota, given the relatively small
11:07:06 percentage of black, it's roughly a small black
11:07:13 population, it's just something that's evolved
11:07:17 over time, not only here, but in other places too,
11:07:21 but here mainly because of the small number.
11:07:24 So I'd say the people on this list and people
11:07:34 not on this list all had a chance to jump in this
11:07:42 pool, so to speak, or in this fray, and evidently
11:07:46 these folks chose to and those that attended
11:07:49 meetings and didn't chose not to.
11:07:53 Q. And so as to Mr. Acquaye, you knew him because you
11:07:57 both worked at Cargill.
11:07:58 A. Right.
11:07:59 Q. And you next saw him at a meeting at Sprenger &
11:08:02 Lang. I mean, you didn't give him Sprenger &
11:08:05 Lang's number or --
11:08:06 A. Before I left Cargill? No.
11:08:08 Q. -- refer him to Larry Schaefer. Or after, I mean

71

11:08:11 at any time.
11:08:12 A. Not to my knowledge.
11:08:13 Q. Okay. How about Sean Allen? You did speak with
11:08:16 him, I gather.
11:08:19 A. I may have. No, I don't think I did, but -- no,
11:08:24 no, because Sean was upset because he thought he
11:08:34 had been promised one thing, and when he -- I
11:08:37 don't know where he was at the time. I think he
11:08:40 was in Florida, or wherever he is, and he didn't
11:08:42 get it and he thought he was, he hadn't been
11:08:48 treated fairly and blah blah blah, so. And I was
11:08:51 surprised to see him join this, I really was, but
11:08:56 no, no.
11:08:57 Q. All right. How about Hollis Branham?
11:08:59 A. I don't even know who Hollis Branham is.
11:09:02 Q. How about Toya Brown, any contact with Toya Brown?
11:09:07 A. No, no.
11:09:08 Q. Dawn Collins?
11:09:09 A. Dawn, yeah. That's not her name, though, I don't
11:09:13 think, that's not the name I know. But yeah, no,
11:09:20 I had contact with her, she was at a meeting, but
11:09:24 no.
11:09:24 Q. At the meeting at Sprenger & Lang?
11:09:26 A. At a meeting, yeah, one of the Saturday meetings,
11:09:31 but no, I didn't, I didn't bring her into the

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003

72

fold, I didn't recruit her.

Q. Are there people on here that you would say you brought into the fold or recruited for this lawsuit or for Sprenger & Lang?

A. To recruit, I don't know. I may have with -- I don't know with whom. I did refer Rod Arnold to Sprenger & Lang, so if that's recruiting, I recruited him.

Q. Okay.

A. Nii-Akwei, I don't think so.

Q. All right.

A. Sean Allen, I talked with, and like I say, I was surprised he was here, so if I did try to recruit him, it didn't work, something else did. Virginia Douglas. These other people, for the most part -- Dawn Collins, no. Louis Darden, no. Virginia Douglas, no relation, that I know of. Valerie Mason-Robinson, I know the name, but no, I don't think so. There was some people I talked to who chose not to get involved, but I would say Rod Arnold is the closest on that list, to be responsive to your question.

Q. Are there people on this list that you do know the story about? You don't know the facts about Sean Wright, I understand, but are there people that

73

you do know the facts about?

A. When you say the facts --

MS. COLER: Objection, vague.

THE WITNESS: -- I know the facts that are in here, that were in the charge, in the complaint.

BY MR. KLAAS:

Q. That would be different from the facts.

A. Well, these facts.

Q. But I think I'm quoting you accurately to say you didn't know the facts one way or the other on Mr. Wright.

MS. COLER: Same objection, vague.

THE WITNESS: I know what he had claimed and what he had put forward as and what other people at that time felt that the way he was treated was fairly, you know, inappropriate, and that others similarly situated were not handled that way and ended up in this reorganization, whatever was going on, in some kind of job, but Sean didn't, so, and the others were white and he was black, so, you know, that led to his being involved in this. But the detail -- no.

When I say facts, the only facts that I would have had or been privy to would be the facts as they were, I guess, that they would have provided

74

in telling me their tale of woe, if these are facts. I don't know what you call them.

BY MR. KLAAS:

Q. Did you participate yourself in the human resource handling of any of these folks? You had some contact, I gather, with Nii-Akwei.

A. With Nii-Akwei, I did, yeah.

Q. Anybody else?

A. Yeah. For example, Sean Allen, when he was hired, they didn't want to hire Sean, he worked for us as an intern for a year or two, one or two years. He was at Mohouse, I believe, and we hired him. He had done all right. And I kind of -- he was young and he worked in the corn milling division, he was hired in the corn milling, I think originally as a merchant, and then he moved around. But no, I would counsel --

No, the issues that, you know, HR issues, management and employee, no, no. But I was like a mentor. Okay? I was like, what did I say, an uncle, avuncular type, we call it something else in the black community, you know, HNIC, but in his case and in some of the other cases, Nii-Akwei I got, he was a little older, I got acquainted with. Della I've known, I've got -- you know, Della has

75

been around for going on 25 or more years, and she worked in the flour milling division when I first went into the food sector. Louis Darden I didn't know. Dawn Collins I knew, I used to see around, but I really didn't get to know Dawn to any great extent. Virginia Douglas, I don't even know who she is. Hughey, Cheneta, I don't know. Jackie Jenkins I should know, but I don't know that I know her. Keith Lewis, yes. Not a great involvement. I'd see him, maybe have lunch together, something like that.

Q. Did you refer him to Sprenger & Lang or have --

A. No.

Q. -- any role in his becoming a member of the plaintiff group in this lawsuit?

A. Keith?

Q. Yes, sir.

A. No.

Q. What about Vivian Little?

A. Don't know Vivian by that name. I might know her if I see her. I'm sure I know all these people or have seen them and may have talked to them, but I can't place a face with a name off this list.

Q. Valerie Mason-Robinson?

A. I should know her. I don't. I can't place her

11:16:10 face.
11:16:11 Q. How about Anthony McDowell?
11:16:13 A. No, I don't.
11:16:14 Q. Michael Mitchell?
11:16:16 A. That rings a bell, but it doesn't.
11:16:18 Q. Phyllis Reece?
11:16:20 A. No.
11:16:21 Q. Tonya Ross?
11:16:23 A. Yeah, I do, I know I know her. I, again, can't
11:16:28 place a face.
11:16:29 Q. Did you have any role in her joining this lawsuit,
11:16:34 to your knowledge?
11:16:34 A. No.
11:16:34 Q. Charles Scott?
11:16:34 A. I know Charles, yeah, I play golf with him.
11:16:37 Q. Any role that you know of --
11:16:38 A. Not that I know of.
11:16:40 Q. -- that you had in his getting in contact with
11:16:42 Sprenger & Lang --
11:16:43 A. No.
11:16:44 Q. -- or Sprenger & Lang getting in contact with him?
11:16:46 A. No.
11:16:47 Q. Clintonia Simmons, you know, as I recall.
11:16:49 A. Right. Clintonia worked in corn milling in
11:16:51 Memphis, and I talked with Clintonia, but whether



11:16:55 she got involved because of that or not, I don't
11:16:57 know.
11:16:58 Q. When you say you talked with her, you talked with
11:17:00 her about this lawsuit or Sprenger & Lang?
11:17:02 A. Right, right.
11:17:03 Q. On the phone?
11:17:04 A. Yes.
11:17:04 Q. Was she at any of these meetings?
11:17:07 A. No.
11:17:08 MS. COLER: Objection, foundation.
11:17:10 THE WITNESS: Not that I was at, put it that
11:17:12 way. I don't know whether she was beyond that, I
11:17:15 don't know.
11:17:16 BY MR. KLAAS:
11:17:16 Q. Yes. And what did you -- tell us about your
11:17:21 conversation with Clintonia Simmons about, you
11:17:22 know, this lawsuit or Sprenger & Lang.
11:17:24 A. Well, I was trying to reach, I got a hold of her,
11:17:28 I was trying to reach a guy by the name of, I
11:17:31 can't think of his name, Wright, and who had
11:17:37 worked at Memphis, and somebody among the group at
11:17:42 that time had indicated that Clintonia may know
11:17:46 where he is, and I called her and asked her if
11:17:50 she, had she seen Ron Wright, is the person, and
11:17:58 she hadn't, evidently, or she said she hadn't, but



11:18:01 she knew somebody who may have and was going to
11:18:06 ask him; and then I got, then she, I think, got
11:18:09 back to me or I got back to her, and she gave me
11:18:13 somebody else's name to contact, and she at the
11:18:24 time was aware of this action being in motion, as
11:18:30 it were, or formulating, and I may have given her
11:18:39 Larry's number or name, I'm not sure, but I think
11:18:43 we did talk about it.
11:18:46 Q. All right.
11:18:49 A. Tausha Tate, Tausha Tate worked in Memphis, if I'm
11:18:59 not mistaken, and I'm not sure if I talked to her
11:19:09 or not. I did talk to her, but I don't know if it
11:19:12 was before or after the fact.
11:19:14 Q. Okay. Emily Tyler?
11:19:21 A. Not that I know of.
11:19:23 Q. Jacqueline Williams?
11:19:26 A. Not that I can --
11:19:28 Q. Cheryl Willis, you indicated you spoke to --
11:19:30 A. Right, Cheryl is here.
11:19:32 Q. -- as I recall. Do you recollect your
11:19:34 conversation with her? About this lawsuit or
11:19:43 about the Sprenger Lang.
11:19:44 A. Yeah, I know we talked about this lawsuit and she
11:19:47 getting involved in it, and evidently she chose
11:19:53 to. I think she was -- she may have been or may



11:19:57 not have been, but yeah, we talked about it.
11:20:00 Q. How about Steve Wint?
11:20:01 A. No.
11:20:03 Q. And Sean Wright you've spoken with and --
11:20:05 A. Sean Wright, yeah.
11:20:06 Q. -- you've talked to us about.
11:20:07 A. Sean Wright was doing this from when I got --
11:20:10 Q. Were any of these folks that you spoke with, that
11:20:17 became plaintiffs, are they, did they ever become
11:20:20 clients of yours or were you ever their coach,
11:20:23 post-retirement from Cargill?
11:20:28 A. I never got paid, if -- so whether I was their
11:20:32 coach or not. Yeah, I talked with some. I would
11:20:39 get, I would get a phone call at least one, two,
11:20:49 three, maybe as many as a half a dozen a week for
11:20:52 different reasons after I retired, people just
11:20:55 wanted to know what I'm doing, how's retirement,
11:20:59 others, hey, I'm running into this or that or
11:21:02 whatever, kind of just an event, some people
11:21:06 called to get, you know, counsel.
11:21:12 When, it was interesting, when I retired, a
11:21:17 group of black employees of Cargill decided to
11:21:21 give me a retirement party, which I really didn't
11:21:24 want, all right, at that time, and they did, and
11:21:27 there was people that came from a lot of places

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003



11:21:31 around the United States that worked for Cargill.
11:21:32 Some of them didn't work for Cargill anymore, but
11:21:36 had, had been former employees who came. And it
11:21:43 was interesting. I was -- from that, I think I,
11:21:51 it went on there, I -- how should I put it. I got
11:22:11 this mantle of being somebody that people could
11:22:14 call and talk to and whatever, and so I was
11:22:22 involved and had been involved in talking with a
11:22:25 lot of people even before Cargill, but even after
11:22:32 Cargill to a great extent; and to some extent, I
11:22:35 feel obligated. It was a nice thing they did for
11:22:38 me, and it was a little more recognition than I
11:22:41 wanted, and from that some other things happened
11:22:44 that were really interesting as well.
11:22:46 But my talking to and involvement with people
11:22:53 on this list or people that talked about this
11:22:59 lawsuit when it was filed and even before it was
11:23:01 filed, as to whether or not they should or
11:23:04 shouldn't be a part of it, just went on as a part
11:23:10 of just normal interaction I had with current,
11:23:14 former, and whatever, primarily, principally
11:23:20 African American or black employees at Cargill.
11:23:23 Q. Did you -- and you didn't -- I understand you
11:23:27 became known as a person who would counsel folks
11:23:31 who were having difficulties, but in terms of



11:23:36 financial arrangements or payments, you've never
11:23:38 received any payments from anybody.
11:23:40 A. I'm waiting. I won't turn them down, okay, but so
11:23:44 far, I haven't --
11:23:45 Q. I mean, are you officially owed money by any of
11:23:48 them? Did you have an agreement that they would
11:23:51 pay you for any of the services that you could
11:23:54 render to them?
11:23:57 A. Just oral, verbal.
11:24:00 Q. With like Rod Arnold?
11:24:02 A. No, no.
11:24:03 Q. Who do you have an agreement with?
11:24:05 A. Cornell.
11:24:06 Q. Cornell?
11:24:07 A. Slade.
11:24:08 Q. Slade?
11:24:09 A. Yeah. He's not on there. He's still at Cargill.
11:24:13 Q. Do you have any oral agreement with any of the
11:24:15 folks that we've just gone through, the actual
11:24:17 plaintiffs?
11:24:18 A. Uh-uh, uh-uh.
11:24:19 Q. All right. Do you have any sort of financial
11:24:21 arrangements with Sprenger & Lang?
11:24:24 A. No.
11:24:25 Q. Do you have any interest financially in this



11:24:28 lawsuit, to your knowledge?
11:24:32 A. Not since it was filed and I'm -- yeah, no,
11:24:36 evidently not.
11:24:37 Q. What do you mean evidently not?
11:24:39 A. Well, at the time that this thing was being in
11:24:46 process or was being developed or was in process,
11:24:54 the parameters hadn't been defined in terms of the
11:24:58 scope of who would be involved or who would be,
11:25:01 you know, included in terms of level; and in
11:25:07 talking with, I believe it was with, yeah, with
11:25:10 Larry, at one time it was indicated that even
11:25:19 though we -- that the majority of the people that
11:25:27 were in salary classes below the B, band level, it
11:25:32 would be possible to include people above or into
11:25:36 the bands, but turned out it didn't, and so I
11:25:40 would have been left out. But had it been, I was
11:25:43 led to believe that even though I had an
11:25:46 agreement, I may have had claims, okay, legitimate
11:25:50 claims that could have been brought under this
11:25:53 action, if it was broad enough to include me.
11:25:56 Evidently it turned out not to be, because it's
11:26:00 cut off at salary class, what is it, 15? Yeah.
11:26:03 Q. Uh-huh. You were too high.
11:26:08 A. I won't say, I won't agree to that. I was in --
11:26:12 Q. C.



11:26:13 A. C, all right. Never too high.
11:26:16 Q. And any other, you know, financial arrangement
11:26:21 with regard to your services to the Sprenger &
11:26:24 Lang firm in terms of getting ready for the --
11:26:26 A. The only thing I got --
11:26:28 MS. COLER: Objection, wait, objection,
11:26:28 leading, assumes facts not in evidence.
11:26:31 BY MR. KLAAS:
11:26:31 Q. For the lawsuit.
11:26:32 A. Only thing I got were lunches, coffee. You know,
11:26:35 I don't know if you guys are buying lunch or not,
11:26:39 but I got, we got, I had -- the meetings I had
11:26:41 with Larry in their offices were, you know, were
11:26:48 lunch, we didn't have a meeting, or coffee or
11:26:51 rolls or whatever. That's the extent of it.
11:26:53 Q. All right, and any discussion at all about any
11:26:57 future, you know, income or remuneration?
11:27:00 A. They'll -- you know, it was, it was -- I've raised
11:27:08 it. Well, you know -- no, not specifically. No
11:27:17 specific reaction, put it that way. I raised it
11:27:21 in terms of my involvement, and I think Larry said
11:27:26 something to the effect that it would depend on a
11:27:29 lot of things, and it was just kind of left
11:27:31 hanging, that we'd have to see at the conclusion
11:27:33 of this thing.

11:33:52 take it, at Sprenger & Lang. Can you recollect
11:33:55 how many? There was at least one on a Saturday, I
11:33:57 heard you mention.
11:33:59 A. Yeah.
11:33:59 Q. How many meetings at which Sprenger & Lang
11:34:04 attorneys and current or former employees of
11:34:06 Cargill were gathered did you attend?
11:34:13 A. No more than, I don't know, half a dozen, no more.
11:34:16 I don't know. Somewhere between four and six. I
11:34:22 don't know. Four? Probably around between four
11:34:24 and six, six at the most; three, four at the
11:34:30 least, somewhere in there.
11:34:31 Q. Were they all on Saturdays or was that common?
11:34:34 A. For those meetings? Yeah, of these people, yes.
11:34:38 Was it common? I don't know. But I attended
11:34:40 three or four of them.
11:34:43 Q. And when did it become clear that you would not be
11:34:50 included in the class because of your salary
11:34:54 grade?
11:34:54 A. Well, I guess for me, it didn't become clear until
11:35:03 it was finally, when it was, at the time it was
11:35:06 filed, and when that would have been is, what, in
11:35:13 the fall of -- or would it have been -- it may
11:35:20 have been after that. When was this filed?
11:35:29 MR. IWAN: Fall of 2001.



11:35:31 BY MR. KLAAS:
11:35:31 Q. Fall of 2001.
11:35:34 A. Okay. It would have been after that, and I tell
11:35:52 you when I really became fully conscious of it is
11:35:56 in the early part of or the middle of 2002.
11:36:03 Q. All right, and when you became conscious of the
11:36:06 fact that you were not included in the class, did
11:36:09 you speak with Mr. Schaefer or anybody at
11:36:13 Sprenger & Lang?
11:36:31 A. I've got to think.
11:36:35 Q. You know what, let me back up, Mr. Douglas. Are
11:36:38 you remembering a moment or something that caused
11:36:40 you to become aware that you weren't in the class
11:36:42 that you place in mid-2002, or is it just a time
11:36:47 or is it an event you remember?
11:36:49 A. Well, in -- I know at one time, and it wasn't said
11:36:59 in a definitive way, but it was said in the sense,
11:37:05 and by Larry, that even though I had an agreement,
11:37:10 that I may still have standing to be a part of
11:37:14 this lawsuit. Okay?
11:37:15 Q. Uh-huh.
11:37:18 A. When I found out about exactly the fact that I
11:37:22 wasn't isn't as clear to me until, I would say, in
11:37:32 towards the middle of '02, whatever, summer of
11:37:45 '02, when, and I don't recall, and it may have



11:38:06 been in a conversation I had with someone. Okay.
11:38:18 This is '03, right?
11:38:21 Q. Someone from Sprenger & Lang or someone else?
11:38:23 A. No, no, someone else.
11:38:26 Q. Who?
11:38:28 A. Duane Reed.
11:38:30 Q. Duane Reed. Does Duane Reed go by
11:38:38 WWWwide48@aol.com?
11:38:42 A. Yeah, worldwide, he was worldwide before there was
11:38:47 a Worldwide Web, yeah.
11:38:49 Q. That's Duane Reed?
11:38:51 A. Yeah.
11:38:51 Q. So Duane Reed tells you you're not in the class --
11:38:54 A. No, he didn't tell me that, no, no, no.
11:38:57 Q. -- or somehow you discover that in the middle of
11:38:59 2002.
11:39:00 A. We were talking about this thing, I think, or
11:39:03 something, and the website is what it was, I
11:39:07 think, and I think this was -- I don't know if
11:39:15 this was on the website or not, but I looked at
11:39:20 it; and clearly, when I looked at the website or I
11:39:26 had a copy of it or whatever, or he had a copy of
11:39:28 it, it was not, you know -- I wasn't part of the
11:39:31 class and he wasn't part of the class.
11:39:34 Q. Did you talk with Mr. Schaefer then or anybody at



11:39:38 Sprenger & Lang about that?
11:39:41 A. I mentioned it to somebody. I don't know if it
11:39:46 was Larry, or there was a guy I used to talk to, I
11:39:54 don't know if I mentioned it to Larry or to -- I
11:39:57 mentioned it to somebody, or Doug.
11:40:00 Q. At Sprenger & Lang?
11:40:02 A. Yeah.
11:40:02 Q. What did they say?
11:40:04 A. Yeah, they said, yeah, that's -- I think it was
11:40:08 Larry, I can't be sure, but they said yes, that's
11:40:12 right, you're not.
11:40:13 Q. What did you say?
11:40:15 A. A class, a putative class.
11:40:17 Q. What did you say?
11:40:19 A. No. I said -- I shouldn't repeat it. Okay?
11:40:22 Q. You can repeat it.
11:40:25 A. No. You're going to make me a bad person. I used
11:40:29 some expletives and just said that this, you know,
11:40:36 whatever, it's bullshit, so, but it was done and
11:40:42 whatever, and understanding why he probably cut it
11:40:58 off where he did, because there is not that many
11:41:01 people in the band C. But was it a promise? No.
11:41:06 Early on, but it was held out as something that
11:41:11 conceivably could include people in the band, or
11:41:14 anyway, in my case, me, but it turned out it

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003

92

11:41:18 didn't.
11:41:18 Q. Now, did you attend any meetings at Sprenger &
11:41:24 Lang after you discovered that you were not in the
11:41:28 class, or were those meetings before?
11:41:31 A. The meetings, no, all the meetings that I
11:41:36 attended, to the best of my knowledge, were
11:41:38 meetings leading up to and right before this was
11:41:43 originally filed. Yeah, I have not met with Larry
11:41:52 since or met at Sprenger & Lang even before this
11:41:58 was filed.
11:42:01 Q. Now, there was --
11:42:03 A. I would say at the end of 2/01 was the --
11:42:09 Q. Was the last meeting?
11:42:10 A. Yeah, physically at, yeah.
11:42:13 Q. Now, we're told that you terminated the
11:42:15 relationship with Sprenger & Lang on February the
11:42:18 24th, 2003. Whether that's the exact date or not,
11:42:23 do you recollect?
11:42:24 MS. COLER: I'll object as a leading
11:42:25 question.
11:42:26 THE WITNESS: Yeah, it's in that
11:42:28 neighborhood, yeah. I'd have to double check it,
11:42:33 but right about then, that's officially. I pretty
11:42:35 much cut it off before that.
11:42:38 BY MR. KLAAS:

93

11:42:38 Q. Why?
11:42:51 A. There were a number of things that I didn't
11:42:56 particularly like that had occurred, one of which
11:43:01 is the turning over of all these documents. Larry
11:43:04 gave me a call and said, you know, I am compelled
11:43:11 or whatever by the court or whomever to turn over
11:43:15 these documents to Cargill, and I'm just giving
11:43:18 you a heads-up or letting you know. This is in,
11:43:23 this is in '02, this is right around June, July,
11:43:27 July I think, early part. And about a week or so
11:43:32 later, I got another call saying that in all
11:43:35 likelihood, I'd be receiving a subpoena, what is
11:43:43 the thing with the duces, whatever it is, and, you
11:43:49 know, and they may contact you, contact us, and
11:43:53 hung up, see. So that was kind of where it was
11:43:56 left.
11:43:57 I thought it was a shitty way to deal with
11:44:00 this, with me, and in terms of how this had all
11:44:08 evolved. I was, my impression was, I was left
11:44:13 kind of just to twist in the wind, and I got the
11:44:19 impression from his tone that he was going to
11:44:27 distance himself or at least distance me from
11:44:30 this, from him on this. So I said fine, okay,
11:44:37 that's the way it is, that's the way it is; and
11:44:40 from that point on, I pretty much was out of it.

94

11:44:50 Q. Okay.
11:44:51 A. And, well, not pretty much, was. Although
11:44:54 officially I didn't tell him I was severing our
11:44:59 relationship, as far as any participation or
11:45:03 anything, no, and we went through this machination
11:45:08 with dates for this deposition back and forth and
11:45:11 what have you, cancellations and on and on and on,
11:45:17 that ended up, you know, occurring as it is now.
11:45:21 But I had no intention of honoring anything that
11:45:28 would have been said in final form, and evidently
11:45:32 it wasn't because of this challenge that you
11:45:36 raised with regard to privileged documents, and so
11:45:41 this thing has been put off and put off and put
11:45:43 off and scheduled and rescheduled, but by and
11:45:47 large, after that, and even before that, after
11:45:50 this was filed, my involvement had gone to
11:45:59 nothing.
11:46:00 (Douglas Deposition Exhibit No. 3 marked for
11:46:01 identification.)
11:46:02 BY MR. KLAAS:
11:46:02 Q. Mr. Douglas, let me show you what has been marked
11:46:05 as Douglas Deposition Exhibit No. 3. This is a
11:46:08 declaration from Mr. Schaefer. You'll see at the
11:46:13 end it's dated May the 2nd, 2003, so early in this
11:46:21 proceedings, or, what, four months ago. Have you

95

11:46:31 seen this before?
11:46:31 A. Not that I recall.
11:46:34 Q. Okay. I won't ask you, because I think
11:46:38 Mr. Schaefer said he'd sent you a copy, but if you
11:46:40 don't recall, you don't recall.
11:46:41 MS. COLER: I'm going to object as leading
11:46:43 the witness, assuming facts not in evidence.
11:46:45 Counsel is testifying.
11:46:47 MR. KLAAS: Fine.
11:46:48 BY MR. KLAAS:
11:46:48 Q. I want to ask you about just a couple of
11:46:51 references in this, Mr. Douglas, and --
11:46:55 A. What para -- 5?
11:46:57 Q. Yeah, 5 would be fine. In paragraph 5,
11:47:03 Mr. Schaefer states that "At the outset of my
11:47:07 interactions with Douglas on this issue, I told
11:47:10 him emphatically and unequivocally that, given his
11:47:14 prior senior management position at Cargill and
11:47:16 his exposure to confidential and attorney-client
11:47:19 privileged communications, he could not disclose
11:47:21 to me or anyone at [Sprenger & Lang] any written
11:47:24 or oral communications that could be considered to
11:47:27 fall within Cargill's attorney-client or work
11:47:30 product privileges." Do you see that, where I've
11:47:32 read that?

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003



11:47:33 A. Uh-huh.
11:47:34 Q. Do you have any recollection that would support that declaration, or is that not true?
11:47:38 MS. COLER: Objection, assumes facts not in evidence.
11:47:54 THE WITNESS: Well, my only response to that is, and there may have been some language or some conversation in this regard, but there were documents that clearly I had gone over with Larry, that Cargill leadership development stuff and other stuff, whether it was confidential or not, I can't recall, but to have had all these documents and to have made copies of them, you draw your own conclusions.
11:48:29 BY MR. KLAAS:
11:48:29 Q. All right. Let me ask you, in paragraph 12, Mr. Douglas, it's a couple pages further along, it's paragraph 12. Mr. Schaefer states, "These --" do you see that? Do you have it?
11:48:46 A. Yeah.
11:48:48 Q. About the third sentence in, he says he's talking with you in December of 2000. Do you see that? He says, "These originals were returned to Douglas in approximately December 2000." Do you see that? Paragraph 12.



11:49:03 A. "Returned to Douglas in approximately," yeah, "December 2000. I also --"
11:49:06 Q. And then it says, "I also talked to Douglas after (sic) the originals were returned."
11:49:10 MS. COLER: Objection, mischaracterizes the record.
11:49:12 THE WITNESS: "I informed him that we were returning these documents --"
11:49:15 BY MR. KLAAS:
11:49:15 Q. "I informed him that we were returning these documents and asked him why they were produced to the firm, given our previous instruction about not providing privileged information. Douglas explained he had never intended to violate this instruction by providing these documents, but ... simply produced all documents in his possession that related to his prior employment without reviewing them against this instruction. He promised that this would not occur in the future, and he had no intention of ever sharing these documents with anyone else." Do you remember any such conversation?
11:50:05 A. No, not -- I can't recall.
11:50:10 Q. In --
11:50:11 MS. COLER: Let him finish.



11:50:14 MR. SCHAEFER: Let him finish.
11:50:16 THE WITNESS: When these documents, first of all, when these documents were returned, they were returned at my behest. No one called up and said, hey, we're going to send these documents back to you, from your office, Larry. I had to say, because I was waiting for them, and I was wondering where in the hell they had done with them or what they had done with them, and I finally called and said, hey, where are these documents that I have over there; and I don't know, I think it was, I'm not sure, I think it was Patty, it was somebody, it wasn't Larry, I don't think, or it could have been Sara, anyway, I think it was Patty, you can ask her, but I got them back, and it was only because I had initiated the request and it wasn't that it was forthcoming from that end.
11:51:07 As far as this business with that these documents intended to violate, that was explained to him, he never intended to violate, look, initially, when I informed him I had some documents regarding some of these issues, some of these programs, I think it was initially in a conversation early on. I then subsequently went



11:51:49 back and looked to see what documents I actually had. I wasn't sure at that time. And I think I knew I had something on CDLP (sic), because it was something I had worked on during the time I was recovering from my knee surgery, and I thought it was still there, but I found that and I found some other things. In a subsequent -- then I think I took those over and we had a meeting and we went over those, and I say, I've got some more documents, I'm going through them. Some of this stuff is confidential, some of this stuff is -- they said, oh, no, we'll just send them over, because it was a lot, and we'll sort them out, and I did. Okay?
11:52:32 BY MR. KLAAS:
11:52:32 Q. Yeah.
11:52:33 A. The wheat from the chaff, I mean the confidential from whatever, and so the documents that I had, the privileged or confidential documents and the other documents, I just sent over, and those that I didn't, yeah, sent over and/or took over, because I was going through them on a piecemeal, case-by-case, and asked for I think from Larry for some direction on what would be or what wouldn't be appropriate. I think it was Larry. Or if it

104

13:08:30 Q. Okay, and it concludes with "At present me thinks--no me knows--Larry is full of shit and playing cat & mouse because of concern for documents returned to me by his office," correct?
13:08:42 A. Correct. I'd gotten different -- my interaction with Larry, or with that office, was primarily through Doug. For whatever reason, Larry and I had ceased talking directly with each other, and Doug was the intermediary as far as our communication was concerned.
13:09:07 Q. Uh-huh, and who is Doug?
13:09:09 A. Doug, I don't know what Doug's last name is.
13:09:11 Q. He's a lawyer at Sprenger & Lang?
13:09:13 A. I don't think he's a lawyer. He's a paralegal.
13:09:17 Q. All right, and then there is some references at the top that appear to be dated July 11th and 12th --
13:09:27 A. Right.
13:09:27 Q. -- of 2002?
13:09:29 A. Right.
13:09:29 Q. It starts, "Called and informed me?"
13:09:32 A. Yup.
13:09:32 Q. Who's that?
13:09:33 A. Larry.
13:09:34 Q. That he's sending documents to --

105

13:09:36 A. To Cargill.
13:09:39 Q. And then there is an entry, Monday, July 22, '02, "Informed me a subpoena --
13:09:46 A. Yeah.
13:09:46 Q. -- and attachment."
13:09:48 A. Yup.
13:09:49 Q. That's Larry again?
13:09:50 A. Yup.
13:09:51 Q. "For doc production from Cargill to depose me was forthcoming."
13:09:54 A. Yup.
13:09:54 Q. "Said I should toss records or documents before." That's Mr. Schaefer?
13:09:58 A. That's correct.
13:09:59 Q. "Call his office, etc., with questions or for assistance," correct?
13:10:04 A. When I receive the subpoena.
13:10:09 Q. So Mr. Schaefer called you on July 22nd and instructed you to toss records or documents before a subpoena was served. Is that right?
13:10:17 MS. COLER: Objection, leading.
13:10:23 THE WITNESS: Yes.
13:10:30 BY MR. KLAAS:
13:10:30 Q. All right.
13:10:32 A. There was a --

106

13:10:33 Q. Now, second page. I'm sorry, go ahead. The second page of this Deposition Exhibit No. 4 doesn't have a heading, but it's typewritten and starts with the words, "Contrary to Matthew E. Klein's assertion?"
13:10:51 A. Right, right, right.
13:10:56 Q. What I want to ask you about --
13:10:59 A. I don't have that -- oh, right, I do have it, I do have it.
13:11:05 Q. The second answer.
13:11:05 A. Yeah, that was in response to that thing that I was sent, that motion or that thing that you guys sent to the Judge.
13:11:12 Q. Right.
13:11:14 A. To get copies or to get the privileged documents.
13:11:19 Q. All right, and the second paragraph ends with the sentence, quote, "It was Larry Schaefer who solicited my knowledge/experience regarding systemic discrimination at Cargill and not I who retained Sprenger & Lang for advice regarding 'systemic discrimination' at Cargill --
13:11:39 A. Right.
13:11:39 Q. -- and a consulting opportunity," close quote, correct?
13:11:42 A. Well, the consulting opportunity I talked about

107

13:11:45 was a consulting opportunity with individuals that still work at Cargill and my position having been what it had been.
13:11:57 Q. That's what you're describing as personal coaching?
13:12:00 A. Yeah.
13:12:00 Q. Okay.
13:12:02 A. But as far as me, in response to what Matthew Klein, was it Matthew E. Klein had written in that affidavit or whatever motion it was to the Judge, he had me as the person who had initiated this whole lawsuit and it was me who had retained Sprenger & Lang and recruited the individuals into their office and subsequently filing this charge, or this litigation.
13:12:48 Q. All right, and all that's untrue. You were approached by Sprenger & Lang, I take it.
13:12:53 MS. COLER: Objection, leading.
13:12:54 THE WITNESS: I was approached, excuse me, I was approached by people who had been involved in this and who had, who were at a and let me know of a meeting that was being held. Okay? And whether that was Sprenger & Lang or not, I don't know, but I, contrary in response to what Matthew Klein was saying in that document he submitted to the court,

13:38:52 certain things, initiatives that would be common
13:38:55 throughout the product line, regardless of
13:38:57 geography, but it was just, you know, talk and
13:39:02 exchange of ideas and experiences and that kind of
13:39:09 thing, methods to, you know, reviews that were
13:39:14 successful and that weren't, and trying to keep
13:39:17 some consistency throughout the entire product
13:39:20 line in how, for example, quality process was
13:39:23 being administrated, or the implementation of a
13:39:27 PMP worldwide or whatever it may be common to all
13:39:30 the businesses, regardless of geography.
13:39:33 Q. Were there lawyers dedicated to the food sector, I
13:39:36 mean, working in the food sector?
13:39:38 A. There were lawyers dedicated to product lines for
13:39:45 the business side. There were -- you know, for
13:39:51 business-related legal issues, I think each of the
13:39:54 product lines had a lawyer, a lead lawyer or, you
13:39:59 know, a person that was responsible for working
13:40:02 with that business on legal issues.
13:40:04 Q. How about HR issues?
13:40:06 A. HR issues, no, that was different. That was
13:40:09 functional. There was a lawyer, Fred Budde,
13:40:14 essentially, from the time -- if you're talking
13:40:17 about from '95 forward, it was Fred Budde. Fred
13:40:21 Budde was the EEO slash employment law lead



13:40:32 attorney.
13:40:33 Q. You said '95 forward. Did you mean '85 forward or
13:40:36 did you mean '95?
13:40:38 A. Well --
13:40:38 Q. The last two years --
13:40:40 A. What period -- because it changed at different
13:40:42 times.
13:40:42 Q. I'm talking 1987. Which lawyer --
13:40:45 A. At '85, that was, that's a -- I don't know who.
13:40:51 It could have been Bill. Bill for awhile was.
13:40:54 When I was in the EEO department, Bill Britt was
13:40:58 the lead person, and then --
13:41:00 Q. Then Fred?
13:41:04 A. Well, there was a period there. Fred was EEO
13:41:05 manager for about six months or whatever, and then
13:41:07 I think he moved into the job that Bill had. Bill
13:41:12 went on to do something different in the salt
13:41:16 division, so that's when Fred replaced him as the
13:41:24 lead EEO slash employment law attorney for
13:41:29 North America.
13:41:30 Q. That was during the '90s then sometime?
13:41:32 A. No. That was in the '80s.
13:41:33 Q. '80s.
13:41:35 A. I'd say about '86, '87, thereabouts.
13:41:41 Q. So during that period then, '85 through say '97,



13:41:46 is the lawyer that you had the most contact with
13:41:49 at Cargill Fred Budde?
13:41:50 A. Fred Budde, Fred Budde, yes. For that period,
13:41:53 yes. There were others that I worked with, Joe
13:41:58 Liesch being probably the second attorney I had
13:42:04 most contact with, and he worked for Fred and
13:42:12 reported to Fred, and then in the last year or
13:42:18 thereabouts, on a couple of things I worked with
13:42:28 Dennis. One was a compliance review finding in
13:42:38 the rice division that, that was in '90 -- yeah,
13:42:44 that was when I was still recovering from knee
13:42:47 surgery. Yeah, but principally Fred Budde was the
13:42:49 person, and Joe Liesch was the person, the second
13:42:54 person I had the most contact with after Fred.
13:42:57 Q. I want to ask you about some tasks that, at least
13:43:02 my understanding, has come with the job of being
13:43:04 the HR manager in the food sector, and I want to
13:43:07 just ask you, I'll describe a task for you, you
13:43:09 tell me whether that was your job during this
13:43:12 period, and maybe I'm correct and maybe I'm
13:43:15 incorrect.
13:43:16 A. All right.
13:43:16 Q. Were you responsible for coordinating or managing
13:43:19 EEO audits and responses to EEO charges?
13:43:24 A. Yes.



13:43:25 Q. All right.
13:43:25 MS. COLER: Can I just clarify the time
13:43:27 period you're asking these questions about?
13:43:29 BY MR. KLAAS:
13:43:29 Q. '85 to '97. And I'm not saying -- I understand
13:43:32 you and Fred or you and Bill, you and Dennis,
13:43:34 but --
13:43:36 A. When a charge was filed at a location in a
13:43:42 business I was responsible for, we had a system
13:43:45 where we come to our department, and I would look
13:43:48 at it, and then get industrial law department and
13:43:56 they'd send out what we call a deputizing letter
13:43:59 to maintain privilege and confidentiality, that
13:44:02 kind of thing, and it would flow from there.
13:44:04 Q. All right. Were you responsible for advising
13:44:08 senior management of the status of the EEO audits
13:44:13 and discrimination charges that were pending in
13:44:13 the food sector?
13:44:15 MS. COLER: Multiple question.
13:44:16 BY MR. KLAAS:
13:44:17 Q. All of the above.
13:44:19 A. Yes, to the extent that -- yes, I would do that on
13:44:23 a routine basis at least twice a year. If there
13:44:29 was a particular issue that had come to the fore,
13:44:37 I'd give them a status report more frequently, if

# Deposition of: Ray Bill Douglas Vol. I
# Date: September 18, 2003

184

15:31:08 four months, whatever elapsed, she was just beat
15:31:11 up. And I think she had gone to someone, I guess
15:31:21 it was Nancy or somebody, with some ideas and was
15:31:24 just totally shot down; and at that point, I think
15:31:27 she was devastated and ended up just leaving and
15:31:34 went to General Mills, where she's said it's night
15:31:39 and day between working at Cargill, and she was at
15:31:42 Cargill for about five or six years. She was
15:31:45 working with in terms of, and she's doing the same
15:31:48 kind of -- well, she's working in the area of
15:31:50 diversity now for General Mills.
15:31:51 In fact, called me about a guy that they
15:31:56 acquired when they picked up the Pillsbury product
15:32:04 line, consumer line, or the business, I guess,
15:32:09 Pillsbury and United Farms, the whole company.
15:32:12 Q. When you say she was discouraged in your e-mail,
15:32:14 where you say that Ms. Harris "was discouraged by
15:32:17 the lack of sincere interest," that's the lack of
15:32:20 sincere interest on Ms. Siska's part?
15:32:22 MS. COLER: I'm sorry, I didn't hear --
15:32:22 THE WITNESS: Lack of, yeah, I mean --
15:32:22 BY MR. KLAAS:
15:32:22 Q. On Ms. Siska's part.
15:32:24 A. When you say Cargill, Cargill will say, you know,
15:32:27 I say there is not a company around that has more

185

15:32:35 expressed concern for what it purports to be, and
15:32:45 is, and tries to be in some cases, and does
15:32:49 achieve in some, fewer, not enough, but, you know,
15:32:54 so when you say Cargill, Cargill, that's one
15:32:56 thing. When you start naming names, that's
15:32:59 another thing, because the transfer, the
15:33:04 translation from stated policy to day-to-day
15:33:10 practice, sometimes there is a disconnect,
15:33:12 sometimes it's great, and sometimes it even flows
15:33:16 contrary to stated policy. So if you're talking
15:33:19 about an individual, fine. If you're talking
15:33:21 about Cargill, that's -- you know what I mean?
15:33:23 Those two are not necessarily one and the same, in
15:33:28 my experience at Cargill.
15:33:32 She was discouraged that there was, in my
15:33:36 view, and you can call her and ask her yourself,
15:33:39 that there was not more support or any, what she
15:33:43 felt to be, necessary support for getting this
15:33:49 thing, you know, off the ground.
15:33:50 Now, she may have had higher expectations
15:33:54 than she should have. She may have done -- and
15:34:03 likely she would, but she's pretty resilient and
15:34:04 she's pretty practical. She's not, you know,
15:34:07 she's not 21 years old, and I thought -- but she,
15:34:13 I don't know what it was, but if I could be -- I

186

15:34:18 think it was Nancy that pretty much shot down the
15:34:21 proposal that she had brought forward, and whether
15:34:27 it was -- I don't think it was a final proposal,
15:34:29 it was just a first draft or a second draft, but
15:34:35 it was, it was something that pretty much knocked
15:34:39 all the air out of her sails; and from that period
15:34:44 on, she just kind of did her little job and was
15:34:48 looking for a way, for another place to be, and
15:34:51 ended up leaving and went to work for
15:34:53 General Mills, where she is now.
15:34:57 Q. When you say, at the end of this e-mail of
15:35:00 November 2, 2000, that you are beginning to
15:35:06 exhaust the list of potentials.
15:35:08 A. Of potentials, yup.
15:35:09 Q. Those are potential plaintiffs for the lawsuit?
15:35:12 A. Yes.
15:35:13 Q. Was there an actual list, or is this just a list
15:35:16 of people that you have in mind or --
15:35:17 A. Well, these are people that, you know, I'd talk to
15:35:20 X, and he'd tell me about W, and W would tell me
15:35:23 about, well, not WW, but X, Y, Z, you know, I'm
15:35:29 talking variables here, so you know, from building
15:35:32 to post, I'm like a pinball. You know, did you
15:35:35 talk to so-and-so. Did you talk to Ron Wright,
15:35:38 you know, Ron Wright really got a raw deal, and so

187

15:35:41 on and so forth.
15:35:42 Q. Why were you doing this?
15:35:43 A. Why was I doing this? I was doing this -- I was
15:35:48 pissed off at Cargill. Okay? My own deal. I was
15:35:53 also doing this because I defended Cargill in the
15:35:57 Foster lawsuit. Okay? I took a lot of shit,
15:36:09 okay, I'll just say it, from people,
15:36:11 African Americans, for taking that kind of
15:36:15 position, and I did it for a couple reasons.
15:36:19 One, I wanted to demonstrate that an
15:36:24 African American could be, could defend a company
15:36:28 such as Cargill in an action like that. I knew
15:36:35 of -- and of the four people involved, I knew them
15:36:39 all, I knew the particulars in probably three of
15:36:45 the four. There was one I wasn't as up to speed
15:36:50 in, but of the three of the four, and they were
15:36:54 questionable, two of them were questionable, one
15:36:58 was just totally not in the ballpark; and I was in
15:37:06 the job of, as the EEO manager for the
15:37:12 corporation, I had worked with two of the people
15:37:16 who were named plaintiffs, Treadwell and Foster,
15:37:25 Art Treadwell.
15:37:26 So I had some firsthand knowledge, and I
15:37:32 worked with defending the lawsuit knowing that,
15:37:40 and in hopes that once it was resolved and the

# Deposition of: Ray Bill Douglas Vol. I
## Date: September 18, 2003

188

consent decree was signed, that things would, and the programs, the proactive programs were put in place, would change, not only initially with, you know, all those other activities, sensitivity training and all that kind of stuff. That did take place. But it would be more long-lasting and we would move forward. That a lot of that old baggage, you know, that World War II kind of mentality, black, white, what have you, would be put away, put behind us.

Two, all right, now fast forward to the present. And that, after the consent decree was signed and we went through the first, what was it, five years, four, five years I think, Foster, and it was concluded, it just, you know, after that and there was, there were no longer this fund to support, this million dollar fund or some portion of it, bigger portion of it to support some of these actions, initiatives, things just tended to, you know, dwindle away to the point where efforts to recruit at predominantly black colleges or colleges that had significantly black enrollment, those efforts diminished.

There were black recruiters who I talked to, Ralph Wesley, saw Ralph at my nephew's wedding in

189

Detroit. We just ran into each other. He happens to be going with the sister of the girl my nephew married, and I'm looking and we're at the reception, I look around and I see Ralph, and I hadn't seen him since I retired, this is two years after. And he said that I quit recruiting at Cargill, why don't you come out and talk with the people out there. And I said why. He said because there is no longer any resources or effort or interest in doing so. Just don't take it and shove it, I'm not going to do it anymore. Others have said the same. Okay? Blacks I'm talking about.

It seems, and that's current, but it seemed that once Foster, the Foster funds were gone, efforts to continue to improve management in this area just seemed to dissipate; and, consequently, it got to the point where it not only, not only did it dissipate, it got to be counter, counteractive. Blacks were not only not coming into Cargill or being sought to be recruited into Cargill, but those that were there were being, on a somewhat wholesale level, being let go, being rifted or being, you know, terminated or leaving on their own or for what, that kind of thing.

190

Year, year or two, Charles Renkins, who's been around 20 some years I think at this point or more, we're in an investment club together, or had been, Charles used to be here, I was talking to Charles, and he said, well, I'm, you know, my last year at Cargill. I said what do you mean? He said, I got a notice that, you know, at the end of the fiscal year, I forget, was it a year or two ago, there is no job for me. You know, it just -- and I asked him, I said, well, what's going on?

And it seems -- here's, here's where I'm heading: It seems that Cargill will take a position in this area and go and progress up to a point, and then at some point the initiative runs out or the impetus runs out, and this thing takes a downturn and it goes in the opposite direction. And I've seen that happen twice in the 20 years I was at Cargill, and this seems to be the third, okay, cycle, for lack of a better term, that this has gone, and I invested -- you asked me why, is that the question?

Q. Yeah. I mean, you said you were pinballing among all these people. I was just trying to figure out why. You indicated you were pissed off at Cargill.

191

A. Yeah, I was personally.

Q. I understand that.

A. But it's more than that, okay, it is more than that, and that is enough; but beyond that, it's this whole notion -- I'm not saying that every black should be hired and not ever fired, but I was out here for 22 years, in fact, even before that, and I got involved in a lot of employment decision-making and discussions leading up to final decisions, and there is a way to deal with people fairly and squarely, short of just, you know, kind of breaking it off and telling them at the eleventh hour, well, you've done all these things wrong, now it's time for you to go, as opposed to, you know, if they're doing something wrong, bring it to their attention, and if they don't, you know, change their ways or change their behavior.

It appears that black employees, for the most part, aren't viewed as having much to contribute, and the little they contribute oftentimes is under or not valued the same. The same thing could be done by an occasion employee and be thought of as having a lot of value, and you could say it was done by a black employee and say, well, the value

192

would diminish by some significant or meaningful amount. It's just not fair treatment, and to have gone through this three times and then put my own credibility on the line in thinking that that would make a difference, not rocking the boat when I left, and then all this shit, you know, continues, no, that's it, that's insult, that's insult to injury.

Q. When you indicated you were pissed off at Cargill, is that because of the conversation you had about $200,000 or whatever?

A. Right, right, right. That, and I left Cargill, like I said, a group of employees got together, black employees, and believe me, I didn't want this at the time, and they gave me this, and they raised the money, I mean, among themselves, and invited my family and me and had a good time over at the Radisson at the, what the hell, over there, Radisson, the Learning Center.

And, you know, about a week after, the word got out, some people sent me some pictures that were taken at that event, and they came and my secretary opened the mail at that time, well, Vonnie was crazy, but she opens all these pictures and she says, well, what is this. Well, word had

193

gotten out that they'd had this party. And then within a week or so, week, week and-a-half of that, I'm approached by Kevin saying, you know, we're going to have this retirement party for you. You know, but for -- and so I ended up going to another retirement party. This one is all white. I went to one that was -- come on.

This is 19, almost the 21st century, and but for the fact that I had this other retirement party, believe me, there would not have been the second retirement party. I just took it as an insult. I went along with it. Again, I don't want to be, at that time I didn't want to be, I didn't want to rock the boat or leave a bad, with bad vibes or anything, but, you know, after thinking about it, even at the time, I just, it just, you know, it just didn't sit well; it just didn't, it just didn't, it just didn't square that it was sincere or my -- and of all the people that pulled this thing off for me was Bassy, and Bassy and I never really got along, and there were a lot of reasons for that, and I know it hurt him as much as it hurt me to sit at the same table that evening at the, where in the hell that was, I can't remember the --

194

THE WITNESS: Where was that place, Dennis, out on, you know --

BY MR. KLAAS:

Q. Out west of town somewhere?

A. Yeah. The nine-hole golf course they've got on the lake.

MR. ORKE: It's out near the golf course, the Learning Center?

THE WITNESS: You got CRS as bad as I have. All right, but my point is this: There is two cultures in Cargill, two distinct cultures. Okay? And for blacks, okay, it's one thing, and for whites, it's another; and it's rare that there is any meaningful, you know, cross, I was going to say crossroads, inter, you know, interaction or interaction, interparticipation, interwhatever.

And in terms of seeing, talking about an employee for consideration for a job, in many cases it's a beauty contest, and for promotions and things like that and as a group, and maybe a few individuals are able to transcend that, but not many. Blacks just don't do well and don't come off well in the final decision-making.

If you're going to tell me after 20 some years of Charles Renkin having worked in two or

195

three other countries, working for a product line like this, ends up being rifted and there is no place for a person like that with his experience and talent at Cargill, and he's asked to train people that are less experienced than he is, don't know as much as he knows, so they can take over a job that he otherwise would have, that's bullshit. Okay? Unadulterated.

BY MR. KLAAS:

Q. In your e-mail, Mr. Douglas, same sentence, actually, it's on page 100310, you say, "I'm beginning to exhaust the list of potentials," and then you go on to say, quote, "James Norton, whose name and status was reported earlier, appears to have no interest in participating in the party --

A. Yup.

Q. -- despite the patently unfair way he was treated."

A. Well, he was.

Q. And he's one of the whiz kids, right?

A. Yup.

Q. When was the whiz kid program put in, do you remember, roughly?

A. Well, Jim had a variant of it early on. It was a trial. He was going to take a couple, and then he