Page 234

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

---

Arnold, et al.,

Plaintiffs,

vs. Court No. 01-2086 DWF/AJB

Cargill, Inc.,

Defendant.

---

VIDEOTAPED DEPOSITION OF
R. BILL DOUGLAS

VOLUME II (Pgs. 234-388)

Taken May 10, 2004

Commencing at 9:46 AM

REPORTED BY: ELIZABETH J. GANGL, RPR

PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER, 527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402-1331
612/339-0545 * 1/800/545-9668 * Fax: 612/337-5575

Page 235

Videotaped deposition of R. BILL DOUGLAS, VOLUME II, taken on the 10th day of May 2004, commencing at 9:46 a.m., at the law firm of Dorsey & Whitney, Suite 1500, 50 South Sixth Street, Minneapolis, Minnesota, before Elizabeth J. Gangl, Registered Professional Reporter and Notary Public of and for the State of Minnesota.

***********

APPEARANCES

On Behalf of the Plaintiffs:

SUSAN M. COLER, ESQ.
LAWRENCE P. SCHAEFER, ESQ.
Sprenger & Lang, P.L.L.C.
325 Ridgewood Avenue
Minneapolis, Minnesota 55403
612-871-8910

On Behalf of the Defendant:

PAUL B. KLAAS, ESQ.
MICHAEL IWAN, ESQ.
Dorsey & Whitney
Suite 1500
50 South Sixth Street
Minneapolis, Minnesota 55402-1498
612-340-5613

and

DENNIS J. ORKE, ESQ.
Senior Attorney, Cargill Law
15407 McGinty Road West
Wayzata, Minnesota 55391

NOTE: The original deposition transcript will be delivered to Paul B. Klaas, Esq. as the taking party of the deposition.

Page 236

INDEX
VOLUME II (Pages 234-388)

WITNESS: R. BILL DOUGLAS Page

CONTINUED EXAMINATION BY MR. KLAAS ........ 237
AFTERNOON SESSION ......................... 321
EXAMINATION BY MS. COLER .................. 374
EXAMINATION BY MR. SCHAEFER ............... 381

OBJECTIONS ....... 241, 242, 244, 246, 250, 256-259, 261, 270, 277, 279, 280, 282, 284, 288, 289, 291, 307, 322, 323, 326, 329, 331, 333, 337-339, 342, 345, 349, 353, 365, 375, 376, 378, 380

DOUGLAS EXHIBITS MARKED AND REFERRED TO:
(Bates numbers in parentheses)

8 Bates SUB 0028
2/24/03 handwritten notes ................ 249

9 Bates SUB 0022-026
3/18/03 letter to Bill Douglas from
Lawrence Schaefer ......................... 282

10 Bates SUB 0137
Handwritten note headed Bill Douglas ...... 321

11 Bates SUB 0140-141
7/6/00 typed transcript of telephone
Interview of Bill Douglas ................. 324

Page 237

DOUGLAS EXHIBITS MARKED (Continued):

12 Declaration of Lawrence P. Schaefer in
Proceedings Regarding Deposition of
R. Bill Douglas ........................... 330

13 Bates SUB 0112
11/27/00 Bill Douglas Interview Summary ... 340

14 Bates SUB 0104
12/22/00 e-mail to Larry Schaefer, Sara
Madsen from Patty Jones ................... 342

15 Bates SUB 0085
3/28/01 handwritten notes ................. 346

16 Bates SUB 0070
12/03/01 e-mail to Larry Schaefer, Doug
Olson, Patty Jones, Sara Nelson from
Susan Coler ............................... 358

17 Bates SUB 0067-069
12/4/01 letter to Bill Douglas from
Lawrence Schaefer ......................... 368

DOUGLAS PREVIOUSLY MARKED EXHIBITS REFERRED TO:

4 Larry Schaefer Chronology of Events
(Single page from Exhibit 4) .... 254, 259, 376

(Original exhibits attached to original transcript; copies to counsel. Previously marked exhibits referred to not attached.)

Page 258

and extended the invitation to have me just bring all the documents down and use, I guess, one of their offices and a big table and, you know, I could sort them out kind of thing. So I'm sure I've talked to her about it, and I may have talked to Larry about it as well.
Q. Um-hum.
A. I think I did, but I can't recall exactly when and what the conversation was.
Q. Um-hum. So Ms. Jones then says I think we returned to you everything that you gave to us?
A. Something to that effect.
MS. COLER: Objection, mis --
A. Well, yeah, something to that effect. If we had that conversation, it would have been along, because I didn't get any more documents. That's the bottom line.
Q. All right.
MS. COLER: Mr. Douglas, I'm going to ask you to let me make my objection before you give your answers, just so we have a clean record.
THE WITNESS: All right.
MS. COLER: Thank you.
Q. Did you ever receive an explanation for why the number of documents that were returned to you

Page 259

were less than the documents that you delivered to Sprenger & Lang?
A. No. Not that I recall.
Q. Okay. Earlier in this page of your notes, the portion of Exhibit 4 that's before you, Mr. Douglas, there is a reference dated July 22nd of 2002 in which Mr. Schaefer informed you that a subject and attachment for document production from Cargill to depose you was forthcoming and said you should toss records or documents before that. Did you do that? Did you toss some records or documents before --
A. Yes.
Q. -- the subpoena arrived?
A. Yep.
MS. COLER: I'm going to object that you're assuming facts not in evidence the way you're -- the document speaks for itself.
Q. Did you, can you give us some idea as to how many documents or records you tossed after July, this conversation on July 22nd of 2002?
A. How many? No. There were several. There were two -- no, I can't tell you exactly how many, but I would say there were several that I did, I just tossed.

Page 260

Q. And are you remembering particular documents?
A. No, no. This, there were two, there were two times. I brought some documents, I'm trying to think of when, how these documents got over there. Excuse me. I brought some documents with me one time to Larry's office, a small number of them, and, and that was one, one, one time, and subsequent to that is when the, the remainder of the documents I had were brought over.
Q. All right.
A. And it was the second set, it was, it was the voluminous number of them anyway, of the two sets, that, that to the extent I got them back they were all old records and I just tossed them. The records that I had brought initially, I don't recall if I took them back or got them back or what at this point.
Q. Um-hum. And were there subject matter differences between these two sets, or was it just what happened to be in a given place --
A. I'm sure there was.
Q. -- or --
A. I can't recall now what, what -- I can't recall what I would have had initially. This goes back to, what, 2001?

Page 261

Q. 2002 is the date here.
A. Yeah. No, but the documents that, that he had in his possession he had before this date.
Q. Right.
A. And had had for a while.
Q. And returned --
A. And had had for a while.
Q. And had he returned them before that date?
MS. COLER: Objection, vague.
A. Evidently by, according to this, he must have.
Q. Did you call Mr. Schaefer's office --
A. Yeah, I --
Q. -- with questions or for assistance in tossing or --
A. No, no.
Q. -- getting rid of these documents?
A. No, I was pissed off. When I got this call our, our communication dropped off almost entirely.
Q. Um-hum. Did Mr. Schaefer tell you why you should toss records or documents?
MS. COLER: Objection, assumes facts not in evidence. Leading.
A. No, and that's part of what, I guess, had pissed me off was, I was under the impression that,

that these documents were, were protected, okay, in terms of, of anything that would require me to, to have to explain or what have you, get involved with, with why I had provided them to him, and, and then when he called and said that, that -- and he had done it before he had even called me. I mean this is, this was after the fact. Now these eggs were scrambled when I got the news, so that was the other thing that didn't set well with me. And initially I said I had a bunch of documents at home, that's what I'm trying to think, I'm trying to get my sense of how this, how this evolved. I think I talked to him on the phone one time and I said some are privileged and some aren't, and at that time he informed me that, that I could bring them down there and they would go through them and they would, you know, go through or sort out the wheat from the chaff, so to speak. And I brought a sample of documents. I think what I -- oh, all right. What I brought, may have brought, was like a copy of, early on, the first set that I brought personally had to do with the Cargill Leadership Development Program, what's the --
Q. CLDP?
A. CLDP. Maybe copies of -- I'm trying to think here -- of a performance appraisal form. It wasn't



MBO, it was --
MS. COLER: PMP?
A. PMP, yeah. Selection grid stuff. And there may, and I'm sure there were other things, but I, that's my recollection. Okay. And then the other documents, second set of documents that were involved were documents that I had received from Cargill in boxes -- when I left I put a lot, because I couldn't take all that stuff with me -- that they sent me, and sent me some boxes of stuff that really they shouldn't have sent, but -- and I had gone through them and I said I'm going to sort through these, and that's when I got the invitation to bring them in. And I think he did, he called and coordinated with Patty, and then I brought some, I brought, I brought, there may have been three times. I brought some documents in my, of the second set with me one time and somebody unloaded them. And then I, and then a courier came and picked up some documents.
Q. Now when the documents were returned to you, my recollection is that you indicated there were fewer documents returned to you than you had delivered --
A. Right, right.
Q. -- to Sprenger & Lang?



A. Right, and I didn't know really, I mean I hadn't gone through all the documents yet, but I mean I'm just looking at, you know, if you give somebody this much and you get this much back (indicating).
Q. Right.
A. That's kind of how I was looking at, you know, what I had received in return versus what I had thought, what I thought I had provided.
Q. Right. Were you able to detect in, were there subject matters that were returned to you, or subject matters that were not returned to you, or was it just less but you couldn't qualitatively separate the documents between those that were returned and those that weren't? That was a very long question. Do you know what I'm driving at?
A. Yeah.
Q. Okay.
A. I get your drift I think. Categories of documents, and --
Q. Right, right.
A. -- relating to this or that or the other thing. My -- I don't know, I can't, you know, I can't, I can't say. My memory on that is, is a -- but I can say for the most part that the documents in, and there was three sets of documents because, I



think there were, in the way I'm trying to recall this, and, and get a sense of what happened. The two, the two, the second and the third set, for purposes of this, were just a bunch of documents that I had gotten that had been sent to me by, I don't know if it was Becky or, not Becky, but Bonnie or BJ or somebody, because they sent a lot of this stuff to my house after I retired from Cargill because there was no way I could carry all that stuff. And they sent me some stuff that for whatever reason they shouldn't have sent me, and I really didn't look at it or know what it was until this thing came up and I started going through these boxes of things that I had from Cargill, and -- that had been sent to me from Cargill. And that's when I came across some of the things that were in the second and third set. Obviously all of the things in the second and third set. The documents -- yeah. And I think the documents that I took with me I took on the first -- the documents in the first set were documents pretty much I think that I, I had in, at home over, you know, had accumulated. I had a lot of records at home. That was the other thing. I had a lot of records from Cargill at home just over the period of time that I worked at Cargill, because a lot of the

Page 266

time -- I spent two and a half or three months at home.
Q. Right.
A. And so I was getting stuff every day and I was, you know, carried stuff back and forth between my home and my office at Cargill during the time I was recovering from knee surgery.
Q. Right.
A. And a lot of those documents remained at home. Plus documents that I had accumulated over time, and just by virtue of working at Cargill. It was that set that I, I think that I took, or some of which I took with me the first, in the first set. Subsequent documents that I provided in, in any, and they were in volume in terms of two or three boxes, whatever it may have been, were documents that had come to me, or had been sent to me from, for the most part, there may have been some others, but sent to me at the time that, following the time I had retired.
Q. Okay. Why were documents being sent to you after you had retired?
A. Well, I had a bunch of stuff. I had, you know, just stuff I had accumulated after 20-some years that, you know, just, you know, pen sets and mugs and on and on and on, and had pretty much packed

Page 267

up that stuff and was going to take it, somebody was supposed to come and pick it up in boxes and take it down to the loading dock, I was going to pick it up myself. And it was so much, and at that time I was still recovering from the surgery I had had earlier, they said, well, why even bother, we'll just send it to you.
Q. Okay.
A. But I did take some. I mean there were some smaller items that I took with me, but by and large the stuff that I had boxed up I had someone, well, they sent it to me.
Q. All right.
A. Or had it sent to me.
Q. And this was stuff that you had boxed up from your old office, I take it?
A. Well, this is -- yeah. And then there was some, well, this is stuff I boxed up from the office, and there was some stuff in there that had, I think was intended to be saved or filed or tossed or whatever that I got as well that I would not, had I, had I done this myself that I would not have taken. I mean they were just old documents.
Q. Okay.
A. Files.

Page 268

Q. All right. Do you remember anything in particular just so we can get an idea?
A. Discrimination complaints and, you know, correspondence of one kind, internal, external, you know, just a mishmash of accumulated documents of all sorts.
Q. When -- now there is, I gather, three deliveries of documents to Sprenger & Lang by you?
A. My recollection, right.
Q. Were there, when the documents came back, did they all come back at once, or were there waves of documents returning to you as well?
A. Well, I took some documents, I think, back myself, and it had to do with CDLP. There was something else. Cargill Leadership Development Program I gave you -- you may be able to come with some of these other documents you have of mine. PMP, pay ranges, the selection grid. And there may have been something else. If I recall something else, I'll let you know, but ...
Q. Okay. You indicated some KEIS documents in your earlier --
A. KEIS.
Q. Do you remember --
A. Yeah, KEIS. Yeah, yeah. Key Employee

Page 269

Identification System.
Q. All right.
A. And that whole, yeah, that whole process.
Q. Okay. So those, all those documents, CDLP --
A. Right, those are the documents I think were, that I felt at the time initially would be meaningful for Larry's purposes.
Q. All right. So those went over --
A. With me.
Q. Okay.
A. All right.
Q. To Sprenger & Lang?
A. Right.
Q. And did those come back ever?
A. I'm trying to think of -- I don't know if I, if I got them back that same day that I went over there, or if I left them and they came back or didn't come back. In other words, I don't know if I, I took them back with me that same day or, or they, they stayed there. I don't know. I can't recall.
Q. Um-hum. And were those documents about CDLP or pay ranges or selection grids or KEIS among the documents that you tossed? Do you remember?
A. No, not -- no. No, no. No, the documents, I tossed the documents after I had this conversation a

Page 270

day or two -- and I bounced this off of Duane, and I won't get into what I said, I don't think, you can imagine. It isn't fit for prime time. And I just said to hell with this, something to that effect, and just, just tossed them. And what, you know, what they were -- my sense is that, well, I don't know. I really don't know. I know I was upset, or I was mad, angry, what have you, when that, for sometime after that.
Q. Um-hum. In your conversation with Mr. Schaefer, did he identify any particular categories of documents that you should toss?
MS. COLER: Objection, leading.
A. Not that I recall.
Q. The entry on July 22nd there you say, and I asked you this, I'm sorry if you've answered already -- did I ask you if you called Mr. Schaefer's office with questions or for assistance in tossing documents?
A. Huh-uh. No, I mean after -- no.
Q. You talked with Mr. Reed?
A. Yeah. Well, I told him, yeah, I told, I told him what had happened in terms of tossing the documents or what have you. No, I don't think I talked specifically to him about that. I just told

Page 271

him what I felt about what had happened and how it happened and that it was bullshit.
Q. Um-hum.
A. You know, and it was just, you know, it was one of those things, and what he, you know, to the extent he talked to Larry about it or what he said to Larry after that, I don't know. I mean he didn't tell me.
Q. Do you, did Mr. Reed participate at all in the --
A. No.
Q. -- tossing the documents --
A. No.
Q. -- or know that that was going on?
A. No.
Q. All right.
A. Well, he may have known it was going on but he didn't, no, you know, he didn't toss one and I tossed one, that kind of thing.
Q. Right.
A. No.
Q. Okay. How physically did you toss the records? I mean just throw them in the trash or just shred them or what happened?
A. The city provides trash receptacles, and I

Page 272

just tossed them in there.
Q. Um-hum.
A. And there weren't that many more. I mean there was some, but it, the number I tossed were not the same number that I had -- they had, okay? Somewhere, somehow some documents didn't get back to me.
Q. Did you toss everything that Sprenger & Lang returned to you?
A. For the most part my recollection is yeah.
Q. But as to particular documents or types of documents or categories or subjects, you just can't tell us what was in there?
A. No -- well, no, no. But from what he told me, he made a copy of everything and gave you, I guess Dorsey, a copy of everything that he had that I had given.
Q. Um-hum. Do you know whether documents concerning CDLP or pay ranges or selection grids or PMP were in, among the group of documents that you tossed?
A. I can't say.
Q. Okay.
A. With any certainty.
Q. And do you know whether the documents --

Page 273

A. And -- huh?
Q. Were or weren't?
A. Right, right.
Q. You can't say with any certainty?
A. Right, right.
Q. All right. And is that also true as to whether those documents were privileged communications between you and Fred and Dennis or anybody else or not?
A. My -- no, they weren't, they weren't communications with attorneys.
Q. What were they?
A. They -- one was an on-line program, people, you know, a list of people who had participated, and the KEIS stuff were instructions and forms and correspondence I had put together. I coordinated the administration of the KEIS rating system for the food sector, which is a lot of work.
Q. Um-hum.
A. And put together instructions to managers in how to evaluate and who to evaluate and when to get it back and, you know, that kind of thing. Ratings -- and instructions on how to, I can't remember, these things now are coming back to me a little bit. You do an initial evaluation of someone,

Page 274

that's on one sheet now, and then for people who, who grade above a certain level and who are in a pay grade at a certain level or above you do a development plan and instructions, that kind of stuff. And then there was a list maybe of names of people who were in pay grades for a product line that it would be mandatory someone do a KEIS on them. We did a, we did a -- and I extended that, that whole process, down below the level that the corporation had intended it to be used.
Q. Grade level?
A. Huh? Right, right, yeah. There is two, KEIS 1 and KEIS 2. That was Kent's, Kent Norby's, I hate to say, his brain child, I guess, of a sort, and between he and Nancy, I guess it was Nancy's, Nancy's brain child and Kent's, Kent was the foster parent of it.
Q. Um-hum.
A. All right. Interesting now that I think about it. But it was that kind of stuff. And then, and then I may have had a sheet, what do you call, a reconciliation sheet, or a spreadsheet, of all the people who, in a given product line or division by job family, in other words, all the people in production in the corn milling division, and it was

Page 275

mandatory a KEIS evaluation be done on and how they ranked relative, you know, a relative ranking of those individuals and their scores. Maybe, you know, copies of some of their development plans, or development plans that had been, you know, their development plans developed by their managers or whomever. And then maybe I would have had -- there was a lot of stuff. I had, there was something else, too, going on then, and I think at the time that I had all of that, and the reason I had all that, is because that was going on, if I'm not mistaken, around the time, during the time I was working from home.
Q. Um-hum.
A. At least getting that stuff out. And even after I returned to work I used to bring a lot of work home because I, I wasn't always sure I would be able to go to work the next day early on in my recovery from knee surgery. But it was that kind of thing. It was the whole KEIS exercise for the food sector, so there were a lot of documents involved, and it was, it was stuff related to ratings and forms and, you know, obviously a lot of duplicates, and then having gotten them back and organizing them, or what is the word, collating them and that kind of

Page 276

stuff, and then putting together, together an overview summary that would have gone to the division head or the division president.
Each of the functional area managers, in other words, the head of the production work force for the corn milling division, would get a copy of all the ratings by managers of his production people, okay, of people that were in the production job family. The accounting job family ratings would all be summarized and go to the division or product line controller, et cetera. Same thing with the merchants, the salespeople, the technical people. I'm leaving somebody out.
THE WITNESS: Who am I leaving out, Dennis?
Q. Okay.
A. People that didn't have one those, I guess, I didn't do anything with lawyers.
Q. Um-hum.
A. They were all rated, like Garrison Keillor they're all above average and outstanding.
Q. Right. Now here's what I want to do. I want to see if I can follow the privileged documents that you had back and forth between you and Sprenger & Lang --

Page 277

A. All right.
Q. -- and you tell us if you can recall where they went and what happened to them. There were some privileged documents that you had initially because you talked with Mr. Schaefer about them, he said bring them on down.
MS. COLER: Objection, mischaracterizes his testimony, assumes facts not in evidence --
MR. KLAAS: Well, I --
MS. COLER: -- and leading.
BY MR. KLAAS:
Q. Well, tell us. You told Mr. Schaefer you had some privileged documents?
A. I told, yeah, we were talking about -- he early on said I, you know, he had heard, found out about KEIS, whether it was from me or from somebody, I don't think -- well, the selection process, the selection grid.
Q. Grid, um-hum.
A. CDLP, development programs, training programs. There may have been something else. And that's, that's the early stuff that I had. And that was, that was the stuff I, in part, described, particularly the KEIS stuff. But I had PMP forms and

Page 322

A. No, sir.
Q. Do you remember being contacted at any time by, in connection with a gender discrimination claim that was being contemplated against Cargill by the Sprenger & Lang firm?
MS. COLER: Objection; leading, assumes facts not in evidence.
A. No.
Q. Do you recollect anyone from the Sprenger & Lang firm contacting you for leads? You see the words on the document, "contact him for leads"?
MS. COLER: Objection, foundation as to what "leads" means.
Q. Well, whatever it means. The document says, "Bill Douglas," arrow, "contact him for leads." Let me ask you, did anyone ever contact you from the Sprenger & Lang firm for leads?
A. I talked to, I talked to, I think I talked to Larry, and maybe – there was another lawyer, Dave, Dave Shulman, early on.
Q. And was the topic of the discussion leads?
A. People who conceivably could have a claim and be interested in joining the class.
Q. Okay. And do you recollect whether this conversation about leads was on the phone or in

Page 323

person?
A. Probably both.
Q. And do you recall particularly whether Mr. Schaefer and Mr. Shulman were together or were they separate or were there many conversations? Tell us what you recall.
A. With regard to leads, my sense is they, I don't recall talking to both of them at the same time about this. I think I recall talking to, to them individually at least, and David wasn't there, I guess he wasn't there that long. So I know I talked to Larry, I'm sure, and David early on, but if I did with David, it was, it had to be relatively early in this thing, because he didn't, he didn't stay long after this thing got going.
Q. Um-hum. In the first instance, Mr. Douglas, if you recall, did you contact Sprenger & Lang about whether there was discrimination against African-Americans at Cargill or did Sprenger & Lang contact you on that subject?
MS. COLER: Objection, vague. Broad in time frame.
A. I went, my first contact with regard to this current action, this present action, was at a, was at a meeting at their office.

Page 324

Q. Okay. And how did you first become involved with Sprenger & Lang on this topic, that is, systemic discrimination at Cargill against African-Americans, whether it exists or not?
A. Oh, just that, nothing, I was informed there was going to be a meeting regarding this and, at their office.
Q. And who invited you to that meeting?
A. I heard about it through, I can't remember his name, his real name. They call him, his nickname is Juicy, whatever.
Q. Okay.
A. And, and I think, and Duane was another person. There was a third person that I had heard this from, but Juicy, Duane, and there was a woman whose name escapes me. Yeah.
Q. Sean Wright from time to time was called Juicy. Is that him?
A. Yeah, Sean. Yeah.
Q. Okay.
A. I couldn't think of his name.
(Douglas Deposition Exhibit No. 11 marked for identification.)
A. Is this mine?
Q. Yes, sir. I wanted to show you what's been

Page 325

marked as Deposition Exhibit No. 11, a two-page document. We received it from Sprenger & Lang. It's entitled "Bill Douglas" and says "Telephone interview, July 6th, Fawn Wilderson." Why don't you take a moment to look at that and tell me when you're done.
A. (Examining document.) Okay.
Q. Do you recollect speaking with Fawn Wilderson on or around July 6th, 2000, on the phone?
A. That's a good question. I, I don't, I do and I don't. Fawn Wilderson, I probably did. Fawn, Fawn Wilderson was a topic of discussion, and so I'm trying to sort out whether it was in her context that I am familiar with Fawn or whether it was through a phone conversation we had. Was this a phone conversation? Telephone interview. Okay. Um-hum, it appears that I did. Sounds like, sounds like something I'd say in all likelihood, yes.
Q. Do you –
A. I can't recall it. Fawn, Fawn called somebody at Cargill and left a message to call them back, to call her back, and I think left Sprenger & Lang's name as the, on the call-back, which made the, didn't make the person on the other end, who was a current employee, feel good obviously.

Page 326

Q. Was that a different call from Fawn Wilderson?
A. That was Fawn but, no, it wasn't me she called, she called somebody else, and that person was upset that she would call Cargill and leave a message like that.
Q. Right.
A. But she did.
Q. Who was that?
A. I don't recall who it was per se. It was somebody, it was a woman. I can't remember who exactly. If I saw a list of plaintiffs it might ring a bell.
Q. Now this conversation, at least according to these notes, starts off with the question how did you get my name, or "How is this going to be handled? How'd you get my name?" Do you remember inquiring of Fawn Wilderson how did you get my name?
MS. COLER: I'm going to object. He hasn't even said he recalls this conversation, so I think this calls for speculation. And there's a foundation question.
Q. Do you remember?
A. Yeah, and no. I, I don't remember the conversation. I mean this, I'm looking at this and

Page 327

I'm assuming I said this because it sounds like me, but I can't, I can't -- the only thing I can remember about Fawn Wilderson, I don't remember this conversation, is that the, there was somebody that really got upset because she had called the, someone on the job, and said for Sprenger & Lang to call her back. It wasn't real bright, but all I can say -- I don't remember the conversation. I'm looking at what was said here and it appears like something that I would, I would admit to saying.
Q. Um-hum.
A. So on that basis ...
Q. In the -- well, on this or any other date with, do you recollect asking Fawn Wilderson how she got your name?
A. Well, up until the time -- I know her father and her mother, but I, up until this time I, I didn't know there was a Fawn Wilderson.
Q. Okay.
A. So if somebody calls you and says I'm Fawn Wilderson, then I guess my question is why, you know, how -- well, then she said what she wanted, I, you know, I'm saying, well, then, yeah, how did you get my name, I have a waiver with Cargill and signed it. So if it's in regard to this matter we're currently

Page 328

discussing, this lawsuit, who had you contact me?
Q. There's a, the third kind of item there listed, Mr. Douglas reads, quote, "I have docs from case Paul Sprenger filed."
A. Right.
Q. "Lawsuit brought against Cargill. There's a lot that Paul Sprenger missed," close quote.
A. Right. I have some documents from the Foster lawsuit.
Q. And as you sit here and look at those notes, does that stir any recollection for you as to a discussion with Fawn Wilderson or anybody at Sprenger & Lang about documents you had from the prior lawsuit or that --
A. Doesn't ring a bell.
Q. -- Paul Sprenger missed a lot?
A. Doesn't ring a bell.
Q. Okay.
A. That doesn't.
Q. All right.
A. But vaguely I can -- did I talk to Fawn Wilderson. Maybe I did.
Q. A few items below that, Mr. Douglas, there's a section that reads, quote, "I would prefer to do this other than on the phone. You could be anybody.

Page 329

That leaves me open to liability. But, I know much. It's all probably the same now as it was then," close quote.
A. Where is this?
Q. That's one, two, three -- the sixth item down. Do you see that?
A. Okay, yeah.
Q. Does that stir any recollection for you of any discussion you may have had with the Sprenger & Lang office as to whether, for example, you know much that's all probably the same now as it was then?
MS. COLER: Objection, broad.
A. What is your question?
Q. Looking at these notes --
A. Right.
Q. -- and I, you know, I don't know anything other than what's on the page here. It looks to me like Fawn Wilderson's notes of a telephone interview with you on July 6th, 2000.
MS. COLER: I'm going to object, the document says what it says.
MR. KLAAS: Yeah, well --
MS. COLER: Counsel is testifying.
MR. KLAAS: -- we'll look forward to investigating further if that's the objection.

BY MR. KLAAS:
Q. But here are the notes and it's saying, for example, "It's all probably the same now as it was then," and all I'm asking you is do you recollect saying anything like that to Fawn Wilderson or anybody at the Sprenger & Lang office?
A. No, the only connection or nexus I have with what's here at this juncture, and nothing has come to mind, would be looking at, at some of these statements, and it being something that I would say. I can't, I can't place Fawn. I don't think I've ever met her, and maybe -- maybe I did talk to her on the phone. I do know, know that there was a discussion about her having called someone at Cargill and having left her name and Sprenger & Lang's, I guess either name and/or telephone number for that person to call back.
Q. Okay.
(Douglas Deposition Exhibit No. 12 marked for identification.)
MS. COLER: This is already an exhibit.
MR. KLAAS: Well, okay.
BY MR. KLAAS:
Q. Let me show you this for ease of reference



what's marked, possibly again, as Douglas Deposition Exhibit No. 12. Mr. Douglas, this is a declaration signed by Mr. Schaefer on May 2, 2003, and submitted to the court. Take as long as you want to read it, but I just have some statements I want to ask you about.
A. (Examining document.) Do you want me to read the whole thing?
Q. I guess the first question is have you ever seen it? To the extent you can tell us that, that would be a good start, and then I just have four or five sentences I think I want to ask you about scattered throughout the document.
MS. COLER: I'm going to object as asked and answered.
A. It rings a bell.
Q. Okay.
A. Parts of it. Some parts of it -- let me look here and make sure. Seems like my good friend Nancy Siska was, when I was recovering from knee surgery, looking out for my, my interest. This I don't remember seeing.
MS. COLER: I'm sorry, I didn't hear your answer.
A. This (indicating) I don't remember seeing.



This other stuff rings a bell. Whether I saw it or heard it, there's some familiarity with it.
Q. All right. What I want to, I guess, first understand is --
A. Parts of it, yes, other parts of it, no.
Q. Right. And to some extent, since I'm working with documents from Sprenger & Lang, I'm attempting to piece this together, too.
A. Okay.
Q. I just want to get things in order here. What is, what we've looked at now is a document with your name on it, "Contact him for leads," and then this telephone interview document where you start off asking how'd you get my name, and then two months after that, maybe -- no, two months after that, Mr. Schaefer refers in paragraph 4 of his --
A. On what page?
Q. It's on page 2, sir, first line of Mr. Schaefer's declaration is that "On September 15, 2000, Douglas met with me to discuss the issue of whether systemic discrimination against salaried African-American employees was occurring at Cargill and had been occurring in the past." Do you see the sentence I'm reading?
A. Right.



Q. Did you come to the Sprenger & Lang firm seeking legal advice or had they sought you out?
MS. COLER: Objection, asked and answered.
A. Well, on this date?
Q. Well --
A. Originally --
Q. However it occurred.
A. I went to Sprenger & Lang close to, I don't know if this was the exact date or not, on February, up in paragraph 3, right after I had retired. I went there with the express purpose of having my agreement reviewed after having had the conversation with Nancy and with Diane Miller about my money. That was my initial contact. I did initiate that.
Q. Yes.
A. Okay. That was in '98. (Examining document.) Now, and I talked to Larry Sprenger, or Larry Schaefer about any conflicts I'd have with doing coaching or consulting with employees present and past.
Q. Right.
A. I did, that's true. And he gave me his --
Q. And what I'm trying to figure out then is two and a half years later --

Page 334

A. Yeah.
Q. -- Douglas is meeting with Larry to discuss this issue, and we've got these --
A. Okay. No, that --
Q. -- intervening documents.
A. All right.
Q. I'm trying to figure out --
A. On the 15th, no, I was made aware there was a meeting on the 15th of September, 2000 that I attended, yes, and that's the one that I, I got that from Juicy, from Duane, and I think, I don't know if it was Tony or who else, but there was two or three, and this was when this thing was just beginning to heat up.
Q. Okay. Now on the top of the next page, paragraph 5, you'll see a sentence from Mr. Schaefer's declaration that states, quote, "At the outset of my interactions with Douglas on this issue, I told him emphatically and unequivocally that, given his prior senior management position at Cargill and his exposure to confidential and attorney-client privileged communications, he could not disclose to me or anyone at S&L any written or oral communications that could be considered to fall within Cargill's attorney-client or work product

Page 335

privileges," close quote. Now do you recollect any such statement from Mr. Schaefer to you?
A. Well, I'll put it this way. The words ring true, or familiar, but I didn't hear them in the form of any kind of a declaration as this is stated, if you get my drift. (Examining document.) Well, I put it this way. I, this was talked about, but it wasn't as definitively declared as it's stated in this item, paragraph 5.
Q. All right. There's another reference to this topic, and let me, let me just show that to you and then I'll ask you globally what you remember. It's at, it's in paragraph 12, it's on page 6 of Mr. Schaefer's declaration. In paragraph 12 you'll see he's discussing the return of the documents that you sent over to Sprenger & Lang, and that paragraph concludes, quote, "I informed him," that is Mr. Schaefer informed you, "that we were returning these documents and asked him why they were produced to the firm, given our previous instruction about not providing privileged information. Douglas explained that he had never intended to violate this instruction by providing these documents, but that he simply produced all documents in his possession that related to his prior employment without reviewing him

Page 336

against this instruction. He promised that this would not happen in the future, and he had no intention of ever sharing these documents with anyone else," close quote. Do you see that reference?
A. Yes.
Q. Now did that happen?
A. Well, let me take this, deal with this piecemeal. One, the documents, any documents that were returned to me were not returned to me by December 2001. Number two, the next sentence, no, I don't recall any of that, Douglas never intended to, no, no, that's not so.
Q. Let me make sure. The sentence --
A. No, I'm just saying "Douglas explained that he had never intended to violate this instruction by providing these documents, but that he simply produced all documents in his possession that related to his prior employment without reviewing them against this instruction."
Q. I guess what I am asking you --
A. No.
Q. Are you providing documents to Sprenger & Lang contrary to their explicit and adamant instructions that you do so for some reason we don't understand, or are you complying with their

Page 337

instructions?
A. Well, I put it --
MS. COLER: Objection, assumes facts not in evidence.
A. I put it this way. I brought some documents.
Q. Right.
A. And -- there. And after several months, more than is indicated in this paragraph preceding this one, whatever it was, 5, I had to initiate contact to try and get them back. So you draw your own conclusion.
Q. Right.
A. No, I, I -- this, this didn't happen to me. And there was no admonishment or anything resembling that about me having provided documents that I had been told previously shouldn't be provided.
Q. Okay.
A. On the contrary. I was invited to bring all the documents, including those that were privileged, to Sprenger & Lang's office and help and/or assist, and a space or place to sort through them.
Q. In paragraph 20, which is at the top of page 9, there's reference then to an oral communication. I want to ask you about that also, Mr. Douglas. Do you see paragraph 20, "Apart from inadvertently

Page 338

providing these documents to S&L"? Why don't you go ahead and read paragraph 20 to yourself.
A. (Examining document.) All right, what is it?
Q. Well, have you read paragraph 20?
A. Yeah.
Q. Mr. Schaefer is saying that you keep violating the ground rules for the relationship that were established at the outset?
MS. COLER: Objection, counsel is testifying. Let's stick with the document.
MR. KLAAS: I'm reading it.
MS. COLER: That's not what the document says.
A. I don't know when, apart from inadvertently providing these documents to S&L, Douglas has never shared -- all right. We talked about Fred Budde, but it wasn't in this context that I can recall. The lead attorney on the employment litigation, and he said he had worked with Fred in the past and knew him. We did have a conversation. I didn't know that -- one time, I don't know if it was here or -- I don't think it was. I don't know when this thing was drafted, but, no.
Q. Let me ask you this. Do you recall an occasion in which you made reference to a comment by

Page 339

Fred Budde, a Cargill lawyer, and Mr. Schaefer immediately reminded you that you were not to disclose that kind of information? Do you remember any occasion like that?
A. No.
Q. Do you recall Mr. Schaefer reminding you of the ground rules for your relationship that were established at the outset not to disclose to him anything privileged or give him any documents that were privileged or anything of that nature? Did that happen at all?
MS. COLER: Objection, broad and vague now.
A. I, it was, it was, I've heard it -- it was brought up, I think, in a meeting, at a meeting in that context. But to me directly, one-on-one, not that I recall.
Q. Um-hum. Did Mr. Schaefer or anybody at Sprenger & Lang ever, you know, say to you, you know, Mr. Douglas, you really shouldn't have told us that or given us those documents, that was bad and a violation of our understanding?
MS. COLER: Objection, multiple question.
Q. Or anything like that?

Page 340

MS. COLER: Facts not in evidence.
A. No, not as I can recall.
(Douglas Deposition Exhibit No. 13 marked for identification.)
Q. Mr. Douglas, this is another document from Sprenger & Lang, it's been marked as Deposition Exhibit No. 13, has a heading, "Bill Douglas Interview Summary, November 27, 2000." Take a moment to look that over.
A. (Examining document.) All of it or just --
Q. Just this one page, yes. I'm told that the author is David Shulman, but that's all I know about it.
A. Okay.
Q. Have you had a chance to look at that, sir?
A. (Nods head.)
Q. Can you, do you first recollect what the topic of the first paragraph is, that whether "Whitney McMillan stated that he wanted people who look and think like him recruited to the company," do you remember that topic coming up --
A. Yes.
Q. -- with Mr. Shulman or somebody from Sprenger & Lang?
A. Well, I heard about it before then. I was

Page 341

still at Cargill is when I initially heard about it, and I also heard about it after that, and at one of the meetings or more than one of the meetings, and from the individuals that were at meetings at Sprenger & Lang.
Q. You heard about it from Duane Reed or others?
A. Duane, Beverly, those two for sure maybe. Other folks as well. I'm not sure.
Q. Um-hum. Is this a statement that you heard Mr. McMillan make?
A. No. Secondhand, thirdhand. I did not attend that meeting.
Q. Do you know anybody who did?
A. Beverly and Duane did.
Q. Did they say so?
A. Yeah.
Q. This document, Exhibit 13, the interview summary of November 27, 2000, concludes with a paragraph again about the documents. It says, quote, "Bill has a box of documents from his days at Cargill."
A. Um-hum.
Q. "He said that he needed to start looking through them. I encouraged him to do so, and we agreed that he would pass on to us anything that he

Page 350

know, I have a number of, I saw that letter, of former and current Cargill employees who, you know, blah, blah, blah, I would like to sit down and see if we can resolve this, if Cargill can resolve this with the parties short of litigation, something to that effect. So I know it went to Steve. And we were talking about, you know, who would be involved in, in this, in that kind of decision making who would be influential, who would make the final decision to pull the trigger, that kind of stuff.
Q. Um-hum.
A. And what would their reaction be to this. That's -- and I mentioned, and I talked about Fred and the fact that he was the lead employment law attorney, and then that's when I found out that Steve Euller, at either this meeting or one before, was the general counsel. And I hadn't really worked with Steve much, if at all that I can recall, up to that time. Well, period, ever at Cargill. And I just, in my opinion that Fred would probably have a lot, opinion would hold sway considerably in the final decision making.
Q. Did you, in addition to identifying Fred Budde as being in his mid 40s --
A. Yeah.

Page 351

Q. -- did you describe the reaction you would expect from Mr. Budde himself?
A. May have. I -- yeah. I, well, I know, when you look at Page and Staley here.
Q. Right on the sheet, right above Euller?
A. Yeah, I know, right.
MS. COLER: What's the question on the table?
A. I don't know, but I'm trying to find an answer for it.
MS. COLER: Well, I want to know what the question is so that we have an answer that's responsive.
Q. The question is did you describe to Mr. Schaefer how Fred Budde would react to this --
A. What I described is the process, you know, this, they would receive this letter, it would go up and it would come back down and there would be a meeting and, yeah, that -- based on my knowledge.
Q. Did you --
A. Of what I thought would happen.
Q. Did you describe for Mr. Schaefer any of the substantive reaction you'd expect, like, you know, Mr. Budde's a tough guy, Mr. Budde is a wimp, you know, whatever it might have been?

Page 352

A. No, I -- I don't know if it would be in that, in those words. It was more along the lines of his thinking process in terms of reacting to something like this, not whether he would be hard or soft. He would look at it and say, and look internally at, at the issues involved and the allegations that would be included and do an in-house audit of those issues that were involved in the complaint and determine, based on that, whether it would be worthwhile to sit down and head this thing off before it went any further or tell them to go, you know, fly a kite, and that kind of thing.
Q. Um-hum.
A. And that the ultimate decision, while it may come from, well, not the ultimate decision but a response from Budde, or whoever the letter was sent to, would involve these other two people, Staley and Page, and their rolls. These are, you know, these would be key people. This is, on an action like that, the law department generally would brief Page and Staley and then there was a recommendation and they would ask some questions and they would go up and come back down and finally they would decide how, of the options that were presented to them from the law department or from whom, yeah, it would be from

Page 353

the law department, choose one or modify one, and those would be the marching orders. That's kind of what we talked about.
Q. Okay. Did you tell Mr. Schaefer anything else about the process or the thinking that Fred Budde would undertake?
A. No.
MS. COLER: Objection, foundation.
Q. That you remember at this point?
A. Well, that's what I just shared with you.
Q. Okay.
A. That he would look internally see how, here's, you know, this is the way, I mean this is the way we handled, I did a lot of charge responses.
Q. Um-hum.
A. And it would have been, it's kind of funny, but in Fred, in something like this, in other cases they would just say, well, we didn't do this, let's take a strong position, write a response saying this is Cargill, regardless of what the facts were. But in this case I don't think Fred would do that, and he would, that would be taken a little more seriously.
Q. Um-hum.
A. So, no, and that was, what he wanted to know was what, what would happen to this thing, who would

Page 374

EXAMINATION
BY MS. COLER:
Q. Mr. Douglas, I'm going to ask you a few questions relating to the matters that Mr. Klaas has been questioning you about today, and then Mr. Schaefer is going to ask you some questions about just some substantive issues relating to this lawsuit. I don't anticipate it's going to take very long at all.
Mr. Douglas, you testified about taking a first pass at the documents that you had, and you talked about meeting with Sprenger & Lang about the systems at Cargill. You talked about KEIS, CLDP, selection grid, PMP, pay grade, and that first pass you had collected documents relating to those topics, is that correct?
A. I believe so, right.
Q. And none of those documents were marked privileged that you discussed with Sprenger & Lang, that's correct also, is that correct?
A. To the best of my knowledge. To the best of my knowledge I don't recall any of them saying privileged on them. They could have been confidential or whatever, but the only exception would be the pay grade sheet.

Page 375

Q. But you don't recall one way or another whether that was marked privileged, is that correct?
A. It was confidential.
Q. Okay. But you don't recall whether it was marked privileged?
A. Correct.
Q. Okay. As a matter of fact, you don't think it was marked privileged?
MR. KLAAS: Object as leading.
A. Yes.
Q. Okay. Now, Mr. Douglas, you left Cargill in January of 1998, is that correct?
A. That is correct.
Q. And from the time that you left Cargill to the present, other than matters relating to setting up this deposition, have you had any communications with any of Cargill's internal attorneys or with any Dorsey attorneys regarding the substance of this Arnold versus Cargill lawsuit?
A. No.
Q. That is, you have had no conversations?
A. I've had no conversations with any Cargill attorneys directly regarding matters in this Arnold v. Cargill or whatever it is. Is it Arnold?
Q. Arnold, yes.

Page 376

A. Okay.
Q. And you've had no other types of communications via letter or e-mail other than setting up this deposition, is that correct?
A. That is correct.
Q. Now I'd like to go back to the July 22nd conversation that you say that you wrote about with Mr. Schaefer, that is July 22nd, of 2002, which is reflected on the Larry Schaefer chronology of events --
A. Okay.
Q. -- which is one page of Exhibit 4. I have a few questions about that interaction with Mr. Schaefer. Now when Mr. Schaefer called you, Mr. Douglas, is it correct that he first told you that he had provided to Cargill documents that you had provided to Sprenger & Lang that were marked privileged?
MR. KLAAS: Object as leading, assuming facts not in evidence.
A. Well, let me, I'll tell you, I think I'll give you what I got. I, he, my recollection is he told me he, that all the documents that he had that I had provided he had turned over to Cargill.
Q. All right. And that made you angry, is that

Page 377

correct, Mr. Douglas?
A. Yes.
Q. And you were angry because you hadn't been consulted before they were turned over?
A. Yeah, the eggs were scrambled. And, yeah, and then -- yeah, that was one, and then, and then he, and then I was told to, you know, get rid of the records I had and, oh, by the way, if they contact you, call and let me know, you know, good luck.
Q. Do you recall Mr. Schaefer saying to you, Mr. Douglas, that he had had a conversation with the Minnesota Board of Professional Responsibility about how to handle the privileged documents that we had received?
A. He mentioned something about, I remember, I don't know if it was at this call. I remember hearing something about the board of whatever it is, responsibility, and that they had consulted with them and were informed that they had no option but to do what they did.
Q. Okay. And --
A. And --
Q. -- it's your testimony, Mr. Douglas, that --
A. Or something to that effect, yes.
Q. Okay, I'm sorry, I didn't mean to interrupt