**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**
**FOURTH DIVISION**

| | | |
|---|---|---|
| RODERICK ARNOLD, et al.,<br><br>On behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 01-CV-2086 (DWF/AJB)<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS, DISQUALIFY, AND IMPOSE ADDITIONAL SANCTIONS (*CORRECTED*)** |

## INTRODUCTION

Cargill's Motion to Dismiss, Disqualify, and Impose Additional Sanctions should be seen for what it is: a tactical motion to divert this Court's attention from class certification issues by impugning plaintiffs' counsel Sprenger & Lang, PLLC (S&L) with every sin it can manufacture. Through the haze of accusations, Cargill's legal argument appears to focus on two primary reasons for disqualification. First, Cargill alleges that plaintiffs may have obtained an unfair advantage in the prosecution of this case through the possibility that S&L personnel read Cargill documents labeled as privileged (the "Documents") that a former employee and S&L client, Bill Douglas, delivered to S&L. Second, Cargill alleges that it cannot prove the extent to which plaintiffs may have gained an unfair advantage because Douglas claims he threw his set of the Documents away on the supposed instruction of lead counsel for plaintiffs, Larry Schaefer.

These allegations of wrongdoing are false. Nobody at S&L read the Documents, and Schaefer did not instruct Douglas to throw them away. All that S&L is "guilty" of is negligence in that one of its clerks copied the Documents despite Schaefer's instructions to the contrary and

the copies then sat unbeknownst to Schaefer in a box in S&L's offices for about 18 months. When discovered, S&L promptly delivered the copies to Cargill, consistent with S&L's previous conduct in this case. Cargill's contrary version of the facts does not even make logical sense. More important, Cargill seeks the extreme sanctions of dismissal and disqualification without offering a shred of evidence that it has been prejudiced. By contrast, it is certain that dismissal and disqualification would severely prejudice plaintiffs. When there is no evidence – just illogical suspicions – of an ethical violation and no evidence of any harm to Cargill, the Court should not punish plaintiffs and plaintiffs' counsel with the ultimate sanctions for an act of negligence that had no impact on the prosecution of this case.

## FACTUAL BACKGROUND[1]

### A. Sprenger & Lang Initiates Investigation of Cargill.

A number of Cargill current and former African American employees first contacted S&L in the summer of 2000 about the possibility of litigating a race discrimination class action lawsuit against Cargill. Ex. 1, ¶ 4;[2] Wright, ¶¶ 1-2. Douglas was not among them. Ex. 1, ¶ 4. Sean Wright was the first plaintiff to retain the firm to investigate this class action and he contacted Sprenger & Lang, not vice versa. Wright, ¶¶ 1-2. Wright did not discuss this matter with Douglas before contacting the firm. *Id.*, ¶ 2.

---

[1] Cargill's version of the facts is so misleading that plaintiffs must devote substantial space to stating the record accurately. It is ironic that, when charging opposing counsel with ethical violations, Cargill and its counsel repeatedly distort the truth.

[2] All exhibits to this memorandum are attached to the Declaration of Lawrence P. Schaefer in Response to Defendant's Motion to Dismiss, Disqualify, and Impose Additional Sanctions. All declarations filed with this memorandum are cited in this brief as "[last name], ¶ __." Transcript pages cited in the brief are designated "[last name], [pages]."

When contacted, S&L already was familiar with Cargill's culture and HR practices. Ex. 1 at ¶ 6. The firm's founder, Paul Sprenger, had prosecuted a race and gender class action lawsuit, *Foster v. Cargill, Inc.*, that resulted in entry of a consent decree that expired in 1989. *Id*. More recently, Schaefer litigated a breach of contract action on behalf of a former Cargill executive, Jeffrey Hilligoss, to a successful jury verdict in July 2000. *Id.* And, at the time of the first contact by the African American employees, Schaefer was pursuing discrimination claims on behalf of two salaried female employees, Gail Berkeley and Carol Hawley. *Id.* These claims arose from some of the same HR systems that the African American employees identified as the bases of discriminatory conduct. *Id*.; *see also* Ex. 2 (Berkley EEOC Charge). Based on S&L's knowledge of Cargill and the information imparted by the African American employees, S&L decided to investigate whether Cargill was systemically discriminating against them. Ex. 1, ¶ 6. That investigation resulted in this lawsuit, filed in November 2001. *Id.*, ¶ 14.

**B. Douglas' Limited Role in the Investigation and Prosecution of This Lawsuit.**

**1. S&L's Prior Professional Relationship with Douglas.**

On February 2, 1998, Douglas contacted S&L to obtain legal advice about whether a consulting opportunity conflicted with the terms of a Release and Settlement Agreement that he signed in connection with his departure from Cargill a month earlier. *Id.*, ¶ 3; Douglas at 333. Douglas executed a Retainer Agreement with S&L and consulted with Schaefer. *Id.*

**2. Douglas' Limited Involvement in S&L's Pre-Suit Investigation.**

In July 2000, an S&L legal assistant contacted Douglas. Ex. 3. The apparently brief interview conducted by the legal assistant was so insignificant to Douglas that he could not even remember that it took place, despite being confronted by Cargill with notes purporting to reflect Douglas' statements during the conversation. *Id.*; Douglas, 325-30. Because the interview

primarily occurred in the context of the Berkeley gender litigation, the notes were kept in the Berkely files. Ex. 4. Accordingly, Schaefer was unaware of this contact and did not mention it in his May 2003 declaration. Schaefer, ¶ 2. Neither the interview notes nor Douglas' testimony even remotely suggests that S&L asked Douglas to reveal privileged information, as Cargill alleges. *See* Ex. 3; Douglas, 325-30. The notes reflect the primary and appropriate purpose of S&L's phone call – to obtain the names of employees who may have experienced discrimination by Cargill or who might corroborate allegations of discrimination. Ex. 3.

Douglas' next contact with the firm occurred on his own initiative two months later when some of the African Americans already involved in the investigation of systemic race bias at Cargill invited Douglas to a meeting at S&L's office on September 15, 2000. Douglas, 323-24, 334; Ex. 1, ¶ 4. This meeting was the first contact with S&L in connection with the present lawsuit that Douglas remembers. Douglas, 323-24. And, notwithstanding Cargill's unfounded skepticism, Douglas himself testified that he sought advice at that meeting about whether he could participate in a class action against Cargill. Douglas, 28-29, 35; Ex. 1, ¶¶ 4, 7.

As S&L's investigation progressed, Douglas, like others interested in the potential suit, occasionally provided the firm with names of current and former African American employees to contact. Ex. 1, ¶ 22. He also contacted witnesses and potential class members and discussed their experiences and communicated the general content of those discussions to S&L. *Id.*

Contrary to Cargill's assertion that Douglas "actively solicited individuals to participate in this action," Cargill's Memorandum of Law in Support of Motion to Dismiss, Disqualify and Impose Additional Sanctions ("Def. Mem.") at 17, Douglas denied "soliciting" or "recruiting" any of the named plaintiffs to join the lawsuit. Douglas, 59-79. In fact, only one of the 26 named plaintiffs — Rod Arnold — was referred to S&L by Douglas. Douglas, 60, 65-66, 72.

And in that instance, Douglas referred Arnold to S&L only after Arnold informed him that he was "looking for an attorney." *Id.* at 66. Cargill has not and cannot cite to testimony indicating that any plaintiffs felt "strong-armed" or for that matter "recruited" into this lawsuit. It simply did not happen. At most, he testified to speaking with eight plaintiffs regarding this lawsuit. Douglas either did not know the remaining eighteen plaintiffs or he did not have contact with them prior to plaintiff meetings held at Sprenger & Lang. *Id.* at 59-79.

Although Douglas was not a named plaintiff, he remained an S&L client and, at least, a witness to Cargill's discriminatory treatment of African Americans. Consistent with its Rule 11 obligations to make reasonable efforts to ensure the accuracy of its allegations, S&L asked Douglas along with its other clients to review the Complaint. Ex. 5, ¶¶ 2-3; Douglas, 57.

**3. S&L Never Misled Douglas About His Class Eligibility.**

Having placed Douglas at the center of S&L's investigation – even in the face of the evidence establishing Douglas' limited involvement – Cargill suggests that Douglas' involvement was spurred by alleged false promises that Douglas would become eligible to participate in the lawsuit.

The evidence provides no support for this allegation. S&L did not give Douglas any assurances about his becoming a class member:

> I know at one time, *and it wasn't said in a definitive way*, but it was said in the sense, and by Larry, that even though I had an agreement, that I may still have standing to be a part of this lawsuit.
>
> * * *
>
> *But was it a promise? No*. Early on, but it was held out as something that *conceivably could* include people in the band, or anyway, in my case, me, but it turned out it didn't.

Douglas, 89, 91-92 (emphasis added); *see also* Douglas, 82. S&L investigated the possibility of including all African American salaried employees in the proposed class, but decided late in the

investigatory process to limit the class to persons in grades 15 and below, which eliminated Douglas. *Id.* at 82. However, when discovery revealed that employees above grade level 15 were complaining about systemic discrimination at Cargill, S&L moved to amend the Complaint in May 2003 to expand the class definition to include salaried African American employees above grade level 15. Schaefer, ¶ 3. Magistrate Judge Boylan denied this motion. June 30, 2003 Order on Motions.

Cargill nonetheless faults S&L for not informing Douglas from the beginning that he could not participate because he had signed a release. S&L, however, believed the release was unenforceable. Courts consistently have invalidated releases like Douglas', that could be construed as prohibiting employees from instituting proceedings before the EEOC. Ex. 6 at 2. *See EEOC v. Sundance Rehab. Corp.*, 2004 U.S. Dist. LEXIS 14318, at **26-32 (N.D. Ohio July 26, 2004); *American Airlines v. Cardoza-Rodriguez*, 133 F.3d 111, 118 n.7 (1st Cir. 1998) (waiver can't be used to interfere with employee right to file charge or participate in EEOC investigation) (citing *EEOC v. Astra USA*, 94 F.3d 738, 744 (1st Cir. 1996) and *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1089-90 (5th Cir. 1987)); *Commonwealth v. Bull HN Info. Sys.*, 143 F. Supp. 2d 134, 147-48 (D. Mass. 2001) (same).

Douglas himself provides the most powerful evidence debunking any notion that he was economically "enticed" into involvement in this lawsuit. Cargill asked Douglas during his deposition "Why were you doing this [helping S&L by contacting potential class members]?" Douglas, 187. The ensuing eight pages of responsive testimony contain not even the slightest suggestion that Douglas was motivated by any *quid pro quo* or, for that matter, that he needed any encouragement at all from S&L to assist in its investigation of Cargill's discriminatory policies. Douglas, 187-95. Rather, Douglas became involved because he believed that the

company short-changed him on his benefits when he retired and because he believed that Cargill's treatment of African Americans was "just not fair" and needed to change. *Id.*

**4. S&L's Instructions Not to Disclose Privileged Communications.**

At the outset of Douglas' contacts with S&L, Schaefer instructed him not to provide any written or oral communications that reflected communications with Cargill counsel. Ex. 1, ¶ 5. Two witnesses confirmed Schaefer's practice of making this instruction. Reed, 193-94; Chavers, 122. Plaintiff Sean Wright stated that Schaefer repeated this instruction in Douglas' presence. Wright, ¶ 3. Cargill nonetheless claims that S&L failed to take adequate measures to prevent disclosure of privileged information by asserting that Douglas "denied ever having been explicitly instructed not to provide confidential or privileged materials." Def. Mem., 2, 8, 15.

But Cargill's rendition of Douglas' testimony is again incomplete and misleading. Initially, Douglas did not deny that S&L gave him an instruction; rather, he answered that he could not "recall" any instruction. Douglas, 35-36. Later in the first day of Douglas' deposition, when Cargill confronted him with Schaefer's declaration describing these instructions, Douglas conceded that "there may have been some language or some conversation in this regard." *Id.* at 96. During the second day of Douglas' deposition, Cargill asked him again whether S&L gave the instructions described in Schaefer's declaration. Douglas responded that the "words ring true, or familiar. . . . this was talked about." *Id.*, 334-35.[3] Asked one more time towards the end of his deposition whether Schaefer had given Douglas ground rules not to disclose privileged

[3] Cargill imagines that the reason Douglas made this admission is because he had reviewed parts of the transcript from the first day of his deposition and because Cargill had questioned him earlier in the second day about "privileged and confidential" documents. This explanation makes no sense and fails to account for Douglas' admissions during the first day of his deposition. Moreover, Cargill failed to probe Douglas' memory during the deposition.

information or documents to him, Douglas unequivocably stated: "I've heard it – it was brought up, I think, in a meeting, at a meeting in that context." *Id.*, 339.

Other than Douglas' production of documents to S&L in November and December 2000 (described below), the record contains no evidence that Douglas failed to preserve Cargill's privilege in his communications with S&L. Douglas' testimony in this regard is consistent with Schaefer's. Ex. 1, ¶ 5; Douglas, 37-43, 46, 268, 273-74, 374-75. Cargill, nonetheless, claims that Douglas testified that he had "at least one extensive conversation about Mr. Budde and other in-house attorneys . . . and how they were likely to investigate and respond to this litigation." Cargill Mem. at 15. As it does over and over again throughout its motion, however, Cargill misrepresents Douglas' testimony. During the deposition, after Cargill asked Douglas if he had described to S&L "how Fred Budde would react to this [litigation]," Douglas responded clearly and concisely:

> "*What I described is the process*, you know, this, they would receive this letter, it would go up and it would come back down and there would be a meeting and yeah, that – based on my knowledge."

Douglas, 351 (emphasis added).[4] Thus, the information that Douglas purportedly conveyed to S&L related to the procedure that Cargill or its counsel would follow to respond to litigation.[5] *See also id.*, 352-53. Cargill also asked Douglas directly whether he had communicated to

---

[4] Fred Budde is the Assistant General Counsel in Cargill's Law Department and an attorney Douglas testified that he had contact with at Cargill regarding legal issues. Douglas, 18. He is the attorney whom Douglas had the "most contact with" during the last twelve years of Douglas' employment. *Id.*, 125-26.

[5] At this point in the deposition, although no question was pending, Douglas voluntarily gave his opinion on how seriously he thought Cargill's counsel would take the allegations in this lawsuit. Douglas, 353. It is not known if Douglas had the same opinion at the time that he was assisting S&L in its investigation. Regardless of whether he did or not, as stated above, Douglas denied that he had ever disclosed to S&L how Cargill's attorneys' would react substantively to plaintiffs' allegations.

Schaefer any privileged communications he had received from Budde. *Id.*, 51. Douglas responded "I don't recall that I did. What would have been the nature of it, I can't recall." *Id.*

During the two days of Douglas' sworn testimony, Cargill never asked him whether he had communicated any other attorney-client privileged information to S&L, or whether he had reviewed any allegedly "privileged" materials with S&L. The closest Cargill came was to ask whether Douglas had "go[ne] over" all the documents he had produced with Schaefer, including documents that "were confidential" or "from the law department." Douglas replied:

> **No, no**. The documents that I recall most clearly presently were involved with the key areas or the key programs that he wanted to know more about. One was, like I indicated, CLDP, the Cargill leadership development program; the KEIS initiative; oh, PMP; the selection grid; and there may have been another one, but those, I think that was the bulk of it, the crux of it.

Douglas, 42-43 (emphasis added); *see also id.*, 45-46 (confirming that he did not discuss with S&L all documents provided to the firm, but only those relating to KEIS, selection grids, CLDP and PMP). Douglas testified at the end of his deposition that, to the best of his knowledge, the documents he actually discussed with S&L were not marked privileged. *Id.*, 374-75.

Cargill did not show Douglas any purportedly privileged documents at his deposition to ask whether he had discussed them with S&L. Cargill had the opportunity to inquire whether privileged information was shared with S&L, but studiously avoided this critical issue. The truthful answer to that question, if Cargill had bothered to ask it, would have been "No."

**5. Douglas' Documents.**

In approximately November and December 2000, while S&L was still investigating the alleged pattern of race discrimination at Cargill, Douglas delivered to the firm documents that he had in his possession, totaling about 4,500 pages. Ex. 7, ¶ 5; Ex. 1, ¶ 8. S&L began reviewing the documents that it had collected from Douglas. Upon noticing that some of the documents

were stamped "Confidential and Privileged," S&L debated what to do, and ultimately decided that the best way to balance its ethical obligations was to return the Documents to Douglas. Ex. 1, ¶¶ 11-12. Accordingly, Schaefer segregated the Documents, which comprised about 200 to 300 pages, from the other documents provided by Douglas without reviewing them substantively, although, since dates tend to be at the tops of documents, Schaefer saw the dates of some of the documents. *Id.*; Ex. 7, ¶ 5.[6] The Documents on which Schaefer noticed dates all preceded 1992. Ex. 1 ¶ 11; *see also* Douglas, 267 ("by and large . . . [boxes] were just old documents").

After they were segregated, the Documents were returned to Douglas in December 2000. Ex. 1, ¶ 12. Douglas testified that he was unsure which documents were returned to him, but he corroborated that less than all the documents that he had provided to S&L were returned, and that at least some of the returned documents were labeled privileged. Douglas, 46-47; Iwan Exh. C at 280.

As S&L would later discover, contrary to instructions given by attorneys at the firm, a case clerk made copies of all of the documents, including the Documents, at some point after Douglas delivered them to S&L. Ex. 1, ¶ 16. After S&L filed this lawsuit in November 2001, Cargill served document requests on the plaintiffs. *Id.*, ¶¶ 14-15. In June 2002, while searching through all documents in S&L's office that might be responsive to the requests, the firm first discovered that it had inadvertently retained copies of the Documents. *Id.* ¶ 15. As with the

---

[6] Among its many fabrications are Cargill's assertions that "after recognizing the confidential and privileged *nature* of the material, Sprenger & Lang continued to sort *through the documents to further the litigation they were planning against Cargill*," and that S&L "made and retained a copy of at least some of these same confidential and privileged documents *for their own use*." Def. Mem. at 10 (emphasis added). The declaration that Cargill cites in support not only fails to provide any justification for these patently false accusations, it contradicts them.

originals that were returned to Douglas in December 2000, S&L did not conduct a substantive review of the contents of these copies. *Id*. ¶ 17. S&L received an advisory opinion from the Minnesota Lawyers Board of Professional Responsibility that S&L should return the documents to Cargill, the potential privilege holder. *Id.*, ¶ 18. The next day, on July 12, 2002, the firm voluntarily turned over the copies of each Document to Cargill's counsel. *Id.*; Ex. 9.[7]

The evidence is uncontradicted that S&L has turned over to Cargill its only copy of every one of the Documents, as well as copies of every document that Douglas provided to it, whether or not relevant to the issues in this case. *Id.*, ¶ 5. On the basis of nothing more than its own imagination, Cargill clings to the fiction, which it asks this Court to adopt, that it has not yet seen "untold number[s]" of documents that were produced by Douglas to S&L. Def. Mem. at 10. There's no support for this baseless allegation.

**6. Conversation with Douglas and His Reaction.**

In a telephone conversation on or about July 22, 2002, Schaefer informed Douglas that S&L had mistakenly kept a set of copies of the Documents and that, pursuant to its ethical obligations, the firm had turned the copies over to Cargill. Ex. 5, ¶ 4. Although Schaefer apologized, this conversation made Douglas extremely angry. Douglas, 261-62, 270.

Douglas was upset that S&L immediately turned the documents over to Cargill and then called him "after the fact." *Id.*, 261-62. He also was concerned that he would now have to provide some explanation for why he had turned over the Documents to S&L. *Id.* Douglas grew so frustrated that, at one point, he said to himself, "to hell with this, something to that effect, and . . . just tossed [the documents that S&L had returned to him]." *Id.*, 270, 272.

---

[7] This was not the first time that S&L had turned over to Cargill a document marked "Privileged." On August 31, 2001, Schaefer received a Cargill internal document from an anonymous source, which appeared to be privileged. Schaefer promptly sent the document to Cargill without reviewing it. Ex. 8; Schaefer, ¶ 4.

Douglas provides another justification – besides his own anger and frustration – for purportedly throwing away the Documents that S&L returned to him. Douglas claims that during the same conversation in which Schaefer informed him that S&L had turned the Documents over to Cargill, Schaefer instructed him to discard the Documents in advance of a subpoena from Cargill. *Id.*, 105, 259-61. Schaefer categorically denies this. Ex. 5, ¶ 4.

Douglas' testimony that Schaefer allegedly advised him to destroy the Documents, as reflected in a "chronology" prepared by Douglas a year after the purported conversation, defies reason. The telephone conference when Douglas claims Schaefer allegedly gave him this advice occurred on Monday, July 22, 2002. Ex. 5, ¶ 4; Iwan Exh. C at Depo. Ex. 4. This was ten days *after* S&L had already delivered to Dorsey & Whitney copies of these same Documents. *See* Ex. 1, ¶18; Ex. 9. It makes no sense that Schaefer would advise a witness to destroy documents when a copy of those same documents had just been delivered to Cargill. Destruction of the Documents could achieve no possible advantage for S&L, the plaintiffs, putative class, or Douglas.

Furthermore, Douglas' recollection that this conversation took place in relation to a "forthcoming subpoena" raises questions about the accuracy of his memory. Cargill did not serve a subpoena on Douglas until March 4, 2003, over *eight months* after this alleged conversation, and after Douglas had terminated his relationship with S&L. Ex. 10, Ex. 1, ¶ 23. Cargill's lead counsel at that time, Jan Symchych, makes no mention of a subpoena in a conversation she had with Schaefer before his conversation with Douglas. Affidavit of Janice M. Symchych, ¶ 5.

Perhaps Douglas' testimony about alleged advice from Schaefer to destroy the Documents is attributable to what Douglas colorfully describes as "CRS Syndrome."[8] Regardless of the reason, Douglas has shown in other ways how his memory is faulty. For example Douglas wrongfully testified that he had never executed a retainer to employ S&L. *Compare* Douglas, 53 with Ex. 11.

Nevertheless, in the hopes of persuading the Court that it has been unfairly prejudiced by Douglas' actions, Cargill feigns ignorance of the identity of the documents that Douglas allegedly discarded. Def. Mem. at 25. But Douglas identified the documents he threw away as the documents that were returned to him by S&L. Douglas, 260. As stated above, S&L only returned the allegedly privileged Documents to him. Thus, Cargill knows what documents Douglas discarded.

**C. Douglas' Position at Cargill and His Alleged Exposure to Relevant Privileged Communications.**

Cargill's characterization of Douglas as an "executive" for many years at Cargill who was privy to attorney-client privileged information critical to this lawsuit is yet another example of the unsupported hyperbole that plagues its motion. Douglas was never an officer at Cargill. For a time, ending in approximately 1985 (or about ten years before the liability period even begins in this case), Douglas was Cargill's Corporate EEO Manager. Douglas, 17. From 1985 or 1986 through the end of his employment in 1997, Douglas was "HR manager for the food sector." *Id.*

Cargill's own records demonstrate that Douglas had little access to Cargill's attorney-client communications. Cargill's privilege log is in excess of 114 pages long. It contains only

[8] At the outset of providing sworn testimony at his deposition, Douglas claimed to suffer from "Can't Remember Shit" or CRS syndrome. Douglas, 15.

three documents referencing Douglas that even fall within the liability period. Ex. 1, ¶ 25, Ex. 12. Plaintiffs deemed none of these sufficiently relevant to select for review by Special Master Thompson. Ex. 7, ¶ 4. In an additional log of documents, the Special Master found only one document privileged that listed Douglas, and he was one of forty-one recipients. *Id.* Also, S&L has searched its database containing approximately 80,000 documents produced by Cargill for documents referencing both Bill Douglas and Cargill counsel, Fred Budde, in texts other than mere lists of employees. Ex. 1, ¶ 25. The search yielded six documents relating to Douglas' negotiation of his termination from Cargill, and five documents dated 1992 or 1993, well outside the liability period in this case. *Id.*[9] Finally, Douglas has had no communications with Cargill or Dorsey & Whitney attorneys regarding the substance of this lawsuit. Douglas, 375.

What is not surprising, yet also shocking, is that Cargill has failed to offer the Court a single one of the allegedly privileged Documents that it claims plaintiffs reviewed to its prejudice. Cargill's complete non-disclosure of any of the Documents should lead to an inexorable conclusion that if they are privileged at all, they are irrelevant, out-of-date, and do not constitute *material* privileged information.

**D. S&L's Contacts With Witnesses.**

Cargill claims that S&L inappropriately solicited current and former employees to participate in this action. In all the investigations it brings on behalf of its clients, S&L has an ethical obligation to pursue all possible leads that might uncover witnesses who can corroborate clients' allegations of discrimination, particularly when the allegations are that a company has engaged in systemic and class-wide pattern of conduct. S&L carefully trains and monitors the

---

[9] Douglas' lack of exposure to privileged or even relevant information relating to this litigation is confirmed by the recent Class Certification Memorandum. S&L cited and attached scores of exhibits in this submission, and not a single one came from Douglas.

staff who perform witness interviews, and adequate controls exist to assure that ethical standards are met. *See* Thompson, ¶¶ 1-10; Buchheim, ¶¶ 1-6. Cargill's accusations in this regard are further examples of the overreaching with which this motion is rife. For example:

- Cargill claims that S&L inappropriately contacted John Chavers, a current management-level HR professional at Cargill. Chavers testified and S&L confirms that his contact with the firm was well before this lawsuit was filed. Chavers, 86; Schaefer, ¶ 5. Because Cargill was not yet a represented party in this matter, no violation of Minn. R. Prof. Conduct 4.2 occurred regardless of how the first communication between Chavers and the firm occurred. Besides, Chavers testified that he asked for legal advice in his first interaction with the firm and had the expectation that the first communications were privileged. Chavers, 88, 93.

- Cargill claims that S&L inappropriately contacted Anthony Skipper. Its evidence consists of double hearsay. The law clerk who initiated the telephone contact with Anthony Skipper denies much of what Skipper's wife claims occurred in the telephone call. Buchheim, ¶ 9. Moreover, Mr. Skipper is a grade 7 supervisor and therefore does not fall within the manager category for whom contact would be inappropriate. Thompson, ¶ ¶ 3, 11.

- Cargill also offers inadmissible hearsay with regard to Candy Smith. Contrary to the affidavit of Harriet Harrington, Smith never told the S&L interviewer not to call, and Smith herself called S&L months after signing her declaration for a status update on the case. Buchheim, ¶ 8. At her deposition, Smith denied making statements to which Harrington attests in her affidavit. Incredibly, Cargill did not offer Smith's contradictory testimony to the Court in its memorandum. *See* Smith, 16-19.

- Cargill accuses S&L of "inducing unrepresented persons to sign declarations drafted entirely by Plaintiffs' counsel." Def. Mem. at 2. To the contrary, S&L has procedures in place to assure that declarations are not signed until clients are satisfied that the statements are correct and in their "voice." Thompson, ¶¶ 9-10; Buchheim, ¶ 6; *see also* Ex. 13 (Declaration of John Smith with handwritten corrections); Buchheim, ¶ 7 (explaining that Glenn Ford used the acronym "MBO" rather than "management by objectives" to discuss one type of performance review he received).

S&L has a policy of offering to represent declarants, whose depositions are noticed by a defendant employer, for purposes of the deposition at no cost to the declarant. Patton, ¶ 3. This violates no ethical rules because the purpose is not pecuniary gain. *See* Minn. R. Prof. Conduct 7.3. Instead, it is S&L's practice to offer assistance to the unrepresented third-party in handling his or her deposition, as well as the opportunity to ask legal questions and receive legal advice in

a privileged context. *Id.* Declarant/deponents, such as Candy Smith, who may not have a sophisticated grasp of the law or the deposition process, may not fully understand this offer of representation, but S&L does not force witnesses to accept representation. *Id.*, ¶¶ 4-6.

In short, Cargill's litany of alleged abuses in this area amounts to nothing even approaching ethical violations. For these reasons, Cargill never raises this issue in its legal argument.

## PROCEDURAL BACKGROUND

Cargill also mischaracterizes the procedural history of this matter. Exhibiting no sense of urgency, it did not conduct the first day of Douglas' deposition until fourteen months after the Documents were returned. Cargill sought an "emergency conference" and evidentiary hearing by letter request to the Magistrate Judge following the first day of Douglas' deposition. Iwan Exh. G. Plaintiffs opposed the request, noting that Cargill had grossly distorted the record, and suggesting that Cargill instead address its motion to this Court promptly. Ex. 14. Magistrate Judge Boylan rejected Cargill's request for a conference, expressly concluding that "the Court will not disqualify the plaintiff law firm on the basis of current record," and noting that "defendant is certainly not barred from going forward on a motion to disqualify counsel and/or motion to dismiss this action as considered appropriate by the defendant." Iwan Exh. H. The Magistrate Judge reached this conclusion on essentially the same evidence that is before this Court.

Instead of promptly going forward with such a motion, Cargill sought to engage in a fishing expedition by filing a motion to stay class discovery and instead noticing depositions of several S&L attorneys and legal assistants. Magistrate Judge Boylan appropriately denied the stay and quashed the depositions. Ex. 15. Observing that "no compelling additional evidence

has come to light" since his prior ruling, Magistrate Judge Boylan concluded that Cargill had "some distance to go to establish sufficient grounds for disqualification" and further found that Cargill had not satisfied the high burden required to depose opposing counsel and staff. *Id.* at 5-6. Cargill waited another seven months before filing this motion, which essentially repeats the same arguments to the Court that were twice rejected by Magistrate Judge Boylan.

Moreover, in the two years since S&L delivered the Documents to Cargill on July 12, 2002, the parties have conducted over 100 days of depositions, engaged experts who have produced reports at substantial expense to the parties, briefed and argued numerous motions, including motions for summary judgment and a motion to compel hundreds of documents that Cargill wrongfully withheld as privileged. Cargill's glacial pace in filing this motion belies any claim that it truly believes plaintiffs have secured any unfair advantage.

**LEGAL ARGUMENT**

Disqualification is a "'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *AVR, Inc. v. Cemstone Prods. Co.*, 1993 U.S. Dist. LEXIS 21258, at *32 (D. Minn. Mar. 25, 1993) (citation omitted); *accord FDIC v. Amundson,* 682 F. Supp. 981, 985 (D. Minn. 1988) ("The decision to disqualify a competent lawyer, freely chosen by a party, is of serious concern to this Court."). The party seeking this remedy bears the burden of proving facts "necessitating disqualification." *AVR*, 1993 U.S. Dist. LEXIS 21258, at *32; *Olson v. Snap Products, Inc.*, 183 F.R.D. 539, 542 (D. Minn. 1998) (describing this burden as a "high standard of proof"). Disqualification is committed to the trial court's discretion, *Snap Product*, 183 F.R.D. at 541; *In re Potash Antitrust Litig.*, 1993 U.S. Dist. LEXIS 19065, at *56 (D. Minn. Dec. 8, 1993), which is especially broad in class action cases. *Jenkins v. Missouri*, 931 F.2d 470, 484 (8th Cir. 1991); *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 165 (3d

Cir. 1984). Courts are loath to disqualify partly because "disqualification motions are often brought for purely strategic purposes having little connection to a party's concern with ethical behavior." *Potash*, 1993 U.S. Dist. LEXIS 19065, at *57 n.39; *see also Snap Products*, 183 F.R.D. at 542-43 ("'because of the potential for abuse by opposing counsel, disqualification motions should be subject to particularly strict judicial scrutiny'") (quoting *Harker v. Commissioner*, 82 F.3d 806, 808 (8th Cir. 1996)).

A disqualification analysis involves a three-step inquiry. First, the Court must determine if ethical violations have occurred. *Amundson*, 682 F. Supp. at 985 (citations omitted). Second, it must determine whether any ethical violations have prejudiced the moving party. Finally, if the Court answers the first two questions in the affirmative, it must balance competing interests in deciding on an appropriate remedy, if any. *See Potash*, 1993 U.S. Dist. LEXIS 19065, at **55-56. The public and the party seeking relief have an interest in fair proceedings, but disqualification will violate the right of the other party to retain its chosen counsel and to avoid additional costs and delays. *See id.* at **27-28, 56-57; *Black v. Missouri*, 492 F. Supp. 848, 873 (W.D. Mo. 1980). As Judge Rosenbaum summarized:

> "The decision to disqualify an attorney chosen by a party to represent him in a lawsuit is of serious concern and the court's inherent power to do so should only be exercised where the integrity of the adversary process is threatened. Even then, the court should not act 'unless the offending attorney's conduct threatens to taint the underlying trial' with serious ethical violation."

*Amundson*, 682 F. Supp. at 987 (quoting *Beck v. Board of Regents*, 568 F. Supp. 1107, 1110 (D. Kan. 1983)).

In this case, the stakes are even higher than usual, because of the stage of the proceedings and because Cargill seeks not only disqualification, but also dismissal of the lawsuit: the ultimate sanctions against the parties, the proposed class, and their attorneys. The facts,

however, do not remotely support the drastic remedies sought. S&L did not violate any ethical rules. Moreover, even if the Court has some doubts on that score, Cargill has not even attempted to show any prejudice from any alleged violations. Without prejudice, the scales are tipped completely against disqualification, dismissal, or any other sanction. Cargill's motion therefore should be denied.

## I. S&L DID NOT VIOLATE ANY RULES OF PROFESSIONAL RESPONSIBILITY.

S&L's conduct in this litigation is governed by the Minnesota Rules of Professional Conduct. D. Minn. L.R. 83.6(d)(2). Cargill argues, or at least suggests in its statement of so-called facts, that S&L violated those rules in at least five different ways. None is close to valid.

### A. Plaintiffs Did Not Violate its Ethical Duties in Conferring with Douglas.

Cargill suggests that S&L violated its ethical duties under Minn. R. Prof. Conduct 4.2 in conferring with Douglas. That rule bars a lawyer from "communicat[ing] about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter." This Rule, however, does not prevent a lawyer from obtaining information from a former corporate manager in contemplation of the initiation of litigation against his former employer.

When the communications between S&L and Douglas occurred that Cargill now challenges, S&L did not know what the scope of the proposed class in the complaint would be. As investigations proceeded, S&L determined that the pay structure of employees above grade 15 generally differed from those in grades 15 and below, and that there were very few African American employees above grade 15. Accordingly, S&L reluctantly decided, not long before delivering a copy of a draft complaint to Cargill in August 2001, to limit the proposed class to

salaried employees in grades 15 and below. If the decision had gone the other way, Douglas would have been included in the class definition.

Cargill suggests that S&L nonetheless knew that Douglas would not benefit from the lawsuit because he had released his claims when he retired. That is false. The terms of Douglas' release prevent him from filing a charge with the EEOC or assisting in its investigation of Cargill. Various decisions hold that this makes the release unenforceable.

At the time of the conversations between Douglas and S&L, the firm thus had good reason to believe that Douglas, a client of the firm, could benefit financially from the lawsuit. Under these circumstances, S&L would not have been violating its duties even if it had permitted Douglas to disclose privileged information in his possession relevant to the case. *See Amatuzio v. Gandalf Sys. Corp.*, 932 F. Supp. 113, 116-17 (D.N.J. 1996) (attorney does not violate ethical rules when client reveals privileged information that furthers client's case); *Neal v. Health Net, Inc.*, 100 Cal. App. 4th 831, 842-44, 123 Cal. Rptr. 2d 202, 217 (2002) (same).

Moreover, even if Douglas could not have benefited financially from the action, S&L could talk with him as a witness. *See Fleetboston Robertson Stephens, Inc. v. Innovex*, 172 F. Supp. 2d 1190, 1194-95 (D. Minn. 2001); *Snap Products*, 183 F.R.D. at 543-45; ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 91-359 (1991); *see generally* Benjamin J. Vernia, *Right of Attorney to Conduct Ex Parte Interviews with former Corporate Employees*, 57 ALR 5th 633 (2003) (and cases cited therein.). In that circumstance however, S&L was obligated to ensure that Douglas did not discuss privileged communications between Cargill and its lawyers.[10]

[10] *Fleetboston*, 172 F. Supp. 2d at 1195 (no violation of Rule 4.2 if privileged information is not discussed); *Snap Products*, 183 F.R.D. at 545 (same); *see also EEOC v. Dana Corp.*, 202 F. Supp. 2d 827 (N.D. Ind. 2002); *Orlowski v. Dominick's Finer Foods*, 937 F. Supp. 723, 728

In an excess of caution, S&L followed, both with respect to Douglas and plaintiffs with access to Cargill's lawyers, the rules applicable to discussions with witnesses rather than those applicable to discussions with clients. Schaefer advised Douglas that he could not disclose privileged communications. Douglas acknowledges that Schaefer's testimony that he gave this advice "ring[s] true or familiar." Other witnesses confirm that Schaefer gave such advice to them. Cargill did not even question Douglas during his deposition about whether privileged matters were discussed with Schaefer or other S&L attorneys, even though this was Cargill's principal justification for the deposition. The record is clear that no such discussions ever took place.

**B. S&L Did Not Solicit Privileged Documents from Douglas.**

Cargill repeats several times a litany of actions S&L supposedly took with respect to the Documents, including "soliciting" them. Solicitation of privileged documents presumably would violate the prohibition against a lawyer "us[ing] methods of obtaining evidence that violate the legal rights" of a non-client. Minn. R. Prof. Conduct 4.4.

Repetition does not make it true. Schaefer's instruction to Douglas not to disclose privileged information applied to documents as well as discussions. In the face of this corroborated instruction, Cargill repeatedly cites a February 2, 2001, letter from S&L attorney Sara Madsen to Douglas inviting production of documents, and refers to a November 27, 2000, note of a telephone interview S&L attorney David Shulman conducted with Douglas in which Douglas agreed to pass along documents "he thinks might be of interest" to S&L. Iwan Exh. C at Depo. Exs. 7, 13. These documents constitute the extent of Cargill's evidence that S&L "solicited" privileged documents from Douglas.

---

(N.D. Ill. 1996); *Aiken v. Business & Industry Health Group, Inc.*, 885 F. Supp. 1474, 1479-80 (D. Kan. 1995).

The Madsen letter was sent to Douglas (as well as all other S&L clients who had retained the firm at that time) *after* the corroborated instruction Schaefer had made to Douglas and *after* Douglas had already provided his documents to S&L (in November and December). Douglas did not provide any documents to S&L pursuant to this letter. Even if he had, requesting clients to provide documents does not constitute solicitation of privileged documents.

The Shulman note is equally unpersuasive for Cargill's purposes. His note clearly does not reflect everything that was said during the conversation. If all that was said was that Douglas would bring documents "of interest" to S&L, as noted above, requesting clients to provide documents does not constitute solicitation of privileged documents. Most important, Douglas' testimony about what documents were "of interest" to S&L is established by his description of the documents he reviewed with the firm. After Douglas sent his box of documents to S&L and after the firm returned the Documents to him, Douglas testified that he met 4-6 times with S&L personnel to review documents. If S&L intended to use Douglas to solicit and review privileged information, these meetings undoubtedly would have focused on the Documents. They didn't. Douglas testified that the only documents he reviewed substantively with S&L related to the systems at issue in this case, and none conveyed or related to privileged communications. The documents and information "of interest" to S&L had nothing to do with attorney-client communications.

**C. S&L Did Not Violate Its Ethical Duties in Returning the Documents to Douglas.**

Without reference to any specific ethical rule, Cargill claims that S&L's returning the documents to Douglas in December 2000 rather than to Cargill breached S&L's ethical obligations. Again, Cargill is wrong.

No Minnesota ethical rule comes close to addressing what actions an attorney should take when a client or a third party provides the attorney with documents stamped "privileged" while the attorney is investigating a possible lawsuit. The closest rule is 4.4, which, as quoted above, prohibits a lawyer from "us[ing] methods of obtaining evidence that violate the legal rights" of a non-client. The Lawyers Professional Responsibility Board has not issued any opinions concerning the issue.

S&L knew that the ABA had addressed a related issue. In ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 94-382 (1994), it opined that "[a] lawyer who receives on an unauthorized basis materials of an adverse party that she knows to be privileged or confidential should, upon recognizing the privileged or confidential nature of the materials," review such materials only to the extent required to determine how appropriately to proceed, "notify her adversary's lawyer that she has such materials," and either follow any instructions from the adversary's lawyer or refrain from using the materials until a court resolves the proper disposition of the materials. In stating this opinion, the ABA recognized that "the Model Rules do not offer explicit guidance on the present issue" and that several state ethics opinions reached the contrary conclusion.

S&L decided that the ABA opinion did not require returning the documents to Cargill. First, an ABA opinion is, obviously, no more binding authority in Minnesota than is the state ethics opinions with which the ABA disagreed. More important, the ABA opinion was premised on there being an "adversary." During the pre-suit investigation, there was no adversary and no court to resolve what to do with the documents.[11] Disclosure of S&L's possession of the

[11] For these same reasons, courts have refused to find ethical violations when similar pre-litigation conduct is challenged. *See Palmer v. Pioneer Inn Assocs.*, 19 F. Supp. 2d 1157, 1164 (D. Nev. 1998) (refusing motion to disqualify because contacts alleged to violate Rule 4.2

documents to Cargill would alert Cargill that a suit was contemplated. Cargill might launch an investigation that could conceivably lead to the discovery not only that Douglas was the source of the Documents, but also that various current employees were involved. Douglas and other clients to whom S&L owed duties, would likely want their involvement kept confidential if S&L decided not to prosecute the suit.

In the absence of any guidance, S&L decided that the best course was to return the Documents, un-reviewed except as necessary to segregate them, to Douglas. This decision complies with its ethical obligations.

**D. S&L Acted Appropriately After Discovering the Copies of the Documents.**

When S&L discovered in June 2002 that copies of the Documents had been made and placed in a box, it acted appropriately. As discussed above, ABA Formal Opinion 94-382 acknowledged that it was at odds with several state ethics opinions. Accordingly, S&L contacted the Minnesota Lawyers Board of Professional Responsibility in July 2002, and was advised to deliver the documents to Cargill. S&L complied promptly. It has *never* reviewed the Documents substantively and has retained no copies. This is precisely the precautionary step courts have proposed as appropriate in similar circumstances, *see, e.g., In re Meador*, 968 S.W.2d 346, 352-53 (Tex. 1998), and even Cargill does not challenge this action as violative of any duties.

---

occurred before litigation and before counsel knew whether potential adversary had retained counsel); *Scott v. Sunrise Healthcare Corp.*, 1997 U.S. Dist. LEXIS 607, at **13-14 (N.D. Ill. Jan. 21, 1997) (ethical obligations of attorney who receives confidential documents when no litigation is pending lacks definitive guidance; no ethical violations found when attorney ultimately returned documents and made efforts to preserve confidentiality).

Cargill instead emphasizes Douglas' allegation that, ten days after delivering S&L's copies of the Documents to Cargill, Schaefer advised him to "destroy" documents. This advice never occurred.

This supposed advice makes no sense. Schaefer had just caused S&L to deliver the copies of every Document to Cargill; nothing was to be gained by having Douglas destroy the originals. Cargill is reduced to engaging in rank speculation that this instruction was motivated by the possibility that S&L did not give Cargill copies of some Documents, whereas it had returned a full set of Documents to Douglas, and that Douglas' retention of the full set would expose S&L's supposed deception. This speculation cannot be supported by any reasonable inference. First, it asks the Court to infer that Schaefer, who initiated this dispute by returning the Documents to Cargill that it did not know he had, would ensure inevitable sanctions by returning less than all of them. Second, Cargill does not even propose a reason for delivering to it less than all of the Documents. S&L could not use an unreturned Document as evidence in this case. If Schaefer was capable of using information from the Documents in some other fashion in shaping or developing this litigation, he could do so just as well even if he returned copies of each Document. Third, Schaefer's conduct relating to privilege matters in this litigation refutes any inference that he is capable of such conduct. He has instructed other highly placed clients or witnesses at Cargill *not to disclose* attorney-client communications to him. Wright Decl., ¶ 3. When receiving a possibly privileged communication at the outset of this litigation, he returned it to Cargill immediately, without reviewing it substantially. Schaefer, ¶ 5. He ultimately caused the Documents to be returned to Cargill. This consistent course of behavior demonstrates respect for this privilege, not a practice of invading it to try to secure an unfair advantage. The

undisputed facts, and reasonable inferences from these facts, cannot support a finding that Schaefer made any such instruction, particularly in the absurd scenario spun by Cargill.[12]

**E. S&L Did Not Violate Any Ethics Rules in Contacts to Class Members.**

Although it ignores the issue in the argument section of its memorandum, Cargill suggests in the factual section that S&L violated its duties under the Rules of Professional Conduct both in supposedly having Douglas solicit potential plaintiffs before the lawsuit was filed, and in its own contacts to class members after the litigation was commenced.

Rule 7.3 prohibits a lawyer from "solicit[ing] professional employment from a prospective client … by in-person or telephone contact …." Rule 8.4(a) bars a lawyer from violating the Rules "through the acts of another." Cargill suggests that S&L put Douglas up to soliciting clients for the lawsuit through telephonic contacts.

During his deposition, Douglas denied soliciting clients. The facts corroborate his testimony: only one of the persons he referred to S&L – Rod Arnold – became a plaintiff in the case, and Douglas referred Arnold to S&L only after Arnold informed him that he was "looking for an attorney."

In this case, as in most or all of its other class cases, S&L implemented a program of calling members of the proposed class to serve as witnesses. The program has several controls to ensure that no "person[] having a managerial responsibility on behalf of [Cargill]" and no "other person whose act or omission in connection with [this] matter may be imputed to [Cargill] for purposes of civil or criminal liability or whose statement may constitute an admission on the part

[12] We probably will never know why Douglas testified as he did. Maybe he misunderstood something that Schaefer said. Maybe his memory is faulty. Or maybe, as he testified, he was angry, threw away the Documents, and this story is his perceived way of shifting the blame back on S&L, because he believes that S&L is attempting to place the blame on him. Any of those scenarios are more reasonable than Cargill's rank speculation.

of [Cargill]," is contacted in violation of Rule 4.2. It also has adequate controls to ensure that declarations are accurate and thereby prevent "dishonesty, fraud, deceit or misrepresentation." Cargill has not shown any instance in which S&L came close to violating these standards.

Finally, Cargill suggests that S&L violated its ethical duties by offering representation to declarants by telephone. S&L did so only when Cargill noticed declarants for depositions and these witnesses sought representation. S&L had no pecuniary interest in doing so, and hence cannot be found to have violated Rule 7.3. S&L charged nothing to represent these declarants, and, if the proposed class is certified, S&L will represent them as a matter of law.

S&L has not violated any of the Rules of Professional Conduct. Accordingly, Cargill's motion for dismissal, disqualification, and other sanctions should be denied.

## II. CARGILL HAS SHOWN NO PREJUDICE FROM ANY ALLEGED VIOLATIONS.

Even if the Court concludes that S&L may have violated one or more Rules, Cargill's motion should be denied because it has not shown any prejudice. The drastic remedy of disqualification can be justified only upon a showing of actual prejudice.[13] Without a showing of prejudice, disciplinary agencies are the appropriate "structure for regulating conduct," and "an antagonist in a collateral proceeding … [does not have] standing to seek enforcement of the Rule." Minn. R. Prof. Conduct, Scope.

---

[13] *See Meat Products Investigators Ass'n v. Spencer Foods*, Inc., 572 F.2d 163, 165 (8th Cir. 1978) (disqualification denial upheld because of insufficient showing of prejudice); *Snap Products*, 183 F.R.D. at 545 (disqualification denied when "there is no evidence that privileged matters were disclosed, or discussed"); *Biocore Med. Tech. Inc. v. Khosrowshahi*, 181 F.R.D. 660, 674 (D. Kan. 1998) (disqualification requires evidence that witness has disclosed something that would harm defendants), *aff'd*, 348 F.3d 1162 (10th Cir. 2003); *In re Nitla S.A. De C.V.*, 92 S.W.3d 419, 423 (Tex. 2002) (actual prejudice beyond simply review of privileged documents must be established before disqualification is warranted); *Neal*, 100 Cal. App. 4th at 841-44, 123 Cal. Rptr. 2d at 210-13 (mere exposure to confidential privileged information does not support disqualification, actual prejudice must be demonstrated).

### A. Cargill Has Shown No Prejudice from Any Oral Communications Between Douglas and S&L.

Cargill bears the burden of proving that Douglas communicated attorney-client privileged information to S&L. *Amundson*, 682 F. Supp. at 986; *Snap Products*, 183 F.R.D. at 542. It has not met that burden.

The cases Cargill cites in which courts imposed a rebuttable presumption that privileged information would be shared without a showing of actual prejudice involve attorneys, investigators, or paralegals switching sides after being exposed to sensitive attorney-client privileged information about the litigation at issue.[14] Douglas was four years removed from Cargill before this case was filed, and hence could not have been exposed to sensitive privileged information about this case. The court's analysis of similar facts in *Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660 (D. Kan. 1998), applies here*:*

> While *American Protection, Rentclub,* and *MMR/Wallace* resulted in disqualification of counsel, the Court finds an important distinction in this case. In the three cases listed above, the former employee was involved in preparation for litigation and possessed attorney-client privileged information and confidential information regarding legal strategy. Here, plaintiffs do not contend that Johnson possessed information regarding current litigation; she has not been privy to plaintiffs' legal maneuvering. The most important factor in determining whether to disqualify counsel is whether the actions have tainted the underlying trial.

[14] *Potash*, for instance, involved retention of a *paid* consultant who was previously the defendant's in house counsel and who knew intimate and privileged facts regarding liability in the case at issue and defendant's litigation strategy. 1993 U.S. Dist. LEXIS 19065, at **13-26; *Camden v. Maryland*, involved solicitation and review of privileged information, and preparation of an affidavit, from the affirmative action coordinator who was responsible for the case, who had "prepared reports on the case for BSU's top management and regularly discussed it with BSU attorneys . . . ." 910 F. Supp. 1115, 1122 (D. Md. 1996). Other cases Cargill cites involve theft of original documents and attempts to coerce settlement by reference to these documents, *Schubot v. Rochester Methodist Hospital*, Civ. No. 3-94-942 (D. Minn. May 3, 1996), and the attempted representation of a Human Resource executive intimately involved in the facts allegedly giving rise to individual and class liability, *Lewis v. Capital One Services*, Civ. No. 3:04CV186 (E.D. Va. Jun. 10, 2004). None of these cases are remotely analogous to the facts here.

> Plaintiffs provide no evidence that Johnson has disclosed anything that would harm them. Without some proof of prejudice, the Court refuses to disqualify [counsel] . . . .

181 F.R.D. at 674 (citations omitted).[15]

Moreover, Cargill has not identified any privileged information that Douglas might possess that might be relevant to the claims in this lawsuit. His days as EEO Manager were ancient history during the liability period, and Cargill's own privilege log in this case suggests that as HR manager for the food sector, Douglas was almost completely out of the loop as to issues relevant to the claims in this case. Cargill has not identified one question or one document production request that it believes S&L was able to make because of its possession of information from Douglas. In their class certification memorandum, plaintiffs did not cite to one document produced by Douglas, whether stamped privileged or not.

**B. Cargill Has Shown No Prejudice from S&L's Possession of the Documents.**

About 200-300 pages of documents bearing privileged markings came into S&L's possession and were inadvertently retained by the firm before being returned to Cargill. S&L did

[15] Numerous Courts have refused to disqualify attorneys or experts based on this same important distinction. *Ellenberg v. Tuffy's Div. of Starkist Foods, Inc.*, 1986 U.S. Dist. LEXIS 21919, at *14 (D. Minn. Aug. 3, 1986) (disqualification denied because witness "was not part of legal team" and no evidence of disclosure of privileged information); *Neal*, 100 Cal. App. 4th at 844-49, 123 Cal. Rptr. 2d at 213-17 (distinguishing precedent where attorneys who worked on the same case switched sides); *Meador*, 968 S.W.2d at 353-54 (distinguishing precedent where employees with extensive responsibilities in litigation switched sides); *Concerned Parents of Jordan Park v. Housing Auth.*, 934 F. Supp. 406, 410-11 (M.D. Fla. 1996) (disqualification denied because witness was no longer employed by defendant when suit was initiated; "vague assertions" of exposure to confidential information insufficient); *First Security Bank, N.A. v. Northwest Airlines*, 170 F.R.D. 1, 2 n.1 (D. Mass. 1996); *EEOC v. AIC Sec. Investigations*, 1993 U.S. Dist. LEXIS 960, **12-13 (N.D. Ill. Jan. 29, 1993) (exposure to relevant, privileged communications is required to justify disqualification); *Vlassis v. Samelson*, 143 F.R.D. 118, 125 (E.D. Mich. 1992) (moving party must prove that expert actually possessed privileged information before disqualification may be warranted); *National Bonded Warehouse Ass'n v. United States*, 718 F. Supp. 967, 969-70 (Ct. Int'l Trade 1989).

not review the Documents. It did not retain copies, mark any as exhibits, or otherwise use the Documents in this case. Cargill asks this Court to assume prejudice from these facts, but this assumption is unsupported by any decision and is belied by Cargill's own established conduct in this case.

As this Court well knows, Cargill refused to produce a far greater number of allegedly privileged documents relevant to issues here. This effort was rejected by Special Master Thompson, this Court, and ultimately, the Eighth Circuit. Eighth Circuit Judgment, dated April 27, 2004. Cargill's conduct makes clear that simply because it marks documents as "privileged" doesn't make them privileged. Throughout this dispute plaintiffs have suggested *in camera* court review of the Documents to determine whether any of them were privileged or relevant to this dispute. Plaintiffs are especially dubious concerning relevance because the Documents whose dates they noticed when segregating them all predated 1992, several years before the liability period. Cargill has refused to proffer them, apparently preferring to have the Court rely on speculation. Courts have conducted *in camera* reviews of documents at issue in similar disputes, *Starway v. ISD No. 625*, 187 F.R.D. 595, 598 (D. Minn. 1999); *see also* R. Flamm, LAWYER DISQUALIFICATION, CONFLICTS OF INTEREST AND OTHER BASES, § 22.4, at 428 n.4 (Banks & Jordon, 2003), and plaintiffs renew this request now as this may dispose of any claim of privilege or prejudice.

Even if one or more of the Documents contained privileged, relevant information, Cargill was not prejudiced because S&L never substantively reviewed them. The Court should accept S&L's unrebutted representation on this point, *see Snap Products*, 183 F.R.D. at 545 (court accepts attorney's representation, as an officer of the Court, that no privileged matters were discussed), especially because, once again, Douglas confirmed in his testimony that he did not

discuss the Documents with S&L and because Cargill has not identified one question or one document production request that it believes S&L was able to make because of its supposed review of the Documents.

### C. Cargill Has Shown No Prejudice from the Challenged Contacts to Potential Plaintiffs and Class Members.

Even if Douglas was engaging in telephonic solicitations for potential plaintiffs, which he was not, Cargill cannot possibly show any prejudice. As discussed above, no plaintiffs joined the case because of Douglas' efforts. Moreover, even if one or more plaintiffs lied in their depositions and were actually recruited by Douglas, it makes no difference in a class case like this whether there are 10, 20, or 25 named plaintiffs.

Cargill also has shown no prejudice from S&L's contacts to members of the proposed class. Even if, despite S&L's controls, a call was made to a class member acting in a managerial capacity, that person must have declined to execute a declaration because Cargill has not identified one declaration in support of plaintiffs' motion for class certification from a managerial employee or other employee who should not have been contacted pursuant to Rule 4.2. Moreover, each declarant signed his or declaration of his own free will. Plaintiffs had no means of pressuring or tricking them into signing.

In sum, Cargill has shown no prejudice from the alleged ethical violations. For the most part, it has not even tried. Its motion should be denied for that reason as well.

## III. BALANCING OF THE EQUITIES SHOWS THAT CARGILL IS NOT ENTITLED TO ANY REMEDY.

Even assuming *arguendo* that the Court concludes that Cargill has shown a violation and resultant prejudice, it is not automatically entitled to dismissal, disqualification, or other remedy.

Instead, the Court must then weigh the degree of prejudice suffered against the impact of the proposed remedy.[16]

Even if the Court concludes that S&L committed a violation and that Cargill has shown some prejudice or some prejudice can be presumed, that prejudice must be small indeed, for all the reasons discussed in Part II above. That is insufficient for disqualification, for the reasons set forth by Judge Rosenbaum in *Amundson*:

> Absent some showing – beyond the metaphysical – that there is some public interest or some wrong either committed or hidden, this Court opts in favor of the client's free selection of a competent attorney when faced with the wrath of a giant national entity. This Court will bow to no one in its anger and in the steps it will take in response to a demonstrable breach of the high standards expected – and demanded – of counsel to the United States District Courts. But the conjuring of an apparition will not trigger a response injurious to the attorney-client bond.

682 F. Supp. at 987; *see also Sequa Corp. v. Lititech, Inc.*, 807 F. Supp. 653, 659 (D. Colo. 1992) ("'[c]ounsel cannot be disqualified on the basis of speculation or conjecture'") (quoting *FDIC v. Sierra Resources, Inc.*, 682 F. Supp. 1167, 1170 (D. Colo. 1987)); *Nuri v. PRC, Inc.*, 5 F. Supp. 2d 1299, 1304 (M.D. Ala. 1998).

In contrast to the "apparitions" conjured up by Cargill, the remedy of disqualifying the firm would impose an incredible hardship on the plaintiffs and putative class. The Court's concluding analysis in *Sequa* aptly reflects the absurdity of this request:

---

[16] *See Kitchen v. Aristech Chemical*, 769 F. Supp. 254, 257-58 (S.D. Ohio 1991); *Neal*, 100 Cal App. 4th at 843-44, 123 Cal. Rptr. 2d at 212; *Meador*, 968 S.W.2d at 352 (setting forth six-factor test to determine whether to disqualify, of which two are "the significance of the privileged information; *i.e.*, the extent to which its disclosure may prejudice the movant's claim or defense" and "the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney"); *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 325 (S.D.N.Y. 1997) (in determining the appropriate remedy for an ethical violation, the Court must attempt to "[m]atch[] the sanction to any prejudice suffered by the adversary"); *see also* Flamm, LAWYER DISQUALIFICATION, § 23.8, at 460-67.

> Sequa has expended considerable resources in prosecuting this action through counsel of its choice. Defendants prove no basis for disqualification of Sequa's counsel, much less dismissal of Sequa's claims. Indeed, the sanctions sought in light of the facts before me lead to the inescapable conclusion that this motion is pressed for tactical advantage.
>
> * * *
>
> Far from increasing the standards of legal ethics and public respect in the system, granting this motion would have the opposite effect.

807 F. Supp. at 663-64.

The plaintiffs and proposed class members, who were completely faultless with respect to any inadvertent production, would be severely prejudiced by the disqualification of S&L. S&L has devoted over $6,000,000 in time and over $930,000 in expenses to the investigation and vigorous prosecution of this case. Schaefer Dec. filed with Class Motion, July 19, 2004, ¶ 21.[17] The firm is among a handful in the demanding field of employment class action litigation with the expertise and wherewithal to challenge a corporate giant like Cargill on a class-wide basis, and develop the record that has been submitted to this Court in the recent class certification motion. Even if a firm with similar expertise and resources could be found, at this point getting another law firm up to speed would be extremely costly and inefficient. While it is difficult to characterize any law firm as irreplaceable, it would work an extreme hardship on plaintiffs to be

---

[17] The vast bulk of this prosecution occurred after the Documents were returned to Cargill in July 2002, and the majority of it has occurred after the first day of Douglas' deposition testimony in September 2003. Cargill knew of the documents over two years ago, and questioned Douglas about them almost a year ago. Yet it delayed until now, right at the time of the class certification briefing, to raise these issues with the Court and seek disqualification and other more extreme sanctions. This delay is relevant both as it relates to Cargill's actual motive and in determining the appropriate remedy. *Bieter Co. v. Blomquist*, 132 F.R.D. 220, 223 (D. Minn. 1990) ("A motion for disqualification of counsel should be made with reasonable promptness after a party discovers the facts which lead to the motion.") (citing *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.*, 573 F.2d 988 (8th Cir. 1978)). A delay of two years in seeking this remedy, which occurred here, can result in a finding that the moving party has waived its right to object to the alleged impropriety. *Id.* at 992; *Nat'l Bonded Warehouse*, 718 F. Supp. at 972 (waiting over two years to press claim for disqualification plus "flimsy factual showing of impropriety" requires denial).

forced to try to secure other counsel at this stage in these proceedings. The impact of disqualification here would be far greater than in any reported decision where this remedy has been considered or ordered. *See, e.g., Panduit Corp. v. All States Plastic Mfg Co.*, 744 F.2d 1564, 1581 (Fed. Cir. 1984) (rejecting disqualification based on estimated cost of more than $30,000 - $50,000 to bring in new counsel and characterizing this as 'catastrophic' to non-moving party).

In fact, even when prejudice can be proven and the taint on the proceedings is apparent, neither of which has occurred here, disqualification should not be ordered when other potential measures can protect the integrity of the proceedings. *Neal,*100 Cal. App. 4th at 844, 123 Cal Rptr. 2d at 212-13 (disqualification unwarranted when other sanctions will suffice); *Caudill v. Foley,* 2001 Tenn. App. LEXIS 625, at *8 (Tenn. Ct. App. Aug. 21, 2001) ("A trial court has a broad range of options available to ensure that its proceedings are fair both in appearance and in fact. Disqualifying an attorney is the most drastic."). This factor overwhelmingly militates against disqualification. Instead of dismissal or disqualification, this Court could bar Douglas from appearing as a witness and prohibit plaintiffs from offering into evidence any document Douglas provided to S&L, either in support of class certification or liability. *See Fayemi,* 174 F.R.D. at 325; *Resolution Trust Corp. v. First of America Bank,* 868 F. Supp. 217, 221 (W.D. Mich. 1994); *Lennen v. John Eppler Mach. Works*, 1997 U.S. Dist. LEXIS 13857, at *8 (E.D. Pa. Sept. 5, 1997). While plaintiffs do not believe these remedies are warranted on the current record, they provide more than sufficient relief to eliminate even the possibility that trial in this matter could be tainted in any manner.

## CONCLUSION

The record on this motion does not remotely support the extreme sanctions of disqualification, dismissal, or reimbursement of fees and costs. Magistrate Judge Boylan has properly recognized this twice, yet Cargill has persisted in pursuing these remedies. Its reasons appear to be tactical and not motivated by any real taint or unfair advantage. For these and all of the foregoing reasons, Cargill's motion should be denied.

DATED: August 3, 2004 SPRENGER & LANG, PLLC

By: ***s/Lawrence P. Schaefer***

Lawrence Schaefer (MN No. 195583)
Susan M. Coler (MN No. 217621)
Teresa K. Patton (MN No. 205679)
David L. Ramp (MN No. 89357)
Mara R. Thompson (MN No. 196125)
Sprenger & Lang, PLLC
325 Ridgewood Avenue
Minneapolis, MN 55403
(612) 871-8910
(612) 871-9270 (*facsimile*)

Michael D. Lieder (DC Bar No. 444273)
Steven M. Sprenger (MO Bar No. 43994)
1614 20th Street, N.W.
Washington, DC 20009-1001
(202) 265-8010

ATTORNEYS FOR PLAINTIFFS