UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | | |
|---|---|---|
| RODERICK ARNOLD, et al., | ) | CIVIL ACTION NO. 01-CV-2086 (DWF/AJB) |
| | ) | |
| On behalf of themselves and all others similarly situated, | ) | CLASS ACTION |
| | ) | |
| *Plaintiffs,* | ) | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF APPEAL FROM MAGISTRATE JUDGE'S JUNE 5, 2002, ORDER DENYING DATA ON SENIOR MANAGEMENT AND IMPOSING RESTRICTIVE PROTECTIVE ORDER** |
| v. | ) | |
| CARGILL, INCORPORATED, | ) | |
| *Defendant.* | ) | |

## INTRODUCTION AND PROCEDURAL HISTORY

Pursuant to Fed. R. Civ. P. 72(a) plaintiffs hereby object to and appeal from Magistrate Judge Arthur J. Boylan's Order of June 5, 2002, denying data on senior management and imposing a restrictive protective order. On June 4, 2002, the parties held their monthly status conference preceded by the submission of letters to Magistrate Judge Boylan on discovery disputes between the parties. Following that conference, Magistrate Judge Boylan issued a June 5, 2002, Order resolving various issues relating to discovery and a protective order. Declaration of Lawrence P. Schaefer, Exh. 1.[1] Plaintiffs object to and appeal from the Magistrate Judge's Order at paragraph 3, denying their discovery request for data on senior management. They further object to and appeal from the Magistrate Judge's imposition of a restrictive protective order as set out in paragraph one and Exhibit A to the Order.

[1] All exhibits to this memorandum are attached to the Declaration of Lawrence P. Schaefer and hereinafter will be referenced only as "Exh. [number]."

**EXHIBIT 3**

The discovery request for complete employment data for senior managers goes to the heart of plaintiffs' claims in this matter – that a glass ceiling at Cargill prevents African-American employees from rising to the same level of achievement at the company as their non-African American counterparts. This discovery is directly relevant to proving both plaintiffs' individual and class claims of discrimination and is thus reasonably calculated to lead to admissible evidence pursuant to Fed. R. Civ. P. 26(b)(1). The Magistrate Judge's denial of this data is erroneous and contrary to law.

The Magistrate Judge further issued a protective order that erroneously prevents plaintiffs from reviewing probative evidence in this case and prevents them from fulfilling their responsibilities as class representatives. The order also deprives plaintiffs and class members of information necessary to preserve their rights under the law and improperly shields these proceedings from any public exposure or scrutiny.

## FACTS

**Denial of Data on Senior Managers**

In their Complaint at paragraph 92, plaintiffs identified the class as including salaried employees "employed at a level below that of vice president (i.e., equivalent to grade 16 and below)." Exh. 2 at ¶ 92. They further allege that various discriminatory practices serve to create a "glass ceiling" for African American employees prevented them from advancing to the level of vice president and higher. *See, e.g.*, Exh. 2 at ¶¶ 2, 3, 48-71, 87, 90, 102, 107.

In its Second Request for Production of Documents, plaintiffs asked for discovery related to *all* salaried employees, including all employees at the level of vice president or higher. Based on the submissions of counsel and the discussion at the June 4, 2002, status

conference, the Magistrate Judge issued an order excluding employees who were already employed at the vice president level or higher at the beginning of the discovery period from Cargill's discovery obligations.[2] Exh. 1 at ¶ 4; *see also* ¶ 3.

**Issuance of Restrictive Protective Order**

Through negotiations, the parties agreed to most of the provisions for a protective order to be entered in this case. However, despite their good faith efforts they were unable to agree on three issues that were then brought to the Magistrate Judge for discussion and decision. The parties' differing positions and the Magistrate Judge's contested rulings are set forth in the attached Addendum.

## ARGUMENT

### I. PLAINTIFFS' REQUEST FOR COMPLETE DATA ABOUT SENIOR MANAGERS IS REASONABLY CALCULATED TO LEAD TO ADDMISSIBLE EVIDENCE.

The preclusion of discovery about employees who were at or above the level of vice president at the beginning of the discovery period is clearly erroneous. At a minimum, this discovery is reasonably calculated to lead to admissible evidence pursuant to Fed. R. Civ. P. 26(b)(1).

Plaintiffs need and have a right to obtain discovery regarding employees in positions higher than the proposed class definition because one of their central claims in this case is a class-wide "glass ceiling" promotion claim. Plaintiffs allege that Cargill unlawfully prevented them from advancing in a manner commensurate with their abilities and in contrast to the higher achieving career paths of comparable non-African American

[2] Cargill must produce complete data regarding employees who held positions at grade 15 or lower at the beginning of the discovery period, but were promoted above grade 15 at some point in the discovery period. Exh. 1 at ¶ .

employees. The glass ceiling alleged by the plaintiffs includes Cargill's refusal to promote them to the level of vice president and higher. For liability purposes, plaintiffs, on behalf of themselves and the alleged class, have a duty to discover the career paths of those who achieved these higher levels, as well as those promoted over the plaintiffs and others in the class. Discovery about the compensation of employees above the glass ceiling is also relevant for damages purposes.

For purposes of this initial phase of discovery, plaintiffs are willing to compromise their request for data on senior management by seeking only the computerized data related to Cargill employees above grade 15 as of the date of the beginning of the discovery period and as requested in Plaintiffs' Document Request No. 8. *See* Exh. 3 at 4. This is an efficient way to get the basic information needed without significant burden on the defendant.

Without rationale, the Court limited the discovery of employee information at the level of vice president and higher by excluding information about employees who had already achieved that level at the beginning of the time period designated for discovery. This exclusion is clearly erroneous because it prevents the plaintiffs from examining complete data about positions above the glass ceiling alleged in the Complaint. For example, the restrictions in the June 5 Order will deprive plaintiffs of the ability just to count the *total* number of non-African American and African-American employees at the level of vice-president and higher during the relevant period. They will not have information about the incumbents who were at that level at and after the date designated as the beginning of the discovery period.

Other district courts in the Eighth Circuit have rejected similar attempts to limit discovery. In *Lyoch v. Anheuser-Busch Co.*, 164 F.R.D. 62, 68 (E.D. Mo. 1995), for example, the plaintiff sought information regarding comparables in the plaintiff's division who were at or above the plaintiff's grade level. The defendant refused to provide the information on relevance grounds. *Id.* The Court ordered the defendant to produce the information about comparables in higher grade levels because it was "relevant to plaintiff's claim in that it will show the career paths of employees promoted beyond Plaintiff's grade level." *Id.*

It is beyond dispute that "[t]he scope of relevance during discovery is much broader than the standard of admissibility at trial." 6 *Moore's Federal Practice* §26.41[1], at 26-87 (Matthew Bender 3d ed.). The burden rests squarely on the party resisting production to demonstrate that the requested documents are not relevant for discovery purposes. *Id; see also Chubb Integrated Sys. v. National Bank of Washington,* 103 F.R.D. 52 (D.D.C. 1984). Under this standard, the denial of data on Cargill employees who were in senior management positions as of the beginning date of the discovery period is clearly erroneous.

## II. THE COURT'S ADOPTION OF CARGILL'S RESTRICTIVE PROTECTIVE ORDER IS CLEARLY ERRONEOUS.

### A. The Named Plaintiffs Should be Allowed to Review All Confidential Documents

For purposes of this litigation, the parties have defined "Confidential information" as follows:

> Confidential information and documents shall include documents, portions of deposition transcripts, interrogatory answers, responses to requests for admission, and any other discovery materials designated as Confidential as set forth below.

Cargill requested and the Court ordered that plaintiffs could only review Confidential information and documents that "directly relate to his or her personal employment at defendant or to which they would have had authorized access as an employee of defendant." Exh. A to Exh. 1 at ¶ 2.

Cargill has offered no legal basis or good cause as required by Fed. R. Civ. P. 26(c) for precluding the named plaintiffs from reviewing all Confidential documents and information. This is the named plaintiffs' lawsuit, and they are entitled to access to complete information derived in discovery (except for highly sensitive "Attorneys' Eyes Only" documents) once they sign the Protective Order. *See* Fed. R. Civ. P. 26(b)(1) ("*Parties* may obtain discovery of regarding any matter . . .") (emphasis added). "The party or person seeking a protective order bears the burden of making the 'good cause' showing that the information being sought falls within the scope of Rule 26(c), and that [the party] will be harmed by its disclosure." *Iowa Beef Processors, Inc. v. Bagley*, 601 F.2d 949, 954 n.5 (8th Cir. 1979). That party must make a particular request and a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm that would be suffered without one. *Gulf Oil v. Bernard*, 452 U.S. 89, 102 n. 16 (1981). Cargill has not and cannot meet this burden.

Cargill not only fails to justify its request that individual plaintiffs be denied access to most confidential information, but it also ignores the fundamentally important role that the individual plaintiffs seek to occupy as representatives of a proposed class. It is an obligation of plaintiffs as the proposed representatives of a class to actively monitor how class counsel conducts its duties throughout the litigation. *Armour v. Network*

*Assocs.*, 171 F. Supp. 2d 1044, 1048 (N.D. Cal. 2001); *see also* Fed. R. Civ. P. 23(a)(4) (requiring the representative parties to "fairly and adequately protect the interests of the class"). The protection of the due process rights of potential class members who are not active participants in the litigation depends in part on the extent to which the named plaintiffs are able to monitor the way in which their attorneys conduct the suit. *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995). Placing narrow limitations on the proposed class representatives' access to discovered information directly conflicts with this oversight duty and is without good cause as required by Fed. R. Civ. P. 26(c).

In this instance Cargill's interest in protecting the confidential information contained in the documents it produces and the named plaintiffs' interest in fulfilling their obligation to oversee the prosecution of their lawsuit can be adequately balanced by requiring the plaintiffs to sign the Protective Order.

**B. The Court Should Enter a Less Restrictive Protective Order**

The Magistrate Judge, as requested by Cargill, ordered that all filings "disclosing Confidential or Attorneys' Eyes Only information" be filed under seal (paragraph 10) and that these same filings may be disclosed only to those authorized to have access to that information (paragraph 9). This Order is truly draconian because it means that *no filings* may be shown to any of the named plaintiffs, let alone the class members. For all practical purposes, this order means that everything filed in this case will be filed under seal and, on plaintiffs' side, can be reviewed only by plaintiffs' counsel. All filings will likely reference at least some information designated as "Confidential."

The Order as it stands therefore violates the fundamental principle that the plaintiffs and the public have an interest and a corresponding right to know the issues involved in publicly filed discrimination disputes. *See Luckett v. Beaudet*, 21 F. Supp. 2d 1029, 1029 (D. Minn. 1998) (noting the importance of "public scrutiny of the dispute and the proceeding" in a discrimination context). There is a recognized policy of favoring public access to hearings and records. *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 386 n.15, (1979); *Capellupo v. FMC Corp.*, 1989 U.S. Dist. LEXIS 4916 at * 3 (D. Minn. Apr. 28, 1989). Historically, both civil and criminal proceedings have been open to the public because "such access can enhance the quality and safeguard the integrity of the fact-finding process and foster an appearance of fairness." *In Re Iowa Freedom of Information Council*, 724 F.2d 658, 661 (8th Cir. 1983); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980).

Because discrimination cases "frequently involve issues critical to the public", the public has a right to "watch and participate" in the litigation in order for adjudication to provide the necessary "community catharsis." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983). In contrast, "secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption." *Id.* The burden is on the party seeking secrecy to make a compelling justification for departing from the principle of openness that is critical to our system of justice. *Capellupo v. FMC Corp.*, 1989 U.S. Dist. LEXIS 4916 at * 4; *see also Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 165 (3d Cir. 1993); *Joy v. North*, 692 F.2d 880, 894 (2d Cir. 1982). Federal Rule of Civil Procedure 26(c) requires a party to show good cause justifying the imposition of a protective order on discovery. Cargill has made no such

showing for the restrictive order it sought, making the Magistrate Judge's imposition of the Protective Order erroneous and contrary to law.

Plaintiff's versions of paragraphs 9 and 10 had certain protections built in such as the filing of all Confidential and Attorneys' Eyes Only documents under seal. Plaintiff is willing to modify its proposed paragraphs 9 and 10 even more to facilitate their ability to communicate with their clients and to meet defendant's concerns. The proposed modification is set forth in the Addendum to this Memorandum. This proposed compromise strikes a reasonable balance, protecting Confidential and Attorneys' Eyes Only documents from disclosure and public filing, and allowing only portions of briefs and affidavits quoting Confidential and Attorneys' Eyes Only information and documents to be filed under seal.

It is untenable for a plaintiffs' counsel to be put in a position where the named plaintiffs, class representatives and, eventually class members, cannot even review the bulk of the briefs written on their behalf, for example, seeking class certification, responding to summary judgment and addressing other legal and factual issues as they arise. Among other things, the restrictions would prohibit the class members from information needed to make decisions about opting out of the class. The Federal Rules of Civil Procedure are designed to allow the "parties" to engage in discovery. As the Protective Order stands now, Cargill representatives may actually engage in full discovery, but the plaintiffs are excluded from everything except that which specifically relates to their facts.

Plaintiffs respectfully request that the Court modify the Protective Order as requested.

## CONCLUSION

For all of the above reasons, plaintiffs respectfully request the Court to grant plaintiffs' appeal, reverse the June 5, 2002, Order and modify the Protective Order as requested by the plaintiffs.

Dated: June 19, 2002

SPRENGER & LANG, PLLC

By: [signature]

Lawrence Schaefer (MN No. 195583)
Susan M. Coler (MN No. 217621)
Teresa K. Patton (MN No. 205679)
Lisa C. Stratton (MN No. 236858)
Sprenger & Lang, PLLC
325 Ridgewood Avenue
Minneapolis, MN 55403
(612) 871-8910
(612) 871-9270 (*facsimile*)

Paul C. Sprenger (MN Bar No. 104164)
Michael D. Lieder (DC Bar No. 444273)
Steven M. Sprenger (MO Bar No. 43994)
1614 20th Street, N.W.
Washington, DC 20009-1001
(202) 265-8010

ATTORNEYS FOR PLAINTIFFS

# ADDENDUM
## TO PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF APPEAL FROM MAGISTRATE JUDGE'S JUNE 5, 2002, ORDER

## I. PROTECTIVE ORDER PROPOSALS AND COURT'S RULING:

(a) Paragraph 6(a) of Protective Order:

**Plaintiffs requested** that documents designated as confidential could be shown to:

(a) The above-named plaintiffs on the condition that each plaintiff acknowledges that he or she is bound by this Stipulation and Order by signing a copy of Exhibit A;

**Defendant requested** that documents designated as confidential could be shown to:

The above-named plaintiffs on the condition that each plaintiff is only shown documents and information that directly relate to his or her personal employment at defendant or to which they would have had authorized access as an employee of defendant.

**Court ruled** in favor of the defendant's language. *See* Exh. A to Exh. 1 at ¶ 6(a).

(b) Paragraph 9

**Plaintiffs requested:**

No Publication. No Confidential or Attorneys' Eyes Only documents or information shall be posted on web sites or otherwise published or disseminated by the parties or their counsel without the permission of the party designating such documents as Confidential or Attorneys' Eyes Only. Portions of affidavits and briefs quoting Attorneys' Eyes Only information or documents shall not be posted on web sites or otherwise

**Defendant requested:**

No Publication. There shall be no reproduction whatsoever of any Confidential or Attorneys' Eyes Only information, except as required in this litigation. Copies, excerpts, or summaries of Confidential or Attorneys' Eyes Only information, including but not limited to affidavits, briefs, and memoranda of law, may be shown or given only to those authorized with

access to Confidential or Attorneys' Eyes Only information pursuant to this Stipulation and Protective Order, and the terms of which shall apply, in full, to any such copies, excerpts or summaries. No such documents or information shall be posted on web sites or otherwise published or disseminated by the parties or their counsel without the permission of the party designating such information or documents as Confidential or Attorneys' Eyes Only.

**Court ruled** in favor of the defendant's language. *See* Exh. A to Exh. 1 at ¶ 9.

(c) Paragraph 10

**Plaintiff requested:**

Court Filings. Any Confidential or Attorneys' Eyes Only documents filed with the Court, shall be filed under seal. Portions of affidavits and briefs quoting Attorneys' Eyes Only information or documents will be filed under seal.

**Defendant requested:**

Court Filings. Any Confidential or Attorneys' Eyes Only documents filed with the Court, and any pleadings, motions, or other papers disclosing Confidential or Attorneys' Eyes Only information shall be filed under seal.

**Court ruled** in favor of the defendant's language. *See* Exh. A to Exh. 1 at ¶ 10.

## II. PLAINTIFFS' PROPOSED AMENDED PARAGRAPHS 9 AND 10 OF PROTECTIVE ORDER:

9. No Publication. No Confidential or Attorneys' Eyes Only documents shall be posted on web sites or otherwise published or disseminated by the parties or their counsel without the permission of the party designating such documents as Confidential or Attorneys' Eyes Only. Portions of affidavits and briefs quoting Confidential and Attorneys' Eyes Only information or documents shall not be posted on web sites or otherwise published or disseminated by the parties or their counsel without the permission of the party designating such information or documents as Confidential or Attorneys' Eyes Only. Portions of briefs and affidavits not filed under seal may be posted on web sites or otherwise published or disseminated by the parties or their counsel without the permission of the party designating such information or documents as Confidential or Attorneys' Eyes Only.

10. Court Filings. Any Confidential or Attorneys' Eyes Only documents filed with the Court, shall be filed under seal. Portions of

affidavits and briefs quoting Confidential or Attorneys' Eyes Only information or documents will be filed under seal. Statistical analyses that do not link Confidential or Attorneys' Eyes Only information to specific employees does not need to be filed under seal. Sealing shall be accomplished by filing the documents in a sealed envelope or container on which the following notice shall be attached:

CONFIDENTIAL – UNDER PROTECTIVE ORDER.

The enclosed document has been filed under seal pursuant to the terms of a Protective Order in this action. This envelope shall not be opened or its contents disclosed or examined except by order of the Court.




Speeches



# Collaborative Leadership: Lessons for the Future
## Warren R. Staley
## Chairman and Chief Executive Officer
## October 9, 2003

Leadership is much on peoples' minds these days. In part, this is because of obvious failures in leadership, like the corporate malfeasance we have heard so much about recently. In part, this is because of the positive difference good leadership makes, such as the many contributions Ken Dayton made to our community or Carol Johnson has made to the Minneapolis school district. And in part, it is because most of us sense that leadership traits are often the same across different kinds of organizations.

So, I understood why those who invited me to speak thought leadership would be an interesting topic. As the head of a large and successful global business, I have firm beliefs about the leadership traits I need to bring to my work as CEO at Cargill, and I think they can apply to other institutions and organizations as well:

- Lead with a vision
- Be credible
- Be consistent and fair
- Do your homework
- Trust your people and delegate – Show support
- Hold yourself and your people accountable
- Courage
- Listen / Show Respect

But what intrigued me most about today's luncheon topic was this notion of "collaborative" leadership. It's almost an oxymoron. To collaborate means working together; it's about teamwork. To lead conveys being front and center; it's about orchestrating the effort.

So, what can we make out of this idea of collaborative leadership? I'd like to look at the concept through three prisms: first, my experiences in managing Cargill's recent transformation; second, Cargill's philanthropic focus on education; and finally, the challenges facing today's leaders in public education.

**Managing Change at Cargill**
Cargill began nearly 140 years ago as a country elevator, sort of your classic local business.

EXHIBIT 4

Over time, we followed midwestern grain into national markets on the coasts and then on to international markets. We also followed grain up the value-added food chain. So, by the mid 1990s, we were a global agrifood company, spanning much of the food chain and with even a few non-food sectors, like steel, deicing salt and financial markets.

Though we had matured dramatically from our roots in grain trading, the world around us was changing at an accelerating pace. We found ourselves largely a transactional commodities company operating in an increasingly knowledge-based, value-demanding, customer-oriented marketplace. In 1997 a Cargill senior management team was asked to review our strategy.

The team concluded that we needed to become more focused in order to lead change rather than merely react to it. We needed to make some fundamental and far-reaching decisions. Three stand out for our conversation about collaborative leadership:

- We needed to clarify our purpose, our reason for existing as a company. And, we needed to define what we call our Strategic Intent.
- We needed to reshape a strong, inherited culture, preserving our basic beliefs and guiding principles while promoting more innovative and outward-focused behavior throughout the company.
- And we needed to modify our business portfolio to align it with a new strategic direction.

I don't have the time – and you probably don't have the patience – to go through the *hundreds* of steps in the transformational journey Cargill has been on since 1998. But let me mention some of the high level answers we came up with in the above three areas.

Our purpose. We decided that the core of what attracted people to Cargill was "to be the global leader in nourishing people." The word "nourishing" reflects our agrifood business focus, but it also extends to other things "necessary for life, health and growth," including the idea of helping enrich the communities in which we operate.

If "nourishing people" is our fundamental reason for existing as a company, we also needed to articulate a clear, more immediate goal for harnessing the efforts of our 100,000 employees.

We called this our Strategic Intent, and it set the mark for what we want to become over the next decade:

By the year 2010, Cargill will be the recognized global leader in providing agrifood chain customers with solutions that enable them to succeed in their businesses.

With our purpose and goal set, we began the difficult work of reshaping Cargill's culture.

We conducted a global culture scan involving focus groups with over 1,000 employees and other stakeholders. We learned that Cargill was well respected for its integrity, hard work and drive to succeed. But we

also discovered some negatives associated with our culture as a large, remote, inward-looking company.

Anyone who has tried to change an inherited culture while continuing to operate successfully knows how challenging our task was. But we were clear about the attributes we wanted to promote – to be trustworthy, creative and enterprising. And we focused on the behaviors we wanted to encourage:

- To become relentlessly focused on our customers and the value we could deliver to and share with them.
- To foster an innovative spirit. And,
- To develop a culture of high performance.

We also were clear about how we were going to evaluate our performance – through four carefully chosen measures: "engaged employees, satisfied customers, enriched communities and profitable growth."

Everything begins with engaged employees – getting the right people into the right positions and then energizing them in pursuit of customer solutions. From engaged employees would flow both satisfied customers and enriched communities, since engagement is about both good business and good citizenship. "Profitable growth" is what would fall out from achieving the other three.

We firmly believe that the right behaviors produce good results, not the other way around.

Having the right goals and the right behaviors laid the foundation for reshaping our business portfolio. It has enabled us to sell over $2 billion of assets in areas where we didn't feel we could be a leader and to make the two largest acquisitions in our history. But those are just the most visible changes.

We also reorganized from a dozen divisions into some 90 individual market-facing business units to put accountability squarely on our business leaders who were closest to our customers.

We've doubled and redoubled our research budget to grow our knowledge capabilities and innovation. And we've brought new skills into the organization through joint ventures, acquisitions and hiring people with skills Cargill didn't possess.

So, what does this story of change management at Cargill have to do with collaborative leadership? Well, I think it helps concentrate attention on key elements: lead with vision; develop and foster a shared mindset about purpose and goals across your organization; link culture and behavior to get everyone engaged; and focus on behaviors that drive performance to get the results you seek. These are the key building blocks. Only when they are solidly in place are you ready for remaking the organization.

**Cargill's Focus on Education**
Now, let me change gears and also pick up the pace a little.

About the same time Cargill was beginning its strategic intent journey, the Cargill Foundation decided to re-examine its philanthropic practices.

I have had the good fortune of watching this change as chair of the Foundation. Perhaps like many corporate foundations, the Cargill Foundation historically had made literally hundreds of relatively small grants across a broad spectrum of causes, with little systematic sense of what was working.

Over the course of 18 months of study, the Foundation Board concluded that it wanted to replace this shotgun approach with a laser-like focus on "educating socio-economically disadvantaged youth in the Minneapolis area."

We chose a highly focused goal because we wanted our grantmaking to:

(1) make a measurable difference in experienced outcomes;
(2) test new ideas; and
(3) develop solutions that could be models for others.

We knew that we were not experts in this area.

So, we used our transition time meeting with community experts in early childhood development, education and the changing profile of our community. The many community leaders we met with had a wealth of practical experience they freely shared with us, and we are deeply indebted to them.

Among those who helped were: Joe Nathan at the Center for School Change, Howard Mizell at YMCA, Emmett Carson at the Minneapolis Foundation, Carol Johnson, and a host of people involved in both public and charter schools.

From their counsel we drew several conclusions.

First, we need to focus on early stages in the educational process before performance gaps become too large to bridge with almost any kind of intervention.

Second, we see many kids who require more attention than just in the classroom: with the challenges they face at home, with English as a second language, with the absence of good role models, and with a host of other concerns that are simply mind-boggling.

Third, we recognize the need for finding and developing relationships with good partners; we are the supporters, not the doers.

As a result, we are supporting a number of interesting programs that we feel are making a meaningful impact on the lives of children who fall within our focus area. For example:

- Loring Nicollet-Bethlehem Community Center For five years we have supported the Early Learning Center (ELC), a full-day, year round preschool program that is preparing children ages two to five years old for kindergarten.
- Washburn High School -- We're funding a four-year grant to

support the Washburn American Studies Academy, a collaboration with the Gilder Lehrman Center in New York City, that is creating a small learning community for students who choose to be part of a rigorous, cross-disciplinary program.
- LDA Learning Center – Through a strong, five-year partnership, we're funding the Learning Connections Program that provides small group tutoring for elementary school children twice a week in selected Minneapolis Public Schools.

We also have initiated some interesting programs on our own involving collaborations with first-rate partners:

- Cargill's "Schools First" initiative involves a collaboration with the University of Minnesota's Center for School Change designed to strengthen reading and math skills, provide training for teachers and enhance parental involvement.

  Nine of the eleven schools involved are making progress against the testing standards ahead of the district's average.

- We have a collaboration with the Minnesota Humanities Commission to introduce a "Core Curriculum" approach.

  Being implemented at nine participating schools, the Core Knowledge Sequence is a detailed outline of specific content to be taught in language arts, history, geography, mathematics, science and the fine arts.

Finally, perhaps our most ambitious – and risky – initiative is "Cargill Scholars."

This is a five-year, $5 million collaboration with the Neighborhood Improvement Program and Big Brothers/Big Sisters that makes an intensive effort between fourth and ninth grades with 50 "at risk" students through a variety of mentoring and other enrichment interventions.

Overall, since we began this educational focus in 2000, we have invested roughly $12 million, substantial time from our Foundation staff, and hundreds of employee volunteer hours to help prepare the next generation for school, work and life. By pairing these resources with good teachers, we are making a difference.

And I know first-hand how important teachers are to this equation – my mother, sister and wife were all part of this most honorable profession. And I am here today, thanks to the impact several teachers had on me.

Again, reflecting upon lessons to be learned for collaborative leadership, the Cargill Foundation focused its efforts around a shared vision and purpose and then realigned its giving portfolio from 150 grantees five years ago to barely 30 programs today to have more impact.

For many socio-economically disadvantaged youth, the paths they must travel to achieve success are incredibly steep and difficult.

But, by looking for strong, committed leaders with clear goals and a commitment to measuring performance, we have found programs that

are succeeding, people and agencies out on the educational front lines doing great work and incredible opportunities for companies and other community institutions to expand their involvement.

After all, we will be the principal beneficiaries of a healthier, better-educated workforce and citizenry.

I wanted to mention one example of what I think is a model for concerned involvement – what Win and Maxine Wallin are doing through their family foundation. They are providing about 190 scholarships to help low- and middle-income kids in the Twin Cities attend college.

Long before I got to know them, I wrote them a letter congratulating them on their effort. And, there is room for others to join in. Their daughter, Rebecca Wallin, met with our Foundation Board last month and told us that many qualified kids still end up without the needed financial assistance for college.

Moreover, significant additional support is needed to enhance their prospects for success once they start college, as many are forced by economics, lack of preparation or other barriers to drop out before they finish. So, the Wallin foundation is actively looking for other partners to join their scholarship efforts. Clearly, there are many ways open for some collaborative leadership in addressing community educational needs.

**Leadership Challenges in Public Education**

Which brings me to my last point: the significant leadership challenges facing Minneapolis and other public education systems today. First, however, I want to thank Carol Johnson for her dedication and commitment these last six years.

Carol met several times with our Foundation and was always available and informed, when we wanted to talk about an initiative.

We all have a huge stake in seeing that the public education system succeeds.

As just one example, more jobs in the future will require at least a college degree, yet the prospects for today's student mix to complete college are actually declining. As a community, we can't afford to let such gaps open up.

Again, drawing upon something Carol said in her last "Carol's Corner" newsletter, "it's not about us, it's about our contribution to building potential in our community-at-large. We have a "collaborative responsibility" to overcome the challenges facing public education."

So, what might such collaborative leadership look like?

I believe it starts by leading with a vision. It requires developing a shared mindset around our goals.

What are the basic standards we want to see met? What kind of public system are we willing to support and invest in?

Then, we need to engage our teachers and school leaders in pursuit of those goals. We should expect high performance and hold them accountable. We need to put responsibility for results as close to the customer – in this case, the student -- as possible.

And, we need to invest in the kinds of training and curricula most likely to achieve the results we seek.

Finally, we must realign our portfolio of educational offerings to meet community expectations.

That will take investments in expanding our skill base, a willingness to explore new solutions for complex issues and a commitment to measure our performance and make needed course corrections.

All of that is challenging. But I believe the business community is prepared to offer more than best wishes.

I believe it is prepared to engage in collaborative leadership.

When you consider the demographic changes taking place in our communities, the need for keeping the Minnesota economy vital, the demands on Minnesota to compete in the global marketplace, and the impact education has on the overall quality of life in our communities, it is simply the right thing to do.



© Copyright 2004 Cargill, Incorporated. All rights reserved.