# PLAINTIFF SUMMARY CHART

## ACQUAYE, NII-AKWEI (05/02/97 – 03/01/02)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 05/02/97 | MARKETING INTERN - PT | HX999 | ADMIN | MINNETONKA, MN (OFFICE CENTER) |
| 06/30/97 | MARKETING ASSISTANT | EX009 | | |
| 04/01/98 | | | | |
| 09/01/98 | ASSISTANT MARKETING MANAGER | EX011 | | |
| 05/01/00 | BUSINESS DEVELOPMENT MANAGER - CORN MILLING | EX012 | BIOSCIENCES | |
| 07/01/00 | | | ERYTHR/SPECFOOD | |
| 09/01/01 | | | NUTRACEUT HEA/FDTECH | |
| 03/01/02 | SR BUSINESS DEVELOPMENT SPECIALIST | EX010 | ADMIN | |
| 04/01/02 | | | | WASHINGTON, DC |

| Plaintiff Claims / Issues |
|---|

Nii-Akwei Acquaye claims discrimination in promotion, compensation, and termination.

Acquaye testified to the following

***about promotion / advancement :***

- Cargill denied Acquaye a promised increase in grade after six months in Specialty Food Ingredients.

***about compensation :***

- Bruce Leslie (Caucasian), Business Unit Leader Food System Design, denied Acquaye a promised increase in pay after six months in Specialty Food Ingredients, even though Acquaye's starting salary was significantly lower than standard for that department (40, 96-99, 146-50, 243).

- Bruce Leslie and Stan Ryan (Caucasian), Business Unit Leader NA Food Ingredients, Acquaye's "mentor," both refused Acquaye's request to investigate or adjust his low PMP scores and pay (94-99, 107-08, 172-74, 192, 196-205, 239-47).

- Acquaye believed that his two white colleagues, Paul Vajda and Ray Banks, were paid more than he was in Specialty Food Ingredients (15-16).

***about termination :***

- In March 2002, Acquaye claims he was constructively discharged after realizing that he would never be able to overcome the biased PMP that had followed him since working for Bruce Leslie (40, 109, 292-93, 301).

***about other issues :***

- Manager Bruce Leslie told Acquaye that he "force ranked" him and that Acquaye was at the bottom of the ranking (278).

*See also* Ox 1, Ans. to Int. No. 2.

| Additional Evidence |
|---|
| Acquaye also testified to other evidence of racial bias, including:<br><br>• Acquaye's first manager encouraged him to leave Cargill, saying: "This company is not a place for African Americans" (353).<br><br>• One of Acquaye's colleagues told him that Manager Bruce Leslie had it in for him because he was black (116).<br><br>• Manager Bruce Leslie made remarks to Acquaye but not white employees, such as: "Don't be afraid of us. We won't eat you." Acquaye interpreted this as a reference to cannibalism (112, 282-83).<br><br>• Bruce Leslie told Acquaye that he didn't "want him around" and offered him a severance package when Acquaye approached him about their working relationship (269-71).<br><br>• In reference to the severance package offer, Leslie told Acquaye, "Don't think you can work hard and everything will be okay" (11, 278-79). |

# ALLEN, SEAN (06/22/92 – present)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | MERCHANDISING INTERN | EX000 | CORN MLG | MINNETONKA, MN (LAKE OFFICE) |
| 06/22/92 | MERCHANT TRAINEE | EX002 | | DAYTON, OH |
| 12/01/93 | SALES REP C | EX004 | | MINNETONKA, MN (OFFICE CENTER) |
| 06/01/95 | SALES REP B | EX006 | | |
| 10/01/97 | SR ACCOUNT REP | EX008 | | |
| 05/16/98 | SALES REP B | EX007 | SALT | BALTIMORE, MD |
| 05/01/02 | SALES REP A | EX009 | | |

| Plaintiff Claims / Issues |
|---|

Sean A. Allen claims discrimination in promotion and compensation.

Allen testified to the following:

***about promotion / advancement :***

- Allen spoke to many people in Ethanol (Corn Milling) about his desire to be promoted, including Pete Boynton (Caucasian), National Sales Manager, Sweetener; Doug Punke (Caucasian), Division Merchandising Manager; Bill Trecker (Caucasian), Ethanol Product Line Manager, and the Human Resource representative involved with SBD, Jodi Horner (Caucasian), but none helped him (103).

- Allen was not approached about new job opportunities, as was the custom since jobs weren't posted, even though Allen made known his desire to learn new things and become a manager within a reasonably short time frame (101-02, 127-28).

- In December 1998, Ethanol Manager Terry Jaffoni (Caucasian) discouraged Allen from seeking a position in SBD and declined to support him for that role (264-66).

- Director of Sales Mike Schmit (Caucasian) told Allen that if he transferred to Salt in 1998, his prior experience would make management opportunities available to him within 18 to 24 months. Since then, Allen has been passed over for several management positions, including Regional Account Manager and National Account Manager positions that went to white counterparts (34-36,140-42, 152-53, 156-57, 168-72, 179-80).

- Allen's lack of experience in a "bigger job" was cited as one of the reasons he was not selected to participate in the SBD program in 1998 (183-84).

***about compensation:***

- From January 1994 to May 1998, Allen was paid less in total compensation than his white peers in Corn Milling (259-61).
- Allen asked manager Terry Jaffoni to review his pay many times but she either refused or was not able to correct his pay, even though other managers consistently told Allen he was being underpaid (93-98, 124-25).
- From May 1998 to the present, Allen has been paid less than similarly situated white peers in total compensation in Salt (93-94).

*See also* Ox 2, Ans. to Int. No. 2.

| Additional Evidence |
|---|
| Allen also testified to other evidence of racial bias, including:<br><br>• Cargill managers, including Tom Devaney (Caucasian) and Rick Schonfelder (Caucasian), failed to address Allen's pay differential from May 1998 to the present (132-33, 136-39, 245-47, 262-63).<br><br>• In 1994 or 1995, Cargill declined Allen's request to attend a Corn Milling conference, even though another (white) non-management employee was invited to go (128-30).<br><br>• Allen believes the selection grid process negatively affected him when he applied for the Southern Regional Manager's job that went to a white colleague (198). |

# ARNOLD, RODERICK (11/05/79 – present)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | FACILITY TRAFFIC MANAGER | EX008 | ADMIN | DAYTON, OH |
| 01/01/93 | REGIONAL TRAFFIC MANAGER | EX011 | | CEDAR RAPIDS, IA |
| 10/01/94 | REGIONAL DISTRIBUTION MANAGER | | | |
| 07/01/96 | DIVISION RAIL FLEET MANAGER | EX012 | CORN MLG | MINNETONKA, MN (OFFICE CENTER) |
| 02/01/01 | CORPORATE RAIL FLEET MAINTENANCE MANAGER | | | |
| 06/01/02 | ASSISTANT RAIL FLEET MANAGER | EX009 | | |

| Plaintiff Claims / Issues |
|---|

Roderick A. Arnold claims discrimination in promotion and compensation.

Arnold testified to the following:

***about promotion / advancement :***

- Between 1995 and January 2001, Arnold testified that he was passed over for several positions for which he was qualified, including the following: two product logistics positions in the 1995-1996 time frame, one given to Richard Dolski (Caucasian) and the other given to Matt Kling (Caucasian); a high profile position that split off some of Arnold's duties and reported to a predominantly, if not completely, Caucasian management group in 1998-1999 (236-37); a Supply Chain Manager position in 2000; a Division Commercial Manager position given to Helde Pettersen in 1998 (239); a Supply Management Consultant position and a Plant Commercial Manager position in 2000 (243–47).

- In 2000, Arnold's Division Rail Fleet Manager position was eliminated and he was demoted to Corporate Real Fleet Maintenance Manager, effective January 2001 (252-61). Additionally, he testified that a less qualified Caucasian, Peter Cleary, was selected for the Rail Fleet Manager position for which Arnold applied and was more qualified (256-57). In April 2002, Arnold was demoted to Assistant Corporate Rail Fleet Manager (262).

- Arnold participated in the CLDP program in 1993-1994. Later, he surveyed the careers of 23 non-African American peers in CLDP. Of those, eight had left the company and the remaining fifteen were either Vice Presidents or Department Heads in highly visible positions. In contrast, Arnold's career path had stalled and ultimately reversed (379-80, 440, Lx 6).

***about compensation:***

- From 1996 to the present, Arnold's compensation has lagged behind his white peers, following the centralization of transportation and distribution in Minneapolis. For example, he testified that he was paid less than Richard Greavu, who reported to one of Arnold's counterparts and who had less experience in transportation and less experience with Cargill (196-97).

***about PMP:***

- As part of his PMP reviews, Arnold felt that he had to support his self-ratings by submitting volumes of

documentation, something he did not observe his white counterparts doing (309-10).

- Arnold believed that "sheer volume of key results areas" in his PMPs were designed to make him fail, also something he did not observe happening to his white counterparts (327-28).

*See also* Ox 3, Ans. to Int. No. 2.

| Additional Evidence |
|---|
| Arnold also testified to other evidence of racial bias, including:<br><br>• As a Regional Distribution Manager in Cedar Rapids 1993, Arnold discovered that he was being paid less than his white subordinate – Mark Klucker (167-68).<br><br>• Manager Tom Erdman arranged social events for senior managers and their spouses in Cedar Rapids. Although Arnold was a senior manager, Erdman did not invite Arnold and his wife to these gatherings. When the gatherings were discussed at work, Erdman would then say, "Oh yeah, I'm going to have to remember to invite you to the next one." But he did not (179-80).<br><br>• Arnold was similarly isolated and excluded from work related events in Minneapolis. For instance, every morning Dale Cox would gather his managers – except for Arnold, the only African-American – and they would go for coffee and doughnuts and talk business. Arnold was only invited if Cox was out of the office that day (219-21).<br><br>• Division President Mike Urbanic "heckled" Arnold during his presentations to management. Urbanic did not act that way during presentations by Arnold's white counterparts (212-15).<br><br>• Arnold was not given any administrative staff when he was solely responsible for a fleet, in contrast to his white peers who were given support staff (350-51). |

# BRANHAM, HOLLIS (07/21/00 – 10/01/01)*

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 06/01/00 | CHEMICAL ANALYST VI | NX006 | WWPHOSPH -- PHOSPHPROD | TAMPA, FL |

* Cargill rehired Branham in January 2002. He left Cargill in May 2004.

| Plaintiff Claims / Issues |
|---|
| Hollis Branham claims discrimination in termination.<br><br>Branham testified to the following:<br><br>***about termination :***<br><br>• Cargill terminated Branham on October 1, 2001 as part of a Reduction in Force. Cargill said that Branham was RIF'd due to the fact that his PMP scores were low when, in fact, they were among the highest of his work group. (87-88, 95).<br><br>• One of the people who rated Branham for purposes of the RIF was Du Nguyen (Asian). Du Nguyen was known for making racial comments, including that he "didn't like black people" (53, 62-63, 66-68).<br><br>*See also* Ox 4, Ans. To Int. No. 2. |

| Additional Evidence |
|---|
| Branham also testified to other evidence of racial bias, including:<br><br>• Among his statements about black people, chemist Du Nguyen (Asian) said the following: when he thinks of black men, he thinks of crime; that he wouldn't sleep with a black woman because they are dirty; and that as a waiter, he didn't like African Americans because they refused to tip him. Branham, as a chemical analyst, effectively worked under Du Nguyen (49).<br><br>• Jim Jobes (Caucasian) used the term "nigger" in the lab in 2002 (171).<br><br>• Manager Angela Nguyen (Asian) treated Branham less favorably than his non-African-American colleagues, for instance, denying him requested vacation days and threatening to fire him. Nguyen did not treat Caucasian chemical analysts that way (53-54, 56-57). |

# BROWN, TOYA (03/17/97 – 03/31/01)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 05/20/96 | MERCHANT INTERN | EX002 | NAG | MAUMEE, OH |
| 06/09/97 | ASSISTANT MERCHANT | EX002 | | HOUSTON, TX |
| 02/01/00 | MERCHANT C | EX005 | | |
| 08/01/00 | MERCHANT C | EX005 | NAGOC | |

| Plaintiff Claims / Issues |
|---|

Toya Brown claims discrimination in promotion, compensation, and termination.

Brown testified to the following:

***about promotion / advancement :***

- Brown worked for Cargill for almost four years but never advanced beyond the level of merchant with the Houston, Texas Grain Division (74-76). She always asked her manager about promotion opportunities and she was always told that promotions were based on performance (116-30). During her three-plus years in Houston, Brown watched as Caucasian Merchants, often with less seniority, such as Stephan Maikkula, were promoted. She was often unable to apply for these promotions because she didn't find out about them until after they were filled via the "Cargill grapevine" system (101, 222, 357). [T]he system was … who you knew, who knew you, and who had an opening and … whoever had that opening, who they wanted to fill it with" (101).

- Cargill literature about Brown's job indicated that new hires would be transferred to another opportunity, another location, within 12 to 18 months. Brown was also told this was a "typical career path" during her interviews (85). Yet, Brown was never able to transfer out of Houston. In fact, Cargill relied on her to train new merchants because she was the sole merchant that had been there so long (279).

- The promotional opportunities for which Brown was not considered or did not receive during her employment included: (1) A Merchant position with the Fertilizer Division in Tampa, FL. Brown was allowed to interview for this position but was not selected. She learned later that the position had been filled before her interview (83-85, 188-89, 198-99); (2) Promotion to a sales position in Chicago that went to Jason Voght (Caucasian) (324, 368); (3) Promotion to a Domestic Phosphate Merchant position that went to Pam Baylor (Caucasian) (368-69); (4) Promotion to a Commodity Marketing Specialist position in Minnesota, given to Patrick McEniry (Caucasian) (324, 369); Promotion to a merchandising position given to Mary LeBlanc (Caucasian) (324, 388); (5) promotion to River Sector merchant position that went to August Hauschild (Caucasian) (324, 332-33); and (6) promotion to Ag Producer Services Merchant position that went to Stephan Maikkula (Caucasian) (324, 329-32).

- Cargill did offer Brown an opportunity in Mount Vernon, Indiana in September 2000. However, Brown believed it to be a lateral move, based on the job description. In addition, the future of the Mount Vernon location was uncertain. She declined the offer (167-68, 174-77, 182).

***about compensation :***

- Brown received regular raises, but they were for the purpose of bringing her up only to the level at which

new merchants were being hired (136-37, 231-33).

***about termination :***

- Brown resigned her employment with Cargill in March 2001 because of the lack of promotional opportunities, consistently seeing her peers promoted and relocated to choice locations, the continued stress brought on by lack of opportunity, and a continued containment of her potential (225-26, 298, 429-30).

*See also* Ox 5, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Brown also testified to other evidence of racial bias, including:<br><br>• A few days before she left Cargill, Manager John Culmer took her to lunch. Culmer told Brown that the treatment she experienced was part of a larger pattern of discrimination at Cargill. They discussed numerous examples of this discrimination. Culmer also told Brown that Cargill should stop recruiting at historically black colleges if they were not going to provide those recruits with the same opportunities as white peers once they were hired (298,Toya Brown Dec. ¶ 9, Ox 31). |

# COLLINS, DAWN KIM (07/20/92 – 08/02/00)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 07/20/92 | ACCOUNTANT B | EX002 | FMD/FMG | MINNETONKA, MN (OFFICE CENTER) |
| 07/20/92 | ACCOUNTANT C | EX002 | | |
| 01/01/94 | ACCOUNTANT B | EX004 | | |
| 10/16/94 | ACCOUNTANT B – PT | | | |
| 01/01/95 | ACCOUNTANT B | | | |
| 08/16/95 | ACCOUNTANT A | EX006 | | |
| 03/06/96 | AUDIT SPECLST C | EX006 | ADMIN | |
| 08/01/96 | CORP AUDITOR B | EX005 | | |
| 01/01/98 | CORP AUDITOR A | EX008 | | |
| 11/01/98 | DIVRSTY/RETN SPEC | EX009 | | |

| Plaintiff Claims / Issues |
|---|
| Dawn Kim Collins claims discrimination in termination. |

Collins testified to the following:

***about termination :***

- As Diversity and Retention Specialist, Collins reported to Sue Sjeklocha (Caucasian), Manager of Corporate Diversity. Collins testified that she grew frustrated with her job and felt ineffective because of the lack of support from Sue Sjeklocha (349-50, 430).

- Collins started looking for another position with Cargill because of her frustration with Sjeklocha. The Financial Family Group offered Collins a job as their Recruiting Manager, but later wrote Collins that *if* it were determined that she were not "a good fit", she would have to find another position within Cargill or leave the company. Collins testified that the tone of the letter indicated to her that Cargill didn't want her to stay. Further, Collins did not believe that the Financial Family Group could "protect" her from Sjeklocha (349-53). Collins testified that, as a result, she declined the position because the letter confirmed her fears about Cargill, and she could no longer work in that environment (355).

*See also* Ox 6, Ans. to Int. No. 2.

| Additional Evidence |
|---|
| Collins also testified to other evidence of racial bias, including: |

- Collins believed that Cargill intentionally discriminated against African-Americans based on her experience in diversity and retention and her knowledge of systems such as compensation and the PMP (128-129).

- Cargill Vice Chairman Dave Raisbeck said, in a meeting Collins attended, that diversity efforts are a lot like going to church: "When you're there on Sunday morning, you hear it all, you understand it all and accept it all. But, then, on Monday, you leave and sometimes it leaves you too." (258-59).

- Scott Van Orsdel told Collins that African American women in the financial job family make less money

than their white male and female counterparts (265).

- Sue Sjeklocha (Caucasian, Manager of Corporate Diversity) told Collins not to spend too much time on diversity recruiting even though that was Collins' job. Sjeklocha also failed to spend the majority of her time (80%) on diversity issues (201-02, 429-30, 435-36, 448, 481-82, 543-44). Collins testified that her predecessor, Tracey Gibson, had warned Collins against accepting the position under Sjeklocha (356-58, 380).

- Functional Leader of Information Technology Lloyd Taylor responded to a question about why there so few people of color in the organization and women in management, "I'm tired of the question of women and minorities. We hire and promote the best people for the job" (425-26).

# DICKSON, DELLA (07/21/80 – present)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | STAFF TRANPORTATION SPECIALIST | EX009 | OILSEEDS | MINNETONKA, MN (OFFICE CENTER) |
| 10/01/93 | ASSISTANT DIV/C TRN MANAGER | EX010 | | |
| 12/01/95 | | EX011 | | |
| 11/01/98 | TRANSPORTATION PROJECT MANAGER A | EX011 | ADMIN | |

| Plaintiff Claims / Issues |
|---|

Della Y. Dickson claims discrimination in promotion and compensation.

Dickson testified to the following:

***about promotion / advancement :***

- Dickson testified that she has been denied many promotions for which she was qualified during the liability period, including the following:
- Rail Leverage Manager, North American Transportation Logistics Services. This position went to Richard Dolski (Caucasian). Dickson had years of experience negotiating millions of dollars worth of contracts and an M.B.A. Dolski had neither (293-99). Stephen Ward (Caucasian) put Dolski in the job (300).
- Project Lead for a Rate Management Project (1998). Stephen Ward (Caucasian) gave this position to Bill Dale (Caucasian) who had no experience leading projects and kept referring to the job as his "first big project" (506-08).
- Valuing Differences Senior Program Manager (2000). Karen Sachs (Caucasian) got the job (203-08).
- Regional Transportation Manager, North American Grain and Oilseeds (2001). This position went to Karen Morgan (Caucasian) (227- 32).
- Rail Leverage Manager, North American Transportation Logistics Services. This position went to Doug Montgomery (Caucasian). Dickson had 15 years of experience negotiating rail rates; Montgomery had none (291-92, 302-03).
- Dickson was also "demoted" from September or October 2000 until December 2000. During that time she was required to report to Doug Montgomery, her peer (552-54).
- Dickson requested the opportunity to participate in CLDP, which was denied. Dickson knows of no African American participants (316-17).
- Dickson testified that KEIS was somewhat of a secretive program. She doesn't think there was widespread knowledge about it among non-participants. "If you don't know that it exists, how can you ask to participate in it?" (417-18).

***about compensation :***

- Dickson believes she earns less than her Caucasian peers. For instance, Dickson did not receive the United Way pledge form for "highly compensated employees" whereas just about everyone else in her department did (332-33).

***about PMP :***

- Dickson believes that the subjective evaluations that are part of the PMP disadvantage her compared to her Caucasian counterparts (403, 406).

*See also* Ox 7, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Dickson also testified to other evidence of racial bias, including:<br><br>• Nearly all the people in her group, except Dickson, seemed to advance their careers through personal relationships, including Richard Dolski, Doug Montgomery and Gene Van't Hof (all Caucasian) (278). |

# DOUGLAS, VIRGINIA (12/03/90 – 11/29/00)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | ACCOUNTANT V | NX005 | CIS | CHICAGO, IL |
| 07/16/96 | ACCOUNTANT B | EX002 | | |
| 03/01/98 | TREASURY ANALYST | EX004 | | |
| 02/01/99 | ACCOUNTANT | EX004 | | |
| 08/01/00 | ACCTING SUPVR | EX006 | | |
| 11/01/00 | STAFF ACCOUNTANT – LEAD | EX006 | | |

Plaintiff Claims / Issues

Virginia Douglas claims discrimination in promotion, compensation, and termination.

Douglas testified to the following:

***about promotion / advancement :***

- In 1998, Douglas expressed interest in an open Regulatory Accounting position, but Accounting Manager Bernadette Fiascone (Caucasian) told Douglas the position had been filled from outside the company. Cargill then filled the job from inside with Heidi Boesen, a much less experienced Caucasian intern Douglas had trained (52-56, 58).

- Douglas was later given a regulatory accounting position, but at grade 2, even though Boesen was holding the job at a higher grade (60-61).

- In 1998, Douglas complained to Bernadette Fiascone that she had not been offered a position she was qualified for and wanted. Fiascone later wrote in an email to her department head that:

> [Virginia] believes she has had to fight for every opportunity she's been given, and to some extent, I agree with her. . . . I honestly did not even think about her when this position opened up. She is a very capable worker, and she is one of the top 3 members of the Treasury team.

(Lx 7 at VD0040-41).

***about compensation :***

- Accounting Manager Richard Levin (Caucasian) gave Douglas only half her raise when she was promoted to Accounting Supervisor, whereas Neil Banwart, a white counterpart, received his entire raise (86-88, 124).

- The Segregation Accounting position Douglas was given was downgraded to salary grade 2, even though Douglas's white predecessor in the job, David Forsyte, had been at grade 4 (122-23).

- Douglas had other experiences of being placed at lower salary grades and with lower salary increases than her white peers (67-68, 84-87).

***about termination :***

- Douglas eventually saw no alternative but to leave Cargill because of all the obstacles to her advancement. She felt "invisible" and that the company didn't take her career seriously. She testified that there were always "road blocks, you know speed bumps to me getting positions … that I wanted, that I inquired about." Finally, she testified, "After the last announcement … I was exhausted" (94-96).

*See also* Ox 8, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Douglas also testified to other evidence of racial bias, including:<br><br>• Douglas believed that her promotion to regulatory accountant was for the purpose of creating a supervisory position for a white employee (Heidi Boesen) (67-68).<br><br>• Douglas believed that white employees David List and Richard Levin were promoted into positions for which they were not the most qualified, because of their race (80-81).<br><br>• Douglas never heard of KEIS, CLDP, or SBD while she was employed by Cargill (154-55). |

# HUGHEY, CHENETA (07/08/96 – 12/19/97)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 07/08/96 | STAFF ACCOUNTANT | EX003 | SEED | MINNETONKA, MN (OFFICE CENTER) |

| Plaintiff Claims / Issues |
|---|

Cheneta N. Hughey claims discrimination in compensation and termination.

Hughey testified to the following:

***about compensation :***

- Hughey claims that she lost wages while at Cargill because she did not receive an increase during the eighteen months that she was there (66).

***about termination:***

- Hughey was hired into a job that her Accounting Manager, John Holbeck (Caucasian), told her would take a year and a half to learn. Then he failed to train her for her job and fired her at a year and a half (61-62, 145-55).
- Hughey felt that Holbeck set her up to fail because he would tell her to do one thing and then contradict himself and say he didn't say that (60-61).

***about PMP:***

- Holbeck falsely criticized Hughey on her PMP. For instance, he criticized her for incorrect calculations when she had relied on information he provided. Hughey did not observe her white coworkers similarly criticized (149). For example, on one occasion Hughey prepared both her reports and those of white coworker Mary Kay Vetsch. Holbeck criticized Hughey's reports but not those of Vetsch (142).
- The first time Hughey was told of any performance criticisms was at her review, and she was put on probation shortly after that (143-44).

*See also* Ox 9, Ans. to Int. No. 2.

| Additional Evidence |
|---|

Hughey also testified to other evidence of racial bias, including:

- Hughey observed that there were very few blacks at Cargill. "Out of a building of almost 3,000 people and you see only … roughly 10 black people out of 3,000, there is an issue." This caused Hughey to believe that management at the top wasn't interested in diversity (87-88).
- Hughey's position was created for her, Holbeck was not involved in the hiring process and Hughey thought there might have been "some resentment there," plus the fact that she was an African-American woman might have been an issue for him (143).

# JENKINS, JACQUELINE (07/11/88 – 09/01/97)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | MERCHANT B | EX007 | CMD/CGD | CHICAGO, IL |
| 06/01/94 | MERCHANT A | EX009 | | MINNETONKA, MN (LAKE OFFICE) |
| 11/01/95 | LOCATION MANAGER B | EX011 | | GUNTERSVILLE, AL |

Plaintiff Claims / Issues

Jacqueline P. Jenkins claims discrimination in promotion, compensation, and termination.

Jenkins testified to the following:

***about promotion / advancement :***

- Cargill denied Jenkins a promotion to Senior Merchant in Gainsville, Georgia in August 1997. Jenkins' Caucasian Manager knew Jenkins was interested in promotions and would have been familiar with this opening, but did nothing to help Jenkins (287-92).

- Jenkins believes the KEIS program is discriminatory because it is not a published program and employees have no knowledge of who is in the program or how they are rated. Jenkins believes that part of what she observed as Caucasians advancing in Cargill, but not African Americans, is due in part to the KEIS program (253-63).

- Jenkins does not know what factors are considered in selecting CLDP participants (180). Jenkins believes the CLDP program was discriminatory because employees had no known way to ask to participate. Rather, that was left to managers' discretion. Jenkins knows of no African American participants. "[H]ow can you participate in something if you don't know what it is?" (258-59).

***about compensation :***

- Jenkins functioned in a dual role in 1995-1996, as a Location Manager and a Senior Merchant, but was compensated only as a Senior Merchant (382-83).

- One of Jenkins' managers gave her an "Exceeds Expectations" in 1996-97 but another manager gave her a lower rating which resulted in a minimal salary increase. Although Jenkins held a Salary Grade of 11, she was compensated below the midpoint of the salary range, even though her high performance rating warranted higher pay (297-98, 352-53).

- Jenkins received a smaller bonus in 1997 than she in 1996, which she believes was due to discrimination by her Caucasian managers (285-86).

***about termination :***

- Jenkins was constructively discharged in August 1997, due to her belief that her chances of being promoted

were "nil", as were her chances of receiving fair compensation and bonuses, compared to her Caucasian peers (285-86).

***about PMP :***

- Jenkins believes that her PMP ratings during the liability period were discriminatory and prevented her from being promoted (203-04)(Ans. to Int. No. 2).

*See also* Ox 10, Ans. to Int. No. 2.

# LEWIS, KEITH (11/02/91 – 07/16/99)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | ANALYST PROGRAMMER A | ED006 | CIS | CHICAGO, IL |
| 08/22/94 | SR I/T BUSINESS ANALYST | ED00G | | |
| 01/16/97 | | | ADMIN | MINNETONKA, MN (WHITEWATER) |
| 04/16/98 | I/T BUSINESS CONSULTANT | ED00F | CCI | MINNETONKA, MN (OFFICE CENTER) |

## Plaintiff Claims / Issues

Sedgwick Keith Lewis claims discrimination in promotion, compensation, and termination.

Lewis testified to the following:

***about promotion / advancement :***

- Manager David Hamm (Caucasian) failed to promote Lewis into an I/T Manager job in CCI, saying the department was not big enough for an I/T manager. Shortly after Lewis' departure from the department, Hamm promoted Lewis' former subordinate Christine Miller (Caucasian) to a newly-created I/T Manager position (337-38).

***about compensation :***

- In April 1998, Lewis received no raise, even though he took on a position at a higher grade level, I/T Consultant (343-44).
- In 1997, Lewis's manager denied Lewis a bonus from his new department (CIS), as well as his old department (CPR), even though only half of the bonus year was spent in CIS (118-19).
- Manager Denny Cerkvenik told Lewis that he planned to submit Lewis' name to KEIS and gave him a form to complete and return, which Lewis did. He never heard anything more about the program after that (314 - 18).

***about termination :***

- Manager David Hamm told Lewis that he "did not fit in" at CCI, and that he and the CCI President were thinking of laying off Lewis in a RIF. Lewis, along with senior managers Duane Reed and Frank Sims, understood Hamm's comment to mean Lewis didn't "fit in" because he was black (203-05, 216-17, 219, 223-24).
- After Lewis complained to upper management about Hamm's discriminatory comments, Hamm retaliated by giving some of Lewis's work to a Caucasian subordinate. Hamm also excluded Lewis from the decision-making group for a large project he had previously headed up (221).
- Lewis was offered a different job but he declined because it provided no upward mobility and would have required job-sharing with CCI and continued reporting to Hamm (266-67).

- Lewis was constructively discharged in July 1999 as a result of Hamm's statement that Lewis "didn't fit in," Lewis' complaints about that statement and Cargill's failure to find Lewis a comparable job that didn't report to Hamm (144, 204-05, 213-19, 221, 223-26, 234-36, 263-67, 274-75, 278-79, 342).

*See also* Ox 11, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Lewis also testified to other evidence of racial bias, including:<br><br>• Lewis talked to an HR representative about the problem of minority retention, the lack of minorities in senior I/T management, and that fact that there were no peer group or mentor programs for minorities (311-12). |

# LITTLE, VIVIAN (11/17/97 – 03/10/03)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 11/17/97 | ADMIN ASSISTANT V | NX005 | CIS | CHICAGO, IL |
| 04/01/02 | ACCOUNTING CLERK VI | NX006 | | |

| Plaintiff Claims / Issues |
|---|

Vivian Little claims discrimination in promotion, compensation, and termination.

Little testified to the following:

***about promotion / advancement :***

- Little believes she was not considered for promotions for which she was qualified and which were given to Caucasians, including IT customer support analyst and IT administrative assistant positions. (204-08, 213-15)

***about compensation :***

- Little believes that she was not compensated fairly for her work in sales and marketing because she was doing the work of two people, and that if she had been non-African-American, she would have been paid more to do all the work she was doing (147-48).

- Little also felt she was discriminated against in compensation in accounts payable because the workload was huge and more than one person could do. Little believed that a non-African-American would not have been asked to do that kind of work and, in fact, many people in her department did a lot less work than Little and were paid more (148-49).

***about termination :***

- Little claims constructive discharge because her Accounting Manager, Sandip Lalli, did not support her, and actively undermined Little's ability to do the best job possible. Little's emotional and physical health were at risk and her physician advised her to leave Cargill for her own benefit. She resigned her employment because she felt she had no other alternative (351-52, 364-65).

***about PMP :***

- Little believes the PMP form can be unfair to African-Americans because the people filling out the forms, management, are making judgments about employees and their ability to perform based on their opinions. She does not know of criteria other than manager's subjective opinions (252-53). Little believes that Peter Wind (Caucasian), Vice President of Financial Services Group, did not take the rating process seriously (248) and that she was underrated on subsequent PMP's (278-79).

*See also* Ox 12, Ans. to Int. No. 2.

| Additional Evidence |
|---|
| Little also testified to other evidence of racial bias, including:<br><br>• Little was left out of meetings having to do with her job. Information was given to her after events had taken place, directly impacting how she was able to do her job (41-42, 54).<br><br>• Accounting Manager Sandip Lalli humiliated Little in front of her co-workers. Lalli pointed out mistakes she thought Little had made in front of others, and made jokes about Little and Little's work. Lalli did not do this to any one else (63-65).<br><br>• On one occasion, Little arrived at a meeting late because she did not know the starting time had changed, and Lalli made a joke about people of color always being late (66- 67).<br><br>• At a work-related dinner, Cargill managers were discussing Tiger Woods when Peter Wind said, "What about our Viv. She's really a black pearl." Another manager then said that the term "black pearl" came from the book *The Bell Curve*. Little knew that "black pearl" referred to the book's statement that a few black people, such as athletes, are "black pearls" but the rest of them are "not very smart." Little was so upset by the remark that she excused herself from the dinner as soon as she was able to compose herself (70-73).<br><br>• Another Cargill Vice President, Chris Malo (Caucasian), asked Little to take a job working for him. Little considered the job until she learned that the only reason Malo wanted her for the job was because his current assistant, an African-American, was leaving because she was unhappy with how she was treated, and Malo wanted another African-American in the position so they wouldn't have any problems with the EEOC and affirmative action (87-88).<br><br>• The Human Resource Department pushed Little very hard to take the position with Malo and continued to pressure her even after she declined the position (87-88).<br><br>• Human Resources representative Anne Woodfin inappropriately told Little confidential information about employees, but she did this only with regard to other African-Americans, never whites. On one occasion, Woodfin was in the restroom with Teri Harris, an African-American employee who was very upset about something that had occurred. After Harris left, Woodfin said to Little, "Well you know that Teri Harris is simply not management material. She will never be a manager or management." Woodfin then proceeded to "dance around the ladies' room, mocking the way Teri Harris walked, her mannerisms and the way that she talked" (96-97).<br><br>• On another occasion, Little went into Senior V.P. Peter Wind's office to deliver some work, and a colleague who was sitting there said, "Hey, Viv, Pete told me that he had a dream about your last night, and it was one of those ebony, ivory and jade dreams." Wind never denied making the remark (257-58). |

# MASON-ROBINSON, VALERIE (07/08/96 – 07/18/98)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 07/08/96 | SALES TRAINEE | EX002 | SALT | BALTIMORE, MD |

| Plaintiff Claims / Issues |
|---|
| Valerie L. Mason-Robinson claims discrimination in promotion, compensation, and termination. |

Mason-Robinson testified to the following:

***about promotion / advancement :***

- Cargill hired Robinson as an entry level Inside Sales Representative in 1996 and told her she could expect a promotion within 12 to 18 months. (28, 54, 43, 46-47).

- After more than a year in her position, Robinson asked about a Sales Representative position for which she was qualified and that had not yet been posted to her knowledge. Tom Brunner (Caucasian), Regional Sales Manager, told her that they had already selected Frank Peterson (Caucasian) to fill the job. (134-45).

- In 1998, Robinson took over the duties of Territory Sales Manager for Salt in Florida. She asked Salt Division Vice President, Mike Venker (Caucasian), about the position. Venker told Robinson "We'll get to you when we get to you" (94). Robinson later learned that, even though qualified, she was never considered for the Territory Sales Manager position in Florida. Robinson believed that race was involved in part because [Cargill] was "like a good-old-boy type of network" (28, 54, 139, 141-42, 144, 148, 150).

- In June 1998, Cargill rejected Robinson for a Territory Sales Manager position for which she was qualified in New Jersey. (28, 54, 152-53).

- Robinson testified that she felt ignored, passed up for different opportunities, uncomfortable, depressed, and that she never really was given the opportunity to prove herself when she was at Cargill (20). She testified that her issue was that she was never given the opportunity to interview for [a position]. "Most things seemed to happen behind closed doors, like hey you got the job, don't worry about it. So by the time I found out about the position or it became public to everybody, it was a done deal." (198).

***about compensation :***

- Robinson received only a minimal raise after eighteen months at Cargill. She was told the raise was two percent of her salary (112-13).

***about termination :***

- After two years with no promotions, Robinson resigned her position with Cargill (202).

***about PMP :***

- Robinson testified that she thought the whole performance evaluation system could be subjective, because it kind of led into the KEIS program; and "that KEIS program was all about, from my understanding, who you know and who likes you, and it was all kind of hush-hush and back door" (185).

- Robinson testified that she found it "hypocritical that Cargill says one thing and does another. They say you have to have 'meets' or 'exceeds expectations' on your PMP's, and I had that, and I had a number of 'exceeds expectations', but those, that documentation of my performance was clearly ignored. So the whole process to me is hypocritical because they don't make their basis or judgments for hiring within, at least regarding … African-Americans, and particularly myself, based on the working knowledge of a person's work ethic and their dedication to the company" (313).

*See also* Ox 13, Ans. to Int. No. 2.

| Additional Evidence |
|---|
| Mason-Robinson also testified to other evidence of racial bias, including:<br><br>• Robinson was subjected to many racially stereotypical jokes and remarks while at Cargill. (86-87, 90-91, 232-34).<br><br>• The racial remarks included ones to the effect that all black people can dance or that all black people are from the ghetto and uneducated. (86-87); Cargill employees would assume that Robinson knew predominantly black neighborhoods and beaches in Baltimore, even though she was from Chicago and had never lived in Baltimore before (209). When Robinson wore braids, other employees would ask her if she washed her hair (271-72).<br><br>• Robinson was the only black woman in sales in her division. She didn't see any people of color in management in her division, and she didn't see that many in Cargill overall (21). |

# MCDOWELL, ANTHONY ("CHRIS") (11/12/97 – 04/02/03)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 11/12/97 | UTILITY | HOURLY | OILSEEDS | FAYETTEVILLE, NC |
| 04/25/98 | ELEVATOR OPERATOR | | | |
| 10/09/00 | PREP OPERATOR | | NAGOC/GRNOSNA | |
| 12/16/00 | CREWLEADER VII | NX007 | | |
| 03/01/02 | PREP OPERATOR | HOURLY | | |

Plaintiff Claims / Issues

Anthony ("Chris") McDowell claims discrimination in promotion, compensation, and termination.

McDowell testified to the following:

***about promotion / advancement :***

- In December 2000, Cargill offered McDowell a supervisory position as a crew leader, the only African American to hold a supervisory role at the plant (66, 241). He began to experience discriminatory treatment almost immediately, which he attributed to race issues (282, 287). For instance, Superintendent Pat Gathman (Caucasian) constantly called him "Whitey" (244-45). In February 2002, Plant Superintendent Jody House (Caucasian), and Production Supervisor Terry Crawford (Caucasian) demoted McDowell, returning him to an hourly position at lower pay. McDowell was replaced by Frank "Ray" Norris (Causasian) (353-54, 413).

***about compensation :***

- McDowell testified that he learned, once he became crew leader, that two other crew leaders were being paid more than he: Ray Norris and Phil Strouble (Caucasians). They were white and recent hires by Cargill (435- 43).

***about termination :***

- McDowell testified that after Supervisor Terry Crawford threatened to fire him over how he handled an event during a plant shut down, he came to the conclusion that he had no future with Cargill. He left in December 2002 (353-54, 357).

***about PMP :***

- While he was crew leader, McDowell never received a PMP performance summary for 2001 from Plant Manager Jody House. House never said anything to indicate that McDowell's performance was deficient (213-14, 218). The first time McDowell saw a PMP performance summary for his time as crew leader was after he was demoted, when he requested a copy of his personnel file in January 2002 (218-19). That is when he learned that House had entered negative comments on his 2001 PMP. McDowell testified that he had never seen the comments before, he had not signed the document, and that the comments were untrue (208-14, 336). McDowell believed House's low ratings of him were influenced by race (286-87).

*See also* Ox 14, Ans. to Int. No. 2.

# MITCHELL, MICHAEL (10/12/99 – 08/14/01)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 10/12/99 | DEPARTMENT SUPVR B | EX007 | FERTILIZER | TAMPA, FL |
| 10/01/00 | DEPARTMENT SUPVR A | EX009 | WWPHOSPH/PHOSPHP ROD | |
| 03/01/01 | TECHNICAL SERVICE REP | EX009 | | |

| Plaintiff Claims / Issues |
|---|

Michael E. Mitchell claims discrimination in promotion, compensation, and termination.

Mitchell testified to the following:

***about promotion / advancement :***

- Mitchell was deterred from seeking a promotion to an IT position in e-commerce in 2000 because the posting stated "a good candidate already identified" (54-56). The job went to a white male (Ox 15, Ans. to Int. No. 2).

***about compensation :***

- Mitchell believes he was paid on the low end of his salary range despite getting high marks on his PMP KRA's (315-18). "It just seemed strange that I was rated an 'Exceeds Some' but when I looked at the range I was not above the midpoints, I was still on the lower end. So I didn't understand what it took to be on the higher end" (317).

***about termination :***

- Mitchell was forced to resign as Technical Services Representative on July 25, 2001 after repeated failed attempts to rectify the unfair and discriminatory treatment he suffered at Cargill (255-56, 321-29). Mitchell was constructively discharged due to unequal treatment and being required to report to Manager Don Jernstrom (Caucasian) who scrutinized Mitchell's work and behavior in a discriminatory manner. Cargill managers did nothing to help Mitchell, despite his repeated requests (249, 255-56, 321-30).

***about PMP :***

- Mitchell believes that Manager Don Jernstrom discriminated when he put him on a Performance Improvement Plan (PIP) in March 2001 (105-06). Jernstrom was unable to provide specifics in response to Mitchell's questions about his alleged performance deficiencies (107-13).

- After putting Mitchell on the PIP, Jernstrom changed Mitchell's 2001 PMP by adding negative comments, and downgrading him two full increments on the five-point scale, from "Exceeds Some" to "Meets Some" (197-98, 205).

*See also* Ox 15, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Mitchell also testified to other evidence of racial bias, including:<br><br>• Jernstrom scrutinized Mitchell in a way that he did not scrutinize Mitchell's Caucasian peers, including Tom Lindsey and Taylor Abel (159, 221-23, 249, 323, 366-67). |

# REECE, PHYLLIS (03/03/93 – 01/02/00)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 03/03/93 | OPERATIONS INTERN | EX000 | CMD/CGD | RESERVE, LA |
| 05/24/93 | PRODUCTION SUPVR D | EX002 | | |
| 05/01/96 | PRODUCTION SUPVR B | EX005 | | NORFOLK, VA |

Plaintiff Claims / Issues

Phyllis Reece claims discrimination in promotion, compensation, and termination.

Reece testified to the following:

***about promotion / advancement :***

- Reece transferred to Chesapeake in 1996 with the understanding that it was a promotion but found out later that she had more assignments and was still categorized as a Production Supervisor B (236).
- Plant Manager John Mooneyham (Caucasian) brushed off her questions about a promotion, saying "you will have your opportunity." Reece believed that was related to race because all the people that Cargill brought in for promotions were white. She felt that as an African-American woman she wasn't given an opportunity (82, 89, 376-77).
- Reece believes that Cargill discriminated against her on the basis of a who-you-know system and by not really giving her the promotions she rightfully deserved, and giving them to her white counterparts. Also, Cargill eventually terminated her (42).
- There were several positions Reece didn't know about until after they were filled. She then asked people about them. Reece would have been qualified for team leader positions but the people Cargill brought in for those were white (279-80).

***about compensation:***

- Reece felt that she was paid less than several individuals. She also believed she was to be a maintenance supervisor at Chesapeake, "[s]o not being paid for the job I was doing, that was a major problem (277, 301).

***about termination:***

- Reece felt the PMP process and her termination were discriminatory based on her race. She felt that Superintendent Robert Taylor (Caucasian) discriminated against her based on race by participating in the PMP that resulted in her termination (91-92).
- Prior to her termination, Reece was put on a performance improvement plan and – towards the end – she felt like Cargill was intentionally doing things to get rid of her (230-31). At one point, her supervisors took her off the premises and told her to resign (257, 262). Kristie Walker (African American), Production Supervisor, told Reece that it was management's intent to get rid of her (392).

***about PMP:***

- Reece testified that she thought Cargill's handbook and the PMP process negatively impacted African-Americans (382, 418). She told Superintendent Donnie Love (African American) that the PMP process negatively impacted African-Americans. She voiced concerns to Human Resources representative Karen Sachs (Caucasian) about the system as a whole (417).

*See also* Ox 16, Ans. to Int. No. 2.

# ROSS, TONYA (12/10/91 – 06/16/01)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | SALES COORD - ENTRY | EX002 | CORN MLG | DAYTON, OH |
| 06/01/94 | SALES COORD E | EX003 | | |
| 02/01/97 | SALES COORD C | EX005 | | |
| 08/01/00 | | | NAS | |

| Plaintiff Claims / Issues |
|---|
| Tonya J. Ross claims discrimination in promotion and compensation.<br><br>Ross testified to the following:<br><br>***about promotion / advancement :***<br><br>• Cargill denied Ross a promotion to Customer Service Manager in 1996. The job went to a Caucasion coworker who had been given more training opportunities than Ross, even though Ross consistently asked for more training (73, 106-09, 287-88, 340-41).<br><br>• Cargill denied Ross a promotion to Customer Service Manager in 1997. Cargill's Regional Commercial Manager, Carl Hoy, gave the job to Marty Hammonds (Caucasian), in spite of being aware of reports that Hammonds was racist and had poor people skills. Ross reported that Hoy brushed off these concerns about Hammonds, saying Cargill planned to send him to diversity training and "people skills" seminars (69-71, 291).<br><br>• Cargill denied Ross a promotion to Customer Service Manager in 1999. The job went to Doug Meyers (Caucasian) (100).<br><br>• Ross's Caucasian counterparts – other fructose or corn syrup coordinators – advanced more quickly and to higher positions, including Sherri Luckett and Barbara Shelton (172-78).<br><br>***about compensation:***<br><br>• Ross frequently performed the duties of Customer Service Manager in 1998-1999, but she was not compensated for that work (158-59, 248-49).<br><br>• Ross believes she was paid less than her Caucasian counterparts during the liability period, in spite of receiving good performance reviews (158-62, 164, 287).<br><br>• Ross also believes she received smaller bonuses than her white counterparts, including those trained by Ross (245).<br><br>***about PMP :***<br><br>• Ross claims there's more of a likelihood to keep African American employees in the "meets expectations" rating than "exceeds expectations", even when an "exceeds expectations" rating is warranted (334-36). |

***about other issues :***

- Ross believes David Hammonds lowered her PMP ratings in retaliation for her complaint to management about hiring him. Up to that point, Ross had excellent reviews. After Ross complained about Hammonds, management "nitpicked every little thing she did" (296-97, 83-87).

*See also* Ox 17, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Ross also testified to other evidence of racial bias, including:<br><br>• In 1997 Ross was demoted from Corn Syrup Coordinator to High Fructose Coordinator. Ross was given no choice but to take the demotion or leave Cargill (51, 249-50, 252-53). |

# SCOTT, CHARLES (02/11/91 – 12/30/97)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | INSIDE SALES REP B | EX002 | CSW | BEAUMONT, TX |
| 07/01/92 | INSIDE SALES REP A | EX004 | | MEMPHIS, TN (WIRE) |
| 04/01/93 | SALES REP | EX007 | | |
| 10/16/94 | MERCHANT B | | CFI | MINNETONKA, MN (OFFICE CENTER) |

**Plaintiff Claims / Issues**

Charles C. Scott claims discrimination in promotion, compensation, and termination.

Scott testified to the following:

***about promotion / advancement :***

- Scott testified that he was never considered for a managerial role in Cargill, even though he consistently let it be known that he wanted to advance. In 1996, Cargill restructured Scott's department (Cargill Ferrous) and promoted two of Scott's Caucasian colleagues, James Kerkvliet and Thomas Keller, ahead of him into management. Scott did not have an opportunity to ask to be considered for the management openings because he did not find out about them until after Kerkvliet and Keller were promoted (319-24, 576).

- Similarly, Scott did not learn of an Inside Sales Manager position in 1995 for which he was qualified until 1996, after it had been filled (317-18).

***about compensation :***

- Scott believed the average pay scale for African-Americans was lower than for Caucasians when he worked at Cargill (524-25). Except for once, Scott was always below the mid-point for the grade he was in (525). He couldn't understand, when he had such positive performance reviews, why he was paid below the mid-range (538).

***about termination :***

- Scott alleges that Senior Sales Merchant Rick Dougherty (Caucasian) showed favoritism toward his Caucasian coworkers, including Jim Kerkvliet and Tom Keller. For instance, Dougherty overlooked it when Kerkvliet missed deadlines for specifications, whereas Dougherty held Scott to a different, higher standard (310-11, 356-58).

- Scott had a good performance record with Cargill (221, 538). After Cargill Ferrous was reorganized in 1997, however, Cargill gave Scott difficult, grade "D" customers. These were clients that complained frequently, had credit problems, or had frequent claims issues. (Charles Scott Dec. ¶ 5, Ox 29). Yet Scott was able to sell sixty-six tons of steel during that time, exceeding his sales goal by ten percent and the sales of the other merchants (435).

- At the same time, Scott's family was facing two serious health crises. Scott's wife was diagnosed with a serious disease requiring aggressive and painful treatment, and Scott's newborn daughter was diagnosed with a rare disease that would prove in two to four years (448-50). Scott acknowledged that in some areas,

his performance was not what it had been during that time (434-35).

- On August 17, 1997, Manager Rick Dougherty told Scott that he had "no future with Cargill" and put him on a 90 day performance improvement plan. (Scott Dec. ¶ 2; 310, 356) Scott testified that the objectives in the performance improvement plan were very stringent compared standards set for his Caucasian colleagues, Steve Chalgren, Kellie Akins, Jim Kirkvielt, Tom Keller, and Jed Tracket (356-58).

- On October 28, 1997, Dougherty terminated Scott amidst allegations that Scott had mishandled a customer order (359). Yet Dougherty told Scott he was not being terminated for performance. He told Scott that if anyone asked his opinion on his performance with Cargill Ferrous, he would say Scott had a good track record but there was no longer a good fit" (363-64, 434).

- Scott alleges that his termination in 1997 was discrimination based on race. (36-37).

*See also* Ox 18, Ans. to Int. No. 2.

# SIMMONS, CLINTONIA (06/01/88 – 07/06/98)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | SALES REP C | EX004 | CORN MLG | DAYTON, OH |
| 03/01/92 | SALES REP B | EX006 | | |
| 06/01/93 | PRODUCT MGR – CORN | EX014 | | MEMPHIS, TN |
| 06/01/95 | PRODUCT MGR A | EX014 | | |

| Plaintiff Claims / Issues |
|---|
| Clintonia T. Simmons claims discrimination in promotion and compensation. |

Simmons testified to the following:

***about promotion / advancement :***

- Cargill denied Simmons a promotion to the position of Commercial Sales Manager in 1998. That job went to Kathy Garrison (Caucasian) (144-45). One of Cargill's product group managers told Simmons that they already had someone in mind for the job (139-40).

- Simmons was deterred from seeking a marketing position in Minneapolis when the National Sales Manager Pete Boynton (Caucasian) discouraged her. That job went to a Caucasian woman, Cindy Pohorski (145-46).

***about compensation :***

- Simmons believes she was paid less than she should have been based on her race. She never reached the minimum for her salary range. Simmons also believes her Caucasian peers, other product managers like Ted Dorow, Jim McCoy, and Mark Risinger, were all making more money in the same job (74, 91-92).

***about PMP :***

- Simmons believes her PMP's were unfair based on her race (74). Simmons had been a top performer in Dayton before she moved to Memphis in 1993. In Memphis, Simmons reported to J.K. Gingery who had a history of racially motivated conduct, and her reviews went down (97-100, 103-07).

*See also* Ox 19, Ans. to Int. No. 2.

| Additional Evidence |
|---|
| Simmons also testified to other evidence of racial bias, including: |

- Simmons observed J.K. Gingery treat African-American employees very differently than whites. For instance, he required an African-American sales manager, Vernon McIntosh, to drive him and his wife back from lunch and Gingery and his wife sat in the back seat as if McIntosh were the "driver." Other white sales representatives laughed at this (103-05).

- On another occasion, Gingery threw his car keys to McIntosh and told him to "go get his car, cool it off, and bring it around." Other Cargill managers, including senior manager Pete Boynton, were present and

snickered and rolled their eyes at each other. When Simmons complained to Boynton about the incident, he told her that Gingery was "a protected species" and did nothing about her complaint (106).

- On another occasion, Gingery sent his African American secretary to his house to help his wife prepare for a work party. He also had her pick up his dry cleaning and perform other menial tasks for him (106-07).

# TATE, TAUSHA (06/15/98 – 04/14/00)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 06/15/98 | PRODUCTION SUPVR C | EX003 | CORN MLG | MEMPHIS, TN |
| 06/01/99 | PRODUCTION SUPVR A | EX007 | | |

| Plaintiff Claims / Issues |
|---|

Tausha Tate claims discrimination in promotion, compensation, and termination.

Tate testified to the following:

***about promotion / advancement :***

- Cargill denied Tate a promotion to a customer service sales position in Memphis in 2000 (37-38, 40).

- Tate was deterred from applying for a promotion to a sales position in 2000 because her managers would not support her (42-44).

- Tate's managers denied her request to move from shift work to special projects. Manager Matt Turner told Tate he would move her off shift "when he wanted to" (48).

- One of Tate's managers, Darren Litle, would not give her guidance and instruction, in contrast to how he treated her Caucasian coworkers. For instance, Tate observed Litle show coworker James Alfieri different parts of the production process and walk him through certain tasks (108-13, 144).

***about compensation:***

- Tate claims she was paid less as a production manager than her Caucasian peers, including James Alfieri, Dawn Leegard, Colin Huie and Jason Bettenga (140-41).

***about termination:***

- In January 2000, Turner and Litle told Tate she should start looking for a new job outside Cargill (117). Tate felt she was forced to resign from Cargill on April 14, 2000 (18, 60).

***about PMP:***

- Tate believes her PMP's were biased on account of her race. She believes the "below expectations" rating she received June 1999 was biased and contained inaccuracies because she is African-American (114-17).

***about other issues:***

- Tate thought her treatment by Memphis management was never going to get better and if she complained to management, it would get worse. She felt powerless in her position (91, 99).

- Tate feared retaliation if she complained of Turner and O'Hare's discrimination. She believed Cargill culture did not invite that type of thing and that the policies in place were just words on documents. They

were "not the policies they lived by" (78-79, 86-88, 91).

- Tate knew Turner had made the lives of people who complained about him "difficult" and that her job would be in jeopardy if she complained (98-102).

*See also* Ox 20, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Tate also testified to other evidence of racial bias, including:<br><br>• Turner spoke harshly to Tate but not to her Caucasian counterpart, James Alfieri. Turner took time to explain things and train her counterpart but he didn't take time for Tate. Turner humiliated and demeaned Tate in public and he didn't do that to Alfieri. Tate was on shift work for over a year but her counterpart was promoted three months after being on shift (61, 65-69, 72-76, 80-82, 94-96, 102-03, 105-07).<br><br>• Manager Greg O'Hare (Caucasian) yelled at Tate, used profane language, demeaned and belittled her, and frequently implied that she was stupid (126-30, 132-34). |

# TYLER, EMILY (05/26/92 – 08/05/00)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 05/26/92 | ACCOUNTANT/ENTRY | EX002 | CIS | CHICAGO, IL |
| 06/01/93 | ACCOUNTANT/ENTRY | EX004 | | |
| 12/01/97 | SR ACCOUNTANT | EX006 | | |
| 08/01/98 | ACCOUNTING MGR | EX010 | | |
| 04/01/00 | FCG MANAGER | | | |

## Plaintiff Claims / Issues

Emily L. Tyler claims discrimination in promotion, compensation, and termination.

Tyler testified to the following:

***about promotion / advancement :***

- Tyler asked Controller Don Zyck (Caucasian) why she wasn't considered for a supervisory position when she had expressed interest in it. Zyck said he didn't realize she was interested in a supervisory position (54-55).

- Tyler asked Zyck and Brian Melby (Caucasian), Accounting Manager, why they had told her they were eliminating supervisor positions and then created two new positions filled by Vito Demonte and Trayce Biancalana (Caucasians). In fact, Tyler informally had been doing the work given to Demonte. Zyck replied that Tyler was "too nice" to be a supervisor (50-60).

- In May 1996, Tyler was denied a promotion to Financial Controls Supervisor. The job went to Michelle Reynolds (Caucasian) (79-81). While the job was posted, Bill Kelly (Caucasian), Accounting Manager, told Tyler that the job "was slotted for Michelle Reynolds" (80).

- Tyler told Human Resource Manager Matt Hankes (Caucasian) that she felt she was being discriminated against because: she was sent to work in operations and it was disbanded two weeks later; it had been twenty months since she had received a salary increase; she consistently talked to Controller Don Zyck about wanting to become a supervisor but was never given the opportunity. She was brought back to regulatory accounting with the promise that she would be a supervisor, but then told she lacked experience. Tyler actually had more experience than the person given the job (93, 248).

- In response, Matt Hankes set a meeting for Tyler, Karen Carlos (Caucasian), Accounting Manager, Don Zyck, and himself. At that meeting, Tyler said she thought she was being discriminated against on the basis of race. They denied it, and nothing ever came out of the meeting (93-94).

- During the liability period, Cargill created a new position entitled Senior Accounting Manager or Financial Control Manager. David List (Caucasian) was placed into this position. He was a temporary employee whom Tyler had initially hired to perform IT Resource work. (102-05,107,109-10).

- Shortly after Tyler was demoted in early 2000, Richard Levin (Caucasian) was promoted into her former position of Accounting Manager. At that time, Levin had been with Cargill only eight months (118).

***about compensation :***

- Tyler believes that the bonus she received when she was a Controls Balancer was discriminatory because it was less than what Staff Accountant IV's were given (49). Tyler also believed it was discriminatory that she never received a raise while in that position (71).

- Tyler received all "exceeds" on her Key Results Area on her 1996 PMP review, but she received an overall "meets" expectations rating which meant that she received the lowest bonus she ever received at Cargill (89).

***about termination :***

- Tyler testified that because she had recently been demoted and because she believed she had no realistic opportunities to advance at Cargill, she was forced to resign effective August 4, 2000 after eight years of service (19,139-40, 143).

***about PMP :***

- Tyler received at least some "exceeds" on all of her PMP's, and in 1998 or 1999 she received an overall rating of "exceeds expectations." Then she complained about discrimination, and on her next review she didn't get a single "exceeds" but rather all "meets." Tyler felt that was a result of complaining about discrimination and that Cargill was retaliating against her (292).

***about other issues :***

- In April 2000, Tyler was demoted from Corporate Accounting Manager to Third-Party Disbursement Manager.

*See also* Ox 21, Ans. to Int. No. 2.

# WILLIAMS, JACQUELINE (06/07/93 – 05/08/02)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 06/07/93 | ANALYST PROGRAMMER C | ED002 | CMD/CGD | MINNETONKA, MN (OFFICE CENTER) |
| 06/01/94 | I/T BUSINESS ASSOCIATE | ED00I | | |
| 10/01/95 | | | | MINNETONKA, MN (WHITEWATER) |
| 04/08/96 | I/T TECHNICAL ANALYST | ED00H | FERTILIZER | TAMPA, FL |
| 06/01/00 | | | WWPHOSPH WWFERTDIS | |

| Plaintiff Claims / Issues |
|---|

Jacqueline D. Williams claims discrimination in promotion, compensation, and termination.

Williams testified to the following:

***about promotion / advancement :***

- Cargill denied Williams a promotion to IT Technical Analyst until 1996. Williams believed that she was hired as an Analyst but found out in 1996 that she was only an Associate (42-44).

- Between 1996 and 2002, Cargill denied Williams a promotion from IT Technical Analyst to IT Senior Technical Analyst. Williams approached her direct supervisor, Stephen Murray, about being denied this in-line promotion on a number of occasions. Murray responded that Williams met all the requirements on the Senior Analyst job description. However, he kept changing the "behavioral competencies" to get the in-line promotion (46-50).

- Williams was not promoted or given a raise in 1999-00, in spite of the fact that she was at or near a 100% comp ratio. Manager Stephen Murray could not explain to her why that was (86-87).

***about compensation :***

- Williams believes she was not compensated fairly because of her race. Some of her white counterparts shared their salary level with her and they were making more money (60-62).

- Some of her white peers also were receiving higher salaries and bonuses when she was in Fertilizer. The only difference between them she knew of was race (65-68, 72-3, 75, 78).

- When Williams asked her manager about these discrepancies, the manager did not explain the differences but rather admonished Williams for discussing bonuses with her co-workers (82-83).

***about termination :***

- Williams took a leave of absence from August 2001 to May 2002 to teach at Florida A&M University. When she called to make arrangements to return to Cargill, she was told there were no open positions for her. Williams learned that there were, in fact, two open positions. Despite this, Cargill did not permit her to return and terminated her at the end of her leave (89-91).

***about PMP:***

- Williams was placed on a 60-day probationary period in 2001, in spite of the fact that her managers could not provide her with specific complaints about her performance. Two of her managers agreed that they had no problems with Williams' work and said that Williams did good work and communicated well. Williams also pointed out an "exceed expectations" rating on one of her reviews for taking responsibility and communicating with teammates (244-45, 249, 251-52).

*See also* Ox 22, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Williams also testified to other evidence of racial bias, including:<br><br>• Williams was unable to get answers from Human Resources about her inability to get promoted or her concerns about pay (53-54)(83-85).<br><br>• In 2002, Williams requested alternative work arrangements so she could work from home, five minutes away. Cargill denied her request, but granted the same request from a Caucasian co-worker (257-58). |

# WILLIS, CHERYL (06/02/86 – 04/30/01)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 01/01/92 | ANALYST PROGRAMMER A | ED006 | ADMIN | MINNETONKA, MN (OFFICE CENTER) |
| 01/01/93 | ANALYST PROGRAMMER/SR | ED008 | | |
| 06/01/94 | SR I/T BUSINESS ANALYST | ED00G | | |
| 07/16/97 | I/T BUSINESS CONSULTANT | ED00F | | MINNETONKA, MN (WHITEWATER) |
| 05/01/99 | | | | MINNETONKA, MN (OFFICE CENTER) |
| 01/16/00 | SR I/T BUSINESS ANALYST | ED00G | | |

| Plaintiff Claims / Issues |
|---|

Cheryl D. Willis claims discrimination in promotion, compensation and termination.

Willis testified to the following:

***about promotion / advancement :***

- Willis was overlooked or rejected for several positions at Cargill that went to white co-workers, including Business Consultant, Education Manager, and a position with Development Architecture (216-33).
- Willis felt that Cargill targeted for demotion when it eliminated her position in the Foundation Data Department and she moved to the position of "Senior Business Analyst" in C-Tech. The Senior Business Analyst position had been deemed a more senior "Business Consultant" position when held by her predecessor. Similarly, Willis was offered a position entitled "Project Manager", with a job description almost identical to that of a more "Senior IT Business Consultant" (191-92).
- Willis complained to Human Resources representative Nancy Parten that she felt she was being demoted due to her race. Willis observed that no other African-American had been able to move from an entry level position into management, and she felt that efforts were being made to "put her back in her place" in a non-management, non-consultant position (193-95).
- Willis expressed her concerns about being "overlooked" for an Education Manager position to Senior Business Consultant Julia Nekola and V.P. for I/T Applications John Bjelland, and Senior Learning Manager Amy Cullen. Cullen's response was to direct Willis back to Bjelland (229-30).
- Willis talked to Architecture Development Department Senior Manager, Harv Kapsner about an I/T Manager position she was interested in. Kapsner told Willis that he didn't know what she did, but that she was not going to get the position. Willis considered this discriminatory because Kapsner had already decided she would not get the position, even though he didn't know what she did and wouldn't take the time to find out. That position was given to a white woman, Kay Quinn (236-37).
- Willis testified that she believed CLDP to be discriminatory because it provided training (including training which she had requested and been denied) to a select group of individuals among whom African-Americans were underrepresented. At one point, Willis was told CLDP was "by invitation only" (377-79).

***about compensation :***

- Willis received consistently low raises at Cargill. When she questioned whether they were related to her race, because she could find no other logical explanation for them, Vice President John Bjelland (Caucasian) warned her not to be so quick to use the "race card" (70-72).

- Later, Willis stumbled across a listing of employee salaries that showed she was, in fact, being paid less than her white peers, such as Lisa Broden (386-87).

***about termination :***

- Willis believes Manager John Ringquist discriminated when he appeared to target her for lay off in the downsizing of C-Tech in 2001. Ringquist told Willis that she would be the first to go and to start looking for another job. Willis's non-African-American coworkers told her that Ringquist did not say anything similar to them. Willis applied for one of the remaining positions in C-Tech, but the job description appeared to have been written to exclude her, specifically requiring a master's degree when Willis was the only member of the department without a master's degree at that time (274-80).

***about PMP :***

- IT Education Manager John Rinquist (Caucasian) insisted on giving Willis a "meets expectations" rating on her PMP, even though she gave him examples of major contributions to the company including one for which she received a company award (267-70).

*See also* Ox 23, Ans. to Int. No. 2.

| Additional Evidence |
| --- |
| Willis also testified to other evidence of racial bias, including:<br><br>• Controller Wayne Majzner was "very consistently opposed to just about anything [Willis] had to say." Willis asked her Manager Bez Mazloom, what she was doing that was "rubbing Wayne the wrong way." Mazloom observed presentations by Willis, found nothing wrong, and said she didn't understand why Majzner was acting that way. After that, Mazloom made the presentations of Willis's projects herself the problem went away (146-47).<br><br>• IT Education Manager John Rinquist sometimes excluded Willis from project meetings, telling her she would get summaries of information later. Willis also felt that Rinquist belittled her, looked for opportunities to dismiss her opinion, and discredited her in front of others (81, 89-90). Willis felt that Ringquist had a problem with her as an African-American and this was one of the ways he showed it (99). |

# WINT, STEPHEN (04/17/00 – 02/26/04)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 04/17/00 | PROCESS TECHNICIAN IV | NX005 | SALT | TAMPA, FL |
| 07/01/01 | PROCESS TECHNICIAN V | | | |
| 12/01/01 | | NX004 | | |

| Plaintiff Claims / Issues |
|---|

Stephen W. Wint claims discrimination in promotion and compensation.

Wint testified to the following:

***about promotion / advancement :***

- Cargill denied Wint a promotion to a 2nd Shift Coordinator in 2002. That job, which had never been posted, went to Alan McDorman (Caucasian)(148, 228-29).
- Cargill denied Wint a promotion from Process Tech IV to Process Tech V, an in-line promotion (195-98, 232).
- Cargill denied Wint a promotion to a Production Manager in 2003. That job that went to Shawn Toloday (Caucasian) (230-31, 235-36).

***about compensation:***

- Cargill hired new Caucasian employees, including Russell Caple, Scott Dixon, and Charles Tatom at salaries above Wint's (157-59, 161, 163-64). Even when Cargill gave Wint a merit increase, they also gave raises to his Caucasian counterparts that were hired at more money. Therefore, Wint was never able to catch up in pay despite having more tenure with Cargill (165).

***about PMP:***

- Wint believes the PMP process discriminates against African American employees because, his conversations with African-American coworkers universally showed that they did not get the ratings they believed they deserved. Managers have told Wint that they cannot give out the highest marks on reviews (182-86).

*See also* Ox 24, Ans. to Int. No. 2.

| Additional Evidence |
|---|

Wint also testified to other evidence of racial bias, including:

- Plant Manager Mike Anderson (Caucasian) referred to Otis Jones (African American) as a "village idiot" in 2002 and posted a memo including this derogatory statement on the break-room door. Wint complained to Human Resources about this incident (110, 115-19, 137).

- Plant Manager Mike Anderson (Caucasian) referred to a task performed exclusively by African-Americans at the plant in 2003 and said he could "get any monkey to drive a payloader" (102-06, 109, 120-21). Wint complained to Human Resources about this incident (121-22).

- Plant Manager Mike Anderson referred to Otis Jones and other African Americans working in the Dome in 2002 with the remark, "You don't rotate a flat tire, you get rid of it." Wint and his coworkers took this at a threat to their jobs (216-22).

- When Wint complained to Manager Joe Giambeer in 2003 about Anderson's conduct, Giambeer replied, in part, "if this is Anderson's facility, he does whatever he wants to do at his facility" (318-19, 321-22).

- Plant Manager Mike Anderson moved Wint from first to second shift even though Wint told Anderson that family considerations made that very difficult for him. Anderson simply replied that he didn't care about Wint's personal reasons. Wint believes Cargill would not have moved a Caucasian employee from first to second shift under those circumstances, and Wint had significant seniority over several Caucasian employees who were not told to work the second shift (103, 122-23, 126-29, 131-32).

- Wint observed that African American employees were much more likely to be given "points" for attendance issues than Caucasian employees at Cargill. For instance, Vernon Davis and Warren McMath (African Americans) got points for being late or taking time off, whereas Scott Dixon and Russell Caple (Caucasians) did not (138-43, 231-32).

# WRIGHT, SEAN (05/19/97 – 08/05/00)

| CARGILL JOB HISTORY SINCE 1992 | | PAY GRADE | DIVISION | LOCATION |
|---|---|---|---|---|
| 05/19/97 | ASSISTANT MERCHANT | EX002 | ADMIN | MINNETONKA, MN (OFFICE CENTER) |
| 08/01/00 | | | NAGOC | |

| Plaintiff Claims / Issues |
|---|

Sean E. Wright claims discrimination in promotion, compensation, and termination.

Wright testified to the following:

***about promotion / advancement :***

- Cargill denied Wright promotions to the position of Merchant. Wright believes this was in part due to the fact that his manager, Kevin Kohler, did not support or promote him with other managers (104, 211).

***about compensation :***

- Wright learned in 1998 that newly hired employees were making $4,000/yr more than he was. When Wright asked a manager about this, he was told not to worry about it. (56-58).

- Wright believed that his Caucasian colleagues were being paid more than he was, based on information he was able to obtain (61-62, 199-200).

***about termination :***

- Cargill terminated Wright in a reduction in force in 2000. When Wright asked his manager for a copy of the selection grid by which he was selected for RIF, he refused to give Wright a copy (469-70).

- Managers Jim Reiff and Paul Butters denied Wright the job of Customer Solutions Specialist. As a result, Wright was terminated in July 2000. These positions were given to four white co-workers (454, 456). Reiff told Wright he didn't get the job because Wright was "gridded out" by Reiff and Butters (452).

***about PMP :***

- Wright believed his 1998 PMP by Kevin Kohler gave him lower ratings than warranted by his performance (398-422).

*See also* Ox 25, Ans. to Int. No. 2.

| Additional Evidence |
|---|

Wright also testified to other evidence of racial bias, including:

- Wright checked out a company laptop computer for work and found an email exchange between two managers about high-level African-American Duane Reed. The managers were discussing their plan to transfer Reed to Minneapolis and to "just keep him quiet until he retires." (147-52).

- A Cargill customer told Wright, "There was a nigger in the wood pile," when discussing a problem with a load of wheat. Wright complained to Caucasian Manager Dennis Inman but as far as Wright knows, Inman never did anything about it (161-65).

- A Cargill customer told Wright in 1998, after a series of tornadoes that he had to "nigger-rig" the phones. Wright complained to manager Kevin Kohler who shrugged off the complaint and took no action (166-67).

- A Cargill customer, after talking to Wright, told others in the room "Who the fuck do these niggers think they are?" Kohler shrugged off this incident as well (168-70).

- When Manager Kevin Kohler (Caucasian) learned that his new boss would be Cornell Slade (African American), he referred to it as a negative thing. When a coworker asked Kohler what was wrong, he looked at Wright, shivered his shoulders, and walked away (98-101).

- Wright did not complain of discrimination while at Cargill because he understood from the prevailing corporate culture that such a complaint would be a "career killer": "[I]t was the surest way to kill your career" (342-45).