C
Only the Westlaw citation is currently available.

United States District Court,
D. Maine.

Dilip K. LAKSHMAN, Plaintiff,
v.
UNIVERSITY OF MAINE SYSTEM, Defendant.

**No. CV-03-52-B-W.**

Aug. 6, 2004.

**Background:** Asian-American scientist brought state court action against university, alleging discrimination in compensation and promotion practices. Action was removed. University moved for summary judgment.

**Holdings:** The District Court, Woodcock, J., held that:
(1) statutes of limitations barred claims based upon discrete acts outside relevant time periods;
(2) scientist failed to establish Title VII unequal pay claims;
(3) scientist failed to establish Title VII failure to promote claims;
(4) university did not intentionally discriminate against scientist;
(5) university did not create hostile work environment;
(6) university did not unlawfully retaliate against scientist; and
(7) alleged pay discrepancies and failure to promote were not based upon gender.

Motion granted.

**[1] Civil Rights 1530**

78k1530 Most Cited Cases

Title VII statute of limitations, requiring plaintiff to file any charge with Equal Employment Opportunity Commission (EEOC) within 180 days after alleged unlawful employment practice, applied to bar claims brought by Asian-American scientist against university, alleging discrimination in compensation and promotion practices, to extent that claims were based upon discrete acts outside relevant time period. Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-5(e)(1).

**[2] Civil Rights 1732**
78k1732 Most Cited Cases

Maine Human Rights Act (MHRA) statute of limitations, requiring plaintiff to commence action not more than two years after purported act of unlawful discrimination, applied to bar claims brought by Asian-American scientist against university, alleging discrimination in compensation and promotion practices, to extent that claims were based upon discrete acts outside relevant time period. 5 M.R.S.A. § 4613(C).

**[3] Civil Rights 1136**
78k1136 Most Cited Cases

Asian-American scientist who brought action against university failed to establish that he was paid less than members outside his protected class holding same position, as required to maintain unequal pay claims under Title VII and Maine Human Rights Act (MHRA); proffered statistical study included all doctorate degree holders, whether they were research scientists or teaching faculty, considered only individual's degree and date of hire, and failed to consider race or gender. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 5 M.R.S.A. § 4551 et seq.

**[4] Civil Rights 1547**
78k1547 Most Cited Cases

Where gross statistical disparities in compensation can be shown, they alone may in proper Title VII case constitute prima facie proof of pattern or practice of discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 1542**
78k1542 Most Cited Cases

Probative worth of statistical testimony in Title VII case must be evaluated in light of methodology employed, data available, and factual mosaic unique

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

to case at hand. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 1535**
78k1535 Most Cited Cases

To establish pretext in Title VII action, independent evidence of discriminatory animus is not required, and in proper case trier may infer ultimate fact of discrimination from components of plaintiff's prima facie showing, combined with compelling proof of pretextual nature of employer's explanation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 1136**
78k1136 Most Cited Cases

Asian-American scientist who brought action against university failed to establish that university's proffered reasons for paying him lower salary than other researchers were pretext for discrimination, as required to maintain unequal pay claims under Title VII and Maine Human Rights Act (MHRA); there was no evidence that alleged offensive comments by co-worker were reflected in university decision, nor of deferential treatment based on prohibited factors. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 5 M.R.S.A. § 4551 et seq.

**[8] Civil Rights 1135**
78k1135 Most Cited Cases

Asian-American researcher who brought action against university failed to present any evidence that senior scientist position he sought was filled by others whose credentials were comparable to his, as required to maintain failure to promote claims under Title VII and Maine Human Rights Act (MHRA). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 5 M.R.S.A. § 4551 et seq.

**[9] Civil Rights 1137**
78k1137 Most Cited Cases

Asian-American scientist who brought action against university, alleging discrimination in compensation and promotion practices, failed to establish that there was deferential treatment in employment action and that adverse employment decision was caused in part by forbidden type of bias, as required to maintain *Desert Palace* mixed motive claim under Title VII, where scientist presented only unsupported assertions that university's actions were result of racial or ethnic bias. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 1383**
78k1383 Most Cited Cases

Four-year statute of limitations applicable to § 1981 actions barred claims brought by Asian-American scientist against university, alleging discrimination in compensation and promotion practices, to extent that claims were based upon discrete acts outside relevant time period. 28 U.S.C.A. § 1658; 42 U.S.C.A. § 1981.

**[11] Civil Rights 1136**
78k1136 Most Cited Cases

**[11] Civil Rights 1138**
78k1138 Most Cited Cases

Asian-American scientist who brought action against university, alleging bias in compensation and promotion practices, failed to present any direct evidence of intentional discrimination, as required to maintain disparate treatment and unequal pay claims under § 1981. 42 U.S.C.A. § 1981.

**[12] Civil Rights 1147**
78k1147 Most Cited Cases

To establish prima facie hostile work environment claim under § 1981, plaintiff must demonstrate that: (1) he is member of protected class; (2) he was subjected to unwelcome harassment; (3) harassment was based on his race, ethnicity, color, or national origin; (4) harassment was sufficiently severe or pervasive as to alter conditions of his employment and create abusive work environment; (5) objectionable conduct was both objectively and subjectively offensive, such that reasonable person would find it hostile or abusive and victim in fact did perceive to be so; and (6) some basis for employer liability has been established. 42 U.S.C.A. § 1981.

**[13] Civil Rights 1147**
78k1147 Most Cited Cases

To establish "hostile work environment" for purpose of § 1981 claim, environment must be sufficiently hostile or abusive in light of all circumstances, including: (1) frequency of discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or mere offensive utterance; and (4) whether it unreasonably interferes

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

with employee's work performance. 42 U.S.C.A. § 1981.

**[14] Civil Rights 1147**
78k1147 Most Cited Cases

In assessing hostile work environment claim under § 1981, court may consider entire scope of claim, including behavior alleged outside statutory time period, so long as any act contributing to that hostile environment takes place within statutory period. 42 U.S.C.A. § 1981.

**[15] Civil Rights 1147**
78k1147 Most Cited Cases

Asian-American scientist who brought action against university, alleging discrimination in compensation and promotion practices, failed to establish that occasional offensive comments from co-employees regarding his ethnicity rose to level of harassment and pervasiveness necessary to sustain hostile work environment claim under § 1981; comments occurred over fifteen-year period, were not threatening, and did not actually interfere with scientist's job performance. 42 U.S.C.A. § 1981.

**[16] Civil Rights 1243**
78k1243 Most Cited Cases

To make out prima facie case of unlawful retaliation under Title VII or Maine Human Rights Act (MHRA), employee must show that: (1) he engaged in protected activity; (2) he suffered adverse employment action after or contemporaneous with such activity; and (3) there was causal link between protected activity and adverse job action. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a); 5 M.R.S.A. § 4633.

**[17] Civil Rights 1246**
78k1246 Most Cited Cases

Asian-American scientist who brought action against university, alleging discrimination in compensation and promotion practices, failed to establish that he suffered adverse employment action as result of his filing civil rights complaints, as required to maintain retaliation claims under Title VII and Maine Human Rights Act (MHRA), where university actually increased scientist's salary after filing. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a); 5 M.R.S.A. § 4633.

**[18] Civil Rights 1251**
78k1251 Most Cited Cases

Asian-American scientist who brought action against university failed to establish that university's proffered reasons for altering his job description were pretext for discrimination, as required to maintain retaliation claims under Title VII and Maine Human Rights Act (MHRA); there was no evidence that university's animus against scientist was so strong that it was willing to reorganize job descriptions of entire research scientist staff to retaliate against him alone. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a); 5 M.R.S.A. § 4633.

**[19] Civil Rights 1067(1)**
78k1067(1) Most Cited Cases

Title IX imposes obligation on educational institutions receiving federal funds to refrain from denying educational opportunities on basis of sex. 20 U.S.C.A. § 1681.

**[20] Civil Rights 1330(2)**
78k1330(2) Most Cited Cases

Title IX enforcement machinery includes implied private right of action through which aggrieved party may seek money damages. 20 U.S.C.A. § 1681.

**[21] Civil Rights 1383**
78k1383 Most Cited Cases

Six-year Maine statute of limitations governing personal injury actions applied to bar Title IX claims brought by male scientist against university, alleging gender discrimination in compensation and promotion practices, to extent that claims were based upon discrete acts outside relevant time period. 20 U.S.C.A. § 1681; 14 M.R.S.A. § 752.

**[22] Civil Rights 1131**
78k1131 Most Cited Cases

Male scientist who brought action against university failed to establish that difference between his wage and wages of other research scientists was based on gender, as required to maintain unequal pay claim under Title IX; scientist presented no evidence regarding gender of other research scientists, number of female as opposed to male researchers, salary levels for female as opposed to male research scientists, and whether any differences could be attributed to factors other than gender. 20 U.S.C.A. §

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1681.

**[23] Civil Rights 1135**
78k1135 Most Cited Cases

To establish prima facie Title IX claim for failure to promote, plaintiff must show that: (1) he was member of protected class; (2) he was qualified for position; (3) he was not hired despite his qualifications; and (4) job was given to person of opposite sex. 20 U.S.C.A. § 1681.

**[24] Civil Rights 1170**
78k1170 Most Cited Cases

Male scientist who brought action against university failed to establish that university's hiring decisions were impermissibly based upon gender, as required to maintain failure to promote claim under Title IX; position for which scientist was allegedly recommended did not actually exist, and scientist was subsequently promoted to senior position. 20 U.S.C.A. § 1681.

**[25] Civil Rights 1171**
78k1171 Most Cited Cases

Male scientist who brought action against university failed to establish that university's proffered reasons for failing to promote him were pretext for gender discrimination, as required to maintain claim under Title IX; although supervisor allegedly discouraged scientist from applying for promotion, she similarly discouraged female research scientist, and two of final three candidates for position were male. 20 U.S.C.A. § 1681.
Judith W. Thornton, Ebitz & Thornton, P.A., Brewer, for Dilip K Lakshman, Plaintiff.

Anne-Marie L. Storey, Rudman & Winchell, Paul W. Chaiken, Rudman & Winchell, Bangor, for University of Maine System, Defendant.

AMENDED ORDER ON DEFENDANT UNIVERSITY OF MAINE SYSTEM'S MOTION FOR SUMMARY JUDGMENT

WOODCOCK, District J.

***1** Plaintiff Dilip K. Lakshman, Ph.D. (Lakshman), is employed as a Senior Scientist at the University of Maine. A dark skinned male of East Asian descent, Dr. Lakshman was born in India and speaks with an Indian accent. [FN1] He has filed suit, claiming the University of Maine System (University) violated his legal rights due to his race, color, ethnicity, national origin, and gender. This Court grants the University's Motion for Summary Judgment, because Dr. Lakshman's claims are either time barred or fail to create genuine issues of material fact within strictures of the statutory provisions he has invoked.

I. Statement of Facts.

In accordance with the "conventional summary judgment praxis," the Court recounts the facts in a light most favorable to Dr. Lakshman's theory of the case, consistent with record support. [FN2] *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 16 (1st Cir.2002). The Court has relied either on the uncontested facts or on Dr. Lakshman's version, if in conflict. After receiving his doctorate in plant pathology from Cornell University in 1984 and undertaking two years of post-doctoral study, Dr. Lakshman became employed at the University of Maine in 1986 as a post-doctoral Research Associate in the Department of Biological Sciences (Department). [FN3] Dr. Lakshman was hired to assist with the research projects of Dr. Stellos Tavantzis, a Professor of Plant Pathology. Dr. Lakshman's job was a non-tenure track position within the Maine Agricultural and Forestry Experiment Station (MAFES). [FN4]

There are at least two career paths for post-doctoral professionals within research universities. The first is the traditional tenured faculty route; the second, less well traveled, is the non-faculty scientist route. Having obtained a Ph.D., many scientists seek a tenure track appointment, but these prized positions become available sporadically and, while waiting for a faculty position to open, the scientist might settle, as Dr. Lakshman did, for a temporary research associate appointment. Encouraged by Dr. Tavantzis, Dr. Lakshman remained at MAFES, the research arm of the University, in the hope his loyalty and talent would lead to a tenure track appointment when the opportunity presented itself.

This did not prove true. Over the years, Dr. Lakshman found himself confined to the role of research scientist. [FN5] His efforts to obtain tenure track positions at the University were rebuffed and he was paid substantially less than his faculty colleagues. Although the University contends that Dr. Lakshman chose the research scientist career path, Dr. Lakshman disagrees. He contends that he did not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

freely elect a less remunerative career path and was not content to remain a research scientist under the direction of higher paid and tenured faculty members of equal qualification. Instead, the University pigeonholed him into a poorly paid position and blocked his efforts to break out into a position consistent with his education and ability.

***2** Dr. Lakshman's explanation for the University's actions forms the basis for his claim. When he came to the University in 1986, he was and still remains one of few non-Caucasian employees in his Department. Although he concedes the University had an affirmative action plan, which applied to Asians, he contends that upon urging by female faculty, the University focused its attention on the recruitment of women, to the detriment of minority males. Dr. Lakshman believes he was, in effect, the victim of two institutional biases: (1) a bias in favor of female faculty candidates; and, (2) a bias against his race, nationality, ethnicity, and color. These biases, he asserts, coalesced to freeze him into a low paying, non-faculty position, and out of a faculty appointment.

Dr. Lakshman alleges the University's discrimination began in 1989, when he expressed an interest in an open tenure track position in the Department. [FN6] When he questioned Dr. Tavantzis about the position, Dr. Tavantzis replied it was marked for a woman. [FN7] Although qualified, Dr. Lakshman did not apply for the position, and it went to Jody Jellison, Ph.D., a female. In 1993, Dr. Lakshman says he applied for a position as an Assistant Research Professor and was rejected. [FN8] Instead, he was awarded an Associate Scientist position, a job requiring only a bachelors degree and paying only $1,300 more than he had been making. In 1995, Dr. Lakshman again approached Dr. Tavantzis. He asked to be promoted to the position of Senior Scientist; instead, he was placed in an Associate Scientist position, requiring only a masters degree, again at a salary far below the level of his qualifications.

In 1997, a tenure track position, in mycology, became available at the University. Dr. Jellison was the chair of the search committee and Dr. Tavantzis was a member. Dr. Lakshman approached Dr. Jellison about the position and she told him not to apply, as she had "some thing else in mind." She said: "If you apply, you won't get it." Upon learning Dr. Jellison's response, Dr. Tavantzis shook his head and said it was unfortunate after so many years of mycological research, Lakshman could not apply and would not be considered. The University hired Seania Annis, Ph.D., a female, for the mycologist position. [FN9] Dr. Annis received her Ph.D. in 1995 in the same field as Dr. Lakshman's: plant pathology. Dr. Lakshman says he was more qualified than Dr. Annis for the mycology position.

In 1998, Dr. Lakshman asked Dr. Tavantzis to request a promotion and raise. Dr. Tavantzis did so, writing to Christopher Campbell, Ph .D., then the Associate Chair of the Department. After Dr. Campbell failed to respond for over a year, Dr. Lakshman wrote him directly on November 20, 2000. In response, on November 27, 2000, Dr. Campbell commissioned a salary study on Dr. Lakshman's behalf and requested the Peer Review Committee to review Dr. Lakshman's promotion request.

Sometime in November and December, 2000, Dr. Lakshman met with Evelyn Silver, Ph.D., the University's Equal Employment Opportunity Director. They discussed his concerns about the mycology position and Dr. Silver gave Dr. Lakshman a copy of his rights under the University's equal opportunity program. During the meeting, after she suggested there must be a misunderstanding within the Department, Dr. Lakshman told Dr. Silver not to take any action on his behalf.

***3** On December 14, 2000, Dr. Lakshman met with Dr. Campbell about his salary inequity and discrimination concerns. Following that meeting, Dr. Campbell repeatedly asked Dr. Tavantzis whether Dr. Lakshman was an "unhappy person." Dr. Tavantzis also told Dr. Lakshman that Dr. Campbell, then the Department Chair, and Susan Hunter, Ph.D., the Vice Chair, wanted Dr. Lakshman to know that they intended to create "disincentives," so that he could no longer work at the University. [FN10] On February 14, 2001, Dr. Lakshman's union representative wrote Dr. Campbell seeking the status of his promotion request and on February 21, 2001, Dr. Lakshman filed a complaint with the Maine Human Rights Commission (MHRC). [FN11]

On March 8, 2001, the Peer Review Committee recommended Dr. Lakshman's promotion to Senior Scientist, but did not specify the amount of his raise or his job description. On March 21, 2001, Dr. Campbell and Dr. Hunter wrote to Dr. Lakshman and informed him, he would now have to work for three faculty, not just one. Dr. Lakshman considered this change of job description to be the "disincentive" Drs. Campbell and Hunter had mentioned to Dr. Tavantzis. After the Campbell-Hunter letter, Dr. Jellison met with Dr. Lakshman and told him he was

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

"an unhappy person" and she was going to "closely monitor him for misbehavior or bad behavior in her lab." Dr. Lakshman contends and the University agrees that he has never behaved badly during his entire time at the University. Dr. Lakshman's union filed a grievance with the University, based on what they alleged was an adverse job action in retaliation for his complaints.

Although the University characterizes ensuing discussions between Dr. Lakshman and the Department as collaborative, Dr. Lakshman says in February 2002, he met with G. Bruce Wiersma, Ph.D., then Dean of the Department and Director of MAFES, and was handed an ultimatum: work on only two projects and be paid $45,000 for ten months or leave the University. At the meeting, Dr. Lakshman, feeling he had no other choice, accepted the new job assignment and salary arrangement. On February 22, 2002, Dr. Lakshman's union filed a grievance, alleging among other things that faculty members have created a hostile and intimidating work environment by using implied threats of negative job evaluations. On May 10, 2002, Dr. Lakshman re-filed his complaint with the MHRC and the EEOC, alleging discrimination on the basis of race/ethnicity and gender.

Dr. Lakshman includes two further contentions. First, he asserts virtually throughout his employment at the University, his salary has been woefully inadequate, far less than the average salary for similarly situated post-doctoral scientists. Second, he points to discriminatory remarks by members of the Department faculty. In addition to Dr. Tavantzis' comment in 1989 and Dr. Jellison's comment in 1997, Dr. Lakshman refers to the following remarks: (1) in 1995-96, Professor Frank Manzer told the Department Chair Douglas Gelinas, Ph.D., and Dr. Lakshman's supervisor, Dr. Tavantzis, he did not know why Dr. Lakshman did not "go back to India"; (2) Dr. Gelinas remarked that Dr. Lakshman could have been considered for jobs in the 1990s if he had been a female or a "Native Indian"; (3) Dr. Tavantzis' comment that the mycologist would have to teach undergraduates and they do not like to listen to "someone with an accent"; (4) Dr. Tavantzis' statement that foreign born scientists have to work "ten times harder to be on a par with Americans"; (5) Dr. Jellison's statement in 2001 that he must be an "unhappy person" and she would have to closely monitor him for bad behavior; and, (6) Dr. Tavantzis' statements to Dr. Lakshman that if he goes to court, he will have difficulty working at the University, that Dr. Tavantzis would say he does not recall many of their conversations, and that the University would be a "very, very uncomfortable" place for him to work.

II. Procedural Posture.

***4** After filing complaints with both the EEOC and the Maine Human Rights Commission (MHRC) on May 10, 2002, and receiving "right to sue" letters in December, 2002, Dr. Lakshman initiated his complaint in State of Maine Superior Court on February 20, 2003. [FN12] In his complaint, he alleged six counts of discrimination in violation of 42 U.S.C. § 1981; the Maine Human Rights Act; Title VII of the Civil Rights Act of 1964; Title IX of the Education Amendment of 1972; and two counts of retaliatory behavior in violation of Title VII and the Maine Human Rights Act. The University filed a Petition and Notice of Removal to this Court and simultaneously filed its answer and defenses on March 27, 2003.

III. Legal Standard.

The moving party is entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." ' *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir.2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)); *see also* *York Ins. Co. v. Schultz*, 307 F.Supp.2d 108, 112 (D.Me.2004). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The trial court is obligated to "view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable references in that party's favor." *Feliciano De La Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir.2000); *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). In a discrimination action, however, "caution is appropriate when considering summary judgment for an employer." *Bilodeau v. Mega Indus.*, 50 F.Supp.2d 27, 44 (D.Me.1999).

IV. Legal Analysis.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A. Dr. Lakshman's Claims Under Title VII and the Maine Human Rights Act.

In Counts II-V of his Complaint, Dr. Lakshman contends the University violated Title VII of the Civil Rights Act of 1964 [FN13] and the Maine Human Rights Act (MHRA). [FN14] 42 U.S.C. § § 2000e-2000e-17; 5 M.R.S.A. § § 4551-4634. More specifically, he alleges (1) because of his race, color, ethnicity, national origin, and/or gender, the University paid him less than similarly situated individuals; and, (2) the University failed to promote him on the same improper grounds. The University posits two defenses: (1) it contends that any claims based on "discrete incidents" prior to July 24, 2001 are barred by the statute of limitation; and, (2) Dr. Lakshman has failed to establish his *prima facie* case to refute the University's explanation of legitimate non-discriminatory reasons for its actions or to demonstrate a discriminatory animus.

1. Statute of Limitations.

a. The Title VII Statute of Limitations.

***5** [1] Section 2000e-5(e)(1) requires a plaintiff to file any charge with the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred" before filing the action in court. [FN15] 42 U.S.C. § 2000e-5(e)(1); *see also* *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In "deferral states," including Maine, where the state has its own anti-discrimination laws and agency, that period is extended to 300 days. *Id.; Maarrero v. Goya of P.R., Inc.*, 304 F.3d 7, 13 (1st Cir.1998); *Paquin v. MBNA Marketing Systems, Inc.*, 233 F.Supp.2d 58, 62 (D.Me.2002); *Hunter v. Siemens Medical Solutions Health Services Corp.*, 2003 WL 21087010, *8 n. 4 (D.Me.2003). In *National Railroad*, the Supreme Court concluded that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the ... 300 day time period after the discrete discriminatory act occurred." *National Railroad*, 536 U.S. at 113. Dr. Lakshman filed complaints with the Maine Human Rights Commission and the EEOC on May 10, 2002. Under federal law, therefore, Dr. Lakshman's claims of discrimination due to "discrete acts" that occurred before July 14, 2001 are time barred. [FN16]

Tracking Dr. Lakshman's recitation of his history of discrimination with the University, this Court must dismiss his Complaint under Title VII for the following discrete acts of alleged discrimination: (1) the 1989 open tenure track position awarded to Dr. Jellison; (2) the 1993 Assistant Research Professor position; (3) the 1997 mycology position awarded to Dr. Annis; (4) claims of discriminatory underpayment from 1989 to July 14, 2001; and, (5) claims of failure to promote from 1989 to July 14, 2001. The single remaining discrete act not barred by the federal statute of limitations is the reconfiguration of Dr. Lakshman's job description, a process that began before July 14, 2001, but completed in February, 2002.

b. The MHRA Statute of Limitations.

[2] A similar analysis applies to the Maine Human Rights Act claim. Under § 4613(C), a MHRA action must "be commenced not more than 2 years after the act of unlawful discrimination complained of." 5 M.R.S.A. § 4613(C). The critical date for the MHRA is the date the complaint was filed in court, not the date the complaint was filed with the MHRC. *Compare* 5 M.R.S.A. § 4613(C) ("[t]he action must be commenced not more than two years after the act..."); *with* 42 U.S.C. § 2000e-5(e)(1) ("A charge under this section shall be filed ... within three hundred days after the alleged unlawful employment practice occurred ..."). *Morrison v. Carleton Woolen Mills*, 108 F.3d 429, 438 (1st Cir.1997); *Pouliot v. Fairfield*, 184 F.Supp.2d 38, 52-53 (D.Me.2002).

The two year statute of limitations in Maine backs up the date for discrete acts to February 23, 2001, two years prior to the date the action was commenced in state court. As such, in addition to the rewriting of the job description, the events surrounding and subsequent to the March 8, 2001 Peer Review Committee recommendations are also captured and may be considered. Any separate events before February 23, 2001 may not form the basis for Dr. Lakshman's MHRA cause of action for discrete acts of discrimination.

2. Remaining Discrete Act Claim: *McDonnell Douglas* Analysis.

***6** The remaining discrete act claim focuses upon the University's response to Dr. Lakshman's request for a raise and promotion, a request that originated in 1998. [FN17] Dr. Lakshman contends the University's February, 2002 decision to require him to work for two, not one, faculty and to receive $45,000 for ten months work was grounded on its improper biases. Even considering the out of time

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

acts as background evidence of discriminatory motive, this Court concludes that the evidence is insufficient to allow the conclusion that the University's actions violated the protections of Title VII and the MRHA.

Although Dr. Lakshman alleges intentional discrimination in his Complaint, there is no direct evidence of intentional discrimination in this record. [FN18] The Court views his allegations under the lens of disparate treatment and will employ the familiar burden-shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, the plaintiff bears the initial burden to establish a *prima facie* case of discrimination. *Id.* at 802.

Dr. Lakshman seeks to satisfy his burden under two separate theories of discrimination: unequal pay and failure to promote. Turning first to the unequal pay claim, Dr. Lakshman's argument is based on the assumption that the *McDonnell Douglas* burden-shifting framework applies. [FN19] To sustain his initial burden under the *McDonnell Douglas* analysis, Dr. Lakshman must show that: (1) he is a member of a protected class; (2) he performed his job in keeping with the University's expectations; and, (3) he was paid less than members outside his protected class who held the same position. *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 77 (1st Cir.2004). Upon sustaining his initial burden, the burden shifts to the University to articulate a legitimate, non-discriminatory reason for the pay disparity. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). If the University carries its burden of production, the burden then shifts back to Dr. Lakshman to demonstrate by a preponderance of the evidence that the legitimate reasons offered by the University were a pretext for discrimination. *Watson*, 487 U.S. at 986; *Rathbun*, 361 F.3d at 71-72 & 77-80; *Malloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir.1997).

Although production of the plaintiff's *prima facie* case is "not onerous," *Watson*, 487 U.S. at 986, the First Circuit has stated that the plaintiff's claim for salary disparity must "identify and relate specific instances where person situated similarly in all relevant aspects were treated differently." *Malloy*, 115 F.3d at 91 (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989)). As the First Circuit explained in *Dartmouth Review*, the test is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonist similarly situated." *Id.* An exact correlation "is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Id.; see also* *Marcoux v. Maine*, 797 F.2d 1100, 1107 (1st Cir.1986) (noting that the plaintiff does not have to show her job was "perfectly congruent" with that of her male counterpart in order to succeed on a claim of sex-based wage discrimination).

***7** [3] Dr. Lakshman has cleared the first two hurdles: he is a member of a protected class and he has performed his job in keeping with the University's expectations. He stumbles, however, at the third hurdle: that he has been paid less than members outside his protected class holding the same position. To sustain his burden of proof, Dr. Lakshman has presented a statistical analysis comparing his salary to the salaries of other Ph.D.'s in the College of Natural Sciences, Forestry and Agriculture. The study reveals that in 2003, Dr. Lakshman was paid $45,000; the average salary for Ph.D.'s (excluding recent post-doctoral hires) was $62,180 and the average salary for Ph.D.'s who began work, as Dr. Lakshman did, in 1986 was $72,078. In the year 2001, the average salary for non-faculty research professionals was $44,852, higher than Dr. Lakshman's salary of $36,326. During most of his time at the University, Dr. Lakshman has been the only non-Caucasian in his Department and, therefore, the individuals comprising the comparison group would be members outside one or more of his protected classifications.

[4][5] Where gross statistical disparities can be shown, they alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination. *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307- 08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). However, in considering the impact of statistics, the First Circuit recently cautioned that the statistical analysis "must still cross a threshold of dependability ." *Rathbun*, 361 F.3d at 79. The probative worth of statistical testimony must be evaluated in light "of the methodology employed, the data available, and the factual mosaic unique to the case at hand." *Id.* (quoting *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1342 n. 5 (1st Cir.1988)); *see also* *Schuler v. Polaroid Corp.*, 848 F.2d 276, 279 (1st Cir.1988) (noting plaintiff failed at *prima facie* stage to present evidence about "the size of the pool of potentially affected employees, the age of kind of employee

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

likely in the pool, the nature of the work force ..., or the way in which these employees were treated that would permit a fact finder to find actionable age discrimination."). In *Rathbun,* the First Circuit found the failure to determine the extent to which the statistical disparities were attributable to factors other than gender to be a "significant shortcoming." *Rathbun,* 361 F.3d at 79. Dr. Lakshman's statistical analysis was performed by Dr. Dennis McConnell, a University economics professor, and, therefore, is not the "rudimentary analysis" conducted by the party's counsel that troubled the *Rathbun* Court. *Id*.

Nevertheless, the study does not sustain Dr. Lakshman's *prima facie* burden. First, for his more significant conclusions, Dr. McConnell included all Ph.D. holders in the College, whether they were research scientists or teaching faculty. [FN20] Second, Dr. McConnell considered only the individual's degree and date of hire. Third, he failed to consider race or gender, both essential components of Lakshman's claim. Finally, Dr. McConnell omitted numerous other factors, which could have explained the statistical disparity including the type of work performed, the Ph.D. holders' responsibilities, skills required for the position, pre- or post-employment achievement and distinction, generation of revenue, affirmative action, or competition. This Court simply cannot conclude from Dr. McConnell's generalized study that it compared Dr. Lakshman's salary with the salaries of individuals who have held "the same position." *Rathbun,* 361 F.3d at 77.

***8** Assuming, *arguendo,* that Dr. Lakshman sustained his burden to show a *prima facie* case, the burden shifts to the University to demonstrate a legitimate, non-discriminatory reason for the discrepancy between Dr. Lakshman's salary and the salaries of other similarly situated individuals. The University contends that Dr. Lakshman was hired as a non-tenure track position and his lower salary is attributable to his career path, not the University's discriminatory animus. At least as regards the inclusion of higher paid tenured faculty in the statistical sample, the University's response sustains its burden of production to show a legitimate, non-discriminatory reason for the discrepancy. In this response, the University has sustained its burden of production.

Once the University met its burden of production, the inference of discrimination fades away and the burden returns to the plaintiff to show that the employer's explanation is a pretext for unlawful discrimination. *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 39 (1st Cir.2003); *Rivera-Aponte v. Rest. Metropol # 3, Inc.,* 338 F.3d 9, 11 (1st Cir.2003). In the Court's view, Dr. Lakshman has not demonstrated that the University's decision to pay faculty members more than non-faculty research scientists was motivated by discriminatory animus against Dr. Lakshman. On this point, the University is entitled to summary judgment.

The analysis cannot, however, stop there. In addition to his broader claim of unequal pay, Dr. Lakshman has a more focused point. Even when only research scientists are considered, Dr. Lakshman has presented evidence that he was underpaid. Dr. McConnell's study confirmed that in 2001, Dr. Lakshman was being paid $36,326 compared with an average of $44,852 among research scientists. Following the initiation of a pay inequity study in 2001, the University ended up increasing Dr. Lakshman's salary to $45,000 for ten months work, allowing him to earn an additional $9,000 for the remaining two months from grant sources. Dr. Lakshman has also provided evidence that allows this Court to infer most, if not all, research scientists were not members of legally protected classes, that they were performing substantially the same work, and that he was paid significantly less than his fellow research scientists. In sum, Dr. Lakshman has sustained his *prima facie* burden: (1) he is a member of a protected class; (2) he performed his job in keeping with University expectations; and, (3) he was paid less than members outside his protected class who held the same position.

In response, to meet its burden of production, the University states it was Dr. Lakshman's late decision to elect the research scientist career ladder that explains his lagging salary. The University says it did not originally anticipate he would remain permanently in the career track for a research scientist and, therefore, did not move him up that career ladder. It claims after it came upon this realization in 1993, it consistently promoted Dr. Lakshman and increased his salary. It points out it never refused Dr. Lakshman a request for a promotion or increase in pay in that career ladder and ultimately, he became a Senior Scientist, the highest MAFES career category. This Court concludes that the University has sustained its burden of production to articulate "a legitimate, nondiscriminatory reason for the pay disparity." *Rathbun,* 361 F.3d at 78.

***9** [6] With this, the burden returns to Dr. Lakshman "to prove ... that the legitimate reasons offered by the (employer) were not its true reasons, but were a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

pretext for discrimination." *Burdine*, 450 U.S. at 253. In the words of *Mesnick*, to this end, "many veins of circumstantial evidence ... may be mined." *Mesnick*, 950 F.2d at 824. These "include--but are by no means limited to--evidence of differential treatment, evidence of discriminatory comments, statistical evidence, and comparative evidence." *Rathbun*, 361 F.3d at 72. Independent evidence of discriminatory animus is not required and in the proper case, the trier may "infer the ultimate fact of discrimination from components of the plaintiff's prima facie showing combined with compelling proof of the pretextual nature of the employer's explanation." *Id.* In the context of this summary judgment motion, Dr. Lakshman must offer "some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion." *Mesnick*, 950 F.2d at 825; *Rathbun*, 361 F.3d at 72; *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 62 (1st Cir.1999).

[7] Once the pay disparity is limited only to research scientists, the issue becomes closer. First, Dr. Lakshman has shown he was the sole minority among research scientists within his Department for most of his term of employment. In 1993, when the University acknowledges it knew Dr. Lakshman had, in its view, decided upon the research scientist career route, it promoted him into the position of assistant scientist, a position that requires only a bachelors degree. Although he was advanced quickly into the position of Associate Scientist in 1995, this position required only a masters degree. By the year 2000, when compared with other Ph.D.s among research professionals, Dr. Lakshman's salary was $33,785 compared with an average of $47,175. The next year, 2001, the disparity was reduced from $44,852 to $ 36,326, but it remained substantial. It was not until 2002, when the University increased Dr. Lakshman to $45,000 for ten months work that his salary became comparable to other Ph.D. level research scientists. The disparity is even odder, since the University seems to agree that Dr. Lakshman has been an excellent researcher and presents no evidence at all of any untoward behavior during his entire course of employment. The extreme degree of the disparity, the extended period it persisted, Dr. Lakshman's acknowledged competence, and his value as a researcher are all powerful evidence in his favor.

What is less persuasive is evidence that this salary disparity was precipitated by discriminatory animus or that the University's reason for the disparity was pretextual. To this point, Dr. Lakshman points to the discriminatory comments he received at work and Dr. Campbell's failure to respond for over a year to his promotion and salary requests. Although perhaps insensitive, there is no evidence the offensive comments were reflected in a University decision. Apart from the salary disparity, there is no evidence at all of any differential treatment among research scientists, much less evidence of differential treatment based on prohibited factors. There is no claim of the more obvious forms of non-salary-based academic discrimination, such as denial of specific projects, laboratory access, grant opportunities, publication credit, further educational chances, monetary allocations to projects, or other non-financial forms of individual recognition.

***10** Given Dr. Lakshman's educational and research achievements, the Court is left to puzzle as to the cause of an unusual degree of administrative inertia. But, what is lacking is any probative evidence this institutional inaction was improperly motivated. [FN21] Dr. Lakshman may well have been taken for granted or neglected, but this Court cannot conclude on this record the University's inaction was because of improper animus. The University's motion for summary judgment on the allegation of unequal pay must be granted.

[8] The sole remaining failure to promote claim is based on Dr. Lakshman's 1998 request for promotion to Senior Scientist and the University's 2002 decision to grant him the title, but to alter his job description. To establish a *prima facie* case, Dr. Lakshman must show: (1) that he is a member of a protected class; (2) that an adverse employment action occurred; (3) that he was at least arguably qualified for the position he sought; and, (4) that the position was filled by others whose credentials were more or less comparable to his. Dr. Lakshman's failure to promote claim is misplaced, since there is no evidence in this record satisfying the last criterion. Dr. Lakshman was ultimately promoted to the position of Senior Scientist and he makes no contention that the Senior Scientist position was awarded to someone else, much less that their credentials were comparable to his. Dr. Lakshman seems to be asserting that the University's decision to alter his job description and salary was in retaliation for his discrimination complaints, a contention this Court addresses later in this Order.

3. *Desert Palace* Analysis: Title VII.

[9] At oral argument, Dr. Lakshman clarified that, in addition to the *McDonnell Douglas* burden shifting framework, he is pressing a *Desert Palace* mixed

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

motive analysis in his Title VII claim. [FN22] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In doing so, he gains nothing. As the First Circuit stated in *Hillstrom v. Best Western TLD Hotel*, "even in mixed-motive cases, plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." 354 F.3d 27, 31 (1st Cir.2003). This is true, even though as *Desert Palace* taught, circumstantial as well as direct evidence may be used to satisfy this burden. *Desert Palace*, 539 U.S. at 97-101.

In his argument, Dr. Lakshman baldly asserts there is evidence from which a jury could directly conclude and evidence from which a jury could infer that the University's employment actions were the result of racial or ethnic bias. He then string cites ("see, e.g. inter alia") four paragraphs to demonstrate direct evidence [FN23] and thirty-three paragraphs to demonstrate circumstantial evidence. [FN24] Based on Dr. Lakshman's argument, this Court concludes that the evidence is insufficient to find the University's actions were the result of mixed motive and grants the University's motion for summary judgment on the Title VII claim to the extent it is grounded on a *Desert Palace* analysis. *Davis v. Emery Worldwide Corp.*, 267 F.Supp.2d 109, 120 n. 2 (D.Me.2003) (stating "because no possibility of a mixed motive for the defendant's actions with respect to this incident is raised by the evidence in the summary judgment record... *Desert Palace* ... does not apply.")

4. Dr. Lakshman's Claims of Hostile Work Environment.

***11** In Counts I through V, Dr. Lakshman initially alleged discrimination in the form of a hostile work environment on the basis of race, color, ethnicity, national origin, and gender pursuant to the MHRA and Title VII. At oral argument, Dr. Lakshman expressly waived his argument of a hostile work environment under Title VII and the MHRA. The University's motion for summary judgment on each such claim is, therefore, granted.

B. Dr. Lakshman's § 1981 Claims.

In addition to his causes of action under Title VII and the MHRA, Dr. Lakshman has initiated claims of discrimination and hostile work environment under 42 U.S.C. § 1981. The University has asserted a statute of limitations defense to the § 1981 claims and has reiterated the same contentions to the merits of each legal theory.

1. Statute of Limitations: 42 U.S.C. § 1981.

42 U.S.C. § 1981 provides in pertinent part:

> Statement of Equal Rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contract ... as enjoyed by white citizens ....

42 U.S.C. § 1981(a). [FN25] Section 1981 forbids racial discrimination in the making and enforcement of private contracts, but contains no express statute of limitations. *See generally* 42 U.S.C. § 1981(a). In 1987, the United States Supreme Court charged federal courts to select the most appropriate or analogous state statute of limitations to apply to § 1981 claims. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). This Court concluded that the six-year statute of limitations in Maine, 14 M.R.S.A. § 752, should apply to § 1981 actions. *De Salle v. Key Bank of Southern Maine*, 685 F.Supp. 282, 285 (D.Me.1988). *See also* *Small v. Inhabitants of Belfast*, 796 F.2d 544, 545-49 (1st Cir.1986) (applied six-year statute of limitations to federal civil rights claim under section 1983); *McKenney v. Greene Acres Manor*, 650 A.2d 699, 701 (Me.1994) (applied six-year statute of limitations to § 1983 action).

After *Goodman*, on December 1, 1990, Congress passed 28 U.S.C. § 1658, a general statute of limitations applicable to all federal statues enacted after that date. It provides in pertinent part:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of enactment of this section may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C. § 1658. On May 3, 2004, the United States Supreme Court resolved the question of whether the four-year statute of limitations in 28 U.S.C. § 1658 applies to § 1981 claims. In *Jones v. R.R. Donnelley & Sons Co.*,-- U.S.--, --- U.S. ----, 124 S.Ct. 1836, --- L.Ed.2d ---- (2004), the Supreme Court held that the four year statute of limitations in § 1658 applied to the petitioners' hostile work environment, wrongful termination, and failure-to-transfer claims, because they were made possible by the 1991 amendments to § 1981. Applying *Jones* to Dr. Lakshman's § 1981 claim, his hostile work environment, failure to promote, and unequal pay claims would not have stated causes of action under the original version of § 1981, since they occurred

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

after the formation of Dr. Lakshman's contract with the University. *Patterson v. McLean Credit Union,* 491 U.S. 164, 177-78, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Because his § 1981 claims were "made possible" by the 1991 amendment, § 1658's four-year statute of limitations must apply.

***12** [10] The critical date, therefore, for Dr. Lakshman's § 1981 claims is February 23, 1999, four years prior to the date Dr. Lakshman filed his complaint in Maine Superior Court. Events occurring prior to that time cannot form the basis of his § 1981 discrete acts claims, but may be considered as background evidence in support of a timely claim; events occurring prior to that time may be considered as part of the hostile work environment claim so long as any act contributing to the hostile environment took place within the statutory period.

2. Disparate Treatment Under § 1981.

[11] Dr. Lakshman's § 1981 disparate treatment claims must be considered under the same analytic framework as his Title VII claims, limited however to considerations of race, ethnicity, and national origin, excluding gender. *Ayala-Gerena v. Bristol Myers-Squibb Co.,* 95 F.3d 86, 95 (1st Cir.1996). The narrow question is whether reaching back to February 23, 1999 changes the result. It does not. There is still no direct evidence of intentional discrimination; Dr. Lakshman has still failed to sustain his burden to make a *prima facie* showing; and, the University has still presented a legitimate, non-discriminatory reason for its actions, which Dr. Lakshman has still failed to demonstrate are pretextual. *McDonnell Douglas,* 411 U.S. at 802.

The Title VII analysis for unequal pay also applies here. The more general claim of unequal pay as against all Ph.D. holders fails at the *prima facie* stage for the same reasons. Under § 1981, the unequal pay claim for Dr. Lakshman's work as a research scientist can reach back to February 23, 1999, instead of the more limited allowable period under Title VII. The additional time does not, however, affect the result. In the § 1981 claim for unequal pay, he has made his *prima facie* case; the University has met its burden of production; and, he has failed to show that the University's reasons were pretextual.

3. Hostile Work Environment Under § 1981.

In Count I, Dr. Lakshman alleges discrimination in the form of a hostile work environment on the basis of race, color, ethnicity, and national origin pursuant to § 1981. Dr. Lakshman failed to respond to the University's argument on the hostile work environment claims and, therefore, has waived the right to object. *Grenier v. Cyanamid Plastics,* 70 F.3d 667, 687 (1st Cir.1995) (noting that "[b]y failing to make this argument in his opposition to summary judgment, Grenier has failed to preserve this claim.") Nevertheless, under Fed.R.Civ.P. 56(e), the court may grant summary judgment if the adverse party fails to respond, only if summary judgment is "appropriate" and at oral argument, Dr. Lakshman stated, in contrast to the Title VII and MHRA hostile work environment claims, he wished to pursue the § 1981 hostile work environment allegation. The First Circuit has concluded that, even in the absence of a response by the opposing party, the district court "must review the motion and the supporting papers to determine whether they establish the absence of a genuine issue of material fact." *Jaroma v. Massey,* 873 F.2d 17, 20 (1st Cir.1989).

***13** [12][13][14] Even if he had responded, Dr. Lakshman's hostile work environment claim falls far short of his burden to establish a *prima facie* case. To satisfy his burden, Dr. Lakshman must demonstrate that (1) he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his race, ethnicity, color, or national origin; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment; (5) that the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive to be so; and, (6) that some basis for employer liability has been established. *O'Rourke v.. City of Providence,* 235 F.3d 713, 728 (1st Cir.2001). The environment must be sufficiently hostile or abusive in light of all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also Reed v. MBNA Marketing Sys.,* 231 F.Supp.2d 363, 371 (D.Me.2002). Unlike the constraint imposed on a discrete act claim, the Court may consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, ... so long as any act contributing to that hostile environment takes place within the statutory period." *Morgan,* 536 U.S. at 104.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Dr. Lakshman contends the hostile work environment arose from the following incidents: (1) being asked if he was going back to India; (2) being told he was an unhappy person; (3) being told he would not be a "very good teacher" because of his accent; (4) being told his chances for promotion would have been better if he had been a "Native Indian"; (5) being told he had to work "ten times harder to be on a par with Americans"; and, (6) being told that if he pursued the claim against the University, it would become a "very, very uncomfortable place" to work. [FN26]

[15] Even accepting Dr. Lakshman's version of the evidence in a light most favorable to him, these comments simply do not rise to a level of harassment and pervasiveness necessary to sustain a hostile work environment cause of action. In terms of frequency, the record indicates these comments occurred over a fifteen-year period. Although there is no "absolute numerical standard" by which to determine whether harassment has created a hostile environment, *Donco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 16 (1st Cir.1999) (quoting *Vance v. Southern Bell Telephone & Telegraph Co.*, 863 F.2d 1503, 1511 (11th Cir.1989), fewer than ten offensive comments over a fifteen year period is hardly evidence of "pervasive" harassment. None was physically threatening. Dr. Lakshman may have found the comments about returning to India and his accent humiliating, but it is difficult to conclude that these were more than offensive utterances. Significantly, there is no showing these comments actually interfered with Dr. Lakshman's ability to perform his job. *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir.1999) (noting "[b]roadly speaking, a hostile environment claim requires the victim to have been subject to harassment severe enough to compromise the victim's employment or educational opportunities ... "). To the contrary, Dr. Lakshman's complaint against the University is based in part on its failure to recognize his superior performance as an employed scientist. In *Farragher*, the Supreme Court noted that the conduct forming the basis for a hostile work environment claim must be "extreme to amount to a change in the terms and conditions of employment" ' and cautioned against interpreting Title VII as a "general civility code." *Farragher*, 524 U.S. at 788.

***14** The cases where courts have found a hostile work environment are simply different in degree and kind from the facts in this case. *Harris v. Forklift Systems*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (employee repeatedly insulted, made the target of sexual innuendo, denigrated); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1988) (employee forcibly raped, repeated demands for sexual favors, fondled in front of other employees); *O'Rouke*, 235 F.3d 713 (female firefighter hired under newly implemented affirmative action policy subjected to overtly sexual behavior, stacks of pornographic magazines, systematic and sustained exclusion and isolation, vandalism, discipline);*Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49 (1st Cir.2003) (female faculty member pawed and lasciviously addressed by chancellor, repeatedly propositioned by head of academic committee); *White v. New Hampshire Dep't of Corrections*, 221 F.3d 254 (1st Cir.2000) (daily, constant sexual references; explicit remarks and innuendo concerning plaintiff); *Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8 (1st Cir.1999) (racial graffiti, physical threat; racial slur over three month interval); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir.1988) (female medical resident subjected to three year period of ongoing sexual harassment, propositioning, and academic discipline). Viewing the evidence in a light most favorable to Dr. Lakshman, this Court cannot conclude there is sufficient evidence of a hostile work environment at the University to withstand its motion for summary judgment on this cause of action.

C. Dr. Lakshman's Claims of Retaliation Under Title VII And MHRA.

In Counts VII and VIII, Dr. Lakshman alleges that as a result of filing complaints with the MHRC and the EEOC, members of his Department at the University retaliated against him, creating a hostile work environment in violation of 42 U.S.C. § 2000e-3(a) and 5 M.R.S.A. § 4633. [FN27] In particular, Dr. Lakshman contends the University retaliated by implementing a dramatic revision of his job responsibilities, effectively demoting him in fact while promoting him in name, and by increasing his salary to an amount lower than it otherwise would have done.

[16] Even where the underlying alleged discrimination may not be viable, a claim for retaliation may survive. *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 174 (1st Cir.2003); *Mesnick v. General Electric*, 950 F.2d 816, 827 (1st Cir.1991); *O'Meara v. Mineta*, 2003 U.S. Dist. LEXIS 17444, * 31. To make out a *prima facie* case of unlawful retaliation, whether under Title VII or the MHRA, an employee must show: (1) he engaged in protected activity; (2) he suffered an adverse employment

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

action after or contemporaneous with such activity; and, (3) there existed a causal link between the protected activity and the adverse job action. *Benoit*, 331 F.3d at 175; *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir.1994); *Bishop*, 143 F.Supp.2d at 62. There is no doubt that Dr. Lakshman's filing of a complaint with the EEOC and the MHRC constituted "protected activity" and, therefore, this Court will turn to the latter two criteria.

***15** The First Circuit has defined "adverse employment action" as including a variety of conduct, including "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir.1998). Dr. Lakshman made his first assertion of Title VII or MHRA rights in either November or December, 2000, when he visited Dr. Silver, the University's Equal Employment Opportunity Director. [FN28] This was roughly at the same time Dr. Campbell had referred his promotion to the Peer Review Committee and had commissioned a salary study. According to Dr. Lakshman, on December 14, 2000, he met with Dr. Campbell, then the Department Chair, and informed him of his concerns about pay inequity and discrimination. Dr. Lakshman asserts that after that meeting, Dr. Campbell continually referred to him as an "unhappy person," and Drs. Campbell and Hunter stated that they would create "disincentives" to force Dr. Lakshman from the University.

[17] Turning first to the salary issue, Dr. Lakshman earned $33,735 in 2000. As a result of his request for a raise, the University ended up increasing his salary to $45,000 in February, 2002 for ten months work and allowing him the opportunity to earn an additional $9,000 in grant money for the remaining two months. In his Memorandum, Dr. Lakshman fails to clarify whether he considers his raise in 2002 to be an adverse employment action. [FN29] This Court concludes there is no evidence to support the contention that the University's 2002 decision to increase Dr. Lakshman's salary to $45,000 for ten months work was either an adverse employment action or in any way causally linked to his complaints of discrimination.

Turning next to the "demotion" issue, Dr. Lakshman claims that after his discrimination complaints became known and were formalized, the University altered his job responsibilities. The timing is significant. Dr. Lakshman first complained of discrimination in November/December 2000 and it is shortly thereafter, he is told of the Campbell/Hunter "disincentive" remark. Dr. Campbell repeatedly referred to Dr. Lakshman as an "unhappy person." He formally filed complaints with the EEOC and MHRC on February 21, 2001. The Peer Review Committee recommended his promotion on March 8, 2001, and on March 21, 2001, Drs. Campbell and Hunter wrote to him, informing him that his job description was going to change. Instead of working solely for Dr. Tavantzis, as he had since 1986, he was now going to work under three faculty members. Dr. Lakshman considered this change a major transformation, since his scientific energies and talents would be dissipated and he would become more a technician than a scientist. Shortly, Dr. Jellison, one of those faculty members, met with him and informed him, she knew he was an "unhappy person" and she was going to closely monitor him for misbehavior or bad behavior in her lab. The University has agreed that there has never been any indication of bad behavior on the part of Dr. Lakshman during his employment there.

***16** During the summer and fall of 2001, Dr. Tavantzis repeatedly warned Dr. Lakshman against maintaining his legal action. He told him his fellow faculty members have been making remarks about Dr. Lakshman that have made it difficult for him to work with them. He also said that if he continued with his legal action, it would be very difficult for him at the University, because "if you fight the people you work with, no one is happy." Finally, Dr. Tavantzis told Dr. Lakshman that if the matter proceeded to court, he would testify against him and would fail to recall conversations with Dr. Lakshman. After the University altered his job description to require him to report to two faculty members, Dr. Lakshman found that he was monitored on a daily basis. When he questioned this change of practice, he was told that Dr. Campbell had expressly demanded a daily report on Dr. Lakshman.

The demotion claim deserves scrutiny. The First Circuit has noted that "there are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles." *Mesnick v.. General Electric Co.*, 950 F.2d 816, 828 (1st Cir.1991). These include: (1) differential treatment in the workplace; (2) temporal proximity; (3) statistical evidence; and, (4) comments by the employer that intimate a retaliatory mindset. *Id.* Dr. Lakshman has produced evidence of differential treatment in the University's individualized daily monitoring. The timing also favors Dr. Lakshman.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

His initial informal complaints were in November/December, 2000, his initial formal filing was in late February, 2001, and the "demotion" decision was made in late March, 2001. He has not presented any statistical evidence, but he has produced evidence of comments by his employer indicative of a discriminatory mindset. He has, in this Court's view, sustained his *prima facie* burden.

Under the *McDonnell Douglas* framework, the burden of production shifts to the University to articulate a legitimate, nondiscriminatory reason for its actions. This it has done. The University has produced evidence that its division of responsibilities among the scientific staff was part of an overall reallocation of its resources among a range of projects, since some MAFES projects had the support of one scientific support staff while others had none. Moreover, the changes were applicable to all scientific support staff and were not personal to Dr. Lakshman. To the extent Dr. Lakshman was singled out, it was only Dr. Lakshman, who received a contemporaneous promotion and salary increase. In fact, the University pointed out that Dr. Lakshman was the last of the scientific staff to work on only one project. With this series of explanations, the University has met its burden of production.

Under the *McDonnell Douglas* burden-shifting process, the burden returns to Dr. Lakshman to demonstrate the University's stated reasons were pretextual. Dr. Lakshman can meet this burden "either directly, by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly, by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In performing its analysis, this Court is mindful of the First Circuit's preference to allow jury resolution of issues of motive and intention. *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 34 (1st Cir.1990); *Rossy v. Roche Products Inc.*, 880 F.2d 621, 624 (1st Cir.1989).

***17** [18] Again, viewing the evidence in a light most favorable to Dr. Lakshman, the record reveals the comments of Drs. Campbell and Hunter about "disincentive" and the troublesome evidence about Dr. Jellison's actions: comments about Dr. Lakshman's unhappiness, singling him out for reporting requirements, and most significantly, stating that he would have to be monitored closely for "bad behavior" when there is no evidence Dr. Lakshman ever behaved badly. But, to sustain his burden, Dr. Lakshman must produce evidence that the University's animus against him was so strong, it was willing to reorganize the job descriptions of its entire research scientist staff to retaliate against him alone. There is simply no evidence in this record to support such a sweeping allegation. *Weston-Smith v. Cooley Dickinson Hospital, Inc.*, 282 F.3d 60 (1st Cir.2002) (finding hospital-wide reorganization not discriminatory). Dr. Lakshman has failed to produce "names, dates, incidents, and supporting testimony" which would give "rise to an inference of discriminatory animus" in the department-wide alteration the job descriptions of the University's research scientists. *Lipsett*, 864 F.2d at 895.

D. Dr. Lakshman's Title IX Claim.

Dr. Lakshman's Title IX claim presents a slight twist on the issues this Court has discussed. In Count VI, he asserts that the University intentionally discriminated against him on the basis of gender: (1) by failing or refusing to promote him; (2) by failing to increase his salary; and, (3) by fostering a hostile work environment, based on his gender.

Title IX of the Education Amendments of 1972 provides in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681.

[19][20] Title IX imposes an obligation on educational institutions receiving federal funds to refrain from denying educational opportunities on the basis of sex. [FN30] *Wills v. Brown Univ.*, 184 F.3d 20, 35 (1st Cir.1999). The statute's enforcement machinery includes an implied private right of action through which an aggrieved party may seek money damages. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283-84, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 64 (1st Cir.2002). Because relevant legal analysis under Title IX is sparse, therefore the Court will apply Title VII case law by analogy. [FN31] *Lipsett*, 864 F.2d at 896; *Brown v. Hot. Sexy & Safe Prods.*, 68 F.3d 525, 540 (1st. Cir.1995).

1. Statute of Limitations.

[21] Like § 1981, the text of Title IX contains no statute of limitations. 20 U.S.C. § 1681. Unlike § 1981, however, Congress has not amended § 1681

since December 1, 1990 and, therefore, under *Jones v. R.R. Donnelly,* the applicable Maine state statute of limitations must apply. Because Title IX redresses sex discrimination, an injury to fundamental individual rights, this Court concludes it should apply the statute of limitations governing personal injury actions. 14 M.R.S.A. § 752; *De Salle*, 685 F.Supp. at 285 (applying 6 year statute of limitations to § 1981 claim); *Small*, 796 F.2d at 545-49 (applying 6 year statute of limitations to § 1983 claim); *McKenney v. Green Acres Manor*, 650 A.2d at 701 (applying 6 year statute of limitations to § 1983 claims). This Court will consider only those claims from February 20, 1997, forward, including the alleged failures to promote in 1998 and 2000, the failure to award the mycology position in 1997, the alleged pay disparities from February 20, 1997, onward, and the claim of a hostile work environment.

2. Hostile Work Environment Claim.

***18** In his complaint, Dr. Lakshman alleged a hostile work environment claim under Title IX; however, at oral argument, he waived any such claim. Accordingly, this Court grants the University's motion for summary judgment on the hostile work environment claim in Count VII of the complaint.

3. Pay Disparities.

[22] This Court has previously discussed Dr. Lakshman's allegations of pay disparities under its Title VII analysis. Regarding the pay disparity between research scientists and faculty, the same analysis and conclusion is applicable here: Dr. Lakshman has failed to show a *prima facie* case; the University has sustained its burden of production, and he has failed to demonstrate its reasons are pretextual.

Restricting the *Rathbun* analysis to gender, there is no evidence that the difference between his wage and the wages of other research scientists was based on his gender. Unlike the record for the Title VII claim, there is no evidence in Dr. Lakshman's Statement of Material Facts about the gender of the other research scientists, the number of female as opposed to male researchers, the salary levels for female as opposed to male research scientists, and whether the differences, if they exist, can be attributed to factors other than gender. Dr. Lakshman has failed to present any evidence he was paid less than the female researchers. *Rathbun*, 361 F.3d at 77 (finding to make out a *prima facie* case of unequal pay, employee must show, among other things, that "[he] was paid less than [women] who held the same position").

4. Failure To Promote.

[23][24] To sustain his burden to demonstrate a *prima facie* case, Dr. Lakshman must show: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he was not hired despite his qualifications; and, (4) the job was given to a female. *Keyes v. Secretary of Navy*, 853 F.2d 1016, 1023 (1st Cir.1988). Dr. Lakshman's first complaint, the 1998 Tavantzis recommendation, fails, because he has not demonstrated that any position actually existed. In 1998, Dr. Tavantzis recommended Dr. Lakshman for a raise and promotion to the position of Senior Scientist, a recommendation that Dr. Campbell failed to receive, ignored, or forgot about for over a year. However, there is no evidence in this record that a position as a Senior Scientist actually opened up and was given to a female during that interval.

Dr. Lakshman's second complaint relates to the failure to promote in 2000, when although ultimately awarded the position of Senior Scientist, he was in fact demoted by job description. For the same reasons set forth above, Dr. Lakshman failed to sustain his *prima facie* burden on this position under Title IX as well.

This leaves the 1997 mycology position. This is more troublesome. The Court is required at this stage to view the evidence in a light most favorable to Dr. Lakshman. With this in mind, the Court concludes that he has met the burden to demonstrate a *prima facie* case: (1) he is male; (2) he was qualified for the position; (3) he was not hired despite his qualifications; and, (4) the job was given to a female. This conclusion, however, is not without hesitation. Dr. Lakshman never actually applied for the mycology position.

***19** Although it seems illogical to hold an employer legally responsible for failing to hire someone who never applied, it would be equally unreasonable to reward an employer who actively and successfully discourages potential applicants for legally impermissible reasons. In general, the failure to file a formal application will not bar a plaintiff from establishing a *prima facie* case of discriminatory hiring provided the plaintiff "made every reasonable attempt to convey his interest in the job to the employer." *Equal Employment Opportunity Comm. v. Metal Service Co.* ., 892 F.2d 341, 348 (3rd Cir.1990) (Title VII claim). Again in a Title VII context, the

Supreme Court concluded that "a nonapplicant can be a victim of unlawful discrimination entitled to make-whole relief when an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him." *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 367, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In this case, after he expressed interest in the mycology position to Dr. Tavantzis, Dr. Jellison, the Chair of the Selection Committee, came to Dr. Lakshman and said: "If you apply, you won't get it." A more forceful and direct discouragement is hard to imagine. Dr. Lakshman can hardly be faulted for taking Dr. Jellison at her word and failing to file an application, even if he thought he was qualified for the position.

Once Dr. Lakshman met his *prima facie* burden, the University has the burden of production to articulate a legitimate, nondiscriminatory reason for its actions. This it has done. First, setting aside for the moment the discouragement issue, the University asserts it could not hire Dr. Lakshman, since he never applied. Second, the University asserts that of the three finalists, two were male. Third, the University states that it offered the position to the two of the final three candidates (at least one of whom had to be male), each of whom turned the University down. Fourth, the University declined to offer the position to the third finalist, based on the interview and evaluation process. Fifth, the position was then offered to the next candidate, Dr. Annis. Sixth, one of Dr. Jellison's female post-doctoral assistants had applied for the mycologist position and was eliminated in the first round. Seventh, Dr. Tavantzis believed Dr. Lakshman was not qualified for the appointment. These accumulated facts more than meet the University's burden of production.

A more difficult issue remains: whether Dr. Lakshman has presented evidence that the University's stated reasons for its actions were pretextual. The evidence on this score focuses on Dr. Jellison, who chaired the search committee, and whether her discouragement of Dr. Lakshman's application on the asserted basis of lack of qualifications was a pretext for her unstated gender bias against him. Dr. Lakshman's evidence of his comparative qualifications includes: (1) his Ph.D. in 1984 from Cornell University in plant pathology; (2) Dr. Tavantzis' statement that it is "too bad" someone with Dr. Lakshman's qualifications in mycology could not be considered; (3) Dr. Seania Annis' degree was in plant pathology, the same discipline as Dr. Lakshman's Ph.D.; and, (4) Dr. Annis had received her Ph.D. in 1995 and had only two years post-doctoral training. Based on Dr. Lakshman's evidence, there is a factual question as to whether his qualifications met or exceeded Dr. Annis' qualifications.

***20** Dr. Lakshman's evidence of the University's improper gender-based motivation comes in three forms. First, the University had long emphasized the recruitment and hiring of female faculty, an emphasis pre-dating the 1997 mycology opening. Second, upon being informed by Dr. Tavantzis of Dr. Lakshman's interest in the mycology position, Dr. Jellison actively discouraged him from even submitting an application. Third, Dr. Jellison is the faculty member, who in 2002, persisted in describing Dr. Lakshman as an "unhappy" person and told him she would monitor him for his illusory "bad behavior." [FN32]

[25] For Title IX purposes, Dr. Lakshman's aggregation of evidence on pretext is fatally flawed. When the evidentiary circle is examined for gender alone, its circumference becomes extremely circumscribed. There is Dr. Tavantzis' remark in 1989 about a job being marked for a woman and Dr. Gelinas's undated remark that if Dr. Lakshman had been a female or "Native Indian," he would have been considered for some jobs. But, there is virtually no evidence in the record that the University's actions regarding the mycology position in 1997 were motivated by gender bias. To the contrary, although Dr. Jellison discouraged Dr. Lakshman from applying, she similarly discouraged a female research scientist and two of the final three candidates were male. The First Circuit has reminded us that "a slight suggestion of pretext, absent other evidence from which discrimination can be inferred, [does not] meet [ ] plaintiff's ultimate burden." *Weston-Smith*, 282 F.3d at 70 (quoting *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40 47 (1st Cir.2002). This Court concludes the Dr. Lakshman's evidence of sex discrimination in the University's 1997 decision to fill the mycology position is inadequate to withstand summary judgment.

E. Dr. Lakshman's Punitive Damages Claim.

In its motion, the University states that Dr. Lakshman's Complaint "appears to seek an award of punitive damages." *Def.'s Mem.* at 29. Dr. Lakshman responded to the University by objecting to the issuance of summary judgment "with respect to punitive damages". *Pl.'s Mem.* at 40, However, at oral argument, Dr. Lakshman waived any punitive damages claim. Accordingly, the Court will not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

consider the University's Motion for Summary Judgment on the punitive damages issue; Dr. Lakshman is barred from asserting such a claim.

V. Conclusion.

Dr. Lakshman's complaint consists of an unusually complex series of actions, requiring for each theory a separate analysis under differing periods of limitation, the application of a variety of statutory criteria, and compliance with differing appellate authority. In the final analysis, the University has demonstrated that there exist no genuine issues of material fact under the intricate legal analyses compelled by this motion and that it is entitled to judgment as a matter of law. The University of Maine System's Motion for Summary Judgment is, therefore, GRANTED.

***21** SO ORDERED.

FN1. Dr. Lakshman became an American citizen in 1999.

FN2. Prior to this decision, the Court issued an extensive Order, ruling on hundreds of objections to the Statements of Material Fact. This recitation is a distillation of the facts that have survived the prior Order.

FN3. The University of Maine, located in Orono, is one of seven universities within the Defendant University of Maine System. The Department of Biological Sciences is a department within the College of Natural Sciences, Forestry, and Agriculture at the University of Maine.

FN4. The Maine Agricultural and Forestry Experiment Station is affiliated with the University. It is funded in part by the United States Department of Agriculture and performs applied research for state constituencies, such as the blueberry and potato industries.

FN5. While he remained at MAFES, however, Dr. Lakshman was confined to the MAFES career ladder, beginning with Research Assistant, and continuing to Research Associate, Assistant Scientist, Associate Scientist, and ending with Senior Scientist, the highest rung on the non-faculty research scientist ladder.

FN6. The Plaintiff uses two different dates for the Jellison appointment. In his Statement of Material Facts, he asserts that she was hired in 1989; in his Opposition Memorandum, he states that he expressed an interest in the position for which Jellison was hired in 1993.

FN7. Dr. Lakshman says Dr. Tavantzis told him: "We need more women in the faculty."

FN8. The University denies Dr. Lakshman ever applied for this position. It says Dr. Tavantzis recommended Dr. Lakshman for three positions in 1993, including Assistant Research Professor, and Dr. Lakshman was awarded one of the other recommended positions: Assistant Scientist. There is no information in the record whether there was in fact an open position as an "Assistant Research Professor" and, if so, who received the appointment. There is no further information about this position.

FN9. The University states that the Search Committee initially narrowed its search to three finalists: two males and one female. It says it offered the position to two of the candidates, each of whom turned the offer down, and decided not to offer the position to the third. Instead, the Committee offered the position to the next candidate, Dr. Annis.

FN10. It is unclear in this record when the "disincentives" comment was made. Dr. Lakshman's memorandum assumes the comment was made "shortly after Lakshman met with Campbell", Pl.'s Mem. at 10, on December 14, 2000, but the record citation, *Lakshman Dep.* at 318: 5-20, makes no mention of the timing of the comment. There is no direct evidence in the record on the point, except the compelled conclusion that the comment, assuming it was responsive to his complaints, was made after

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the complaints.

FN11. Dr. Lakshman withdrew the complaint on November 18, 2001, and the MHRC dismissed it in December, 2001.

FN12. Under 42 U.S.C. § 2000e-5(f)(1), Dr. Lakshman was required to file this action within ninety days of receiving his right to sue letter from the EEOC. *Pouliot v. Fairfield*, 184 F.Supp.2d 38, 52 (D.Me.2002). There is no claim that Dr. Lakshman failed to comply with this aspect of the federal statute of limitations. Under § 4611 of the Maine Human Rights Act (MHRA), a complainant has six months "after the alleged act of unlawful discrimination" to file a complaint with the MHRC. 5 M.R.S.A. § 4611. Once the complaint is filed, the complainant may request a "right to sue" letter if within 180 days, the MHRC has not filed a civil action or has not entered into a conciliation agreement. If the letter is issued, the MHRC ends its investigation. 5 M.R.S.A. § 4612(6). Dr. Lakshman attached to his Complaint a copy of right to sue letters from the EEOC and the MHRC. MHRC letter dated December 11, 2002; EEOC Notice of Right to Sue dated December 12, 2002. *Walton v. Nalco Chem. Co.*, 272 F.3d 13, 21-22 (1st Cir.2001).

FN13. Title VII states that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e-2(a)(1).

FN14. The MHRA provides that it is unlawful for any employer to "discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment ... because of race or color, sex ... ancestry or national origin ...." 5 M.R.S.A. § 4572(1)(A).

FN15. 42 U.S.C. § 2000e-5(e)(1) provides in pertinent part:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ..., except in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State ... agency with authority to grant or seek relief from such practice ..., such charge shall be filed ... within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State ... has terminated the proceedings under the State law ..., whichever is earlier ....

5 M.R.S.A. § 4611 provides in pertinent part:

Any person who believes that the person has been subject to unlawful discrimination ... may file a complaint under oath with the commission ..., provided that such complaints must be filed ... not more than 6 months after the alleged act of unlawful discrimination.

Maine is considered a "deferral state" under this statute, meaning that it is a state in which a plaintiff may institute proceedings on such a claim with a state agency, making the deadline for filing court action 300 days after the practice at issue occurred rather than 180 days. *Hunter v. Siemens Medical Solutions Health Services Corp.*, 2003 WL 21087010, *8 n. 4 (D.Me.2003).

5 M.R.S.A. § 4613(2)(C) provides "[t]he action shall be commenced not more than 2 years after the act of unlawful discrimination complained of."

FN16. As *National Railroad* clarified, "discrete acts" claims "are different in kind" from "hostile environment claims." *National Railroad*, 536 U.S. at 115. Unlike discrete act claims, in a hostile work environment claim, it does not matter that some of the component acts of the hostile work environment fall outside the statutory time period, provided an act contributing to the claim occurs within the filing period. *Id.* at 117. This portion of the Court's ruling addresses only the "discrete acts" claims under both Title VII and the MHRA.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN17. This claim itself rests substantially upon events prior to February 20, 2001 and July 14, 2001. The change in job description and salary did not take place until sometime in February, 2002 well within both statutes of limitation. However, the University's action stands out of context unless out of time events are considered, including (1) the University's previous discouragement of his interest in a faculty position and hiring of less qualified female applicants; (2) Dr. Campbell's failure to respond to his 1998 salary and classification inquiry for over a year; (3) the "unhappy person" comments that followed his December, 2000 meeting with Dr. Campbell; (4) (depending on the date) the "disincentive" comments from Drs. Campbell and Hunter; and, (5) the stray comments going back to 1995. Under *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), Dr. Lakshman would not be barred from "using the prior acts as background evidence in support of a timely claim." *Vesprini v. Shaw Contract Flooring Services, Inc.*, 315 F.3d 37, 42 n. 4 (1st Cir.2002); *Martin v. Inhabitants of the City of Biddeford*, 2003 WL 1712510 * 8 (D.Me.2003).

FN18. In his Opposition Memorandum, Dr. Lakshman states he has "pointed to sufficient facts, if believed, from which a jury could *directly conclude* that he was discriminated against on the basis of race/ethnicity." *Pl.'s Opp. Mem.* at 15 (emphasis in original). He then string cites four references to the record: paragraphs 57, 246, 247, and 276. Paragraph 57 is the University's statement that Dr. Jellison's belief that Dr. Lakshman was not competitive for the mycology position was unrelated to his race, ethnicity, national origin, color, or gender. Dr. Lakshman responded by denying the University's statement and making a record reference to Dr. Lakshman's deposition testimony that Dr. Tavantzis told him the University needed someone to teach BIO 101 and his accent could pose a problem. Paragraph 246 is Plaintiff's statement that "Dr. Tavantzis told [him] that Dr. Gelinas had said he [would have been] considered for some of those [jobs] if he [had been] a female or a 'Native Indian." ' Paragraph 247 is Plaintiff's statement that "Dr. Tavantzis told [him] he should work ten times harder to be on a par with Americans in research." Finally, paragraph 276 is Plaintiff's statement that in 1995-96, "Professor Frank Manzer told the Department Chair Gelinas and his supervisor Tavantzis that Plaintiff should go back to India."
Contrary to Plaintiff's assertion, none of these references constitutes direct evidence of the University's discriminatory motivation in its actions in February, 2002. The First Circuit has defined "direct evidence" as "statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Wennik v. PolyGram Group Distrib.*, 304 F.3d 123, 132 (1st Cir.2002); *Kirk v. Hitchcock Clinic*, 216 F.3d 75, 79 (1st Cir.2001); *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir.2000). None of these statements fits the First Circuit definition.

FN19. This case is thus similar to *Rathbun*, where the First Circuit recently noted that since the plaintiff had "acquiesced in this mode of analysis," the district court properly applied it and the plaintiff "forfeited the opportunity to argue for the application of a different, more plaintiff-friendly standard." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 72 (1st Cir.2004). It is by no means clear the *McDonnell Douglas* burden shifting analysis should be applied in equal pay claims initiated under Title VII. As *Rathbun* pointed out, federal courts are divided on this issue. *Id.* at 73. In this case, however, Dr. Lakshman has elected not to make an Equal Pay Act, 29 U.S.C. § 206(d)(1), claim directly and, as in *Rathbun*, has "abjured any suggestion that the Equal Pay Act framework might apply." *Id. Rathbun* concluded that the decision to apply *McDonnell Douglas* to the employee's claim could not "plausibly sink to [the] level" of plain error. *Id.* at 73 n. 4.

FN20. The flaw in this part of Dr. Lakshman's argument is it erroneously

equates academic degree with academic position.

FN21. The Court can only speculate why the University paid Dr. Lakshman less over an extended period. Was this an institutional application of Newton's First Law: "A body at rest tends to stay at rest"? Was it an example of Downeast parsimoniousness? Dr. Tavantzis's lack of influence on behalf of his subordinate colleague with the Department Chairs? Dr. Lakshman's inability to independently generate grant and research funding? All of these are possible and speculative. What is equally speculative and fatal is any evidence that connects the University's inaction to improper bias.

FN22. Dr. Lakshman made a *Desert Palace* argument in only the most oblique and cursory manner. There is nothing on the face of his complaint triggering a mixed motive analysis. On the understandable assumption that Dr. Lakshman was not engaging in a *Desert Palace* approach, the University did not mention a mixed motive analysis in its initial Summary Judgment Memorandum. In his reply, Dr. Lakshman's references to *Desert Palace* appear in the context of whether direct evidence is necessary to sustain a claim of Title VII discrimination. During the discussion, Dr. Lakshman mentions the rubric from *Desert Palace* that unlawful employment discrimination can be established if the plaintiff "demonstrates that ... an illegitimate criterion was a motivating factor for any employment practice, even though other factors may have motivated the practice." *Desert Palace*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84. However, his memorandum fails to engage in a *Desert Palace* analysis; there is no attempt to fit the law to the facts. He simply argues he has "pointed to sufficient facts, if believed, from which a jury could directly conclude that he was discriminated against on the basis of race/ethnicity." *Pl.'s Reply Brief* at 14-15. To give Dr. Lakshman the benefit of the doubt, the Court will address these conclusory assertions as having raised a mixed motive theory of discrimination. In failing to explain his argument, Dr. Lakshman has left the University and the Court in the dark to guess why he contends he has established the factual predicate for the application of *Desert Palace*.

FN23. This Court has already discussed Dr. Lakshman's references to "direct evidence" in SMFs ¶ ¶ 57, 246, 247, and 276 and concluded they did not constitute direct evidence as defined by the First Circuit.

FN24. The thirty three paragraphs string cited for circumstantial evidence amount to a classic scattershot. Some are within time; most are out of time. The vast bulk has nothing to do with the remaining Title VII discrete act claim. The plaintiff seems to be saying to the Court: "There must be some evidence supporting my case somewhere in my statement of material facts. You go find it." The Court declines the plaintiff's invitation to act as his advocate. *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)(The Court will not pay heed to "conclusory allegations, improbable inferences (or) unsupported speculation.")).

FN25. Congress amended § 1981 by adding § 101 of the Civil Rights Act of 1991: "[f]or purposes of this section, the term, 'make and enforce contracts' includes the making, performance, modification, and termination of all benefits, privileges, and conditions of the contractual relationship." Pub.L. 102-166, 105 Stat. 1071 codified in 42 U.S.C. § 1981(b). The congressional enactment followed the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 177-78, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which held that while § 1981's "make and enforce contracts" language prohibited discriminatory hiring, it did not proscribe discriminatory termination or other discriminatory actions occurring after the employment relationship was formed. The 1991 provision made § 1981's prohibition against racial discrimination in the making and enforcement of contracts apply "to all phases and incidents of the contractual relationship, including discriminatory contract terminations."

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Rivers v. Roadway Express*, 511 U.S. 298, 302, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).

FN26. Dr. Lakshman also contends he was told that his chances for promotion would have been greater if he had been female and that he was unqualified for the mycology position because he was male. These comments would not be applicable to a § 1981 cause of action, since they involve potential gender bias.

FN27. The retaliation provisions of Maine statutory law essentially track the provisions of federal law and the same analytic processes apply to each. *Bishop v. Bell Atlantic Corp.*, 143 F.Supp.2d 59, 62 (D.Me.2001).

FN28. With respect to Dr. Lakshman's claims for salary disparity and change in job description, for purposes of the statute of limitations, the dates are the same as determined in the Title VII and MHRA discussion, *supra* Section (A)(1)(a), (b): February 23, 2001 under the MHRA and July 14, 2001 under Title VII. The Court's recitation of the events prior to these dates is for background purposes only. *Infra* n. 17.

FN29. Dr. Lakshman states that "although his raise was increased by 19%, his previous salary was so low that it was only increased from $37,000 to $45,000, approximately by $8,000. Surely that $8,000 alone would not in itself have caused the time and energy expended by University agents in battling this matter with Plaintiff and the union for over a year." *Pl.'s Mem.* at 38-39. His complaint alleges lost wages and lost future earnings as a consequence of the University's alleged retaliation.

FN30. The University has admitted in its Answer it receives federal funds. *Pl.'s Complaint* para. 51; *Def.'s Answer* at p. 51.

FN31. Title VII (and thus Title IX) strikes "at the entire spectrum of disparate treatment of men and women, including conduct having the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile or offensive environment." *Brown*, 68 F.3d at 540 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64-65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) (internal quotation marks excluded).

FN32. As it turned out, Dr. Jellison was not the individual who later initiated the daily reporting requirement that further singled out Dr. Lakshman. There is no evidence as to who this person was or why the daily reporting requirement was instituted.

2004 WL 1770706 (D.Me.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.