UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RODERICK ARNOLD, et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CARGILL, INCORPORATED,

Defendant.

Civil File No. 01-CV-2086 (DWF/AJB)

**CARGILL'S COMBINED MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE EXPERT REPORTS AND OPINIONS OF RONALD L. ADLER, WILLIAM T. BIELBY, AND DAVID W. PETERSON**
**(ORAL ARGUMENT REQUESTED)**

---

Dated: 21st day of September, 2004

DORSEY & WHITNEY LLP

By s/Michael Iwan
Paul B. Klaas #0056327
Mark Ginder #1016794
Michael Iwan #028628X
Ryan E. Mick #0311960
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Attorneys for Defendant
CARGILL, INCORPORATED

# I. INTRODUCTION

Plaintiffs alleged across-the-board discriminatory treatment, but they have no evidence of either centralized, discriminatory human resources policies or "entirely subjective" decision-making systems, as required by United States Supreme Court precedent. In fact, the evidence establishes that Cargill's policies are non-discriminatory and state-of-the-art. Plaintiffs and their experts cannot now seriously contend otherwise. Accordingly, Plaintiffs have shifted to contending that Cargill purposely created and maintained a centralized – but informal – "culture" of discrimination. Plaintiffs' new argument is premised exclusively on testimony of Plaintiffs' experts, Ronald Adler and William Bielby, who, in turn, rely on statistical analyses by David Peterson. All three experts' opinions are fundamentally flawed, both methodologically and in their factual and scientific assumptions and foundations. All three experts' testimony should be excluded under Fed. R. Evid. 702.[1]

## A. Ronald Adler

Ronald Adler is a "consultant." He lacks the education, training, or experience necessary to qualify as an expert in this case. He has no formal training in sociology or industrial organization psychology. He has had no professional experience whatsoever in the area of corporate "culture." Adler's lack of expert training and experience is evident in his report and testimony. His "methodology" is grounded solely in his own *ipse dixit* that Cargill does not do enough, at a corporate level, to ensure equal opportunity for African-American employees. He completely ignores the dictates of the scientific method for drawing valid expert conclusions, including such basic premises as working toward a conclusion by eliminating possible alternative causes for an observed event. On the contrary, Adler presupposes his conclusion that Cargill discriminates and then looks for evidence to support it.

Even were the Court to ignore the fundamental methodological flaws in Adler's report and opinions, he still does not satisfy the United States Supreme Court's requirements for expert testimony

[1] Plaintiffs' and Defendant's expert reports already have been submitted to the Court at Docket Entries 324 (Plaintiffs) and 338 (Defendant), which, in the interest of economy, Defendant has not resubmitted. Deposition excerpts and unpublished authorities cited herein are attached to the accompanying Declaration of Michael Iwan, filed conventionally and under seal.

because his opinions are of no use to the Court in deciding the propriety of class certification. Instead of opining as to whether Cargill has a "standard operating procedure of discrimination," Adler repeatedly admits that he has no opinion as to whether there has been any bias or discrimination at Cargill at all, intentional or otherwise. He opines only that "if" or "to the extent that" there is bias, African Americans *may* suffer discrimination.

**B. William Bielby**

William Bielby is unqualified to offer the opinions he proposes to offer. Bielby may be an expert on gender discrimination; he is not an expert on race discrimination. Bielby's methodology also is fundamentally flawed. Bielby proposes to use a "social framework analysis" as the basis for his opinions, but he misunderstands and misuses the scholarly literature he cites. Instead, Bielby presents equivocal and selective research findings as supporting his pre-existing presumption that African Americans will face barriers to career development at Cargill. He does so without actually inquiring into the reality of Cargill's culture and EEO efforts. Bielby's bare assertion that particular elements of that culture or those EEO efforts *may* harm African Americans simply does not satisfy Fed. R. Evid. 702.

Quite apart from foundational and methodological flaws, Bielby's opinions are of no use to the Court in determining class certification because he offers no opinion having any bearing on the outcome of this intentional discrimination lawsuit. As to Cargill's culture, Bielby expressly disclaims any opinion that Cargill intentionally developed a racially discriminatory culture. Instead, he opines that Cargill has a strong culture that has several race-neutral flaws that may impact African Americans more adversely than whites. But this is not a disparate impact lawsuit, and Bielby's opinion has nothing whatsoever to do with intentional discrimination. Similarly, Bielby opines that, while Cargill took a number of very positive steps toward "EEO accountability," it did not do enough. Yet he offers no opinion at all whether this shortcoming was intentional or unintentional. Thus, not only is Bielby's opinion concerning EEO accountability purely a matter of his own "say so," since his opinion that Cargill's efforts were insufficient is purely a matter of personal preference, but it only addresses the possibility of a disparate impact against African Americans at Cargill, not intentional discrimination.

**C. David Peterson**

Both Bielby and Adler rely heavily on statistician David Peterson's findings of "something other than perfect parity" in employment outcomes as between African Americans and Caucasians. Peterson admits that he was asked to look for statistical evidence supporting a claim of discrimination, but when pressed, Peterson must admit that his findings are no more likely to be indicative of race discrimination than not. Ultimately, Peterson does little more than create artificial employee groups ("cohorts") which, even if assumed to be meaningfully constructed, prove only that Cargill does not *randomly* assign performance ratings, select employees for promotion or termination, or determine changes in salary.

Aside from the failure of Peterson's statistics to shed any light on the question of class-wide, intentional discrimination, they are fundamentally flawed. His "cohorts" are not composed of similarly situated employees; he has failed to control for actual performance differences as reflected in the performance ratings earned by Cargill's employees, he has failed to control for employee interests, performance, and qualifications in the selection of employees for promotion;[2] he has failed to control for individual and business unit performance and market factors in the determination of pay increases and incentive and bonus awards; and he has failed to control for the highly individualized factors that go into termination decisions. These shortcomings, and others, render Peterson's report so flawed as to make it, too, inadmissible as a matter of law.

The Court should carefully scrutinize these experts' opinions, as each attempts to conceal its shortcomings in the shadow of the others. Standing alone, not one is reliable enough to be admitted; rigged together, they do no better. Statistics that may be evidence of illegal discrimination – *or not*, combined with opinions about a culture that might be vulnerable to discrimination – *or not*, cannot support any conclusions as to whether a pattern or practice of intentional discrimination did or did not exist. Evidence that does not tip the scale more one way than another is insufficient to meet any threshold test of relevance, even at class certification, and should be excluded.

## II. ARGUMENT

### A. The Court Should Consider Daubert Motions In Advance Of Class Certification So As To Eliminate Methodologically Unsound And Unhelpful "Expert" Testimony.

The Court is obliged to consider the validity, relevance, and admissibility of expert testimony before relying on that testimony as a basis for deciding the propriety of class certification. While some courts have held that it would be improper to critique an expert on the strength of his conclusions *if* the expert has not been able to undertake a thorough review of available data, it is almost universally agreed that a court may disregard an expert's testimony prior to class certification if it is not relevant, or where it is apparent that the expert's methodology falls short of assuring the court that the expert's conclusions – whatever they may be – will be valid and, therefore, of some use to the ultimate decision-maker.[3]

For example, this Court recently held that "Daubert is helpful [at the class certification stage] to the extent that it can assist the Court in preventing the entrance of a methodology so apparently flawed." Midwestern Machinery v. Northwest Airlines, Inc., 211 F.R.D. 562, 566 (D. Minn. 2001) (Frank, J.). This opinion has been echoed by courts across the country. Even those courts that hold that a full Daubert analysis is inappropriate at the class certification stage have agreed that "the court [must] carefully scrutinize[] expert testimony to determine whether it in fact supports the certification of a class in this case." Bacon v. Honda of Am. Mfg., Inc., 205 F.R.D. 466 (S.D. Ohio 2001); see also Nichols v. SmithKline Beecham Corp., 2003 WL 302352 (E.D. Pa. Jan. 29, 2003) ("[T]he Court has carefully

---

[2] As both Bielby and Peterson agree, employee interests, qualifications, skills, and preferences affect employment outcomes. Bielby Dep. 191-193; Peterson Dep. 104-07. Neither measured them. The same is true for actual performance.

[3] "To preclude expert testimony at class certification stage, it must be shown that opinion is the sort of 'junk science' that Daubert inquiry at this preliminary stage ought to screen." In re Bromine Antitrust Litig., 203 F.R.D. 403, 408 (S.D. Ind. 2001); see also Vickers v. Gen'l Motors Corp., 204 F.R.D. 476, 479 (D. Kan. 2001) (while Daubert analysis is not required at class certification stage, court should not certify class on basis of expert opinion so flawed that it is inadmissible as matter of law). Moreover, it goes without saying that the court need not consider the scientific validity of an expert opinion at the class certification stage, if the court makes a determination that the opinion is not relevant to the issues before the court. Gosho v. U.S. Bancorp Piper Jaffray, Inc., No. C-00-1611-PJH, slip op. (N.D. Cal., October 1, 2002) (rejecting Bielby's opinions and report based on unscientific "Cultural Assessment Report") (unpublished, copy attached).

scrutinized plaintiffs' medical evidence to determine whether it supports class certification.") (copy attached).[4]

With this Motion, Cargill focuses solely on the fundamental and widespread foundational and methodological flaws infecting Adler's, Bielby's, and Peterson's opinions, and the manifest inability of those opinions to assist the Court in determining the propriety of class certification in this across-the-board, intentional discrimination lawsuit.

**B. Ronald Adler**

**1. Adler Lacks Pertinent Education, Training, Experience, Or Knowledge.**

The first requirement of Fed. R. Evid. 702 governing the admissibility of expert opinions is that the putative expert be qualified by "knowledge, skill, experience, training, or education" in a pertinent area of specialized knowledge. Fed. R. Evid. 702. Adler is not qualified to testify as an expert on corporate culture, organizational bias, or the adequacy of policies to prevent bias in this race discrimination case.

Adler is not qualified by education or training. He has a bachelor's degree in finance and an M.B.A. He has no degrees and, indeed, has received no formal education in sociology, psychology, or industrial organization psychology, the recognized scholarly disciplines usually addressing culture and organizational bias issues. Adler Dep. 34-35. He has received no formal training in the areas of employment discrimination, effectiveness of EEO policies, practices or procedures to reduce vulnerability to racial bias, or dynamics of race discrimination in the workplace. Id. at 58-59.

---

[4] See, e.g., Mukhtar v. Cal. State Univ., 299 F.3d 1053, 1063 (9th Cir. 2002) (district court judge has a "'special obligation' to determine the relevance and reliability of expert[] testimony"); In re Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 26 (N.D. Ga. 1997) ("At the class certification stage, the Court simply examines whether [plaintiffs' experts] methodology, as proposed, will comport with the basic principles of econometric theory, will have any probative value, and will primarily use evidence that is common to all members of the proposed class."); In re St. Jude Medical, Inc. Silzone Heart Valves Products Liability Litigation, 2003 WL 1589527 (D. Minn. March 27, 2003) (court "carefully scrutinized plaintiffs' medical evidence to determine whether it supports class certification" because court has a duty to "ensure[] that the basis of the expert opinion[s are] not so flawed that [they] would be inadmissible as a matter of law") (citing In re Visa Check/Mastermoney Antitrust Lit., 280 F.3d 124, 135 (2d Cir. 2001)) (copy attached).

He also is not qualified by experience or knowledge. He has published no articles or scholarly works concerning the issues he opines about in his report. Id. at 36, 46, 73. He has conducted no empirical or scholarly research in any of those areas. Id. at 59-60.[5] He claims to have been a consulting expert for various publications, but he can recall no time when he consulted concerning the issues on which he now claims expertise. Id. at 40-41. He claims experience advising governmental and industrial organizations in employment issues, but, again, recalls virtually no instance where that advice concerned the issues addressed in his report. Id. at 42-50. The vast majority of his experience with these organizations focuses on unemployment insurance. Id. None dealt specifically with corporate culture or HR systems in the context of race discrimination, id. at 56-57, with the exception of a single discussion of culture as it relates to small business organizations, id. at 49.

Adler self-identifies as an expert based solely on his consulting experience using his commercial HR auditing program – Employment and Labor Law Audit ("ELLA"). This experience does not make him competent to serve as an expert in this case and, in any event, is irrelevant because Adler failed even to use his own ELLA program to evaluate Cargill. Id. at 32-33, 263-64. His background also has clearly failed to verse him in the principles of the scientific method for drawing reliable expert conclusions – as evidenced by his blatant violations of those principles, explained below. Even if his experience renders Adler competent as a consultant, it does not make him competent to testify as an expert in a court of law

[5] Likewise, none of his teaching experience bears any relation to the issues of corporate culture, and very little relation to organizational bias or the effectiveness of EEO policies and practices. Id. at 69-72. Adler cannot even recall viewing scholarly articles specifically concerning HR issues, or articles dealing with the possible impact of culture on discrimination, in preparation for his report. Id. at 76-78.

applying specific standards of reliability, veracity, and relevance.[6] Adler fails to qualify as an expert by education, training, experience, or knowledge.[7]

**2. Adler's Ignorance Of The Facts Precludes A Finding That His Opinions Are Based On An Adequate Foundation.**

The second requirement for the admissibility of expert testimony is that the expert must base his opinions on an adequate factual foundation. See Fed. R. Evid. 702 (qualified expert may testify if "(1) the testimony is based upon sufficient facts or data"); see also Guidroz-Brault v. Mo. Pac. R.R. Co., 254 F.3d 825, 830-32 (9th Cir. 2001) (criticizing experts for formulating opinion without reliable factual basis); United States v. City of Miami, 115 F.3d 870, 873 (11th Cir. 1997) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion."). Adler's deposition testimony reveals an ignorance of many critical facts and widespread abuse of others, totally undermining his ability to express a reasonably accurate conclusion.

Adler's review of the evidence was patently inadequate. Instead of independently reviewing the documents and transcripts for pertinent evidence, Adler relied on Plaintiffs' counsel to provide him with

[6] Adler's consulting experience has inculcated him with decision-making standards, applied in his report, that should never be accepted in a court of law. He opines about an alleged common discriminatory culture based upon anonymous employee comments, which he arbitrarily selects without concern for the truth of those statements. Compare Adler Dep. 86-87, 98, 115-22, 144-47, 229-30, 283-84, 288 with Fed. R. Evid. 602, 603. He looks to see if Cargill has a reputation for discrimination and bases his opinions on that "character evidence," again without regard for its truth. Compare Adler Dep. 185-89, 194-96 with Fed. R. Evid. 404(a). He arbitrarily selects other evidence for consideration, id. at 181-83, 314-15, and fully admits that his opinion has nothing to do with whether Cargill discriminated, intentionally or otherwise, id. at 84-92, 123, 130-33, 158-60, 218-19, 258, 284, 308, 324-25; compare Fed. R. Evid. 401.

[7] "[E]ducated guesses dressed up in evening clothes" are not sufficient basis for an expert opinion. Siharath v. Sandoz Pharms. Corp., 131 F. Supp. 2d 13471373 (N.D. Ga. 2001) (quoting Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387, 1407 (D. Or. 1996), aff'd, 295 F.3d 1194 (11th Cir. 2002)).

references. Adler Dep. 17-18.[8] Of particular note is Adler's testimony that he did not carefully consider the named plaintiffs' claims in establishing his opinions; in fact, he only looked at documents for two of the twenty-four plaintiffs. Id. at 98, 132. Yet, he concludes that all twenty-four *may* have suffered discrimination simply by accepting their anecdotes as true. Id. at 98. Adler also concedes he did not conduct any survey concerning Cargill, and did not even utilize his own human resource audit tool, ELLA, in his evaluation of the company. Id. at 32-33, 263-64. Such an arbitrary review process, guided by plaintiffs' counsel or Adler's whim, falls far short of Rule 702's requirements.

Adler's failure to consider sufficient evidence fundamentally undermines the reliability of his central opinions. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143-47 (1997) (expert's conclusions must be reasonable extrapolations from the underlying data); see also Landy Resp. to Adler at 20-21 (Adler ignored relevant empirical data). Adler admits that, were he to actually apply his auditing tool to Cargill, he would recommend a separate ELLA audit for each Cargill Business Unit ("BU"). Adler Dep. 263-64. However, Adler not only failed to use even his proprietary audit tool, but totally ignored the diversity in practices and policies across the BU's.[9]

[8] Other documents he selected for review arbitrarily. See Adler Dep. 181-82 (Adler selected four business unit ("BU") business plans, "[s]ort of random[ly]. I wanted some sort of a sense of what was going on and no particular reason for those."), 189-94 (Adler selected for reference several prejudicial comments posted on a commercial website,Vault.com, "[j]ust general reading and pulling out answers," and did not bother to look at Vault.com's full analysis of Cargill), 314-15 (Adler selected one memo concerning one BU's compensation policies as a basis for his opinions on Cargill's compensation system: "I'm not certain at this point why I picked that particular one. It was one of the memos that surfaced in my review of the documents."). Expert opinions must be based on and the result of rigorous analysis of the relevant record, not the result of flailing about in a sea of discovery using plaintiffs' counsel's selective record as a lifejacket.

[9] For example, notwithstanding his recognition that Cargill is highly diverse, that decision-making authority is delegated to BU management, that he would expect to find cultural differences between locations, and that a BU by BU review of policies is desirable, Adler Dep. 108-10, 175, 179-80, 323-24, Adler failed completely to look at the available BU policies that existed in the areas of EEO, affirmative action, and diversity. Id. at 19; see also id. at 109-12 (Adler did not review BU job posting policies), 145-55 (Adler did not consider BU accountability practices), 175 (Adler did not look at PMP completion rates for the BUs), 180 (Adler did not consider BU orientation practices), 224 (Adler did not look at outcomes for African Americans by BU), 270-71 (Adler did not compare culture scan results among BUs), 286-88 (Adler did not compare BU promotion policies or practices), 301 (Adler did not examine BU-level limitations on managerial discretion), 304-05 (Adler did not review BU job posting policies); cf. Landy Resp. to Adler at iv (Adler overlooks Cargill's actual diversity and EEO efforts).

In addition to failing to look at documents concerning BU policies and practices, Adler largely ignored the testimony of the embedded HR personnel responsible for implementing those policies and practices and, therefore, the persons most knowledgeable about Cargill's EEO and diversity efforts. Adler Dep. 73, 148-49; see also Jeanneret Rpt. at 80 (listing 30(b)(6) deposition transcripts not reviewed by Adler). Adler failed to conduct a systematic review of relevant testimony and was unaware that Cargill's embedded HR personnel had KRAs (specific, objective "Key Results Areas" against which their performance would be measured) concerning EEO issues, the Valuing Differences Initiative, and affirmative action issues. Adler Dep. 152-54, 164, 226-27. Adler further was unaware that Cargill's diversity council solicited feedback from employees on diversity issues. Id. at 229. Adler's central conclusion that Cargill failed to institute adequate policies and practices to reduce vulnerability to bias cannot be considered a reasonable extrapolation from the underlying data, see Joiner, 522 U.S. at 143-47, when he failed to consider the vast majority of evidence concerning BU policies and practices, the primary focus of Cargill's diversity efforts. See J.B. Hunt Transp., Inc. v. Gen. Motors Corp., 243 F.3d 441, 443 (8th Cir. 2002) (expert opinion excluded as "mere speculation and pure conjecture" due to foundational deficiencies in expert's core opinion).

Similar problems plague Adler's other opinions. Although he relies heavily on selected statements from Cargill's engagement survey and culture scan as proof of a discriminatory culture, Adler professes ignorance about the methodologies and actual results of those efforts. Adler failed to look at the complete engagement survey, Adler Dep. 133-36, and he knows nothing about the information-gathering process or whether the survey applied any controls, id. at 133-40. He points to no scientific or professional method for confirming the credibility of anonymous comments he drew from the survey. Id. at 307. As for the culture scan, Adler does not know if it was quantified or how widely the snippets of opinion he cites were held. Like the engagement survey, he does not know how information was gathered for the culture scan or how particular responses were selected for publication. He does not know if there

was a control group or if there were standard scientific measures of reliability or validity applied, and he is unaware of any norms against which to evaluate a culture scan. Id. at 268-72.[10]

Adler also criticizes the application of Cargill's performance management system ("PMP"), but without any foundation.[11] He visited no Cargill locations and looked at no individual employee personnel files. Id. at 102-03. He did not review any individual performance evaluations, nor did he survey Cargill employees concerning their perceptions of the PMP. Id. at 172-74, 290. He performed no study of any sort to determine whether the PMP allowed bias to infiltrate employee ratings. Id. at 173-74.[12]

In sum, Adler's abject failure to review relevant evidence, including crucial evidence concerning the named plaintiffs and Cargill's actual diversity and EEO efforts, precludes the Court from recognizing him as an expert in this case and requires that his report and opinions be stricken. See Erpelding v. Skipperliner Industries, Inc., 2002 WL 31014823 at *3 (D. Minn. Sept. 5, 2002) (Frank, J., copy attached) ("The flaws in [plaintiff's expert's] opinion run deeper than the usual Daubert-Kumho Tire concerns. [The expert's] opinion utterly lacks foundation, and should be excluded pursuant to Rule 104(a).").

**3. Adler's "Methodology" Is Based Solely On His *Ipse Dixit*, Not Scientific Or Professional Standards, Or The Scientific Method.**

The third requirement governing the admissibility of expert testimony is that "the testimony is the product of reliable principles and methods." Fed. R. Evid. 702. In other words, an expert – even if not a

---

[10] Like the "Cultural Assessment Report" in Gosho, neither the Culture Scan nor the Engagement Survey, relied upon by both Adler and Bielby, are scientific studies, and they contain" largely hearsay" and "an amalgam of impression" garnered from employees. Gosho, *supra*, note 3.

[11] Adler also demonstrates a fundamental ignorance of the importance of the PMP. As he understands the process, certain PMP scores are required for advancement, id. at 298-99, 302, and he believes that Cargill mandated a forced distribution of PMP scores to the disadvantage of African Americans, id. at 311-12. Those impressions simply are not true. Farrar Dep. 188-94; Siska Dep. 322-24, 458-61; see also Jeanneret Rpt. at 84-86. Adler also demonstrates an ignorance as to PMP completion rates for the entire class period, although he claims low completion rates are a significant component of his opinion. Adler Dep. 174-75. He seems completely unaware that PMP completion rates increased steadily from the "low" point he identifies in 1997, ultimately to a 99% completion rate by 2002-03. See Jeanneret Rpt. at 84.

[12] Other examples of Adler's failure to review relevant evidence abound. See, e.g., Adler Dep. 131-32 (Adler does not know that Cargill complied with its obligations under the OFCCP conciliation agreement), 181 (Adler did not review all available Cargill affirmative action plans), 212-13 (Adler performed no systematic study to confirm belief that there was "widespread skepticism" about management's commitment to diversity).

scientist – must derive his conclusions from application of the scientific method, which sets forth principles for drawing sound expert conclusions in any field of knowledge. See Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315-16 (9th Cir.), cert. denied, 516 U.S. 869 (1995) ("Daubert II") ("[I]t is [the court's] responsibility to determine whether [the] experts' proposed testimony amounts to 'scientific knowledge,' constitutes 'good science,' and was 'derived by the scientific method.'"); id. at 1317-18 (where expert testimony "is not based on [his own] independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles"); Bradley v. Brown, 42 F.3d 434, 438 (7th Cir. 1994) ("[T]he first and most significant Daubert factor is whether the [expert's] theory has been subjected to the scientific method."). Based on numerous admissions and concessions in his deposition testimony, it is readily apparent that Adler's methodology falls far short of any scientific or professional standards of reliability.

First among Adler's methodological flaws is that he attributes his analysis to absolutely no recognizable scientific basis, although he purports to testify concerning a field of social scientific knowledge. See Contractors' Ass'n of E. Pa. v. City of Philadelphia, 893 F. Supp. 419, 437 (E.D. Pa. 1995) ("[N]o understandable scientific basis [for the expert's hypothesis] is stated. Personal opinion, not science, is testifying here."); Erpelding, 2002 WL 31014823 at *3 ("[Plaintiff's expert testimony] should be … excluded. [T]he record provides little to no information about what, if any, scientific principles informed [the expert's] opinion or what, if any, scientific method he used to reach that opinion."); see also Jeanneret Rpt. at 81, 90 (Adler fails to identify the professional standard upon which he relies).[13] Instead, his understanding of Cargill's corporate culture, Adler Dep. 22-27, is based solely on his own unfounded assertions as to what culture is, how it is expressed, and how it affects employment decision-making. The

[13] Although Cargill's expert, Dr. Landy, and plaintiffs' expert, Dr. Bielby, disagree significantly in their conclusions, they basically agree that there are core bodies of sociological literature that necessarily inform any understanding of corporate culture or organizational bias. See Landy Resp. to Adler at 18-19. Adler references none of this literature as a foundation for his opinions in either his report or his deposition testimony. See Adler Dep. 66-69; Jeanneret Rpt. at 79, 88 (Adler indicates no knowledge of research principles on scientific findings concerning organizational bias as the impact of "subjectivity" and cites no publications of scientific standing); see also id. at 81-82, 88 (Adler ignores the checklist of practices, validating Cargill's performance review process, in the article he cites).

law is clear that a witness's *ipse dixit* is not an adequate foundation for an expert opinion. See J.B. Hunt, 243 F.3d at 444 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert.") (quoting Joiner, 522 U.S. at 146).

Apart from his apparent ignorance of bedrock sociological literature on culture and bias, Adler's non-scientific methodology entailed no reference to any of the types of evidence that a court would consider reliable under Fed. R. Evid. 702. Adler relied on no empirical research concerning any possible correlation between culture and limited equal employment opportunity. Adler Dep. 25-26. He relied on no Cargill-specific research at all, other than Dr. Peterson's data. Id. at 86, 93, 121. Instead, Adler draws his decision-making criteria from commercial websites and popular publications, without any basis for attributing scientific validity to them. Id. at 62, 74-75, 125, 189-206, 233-35, 238-42; see also Landy Resp. to Adler at 14 (reliance on selective references to magazines and websites violates scientific method). This approach – equating pop culture with scientific authority – simply creates "pop science," which not even Adler pretends should satisfy the requirements of Fed. R. Evid. 702. He believes these sources are not scientific, see, e.g., Adler Dep. 240, and has no idea whether other experts treat them as authoritative, id. at 197. He candidly admits that he did not consider any controls when comparing Cargill to these "standards." Id. at 237.[14]

Adler's methodology also must be rejected because it has never been tested to establish reliability. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993) ("[A] key question to be answered in determining whether [an expert's] theory … is [sufficiently reliable to be admissible] is whether it can be (or has been) tested."); Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761, 776 (8th Cir. 2004) (in determining whether expert testimony meets Fed. R. Evid. 702 reliability

requirements, court should consider "whether the theory can be or has been tested"). Adler identifies his ELLA tool as the generally accepted standard for employment-related risk assessment techniques, again based solely on his own unfounded and unscientific opinions. Adler Dep. 78-81, 166-67. However, he admits that ELLA has never been subjected to a scientific study to determine its validity. Id. at 28, 169; see also Jeanneret Rpt. at 80-81 (ELLA has undergone no scientific testing to determine reliability); Landy Resp. to Adler at 7-8, 19-20 (theory underlying ELLA is unpublished and untested). It has never been peer-reviewed in a scientific sense. Adler Dep. 30-31. He also admits that his own ability to identify a culture that presents barriers to advancement or to draw conclusions concerning a corporation's vulnerability to bias – the issues about which he opines in this case – has never been validated. Id. at 68-69. In fact, Adler is unaware of any professional standard that could be used to establish the reliability of his methodology. Id. at 60-61, 156, 164-66.

Adler also consistently ignores fundamental principles of reliability associated with the scientific method. See Landy Resp. to Adler at 8-13 (describing process of falsifiability). He admits that he did not eliminate *any* other possible causes of perceived disparities other than the policies and procedures, Adler Dep. 114, and fails to quantify any of his conclusions, id. at 101, 290-91, 303-04 (Adler cannot quantify how much vulnerability to bias any particular HR policy or practice imports into employment decisions), 323 (Adler cannot quantify degree of managerial discretion in any Cargill employment decision). Opinions based on such an unreliable approach to the evidence cannot be admitted. Craftsmen Limo, 363 F.3d at 777 (expert's opinion excluded as unhelpful when he attributed causation to defendant without considering possibility of other influential factors).

A prime example of Adler's methodological flaws is his consideration of Cargill's "employment brand" as one of the foundations for his opinions. Adler Dep. at 189. Adler purports to say that an

---

[14] Moreover, in Adler's world of perceptions, he applies these "pop science" standards to Cargill by uncritically accepting plaintiffs anecdotes of discrimination, id. at 86-87, 98, 115-17, 121-22, 144-45, 147, 218-20, 229-31, 284, 288, 300, *without any concern for the truth of those perceptions*, id. at 122-23, 145-47, 157, 194-95, 201-02, 277-79, 308. In fact, Adler specifically states that he would not look at the plaintiffs' claims scientifically for purposes of his methodology. Id. at 98. He simply concludes that a

employer can enhance its "employment brand" (*i.e.*, reputation), and thereby decrease risk of a lawsuit, by following certain practices, id. at 62-63, 65, but he cannot state to any degree of professional certainty how much any particular policy increases or decreases the risk of claims. Id. at 101, 290-91. He identifies no recognized standards or benchmarks for evaluating a company's employment brand, id. at 186-87, and no scientific study correlating employment brand with vulnerability to bias (let alone actual and intentional bias), or to culture, id. at 188-89. His evaluation is based, in significant part, on his selective review of posted comments on a website called Vault.com, an on-line chat room in which individuals leave written postings under pseudonymous user names about virtually any topic, regardless of whether they actually have any basis or knowledge to support the comments they make. Remarkably, Adler relies on these postings despite the absolute impossibility of authentication and notwithstanding the unbelievable and blatantly racist nature of those comments. Id. at 194-201 ("Large Marge," cited by Adler, expressed her belief that "[e]veryone knows if a Chinese family owns 4 dogs they are considered a 'Cattle Rancher'"; "King Nazi," also cited by Adler, expressed his belief that "[w]etbacks have lowered everyone's standard of living in the U.S.A."). Adler Rpt. 13. He does not use a test or methodology to evaluate Cargill's employment brand; he just relies on "general observation." Adler Dep. 187-88. He relies on his own "say so" as proof of what factors should have what weight in determining employment brand. Id. at 203-06.[15]

wider pattern of discrimination exists, based on a few anonymous employee comments, which may or may not accurately reflect Cargill's culture. Id. at 122-23.

[15]Other examples of Adler drawing crucial conclusions based solely on his *ipse dixit* abound. See, e.g., id. at 120-23 (unfounded conclusion that culture affects African Americans more negatively); 156 (whether an organization has too many critical vulnerability factors is left to expert's discretion); 209-10 (baseless conclusion that a company shows less commitment to diversity if it publishes management's EEO statements on the intranet, rather than sending them to all employees); 229-30 (unfounded inference that Cargill's Ebony Council and open line are inadequate means of gathering employee feedback); 246-49 (Adler relies on unaccepted, untested, unvalidated analogy to Maslow's Hierarchy of Needs – his own "original work" – to critique Cargill's EEO efforts); 303 (Adler concludes that Cargill's promotion, PMP, compensation, termination, and talent management systems are inadequate without any benchmarking against any generally accepted promotion systems or reference to scholarly research); 309 (in preparing Adler Ex. 103, he failed to control for salary grade or performance, but rather listed percentages without any statistical analysis).

Plaintiffs, it is expected, will argue that none of these criticisms should concern the Court, who has considerable flexibility to determine the admissibility of expert testimony. But the Court's discretion is not trumped by some purported expert's assertion. See Craftsmen Limo, 363 F.3d at 776-77 ("In making that determination, the district court is free to evaluate one or all of the following factors: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community."). Here, Adler's opinions satisfy none of the several factors the Court may consider to determine reliability. His methodology has not been tested, has not been subject to peer review, cannot be quantified, is subject to no controlling standards, and is not generally accepted in the scientific community.

**4. Adler Fails To Apply Reliable Principles To The Law And Facts Of This Case, And His Opinions Will Not Aid The Court As Decision Maker.**

The final requirement governing the admissibility of expert testimony is that "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Adler's opinions cannot satisfy this final hurdle, in light of his flawed methodology and inadequate factual foundation. Moreover, Adler ignores the legal standard for liability set forth by United States Supreme Court precedent and indicts Cargill for allegedly failing to satisfy a completely different standard without any basis in law. See Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir.), cert. denied, 531 U.S. 979 (2002) ("[A] theory that might meet certain Daubert factors should not be admitted if it does not apply to the specific facts of the case."); Daubert II, 43 F.3d at 1321 n.17 ("Federal judges must … exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case.").

Adler's methodology is concerned solely with formulating opinions based upon outcomes, *i.e.* whether or not a company's EEO and diversity policies and practices result in a proper representation of minority employees per their overall representation in the pertinent workforce. Adler Dep. 27, 67-68, 84-

85, 89, 111-13, 123, 128, 130-33, 144, 222, 247-48, 249-50. At most, Adler's analysis focuses on determining whether Cargill's policies and practices result in a disparate *impact* on African-American employees. Yet, Plaintiffs have expressly disclaimed any intention to seek class certification of a disparate impact claim. See Pls. Mem. Supp. Class Cert at n.2.

Adler repeatedly concedes that he has no independent opinion as to whether Cargill (or any of its managers) actually discriminated in any way against African Americans, or if Cargill is actually infected by race bias (systemic or individual), or even if any Plaintiff actually suffered discrimination or from bias (systemic or otherwise). Adler Dep. 84-85, 89-92, 98-104, 117, 123, 130-31, 133, 158-60, 218-19, 258, 284, 310, 323-25. In fact, he only suggests that Cargill does not intend to discriminate, but that latent bias *may* be resulting in discriminatory impact. Id. at 95-96. Yet, Adler persistently presumes the existence of bias and discrimination and offers conditional opinions "if" or "to the extent that" those presumptions are true. Id. at 91-92, 121-23, 171-76, 248-49, 265-66, 278-88, 294-95, 312-13, 323-24. The Court does not need an "expert" to tell it that Cargill, or any other company, *may* be vulnerable to individualized discrimination *if* those decisions actually reflect race bias.[16]

[16] Instead of offering an opinion pertinent to the question of intentional discrimination, Adler seeks to apply a standard of "guilt" devoid of any relationship to this § 1981 lawsuit. Adler claims there are systemic problems with Cargill's systems, but does not opine that those systems are themselves discriminatory or are "entirely subjective," as required for liability under Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147 (1982). Adler Dep. 84-85, 113-14, 151-52, 154-55. Instead, Adler opines that Cargill "failed" in its EEO efforts based on perceived under representation of African-American employees and Cargill's alleged failure to monitor those outcomes. Id. at 113, 142-48, 215-17, 256-57. Momentarily setting aside the fact that Adler ignored most evidence of Cargill's monitoring and accountability efforts, see supra part II.B. (citing Adler Dep. *passim*), this is patently not the standard applicable to an intentional discrimination case. The Supreme Court has held that to justify certification of an intentional discrimination class, the plaintiff must show that discrimination was the company's "standard operating procedure." Beckmann v. CBS, Inc., 192 F.R.D. 608, 618 (D. Minn. 2000) (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977); Catlett v. Missouri Highway & Transp. Co., 828 F.2d 1260, 1265 (8th Cir. 1987)). To do so, the plaintiff must show either a centralized discriminatory policy or an "entirely subjective" decision-making system. Falcon, 457 U.S. at 159, n.15; Beckmann, 192 F.R.D. at 613-14. Adler's theory of EEO "failure," based on his perceptions of disparate impact and a failure to track minority representation, simply does not satisfy either Falcon standard. Thus, his opinions would be of no help to the Court in determining the propriety of class certification. As another example, Adler sets up Cargill's diversity goals as a *de facto* legal standard and opines that, because Cargill did not reach its own diversity goals, it "failed" in its EEO efforts, notwithstanding the fact that those diversity goals sought to do more than the law requires. Id. at 85, 92-93.

An additional example of Adler's inexplicable failure to apply principles and methods reliably to the facts of this case is the unexplained (and unexplainable) distinction between his stated beliefs concerning the evidence necessary for Plaintiffs to prevail on their claims, and his utter failure to examine such evidence in drawing his "expert" conclusions. Adler agrees that to determine whether any claimant actually suffered race discrimination, one must look at individual circumstances, including performance and the experience of similarly-situated employees. Adler Dep. 106-08, 120-21, 177, 249-50, 319-21. Yet he never looked at any individual personnel files or performance reviews, id. at 102-03, 172-73, 290. If Plaintiffs' own expert believes that proof of liability will require detailed individual fact inquiries, certification of an across-the-board class is improper. The Court should not credit his opinions that Cargill "failed" in its EEO efforts when Adler ignores the very factual inquiries he believes are necessary to any finding of liability, and fails to demonstrate the existence of any discrimination.

**C. William Bielby.**

**1. Bielby Is Unqualified To Offer An Opinion Concerning The Impact of Culture Or EEO Accountability Efforts On African Americans.**

Bielby proffers two opinions: (1) that Cargill's culture creates or sustains barriers to career advancement for African Americans, and (2) that Cargill has failed to undertake adequate EEO accountability efforts to eliminate the effects of those barriers. In offering these opinions, Bielby is not simply professing expertise on general sociological knowledge. Instead, he is professing expertise on that subfield of sociology that concerns the interplay between race and culture. He also is professing expertise as to how these interactions are allegedly manifested throughout Cargill. Bielby is not qualified to offer those opinions.

Bielby has been permitted to testify in gender discrimination cases. He repeatedly conflates gender and race and cites gender-related studies as authoritative for purposes of this race case, see Bielby Dep. 19-20, 37, 40-41, 65-66, 191-92, 196-97; see also Landy Resp. to Bielby at 22-23 (discussing gender studies cited as authoritative by Bielby), even though he admits the principles and conclusions of those

studies may not apply in a different field of sociological knowledge, see Bielby Dep. 20-21.[17] Although a small fraction of his research and expert experience concern race issues, none addresses the issues on which he proposes to opine in this case. See id. at 16-19 (prior expert testimony minimally involved culture issues); 21-24 (Bielby's race-related research primarily focused on the entertainment industry); 25 (no published books or scholarly articles on race and corporate culture). His review of race-focused literature does not qualify him as an expert under Fed. R. Evid. 702, see Rasmussen, 57 F. Supp.2d at 63-65, especially in light of his misuse of that literature, discussed below.

**2. Bielby's Methodology Exhibits None Of The Assurances Of Reliability Required By Fed. R. Evid. 702.**

The second fundamental flaw rendering Bielby's report and opinions inadmissible is the unreliability of his methodology. See Fed. R. Evid. 702. Bielby professes to use a "social framework analysis" ("SFA") to draw his conclusions in this case. See Bielby Dep. 32-35, 50. While courts have accredited experts using SFA, Bielby violates every central tenet underlying that framework, thus destroying the validity of his conclusions.

In his deposition, Bielby described SFA as a non-scientific process whereby an expert reviews social science literature and seeks to apply the conclusions drawn in that literature to the facts of the case at hand. See id. at 33-35, 50. Bielby cites the work of Monahan & Walker as the foundation for his methodology. See id. at 60-61, Bielby Rpt. at 4. While Monahan & Walker may be the leading authority

---

[17] Numerous studies have concluded, overwhelmingly, that observed gender effects simply are not found when race effects are examined. See Landy Resp. to Bielby at 22-23 (citing studies refuting the notion of race effects), 53-55 (same), 57-59 (same), 61-64 (same). Something other than the mechanisms of gender bias appears to be at work when race is considered, and a sociologist cannot claim expertise in the subfield of race simply by applying uncritically the specialized knowledge or conventions learned in the subfield of gender. See, e.g, Kumho Tire Co., Ltd., 526 U.S. 137, 153-58 (1999) (finding the proffered expert qualified as an expert in mechanical engineering, but that his methodology in analyzing a particular tire failure was not reliable); Castro v. Oklahoma, 71 F.3d 1502, 1515 (10th Cir. 1995) ("We believe a serious question whether [psychologist] was competent to provide expert psychiatric assistance exists. [His] specialties in child and geriatric psychiatry probably render him unqualified to offer an expert opinion on many of the issues raised in a capital murder trial. A forensic psychiatrist or psychologist is the proper specialist for such a task."); Smith v. Rasmussen, 57 F.Supp.2d 736, 763-69 (N.D. Iowa 1999) (psychologist in general practice, with emphasis on child and adolescent services, qualified to testify as an expert on general psychological principles, but not qualified to testify as an expert on gender identity disorder; review of psychological literature concerning gender identity was insufficient).

for SFA in the litigation context, the SFA they developed and expounded does not even remotely resemble what Bielby purports to do in this case.

SFA was never intended to be applied based on unfounded presuppositions of the sort Bielby advances as sociological "knowledge." See Landy Resp. to Bielby at 21. According to Monahan & Walker, SFA is to be premised on "social fact." To be a social fact, a body of empirical research must unequivocally support a causal or directional relationship between two variables. Id. In other words, the sociological research must all point to the same conclusion or, if not, the expert must conduct additional empirical tests of the scientific principles that serve as the foundation for his opinions, in order to validate their application. Id. at 21-28.

Bielby does no such thing. Instead of offering a neutral statement of sociological knowledge, Bielby takes sides, exhorting the fact finder to decide the case against Cargill. Specifically, he claims sociological knowledge establishes that Cargill did not do enough to prevent unfair racial bias (to the extent it even exists). Those opinions usurp the role of the fact finder,[18] directly contrary to the established framework he purports to use.

Bielby also advances as sociological "knowledge" unfounded theories of race effects that do not satisfy the requirements of social fact. As Bielby concedes, the sociological research does not unequivocally point to the conclusion that perceived unequal outcomes for African Americans can be causally attributed to corporate culture or latent bias.[19] In light of that disagreement, proper application of

---

[18] Although an expert is allowed to opine on a matter embracing the ultimate factual issue to be decided by the fact finder, see Fed. R. Evid. 704, he is allowed to do so only on the basis of a legitimate methodology, see Fed. R. Evid. 702. Thus, the failure of Bielby's analysis is not that he opines on an ultimate factual issue *per se*, but that he does so absent any grounding in a legitimate methodology. Bielby may not avoid Rule 702's requirements simply on the basis of his *ipse dixit*. See J.B. Hunt, 243 F.3d at 444.

[19] See Bielby Dep. 43-44, 66-70. At best, sociologists disagree on that point. The majority of research, in fact, either has been unable to confirm or directly refutes the notion of race effects similar to the gender effects Bielby usually considers. See Landy Resp. to Bielby at 22-23, 38-42, 46-52; see also Bielby Dep. 68-70, 107-09 (Bielby aware of no studies attempting to determine whether corporate culture is likely to create or sustain bias); 124-27 (Bielby concedes that cognitive bias cannot be measured, or even determined empirically to exist); 151-53 (Thomas study challenged opinion that blacks cannot find developmental relationships in white organizations); 180 (studies on cognitive bias cannot be generalized).

the SFA would require that social fact be established by conducting independent empirical research on the experience of African Americans at Cargill. See Bielby Dep. 205-06. Bielby did not do so.

Indeed, Bielby circularly concedes that his conclusions would be accurate only if he is "correctly characterizing what's happening at Cargill." Id. at 58. However, he repeatedly concedes that he undertook no research to confirm his characterizations. Id. at 35 (no empirical or scientific study of Cargill); 49-50 (no inquiry into possible differences in BUs' vulnerability to bias); 56-57, 87 (no effort to determine if African Americans at Cargill actually are denied access to social networks); 96, 113, 135 (no inquiry into cultural differences between BUs); 179 (no inquiry into uniformity of barriers across BUs); 187-89 (no examination of percentage of HR managers with diversity KRAs); 193-95 (no assessment of relative employment skills or availability of training or development opportunities for African Americans at Cargill); 206 (Q: "[D]id you analyze whether or not Cargill had undertaken sufficient steps to roll [PMP] out across the company and train managers, HR people and the employees in [that] process?" A: "Well, I didn't focus so much on that systematically."). As such, Bielby's proffered sociological "knowledge" is nothing more than his *ipse dixit* as to the existence and cause of any differences in outcomes by race at Cargill; as such, it fails as a valid foundation for his opinions.[20]

Bielby admits that his methodology has never been tested or peer-reviewed, either as to his culture theory or "EEO accountability paradigm." Bielby Dep. 40-42, 52-53, 61-62, 126, 190-91, 195-96; see also Landy Resp. to Bielby at 70-71 (critiquing Bielby's representation that his EEO accountability paradigm has been "widely cited"). He has never conducted any original empirical research in the areas of race and corporate culture, latent race bias, or the effectiveness of EEO policies and practices to reduce

[20] "As for the sociological opinion [by Dr. Bielby], even if one puts aside reservations one might have as to its ultimate admissibility under the standards of *Daubert*, it consists on its face of little more than rank conclusion and gross speculation. For example, the opinion baldly premises that negative stereotypes result in African-American's being considered 'inappropriate for higher level jobs' by defendant's managers. Similarly, the opinion simply presumes that Metro-North's personnel and disciplinary systems are inherently subjective and allow managers to materially circumvent policies that would reduce subjectivity and bias. No meaningful weight can reasonably be attributed, even at this state [sic] of the proceedings, to a report so facially suspect." Robinson v. Metro-North Commuter R&R Co., 175 F.R.D. 46, 48 (S.D.N.Y. 1997), rev'd on other grounds, Caridad v. Metro-North Commuter R.R., (2d Cir. 1999).

race bias. Bielby Dep. 21-25. He cites to no controlling standards applicable to his methodology, id. at 27-32, 51-52 (no standards for measuring corporate culture); 42-43 (no set standards for evaluating methodology proposing to measure "vulnerability" to bias). He agrees that his opinions cannot be quantified, let alone assigned a potential rate of error. See id. at 38-39, 59-64. As explained above, his tortured social framework methodology is not generally accepted by the scientific community. See Landy Resp. to Bielby at 17-28. Instead, Bielby simply asks the Court to treat theories and conclusions as reliable because he is a sociologist. That request cannot be granted as a matter of evidence law.

**3. Bielby Opinions Are Not Helpful Because They Are Irrelevant.**

Finally, Bielby's report opinions are of no help to the Court in determining the propriety of class certification. Like Adler, Bielby offers opinions that, at best, might support the notion of a disparate *impact* case; he offers no opinion that would help determine whether Cargill intentionally discriminated on a class wide basis.

Bielby does not opine that Cargill's employment decision making was actually infected with any race bias, latent or otherwise. Bielby Dep. 37-38, 64, 122-23, 164, 167-69, 177, 204 ("I mean sort of no one is immune from [cognitive bias], it is sort of part of how we perceive the world no matter who we are ...."). He does not opine that Cargill has a racially discriminatory culture. Id. at 45-48, 126-29 (identifying Cargill's Guiding Principles as non-discriminatory markers of Cargill's culture). He does not opine that Cargill's decision-making system was "completely subjective" (like the decision-making system in the sociology department at the University of California, Santa Barbara, where he was head of the department.) Id. at 71-79. He does not opine that Cargill has a centralized policy of race

discrimination; indeed, he does not opine that Cargill or any of its officers or managers ever had any discriminatory intent when making policy or employee-specific decisions.[21] Id. at 164-75.

The crux of Bielby's opinion concerning Cargill's culture can be found on pages 83-87 of his deposition transcript. He fully agrees with the notion that Cargill did not develop a culture to exclude African Americans or otherwise discriminate against them. Id. at 83-86. Instead, because Cargill has traditionally operated in rural, majority white areas, Bielby believes African Americans are likely faced with hurdles to advancement that occur *whenever* African Americans are a minority in the work environment, including hurdles raised by their own *perceptions* of a "white" environment. Id.; see also id. at 39-40, 174-75. Nowhere, however, does Bielby opine that either the strength of Cargill's culture or any perceived flaws actually are a vehicle for, or actually result in, intentional race discrimination. Id. at 55-56, 64, 86-87, 92-97, 150, 174-75. He also concedes that there will be cultural differences among BUs, although he failed to inquire into those differences. Id. at 91-92; see also id. at 93-97, 111-12, 170-72. Without some well-grounded, admissible opinion relevant to the question of whether Cargill centrally manifested intentional race discrimination in or through its corporate culture, Bielby's opinions offer no support for Plaintiffs' legal theory.

Bielby's opinion concerning EEO accountability is similarly irrelevant. He expresses no criticism of Cargill's underlying decision to decentralize accountability for EEO goals. Id. at 120-21. Rather, he opines that, while Cargill took a number of very positive steps toward EEO accountability, it did not do enough. Id. at 89. Yet he offers no opinion at all suggesting that this shortcoming was intentional. On the contrary, Bielby testified explicitly that the discrimination he speaks of, assuming it

---

[21] On the contrary, Bielby specifically testified to elements of Cargill's decision-making systems that limit managerial discretion. Bielby Dep. 181 (corporate management instituted some proactive EEO accountability measures); 185-86 (Cargill widely publishes EEO policy and has EEO requirements for managers, including diversity KRAs and BU contracts); 202-03 (praising Cargill's RIF process); 207-09, 214-15 (listing monitoring efforts undertaken by Cargill). He also recognized, but then ignores, the highly positive elements of Cargill's culture and evidence that Cargill's corporate decision makers were truly committed to principles of non-discrimination and racial diversity. Id. at 88 (less backstabbing, less throat-cutting, goodwill, respect, willingness to help, integrity and ethical practices are key markers of Cargill's culture); 89 (Cargill has had strong formal commitment to EEO for decades); 95 (highest standards of ethics and integrity and accountability for unethical conduct are markers of Cargill's culture).

even exists, is discrimination based on *unconscious* stereotypes. Id. at 123-24 (Decision maker acting on the basis of a stereotype "wouldn't necessarily be acting out of prejudice and a desire, an explicit desire to treat [African Americans] less favorably.").

Bielby also offers no factual or scientific basis for his opinion that Cargill's diversity efforts were inadequate. See, e.g., id. at 54. Not only did he fail to inquire into Cargill's actual EEO accountability practices, by failing to inquire into BU-level efforts, see id. at 49-50, 56-57, 87, 96, 113, 135, 179, 187-89, 193-95, 206, but he offers no empirical research, or even recognized theory, suggesting that Cargill's particular efforts were inadequate. While he cites his own article for the general proposition that EEO accountability is important, id. at 195, he cites no scholarship or empirical research supporting his conclusion that Cargill provided inadequate accountability, id. at 195-96, or that any inadequacy results in intentional discrimination. Again, he simply asks the fact finder to take him at his word, as an expert, that Cargill should have done more.

Thus, Bielby's opinion is completely useless to the Court, because he offers nothing bearing on the question of intentional discrimination. Conditional, circular opinions about increased "vulnerability to bias," (which Bielby will not venture to quantify as more than even 1% greater due to Cargill's policies or culture, although he would expect it to be at least one-tenth of a percent, see Bielby Dep. 56-60) are meaningless, especially on the question of class certification (as Bielby admits this "vulnerability" would vary from BU to BU, id. at 102).[22]

Bielby's opinions, like Adler's, fall woefully short of any relevance to the theory of a pattern and practice of intentional discrimination that is at the heart of Plaintiffs' class certification motion. Not only are they based entirely upon his *ipse dixit* as to what sociological knowledge is and how it should be applied to Cargill, but they also offer no support for the notion that Cargill *intentionally* discriminated

against all of its African-American salaried employees across-the-board, either through its culture or its EEO accountability efforts. His opinions fail to enlighten the Court as to the existence of a standard operating procedure of discrimination at Cargill, which Plaintiffs must show to justify class certification and should be stricken. See Teamsters, 431 U.S. at 336; Falcon, 457 U.S. at 159 n.15.

**D. David Peterson.**

**1. Peterson's Statistical Model Is Unhelpful And/Or Unreliable.**

The danger of relying on statistics as an aid to prove legal causation, as Peterson himself admits, is that an analysis can be computationally correct and yet utterly meaningless because it either does not accurately model the decision-making process at issue or it fails to account for all reasonable explanatory factors for the result observed. See Peterson Dep. 43-44 ("If you have two models, one of which better reflects the alternatives that were available to the employer than the other, then the one that should be given more credence is that which more faithfully reflects the alternatives."); id. at 93 ("[I]t seems to me that a stronger case is made by a showing that incorporates more factors that might reasonably bear on an employer's decisions."); id. at 207 ("[I]f Cargill can explain why the disparities that I found in the different cohorts exist, that will explain why the model I have chosen is inadequate under the present circumstances."); see also Bazemore v. Friday, 478 U.S. 385, 400 n.10 (noting that a statistical analysis "may be . . . so incomplete as to be inadmissible as irrelevant"); see also Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (collecting cases); Raskin v. Wyatt Co., 125 F.3d 55, 65 (2d Cir. 1997) (noting that, under the Daubert framework, trial courts may exclude statistical expert testimony that is not

---

[22] Adler is similarly afflicted with an inability to determine how much, if any, more or less "vulnerable" Cargill is to bias because of any particular system or culture. Adler Dep. 290-91, 295. Peterson does no better, admitting that his statistics can not prove discrimination. No matter how large the standard deviation, it says nothing about the odds of discrimination having occurred. Peterson Dep. 129-34 ("Q. So regardless of the size of the standard deviation, you cannot give an opinion as to how likely it is that it was any one of those three things? A. That's right." (discussing "exculpatory" and "non-exculpatory" reasons for statistical disparities)).

"helpful" to the trier of fact). Peterson's analysis suffers from two flaws so fundamental as to render it entirely inadmissible under the Daubert standard.[23]

Peterson essentially presumed the existence of the very discrimination for which he was retained by Plaintiff's counsel to find statistical evidence, thereby creating an entirely circular and self-fulfilling hypothesis. Despite his assertion that a statistician in an employment case has a responsibility to model the decision-making processes under examination as closely as possible, see Peterson Dep. 41 ("I'm trying to tailor the analysis to follow legitimate, to follow, to reflect factors that might legitimately influence the decision process."), Peterson did not read a single deposition transcript, interview any of the Plaintiffs or any other current or former employee or manager of Cargill, or read a single document about any of the employment processes (PMP, pay, promotion, termination) he analyzed, see Peterson Dep. 23, 30-32, 59-60, 103.

In fact, as Peterson himself makes clear, he has based his entire analytical framework on his generalized assumptions about how employers typically make employment decisions and not at all on how Cargill actually makes such decisions – because he has no foundation for understanding how Cargill makes such decisions. See, e.g., id. at 88, 103 (claiming that "the reason I didn't use performance as an explanatory variable is that, in my experience, performance ratings are assigned in a nonobjective way" but agreeing that "[I] haven't actually looked at Cargill's performance evaluation system to compare it to the other ones [I] may have seen in [my] experience").

[23] In its opposition to class certification and in its response to reconsideration of summary judgment on the claims of Plaintiff Louis Darden, Cargill has pointed out to the Court a variety of ways in which Peterson's analysis *is not* computationally correct, for example, by double-counting or failing to count large numbers of employees, constructing cohort groups that do not correspond at all to the comparators identified by the named plaintiffs, looking at pay progression in gross dollar terms rather than percentage increases, combining misconduct-based terminations along with performance-based terminations, economically motivated reductions-in-force, and even wholly voluntary terminations, and most significantly aggregating, in an undisciplined and misleading way, "overall" statistical results across divisional, job group, and temporal lines). See, e.g., Def.'s Mem. Opp. Class Cert. at 18-21, 36-37; Def.'s Mem. Opp. Reconsideration of Summ. J. of Louis Darden at 9-14. While such errors should not be forgotten, this motion reaches the more fundamental question of whether Peterson's analysis, and the legal assertions Plaintiffs draw from it, rest on a sound foundation of "principles and methodology." Erpelding, 2002 WL 31014823 at *2.

Second, because Peterson does not know how Cargill makes such decisions, he cannot possibly know whether he has controlled for all reasonable, non-discriminatory explanatory factors. Peterson does not deny, in fact, the existence of other explanatory variables, he just shrugs off their omission from his analysis on the grounds that such data either was not contained within the Cargill HRIS database or his unproven assumption that, to the extent such data could have been obtained from the HRIS data, it was unreliable or inherently discriminatory. See Munoz v. Orr, 200 F.3d 291, 301 (5th Cir.) (declining to review decision of district court to exclude as unreliable expert testimony where expert assumed from outset that challenged employment practice was discriminatory, failed to control for other, relevant variables through a multiple regression analysis, and relied on data provided by plaintiff's counsel without seeking independent verification), cert. denied, 531 U.S. 812 (2000).

Of course, such explanations merely confirm the fact that Peterson essentially assumed from the outset the discrimination Plaintiffs' counsel assured him existed at Cargill and asked him to demonstrate through statistical evidence. Nowhere is that more evident than in his failure even to consider the effect that actual performance ratings at Cargill (for which he had data) had on employment decision-making, notwithstanding his testimony that individual employee performance is probably the most significant (and legitimate) factor "that might influence employment decisions." Peterson Dep. 53-54 ("That's [performance is] the big one."); see also id. at 94 ("I would assume, as a general principle, that the quality of an employee's work would affect decisions that the employer makes about the employee.").

There is no dispute that Peterson had available to him data on individual performance ratings at Cargill. In fact, he conducted a superficial analysis of the distribution of the performance rating data over the liability period and concluded that the distribution did not appear to be random. Remarkably, Peterson failed to take the next logical (and necessary) step, which would have been to determine whether the distribution of performance ratings could explain, in whole or in part, the statistical disparities that Peterson claims to have found in pay, promotion, and termination decision-making and which Peterson (or at least Plaintiffs' counsel) attributes to racial discrimination. See Topel Rpt. 6 ("For each of the outcomes he studies, Dr. Peterson fails to connect outcomes (such as pay progression) to the performance

evaluation systems that are central to this case and that are the sole source of information on actual performance of employees."); Peterson Dep. 87-88.

Peterson attempts to excuse this shortcoming in his analysis on the grounds that "[m]ost performance ratings, in my experience, are subjectively awarded, and therefore would not pass muster under an objectivity standard." Peterson Dep. 54. Of course, the evaluation and rating of employee performance necessarily entails the exercise of judgment and, in this regard, "subjective" does not, as a legal or statistical matter, equate to unreliable or discriminatory. See, e.g., Abram v. UPS, 200 F.R.D. 424, 430 (E.D. Wis. 2001) ("The decision to permit some consideration of subjective factors is not, *in and of itself*, a discriminatory practice . . . ." (emphasis in original)). Moreover, Peterson self-admittedly "know[s] very little about the performance evaluation measuring process at Cargill." Id. at 55.

Peterson's complete lack of curiosity as to whether the performance of individual employees, at least as captured by performance ratings, could explain some or all of the statistical disparities he claims to have found in employment decision-making at Cargill, undermines both the soundness of his theoretical approach and his findings. If, for example, controlling for performance ratings reduces any disparities in pay, promotion, and termination to statistical insignificance (and it does), then the question of intentional bias against African-American employees at Cargill turns on a completely different issue – namely, whether Cargill had any reason to believe that its performance review system, designed with the assistance of outside consultants to meet the current "state of the practice," did not accurately capture employee performance and, more to the point, systematically resulted in African-American employees receiving lower ratings than their actual performance warranted. Otherwise, by failing even to consider the possibility that performance ratings might explain the disparities in other areas, Peterson has simply reported employment outcomes and not attempted to identify the causes of those outcomes.

Peterson also completely ignores a host of "pre-market" factors, correlated with race, that impact employment outcomes. See Topel Rpt. 32-37. He has also failed to control for actual employee interests, qualifications, and experience, instead constructing "cohorts" that assume their members of similar tenure, education level, job family, division, and FLSA status (rough approximations that, at best, are

poor substitutes for actual employee performance, interests, qualification, and experience) have an equal chance of being selected for promotion, termination, etc. – which everyone, even Peterson, agrees is not true. See, e.g., Peterson Dep. 91 ("In actual fact, there are distinctions between people in a cohort that make some more eligible for promotion than others."). The fact that a typical HRIS database does not have fields that capture these variables does not validate an analysis that is fundamentally flawed by ignoring them. Even worse, Peterson failed to control for performance and salary grade, both highly relevant variables and both found in the data.[24]

Particularly where common sense or the defendant's own asserted defenses identify non-discriminatory variables that may have a significant effect on the observed outcome, a proper analysis must address these variables and explain their relative effect. See McIntosh v. Weinberger, 810 F.2d 1411, 1428 (8th Cir. 1987), vacated on other grounds, 487 U.S. 1212 (1988); see also Evers v. Alliant Techsystems, Inc., 241 F.3d 948, 954 (D. Minn. 2001) (discounting plaintiff's statistical evidence because it failed to take into account extent to which performance ratings may have accounted for disparities observed in layoff decisions); Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc, 254 F.3d 644, 652 (7th Cir. 2001) (noting that statistics that do not attempt to account for non-discriminatory explanations offered by defendant for observed results do not permit inference of discrimination); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 762 (3d Cir. 1994) (noting that to establish that an expert's opinion on causation is sufficiently reliable, an expert had to offer a good explanation as to why his

---

[24] Peterson's report is plagued by a host of other shortcoming, both methodologically and analytically. Topel Rpt. 38-67. Peterson controlled only for characteristics easily measured in an HRIS database, relying, at best, on an indirect and hypothetical relationship between an HRIS entry and actual relevant factors – job group (but not for actual job grade and other job-related categories which can be important variables in assessing pay growth differences), see Peterson Dep. 68-71, division (but not for location), see id. at 65-67, 256-57, education (but lumped the largest group into an "other " category containing everything from Ph.D. to high school dropout), see id. at 72-77, and service quartile (but treating 2 and 3 years-of-service individuals differently, and 17 and 35 years-of-service employees identically), see id. at 77-87. Peterson only controlled for relevant factors to the extent, hypothetically, such variables are in fact correlated with job groups or divisions, if at all. Id. at 184. An appropriate statistical analysis, however, must account for "major factors" which could affect the results, Bazemore, 478 U.S. at 400, which Peterson fails to do, even though he admits there can be legitimate, non-discriminatory reasons for statistically significant imbalances, see Peterson Dep. 126, 215, 254-55. The burden of accounting for truly relevant factors remains with Plaintiffs.

conclusion remained reliable when defendants pointed to other likely causes of plaintiff's illness other than the defendants' actions), cert. denied sub nom, General Elec. Co. v. Ingram, 513 U.S. 1190 (1995); Erpelding, 2002 WL 31014823 at *3 (excluding expert opinion that a malfunction in an electrical device caused a fire where the expert could not exclude any of a number of electrical devices that could have been the cause, because such an conclusion "adds little to the record at all").

Importantly, Cargill's objection to the legitimacy of Peterson's analysis is not simply that Peterson ignores potentially explanatory data. Rather, Cargill's own expert has analyzed the effect that controlling for performance ratings would have on the claimed disparities and demonstrated that it actually explains the outcomes in pay, promotion, and termination. See, e.g., Topel Rpt. 59 ("[A]ny significant disparity in promotion rates between black and white employees is accounted for by Cargill's evaluation of individual performance.").

In this regard, the present case closely resembles the circumstances recently encountered by the Eighth Circuit in Morgan v. United Parcel Serv. of America, Inc., 380 F.3d 459, 466-471 (8th Cir. 2004), in which the court critically rejected the conclusions reached by the plaintiffs' expert in support of an attempt to certify a nation-wide class of employees in a § 1981 action because of the very flaws that plague Peterson's analysis. As the court noted in Morgan, "the selection of explanatory variables is quite important," id. at 466, "[s]electing proper explanatory variables is a function of the particular employer's [employment] determinations," id. at 469, and the omission of a factor by an expert so obviously relevant to that decision-making process alone can provide a basis for the court to reject the expert's conclusions, id. Moreover, a statistical analysis of employment outcomes cannot fail at least to consider obviously relevant explanatory factors simply because of the unproven claim that the explanatory variable is tainted by discrimination. See id. at 470. In fact, as the court observed in Morgan, in response to the plaintiffs' expert's omission of both past pay and performance ratings from an analysis of current pay and promotion rates, such an argument is entirely self-fulfilling and circular, and "[t]his sort of bootstrapping cannot create an inference of discrimination." Id. at 470.

In the end, due to its errors, omissions, and questionable choices, all Peterson's analysis really shows is that Cargill does not make employment decisions in a random manner. See Peterson Dep. 118, 120, 171, 176, 224. Of course, Cargill does not make random employment decisions and, moreover, Peterson himself does not think that employers generally should make employment decisions randomly. See id. at 120-21. Peterson failed to educate himself about the employment decision-making processes he was attempting to model, failed to even try to control for one of the most significant explanatory factors influencing employment decision-making (*i.e.*, performance), and failed to demonstrate anything other than the common sense conclusion that Cargill does not make employment decisions in a random manner.[25] The Court, of course, does not need a faulty and flawed expert report to tell it that; the report lacks foundation, applies flawed principles and methodology, is not helpful to the factfinder, and should be excluded under Daubert. Cf. Erpelding, 2002 WL 31014823 at *3.

**III. CONCLUSION**

The opinions of Ronald Adler, William Bielby, and David Peterson fail to satisfy the requirements of Fed. R. Evid 702. Those opinions are, thus, inadmissible, and Cargill respectfully requests that the Court grant its motion and strike the reports and opinions of Adler, Bielby, and Peterson.

[25] Both Adler and Bielby similarly failed to establish any reasoned connection between outcome and any alleged flaws in Cargill's policies. They simply assert the existence of disparate employment outcomes on the one hand and make general observations about employment decision-making on the other, without linking the two in any way to the manner in which Cargill's systems actually operate.