FILED
2002 OCT -1 PM 7:16
RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA

NOT FOR CITATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CAROL GOSHO and SARAH LEWIS,

Plaintiffs,

v.

U.S. BANCORP PIPER JAFFRAY, INC.,

Defendant.
_______________________________/

No. C-00-1611-PJH

**ORDER RE MOTIONS TO STRIKE EXPERT OPINION TESTIMONY**

Before the court are the motions of defendant U.S. Bancorp Piper Jaffray ("Piper Jaffray") to strike opinion testimony of plaintiffs' experts, Dr. Janice Fanning Madden and Dr. William T. Bielby, submitted in support of plaintiffs' renewed motion for an order certifying the class.[1] Piper Jaffray contends that these expert opinions do not meet the standard under Federal Rule of Evidence 702, as articulated by the United States Supreme Court in Daubert v. Merrill Dow Phamaceuticals, Inc., 509 U.S. 579 (1993). Specifically, Piper Jaffray argues that Dr. Madden's report fails to address any issue relevant to plaintiff's renewed motion for class certification, and that Dr. Bielby's opinion is

[1] Although it is not entirely clear from the parties' papers, these Daubert motions may also be applicable to Piper's Jaffray's motions for summary judgment on the claims of plaintiffs Carol Gosho and Sarah Lewis.

unscientific, unreliable, and speculative. In a third motion, Piper Jaffray seeks an order striking the Declaration of Paul R. Neergaard submitted in opposition to Piper Jaffray's motion for summary judgment, on the ground that the Neergaard Declaration impermissibly attempts to submit information he obtained from Dr. Madden, and which could not have been admitted under Dr. Madden's name because it contradicted her previous testimony.

Rule 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify "in the form of an opinion or otherwise," where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In Daubert, the Supreme Court expounded upon the standard for admitting scientific or other expert testimony "in a federal trial." Daubert, 509 U.S. at 582. Under that standard, federal district judges are charged with ensuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." Id. at 597. The trial judge is required to act as a "gatekeeper," in making a preliminary assessment of the testimony's reasoning and methodology, and determining whether that reasoning and methodology can be properly applied to the facts in issue. Id. at 592-93.

In general, a motion to strike expert evidence pursuant to Daubert "involves an inquiry distinct from that for evaluating expert evidence in support of a motion for class certification." In re VISA Check/Mastermoney Antitrust Litigation, 280 F.3d 124, 132 n. 4 (2d Cir. 2001). Whether an action warrants class treatment is a matter to be decided "[a]s soon as practicable after the commencement of [the] action." Fed. R. Civ. P. 23(c)(1). While the court will often find it necessary to look beyond the pleadings before "coming to rest on the certification question," Gen'l Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982), the court is not permitted to make a "preliminary inquiry into the merits" of the plaintiffs' claims at that stage of the litigation. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974).

By contrast, a Daubert motion is typically not brought until later in the litigation, as, for example, a motion in limine, or in conjunction with a motion for summary judgment.

United States District Court
For the Northern District of California

See VISA Check/Mastermoney, 280 F.3d at 132 n.4. Indeed, the text of Rule 702 clearly indicates that the rule governs the admissibility of scientific evidence used by the trier of fact to determine a fact in issue in a federal trial – in other words, the merits of the claim. When an inquiry into the admissibility of a plaintiff's expert testimony at the class certification stage is directed at the merits of the plaintiff's claims, a Daubert analysis may not be called for. See, e.g., O'Connor v. Boeing North American, Inc., 184 F.R.D. 311, 320-21 & n.7 (C.D. Cal. 1998). Particularly where the dispute evolves into a "battle of the experts," it is not appropriate for the court to determine which expert is more credible at the class certification stage. Bromine Antitrust Litig., 203 F.R.D. 403, 408 (D.Ind. 2001); In re Linerboard Antitrust Litig., 203 F.R.D. 197, 217 n.13 (E.D.Pa. 2001).

To preclude expert testimony at class certification stage, it must be shown that opinion is sort of "junk science" that Daubert inquiry at this preliminary stage ought to screen. Bromine, 203 F.R.D. at 408; see also Vickers v. Gen'l Motors Corp., 204 F.R.D. 476, 479 (D.Kan. 2001) (while Daubert analysis is not required at class certification stage, court should not certify class on basis of expert opinion so flawed that it is inadmissible as matter of law). Moreover, it goes without saying that the court need not consider the scientific validity of an expert opinion at the class certification stage, if the court makes a determination that the opinion is not relevant to the issues before the court.

In this case, plaintiffs have asked the court to reconsider its earlier decision denying certification of the plaintiff class, based on the discovery of additional evidence that plaintiffs contend establishes the requisite commonality and typicality under Rule 23(a). Therefore, as stated in the order denying the renewed motion for class certification, filed herewith, the court considers only the question whether the additional evidence warrants certification. In particular, the court need not reconsider evidence that it already considered in connection with the prior motion.

The Madden report, dated July 19, 2001 (supplemented by a declaration and a report dated August 16, 2001), was submitted in support of plaintiffs' original motion for class certification. Dr. Madden, a labor economist, prepared statistical analyses of

disparities in compensation between male and female brokers employed by Piper Jaffray. Plaintiffs contend that these disparities are the result of the delegation of authority to individual branch managers to determine certain conditions of employment -- for example, the assignment of accounts and the provision of office amenities. Plaintiffs argue further that these disparities provide support for their claim that Piper Jaffray engaged in a pattern and practice of discriminatory treatment of female brokers, and that Dr. Madden's statistical analyses provide support for plaintiffs' claim that the existence of common issues of law and fact support the certification of a plaintiff class in this action.

The court found, however, in the September 13, 2001, order denying the first motion for class certification, that plaintiffs had failed to establish any causal connection between plaintiffs' compensation and the actions by the individual branch managers, sufficient to show the existence of common issues of law and fact with regard to plaintiffs' claim of disparate treatment. As Piper Jaffray notes in its opposition to the motion to strike expert testimony, while Dr. Madden takes some variables into account, her report does not incorporate the effect of production on compensation of brokers in Piper Jaffray's production-based system of compensation, and does not analyze statistically whether any discriminatory policy or practice affects production or commonly occurs within specific branch offices or across the board.

Plaintiffs argue that the statistical evidence provides support for their "pattern-and-practice" claim. Pattern-or-practice claims focus on allegations of widespread acts of intentional disparate treatment of individuals. Int'l Bd of Teamsters v. United States, 431 U.S. 324, 335 (1977). To succeed on a pattern-or-practice claim, a plaintiff must establish the occurrence of more than isolated, accidental, or sporadic acts of discrimination; rather, she must show that intentional discrimination was the defendant's "standard operating procedure." Id. at 336; see also Cooper v. Fed. Res. Bank, 467 U.S. 385, 401-02 (1984). Plaintiffs bringing such actions generally utilize two types of circumstantial evidence to establish the existence of a policy, pattern, or practice of intentional discrimination: statistical evidence aimed at showing the defendant's past treatment of the protected



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

group, and testimony from members of the protected group detailing specific instances of discrimination. See, e.g., Spaulding v. Univ. of Washington, 740 F.2d 686, 704 (9th Cir.), cert. denied, 469 U.S. 1036 (1984).

Thus, in order to show commonality with regard to the claim that Piper Jaffray had a policy or practice of discrimination that resulted in lower compensation for female brokers, as opposed to males, plaintiffs must provide evidence that similarly-situated female brokers repeatedly and regularly experienced similar discriminatory treatment throughout a significant number of Piper Jaffray's branch offices. Dr. Madden's statistical analysis is not relevant here because it does not establish the existence of either a discriminatory pattern or practice, or common issues with regard to individual claims of disparate treatment.

Dr. Bielby's opinion is presented in a declaration or report dated May 14, 2002. In that report, Dr. Bielby first looks at the statistics presented by Dr. Madden, and finds that those statistics indicate a large disparity by gender in the compensation of brokers at Piper Jaffray. He claims that the materials he reviewed showed that Piper Jaffray uses an arbitrary and subjective system to allocate resources that affect the ability of brokers to succeed in the company. He contends that because Piper Jaffray has a male-dominated work culture, this arbitrary and subjective system allows stereotypes and gender bias to substantially impact female brokers' opportunities at the company. He concludes that compensation differences between male and female brokers (which the evidence unambiguously shows reflect differences in sales performance) are caused by unequal allocation of accounts, administrative assistants, and other resources provided by Piper Jaffray to its brokers, and that this unequal allocation is a product of Piper's male-dominated work culture. He also maintains, based on his own analyses of Dr. Madden's data, with the addition of several variables, that the magnitude of the gender gap is consistent across branch offices.

Piper Jaffray seeks an order striking the Bielby report, on the ground that it does not meet the requirements of admissible expert testimony under Daubert. Piper Jaffray argues that Dr. Bielby has no scientific basis for the opinions provided in this case -- specifically,

United States District Court
For the Northern District of California

that Dr. Bielby has no objective basis for his opinion that Piper Jaffray brokers are employed in a "male-dominated" work environment in which decision-making is based on gender stereotypes. Piper Jaffray does not dispute plaintiffs' claim that Dr. Bielby is a highly-respected sociologist whose expert opinion has been admitted in numerous legal proceedings in both state and federal courts. Piper Jaffray argues, however, that Dr. Bielby's opinion is not admissible for the purpose of showing a pattern and practice of discrimination.

In Daubert, the Supreme Court provided a non-exhaustive list of factors to be used in determining whether expert testimony is sufficiently reliable to be admitted into evidence, including 1) whether the scientific theory or technique can be (and has been) tested, 2) whether the theory or technique has been subjected to peer review and publication, 3) whether there is a known or potential error rate, and 4) whether the theory or technique is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94. The Daubert factors apply to testimony based on technical and specialized knowledge, not just scientific knowledge, and the trial court can consider one or more of those factors what kind of technical, non-scientific evidence is admissible as expert evidence. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). While the trial court has broad latitude in determining whether an expert's testimony is reliable, and in deciding how to determine the testimony's reliability, Elsayed Mukhtar v. California State Univ., Hayward, 299 F.3d 1053, 1063-64 (9th Cir. 2002), the trial court is nevertheless required to "make some kind of reliability determination to fulfill its gatekeeping function." Id. at 1066. The Ninth Circuit has noted that "some . . . reliability determination" must be apparent from the record before it will uphold a district court's decision to admit expert testimony. Id. (citing United States v. Velarde, 214 F.3d 1204, 1210 (10th Cir. 2000).

The court finds that plaintiffs have failed to establish the reliability of Dr. Bielby's opinion because they make no showing that his theory can be tested or that it is accepted in the relevant scientific community. Dr. Bielby admitted in his deposition that he had no specific knowledge of the operations of any particular Piper Jaffray branch office, nor did

he visit any of the branch offices, or speak to any branch manager or to any Piper Jaffray employee. In forming his opinion that Piper Jaffray has historically fostered a male-dominated work culture, he simply relied on the findings and conclusions of "Cultural Assessment Report" prepared for Piper Jaffray in December 1997 by Fran Sepler of Sepler & Associates ("the Sepler Report"), and on other evidence relating to the Sepler Report's findings and recommendations. Dr. Bielby states in his declaration dated May 14, 2002, that plaintiffs retained him, first, to address the "relevance [of the Sepler Report] for understanding [Piper Jaffray's] personnel system;" and second, to determine, based on documents produced by Piper Jaffray and deposition testimony of Piper Jaffray managers, as well as on "statistics on employment and compensation trends," whether there are company-wide policies and practices that adversely affect the earnings of female brokers as compared with male brokers.

Dr. Bielby testified in his deposition that his understanding of what Sepler was trying to do was to "identify the key elements and dimensions of the Piper culture," and not to do a study of the employees' attitudes or opinions. He considered the report to reflect a "study of perceptions" or a "cultural assessment," in which Sepler "weighed information that she learned about individuals' perceptions in identifying elements of the culture." He defined "cultural assessment" as an attempt to find out "the key elements of an organization's culture . . . the values, the taken-for-granted understandings, and so on." He stated that Sepler was not conducting "a quantitative survey where she can apply standard measures of reliability and validity," but rather, was "looking at some quantitative information, some qualitative information, the documents, and so on." He specifically acknowledges, in his May 14, 2002, declaration, that the Sepler Report was "not undertaken as a scientific study."

Despite describing the Sepler Report in terms that clearly reflect a lack of scientific validity, Dr. Bielby nevertheless supports his opinion with quotations from the Sepler Report, and extrapolates from Sepler's comments and findings the conclusion that Piper Jaffray has a male-dominated work culture, which facilitates the alleged subjective



United States District Court
For the Northern District of California

decision-making. For example, he refers to Sepler's statements that "[s]tatus is a pervasive factor in the Piper organization [and is] highly intertwined with financial contribution and personal wealth," and that rewards are given to the top producers at Piper, to support his conclusion that "[i]n the absence of clear, written guidelines, it is inevitable that branch manager discretion will be used to consistently favor the mostly male high-status brokers" (emphasis added).

As the court indicated in the Order re Renewed Motion for and Order Certifying a Plaintiff Class, filed herewith, the Sepler evidence is largely hearsay and is inherently unreliable because it is essentially nothing more than an amalgam of impressions obtained by Sepler and her associates via interviews with individual employees and groups of employees participating in "focus groups." Plaintiffs provide no evidence that Sepler attempted to control for any variable or to conduct the interviews or compile the results using a methodology considered valid in any scientific community. "[I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. . . . [T]he requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." Daubert, 509 U.S. at 590. This standard of "evidentiary reliability" requires "a valid . . . connection to the pertinent inquiry as a precondition to admissibility. Kumho, 526 U.S. at 147-48. Plaintiffs have not met their burden of showing that Dr. Bielby's report, which depends in large part on the unreliable Sepler Report and its compilation of impressions and anecdotes, is sufficiently reliable to be admitted as expert opinion in this action.

Finally, with regard to the Neergaard Declaration, the court finds that the statistical evidence is admissible to the extent that it provides a summary of the number of accounts that Carol Gosho received, but not for the purpose of establishing a gender imbalance in the assignment of accounts, because as Dr. Madden herself admitted, the data on transferred accounts provided by Piper Jaffray, upon which both Dr. Madden and Mr. Neergaard based their analyses, do not permit a scientifically valid analysis of the effects of transfers of accounts on gender differences in compensation.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Defendants' motions are GRANTED as set forth in the foregoing discussion. This order fully adjudicates the motions listed at Nos. 315, 325, 348, and 350 on the clerk's docket for this case.[2]

**IT IS SO ORDERED.**

Dated: October 1, 2002

PHYLLIS J. HAMILTON
United States District Judge

Copies mailed to counsel of record

[2] To the extent that the court does not address specific evidentiary objections made by Piper Jaffray or by plaintiffs, either the objections are overruled or the evidence is not relevant to the issues raised in the underlying motion or motions.

FILE COPY

lm

United States District Court
for the
Northern District of California
October 1, 2002

* * CERTIFICATE OF SERVICE * *

Case Number:3:00-cv-01611

Crawford

vs

US Bancorp

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 1, 2002, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Vivian L. Schneider, Esq.
Vivian L. Schneider Law Offices
60 E Sir Francis Drake Blvd
Ste 310
Larkspur, CA 94939

Paul W. Mollica, Esq.
Meites Mulder Burger & Mollica
208 S. LaSalle
Suite 1410
Chicago, IL 60604

Jamie S. Franklin, Esq.
Meites Mulder Burger & Mollica
208 S. LaSalle
Suite 1410
Chicago, IL 60604

Thomas R. Meites, Esq.
Meites Frackman Mulder & Burger
208 South LaSalle St., Suite 1410
Chicago, IL 60604

Nancy E. Pritikin, Esq.
Littler Mendelson

650 California St 20th Flr
San Francisco, CA 94108-2693

Michelle R. Barrett, Esq.
Littler Mendelson
650 California St 20th Flr
San Francisco, CA 94108-2693

Richard W. Wieking, Clerk

BY: ______________________
Deputy Clerk