**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| RODERICK ARNOLD, ET AL,<br>on behalf of themselves and all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>Defendant. | Civil Action No.: 01-CV-2086 (DWF/AJB)<br><br>**REPLY MEMORANDUM IN SUPPORT OF SPRENGER & LANG'S MOTION FOR DIRECTIONS FROM THE COURT FOR THE IMPLEMENTATION OF THE SEPTEMBER 24, 2004 ORDER AND TO AMEND THE PROTECTIVE ORDER** |

## INTRODUCTION

In its opening brief in support of its motion seeking direction for implementation of the Court's September 24 Order, Sprenger & Lang ("S&L") identified two positions that Cargill had taken that have hamstrung S&L's efforts to assist plaintiffs in retaining successor counsel. First, Cargill took the position that documents could not be provided to prospective successor counsel under the protective order in this case. To address Cargill's concerns, S&L suggested modifications to the protective order. In its opposition Cargill does not identify any basis for believing that the proposed modifications would not adequately protect its interests.

Cargill devotes considerably more energy in defense of its second position, namely, that S&L's actions or inactions with respect to Bill Douglas that led to its disqualification created a taint on any work performed by S&L that would infect and therefore disqualify any potential successor counsel that saw S&L's work product. With minor exceptions, Cargill argues in the abstract concerning S&L's work product in general, rather than addressing the specific documents that S&L now seeks leave to provide to potential successor counsel. Cargill does not

even attempt to make a showing as to how these particular documents could possibly be tainted. It cannot do so.

In place of reasoned argument directed to the issues raised by S&L's motion, Cargill resorts largely to unnecessary sarcasm and unprofessional rhetoric. One of the targets of Cargill's venom is Cohen, Milstein, Hausfeld & Toll ("Cohen Milstein"), one of the firms identified in S&L's opening brief as a potential replacement counsel. The plaintiffs have now selected Cohen Milstein and one of its members, Joseph Sellers, as replacement counsel, if the firm accepts. The background and representations of Mr. Sellers filed herewith provide additional support for entry of the Order sought by S&L. For all of these reasons, the Court should grant S&L's motion.

## ARGUMENT

## I. THE COURT SHOULD AMEND THE PROTECTIVE ORDER.

In response to S&L's request that the protective order be modified in one narrow and specific manner to allow proposed successor counsel to review certain specified documents, Cargill states the obvious, pointing out that the provisions of the protective order were not drafted in the anticipation that law firms other than S&L would be able to receive copies of documents designated as confidential. To be sure, neither counsel nor the Court anticipated the situation that has now arisen. But Cargill offers absolutely no reason why the modifications of the document proposed by S&L, precisely tailored to the situation of prospective successor counsel, would not adequately protect it against improper disclosure or use of the confidential documents. The Court should assume from Cargill's failure even to attempt to show that the proposed protections are inadequate that Cargill can find no fault with them.

Mr. Sellers, on behalf of Cohen Milstein, has stated his willingness to sign such a modified agreement. (Sellers Decl., ¶ 23.) S&L will not show any documents to any of the other potential replacement counsel unless and until Cohen Milstein declines to represent plaintiffs.[1] Accordingly, Cargill does not have to worry, as it hypothesizes, about sets of documents designated as confidential in the hands of multiple plaintiffs' law firms, unless Cohen Milstein decides not to accept the proffered representation, and even then, such firms would be subject to the protective order.

Cargill also attacks our proposal that S&L retain custody of the materials until successor counsel enters its appearance and has had adequate time to seek those materials it would want, through motion or otherwise. The issue is a red herring for purposes of this motion. Under the protective order, S&L is permitted to retain "their work product and all briefs, pleadings or other filings with the Court . . ." (Protective Order, ¶ 12.) The documents that are the subject of this motion are court filings: motion papers and supporting exhibits. Even if S&L immediately returned or destroyed all documents required to be returned or destroyed under paragraph 17 of the protective order, it would have the right to retain the documents that it asks to be allowed to provide to potential replacement counsel.

Even if the Court were inclined to address the issue of who should hold documents that are not the subject of this motion, the answer should be S&L until the document turnover process

---

[1] The plaintiffs have indicated that Mr. Sellers and his colleagues at the Cohen Milstein firm are their first choice for replacement counsel. If Cohen Milstein is willing to become counsel of record in this case, there will be no need for anyone else to review any other documents.

The only reason that the proposed order must refer to any other potential replacement counsel is in the event that Mr. Sellers determines not to become involved in this case. In that case, plaintiffs must be able promptly to provide the same information to another prospective successor counsel. Accordingly, throughout this brief we will refer to Cohen Milstein as the proposed recipient of documents, with the understanding that this means "Cohen Milstein unless it declines representation, in which case another prospective successor counsel."

is complete, as suggested in S&L's opening brief and proposed order. Cargill castigates S&L as "the least appropriate custodian of Cargill confidential information on Earth." Cargill, however, has not pointed to one instance in which S&L violated the protective order. The violations that the Court found did not involve the protective order. There is no reason to think that S&L will start violating that order now. [2]

S&L is unaware of any decision, and certainly Cargill has not pointed to any, in which a court ordered that opposing counsel or the Court be the repository of disqualified counsel's files while it is determined which documents may be turned over to successor counsel. S&L will be happy to be rid of the documents as soon as feasible. Not only do they occupy a large amount of office and computer space, they are a constant reminder of a very painful event in the firm's history. For now, however, there is no viable alternative.

---

[2] Cargill has not suggested a viable alternative to S&L's holding documents subject to the protective order until successor counsel is in place and it has been determined what materials may be given to that law firm. Cargill first suggests its own law firm, Dorsey & Whitney should hold the documents. Assuming that Cargill does not ask to take possession of S&L's work product--which would be highly ironic, given the Court's findings that led to the disqualification ruling--either Cargill wants S&L to destroy that work product before there has been a determination of what, if any, of it may be turned over to successor counsel, or the work product will remain in the hands of S&L, obviating the purpose of designating Dorsey as the repository.

Cargill then suggests delivery of the protected documents to the Court. The clerk's office is not set up to handle in excess of 300,000 pages of documents, over 100 volumes of deposition transcripts, multiple expert reports, and electronic databases containing voluminous work product. If the clerk's office were unable to organize the files and respond promptly to requests from potential successor counsel, the plaintiffs' ability to secure replacement counsel within the time frame established by the Court would be seriously hampered.

## II. CARGILL CANNOT JUSTIFY ON THE GROUNDS OF SUPPOSED TAINT DENYING TO POTENTIAL SUCCESSOR COUNSEL THE DOCUMENTS THAT S&L SEEKS TO PROVIDE.

### A. Cargill Has Not Shown that the Documents Are Tainted

Cargill's primary opposition to this motion is based on the premise that the Court's 9/24/04 Order disqualifying S&L determined *sub silentio* that all, or virtually all, of S&L's work product should be deemed tainted. Cargill's amorphous "taint" theory goes something like this: The Court decided that S&L should be disqualified because its acts and omissions tainted this litigation. Therefore, the Court should conclude, for the same reason and without any other support, that all of the documents that successor counsel would need to review to decide whether to come into this case should be deemed tainted as well.

In advancing this theory, Cargill takes great pains to avoid addressing any of the specific documents that S&L seeks leave to provide to potential successor counsel, to the point of even expressing uncertainty about what the documents in question are ("[w]hatever that might encompass"). (Opp. at 5.) Cargill knows exactly what those documents are.[3] It avoids talking about specific documents because it knows that it cannot show any taint.

S&L first seeks leave to provide Cohen Milstein with the filings concerning the pending statute of limitations issue. These briefs obviously are relevant to assessing the size of and potential injuries to the class. The arguments are almost entirely legal in nature. Neither side attached any factual materials as exhibits. Surely, Cargill is not arguing that Bill Douglas, a non-lawyer, told S&L something that influenced the legal arguments on that motion. No taint can be shown.

---

[3] Lest there be any uncertainty about what materials are the subject of this motion, a chart listing the specific filings that S&L requests leave to provide to Cohen Milstein is attached as Exhibit A to the Reply Declaration of Michael Lieder. The documents are specifically identified by docket number so that there can be no possible misunderstanding about the subject matter of this motion.

S&L also seeks to provide Cohen Milstein with the class certification briefs and supporting exhibits. The exhibits consist of expert reports, documents produced by parties in this case, deposition transcripts, and summaries of the above information. Cargill has now had the opportunity to identify particular passages that it believes to be tainted. The Court's comment (in its Order dated October 13, 2004) that it could conduct an *in camera* review of specifically challenged documents suggests that this type of challenge is precisely what the Court expected. Cargill, however, has not even attempted to do so.

Cargill's own experts prepare four of the eight expert reports in the filings that S&L requests leave to provide to Cohen Milstein.[4] Certainly Cargill is not suggesting *that its own experts* were tainted by S&L's communications with Douglas or by S&L's possession of Douglas' documents.

Cargill also cannot explain how the plaintiffs' expert reports are tainted. The experts have cited the specific documents and deposition excerpts on which they relied for information about Cargill. Plaintiffs' statistical expert relied primarily on information produced by Cargill in its HR database that is known to both parties. If plaintiffs' experts made any factual statements for which their support was not evident, Cargill's lawyers were free to, and presumably did, question them about those statements in their depositions. Cargill thus has had ample opportunity to identify statements that might conceivably have been influenced by information supposedly obtained by S&L lawyers from Bill Douglas. It has not identified any such

[4] Cargill used three experts, but submitted two reports from one of them, Dr. Landy. Plaintiffs used three experts and submitted to the Court two reports by Dr. Peterson. In their brief, plaintiffs relied on Peterson's April 21, 2004 (Revised July 9, 2004) report that analyzes employee data from 1995 to 2003. Plaintiffs also submitted a report by Dr. Peterson that analyzes employee data from 1997 to 2003. *See* Ex. A to Reply Declaration of Michael D. Leider.

statement. Yet it wants to prevent Cohen Milstein from reading plaintiffs' expert reports, even though all the world (except Mr. Sellers and his team) can read two of them as a result of a Court order.

Cargill recognizes that it is a huge stretch to argue that the depositions taken by its own counsel were tainted by any information obtained improperly from Bill Douglas. It says that "most discovery conducted by Cargill, such as transcripts of named Plaintiff and declarant depositions" "could be deemed untainted." (Opp. at 10 n.3.) Yet Cargill apparently is unwilling to concede the obvious: that none of this discovery could be tainted by communications between S&L and Mr. Douglas.

The same is true of the transcripts of the depositions taken by S&L on behalf of plaintiffs. Cargill has not identified a single deposition question that it suspects S&L lawyers asked because of information improperly obtained from Mr. Douglas. But even assuming contrafactually that S&L lawyers were guided in what to ask by information obtained from Mr. Douglas, S&L could certainly not influence the answers given by Cargill's witnesses.. Each witness was sworn to tell the truth, and may be presumed to have done so. Which presumably truthful answers from witnesses its own counsel represented during their depositions does Cargill want to take back?

The class certification motion papers also rely heavily on policy and other documents produced by Cargill. Cargill already has acknowledged that "most documents produced by Cargill" "could be deemed untainted." (*Id.*) Cargill again does not explain why all of those documents are not taint-free. It has not even identified a document production request of S&L that it deems shaped by improper information from Mr. Douglas.

Finally, S&L seeks to provide Cohen Milstein with the class certification briefs themselves. Cargill presumably does not contend that its own brief was tainted. And it beggars

belief that the briefs filed by S&L on behalf of plaintiffs were any more tainted. Experienced counsel would not be relying for arguments concerning class certification on the opinions of someone without any legal training, especially opinions given before discovery began and therefore without the benefit of the information obtained during discovery.

S&L is not seeking at this time an opportunity to tell replacement counsel what its Cargill litigation team knows. Whether there should be a turnover of additional work product, and if so under what conditions, should be worked out after replacement counsel is in place. As to the documentation that S&L does seek to convey, where is the taint? Cargill has not addressed this question in any way.

**B. Denial of Information to Potential Successor Counsel Will Unfairly Prejudice Plaintiffs.**

We agree with Cargill that this case is relatively unique, although not necessarily for the reason that Cargill suggests. (Opp. at 11-12.) None of the reported cases deals with a prevailing party in a disqualification motion who sought to bar successor counsel's access to three years of court filings and discovery conducted by disqualified counsel and to force a complete recreation of those filings and discovery, all without a showing of any specific prejudice but simply in the belief that the Court may never be able to determine in what, if any, way the party may have been prejudiced.

The result Cargill hopes to obtain by its extreme position could not be clearer. Cargill wants the case dismissed.

Cargill already sought dismissal in its original motion as a remedy for the alleged misconduct. This Court denied that request, and then went on to grant the plaintiffs 120 days within which to obtain successor counsel, expressing concern about the process of obtaining successor counsel:

> The Court recognizes the difficult and complicated position that plaintiffs and the putative class are placed in and does not minimize the hardship the plaintiffs will incur in trying to secure other counsel at this stage in the proceedings.

To date, in reliance on the Court's Order, the plaintiffs have used less than 40 days of the allotted time to organize, investigate and interview potential successor counsel, and select a firm. (Sellers Decl., ¶¶ 2-10.) If, as Cargill now argues, this Court actually intended its ruling to deny plaintiffs' selected lawyers any right to review the files related to these two pivotal motions, then the Court's grant of 120 days to find new counsel was illusory and plaintiffs' fervent efforts to comply with this deadline have been in vain. As Mr. Sellers explains in his declaration, the type of due diligence necessary to make a decision about whether to embark on an employment discrimination class action lawsuit of this magnitude typically consumes far more than the time remaining under the Order (69 days and counting as of the November 16 hearing on this motion). (*Id.* ¶¶ 18-23.) Without adequate time to investigate if it is denied access to the documents that are the subject of this motion, Cohen Milstein, and any other firm experienced in this practice, is likely to decline representation. We certainly do not think that the Court intended to cause plaintiffs to engage in pointless efforts to find successor counsel and we believe Cargill is mistaken in making such an assumption.

Cargill ignores the controlling law holding that one of the important factors a court must consider in this context is whether the clients themselves were guilty of any misconduct. (*See* cases cited in S&L's original memorandum at pp. 15-16.) Here, it is undisputed that the plaintiffs were innocent of any misconduct. The fact that Mr. Douglas provided to S&L certain documents marked "privileged" and destroyed the returned documents cannot and should not be attributed to the plaintiffs. But for that destruction, Cargill's position about the scope of the "taint" would be without any support whatsoever. Punishing the plaintiffs themselves where the

Court has found misconduct by their attorney is not fair, and it is directly inconsistent with controlling law.

If Cargill is not successful in its attempt to compel the dismissal of plaintiffs' lawsuit, then Cargill's fallback plan is to make the continued litigation as difficult and expensive as possible for the plaintiffs. Cargill suggests a "do-over" on every deposition taken by plaintiffs. (Opp. at 14) Crying crocodile tears, it laments how it will be hurt by the re-deposition of its employees. Nonsense. Cargill would not be taking this position in the first place if it really thought that those costs outweighed the substantial benefits it hopes to receive from its present strategy.

In fact, Cargill would achieve an overwhelming advantage from its "do-over" approach. In preparing its witnesses, Cargill's counsel, and the witnesses themselves will have access to the transcripts. They will know precisely what plaintiffs' counsel asked each witness the first time around, what the responses were, and how plaintiffs used that information in the litigation. Successor counsel for plaintiffs, on the other hand, would be approaching the deposition for the first time without access to the first deposition transcripts. It would lack even the ability to impeach inconsistent new answers based on the prior testimony. A more unfair litigation advantage can hardly be imagined.

Cargill seems to acknowledge the principle that the issue of document turnover is qualitatively different than the disqualification of counsel. Cargill must show at least some prejudice with respect to the specific information to be turned over to warrant what would essentially be a total bar to prior proceedings, tremendous costs for replacement counsel and the legal system, and lengthy delay for plaintiffs.

In summary, the controlling law requires the Court to balance the harm to the plaintiffs against the supposed harm to Cargill. Cargill's suggestion that the case should just start all over again at the beginning and that all of its witnesses get a free dress rehearsal of each deposition is simply not a fair balancing.

## III. NOTHING CARGILL SAYS ABOUT COHEN MILSTEIN SUPPORTS A DIFFERENT RESULT.

Cargill's scathing attacks on Cohen Milstein and its relations with S&L are false, misleading, and just plain mean-spirited. With respect, Cargill's attempts to prejudice the Court against plaintiffs' chosen counsel should at least wait until the firm has had a chance to decide whether to become involved in the case.

Plaintiffs did not approach Mr. Sellers because he is a friend of S&L. Despite Cargill's representations to the contrary, S&L has never been co-counsel with Cohen Milstein.[5] The fact is – and Cargill does not dispute it – that there are precious few law firms in the United States with the experience and qualifications to handle a case like this. Cohen Milstein is one of the few.

And Mr. Sellers and the employment lawyers at Cohen Milstein with whom he works are certainly not tainted by what other lawyers at Cohen Milstein may have done many years ago in

[5] S&L was co-counsel with the Washington Lawyers' Committee for Civil Rights and Urban Affairs ("Civil Rights Committee") in several consolidated cases against the Potomac Electric Power Company that was eventually certified as a class action. In that capacity, S&L worked with Mr. Sellers, who was then the head of the employment discrimination section of the Civil Rights Committee. (Lieder Decl., ¶ 3.) The litigation against PEPCO was settled in 1993, several years before Mr. Sellers, after many years of work for this non-profit entity, left to head the then-nascent employment discrimination practice of Cohen Milstein. (*Id.*; Sellers Decl., ¶ 16.) The other two cases in which Cargill claims that S&L co-counseled with Cohen Milstein were ERISA class actions. S&L ceased involvement in those cases when the lawyer most involved in their litigation left the firm, and thereafter that lawyer chose to co-counsel with Cohen Milstein. (Lieder Decl., ¶ 4.) Mr. Sellers has not been involved in those cases at Cohen Milstein. (Sellers Decl., ¶ 16-17.)

the *Potash* case. Mr. Sellers was not even at Cohen Milstein at that time, and *Potash* was not an employment discrimination case. And it is difficult to believe that Cargill and its counsel are taking the position they appear to be taking: that any time any lawyer in a law firm is subject to a disqualification Order, ethics sanction, or other charge of misconduct, then every other lawyer in that law firm should be deemed forever tainted. Even the most prominent and respected law firms would find that standard to be completely unworkable. See e.g., *In re O'Hagen*, 450 N.W.2d 571 (Minn. 1990).

Mr. Sellers has taught professional responsibility for several years and is a leader in employment discrimination class actions. Cargill's attempts to smear him before this Court are reprehensible. He is an ideal successor counsel. The Court should reject the barriers that Cargill seeks to erect to his appearance in the case.

## CONCLUSION

S&L has proposed a simple method of permitting plaintiffs to have an opportunity to secure replacement counsel while protecting Cargill's interests. Plaintiffs have done their part by promptly selecting excellent successor counsel. Cargill has offered no reasoned basis for denying S&L's motion. The Court should grant that motion and allow this case a chance to move forward.

**BASSFORD REMELE**
***A Professional Association***

Dated: November 8, 2004

By s/ Charles E. Lundberg
Lewis A. Remele, Jr. (License #90724)
Charles E. Lundberg (License #6502X)
Tiffany M. Quick (License #0313038)
Attorneys for Sprenger & Lang PLLC
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota 55402-3707
(612) 333-3000

442504.doc