**EXHIBIT 2**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Gwen D. CARLSON, et al., Plaintiffs,
v.
C.H. ROBINSON WORLDWIDE, INC., Defendant.
**No. Civ.02-3780 JNE/JGL.**

March 31, 2005.

Steven Sprenger, Susan Coler, Micheal Lieder, and Eden Brown Gaines, Sprenger & Lang PLLC, for Plaintiffs Gwen D. Carlson, Carol Flannigan, Amy Hossenlopp, Debra Kinniry, Sandy Nelson, Cathy Perky, Tricia Porter, Andrea Prout, LeeAnn Puckett, Angela Roberts, Jennifer Smyrl, and Jessica Vetter individually and on behalf of all others similarly situated.

Janet C. Evans, Thomas Hatch, Thomas Undlin, and Lisa Heller, Robins, Kaplan, Miller & Ciresi, LLP, for Defendant C.H. Robinson Worldwide, Inc.

ORDER

ERICKSEN, J.

***1** This is a putative class action involving sex-discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e to 2000e-17 (2000) (Title VII). [FN1] The case is before the Court on Plaintiffs' motion for class certification, Plaintiffs' motion for partial summary judgment as to liability on their class sexual harassment claims, C.H. Robinson Worldwide Inc.'s (CHR) motions for partial summary judgment on Plaintiffs' hostile work environment claims, and CHR's motion in limine to exclude part of the expert report of Victoria Fuhrer. The parties presented oral argument on October 15, 2004, and November 12, 2004. The Court grants and denies the motions for the reasons set forth below. [FN2]

FN1. Plaintiffs' claims under the Federal Labor Standards Act, 29 U.S.C. § § 201-219 (2000) (FLSA), are being pursued in a concurrent litigation.

FN2. Thousands of pages of documents have been filed by the parties in connection with the motions in this case. The Court has been vexed to discover that it could not always rely on counsel's statements with respect to the record. This has added substantially--and unnecessarily--to the time required to decide the motions. *See* *Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662-63 (7th Cir.1994) (observing that judges are not archaeologists sifting through masses of papers in search of revealing tidbits; that burden is on the parties, and judges have limited resources).

I. BACKGROUND

CHR is a transportation logistics company with at least 134 branch offices in over 42 states. [FN3] CHR began operations in 1905 and was employee-owned until its IPO on October 15, 1997. Between 1997 and 2002, CHR expanded from roughly 1900 employees to 3800 employees. The company's growth was due in large part to acquisitions of other companies. CHR's business is divided into six "lines": Produce (buying, selling and transporting produce--includes Corporate Procurement Distribution Services (CPDS) which specializes in large national customers' inventory and logistics of their businesses); Transportation (general trucking services); Ross (transportation and management of time-sensitive printed materials); Intermodal (transportation by rail); International Sales (transportation by ocean freight, air freight, rail freight, trucking and rail); and T-Chek (a wholly owned subsidiary that operates credit services for drivers).

FN3. Since the onset of this litigation, CHR has expanded from 100 to at least 134 branches.

Centralized management at CHR is located in Eden Prairie, Minnesota. Each business line has an operational vice president who oversees performance of that line at all of the branches. All the operational vice presidents are men, as are CHR's board of directors. The corporate offices contain the human-resource department (HR), the payroll department, and the in-house legal department. HR centrally administers the compensation system and enforces EEO polices and procedures, and provides human

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

resource services to the entire branch network. Before August 2002, HR was called Organizational Resources and provided additional support to the operational vice presidents.

*Policies against discrimination*

CHR prohibits discrimination on the basis of gender. All employees are required to sign a copy of CHR's anti-discrimination policy at the start of their employment. CHR provides training to new employees, including a seminar on sexual harassment in the workplace. CHR also maintains a policy against employee misuse of the Internet. Employees annually sign compliance certificates, stating that they have complied with all CHR policies during the preceding year.

If an employee experiences an incident of discrimination or inappropriate behavior, CHR recommends reporting the incident in one of several ways: (1) to the employee's branch manager; (2) to CHR's in-house legal department; (3) to an anonymous third-party toll-free hotline; or (4) to CHR's anonymous email service. These recommendations are located on CHR's website.

*CHR workplace*

***2** The majority of CHR employees occupy sales positions. Sales employees' primary job duties are to book loads, to ensure the timely and safe arrival of the load, and to negotiate rates that provide a margin of profit to CHR. All employees use computers to facilitate these transactions, especially with regard to tracking loads. The software used by CHR to facilitate these logistics requires access to the Internet. Employees are constantly on the phone, engaging in rapid-fire deal making. As a result, branches often have a loud, frenetic atmosphere.

Employees at CHR work in areas organized in "pod" formations with several employees' desks and computers clustered together and in close proximity to other pods. Short partial walls separate employees' desks. The short walls provide minimal privacy and co-workers' computers are essentially visible to each other. In general, employees' phone conversations and conversations amongst co-workers are readily overheard.

*Compensation*

CHR employees have individualized compensation packages that are reviewed annually. Salaried employees have four facets to their pay package: base salary; contractual bonus; growth pool bonus; and stock option grants. [FN4] Generally, full-time hourly employees receive an hourly rate that falls within a range set by CHR, and they are eligible to receive a year-end bonus, usually equivalent to no more than two-weeks' pay. The annual compensation review process begins with a meeting between the branch manager and the employee to review and amend each employee's compensation package and contract. This typically includes reviewing the employee's past performance and discussing the employee's future goals. [FN5]

FN4. Although no longer available, at times during the liability period at issue CHR had a company-car program for sales employees. Sales employees were eligible for the program after 18 months of employment. The cash value to recipients was approximately $5700 per year and as the program was phased out, the recipients received cash instead.

FN5. Employees are encouraged, but not required, to make annual marketing plans that use SMART goals. (SMART stands for "Specific, Measurable, Action Oriented, Result Oriented, and Time Based.") Performance reports showing the loads booked and margins achieved for branches and individual employees are posted on-line so that employees may track their progress in achieving their goals.

With regard to a salaried employee's base salary, CHR provides a formula to calculate a range of base salaries, based in part on factors such as experience and cost of living differences. Within the base salary range, the branch manager negotiates a base salary with each employee. Next, the contractual bonus is a spreadsheet of percentage points that each employee makes per $100,000 profit generated within the branch. This bonus sheet is negotiated into the employee's annual contract. Third, the growth pool bonus program is additional compensation that is awarded to branches that achieve success and growth over certain threshold minimums. The branch manager has total discretion on how to distribute the pool to his employees. Finally, a salaried employee may receive stock options. The stock option program began in 1997, and approximately 15% of all employees receive stock options. Although stock options may be considered part of an employee's overall compensation, decisions regarding stock

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

options are made separately from the rest of the compensation package.

After developing the compensation packages for each of his employees, the branch manager submits the branch's entire compensation package to the CHR compensation managers for review. At that point, the CHR compensation manager and the branch manger discuss and review each employee's compensation package. In a meeting that may last several hours depending on how many employees are in the branch, the branch manager explains the choices and decisions he has made with regard to compensation. At least five minutes is spent discussing each employee. [FN6] The parties dispute who has final say regarding an employee's compensation. Plaintiffs allege that the compensation manager's suggestion controls, and CHR contends that it is the branch manager with whom the final decision rests.

FN6. Allocation of stock options operates under a similar procedure to the compensation review, with three exceptions. First, the process takes place months after the compensation review. Second, input from the operational vice presidents is considered and they have authority to add names. Third, stock option grants require approval by the board of directors before distribution.

***3** Through 1998, the sole CHR compensation manager was Greg Goven. In anticipation of his 2002 retirement, Goven asked others to assist him in the compensation review process. From 1998 to 2002, Greg Goven, Mary Gorski, Colleen Zwach, Scott Satterlee, and Tim Manning acted as compensation managers and conducted compensation reviews.

*Promotions*

With regard to promotions, CHR generally favors internal candidates as opposed to external candidates. Lower-tier promotions, such as team or pod leaders, are done by the branch manager from within the branch. Some support and operations employees consider a transfer to a sales position to be a promotion. In the process of selecting sales employees, CHR administers a personality test, the Stein test, which is intended to distinguish those applicants who possess management skills. It is unclear whether the results of the Stein test are used in any other way. An employee interested in a management position or promotion is expected to notify his or her branch manager. A branch manager uses an informal system, a "succession planning chart," to record his recommendations regarding the upward mobility of his employees.

Before this lawsuit, CHR did not regularly post--either internally or externally--openings for branch manager positions. Other positions, such as sales, were routinely posted on CHR's website. Branch manager positions were generally filled through the recommendations of either the line vice president or the out-going branch manager.

*Plaintiffs*

Gwen Carlson was hired on September 1, 1996, by CHR's Minneapolis International branch to work in operations. In November 1998, Carlson moved into a sales position that did not suit her well. In February 2001, after interviewing for several other positions, Carlson accepted a newly developed position known as the Domestic Drayage Coordinator. Carlson is still employed by CHR in that position. During her entire period of employment by CHR, Carlson has been a full-time, salaried employee. Carlson filed a claim with the EEOC on June 20, 2001. The remaining named Plaintiffs have all been employed or continue to be employed by CHR in branch offices across the United States.

## II. MOTION TO STRIKE

Before turning to Plaintiffs' motion for class certification, the Court first addresses CHR's motion to strike the expert report and testimony of Victoria Fuehrer insofar as she opines on issues relating to hostile work environment and sexual harassment. Plaintiffs retained Ms. Fuehrer as an expert in human resources. She has been involved in the human resources field for approximately thirty years. She received two B.A. degrees, one in psychology and one in sociology. She worked in the human resources department at Amhoist from 1975 to 1983, and was thereafter employed by Norwest Corporation as Vice President of Compensation from 1983 to 1984. From 1984 to 2000, Ms. Fuehrer ran a consulting firm that specialized in human resources and "organizational effectiveness." She has published approximately fourteen articles in the human resources field generally (none relating to sexual harassment). The section of Ms. Fuehrer's report at issue here focuses on whether CHR's human resource policies and procedures with respect to sexual harassment comport with accepted business practices.

***4** CHR moves to strike Ms. Fuehrer's report and testimony because she lacks the appropriate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

experience to be considered an expert in the field of sexual harassment in the workplace. In particular, CHR argues that Ms. Fuehrer has no formal education or training with respect to sexual harassment, nor has she conducted any training or written any articles on the topic of sexual harassment. Further, CHR contends that Ms. Fuehrer's practical experience has been limited to writing several policies regarding sexual harassment and participating in one internal investigation while working as a consultant. According to CHR, this experience does not qualify Ms. Fuehrer to opine on issues of sexual harassment in the workplace.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." When evaluating the admissibility of expert testimony under Rule 702, a district court must determine whether the testimony is reliable and relevant. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Moreover, "it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir.2001) (citing *Kumho Tire*, 526 U.S. at 156). The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n. 10; *Lauzon v. Senco Prods. ., Inc.*, 270 F.3d 681, 686 (8th Cir.2001).

Plaintiffs argue that at the class-certification stage, *Daubert* and Rule 702 do not apply because an analysis under them entails an impermissible inquiry into the merits of the underlying action. Rather, Plaintiffs contend that a district court must only make certain that the expert testimony is not "so fatally flawed as to be inadmissible as a matter of law." Pls.' Mem. Opp'n. at 9. In support, Plaintiffs rely on *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir.2001), wherein the Second Circuit Court of Appeals noted that "a motion to strike expert evidence pursuant to [*Daubert* ] involves an inquiry distinct from that for evaluating expert evidence in support a motion for class certification." 280 F.3d at 134. That court further stated that a "district court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter law." *Id.* at 135.

The Court concludes that even under the *In re Visa Check/MasterMoney* standard, Ms. Fuehrer does not qualify as an expert on matters relating to sexual harassment. Here, Ms. Fuehrer's resume fails to identify any experience, skill, training, or education in sexual harassment in the workplace. The Court's review of her deposition testimony reveals that she consulted on one internal investigation of a sexual harassment charge at a client's company and she wrote eight to ten policies that address sexual harassment as part of writing employee manuals, but that the bulk of her experience with sexual harassment occurred during her time at Amhoist. Ms. Fuehrer testified in relevant part as follows:

***5** Q. Have you ever been in charge or involved in an EEOC investigation?
A. I don't recollect that I have.
Q. Okay, Have you ever been involved in any internal investigations where--in a company where there were allegations of sexual harassment?
....
A. Okay, I have had experience in consulting with one of my clients in a sexual harassment, an internal investigation on sexual harassment and advising that company on steps.
....
Q. Okay. So that's the only sexual harassment that you've been involved in?
A. To my recollection, yes.
....
Q. Now you said you wrote sexual harassment policies.
A. Uh-huh.
Q. When?
A. I've written sexual harassment policies off and on for a variety of my clients.
Q. Okay.
A. But I would say the majority of that work was performed when I was at Amhoist.
....
Q. Okay. Any training, sexual harassment training that you've developed or given?
A. I have not--I don't recall that I have developed any sexual harassment training.
Q. Ever written an article about sexual harassment?
A. I don't think so, no.
....
Q. Okay. So your experience kind of in the area of sexual harassment policy implementation, administration and enforcement would be limited

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to the policies that you have written and the one-time consulting?
A. I don't--I'm not sure that the word limited is a good word. I mean I've had experience writing sexual harassment policies and administering them. And the focus--the focus of my consulting has been in a more--in the compensation career progression, performance management.
Q. Where have you had experience administering sexual harassment policies?
A. At Amhoist.
Q. Okay. Anywhere else?
A. I would say not.
....
Q. Okay. While you were at Amhoist, was--do you recall any allegation of sexual harassment that you were involved with in either advising, investigating, anything?
A. Uh-huh, uh-huh. I don't recall any.
(Fuehrer Tr. at 134-139.)

The Court notes that Ms. Fuehrer's time spent at Amhoist, from 1975 to 1983, predates all relevent decisions by the United States Supreme Court with respect to sexual harassment, as well as subsequent statutory amendments to Title VII. *See, e.g., Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Plaintiffs essentially ask the Court to accept Ms. Fuehrer as an expert in sexual harassment even though her resume and testimony clearly demonstrate that her expertise lies elsewhere.

Although it is not compulsory for a purported expert to have "knowledge, skill, experience, training, *and* education" in a particular field to be qualified as an expert, possession of at least one of these characteristics is necessary. *Cf. Midwestern Mach. v. Northwest Airlines, Inc.*, 211 F.R.D. 562, 568 (D.Minn.2001). Plaintiffs fail to establish that Ms. Fuehrer possesses any one of these characteristics with respect to sexual harassment in the workplace. Accordingly, Ms. Fuehrer is without a reliable basis for forming opinions with respect to sexual harassment in the workplace, and the Court therefore grants CHR's motion to strike.

## III. CLASS CERTIFICATION

### A. Class Certification Standard

***6** Rule 23 of the Federal Rules of Civil Procedure governs a district court's consideration of a motion for class certification. Decisions on whether to certify a class action are within the discretion of the district court. *See Coleman v. Watt*, 40 F.3d 255, 259 (8th Cir.1994); *Morgan v. United Parcel Serv.*, 169 F.R.D. 349, 354 (E.D.Mo.1996). In determining whether to certify a class action, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (citations omitted). Accordingly, while the Court must conduct a "rigorous analysis," *see Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), class certification is a procedural determination and should not include an inquiry into the merits. *See Eisen*, 417 U.S. at 177-178. The plaintiff bears the burden of satisfying the requirements of Rule 23. *Coleman*, 40 F.3d at 259.

Rule 23 requires a plaintiff to demonstrate that: (1) the class is so numerous that joinder of all the members is impracticable; (2) questions of law or fact are common to the class; (3) the claims or defenses of the representative parties are typical of the class; and (4) the representative parties fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). In addition to the Rule 23(a) factors, a plaintiff must also demonstrate at least one of the following subsections of Rule 23(b): (1) that there is a risk of inconsistent verdicts if the class is not certified; (2) that injunctive or declaratory relief is appropriate; or (3) that a common question of law or fact predominates any questions affecting only individual members and that a class action would be superior to other available methods. Fed.R.Civ.P. 23(b).

Plaintiffs move the Court to certify one across-the-board class consisting of "all females who were employed by C.H. Robinson any time during the liability period or who will be employed in the future," and three subclasses-- compensation, promotion and sexual harassment. With regard to their compensation and promotion claims, Plaintiffs allege gender discrimination claims of disparate treatment and disparate impact. [FN7] With regard to hostile work environment, Plaintiffs allege only a disparate treatment claim. [FN8]

FN7. To establish liability based on a pattern or practice of disparate treatment, Plaintiffs must ultimately demonstrate that intentional discrimination was CHR's "standard

operating procedure the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Disparate treatment occurs where "[t]he employer simply treats some people less favorably than others because of their race, color religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* at 335 n. 15. Statistical evidence is one of the most common methods of proof for a disparate treatment claim. *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir.1984). However, statistics alone are not dispositive. *Catlett v. Miss. Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir.1987).
Plaintiffs' claims of disparate impact "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters*, 431 U.S. at 335 n. 15. "Under a disparate-impact theory of discrimination, 'a facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a disparate-treatment case." ' *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645-46, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), *superceded on other grounds*, Civil Rights Act of 1991 § 105, 42 U.S.C. § 2000e-2(k) (2000)); *see also Teamsters*, 431 U.S. at 335 n. 15 (noting that proof of discriminatory motive is not required under a disparate impact theory).

FN8. Class actions alleging a hostile environment are of a relatively recent vintage. *See Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 875 (D.Minn.1993) (noting that it was the first class action alleging hostile environment based on sexual harassment to make it to a liability determination). A notable difference between hostile environment and other disparate treatment claims is that hostile environments and sexual harassment are not susceptible to statistical analyses and therefore, while plaintiffs' ultimate burden remains the same, plaintiffs generally must rely on anecdotal evidence and non-statistical experts.

Turning first to Plaintiffs' motion to certify an across-the-board class, the Court concludes that Plaintiffs have failed to satisfy their burden to demonstrate that this class warrants certification. *See* 8 Alba Conte & Herbert Newberg, Newberg on Class Actions § 3:9 (4th ed.2002) (noting that plaintiffs carry the burden of establishing the elements of Rule 23 with respect to both across-the-board class and subclasses). Here, Plaintiffs fail to direct the Court to evidence in the record in support of their across-the-board class and fail to distinguish it from the subclasses. Indeed, during oral argument and in their memoranda, Plaintiffs rarely mention the across-the-board class. Furthermore, Plaintiffs fail to demonstrate how the across-the-board class independently satisfies the Rule 23 factors. Without more, Plaintiffs have not met their burden. Accordingly, the Court will not certify the across-the-board class.

***7** This conclusion does not, however, preclude certification of Plaintiffs' subclasses as individual classes. *See In re Monumental Life*, 365 F.3d 408, 414 (5th Cir.2004) (noting that district courts have discretion to modify class definitions to provide needed precision); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."). Instead, the Court construes Plaintiffs' motion for class certification as a motion to certify three separate classes--compensation, promotion and sexual harassment--and further construes Plaintiffs' request for injunctive relief to apply to each of the three classes. Plaintiffs' proposed class definitions are as follows: (1) Compensation--"All females who have been employed on a full-time basis by C.H. Robinson in a domestic branch office at any time during the liability period;" (2) Promotions--"All females who were employed by C.H. Robinson in a domestic branch office and had more than two years' experience in a sales and/or operations position at any time during the liability period;" and (3) Sexual Harassment--"All females who have been employed by C.H. Robinson in a domestic branch office at any time during the liability period." The Court now turns to the Rule 23 factors as applied to each class.

B. Rule 23(a) factors

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*1. Numerosity*

The first requirement of Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "Impracticable does not mean that joinder must be impossible, but it does require a showing that it would be extremely difficult or inconvenient to join all members of the class ." *Morgan,* 169 F.R.D. at 355. Factors relevant to this inquiry include: the number of persons in the proposed class; the size of the individual claims; the inconvenience of trying individual suits; and any other factor relevant to the practicability of joining all of the putative class members. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 559-60 (8th Cir.1982).

Here, the parties do not dispute numerosity. Plaintiffs have put forth evidence that each class would contain between 625 and 1300 women who reside in over 40 different states. In particular, Plaintiffs assert that the compensation and sexual harassment classes each could encompass 1300 women while the promotion class could contain as many as 625 women. Given the large number of putative class members combined with their geographic dispersion, the Court concludes that joinder would be impracticable. *See* *Morgan,* 169 F.R.D. at 355. Accordingly, the Court finds that Plaintiffs have met their burden with respect to this prong of Rule 23(a).

*2. Commonality*

The next requirement of Rule 23(a) is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The commonality requirement of Rule 23(a) "does not require that every question of law or fact be common to every member of the class." *Paxton,* 688 F.2d at 561. The Supreme Court in *Falcon* noted:

> ***8** Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class. For in such cases, the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23.

457 U.S. at 155 (quotations omitted). In assessing commonality, there is not one determinative factor for courts to consider. *See* *Morgan,* 169 F.R.D. at 355 (listing non-exclusive factors). In general, the commonality requirement is not an oppressive burden to meet. *See* *Egge v. Healthspan Servs. Co.,* 208 F.R.D. 265, 268 (D.Minn.2002) (commonality "is easily met in most cases because it 'requires only that the course of conduct giving rise to a cause of action affects all class members, and that at least one of the elements of that cause of action is shared by all members" ' (quoting *Lockwood Motors, Inc. v. Gen. Motors Corp.,* 162 F.R.D. 569, 575 (D.Minn.1995)). The Court now turns to the Plaintiffs' proffered evidence to consider whether each class satisfies the commonality requirement.

a. Compensation Class

Plaintiffs contend that commonality is met because the issues of whether CHR discriminated against women in compensation and whether CHR's compensation process had a disparate impact on women pervades all of the class members' claims. According to Plaintiffs, CHR has a centralized, all male group of vice presidents who dictate compensation based on the subjective recommendations of the branch managers. Plaintiffs allege that the branch manager's unfettered discretion to compute salary, bonuses, and other compensation perks, coupled with the absence of objective factors such as mandatory performance reviews, led to women being paid less than men.

In support of their argument, Plaintiffs put forth the expert report of Dr. Janet Thornton who conducted a multiple regression analysis and determined that, when aggregating all of CHR's employees across the branches, there were statistically significant disparities in the pay between men and women. [FN9] Specifically, Dr. Thornton concluded that women received fewer contract points and stock options and received less overall compensation than male workers at CHR. She arrived at this conclusion by aggregating the data of employees across all of the branches. Later, Dr. Thornton confirmed her conclusion by sampling 39 branch years from branches employing more than 20 employees and at least 1 female employee. She revealed her results in her rebuttal report, noting that 33 out of the 39 branch years had female negative disparities and that the remaining 6 branch years had female positive disparities. Importantly, Dr. Thornton found that 10 of the 33 female negative disparities were statistically significant (greater than 2 standard deviations), while none of the 6 positive disparities were statistically significant.

FN9. The Eighth Circuit described multiple regression analysis as follows:

> Statistical significance is a measure of the probability that an observed disparity is not due to chance. A finding that that a disparity is statistically significant at the .05 or .01 level means that there is a 5 per cent or 1 percent probability, respectively that the disparity is due to chance. Baldus & Cole, *Statistical Proof of Discrimination* § 9.02, at 290 (1980). Normally, courts and social scientists, when confronted with such low probabilities, conclude that something other than chance is causing the disparity. The courts must decide whether that something is illegal discrimination or some other, nondiscriminatory influence. The Supreme Court recognized a variation of this principle when it noted that "[a]s a general rule ..., if the difference between the expected value and the observed number is greater than two or three standard deviations," the disparity is not due to chance. *Castaneda v. Partida,* 430 U.S. 482, 496- 97, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). For large samples, this test "is essentially equivalent to a rule requiring significance at a level in the range below 0.05 or 0.01." Baldus & Cole, *supra*, § 9.03, at 297.
> *Craik*, 731 F.2d at 475 n. 13.

***9** In response, CHR argues that the claims of the putative class members are too individualized to support a finding of commonality because the branch managers employed factors unique to each employee when determining each employee's compensation. CHR contends that compensation is determined on the basis of objective and subjective factors, primarily performance and branch contribution, and that a gender-diverse group conducts the compensation reviews. Moreover, CHR's statistical expert, Dr. Elizabeth Becker, argues that Dr. Thornton's regression analysis is systemically flawed because she improperly aggregated the data and because she failed to take into account the most important compensation factor--productivity. Dr. Becker opines that by aggregating the workforce, Dr. Thornton skewed the relevant labor market. CHR also directs the Court's attention to cases involving decentralized businesses that have found a lack of commonality in compensation class claims because the compensation determinations were exclusively within the province of local managers. *See* *Seidel v. Gen. Motors Acceptance Corp.*, 93 F.R.D. 122, 124 (W.D.Wash.1981) (denying class certification in part on the absence of commonality because employment decisions, including compensation, were made exclusively by branch management at over 300 branches); *Webb v. Westinghouse Elec. Corp.*, 78 F.R.D. 645, 641 (E.D.Pa.1978) ("The complete autonomy of each plant with respect to personnel decision making prevents [plaintiffs] from satisfying the commonality and typicality requirements.").

Based on a review of the record and relevant case law, the Court concludes that Plaintiffs have met their burden with respect to commonality in the compensation class for salaried employees. First, unlike *Seidel* and *Webb,* CHR's compensation review process does include some management oversight. In particular, there is evidence in the record that CHR's line vice presidents and board of directors, who are all men, have significant influence in some aspects of the compensation review process. *Cf.* *Craik*, 731 F.2d at 474 (noting that a hiring process that "is subjective and dominated by men requires particularly close scrutiny"). Moreover, all class members are subjected to the same practices that form the basis of their discrimination claims. Plaintiffs uniformly allege that the subjectivity given to the branch manager to determine each facet of a relatively complex compensation scheme, led to salaried women being paid less then their male counter-parts and that these allegations are applicable to all salaried employees. Here, any individual factual disparities in individual compensation determinations do not justify denying class certification. *See* *Paxton*, 688 F.2d at 561 (noting that "factual variations are not sufficient to deny class treatment to the claims that have a common thread of discrimination"). Finally, notwithstanding the parties' dispute regarding the relevant labor market, Dr. Thornton's rebuttal analysis of 39 branch years produced statistically significant disparities between the salaries of male and female employees. At this stage, Plaintiffs' statistical evidence is enough to give rise to an inference of discrimination with regard to disparities in compensation between men and women at CHR. *See* *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 155 (N.D.Cal.2004) ("[T]he Court delves into the substance of the expert testimony only to the extent necessary to determine if it is sufficiently probative of an inference of discrimination.").

***10** With respect to hourly employees, the Court's review of the record reveals no statistical evidence to support an inference of discrimination. Specifically, Dr. Becker opines that there is no evidence that hourly employees were underpaid to a statistically significant degree. Plaintiffs do not dispute her assertion. Given this, the Court concludes that commonality is not met with regard to hourly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employees. Accordingly, the Court finds that the compensation class should consist only of salaried employees.

b. Promotion

Next, Plaintiffs contend that commonality is satisfied in their promotions class because the issues of whether CHR discriminated against women in granting promotions to branch manager and whether CHR's branch manager promotion process, or lack of a formal promotions process, had a disparate impact on women are common to all class members' claims. According to Plaintiffs, CHR failed to promote women proportionally to their workforce numbers because it operated an all-male, centralized subjective decision-making promotions process, employed a gender-biased personality test to assess promotability, failed to post branch manager opportunities, and failed to utilize an application process in favor of a "tap on the shoulder" policy. Plaintiffs also contend that the system was reinforced by CHR's failure to keep records or audit the process for discrimination. Plaintiffs support their claims with Dr. Thornton's statistical analysis of CHR's branch manager promotions. With regard to branch manager promotions, Dr. Thornton found a disparity in the number of women branch managers (4.2%) as compared to women in the CHR workforce (34%). Based on the minimum requirements distilled from analysis of the 117 promotions to branch manager between 1999-2002, Dr. Thornton created hypothetical pools to establish a qualified applicant group. From those pools, Dr. Thornton conducted multiple regression analysis and determined that 18 of the 117 promotions should have gone to women. In actuality, only 7 of the 117 promotions went to women.

In response, CHR contends that commonality is not met because the determinations involved in assessing promotion candidates are individualized and based on the specific needs of each branch, not general qualifications. At oral argument, CHR put forth two examples of the individualized nature of branch manager promotions. First, the opening for a branch manager at the Charleston International branch required the candidate to have an international brokerage license. Second, the opening for a branch manager at Laredo, Texas, required hiring someone outside the company because there were systemic problems at the Laredo branch. According to CHR, these are but a few of illustrations of why each branch manager position requires individualized analysis. CHR also disputes the statistical results put forth by Dr. Thornton because she arrived at her results using hypothetical applicant pools. Finally, while CHR's expert Dr. Becker did not conduct her own promotions analysis, she nevertheless opines that Dr. Thornton's analysis is faulty because it cannot be reliably correlated.

***11** After reviewing the record, the Court concludes that commonality is met with respect to the promotion class. The Court's concern regarding the presence of individual fact issues due to CHR's decentralized nature is outweighed, at this stage, by the uniformity of CHR's subjective decision making and failures to post available positions, to have any formal path to promotion and to maintain a record-keeping system of promotions. *See* Morgan, 169 F.R.D. at 355 (concluding that because defendant's decentralized system was supported by uniform policies, the individualized nature of the promotions decisions supported, rather than prevented a finding of commonality); *see also* *Dukes*, 222 F.R.D. at 149-150 (collecting cases). Under CHR's promotion equation, the branch managers have total discretion to promote or identify candidates for promotional consideration. Then, the all-male vice presidents may approve or deny the promotion, or offer their own candidate. The Court concludes that this process, coupled with the statistical analysis of Dr. Thornton, which demonstrates at least an inference of discrimination, supports a finding of commonality. *See* *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir.1999) ("Where the decision-making process is difficult to review because of the role of subjective assessment, significant statistical disparities are relevant to determining where the challenged employment practice has a class-wide impact.").

c. Sexual Harassment

Plaintiffs contend that their proposed sexual harassment class satisfies the commonality requirement because the issue of whether CHR fostered or tolerated sexually hostile environments in the branch offices is common to all of the class members. Plaintiffs assert that hostile environments exist at a majority, if not all, of the CHR branches where women are employed, that these hostile work environments were promoted by the branch managers as well two operational vice presidents, Barry Butzow and Joe Mulvehill, and that CHR knew that female employees were being subjected to pornography and sexual harassment and failed to take remedial action in a timely fashion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In support, Plaintiffs put forth anecdotal evidence from female employees, evidence regarding CHR's oversight of complaints of harassing conduct, and the expert report of Dr. Peter Glick, a social psychologist. This anecdotal evidence comes from numerous affidavits and declarations, the majority of which focus on the prevalent use of foul language and frequent occurrences of male co-workers either looking at on-line pornography or receiving/viewing/sending pornographic emails. For example, Hossenlopp, Nelson, Perky and Roberts testified to witnessing pornographic images on their male co-workers' computer screens, and many of Plaintiffs' declarants attest to being aware of male co-workers and managers viewing pornography because men were seen clustered around one computer, laughing and pointing. Plaintiffs also allege the prevalent use of unprofessional language by their male co-workers. In particular they refer to the use of the words "fuck" and "rape," as well as derogatory terms directed specifically at women, such as "whore." Plaintiffs also claim that comments were commonly made by male co-workers regarding the manner in which female co-workers were dressed and their sexual proclivities. Declarants allege that on two occasions striptease artists performed in the workplace, once in the Richmond branch and once in the Los Angeles branch. Finally, offensive behavior also occurred on an individualized basis. Examples of such behavior include Kinniry's deposition testimony that Mark Derks, her supervisor, made comments to her such as: "Stop sucking on your finger, it's making me horny," and "Now that you are leaving, I can tell you that I always wanted to have sex with you," and Roberts' deposition testimony that at a branch retreat Eric Gebuhr, a male co-worker, slapped her hip and buttock and stated: "Why are you playing hard to get?"

***12** Plaintiffs also put forth documentation regarding CHR's HR and legal departments' involvement in complaints of sexual harassment or inappropriate behavior. According to Plaintiffs, CHR's responses were ineffective and delayed. Plaintiffs cite as an example a complaint made by Perkey on February 23, 2001, using CHR's anonymous hotline. Perkey complained after observing a pornographic image on a male co-worker's computer in the Minneapolis branch. Shortly thereafter, Carlson also called and complained about the branch. After these complaints, over the course of the next six months, CHR required all of the Minneapolis International employees to attend a day of sexual-harassment training and CHR hired outside counsel to come in to investigate the complaints. The investigation resulted in reprimands or suspensions for approximately nine employees--both male and female--and the branch manager, Jeff Scovill, was suspended without pay for thirty days and was required to attend management-training courses.

Plaintiffs also present Dr. Glick's expert report in support of their theory that a culture existed at CHR that demeaned women, thereby producing a hostile work environment. His report is based primarily on the declarations and deposition testimony of male and female CHR employees. Dr. Glick opines that even a few instances of behavior that degrades women have the potential to create a gender-biased atmosphere. He theorizes generally that sexism is either hostile or benevolent and often is induced by group mentalities--i.e. "men who might not otherwise have a predisposition to sexually demean women, can be encouraged to do so by an environment that sexualizes women and conveys permissive norms about treating them as sex objects." (Glick Rep. at 11.) According to Dr. Glick, CHR is a male-dominated culture that encourages male employees to engage in stereotypical masculine forms of misbehavior, and that the culture results in an environment that "appears to be highly sexualized in its treatment of women." (*Id.* at 19.)

In response, CHR contends that commonality is not met because the question of whether a hostile environment exists is too individualized in that branch managers are each responsible for maintaining a professional office environment and therefore, these issues are not susceptible to common proof and class treatment. Specifically, CHR argues that not all of the branches had complaints of hostile environments, and for the remaining branches, the Court will necessarily have to conduct mini-trials to establish whether the environment at each branch was objectively hostile. Moreover, CHR contends that it took all reasonable preventative measures, that all complaints were remedied in a timely fashion, and that perpetrators were disciplined for any offensive behavior. [FN10]

FN10. CHR also argues that the record does not support Plaintiffs' claims of CHR's centralized policy of discrimination, and specifically the allegations regarding Mulvehill and Butzow. These arguments, however, address the merits of Plaintiffs' claims and therefore the Court will not consider them at this time. *See* *Eisen,* 417 U.S. at 178.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The parties fundamentally disagree as to whether class claims for sexual harassment over multi-facility employers can meet the commonality requirement. The Court's review of the relevant case law finds such decisions to be highly fact-specific. For example, in *Wilfong v. Rent-A-Center, Inc.*, Civ. No. 00- 680, 2001 WL 1795093 (S.D.Ill.Dec.27, 2001), the court certified a class alleging claims of hostile work environment against a defendant with over 2200 stores. 2001 WL 1795093, at *6. That court found commonality based on: (1) evidence that demonstrated repeated failures of management to respond to plaintiffs' complaints; (2) the statements of the defendant's CEO, including his comments that the company would not "have as many sexual harassment suits" as the number of women employees declined; and (3) judicial estoppel because the defendant conceded commonality during settlement negotiations in a concurrent gender discrimination class action. *See id.*, at *4, *6 n. 7. The *Wilfong* court rejected defendant's argument that the need for individualized assessments of sexual harassment claims precluded a finding of commonality because those individual issues could be addressed in the remedial phase, *see id.*, at *5. Although smaller in scale, this Court in *Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 613-14, 619 (D.Minn.2000), conditionally certified a class in a sexual harassment case after finding that commonality existed among class members who worked in five geographically diverse stations under general managers who all reported to the same vice president.

***13** On the other hand, the court in *Faulk v. Home Oil Co.*, 184 F.R.D. 645 (M.D.Ala.1999), certified hiring and promotion classes but denied certification for a hostile work environment class because the twenty-one facilities at issue were not subject to common proof. 184 F.R.D. at 659. Rather, the court concluded that because the hostile environment claims were dependent on the comments and actions of individual store managers, the "individual claims of hostile work environment [were] sufficiently different that they [would] require different proof to establish liability." *Id.* Similarly, the court in *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655 (N.D.Ga.2001), denied certification of a hostile work environment class claim over multiple facilities because "the actions constituting the alleged hostile environment occurred with varying frequency and possessed varying degrees of severity." 205 F.R.D. at 675-76. The court noted that "those individuals who have complained only about the occasional, sporadic acts of co-workers [were] not typical of other individuals who described much more severe and pervasive conduct," and that "Plaintiffs have made no attempt to explain how their hostile environment claims [could] be proven on a class-wide basis given that many members of the class did not experience harassment and that those who did complained of harassment in various forms." *Id.* at 676.

After reviewing the relevant case law and the parties' arguments, the Court concludes that Plaintiffs have failed to meet their burden to establish commonality with respect to sexual harassment. With regard to Plaintiffs' assertions about the existence of CHR's centralized policy and practice of tolerating or promoting sexual harassment, the Court is not persuaded that Plaintiffs' anecdotal evidence demonstrates the existence of such a policy, let alone an inference of intentional discrimination arising from such a policy. Moreover, Plaintiffs fail to demonstrate that the question of whether Plaintiffs in different branches are subjected to severe and pervasive harassment based on sex is subject to common proof. The decentralized and independent nature of the branches and business lines defeats a finding of commonality in this case. Indeed, Smyrl testified that she experienced a hostile environment in only one of the two CHR branches where she worked. Furthermore, Nelson, who worked in four different departments in the same branch, testified to a hostile environment in only two out of the four. Although promotion claims were at issue, the Court finds the following pronouncements of the Supreme Court germane to the present situation:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, *he must prove much more than the validity of his own claim.*

***14** *Falcon*, U.S. at 157-58 (emphasis added). Without more, Plaintiffs in this case have failed to bridge the gap between individualized hostile work environment claims and common questions of law susceptible to common proof. *See id.* Accordingly, the Court concludes that the facts of this case preclude a finding of commonality with respect to the sexual harassment class.

*3. Typicality*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Typicality requires that the claims of the representative parties be typical of the claims of the class." Fed.R.Civ.P. 23(a)(3). As such, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (citations omitted); *see also* *Dukes*, 222 F.R.D. at 143-44 ("The named plaintiffs' claims need not be identical to the claims of the class to satisfy typicality; rather the claims are typical if they are reasonably co-extensive with those of absent class members. It is sufficient for plaintiffs' claims to arise from the same remedial and legal theories as the class claims.") (citations omitted). Although some courts combine the components of commonality and typicality into one factor, the Eighth Circuit Court of Appeals has made clear that these are two separate components. *Paxton*, 688 F.2d at 562. In general, "the burden of showing typicality is not an onerous one." *Id.*

a. Compensation

Gwen Carlson, Carol Flannigan, Amy Hossenlopp, Debra Kinniry, Sandra Nelson, Cathy Perky, Tricia Porter, Andrea Prout, Lee Ann Puckett, Angela Roberts, Jennifer Smyrl and Jessica Vetter are named as representative Plaintiffs for the compensation class. CHR does not dispute that these Plaintiffs' claims satisfy the typicality requirement of Rule 23(a)(3). All of the named Plaintiffs are or were at some point salaried employees and all allege that they have been paid less than similarly situated male co-workers. Accordingly, the Court concludes that their claims are reasonably co-extensive with that of the compensation class and therefore, the class representatives' claims satisfy the typicality requirement.

b. Promotion

Plaintiffs Carlson, Hossenlopp, Porter, Prout, Puckett and Smyrl are named as representative Plaintiffs of the promotions class. The Court's review of the record reveals that Andrea Prout is not typical of the class because she does not fall within the class definition. Because she was employed by CHR for only 22 months, Prout therefore does not satisfy the two-year tenure requirement. The remaining Plaintiffs, Carlson, Hossenlopp, Porter, Puckett and Smyrl, are or were employed by CHR for at least two years in sales or operations, and each contends that she was denied promotion opportunities because of her gender. Accordingly, the Court concludes that typicality is met with respect to the remaining named Plaintiffs because their claims arise from the same or similar legal theories as those alleged by the class.

*4. Adequacy*

***15** The final Rule 23(a) factor requires that "the representative parties will fairly and adequately protect the interest of the class ." Fed.R.Civ.P. 23(a)(4). "In deciding this question, the Court considers (a) whether the class representatives and their counsel will competently and vigorously pursue the action, and (b) whether differences exist between the interest of the class representatives and the putative class." *Morgan*, 169 F.R.D. at 357.

In approving class counsel, the Court must consider: (1) counsel's work thus far in the action; (2) counsel's experience in handling class actions, and specifically, in handling claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; (4) the resources counsel will commit to representing the class; and (5) any other matter pertinent to counsel's ability to fairly and adequately represent the interest of the class. Fed R. Civ. P. 23(g)(1)(C)(i)-(ii). CHR does not contest the adequacy of the named Plaintiffs and their counsel to represent the classes. Plaintiffs' counsel, Sprenger & Lang, has put forth evidence of their frequent participation in class-action lawsuits, a number of which have involved allegations of gender discrimination in employment. The Court concludes that Sprenger & Lang has performed sufficient work in identifying or investigating the potential claims in this action, they have experience in handling employment discrimination class actions, they are familiar with the law relating to gender discrimination in class actions, and they will continue to commit the resources necessary to this litigation. Accordingly, the Court finds that Plaintiffs' counsel satisfies the adequacy prong.

The next step is to ascertain whether differences exist that make the named Plaintiffs' claims and interests antagonistic to the rest of the class. *See* *Morgan*, 169 F.R.D. at 357. The Court's review of the record has not found any evidence that demonstrates that the class representatives are inadequate in this regard. Accordingly, the Court concludes that the respective class representatives will adequately serve the interests of the proposed classes.

C. Rule 23(b) Subsections

Having concluded that Plaintiffs' compensation and promotion classes satisfy the Rule 23(a) factors, the Court now turns to Rule 23(b). Plaintiffs argue that these classes are appropriately certified under Rule

23(b)(2), or in the alternative, a hybrid of Rule 23(b)(2) and 23(b)(3). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class," making declaratory or injunctive relief appropriate. Fed.R.Civ.P. 23(b)(2). Plaintiffs seek injunctive relief, including an order requiring CHR to adopt policies and procedures in accordance with Title VII and enjoining CHR from continuing its allegedly discriminatory policies and practices. Plaintiffs also seek back pay and front pay (collectively, lost wages), nominal damages and punitive damages. CHR contends, *inter alia*, that Rule 23(b)(2) certification is inappropriate because the requests for monetary damages are not incidental to the injunctive relief.

***16** Rule 23(b)(2) certification is appropriate in cases where the plaintiffs seek injunctive relief so long as injunctive or declaratory relief is the predominant relief sought for the class. *Paxton*, 688 F.2d at 563; *Morgan*, 169 F.R.D. at 358. The question of whether injunctive or declaratory relief predominates is a matter for the Court's discretion. *Morgan*, 169 F.R.D. at 358. Here, the Court concludes that Plaintiffs' primary request for relief is injunctive and therefore, certification of a Rule 23(b)(2) class is warranted.

However, Plaintiffs' request for lost wages, nominal damages and punitive damages, necessitates a second, remedial phase to the litigation that is separate from resolution of their claim for injunctive relief. *See* *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 159 (2d Cir.2001) ("If individual relief such as back pay, front pay, or compensatory recovery is sought in addition to class-wide injunctive relief, the court must conduct the 'remedial' phase."). Importantly, these damages inquiries require individualized factual determinations whose manageability could overwhelm the litigation.

Plaintiffs argue that the Court should fashion a formula for the distribution of lost wages and punitive damages, thereby obviating the need for individualized determinations. In support, Plaintiffs rely on *Palmer v. Combined Insurance Co. of America*, 217 F.R.D. 430 (N.D.Ill.2003). In that case, the court found a unique set of circumstances where a blanket award of punitive damages based on the defendant's conduct might be appropriate. *Id.* at 439-40. Those circumstances are not present in this case and the Court is not persuaded that, on the record thus far, a blanket award of punitive damages not premised on individualized harm is appropriate. *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section ... if the complaining party demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of *an aggrieved individual."* (Emphasis added)); *see also* *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business."); *see generally Beck v. Boeing Co.*, Civ. No. 00-301-MJP, 2003 WL 683797, at *1 (9th Cir. February 25, 2003) (holding that the district court erred in certifying class-wide punitive damages without certifying underlying request for back-pay damages); *but see* *Anderson v. Boeing Co.*, 222 F.R.D. 521, 540-42 (N.D.Okla.2004) (certifying a Rule 23(b)(2) class where plaintiffs requested injunctive relief, back pay and punitive damages).

However, this conclusion does not preclude the certification of a Rule 23(b)(2) class. *See* *Robinson*, 267 F.3d at 162-66; *Williams v. Boeing Co.*, 225 F.R.D. 626, 638-39 (W.D.Wash.2005). Pursuant to Rule 23(c), the Court has discretion to limit certification to specific issues. Fed.R.Civ.P. 23(c)(4)(A); *see* *Robinson*, 267 F.3d at 167 ("District courts should take full advantage of [23(c)(4)(A) ] to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies.") (Quotations omitted)); *accord* *Morgan*, 169 F.R.D. at 358. Accordingly, the Court severs the issues of liability and declaratory or injunctive relief from Plaintiffs' requests for monetary damages and certifies only the issue of liability and request for declaratory or injunctive relief as a Rule 23(b)(2) class action. [FN11] *See* *Morgan*, 169 F.R.D. at 358. If liability is established in either the compensation or promotion class, then the Court will consider Plaintiffs' motion to certify the damages phase as a Rule 23(b)(3) class action. *See id.;* *Williams*, 225 F.R.D. at 638-39.

> FN11. Having decided that only a Rule 23(b)(2) class is appropriate at this time, the Court will not address Plaintiffs' alternative request that the Court certify a hybrid Rule 23(b)(2)/ 23(b)(3) class.

***17** Having certified the compensation and promotion classes under Rule 23(b)(2), the Court must now decide if notice should be sent to class members. In certifying a Rule 23(b)(2) class, the Court has discretion to "make appropriate orders ...

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requiring for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action." Fed.R.Civ.P. 23(d)(2). Given this, the Court requests supplemental briefing on the issue of whether notice should be sent. [FN12]

FN12. The Court sets the following schedule. The parties shall simultaneously submit briefs on the issue no later than 14 days from the date of this Order. The briefs shall be no longer than 10 pages in length and shall be limited in scope to the issue of notice. There shall be no reply briefs.

IV. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs have moved for summary judgment as to liability of the hostile work environment class. Because no hostile work environment class has been certified, Plaintiffs' motion is moot. Accordingly, the Court denies Plaintiffs' motion.

V. CHR's MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

CHR contends that it is entitled to summary judgment on each Plaintiff's individual claim for hostile work environment because none of the named Plaintiffs can establish a prima facie case for hostile work environment. In response, Plaintiffs rely on newly-filed declarations (July 2004 Declarations) to create issues of material fact that would preclude summary judgment. CHR argues that these declarations constitute sham affidavits and therefore are inadmissible.

A plaintiff cannot create sham issues of fact in an effort to defeat summary judgment by filing an affidavit contradicting deposition testimony. *Marathon Ashland Petroleum, LLC. v. Int'l Bhd. of Teamsters*, 300 F.3d 945, 951 (8th Cir.2002). The court in *Marathon* reasoned that "this is so because otherwise any party could head off summary judgment by supplanting previous depositions *ad hoc* with a new affidavit, and no case would ever be appropriate for summary judgment." *Id.* (quotations omitted). To the extent that the July 2004 Declarations raise inconsistent or contradictory allegations, the Court strikes those paragraphs. Because Plaintiffs' arguments in their combined response to CHR's summary-judgment motions rely exclusively on the July 2004 Declarations, the Court has undertaken a thorough examination of the record, specifically Plaintiffs' deposition testimony, EEOC charges, and answers to interrogatories as provided, to ensure that any genuine issues of fact are identified. Accordingly, the Court recites below the facts relating to each Plaintiff in the light most favorable to her without discussion of any stricken portions of the July 2004 Declarations.

A. Hostile work environment

***18** Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color religion, sex, or national origin." 42 U.S.C. § 2002e-2(a)(1). Discrimination based on sex which creates a hostile or offensive work environment violates Title VII. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "Sexual harassment standards are demanding--to be actionable, conduct must be extreme and not merely rude or unpleasant." *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir.2005) (quotations omitted). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* (quotations omitted). A plaintiff must prove that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal citations and quotations omitted).

To establish a prima face case of hostile work environment based on sex, a plaintiff must show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition or privilege of her employment; and (5) if the harasser is a non-supervisory employee, that the employer knew or should have known of the harassment and failed to take proper remedial action. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 965 (8th Cir.1999). Before considering whether each Plaintiff establishes her prima face case, the Court sets forth the governing law regarding the third, fourth and fifth elements. [FN13]

> FN13. For each Plaintiff, CHR moves on some combination of these three elements. Accordingly, the Court assumes for the purposes of these motions that each Plaintiff has established the first and second elements.

*1. Harassment based on sex*

To satisfy the third element of the prima facie case, a plaintiff must demonstrate that the harassment is based on sex. "An offensive workplace atmosphere does not amount to unlawful discrimination unless one gender is treated differently than the other." *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 933 (8th Cir.2002) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). A plaintiff need not show "that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment." *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir.2001); *see Duncan*, 300 F.3d at 934. "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus ." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir.1999). In *Oncale*, the Supreme Court stated that "the plaintiff ... must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina [tion] ... because of ... sex." ' 523 U.S. at 81.

*2. Harassment affects a term, condition, or privilege of employment*

***19** To satisfy the fourth element of the prima facie case, the unwelcome harassment must be sufficiently severe or pervasive so as to affect a term, condition, or privilege of employment by creating an objectively hostile or abusive environment. *Harris*, 510 U.S. at 21-22; *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir.2003). To meet this standard, a plaintiff must show that she subjectively perceived the harassment as sufficiently severe or pervasive to alter the terms or conditions of employment, and that her subjective perception was objectively reasonable. *Harris*, 510 U.S. at 21-22; *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir.2004) ("The fourth element involves both objective and subjective components."). Whether a reasonable person would have perceived the environment as hostile is a function of both the severity and pervasiveness of the offensive conduct, "with a high level of severity compensating for a low level of pervasiveness and vice versa." *Jackson v. Flint Ink N. Am. Corp.*, 370 F.3d 791, 794 (8th Cir.), *rev'd on other grounds*, 382 F.3d 869 (8th Cir.2004). A court must look to the totality of the circumstances to determine whether the work environment is hostile or abusive. *Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir.2004). "Each case must stand on its own circumstances." *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 760 (2003). Several factors are relevant, including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "The question of whether an environment is sufficiently hostile to be actionable is a legal question, and like any legal question is a matter for the court to decide." *Jackson*, 382 F.3d at 869.

As discussed in detail below, Plaintiffs allege exposure to pornography in the workplace. The Court notes that this alone is not sufficient to meet the demanding standard for whether an environment is sufficiently hostile to be actionable. By way of example, the Eighth Circuit Court of Appeals in *Duncan* found that this standard was not met where at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

least one component of a plaintiff's alleged harassment was exposure to her supervisor's pornographic screensaver. *See* *Duncan*, 300 F.3d at 935. In that case, the Eighth Circuit overturned a jury verdict and concluded that the district court erred in denying the defendant's post-trial motion for judgment as a matter of law because the plaintiff had failed to show that the harassment was "sufficiently severe or pervasive so as to alter the conditions of her employment, a failure that dooms [her] hostile work environment claim." *Id.* The court considered several harassing incidents over three years directed at the plaintiff including her supervisor's proposition for a relationship, criticism that she was "incompetent" after she denied his proposition, improper touching of plaintiff's hand on multiple occasions, request that the plaintiff sketch a sexually objectionable planter, posting of a "Man Hater's Club" poster that portrayed plaintiff as the president and CEO, and request that the plaintiff "type the He-Men Women Haters beliefs." *Id.* at 933-34. The supervisor also had in his office a child's pacifier in the shape of a penis and a pornographic screen saver on his computer. *Id.* at 931. The court found that the harassment made the plaintiff uncomfortable and was "boorish, chauvinistic, and decidedly immature," but that in the aggregate, it did not meet the standard necessary to be actionable. *Id.* at 934-35.

*3. Employer's prompt remedial action*

***20** To satisfy the fifth element, a plaintiff must demonstrate that the employer knew or should have known of the harassment and failed to take proper remedial action. "Prompt remedial action shields an employer from liability when the harassing conduct is committed by a co-worker rather than by a supervisor." [FN14] *Meriwether*, 326 F.3d at 993. The remedial action must be "reasonably calculated to end the harassment once the employer knew or should have known about the harassment." *Scusa*, 181 F.3d 967. Several factors are relevant in assessing the reasonableness of an employer's remedial measures: "the temporal proximity between the notice and remedial action, the disciplinary or preventative measure taken and whether the measures ended the harassment." *Meriwether*, 326 F.3d at 993. *See* *Scusa*, 181 F.3d at 968 ("The undisputed evidence showed that every time she complained to management, it responded to her satisfaction. Moreover, after management took action, the incidents were not repeated. Thus, management took appropriate action to end the alleged sexual harassment."); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1265 (8th Cir.1997) (denying summary judgment where employer took four months to respond to the plaintiff's initial complaint).

FN14. In cases where the harasser is a supervisor, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807. "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages." *Id.* The affirmative defense is comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

B. Plaintiffs' exposure to pornography

For the sake of brevity, the Court addresses here the question of whether Plaintiffs' individual allegations of exposure to pornography in the workplace constitute harassment "based on sex." [FN15] The parties do not dispute that each Plaintiff, with the exception of Kinniry, alleges at least one instance of inadvertently seeing pornography on a co-worker's computer. Plaintiffs assert that the absence of partitions separating workspaces and the close proximity of co-workers to each other facilitated this involuntary exposure to pornography.

FN15. CHR also argues that other plaintiff-specific conduct is not based on sex. The Court considers those arguments as they arise in relationship to each Plaintiff.

CHR contends that Plaintiffs' exposure to pornography in this case does not constitute harassment based on sex. Since CHR did not move on the ground that Plaintiffs failed to establish the second element of the prima facie case, the Court assumes that Plaintiffs' exposure to pornography constitutes unwelcome harassment. Thus, the issue before the Court in CHR's motions is whether the alleged harassment is "based on sex." In support of its argument, CHR primarily relies on an unpublished Eighth Circuit opinion, *Ellet v. Big Red Keno*, 221 F.3d 1342, 1342 (8th Cir.2000) (unpublished table decision). In *Ellet*, the Eighth Circuit stated: "A

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dually offensive sexual atmosphere in the workplace, no matter how offensive, is not unlawful discrimination unless one gender is treated differently." *Id.* As applied in the instant cases, CHR argues that because both sexes were exposed to the pornography, each Plaintiff's branch constitutes a "dually offensive" environment and therefore, exposure to pornography does not amount to harassment based on sex. In response, Plaintiffs rely on *Andrews v. Philadelphia*, 895 F.2d 1469, 1482 n. 3 (3d Cir.1990), for that court's pronouncement that pornographic materials should be recognized as discrimination based on sex as a matter of course. The Court is not persuaded by either argument. A determination of whether harassment is "based on sex" must be made given all of the attendant circumstances. *Cf.* *Oncale*, 523 U.S. at 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or physical acts performed."). Accordingly, a *per se* rule, either way, is not appropriate.

***21** Here, there is no dispute that CHR workspaces are open, with limited ability for co-workers to avoid seeing each other's screens. Moreover, Plaintiffs' allegations almost exclusively involve images of naked women. Viewing the facts in the light most favorable to Plaintiffs, a reasonable fact finder could conclude that the unwelcome exposure to pornography--specifically that pornography objectifying women--satisfies the "based on sex" requirement. Accordingly, the Court rejects CHR's argument that each Plaintiff's exposure to pornography does not constitute harassment based on sex.

C. CHR's Individual Motions

*1. Jessica Vetter*

CHR moves for partial summary judgment on Jessica Vetter's hostile work environment claim. Vetter concedes that summary judgment is appropriate. *See* Pls.' Comb. Mem. Opp'n at 1 n. 1. Accordingly, the Court grants the motion.

*2. Sandra Nelson*

Sandra Nelson was hired by CHR in August 1996 as an hourly administrative assistant in the Minneapolis branch's carrier-relations department. The Minneapolis branch contains departments that service all six of CHR's business lines. From May 1998 to March 1999, Nelson held a salaried operations position in Intermodal. Nelson then transferred to an hourly support position in accounts payable. In September 1999, she became a salaried replenishment analyst in CPDS. Nelson stayed in CPDS until her September 2000 resignation.

Nelson contends that she was subjected to severe and pervasive sexual harassment only during her time in Intermodal (May 1998-March 1999) and in CPDS (September 1999-September 2000). Nelson alleges that in both locations her male co-workers frequently viewed and shared pornographic images. In her deposition, she testified to seeing several of these images generally--i.e., naked or barely clad women in a variety of poses. She specifically recalls seeing one image during her time in CPDS--that of a woman doing the limbo with her genitalia exposed. Nelson also identifies four images: (1) a series of mock MasterCard priceless ads; (2) an email portraying a Barbie doll as an exotic dancer with a Ken doll giving her money; (3) a Barbie doll holding a bottle of vodka with the words "Lactating Barbie" written across the picture; and (4) an email attachment entitled "Life" that displays a bag of narcotics, a woman's vagina, and a large pile of cash between her legs. Nelson, however, does not remember where or when she saw these pictures.

Turning first to CPDS, Nelson contends that the work environment in CPDS was hostile toward women, herself included, because in addition to the pornography, her male co-workers behaved inappropriately, as though they were in a "locker room." She stated:

> [W]hen I was working in the CPDS department, there was a lot of--a lot of men that were in their mid to late 20's and they--they would yell, they would holler, you know, smack each other on the back or whatever, they would use, you know, profanities and it was just a real--you know, chewing on--on tobacco and spitting it in cups and it just--it was just real you know it was almost like you know a college fraternity.

***22** (Nelson Tr. at 119.) In particular, Nelson described one occasion when Dan Jost, a CPDS co-worker, yelled out to the entire office that a female co-worker was pregnant. In fact, the female co-worker was not pregnant. Nelson felt embarrassment for the female co-worker because others were cheering and laughing before the female co-worker yelled out that she was not pregnant.

During her time in Intermodal, Nelson alleges that

male co-workers viewed pornography although not as frequently as in CPDS. Nelson testified that there were three to five occasions when men were gathered around a computer. Although she could not see what was displayed on the screen, Nelson assumes that they were viewing pornography. Nelson alleges that the following people sent or received pornographic emails: Dan Brau, Angela Stanely, Pat Anton, Kelly (last name not known), and Todd Limesand who was the Intermodal manager. Also during her time in Intermodal, Nelson recalls one incident when Tom Perdue made a sexually derogatory remark about a female known to several men in the office. When the comment was made, Nelson felt uncomfortable, as though the group of men were looking at her for a reaction. She informed Perdue that she thought it was inappropriate for him to make that comment in her presence and he apologized to her. Nelson did not complain about the environments in CPDS or Intermodal to immediate supervisors or through the channels provided by CHR management. She contends that complaining would have made the situation worse.

CHR contends *inter alia* that it is entitled to summary judgment because Nelson's alleged harassment was not so severe or pervasive as to alter a term or condition of employment. First, the Court looks to whether Nelson subjectively perceived the alleged conduct to be harassment. *See* *Harris,* 510 U.S. at 21-22. Viewing the facts in the light most favorable to Nelson, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, Nelson saw several objectionable pornographic images on co-workers computers, overheard two offensive comments directed at other women, and experienced a "locker-room" atmosphere. Notably, none of the alleged harassment was directed at her. *See* *Bainbridge v. Loffredo Gardens, Inc.,* 378 F.3d 756, 760 (8th Cir.2004) (affirming grant of summary judgment in claim for racial hostile work environment where comments alleged were not directed at the plaintiff and were "sporadic, no more than one per month, ... were used in reference to customers, competitors, or other employees ... [and] were merely overheard by [plaintiff]"). Viewing the totality of the circumstances, the discrete conduct involved here was interspersed over Nelson's four-year tenure at CHR and was not severe, physically threatening or humiliating. *See* *Harris,* 510 U.S. at 23. Moreover, there is no evidence in the record that it unreasonably interfered with Nelson's work. *See id.* Accordingly, the Court concludes that Nelson fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor,* 477 U.S. at 67; *Duncan,* 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's motion for summary judgment on Nelson's sexual harassment claim.

*3. Andrea Prout*

***23** CHR hired Andrea Prout in October 1999 in its Yakima, Washington, branch as a transportation sales representative. In August 2000, Prout requested and received a transfer to CHR's Portland branch. After her transfer, Prout continued in transportation sales until February 2001 when she began working in "less than a truckload" (LTL) sales. Prout resigned in August 2001.

Prout contends that she was subjected to sexual harassment at both the Yakima and Portland branches. Prout identifies four kinds of evidence in support of her claim: (1) her co-workers' prevalent use of word "rape"; (2) her co-workers' viewing of pornography; (3) her co-workers' generally offensive conversations; and (4) her dissatisfaction with the management at the Portland branch. First, Prout alleges that transportation sales representatives commonly used the word "rape" to refer to a load for which a trucker had charged too much, e.g., "that trucker raped me." Prout was offended by this usage and in the Yakima branch, brought it to the attention of a co-worker who used the phrase excessively. After that, Prout did not hear him use it again. In the Portland branch, Prout complained to Portland branch manager Todd Ortman, about the use of the word "rape." Prout believes that he did not address her complaint with her co-workers.

Second, Prout alleges that co-workers in both branches viewed pornography on their computers. In Yakima, co-workers used "popcorn" as a code word for pornography. Prout received pornographic emails from co-workers and from unknown sources outside of CHR. Prout identifies several men who she believes viewed pornographic pictures either on the internet or through email: Jack Walrath, Willie Edwards, Louie (last name unknown), Manuel Martinez, Jorge Delgado, Chris Jensen, Jason Cameron, and Bart Erwin.

Third, Prout contends that her Portland co-workers

engaged in offensive conversations consisting of derogatory jokes and vulgar language directed at a variety of different racial and ethnic groups. For example, Prout contends that her co-workers would often use xenophobic epithets such as "towel-head" and "spic." (Prout Tr. at 191.) She also contends that there was prolific swearing, but concedes that occasionally, she too swore.

Finally, Prout alleges that there were personal conflicts in Portland between her and her immediate supervisor, Jensen, as well as between her and Ortman. With regard to Jensen, Prout felt that he micro-managed her and that he misused his management position to advance his career. Prout testified, however, that she thought Jensen's actions to get ahead just happened to be at her expense. (*Id.* at 191.) With regard to Ortman, Prout contends that he did not like her. In particular, Prout claims that Ortman did not implement her suggestions on business expansion. Prout first suggested that the Portland branch begin selling refrigerated freight, which, although it involves greater risks to the company, Prout was skilled at selling (from her experience in Yakima). Prout also suggested adding an international line to the branch. According to Prout, Ortman's refusals to adopt her suggestions were based on Prout's gender because Ortman had previously implemented a business suggestion made by a male co-worker. Finally, Prout claims that Ortman denied her request for a car allowance, which she believes she was due to receive eighteen months after hire.

***24** CHR contends that it is entitled to summary judgment because Prout's alleged harassment was neither based on sex, nor so severe and pervasive as to alter a term or condition of employment. The Court considers each in turn.

a. Harassment based on sex

CHR asserts that Prout's alleged harassment does not constitute conduct based on sex. In particular, CHR contends that Prout's co-workers' general use of the word "rape," Jensen's behavior, and the exposure to pornography do not constitute harassment "based on sex." Although Prout testified that she was offended by her co-workers' use of the word "rape," she does not respond to CHR's argument in this regard. In her deposition, Prout concedes that the term was never directed at her, and was only used in "a business sense." Without more, a reasonable fact finder could not conclude that Prout's co-workers' use of this term resulted in one gender being treated differently, or that women were the "primary target of such harassment." *See* *Duncan*, 300 F.3d at 933- 934; *Beard*, 288 F.3d at 798; *see also* *Hocevar v. Purdue Fredrick Co.* ., 223 F.3d 721, 737 (8th Cir.2000) (citing *Kriss v. Sprint Communications Co.*, 58 F.2d 1276, 1281 (8th Cir.1995) for the proposition that use of the word "bitch" without additional evidence of gender discrimination does not satisfy the "based on sex" requirement). With regard to Jensen's conduct, Prout again does not address this argument. According to Prout, Jensen's retention of the most lucrative accounts for himself just happened to be at her expense because he was doing it solely for self-promotion. Accordingly, no reasonable fact finder could conclude that Prout's difficulties with Jensen were based on sex. For the reasons stated above, a reasonable fact finder could conclude that exposure to porn could constitute harassment "based on sex." The Court therefore turns to the fourth element. *See* *Duncan*, 300 F.3d at 934 (proceeding to fourth element where some, but not all, alleged harassment was "based on sex").

b. Harassment alters a term or condition of employment

First, the Court turns to whether Prout subjectively perceived the alleged conduct to be harassment. *See* *Harris*, 510 U.S. at 21-22. Assuming that Prout's experiences from two distinct branches should be aggregated, and viewing the facts in the light most favorable to her, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next considers whether that subjective perception is objectively reasonable. *See id.* Here, Prout saw co-workers viewing and discussing pornography, she received and deleted at least one explicit email, and she had disagreements with Ortman. Viewing the totality of the circumstances, these few incidents spread over two years were not frequent. *See* *Harris*, 510 U.S. at 23; *Bainbridge*, 378 F.3d at 760. Moreover, the conduct involved here was not severe, physically threatening or humiliating, and there is no evidence in the record that it unreasonably interfered with Prout's work. *See* *Harris*, 510 U.S. at 23. Accordingly the Court concludes that Prout fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motion for summary judgment on Prout's sexual harassment claim.

*4. Cathy Perkey*

***25** Perkey began her employment with CHR in September 1999 in the Minneapolis International branch. She was employed as an import clerk until her termination in June 2004. As an import clerk, her responsibilities included billing, customer service and preparation of paperwork necessary for international goods to clear United States Customs as well as doing some billing, customer service, and securing trucks to move freight.

From some point after she started in 1999 until February 2001, Perkey alleges that she was subjected to sexual harassment that was both severe and pervasive. Perkey bases her sexual harassment claim primarily on five incidents. First, in December 1999, she recalls Jeff Enger and Troy Bachman, two male co-workers, viewing a picture of a naked woman. Perkey overheard Enger say that his wife had sent it to him. Second, in December 2000, Enger displayed a holiday card on his file cabinet that Perkey found offensive. The card, which was given to Enger in the branch's Secret Santa exchange, depicted a large naked woman and had the phrase "Takes a whole lot of woman to please a man," written on the front. (Perkey Tr. at 92.) Perkey saw the card once, although she believes that it was left out for a week. Third, Perkey alleges that her female co-workers engaged in offensive conversations regarding their sex lives and other sexual topics. Fourth, Perkey received an email joke with a naked man and a snow blower that she found offensive. Finally, on February 23, 2001, Perkey witnessed Enger, Bachman, Jesus Caldaza, and Joe Hauer viewing a picture displayed on Enger's computer that depicted a woman bent over with her genitalia exposed. Perkey was shocked and offended. She used CHR's anonymous toll-free telephone number to register a complaint against Enger for sexual harassment and CHR policy violations. Since her complaint, Perkey attests that the only pornography she has seen in the office has been on the computer of co-Plaintiff Gwen Carlson. [FN16]

> FN16. Perkey testified that Carlson was showing her how, despite CHR's firewall software to block out pornographic websites and spam, Carlson could still receive or access pornography. (Perkey Tr. at 182-84.)

Shortly after Perkey's anonymous complaint, Carlson also called the anonymous hotline to lodge a complaint. Several events took place as a result of the two complaints: (1) CHR required everyone in the branch's International department to re-sign CHR's sexual harassment policy and internet policy and attend sexual harassment training; (2) within six weeks, outside counsel was hired to conduct an investigation; (3) CHR's CEO Sid Verdoorn, sent an email addressing the situation to all CHR employees; (4) CHR reprimanded several employees--both men and women; and (5) CHR suspended the branch manager without pay for one month and required him to attend diversity training.

Perkey also testified that her immediate supervisor Julie Bergquist, singled her out by tracking Perkey's arrival and departure times. According to Perkey, Bergquist had been doing this since May 2000. Perkey testified that she considers it a hostile work environment to be monitored in this way, but makes no claim that Bergquist singled her out because of her sex. Perkey also alleges that Bergquist discriminated against her by changing her work hours. Perkey admits, however, that because she was only working a seven-and-one-half-hour day, the change in her work hours simply brought her in line with the other who employees worked an eight-hour day. Bergquist told her that this change was in part to be fair to everyone and in part to give Perkey more time to get her work done. At some point after Perkey filed her February 2001 complaint, she also notes an instance where Bergquist emailed a co-worker regarding Perkey's hours and accidentally sent it to Perkey as well. Perkey complained to Gordon Anderson, her manager, that she thought this was inappropriate. He said he would talk to Bergquist and asked that Perkey keep it between them. Perkey inferred that he was asking her not to take the complaint to CHR management.

***26** CHR argues *inter alia* that it is entitled to summary judgment because Perkey cannot demonstrate that her alleged harassment was so severe or pervasive as to alter a term or condition of her employment, nor can she demonstrate that CHR did not provide prompt remedial action upon Perkey's complaint. First, the Court looks to whether Perkey subjectively perceived the alleged conduct to be harassment. *See* *Harris*, 510 U.S. at 21-22. Viewing the facts in the light most favorable to Perkey, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective

perception was objectively reasonable. *See id.* Here, Perkey saw several images of naked women, overheard some inappropriate conversations, and received one offensive email. Other than the email, none of Perkey's alleged harassment was directed to her. *See* *Bainbridge*, 378 F.3d at 760. Viewing the totality of the circumstances, the conduct involved here was spread over an eighteen-month period and cannot be considered frequent, nor was it severe, physically threatening or humiliating. *See* *Harris*, 510 U.S. at 23. Moreover, there is no evidence in the record that it unreasonably interfered with Perkey's work. *See id.* Accordingly, the Court concludes that the conduct involved was unprofessional, but that Perkey fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's motion for summary judgment on Perkey's sexual harassment claim.

*5. Angela Roberts (n/k/a Angela Jackson)*

From September 1999 until her termination for habitual tardiness in April 2001, Angela Roberts worked for CHR in its Chicago North branch as a transportation sales representative. During her tenure, Gene Scheisser was the Chicago North branch manager.

Roberts contends that she was subjected to severe and pervasive sexual harassment in two forms: (1) generally offensive behavior by male co-workers; and (2) specific instances of harassment directed at her. As to the former, Roberts alleges that male co-workers asked questions of a personal nature to her female co-workers such as, "What did you do over the weekend?" and "Who are you dating?" Roberts also testified that she witnessed co-workers viewing pornography. Roberts further recalls that male co-workers threw a foam football around the office.

With regard to harassing behavior directed at her, Roberts contends first that she received offensive emails. She identifies three specific instances: (1) an image of a girl doing the limbo with her genitalia showing; (2) an image of a girl at a party with her breasts displayed; and (3) an internet link to a gay pornography website. Roberts complained to Scheisser and forwarded the emails to him. According to Roberts, Scheisser responded by sending out a branch-wide email stating the email system is to be used only for work-related business.

***27** Second, she recalls that Jeff McDonald made frequent comments about her clothes and how she looked. Third, during a nighttime campfire at a weekend retreat for the branch, Eric Gebuhr, a male co-worker, slapped her hip and buttock and stated, "Why are you playing hard to get?" Roberts contends that she and Gebuhr had not previously had a flirtatious relationship, and that he had consumed a lot of alcoholic beverages that evening. Indeed, Roberts claims that she awoke later that night to find Gebuhr passed out in the women's cabin on an extra bed. (Roberts Tr. at 90-97.)

Finally, at some point during the summertime, Roberts was talking to Ed Celler, a co-worker, and she noticed that he was not looking at her face. Roberts asked him, "Ed, are you looking at my breasts?" He replied: "Well they are right there. What am I supposed to do?" (*Id.* at 103.)

CHR contends *inter alia* that it is entitled to summary judgment because Roberts cannot demonstrate that her alleged harassment affected a term or condition of her employment. First, the Court looks to whether Roberts subjectively perceived the alleged conduct to be harassment. *See* *Harris*, 510 U.S. at 21-22. Viewing the facts in the light most favorable to Roberts, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, Roberts alleges generally that she saw pornography in the office and overheard inappropriate comments, and specifically that she was harassed based on McDonald's comments about her attire, Gehbur's inappropriate behavior at the retreat, and Celler's staring at her breasts. Viewing the totality of the circumstances, the alleged harassment was sporadic and spread over Roberts' nineteen-month tenure at CHR. *See* *Harris*, 510 U.S. at 23. Although there was physical conduct and Celler's comment was undoubtedly embarrassing, there is no evidence in the record that the alleged harassment unreasonably interfered with Roberts' work. *See id.* Given previous decisions of the Eighth Circuit, the Court concludes that she has failed to show that these occurrences in the aggregate were so severe and extreme that a reasonable person would find that the terms or conditions of her employment had been altered. *See, e.g.,* *LeGrand*, 394 F.3d at 1102-03 (holding that several incidents over a nine month period did not

constitute severe and pervasive harassment where conduct included: (1) defendant's request for plaintiff to watch pornographic movies with him and "to jerk off with him" to relieve stress; (2) defendant's suggestion that plaintiff would advance in the company if he watched pornographic movies and "jerked [defendant's] dick off"; (3) defendant kissed plaintiff on the mouth while grabbing his buttocks; and then reached for plaintiff's genitals; and (4) defendant gripped plaintiff's thigh while both were seated at a table during a meeting). Although the conduct involved was unprofessional and inappropriate, the Court concludes that that Roberts fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's motion for summary judgment on Roberts' sexual harassment claim.

*6. Tricia Porter*

***28** Tricia Porter works as a transportation sales representative in the Los Angeles branch. She began her employment with CHR in March 1997 at the Chicago North branch. For her first year, Jeff Begin was Chicago North's branch manager. Gene Scheisser replaced Begin in 1998. According to Porter, she transferred to the Los Angeles branch in April 2000, to escape personal conflicts between her and Scheisser. Porter alleges that she was subjected to severe and pervasive sexual harassment in Chicago and Los Angeles.

Turning to her time in Chicago, Porter identifies four specific occasions and makes general allegations regarding the existence of an inappropriate work environment. First, she alleges that, during Begin's management, Begin remarked that he had taken a support employee on a sales call because she was attractive. Second, in 1998, believing that she needed his approval, Porter asked Scheisser to allow her to apply for an assistant branch manager position in a newly opened Birmingham office, and he refused. Scheisser allegedly stated that he knew the Birmingham branch manager and that the two of them would not get along. Porter contends that because Scheisser had only recently come to the Chicago North branch and did not know Porter well, his refusal was based on her gender and race. [FN17]

FN17. Any claims Porter may have regarding race discrimination are not before the Court.

Third, when Porter came back from maternity leave in 1999, she expected to resume work on an important account that she had been "growing" before she left. During her absence, Scheisser had assigned the account to a male co-worker. Upon her return, Scheisser questioned whether Porter could handle the responsibility because they were just getting ready to expand it to a national account. After Porter protested, Scheisser allowed her to resume responsibility over the account. Thereafter, Porter contends that Scheisser attempted to diminish her success with the account and the client.

Fourth, Porter describes an incident where Scheisser stood up on his desk and yelled to the entire office that he was "tired of people taking craps on his time." (Porter Tr. at 190.) He went on to say that people should not spend so much time in the bathroom and that employees should "take craps on personal time not his." (*Id* .) A few days later, Scheisser sent a follow-up email that stated: "I want to make a policy adjustment to using the bathroom for the second purpose. Please try to avoid mornings, but if you have to go ahead, I wouldn't want anyone to injure themselves." (*Id.* at 191-92.)

Finally, Porter alleges that male co-workers frequently clustered around certain computers, laughing and joking. Porter assumes that they were viewing pornography and recalls seeing at least one offensive image. [FN18]

FN18. Porter specifically recalls two explicit images, but cannot remember which image she viewed in which branch--either Chicago North or Los Angeles. She describes one image depicting the Flintstones cartoon characters engaging in sexual acts, and another image showing a man trying to penetrate an elephant.

Turning to the Los Angeles office, Porter contends that the environment there was an improvement over Chicago, but that she continued to be subjected to a hostile work environment. In particular, Porter alleges that co-workers engaged in inappropriate conversations in the form of sexually offensive jokes. Porter recalls one joke in particular: "What's the difference between a wife and a mistress? ... Forty pounds." She contends that her co-worker, Brian Jackson, had a "fart man"--a three-dimensional figure that when pressed, bends forward and his pants drop down. Porter contends that the area around Jackson's desk was known as the "fart zone" and that male co-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

workers routinely passed gas in that area. As in Chicago North, Porter noticed on one or two occasions male co-workers huddled around a computer, and she assumes that they were viewing pornography. With regard to emails, Porter reports that her male co-workers frequently laughed in unison or called out to each other when sending each other emails. Porter remembers receiving one offensive email. She immediately deleted the email and does not know who sent it to her. In addition, Porter recalls that Eric Foe hung a picture of a girl in a bikini. When a co-worker asked him to take the picture down, he did.

***29** Porter also testified that she frequently had disagreements with her co-worker, Cesar Bustamente. According to Porter, Bustamante was rude and condescending, particularly to women. Further, while she cannot recall the details or the timing, Porter testified that she spoke with Nystie about her difficulties with Bustamante.

In addition, Porter complained twice to Nystie about harassment from carriers she contacted to move loads for her customers. According to Porter, the carriers propositioned her and asked her inappropriate questions. Porter testified that these comments came from the group of carriers she contacts when her regular carriers are unavailable. On the first occasion, the carrier asked Porter her blouse size. She reported to Nystie who told her he would handle it. (*Id.* at 33-34.) On a second occasion, another carrier made offensive remarks to Porter, after which Nystie sent a letter to the carrier. [FN19] (*Id.* at 42.)

FN19. The Court need not decide here the issue of CHR's liability, if any, with respect to carriers who are not CHR employees. The Court assumes, for purposes of this motion only, that Porter's allegations regarding her carriers' comments contribute to her claims of harassing conduct.

Porter also contends that since the onset of this litigation, she has again been subjected to hostility from Scheisser. In 2002, Scheisser went to Los Angeles for a business appointment and, while waiting to leave, he sat in the pod next to Porter and stared at her. When Nystie realized what was going on, Porter claims that he made a public comment to the effect that Scheisser should be careful not to do anything inappropriate or sexually harassing. Porter took this as a personal attack on her participation in this lawsuit. Nystie later came to her and told her that he had scolded Scheisser for his behavior and had offered to allow him to wait in his office. Porter alleges that Nystie's public comment only perpetuated the sexual harassment.

With respect to Porter, CHR contends *inter alia* that it is entitled to summary judgment because she cannot demonstrate that her alleged harassment affected a term or condition of her employment. First, the Court turns to whether Porter subjectively perceived the alleged conduct to be harassment. *See* *Harris*, 510 U.S. at 21-22. Assuming that Porter's experiences from two distinct branches should be aggregated, and viewing the facts in the light most favorable to her, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, Porter's alleged harassment consists of her personal conflicts with Scheisser and Bustamante, her problems with certain carriers, two viewings of pornography, one explicit email, and general offensive conduct of her co-workers. However, this conduct, spread over five years, amounts to sporadic instances of offensive behavior and ordinary tribulations in the work place. *Cf.* *Faragher*, 524 U.S. at 778 (noting that Title VII is not meant to redress "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes and occasional teasing"). Viewing the totality of the circumstances, the Court concludes that the alleged harassment does not demonstrate that Porter's workplace was "permeated with discriminatory intimidation, ridicule and insult." *Harris*, 510 U.S. at 21. Indeed, the Eighth Circuit has found conduct as frequent and intrusive as Porter's insufficient to reach this standard. *See* *Duncan*, 300 F.3d at 934-35; *LeGrand*, 394 F.3d at 1102-03. While some of the conduct involved here was markedly unprofessional, there is no evidence in the record that it unreasonably interfered with Porter's work. *See* *Harris*, 510 U.S. at 23. Accordingly, the Court concludes that Porter fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's motion for summary judgment on Porter's sexual harassment claim.

*7. Debra Kinniry née Cash*

***30** Debra Kinniry began work at CHR on

December 15, 2000. She was employed as a sales representative for e-Stop, a subset of CHR's T-Chek line. The e-Stop business sells information collected by T-Chek regarding fuel services. Her direct supervisor was Mark Derks. Kinniry resigned on December 31, 2001.

Kinniry alleges that she was subjected to severe and pervasive harassment by her co-worker, Tom Berry, and by Derks. With regard to Berry, Kinniry forwarded to him the resume of a male friend. Shortly thereafter, she inquired into whether he received it and Berry asked if the resume belonged to one of her boyfriends. Kinniry felt as though Berry was implying that she was promiscuous. Kinniry complained to Derks, who asked her if she wanted to document the situation. She declined. Kinniry states that she was afraid of retaliation and did not want to jeopardize her job. Nonetheless, Derks documented the incident with J.J. Singh, the president of T-Chek. Singh contacted Kinniry to confirm that she did not want to document the conduct.

With regard to Derks, Kinniry alleges that he made several inappropriate comments to her. First, when Kinniry was picking her teeth with her finger, Derks said, "Stop sucking on your finger, it's making me horny." (Kinniry Tr. at 92.) Next, as Derks and Kinniry were preparing for her review, Derks said something to the effect that they could conduct the review under his desk. In addition, after she tendered her resignation, Derks stated "Now that you are leaving, I can tell you that I always wanted to have sex with you." (*Id.*) Kinniry admits to having a flirtatious encounter with Derks when the two were traveling in Florida on business, but contends that there was no sexual contact. Kinniry also contends that Derks inappropriately shared his opinion of a co-worker, Nettie Helquist, with her. According to Kinniry, Derks told her that Helquist was a troublemaker. Finally, when Kinniry asked Derks why her male co-worker Nate Wanamaker received a temporary position in card sales, a position Kinniry wanted, Derks allegedly stated that Wanamaker was the typical CHR recruit--male and in his twenties.

Kinniry also contends that she periodically received offensive emails. She could not remember from whom, testifying: "I never really paid attention. They went around frequently, they came around the company frequently and I didn't pay attention to who they were from, they were just deleted." (*Id.* at 82.) When asked if she found it offensive, Kinniry testified "I think anyone would find it offensive to some degree, but it went on so frequently that it was the norm. It was not--It was something you just, you got used to dismissing." (*Id.* at 84.) Kinniry also recalls two male co-workers gathered around a computer and she assumed that they were viewing pornography.

Finally, Kinniry contends that she felt unwelcome by her male co-workers. In particular, Kinniry describes a CHR golf tournament to which she received a last-minute invitation. After a few holes, Kinniry asked why she was the only woman. Derks replied that Singh had asked that she be invited so that it would not be an all-male event. Kinniry felt uncomfortable thinking that her male colleagues did not want her there.

***31** CHR contends *inter alia* that it is entitled to summary judgment because Kinniry's alleged harassment was not so severe or pervasive as to alter a term or condition of employment. First, the Court looks to whether Kinniry subjectively perceived the alleged conduct to be harassment. *See* *Harris*, 510 U.S. at 21-22. Viewing the facts in the light most favorable to Kinniry, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, a reasonable person could not conclude that Kinniry was subjected to harassment so severe or pervasive as to alter a term or condition of employment. Viewing the totality of the circumstances, the alleged harassment was sporadic. Berry's comment, Derks' comments, and her feeling of being unwelcome at the golf tournament do not demonstrate that Kinniry's work place was "permeated with discriminatory intimidation, ridicule and insult." *Id.* at 21. Moreover, the Eighth Circuit has found conduct more intrusive than Kinniry's insufficient to reach this demanding standard. *See, e.g.,* *LeGrand*, 394 F.3d at 1102-03. None of the conduct involved here was severe, physically threatening or humiliating, and there is no evidence in the record that it unreasonably interfered with Kinniry's work. *See* *Harris*, 510 U.S. at 23. Accordingly, the Court concludes that Kinniry fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's motion for summary judgment on Kinniry's sexual harassment claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*8. Carol Flannigan*

Carol Flannigan was employed at CHR's New Orleans branch from August 1999 until her termination in May 2001. She started in support and accepted a promotion in July 2000 to produce sales. From July to September 2000, Flannigan assisted the produce manager, Eric Waitzman. In September 2000, Waitzman took an unexpected leave of absence, and Flannigan began to work independently in produce sales. In January 2001, the branch manager, Duane Leier, retired and he was not replaced. Instead, Kevin Meguire, the regional produce manager, assumed the New Orleans branch's produce managerial duties.

Flannigan asserts that she was subjected to a hostile work environment in the New Orleans branch based on her co-workers' generally inappropriate conduct, conversations, and vulgar language, as well as specific comments directed to her. With regard to general conduct, Flannigan contends that her male co-workers frequently viewed pornography on their computers. In her first week of work, Flannigan complained to her support supervisor, Barbara Brevelle, that she had seen co-workers viewing pornography. Flannigan alleges that Brevelle told her that there was nothing that could be done about it. During her time in support, Flannigan estimates that she saw pictures of naked women three times per week on Waitzman's computer, a total of five times on Craig's (last name not known) computer, a total of five to ten times on Donald Pecot's computer, and a total of three to four times on Dan Anderson's computer. She specifically remembers seeing a pornographic slide show on Waitzman's computer. Also during her time in support, Flannigan recalls that Leier reprimanded several co-workers who had repeatedly accessed inappropriate websites. After Leier left that day, the co-workers congratulated each other on the number of hours each had logged. Flannigan was offended by the co-workers' reaction. Although her co-workers thereafter concealed it from Leier, Flannigan believes that they still viewed pornography. After her move to produce sales, and while working closely with Waitzman, Flannigan saw some explicit images on his screen. Flannigan told him that she did not want to see those kinds of images and he closed his computer screen. Thereafter, Flannigan did not see pornography on his or any other co-workers' computer. Nevertheless, Flannigan alleges that employees continued to view pornography.

***32** Flannigan testified that Leier never engaged in viewing offensive images and would not have tolerated it had he seen it. Nonetheless, she did not report her experiences to him. In addition, Flannigan claims she did not report the pornography through CHR's other channels because she was afraid of retaliation. She bases this fear upon her contention that after Brevelle reported an affair between Anderson and Robin Brantley to CHR management, Anderson treated Brevelle poorly and ignored her.

Flannigan also alleges that co-workers engaged in inappropriate conduct at a sales conference in Dallas, Texas, by drinking alcohol and wrestling at a poolside barbeque. In addition, she asserts that the Anderson/Brantley affair interfered with her ability to work because co-workers frequently engaged in conversations and speculation regarding the affair. Flannigan contends that the widespread gossip created a hostile environment. Flannigan further alleges that co-workers often used foul language including the words "fuck," its derivations, and "rape" (e.g., "that truck driver raped me on a load"). Flannigan concedes that both male and female co-workers used foul language.

With regard to specific comments made to her, Flannigan alleges first that she was offended by her co-workers calling her "Eric's secretary" after she moved into produce sales. Second, Flannigan alleges that Meguire made two offensive comments about her. Specifically, the first time she met Meguire before he assumed Leier's duties in December 2000, he took the produce sales employees out to dinner. During dinner, he asked what each person did before coming to CHR. Flannigan brought up her work at a veterinarian's office. Meguire asked if she had any pets and she responded that she had two dogs and four cats. Meguire then stated that he had eaten cat. Flannigan believes that Meguire used the word "cat" as a euphemism for a woman's vagina. On another occasion, Flannigan asserts that Meguire intentionally humiliated her by asking her, in front of other colleagues, where she had gone to college. According to Flannigan, Mequire knew that she had not gone to college. Also at that time, she alleges that Meguire made fun of her work at the veterinary clinic.

CHR contends *inter alia* that it is entitled to summary judgment on Flannigan's sexual harassment claim because she cannot demonstrate that Meguire's comments were based on sex, or that the alleged harassment was severe or pervasive. The Court turns first to whether the harassment was based on sex.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a. Harassment based on sex

CHR argues that Flannigan does not demonstrate that Meguire's comments were based on sex. Flannigan fails to respond to this argument. To be actionable, "the harassment must be based on the complaining person's sex." *Scusa*, 181 F.3d at 965. An offensive workplace atmosphere does not amount to unlawful discrimination unless one gender is treated differently than the other." *Duncan*, 300 F.3d at 933 (citing *Oncale*, 523 U.S. at 80). Viewing the facts in the light most favorable to Flannigan, a reasonable fact finder could conclude that Meguire's comment regarding cats was "based on sex." The Court therefore denies CHR's argument with respect to this element.

b. Harassment alters a term or condition of employment

***33** First, the Court looks to whether Flannigan subjectively perceived the alleged conduct to be harassment. *See Harris*, 510 U.S. at 21-22. Viewing the facts in the light most favorable to Flannigan, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, Flannigan alleges that she was subjected to harassment based on her sex because of the office gossip regarding Anderson's affair, the inappropriate language, conduct and comments, the pornography, and Mequire's comments. Other than Mequire's comments and being called "Eric's Secretary," none of Flannigan's alleged harassment was directed at her. *See Bainbridge*, 378 F.3d at 760. Moreover, a reasonable person could not conclude that Flannigan's not attending college, and Meguire's cat comment when coupled with Flannigan's other allegations constitute humiliating conduct sufficient to satisfy the demanding standards set forth by the Eighth Circuit. *See e.g., Duncan*, 300 F.3d at 934-35; *Ottman v. City of Independence*, 341 F.3d 751, 760 (8th Cir.2003) (holding that the district court erred in denying summary judgment where supervisor had belittled female employees' work product but not male employees' work; had spoken condescendingly to plaintiff as if she were a child; had on two separate occasions made the comment, "It's just like a woman" referring to two women who had disagreed with him; had occasionally referred to women as "girls"; had declared "we need more men"; and sometimes told female workers to "be quiet, men are talking"); *LeGrand*, 394 F.3d at 1102-03. Viewing the totality of the circumstances, her exposure to pornography was frequent during her first several months, but none of Flannigan's alleged harassment was severe, physically threatening or humiliating, and did not unreasonably interfere with Flannigan's performance. *See Harris*, 510 U.S. at 23. Plainly, some of the conduct alleged was juvenile and unprofessional, but Flannigan fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's motion for summary judgment on Flannigan's sexual harassment claim.

*9. Amy Hossenlopp*

Amy Hossenlopp works as a transportation sales representative in CHR's Columbia, South Carolina, branch. She began working there on May 27, 1998. Until March 2004, Mike Borowiec was Hossenlopp's branch manager.

Hossenlopp contends that she has been subjected to sexual harassment that was severe and pervasive. First, she alleges that the environment was "hostile" because her co-workers were combative with each other. For example, Ken Clarkson and Bill Colvin engaged in a verbal altercation at work in 2001. Hossenlopp alleges that she was on the phone with a customer at the time and that their "threatening tones" and "vulgar language" made it difficult to concentrate on what her customer was saying. Hossenlopp also describes a March 2002 incident when Clarkson, Hossenlopp's "zone" leader, was verbally abusive to her and her co-worker, Stephen Dowey, after they sacrificed a profit on a load to accomplish a delivery that had gone awry. Even though Hossenlopp and Dowey had cleared sacrificing the profit with Borowiec, Clarkson belittled and yelled at them the next morning. Hossenlopp complained to Borowiec about Clarkson's behavior. Borowiec spoke with Clarkson on her behalf. Shortly thereafter, Clarkson emailed her that he was unhappy that she had gone to Borowiec. According to Hossenlopp, Clarkson continued to be verbally abusive to co-workers. Hossenlopp also describes an unpleasant exchange with CHR's Iowa branch manager, Scott Shannon. Shannon called her and her co-worker, Kevin Harthan, incompetent because a truck hired by Hossenlopp to transport an important load broke down.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***34** Next, Hossenlopp contends that her co-workers engaged in generally offensive conversations, and that some inappropriate comments were directed at her specifically. With regard to the offensive comments, Hossenlopp alleges that William Speas, referring to a female CHR recruiter, stated: "I guess that's how women in the company advance to the top. They sleep their way up." (Hossenlopp Tr. at 153.) As Speas was speaking, he made a thrusting motion with his pelvis. Hossenlopp also alleges that she overheard a conversation between Smallwood and Harthan regarding golf. At some point in the conversation, Smallwood said, "Why don't you go with William Speas at lunch or go with so and so and try and do something with anal beads." (*Id.* at 151.) Harthan looked at him and stated: "I don't know how to respond to that." (*Id.*) Smallwood laughed and said, "I don't even know why I said that." (*Id.*) Finally Hossenlopp contends that vulgar language was used in the branch, particularly the word "rape," (e.g., "he's raping me on this load"). Hossenlopp concedes that she too cursed on occasion.

Turning to comments directed at Hossenlopp, she recalls speaking with Borowiec in 2000 about comments she had received from her co-workers regarding her attire. In particular, Bill Colvin commented on her new clothes and, on another occasion, suggested that she must have a hot date that night because of her nail polish and make-up. Hossenlopp next alleges that when she went on her first sales call, Julian Montegue made a comment about how she was going to "service the customer." (*Id.* at 147.) In addition, Hossenlopp describes an instance where Montegue brought in his leftover birthday cake that was topped with candy in the shape of a woman's breasts. Hossenlopp testified:

> One of the guys came to my desk and told me I need to go into the kitchen because Julian had brought in his birthday cake and I heard them snickering behind my back when I went into the kitchen and when I lifted the lid on the cake and realized what it was I was very appalled and very embarrassed at the same time and went back to my desk because everybody in the branch saw the cake because it was sitting in the breakfast room all day long.

(*Id.* at 150.) Hossenlopp also alleges that her co-workers were throwing a foam ball around the room and it hit Hossenlopp. She stood up and told them "this was not Romper Room" and that they had to stop. (*Id.* at 200.) They ceased and returned to their desks.

Third, Hossenlopp asserts that she has been subjected to sexually explicit pictures and male co-workers viewing pornography during work hours. Hossenlopp recalls Clarkson viewing pornography as early as Winter 2000. She also remembers seeing a "naked brunette" on Steve Smith's computer. Smith shut it off when he realized she was nearby. She also witnessed Clayton Smallwood viewing a pornographic video depicting a naked man being hung by restraints and being kicked in the groin by a female. The video had some "vile" sounds that went along with it. Hossenlopp told Smallwood "that was not conducive." (*Id.* at 150.) Finally, she recalls that Clarkson and Neal Elgin gathered around Colvin's computer. They attempted to close the screen when they realized she was approaching, but she saw part of a woman's breast before Colvin could close it completely. She did not report any of these incidents at the time that they occurred.

***35** Between 1998 and her deposition in August 2003, Hossenlopp recalls receiving 3 explicit emails: (1) in 1998, a co-worker from the Boston branch sent her an email that covered her screen with a picture of a naked woman that she could not readily delete from her computer; (2) a picture with a representation of Osama Bin Laden naked, bent over with the Empire State Building inserted in his rear end; and (3) a cartoon joke that she did not understand and deleted immediately.

In the later part of 2001, Hossenlopp mentioned to Borowiec that she might have seen an inappropriate screensaver on someone's computer but that she was not one hundred percent sure at that time. Hossenlopp told Borowiec that she did not want to "go pointing fingers at people without having the facts." (*Id.* at 53.)

During her March 2002 conversation with Borowiec regarding Clarkson's behavior, Hossenlopp also told Borowiec that she had seen things that she believed were inappropriate. Specifically, Hossenlopp stated that she would hate for her mother or a customer to see "that kind of stuff" in the office. (*Id.* at 59.) Borowiec agreed with her and said he would address the situation. During that conversation, Hossenlopp, however, did not disclose to Borowiec that she had 23 disks of pornography that she had downloaded from Julian Montegue's, Colvin's and Eric Broderick's computers at the end of 2001. On March 20, 2002, Borowiec sent an email to all Columbia employees reminding them of CHR's business and ethics policies, and instructing them to refresh their understandings of the policies.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In September 2002, Hossenlopp spoke with Michelle Debben, a CHR HR employee, and complained about the branch's environment. In particular, she complained about Clarkson and Smallwood. As a result, Tim Manning and Amy Taber conducted an investigation at the Columbia branch on September 27 and 28, 2002. After the investigation, Borowiec brought each employee into his office to explain its outcome. Disciplinary action included Clarkson's one-month suspension, after which he resigned, and Smallwood's one-week suspension. Since that time, Hossenlopp testified that she is not aware of any sexually explicit emails or images, or sexually offensive conduct in he branch.

CHR contends that it is entitled to summary judgment on Hossenlopp's hostile work environment claim because she cannot meet her burden to demonstrate that the harassment was based on sex, that it was so severe or pervasive as to alter at term or condition of employment, or that CHR took did not take prompt remedial action.

a. Harassment based on sex

"Abusive behavior is not 'based on sex' if the harasser subjects both men and women to similar abuse." *Hesse v. Avis Rent A Car Sys., Inc.*, Civ. No. 02- 3653, 2004 WL 569563, at *5 (D.Minn.2004), *aff'd*, 394 F.3d 624 (8th Cir.2005). "Similarly, a supervisor's legitimate criticism of a female employee's mistake--however harsh or insensitive--is not harassment based on sex if the supervisor would have reacted the same way to a male employee's mistake." *Id.*

***36** CHR argues that Clarkson's behavior does not constitute harassment based on sex. Hossenlopp does not respond this argument. At her deposition, she testified that Clarkson subjected both her and her male co-workers to verbal abuse and vulgar language. She gave similar testimony regarding Shannon's disparaging remarks. The record does not reveal any evidence that Clarkson referred to Hossenlopp's gender or made sexual innuendoes. Accordingly, a reasonable fact finder could not conclude that Clarkson's behavior was based on sex. *See* *Schoffstall v. Henderson*, 223 F.3d 818, 827 (8th Cir.2000) (finding that behavior that included plaintiff's supervisor losing his temper, swearing at plaintiff, intimidating her, pounding on desks and on one occasion lunging across his desk at her, was not based on sex where none of the conduct referenced her sex or contained sexual innuendo); *Montandon v. Farmland Indus. Inc.*, 116 F.3d 355, 357-58 (8th Cir.1997) (concluding that harassment was not based on sex where supervisor "used vulgar, profane language, slammed things, stomped around, loudly reprimanded employees and used intimidation" on men and women alike). For the reasons previously discussed, a reasonable fact finder could conclude that exposure to porn could constitute harassment "based on sex." The Court therefore turns to the fourth element. *See* *Duncan*, 300 F.3d at 934 (proceeding to fourth element where some, but not all, alleged harassment was "based on sex").

b. Harassment alters a term or condition of employment

First, the Court looks to whether Hossenlopp subjectively perceived this conduct to be harassment. *See* *Harris*, 510 U.S. at 21-22. Viewing the facts in the light most favorable to Hossenlopp, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, Hossenlopp puts forth two categories of behavior: (1) general branch environment, which consists of co-workers viewing pornographic images and offensive comments, vulgar language and conversations; and (2) conduct specific to Hossenlopp which consisted of: comments regarding her attire, the incident with Montegue's birthday cake, Montegue's comment about "servicing the client" on her first sales call, and receipt of three offensive emails. Viewing the facts in the light most favorable to Hossenlopp, the Court concludes that she fails to demonstrate that her workplace was "permeated with discriminatory intimidation, ridicule and insult," such that it altered a term or condition of her employment. *Id.* at 21. In particular, a minority of the alleged conduct was directed at Hossenlopp and it spanned over five years. *See* *Bainbridge*, 378 F.3d at 760. Moreover, while inappropriate and juvenile, the conduct was not severe, physically threatening or humiliating and did not unreasonably interfere with her ability to do her job. *See* *Harris*, 510 U.S. at 21. Given previous decisions of the Eighth Circuit, *see, e.g.*, *Duncan*, 300 F.3d at 934-35; *LeGrand*, 394 F.3d at 1102-03, the Court concludes that Hossenlopp fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court concludes that Hossenlopp fails to meet her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

burden with respect to this element.

c. Employer's remedial action

***37** Even assuming that Hossenlopp could demonstrate that a reasonable person would consider the harassment so severe or pervasive as to alter a term or condition of employment, Hossenlopp must also demonstrate that CHR knew or should have known of the conduct and failed to take proper remedial action. *Meriwether*, 326 F.3d at 993. Appropriate remedial action must be "reasonably calculated to end the harassment once the employer knew or should have known about the harassment." *Scusa*, 181 F.3d at 967. Several factors are relevant in assessing the reasonableness of an employer's remedial measures: "the temporal proximity between the notice and remedial action, the disciplinary or preventative measure taken and whether the measures ended the harassment." *Meriwether*, 326 F.3d at 993.

Turning first to Hossenlopp's complaint to Borowiec in 2002, a reasonable fact finder could conclude that Borowiec's email was reasonably calculated to address Hossenlopp's complaints based on sexual harassment. Here, Hossenlopp did not tell Borowiec about the 23 discs of pornography that she had collected. Instead, she stated that she had generally seen offensive images and that she would not want her mother or a client to see what she had seen. Looking to the *Meriwether* factors, the temporal proximity between Hossenlopp's notice and Borowiec action was brief--apparently within a week--and the action taken was commensurate with Hossenlopp's complaints.

Turning next to Hossenlopp's complaints to Debben, a reasonable fact finder could only conclude that CHR's actions were reasonably calculated to end the harassment. First, it was only a matter of weeks before Taber and Manning came out to conduct an investigation, and the disciplinary action came only days later. *Cf.* *Smith*, 109 F.3d at 1264 (denying summary judgment where employer took four months to respond to the plaintiff's initial complaints). Hossenlopp contends that CHR did not do enough and that the actions taken by CHR amount to "inconsequential discipline." Pls.' Comb. Mem. Opp'n at 192. The Court disagrees. In fact, two employees were suspended--Clarkson for one month and Smallwood for one week, and every branch employee received and was required to sign individualized notices acknowledging that the alleged behavior was unacceptable. For many employees, that notice included either a warning or a final warning regarding his or her own behavior. Hossenlopp herself was warned regarding her use of inappropriate language. Moreover, Clarkson resigned permanently at the end of his one-month suspension, and Hossenlopp testified that thereafter she did not see explicit images or endure offensive comments. A reasonable fact finder could only conclude that CHR's actions were significant and that, based on Hossenlopp's testimony, the measures were largely successful. Accordingly, the Court concludes that CHR took prompt remedial action reasonably calculated to end the harassment.

***38** In sum, Hossenlopp fails to demonstrate that Clarkson's behavior was harassment based on sex, that her alleged harassment affected a term or condition of her employment and that CHR failed to take proper remedial action. The Court therefore grants CHR's motion for summary judgment on Hossenlopp's claim for sexual harassment.

*10. Jennifer Smyrl*

In August 1996, CHR hired Jennifer Smyrl as a transportation sales representative in its Pleasanton, California, branch. She worked there until December 1999 when she requested a transfer within CHR to Salt Lake City. In January 2000, Smyrl began working in the Salt Lake City branch as a transportation sales representative. She resigned in June 2002. Smyrl's claims of sexual harassment relate only to her time in Salt Lake City and are based in large part on the behavior of branch manager, Chris Czekai.

Smyrl alleges that Czekai often made belittling comments to her such as: (1) what she did "anybody could do" and that "it wasn't worth anything"; (2) that he "didn't know why [she] was working. Why didn't [she] just stay at home and be a mom?"; (3) "Why did you get pregnant if you wanted to continue to work?"; (4) "What were you thinking getting pregnant?"; and (5) "What customer is going to want to see you fat?" (Smyrl Tr. at 116; Smryl Resp. Interrogs. at 20.) Smyrl asserts that during a difficult period in Smyrl's pregnancy, Czekai refused to reduce her hours to a forty-hour workweek until she threatened to go to the labor board. Smyrl was then required to bring in a doctor's note regarding the reduction in hours as well as notes for any additional visit to the doctor's office during her pregnancy. (Smyrl Tr. at 234.)

Smyrl also claims that Czekai's treatment of women differed from his treatment of men with respect to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tardiness and work schedules. She contends that women were called into his office when they were late, but men were not. In particular, Smyrl identifies Jason Berquist as someone who received special treatment by Czekai. Smyrl also contends that Czekai openly made belittling and offensive comments about other women in the branch. For example, Smyrl overheard Czekai state that assistant branch manager Stephanie Harrison dressed like a slut. With regard to co-worker Candace Wickstrom, Czekai allegedly said "if you have a horse, work it for what it's worth." (*Id.* at 146.) Smyrl also contends that Czekai and other male co-workers considered Wickstrom unattractive and consequently, she was the topic of many offensive jokes and comments. Smyrl reports hearing a rumor that Czekai was "going to get rid of all of the women" in the branch and another rumor that he said "this bunch of bitches aren't going to get anywhere with me." (*Id.* at 212.) Finally, Smyrl asserts that she was not allowed to play on the branch softball team because Czekai did not allow women on the team.

In addition to Czekai's behavior and comments, Smyrl also alleges that the Salt Lake City branch had an abusive and harassing environment to women. In particular, she contends that there was prolific swearing--to the extent that she had to hide under her desk to avoid having her customers hear Kim Smith, a male co-worker, swearing at the desk next to her. She testified that when she complained to Czekai, Smith's language improved for a week, and then he moved his desk over to the other side of the room and resumed his previous manners. Smyrl elaborated that she was not complaining about "reactive" swearing, meaning a verbal response to something bad that just happened, but that the swearing was "proactive" swearing directed at co-workers or customers. For example, co-workers called each other "pussy" and "you fucking idiot." (*Id.* at 228.)

***39** Smyrl further contends that her male co-workers created a "fraternity" atmosphere and that she witnessed them viewing pornography. She asserts that the pornography consisted of explicit photographs of nude women in various poses. Smyrl identified several images from Plaintiffs' Second Amended Complaint, namely the imitation MasterCard Priceless advertisements, and a picture of a woman's breasts. Smyrl alleges that Smith, John Pearson, Mike Radcliff, Rodney Barton, Czekai, Chris O'Shea, Jason Tresnor and Berquist all forwarded pornographic emails to her. With regard to Barton, Smyrl requested that he stop sending her inappropriate emails. She alleges that he would stop for a few weeks, and then resume sending them.

In March 2002, Smyrl used CHR's anonymous email service to report Czekai's behavior and the environment of the branch. In April 2002, CHR HR representatives Amy Taber and Tim Manning came out to the Salt Lake City branch to investigate complaints made about Czekai. They individually interviewed the branch employees. Smyrl contends that she did not alert either Taber or Manning to Smyrl's specific allegations of sexual harassment, but generally described Czekai's behavior. Smyrl alleges that she feared retaliation if she disclosed everything and that after Taber and Manning left, Czekai did in fact retaliate. (*Id.* at 234.)

CHR contends that it is entitled to summary judgment on Smyrl's hostile work environment claim because Czekai's conduct is not harassment based on sex and because Smyrl fails to demonstrate that the harassment was so severe or pervasive as to alter a term or condition of her employment. The Court considers each in turn.

a. Harassment based on sex

Because Czekai's abuse indiscriminately reached both men and women, CHR contends that it was not based on sex. The Court disagrees. Here, Czekai was physically and verbally abusive to both sexes. However, evidence in the record reveals that this behavior was coupled with comments and conduct that referenced gender or contained sexual innuendo. *Cf.* *Schoffstall,* 223 F.3d at 827; Montandon, 116 F.3d at 357-58. In particular, Czekai made comments regarding Harrison, Wickstrom, Smyrl and he excluded women from the branch softball team. Even if, when viewed in isolation, some of Czekai's conduct cannot be described as based on sex, it is all "part of a course of conduct which is tied to evidence of discriminatory animus." *Carter,* 173 F.3d at 701. Because a reasonable fact finder could conclude that Czekai's conduct was based on sex, the Court denies CHR's motion with respect to this element.

b. Harassment alters a term or condition of employment

First, the Court looks to whether Smyrl subjectively perceived the alleged conduct to be harassment. *See* *Harris,* 510 U.S. at 21-22. Viewing the facts in the light most favorable to Smyrl, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***40** The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, viewing the facts in the light most favorable to Smyrl, a reasonable person could conclude that her alleged harassment was so severe and pervasive so as to alter a term or condition of employment. If Smyrl's only complaints were based on Czekai's belittling and chauvinistic behavior, the Court might conclude that this was no more severe than the conduct at issue in *Ottman.* In that case, the Eighth Circuit reversed the district court's denial of summary judgment where the supervisor's behavior was belittling and sexist. *See id.* at 760. In this case, however, Smyrl's allegations over the course of two years include co-worker acceptance of and participation in Czekai's antics. In particular, Smyrl's complaints include frequently demeaning remarks and jokes regarding Wickstrom, pornography and crass "proactive" language. Accordingly, the Court concludes that a reasonable fact finder could find that the conduct involved here was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive working environment. *See Meritor*, 477 U.S. at 67. The Court therefore denies CHR's motion for summary judgment on Smyrl's sexual harassment claim.

*11. LeeAnn Puckett*

In August 1999, Lee Ann Puckett was employed at CHR's Salt Lake City branch through a temporary employment agency. At that time, the Salt Lake City branch dealt primarily with transportation sales, and Puckett's position was support for the sales employees. In December 1999, branch manager Scott Satterlee offered her a full-time position in sales support, and she accepted. In October 2000, Satterlee was promoted and replaced by Chris Czekai. Puckett continued in her position under Czekai's management until her resignation in August 2002.

Puckett contends that she has been subjected to sexual harassment based on Czekai's behavior and generally inappropriate conduct by co-workers. Prior to Czekai's promotion to branch manager, he was the transportation sales manager and sat next to Puckett. According to Puckett, Czekai did not like her. Puckett testified: "He would shun me quite a bit. He gave me the feeling--he acted like he was better than myself and other female employees in the office.... I never felt welcomed working for him or with him." (Puckett Tr. at 67.) She further recalls seeing pornography on his computer. Specifically, Puckett recalls Czekai viewing an image of two naked women fondling each other. Around this time, Puckett called the Employee Assistance Program (EAP) hotline to request help on how to deal with Czekai. As a result, EAP sent Puckett materials on stress management and how to deal with constructive criticism. [FN20]

FN20. EAP is a confidential service that is not coordinated with the toll-free hotline used to report violations of CHR policies.

After Czekai's promotion, Puckett's problems with him continued. Puckett contends that Czekai was a "stickler" for details, and that he tracked his employees' hours. On days when she would be out sick, Puckett was required to call in twice during the day to check-in. According to Puckett, only female employees had to report in on their sick days. On one occasion, she was required to bring in an obituary when she left work to go to a funeral. Puckett also claims that Czekai would roll his eyes at her and would mimic her by pursing his lips, and that he once said that women were too emotional. He also commented on her style of dress: "Do you think this is high school LeeAnn? What is that you are wearing today?" (*Id.* at 160). Puckett testified that his comments made her feel self-conscious. Finally, Puckett asked Czekai if there were any positions available in sales and he replied that sales positions require a college degree, which Puckett did not have.

***41** Puckett was also offended by Czekai's behavior directed at others. Puckett alleges that Czekai spoke about her female co-workers in a demeaning manner. Specifically, he called Stephanie Harrison "white trash," "trailer trash," and a "whore" during a discussion with another male when Harrison was not present. (*Id.* at 73.) In addition, Puckett heard a rumor that Czekai had said that he was "going to get rid of all the women" in the office. Puckett also recalls an occasion when Czekai and others were playing football in the office and Czekai teased Matt Wagstaff because he was "throwing it like a girl." (*Id.* at 72.) Czekai and others continued to tease Wagstaff about his throwing. Puckett told Czekai that he shouldn't treat people that way. Additionally, Puckett recalls an instance where Rodney Barton and Czekai had a fight. Although it was in Czekai's office, everyone could hear yelling and what sounded like furniture being thrown about. Barton later told Puckett that Czekai had threatened to burn Barton's house down. Finally, Puckett alleges that she was fearful of Czekai because he would frequently walk around with a golf club or hockey stick and swing it around his head during branch meetings.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Puckett also alleges harassment not related to Czekai. In particular, she recalls seeing pornography on co-workers' computers. For example, she asserts that on her first day of work she saw a picture of naked woman on Mike Radcliff's computer. In 2000, she also witnessed: male co-workers gathering around Johnny Pearson's computer; Kim Smith viewing a web site directed at gay pornography; and an image of two women "engaging with each other and another man" on Jason Tresnor's computer. (*Id.* at 76-77.) Puckett contends that pornography was a frequent topic of conversation among her male co-workers and that they told offensive jokes. She also alleges that Radcliff made inappropriate flirtatious comments to her. She admits to being flirtatious with Barton and having an intimate relationship with another co-worker.

Puckett also asserts that she complained periodically to Harrison, the assistant branch manager, but that the environment never improved. In March or April 2002, Puckett contends that she and others complained to CHR management regarding Czekai's behavior. Shortly thereafter, Amy Taber and Tim Manning from CHR HR visited the Salt Lake City branch and individually interviewed employees regarding Czekai's behavior. During her interview, Puckett did not report to Taber any issues or instances relating to sexual harassment. Puckett claims she did not report them because she feared retaliation. According to Puckett, after Taber and Manning left, the Salt Lake City branch became quiet and tense, and Czekai remained as manager. Several months later, Puckett called Taber to ask about the outcome of the investigation. Taber informed Puckett that the investigation had been closed and that disciplinary action had been taken.

***42** CHR contends that it is entitled to summary judgment as to Puckett because she cannot demonstrate that Czekai's behavior was based on sex or that the harassment was severe or pervasive. Here, Puckett's allegations regarding Czekai are substantially similar to those that the Court has previously found to be based on sex. Because the Court has already concluded that a reasonable fact finder could conclude that Czekai's behavior was based on sex, the Court turns to whether Puckett demonstrates that her alleged harassment was severe and pervasive.

First, the Court looks to whether Puckett subjectively perceived this conduct to be harassment. *See* [*Harris*, 510 U.S. at 21-22]. Viewing the facts in the light most favorable to Puckett, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, Puckett puts forth Czekai's behavior directed at her and her co-workers. In particular, Puckett's complaints include his demeaning remarks, differing treatment of male and female co-workers, viewing of pornography, and use of offensive language and threatening conduct. Accordingly, a reasonable fact finder could conclude that the conduct alleged was frequent, was physically threatening, and given her phone calls to EAP, interfered with her ability to do her job. *See* [*Harris*, 510 U.S. at 21-23] (listing factors and noting that the effect of the alleged harassment on the employee's psychological well-being is one relevant factor). As such, a reasonable fact finder could also conclude that the conduct involved here was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive working environment. *See* [*Meritor*, 477 U.S. at 67]. The Court therefore denies CHR's motion for summary judgment on Puckett's sexual harassment claim.

*12. Gwen Carlson*

Carlson has worked for CHR since September 1996 and began working in sales in November 1998. In October 1999, she and her branch manager, Jeff Scovill, discussed that she needed to begin looking for different position because her job performance in sales was deficient. In February 2001, Carlson assumed her current position as the Domestic Drayage Coordinator in the Minneapolis branch. Since September 1996, she has had three branch managers: Diane Johnson, from 1996 to 1999; Scovill, from 1999 to early 2003; and Matt Castle from early 2003 to present.

CHR contends *inter alia* that it is entitled to summary judgment on Carlson's sexual harassment claim because Carlson cannot satisfy her burden to show that the alleged harassment was so severe or pervasive as to alter a term or condition of her employment. CHR also moves for summary judgment on Carlson's compensation and promotion claims for failure to exhaust administrative remedies. The Court considers each in turn.

a. Carlson's sexual harassment claim

***43** Carlson contends that she has been subjected to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sexual harassment based on events occurring between November 1998 and September 2001. She alleges that her co-workers, both male and female, used foul language, engaged in offensive conversations, displayed inappropriate materials, and viewed pornography on their work computers. Carlson also asserts that she received inappropriate emails and that she experienced difficulties with Scovill. In support of her claims, Carlson kept a diary from February 1999 to April 2001, in which she detailed her daily life in the branch and wrote down co-workers' conversations that she had overheard. In addition, Carlson surreptitiously downloaded examples of pornographic or offensive emails by accessing two of her male co-workers' computers.

First, with regard to her claims regarding foul language and conversations, the following examples are excerpts from Carlson's diary of conversations that occurred during summer 2000. First, she wrote down a conversation between Brain Harms and Matt Castle:

Harms: "Are you going out with me and Patrick tonight?

Castle: "I can't go out with you I need to get my dog from the vet. He had to have her [*sic* ] butt shaved.

Harms: "What? ? Have you been lubing him up and hitting him too hard? You gotta stop doing that shit with your dog."

(Carlson EEOC Charge at A5.) Carlson reports that at some point later, Harms stated to Scovill: "Hey Jeff, Matt has been fucking his dog so bad he had to get his ass shaved so he can't join us for dinner."

A second example occurred between Bonnie Buechele and Harms:

Buechele: "You fucking switched chairs with me first you asshole."

Harms: "Fuck you. I did not switch chairs."

(*Id.*) Carlson provides a third example, consisting of a conversation between Harms, Castle and Scovill regarding their golf game:

Harms: "He is over here cocking off about how he is going to beat me."

Scovill: "Fuck him, ... I'll beat both your asses."

Harms: "He's been mouthing off since yesterday."

(*Id.* at A6.) A final example is a conversation between Heidi Halverson, Harms, Adam Hall, and Scovill:

Halverson: "Did he call him pumpkin?"

Scovill: "Me, no, he called him butt head."

Hall: "I don't mind if he calls me pumpkin."

Scovill: "Are you ready to do this?"

Hall: "Ok."

Harms: "I will call you scrunch nuts then."

(*Id.* at A6.)

Next, Carlson alleges that offensive materials were displayed in the office. First, a "Prayer for the Stressed" was posted in the sales area. The "prayer" asked for "the courage to accept things I cannot change, the courage to change the things I cannot accept, and the wisdom to hide the bodies of the people I had killed today because they pissed me off." It continued by asking for help remembering "when I am having a really bad day, and it seems that people are trying to piss me off, that it takes 42 muscles to frown and only 4 to extend my middle finger and to tell them to bite me!" Second, in December 2000, Carlson saw a card that was displayed on Jeff Enger's file cabinet. The card, which was given to Enger as part of the branch's Secret Santa gift exchange, depicted a large naked woman and had the phrase "It takes a whole lotta man ... to satisfy a whole lotta woman" written on the front. [FN21] (*Id.* at A17.) Carlson contends that the card was signed by Harms, "go for it stud." (*Id.*) Carlson also found a number of other Secret Santa gifts offensive, including a Sports Illustrated swimsuit edition desktop calendar and a band-aid box labeled "bondage tape" with a roll of duct tape inside.

FN21. Both Perkey and Carlson remarked on the same card, but remember slightly different versions of what it said. The Court describes it for each as they recall it.

***44** Carlson further alleges that her co-workers viewed pornography on their computers. Around October 1999, she recalls seeing an image on Castle's computer showing "a line-up of men on the beach in speedo swimsuits and women on their knees performing oral sex on the men." (*Id.* at A2.)

With regard to conduct directed toward her, Carlson recalls receiving two offensive emails. Buechele sent the first email to her; it listed crayon colors such as "Long John Silver," "Spousal abuse black and blue," and "Spank me pink." Carlson asked Buechele not to send her emails of that nature again. The second email came from an unknown source and it depicted a man crawling in the desert and a sign that said "water this way, half a mile" and another sign that said "women with big breasts, this direction, 22 miles." (Carlson Tr. 154-55.)

Carlson also asserts that she had personal difficulties with Scovill, and that their difficulties were two-fold. First, she contends that he allowed the allegedly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hostile environment to exist, in part by his participation and in part by neglecting his responsibilities as branch manager. In August 2000, Carlson called Johnson, who at that time was managing CHR's Laredo branch, and reported that she suspected that Scovill was having an extra-marital affair with a customer, that she was concerned about the branch's financial reliance on one large account, and that she felt that there was inappropriate behavior in the workplace. On August 28, Scovill confronted Carlson in his office and asked if she had reported him to Joe Mulvehill, Scovill's supervisor. She explained that she spoke with Johnson, who then spoke with Mulvehill.

Second, Carlson contends that Scovill impeded her progress in finding a job within CHR, and that he retaliated against her for speaking to Johnson and for a later visit she made to Greg Goven, senior vice-president of CHR, regarding Scovill. According to Carlson, Scovill retaliated by moving her desk, excluding her from a group meeting, taking her off of the sales group email list and not giving her any new work. [FN22] On October 24, 2000, Scovill and Carlson discussed her complaints and "cleared the air." Between November 2000 and January 2001, Carlson contends, however, that she continued to search unsuccessfully for a new position within CHR. Her search ended in February 2001, when Scovill presented her with the option of creating the position of Domestic Drayage Coordinator.

FN22. Carlson's retaliation claim is not part of the litigation currently before the Court.

On March 4, 2001, Carlson called CHR's toll-free hotline and reported the existence of a hostile environment at her branch. According to Carlson's diary, she called the hotline after she perceived that CHR was not responding to Perkey's February 23 complaint. (Carlson EEOC Charge at A20.) From March to August, CHR took progressive remedial steps, including the suspension of Scovill. In part, Scovill was suspended for his failure to attend to Carlson's complaints. Since September 2001, Carlson testified that she is not aware of co-workers viewing pornography or engaging in offensive conversations, though she contends that she has received unsolicited pornographic "spam" emails from unknown sources outside of CHR.

***45** CHR contends that it is entitled to summary judgment on Carlson's sexual harassment claim because she cannot satisfy her burden to demonstrate that the harassment was so severe or pervasive as to alter a term or condition of employment. First, the Court looks to whether Carlson subjectively perceived her alleged conduct to be harassment. *See* *Harris*, 510 U.S. at 21-22. Viewing the facts in the light most favorable to Carlson, the record reveals that she subjectively perceived the alleged harassment to be so severe or pervasive as to alter a term or condition of her employment.

The Court next turns to whether her subjective perception was objectively reasonable. *See id.* Here, Carlson complains about the general branch environment, specifically that male and female co-workers viewed pornographic images, engaged in offensive conversations, and used vulgar language. Although Carlson's diary describes the content in detail, with the exception of two emails, none of the conversations, language or pornography was directed at her. *See* *Bainbridge*, 378 F.3d at 760. Viewing the facts in the light most favorable to Carlson, the Court concludes that she fails to demonstrate that her workplace was "permeated with discriminatory intimidation, ridicule and insult." *Harris*, 510 U.S. at 21; *see* *Faragher*, 524 U.S. at 778 (noting that Title VII is not meant to redress "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes and occasional teasing"); *LeGrand*, 394 F.3d at 1101 (noting that conduct that is "merely rude or unpleasant" is not sufficient to meet this standard). While the conversations and language occurred regularly, the conduct in its totality was not severe, physically threatening or humiliating and did not unreasonably interfere with her ability to do her job. *See* *Harris*, 510 U.S. at 21. Accordingly, although the atmosphere was sophomoric and crude, the Court concludes that Carlson fails to demonstrate a sexually hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. *See* *Meritor*, 477 U.S. at 67; *Duncan*, 300 F.3d at 935. Because the conduct does not rise to the level necessary to be actionable, the Court grants CHR's motion for summary judgment on Carlson's sexual harassment claim.

b. Carlson's compensation and promotion claims

CHR contends that it is entitled to summary judgment on Carlson's compensation and promotion claims because she has failed to exhaust her administrative remedies. Title VII provides an administrative procedure through which a complaining employee must proceed before filing a lawsuit in federal court. *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir.1994) (citing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). To exhaust administrative remedies, an individual must: (1) timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge; and (2) receive notice of the right to sue. 42 U.S.C. § 2000e-5(b), (c), (e). A plaintiff "may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nichols v. Am. Nat. Ins. Co.*, 154 F.3d 875, 886-87 (8th Cir.1998). In determining whether an alleged discriminatory act falls within the scope of a Title VII claim, the administrative complaint must be construed liberally "in order not to frustrate the remedial purposes of Title VII." *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir.1988). However, "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Williams*, 21 F.3d at 223 (quotations omitted). "The breadth of the civil suit is, therefore, as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 630-31 (8th Cir.2000).

***46** Here, the parties agree that Carlson filed a timely EEOC charge, that she exhausted her administrative remedies with respect to her sexual harassment claim, and that she received her notice of right to sue from the EEOC. Accordingly, the issue before the Court here is whether her initial EEOC charge encompasses her gender discrimination claims for compensation and promotion.

Carlson completed her charge of discrimination in June 2001. The face of Carlson's EEOC charge form states: "CAUSE OF DISCRIMINATION BASED ON (*Check the appropriate box(es* ))" and then provides nine boxes, "RACE, COLOR, SEX, RELIGION, AGE, RETALIATION, NATIONAL ORIGIN, DISABILITY, OTHER (*specify* )." Carlson checked the "SEX" and "RETALIATION" boxes. In the particulars, she stated: "I really believe the hostile work environment is a symptom of sex discrimination throughout the company (e.g., number of females in management, pay disparity, double standards, enforcement of company policy, company benefits--ask about company advancement motto). See other charges of record." On page two of her EEOC intake form, Carlson also checked that the line corresponding to "refused promotion."

An investigation by the EEOC ensued. As part of the investigation, the EEOC solicited from CHR a reply to Carlson's charge. In response, CHR submitted a multi-part letter denying any wrongdoing. By letter dated August 30, 2001, Counsel for Carlson responded to CHR's letter as follows:

> *Sexual Discrimination Charge:* CHR's attorney does not even address the sexual discrimination claim made and documented by Ms. Carlson. CHR's own records and statistics confirm that discrimination exists at CHR.... The sexually hostile work environment is a symptom of CHR's sexual discrimination against women and minorities. A review of the floppy disks and titles that the employees of CHR exchanged demonstrate an attitude of degradation of both women and minorities.... The employees [listed in an attached exhibit] will confirm sexual discrimination. A simple pay analysis will further confirm that sexual discrimination permeates CHR.

(Emphasis in original). In March 2002, before the EEOC investigation concluded, Carlson withdrew her charge to pursue her claims in federal court.

The record reveals that Carlson marked sex discrimination and mentioned pay disparities in the particulars of her EEOC charge, and that she marked "refused promotion" on her intake questionnaire. Moreover, her counsel's subsequent letter to the EEOC raised the issue of gender discrimination related to compensation. Although none of these documents is artfully crafted, an investigation into gender discrimination based on compensation and promotion reasonably could have been expected to result from Carlson's initial charge of discrimination. *See Stuart*, 217 F.3d at 630-31. The Court therefore concludes that Carlson exhausted her administrative remedies with respect to her compensation and promotion claims. Accordingly, the Court denies CHR's motion for summary judgment as to this issue.

D. Constructive discharge

***47** CHR also moves for summary judgment on the constructive discharge claims of Debra Kinniry, Sandra Nelson, Andrea Prout, Jennifer Smyrl and Jessica Vetter. In response, Plaintiffs assert that "none of the plaintiffs has asserted a separate count (or claim for relief) based on constructive discharge." Pls.' Comb. Mem. Opp'n at 1 n. 2. Given Plaintiffs' concession, the Court grants CHR's motions.

VI. CONCLUSION

Based on the files, records, and proceedings herein,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and for the reasons stated above, IT IS ORDERED THAT:

1. CHR's motions for partial summary judgment [Docket Nos. 501, 505, 509, 513, 517, 521, 525, 529, and 537] are GRANTED.
2. CHR's motion for partial summary judgment [Docket No. 533] is DENIED.
3. CHR's motion for partial summary judgment [Docket No. 541] is GRANTED as to Carlson's sexual harassment claim, and DENIED as to Carlson's compensation and promotion claims.
4. CHR's motion for partial summary judgment [Docket No. 545] is GRANTED as to Smyrl's constructive discharge claim, and DENIED as to Smyrl's sexual harassment claim.
5. Plaintiffs' motion for class certification [Docket No. 573] is GRANTED IN PART and DENIED IN PART.
6. The Court certifies the following two classes for purposes of liability, injunctive and declaratory relief:

A. All females employed on a full-time salaried basis at any domestic CHR branch office at any time since August 17, 2000, who have been or may be subjected to CHR's challenged compensation policies and practices.

B. All females employed at any domestic CHR branch office at any time since August 17, 2000, who have more than two years' experience in a sales and/or operations position and who have been or may be subjected to CHR's challenged promotion policies and practices.

7. Plaintiffs' motion to file excess pages [Docket No. 612] is GRANTED.
8. Plaintiffs' motion for partial summary judgment [Docket No. 617] is DENIED AS MOOT.
9. CHR's motion to exclude the testimony of Victoria Fuehrer [Docket No. 670] is GRANTED.
10. The parties' supplemental briefs on the issue of notice shall be received no later than 14 days from the date of this Order. The briefs shall be no longer than 10 pages in length and shall be limited in scope to the issue of notice. There shall be no reply briefs.

Not Reported in F.Supp.2d, 2005 WL 758602 (D.Minn.)

**Motions, Pleadings and Filings** **(Back to top)**

• 2005 WL 3024542 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant C.H. Robinson Worldwide, INC. IN Support of its Motion to Decertify Plaintiffs' Claims under the Fair Labor Standards Act (Sep. 16, 2005)

• 0:02cv03780 (Docket) (Oct. 02, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.