UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | | |
|---|---|---|
| RODERICK ARNOLD, et al., on behalf of themselves and all others similarly situated, | ) | Civil Action No. 01-CV-2086 (DWF/AJB) |
| *Plaintiffs,* | ) | **MEMORANDUM OF LAW IN SUPPORT OF SPRENGER & LANG, PLLC'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES** |
| v. | ) | |
| CARGILL, INCORPORATED, | ) | |
| *Defendant.* | ) | |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. PROCEDURAL BACKGROUND ........ 2

A. S&L's Services to Its Clients Prior to Disqualification ........ 2

B. S&L's Disqualification from Representing Plaintiffs ........ 5

C. Proceedings After S&L's Disqualification ........ 6

III. ARGUMENT ........ 8

A. The Settlements Apparently Preserve S&L's Right to Seek Payment of Fees and Reimbursement of Expenses from Cargill ........ 8

B. S&L May Recover for Its Work and Expenses that Benefited Plaintiffs ........ 10

C. S&L Has Calculated Appropriately the Value of Its Work and Expenses ........ 12

1. S&L Has Appropriately Identified and Allocated Time Between Work that Advanced Individual Claims and Work Directed Exclusively at Class Claims ........ 13

2. S&L's Applicable Hourly Billing Rates Are Set Based on Market Data and Are Supported by Applicable Precedent ........ 17

3. S&L Has Appropriately Identified the Expenses for Which It Should Be Reimbursed ........ 20

D. S&L's Compensable Lodestar Fees Should Be Reduced by a Maximum of 25% Under the Factors Set Forth in Minn. Stat. § 549.20, Subd. 3 ........ 23

IV. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

Cases Page

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975) ........ 8

*Blum v. Stenson*,
465 U.S. 886 (1984) ........ 12

*Bremer Bus. Fin. Corp. v. Dorsey & Whitney, LLP (In re SRC Holding Corp.)*,
364 B.R. 1 (D. Minn. 2007) ("*Bremer II*") ........ *passim*

*Bremer Bus. Fin. Corp. v. Dorsey & Whitney, LLP (In re SRC Holding Corp.)*,
352 B.R. 103 (Bankr. D. Minn. 2006) ("*Bremer I*") ........ 26

*Burrow v. Arce*,
997 S.W.2d 229 (Tex. 1999). ........ 24

*Cadena v. Pacesetter Corp.*,
1999 U.S. Dist. LEXIS 9923 (D. Kan. Apr. 27, 1999),
*aff'd*, 224 F.3d 1203 (10th Cir. 2000) ........ 14

*City of Burlington v. Dague*,
505 U.S. 557 (1992) ........ 18

*Commercial Assocs. v. Work Connection, Inc.*,
712 N.W.2d 772 (Minn. Ct. App. 2006) ........ 23-24, 25

*Copeland v. Marshall*,
641 F.2d 880 (D.C. Cir. 1980) ........ 14

*Emery v. Hunt*,
272 F.3d 1042 (8th Cir. 2001) ........ 10

*Environmental Defense Fund v. Environmental Protection Agency*,
672 F.2d 42 (D.C. Cir. 1982) ........ 14

*Evans v. Jeff D.*,
475 U.S. 717 (1986) ........ 8

*Fish v. St. Cloud State Univ.*,
295 F.3d 849 (8th Cir. 2002) ........ 19



2020357

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999) .......... 8

*Gilchrist v. Perl*,
387 N.W.2d 412 (Minn. 1986) ("*Perl III*") .......... *passim*

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) .......... 10, 12

*In re Xcel Energy, Inc.*,
364 F. Supp. 2d 980 (D. Minn. 2005) .......... 19

*Jensen v. Walsh*,
623 N.W.2d 247 (Minn. 2001) .......... 29

*Johnston v. Comerica Mortg. Corp.*,
83 F.3d 241(8th Cir. 1996) .......... 12

*Jones v. R.R. Donnelly & Sons, Co.*,
541 U.S. 369 (2004) .......... 20

*Mar Oil, S.A. v. Morrissey*,
982 F.2d 830 (2d Cir. 1993) .......... 23

*Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*,
26 F.3d 842 (8th Cir. 1994) .......... 8

*McDannel v. Apfel*,
78 F. Supp. 2d 944 (S.D. Iowa 1999) .......... 8

*Parke v. First Reliance Std. Life Ins. Co.*,
368 F.3d 999 (8th Cir. 2004) .......... 10

*Perl v. St. Paul Fire & Marine Ins. Co.*,
345 N.W.2d 209 (Minn. 1984) ("*Perl II*") .......... 23

*Pinkham v. Camex, Inc.*,
84 F.3d 292 (8th Cir. 1996) .......... 8

*Powers v. Commissioner*,
43 F.3d 172 (5th Cir. 1995) .......... 14

*Rice v. Perl*,
320 N.W.2d 407 (Minn. 1982) ("*Perl I*") .......................................................... 23

*Sweeney v. Athens Reg'l Med. Ctr.*,
917 F.2d 1560 (11th Cir. 1990) .................................................................... 23

*West v. Border Foods, Inc.*,
2007 U.S. Dist. LEXIS 43423 (D. Minn. June 8, 2007) ................................ 18, 19

Statutes, Rules and Regulations

42 U.S.C.
§ 1981 ............................................................................................ 8, 10, 19
§ 1988(b) ........................................................................................................ 8

Minn. Stat.
§ 549.20, subd. 3 ........................................................................................ 27

Minnesota Rules of Professional Conduct
Rule 4.1 ...................................................................................................... 5, 6
Rule 4.2 ...................................................................................................... 5, 6
Rule 4.4 ...................................................................................................... 5, 6

Secondary Authorities

*Restatement of the Law, Third, The Law Governing Lawyers* (2000)
§ 37 ............................................................................................................ 24

## I. INTRODUCTION

Almost three years ago, this Court disqualified the law firm of Sprenger & Lang, PLLC ("S&L") in this case. The Court found that S&L[1] violated several ethical duties in its interactions with Bill Douglas, a former high-level human resources employee of defendant Cargill Incorporated ("Cargill"). S&L apologizes to the Court, the plaintiffs, and Cargill for the failures to establish the necessary level of protections when dealing with such a sensitive witness, failures that caused the Court to disqualify the firm.

Disqualification, however, does not necessarily mean that a law firm is deprived of all right to compensation for its pre-disqualification work on a case. Pursuant to this Court's Order dated July 10, 2007, S&L was notified that all of the plaintiffs have settled their claims against Cargill and that successor counsel have agreed to an award of fees and expenses. S&L now asks the Court to order Cargill to pay it $862,025.55 in "lodestar" fees and $283,630.76 for reimbursement of expenses incurred between the firm's first communications with plaintiffs in the summer of 2000 and the firm's disqualification on September 24, 2004.

This request represents only about 12% of the fees and 27% of the expenses shown in the contemporaneously maintained records of S&L. S&L has discounted its fees and expenses so dramatically for two reasons. First, because the Court declined to certify the proposed class, the plaintiffs' settlements apparently[2] were purely individual in nature, and S&L thus seeks recovery only for its work and expenses that advanced the

[1] *See* footnote 6, *infra*.
[2] S&L can speak only about the "apparent" terms of the settlements because Cargill has refused its request for access to information, as discussed more fully below.

individual claims of the plaintiffs. Second, because it was disqualified from this case, S&L believes that a reduction of 25% on its otherwise compensable lodestar fees is an appropriate penalty.

To deprive S&L of any compensation for the many thousands of hours of work performed in this litigation and of any reimbursement for expenses incurred would be overly punitive. S&L and Larry Schaefer, its former partner in charge of this case, already have been punished in several ways. These punishments vindicate the integrity of the Minnesota Rules of Professional Conduct and proceedings in front of this Court. Additional punishment in the form of deprivation of all reimbursement and all compensation for their work on this case is not needed to deter S&L or other lawyers from violating the rules.

## II. PROCEDURAL BACKGROUND

### A. S&L's Services to Its Clients Prior to Disqualification

In the summer of 2000, Cargill employees who would become plaintiffs in this lawsuit first began communicating with S&L about their experiences of racial discrimination at Cargill. (Lieder Decl., ¶ 2 & Ex. A (Time Records).[3]) Over the next several months, the firm's lawyers, paralegals and legal assistants spent hundreds of hours interviewing and gathering information from these future plaintiffs and other current and former Cargill employees. (*Id.*) Based on this information, S&L agreed to initiate a race discrimination class action lawsuit in the spring of 2001 on behalf of about

[3] All references to the "Lieder Decl." are to the Declaration of Michael D. Lieder in Support of Sprenger & Lang, PLLC's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

25 named plaintiffs and the class they were prepared to represent. (*Id.*, ¶¶ 4-5.) The retainer agreements provided that payment of fees would be contingent on recovery and that S&L would advance all litigation expenses. (*Id.*, ¶ 5.)

Mr. Schaefer performed most of the work involved in drafting a complaint, which was delivered to Cargill to explore the possibility of a pre-filing settlement. (*Id.*, ¶ 6 & Ex. A.) That effort failed. On or about November 15, 2001, S&L filed a complaint stating claims under federal and Minnesota law.

Cargill promptly filed Partial Motions to Dismiss, for Summary Judgment, and to Strike. Plaintiffs, through S&L, opposed. After briefing and argument, the Court allowed the plaintiffs to proceed, except that it barred plaintiffs who had not worked in Minnesota during the liability period from suing under the Minnesota Human Rights Act and dismissed the claims of one plaintiff based on a release that he had signed. (Mem. Op. & Order July 15, 2002 (Dkt. 67).)

Over the next two years the parties engaged in extensive discovery. Cargill served seven sets of interrogatories and eight sets of document production requests on the plaintiffs, including individualized questions and requests requiring individual responses from each of them. It also deposed each of the plaintiffs, most of them for two days.[4] Plaintiffs engaged three expert witnesses, each of whom prepared reports and were

[4] S&L advanced the transportation and lodging costs for the deposition of plaintiffs who worked out of town.

deposed by Cargill. (Coler Decl., ¶ 2.[5]) Plaintiffs, through S&L, likewise served interrogatories and document production requests on Cargill, primarily oriented toward class certification issues but including requests for documents concerning "comparables" — that is, non-African American employees who were similarly situated to each plaintiff. The firm's personnel spent many hours reviewing the hundreds of thousands of pages of documents produced by Cargill in response to those requests, and S&L's lawyers deposed Cargill's witnesses for approximately 43 days. (*Id.*, ¶ 3.) The parties had regular status/discovery conferences with Magistrate Judge Boylan. Discovery disputes that the parties could not resolve resulted in numerous decisions by the Magistrate Judge, and several appeals to the District Court. (*Id.*)

After the conclusion of discovery, the parties attempted unsuccessfully to resolve the litigation through a class-wide settlement (*Id.*, ¶ 4) and filed several motions. S&L successfully opposed Cargill's motion for summary judgment as to 14 of the 15 plaintiffs against whom Cargill moved, and even as to the one exception, on a motion for reconsideration, convinced the Court to limit its dismissal of that plaintiff's claims to his discriminatory termination claim only. (Mem. Op. & Order May 28, 2004 (Dkt. 216); Mem. Op. & Order Nov. 8, 2004 (Dkt. 390).) Other motions – plaintiffs' motion for class certification, Cargill's motion to strike plaintiffs' expert reports, and Cargill's motion for reconsideration as to the statute of limitations to apply to plaintiffs' claims –

[5] All references to the "Coler Decl." are to the Declaration of Susan M. Coler in Support of Sprenger & Lang, PLLC's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

were fully briefed but still pending when the Court issued its ruling disqualifying S&L from further representation of plaintiffs in this lawsuit.

**B. S&L's Disqualification from Representing Plaintiffs**

On September 24, 2004, this Court granted Cargill's motion to disqualify S&L from this case. (Mem. Op. & Order Sept. 24, 2004 (Dkt. 380), at 28.) It found that Mr. Schaefer (and possibly other S&L lawyers)[6] had violated: Cargill's rights to confidentiality and privilege protected by Rule 4.4 by not making sufficient efforts in the firm's interactions with Mr. Douglas to protect Cargill's confidences and by coming into possession through Mr. Douglas of Cargill's privileged information, principally hundreds of pages of documents marked privileged (*id.* at 14-16; *see also id.* at 19-21); the duty under Rule 4.2 to ensure that privileged matters are not intruded upon in any communications with a former managerial employee of a corporation represented by other counsel (*id.* at 17-19); and the duty of truthfulness under Rule 4.1 by informing Mr. Douglas that he might benefit financially from the litigation (*id.* at 12-14). The Court refused, however, to dismiss the plaintiffs' claims or to impose financial sanctions on S&L, as Cargill had requested. (*Id.* at 28.) In ruling on later motions, the Court allowed S&L to provide almost all of its work product to successor counsel for plaintiffs and the putative class. After the transition to new counsel, the litigation proceeded with little if

[6] The parties in their briefing, and the Court in its opinion, addressed whether S&L had violated ethical rules. Under Minnesota law, only individuals (not firms) are subject to and may violate the Rules. Except as to one incident involving David Schulman, the only S&L attorney mentioned in the Court's opinion is Mr. Schaefer. Neither Mr. Schaefer nor Mr. Schulman is still with S&L.

any need to re-brief or otherwise re-visit the issues before the Court at the time of the disqualification.

As the Court may know, the disqualification of the firm damaged S&L as a whole and Mr. Schaefer individually. (Lieder Decl., ¶¶ 13-16) The disqualification received substantial attention in the Twin Cities' daily newspapers and legal publications. (*Id.*, ¶ 14; Coler Decl., ¶ 5.) Mr. Schaefer never worked for S&L again. (Lieder Decl., ¶ 13; Coler Decl., ¶ 5) The disqualification had a severe economic impact on the firm as well. (Lieder Decl., ¶¶ 15-16.)

Mr. Schaefer self-reported to the Board of Professional Responsibility within days after the Court's disqualification decision. Shortly thereafter, Cargill also reported Mr. Schaefer's violations to the Board and became, in effect, the complainant. After a thorough investigation, including telephonic or in-person interviews of Mr. Schaefer and other current and former S&L personnel, the Board concluded that Mr. Schaefer had failed to adequately supervise S&L personnel. It did not find that he had violated Rules 4.1, 4.2, or 4.4. (*Id.*, ¶ 12.)

**C. Proceedings After S&L's Disqualification**

S&L contacted plaintiffs about the need for new representation shortly after the disqualification decision and, at their request, contacted Joe Sellers of Cohen, Milstein, Hausfeld & Toll PLLC ("CMHT"), as well as other firms, about the possibility of taking over the representation of plaintiffs. The plaintiffs ultimately retained CMHT and two local firms – Nichols Kaster & Anderson, PLLP and Heins Mills & Olson, P.L.C. – to serve as co-counsel. S&L spent considerable time collecting the evidence in the case for

review by Special Master Peter Thompson before it could be delivered to new counsel for plaintiffs. (Dkt. 423, 427 and 430.) Since then, S&L has had no involvement in the litigation.

S&L knows from reported decisions that the Court denied Cargill's motion to strike two of the three experts, but in the same decision also denied plaintiffs' motion for class certification (Dkt. 465.) Apparently some time after the denial of the motion for class certification, the parties began negotiating settlement of plaintiffs' individual claims.

This Court's Order of July 10, 2007, states that all plaintiffs have settled and/or voluntarily dismissed their claims and that "the matters of attorneys' fees and costs have been resolved with respect to" successor counsel. S&L is omitted from the list of firms for which "the matters of attorneys' fees and costs have been resolved." The Order also states that the action will be dismissed in its entirety with prejudice within 30 days of the Order (August 9, 2007), and directs successor counsel to send a copy of the Order to S&L. It contains no other language concerning S&L's rights.

S&L tried to obtain additional information about its rights by asking Cargill for copies of the portions of settlement agreements relevant to S&L's right to seek fees or expenses (suggesting that names and amounts could be redacted), for the total amount of the settlements, and for the right to ask successor counsel for information about the extent to which they used the information accumulated by S&L during the settlement negotiations. S&L advised Cargill's counsel that it was leaning strongly to seeking some fees and expenses, but that the requested information could cause S&L to decide not to

pursue any fees and expenses. Cargill refused to provide any of the requested information. (Lieder Decl., ¶ 39.)

## III. ARGUMENT

### A. The Settlements Apparently Preserve S&L's Right to Seek Payment of Fees and Reimbursement of Expenses from Cargill

In actions brought under 42 U.S.C. § 1981, such as this case, a court may, pursuant to 42 U.S.C. § 1988(b), "allow the prevailing party … a reasonable attorney's fee as part of the costs." Although the statute uses the word "may," a prevailing plaintiff should be "awarded attorneys' fees in all but very unusual circumstances." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415 (1975) (quoted in *Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842, 848 (8th Cir. 1994)). "[R]easonable out-of-pocket expenses of the kind normally charged to clients by attorneys" are included within the concept of a "fee." *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294-95 (8th Cir. 1996). The party may assign the right to a "fee" to its attorney. *Evans v. Jeff D.*, 475 U.S. 717, 730-31 (1986) (Section 1988 does not "legislate[] against assignment of this right [to a discretionary award of attorneys' fees] to an attorney, such as effectively occurred here."); *Gilbrook v. City of Westminster*, 177 F.3d 839, 875 (9th Cir. 1999) ("*In the absence of a contractual assignment to counsel***,** § 1988 requires that attorney fee awards be made directly to the prevailing party, with the ultimate disposition of the award dependent on the contract between the lawyer and the client.") (emphasis added); *McDannel v. Apfel*, 78 F. Supp. 2d 944, 953 (S.D. Iowa 1999) (following *Gilbrook*).

S&L assumes from three facts and circumstances that the plaintiffs have assigned or otherwise transferred their rights to fees and expenses to their attorneys, including S&L, and that S&L now has the right to seek such fees and expenses from Cargill. First, S&L knows of no reason for Magistrate Boylan to have directed notice to S&L and to keep the action open for thirty days unless to give the firm an opportunity to seek fees and expenses. Second, the language of the Order of July 10, 2007, suggests that first the clients settled with Cargill, and then successor counsel reached a separate agreement as to fees and expenses. If attorneys' fees and expenses had been settled by the clients, presumably the Order would have spoken of the plaintiffs having settled all of their claims, including their claim to fees and expenses. Finally, and perhaps most tellingly, if the settlements reached by the plaintiffs or by successor counsel had encompassed S&L's right to fees and expenses, presumably Cargill would have provided at least that language to S&L as requested, or at minimum informed S&L when refusing to provide the requested language that the language barred any claim by the firm for fees and expenses. It did not.

If Cargill nonetheless argues that the terms of the settlements do not give S&L any right to seek fees, it should voluntarily, or if not by Court Order, provide all of the relevant language from the settlement agreements and any documents setting out the chronology to determine whether the parties' subsequent conduct sheds any light on any ambiguous terms in those agreements. S&L should be permitted an opportunity to reply once it has access to this information.

**B. S&L May Recover for Its Work and Expenses that Benefited Plaintiffs**

The plaintiffs apparently were successful in their individual claims, settling them after defeating partial motions to dismiss and for summary judgment. They were unsuccessful in their class claims. Relying on the Supreme Court's decision in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Eighth Circuit has enunciated the following standard for awards of attorneys' fees and costs in such circumstances:

> When a plaintiff has prevailed on some claims but not on others, the plaintiff may be compensated for time spent on unsuccessful claims that were related to his successful claims, but not for time spent on unsuccessful claims that were "distinct in all respects from his successful claims." [*Hensley*, 461 U.S. at 440.] Claims are related, and hence deserving of compensation, if they "involve a common core of facts" or are "based on related legal theories." *Id.* at 435.

*Emery v. Hunt*, 272 F.3d 1042, 1046 (8th Cir. 2001).

This standard applies to cases in which plaintiffs were unsuccessful in their class claims but successful in their individual claims, as long as the work devoted to each aspect of the case is separable. In *Parke v. First Reliance Std. Life Ins. Co.*, 368 F.3d 999 (8th Cir. 2004), the Eighth Circuit upheld Judge Tunheim's fee award in an ERISA case in which the proposed class had been denied but the individual plaintiff prevailed on his claim. *Id.* at 1013. ERISA, like 42 U.S.C. § 1981, has a "prevailing party" requirement for fee shifting.

Although the plaintiffs' individual and class claims certainly involved overlapping facts, with rare exceptions S&L's work and expenses were directed either at the individual or the class claims, not at both. Thus, categories of tasks and expenses may be

identified as individual or class in nature, compensable or non-compensable. The types of work and/or expenses are allocated as follows:

| Activities | Individual Work | Class Work |
|---|---|---|
| Case investigation | Interviews with future plaintiffs;<br>damages questionnaires completed by future plaintiffs | Interviews with persons outside class or who chose not to become plaintiffs;<br>investigations concerning Cargill's corporate structure and practices |
| Preparation of complaint | Paragraphs dealing with individual plaintiffs and causes of action in the complaint and amended complaints; motion for leave to file amended complaints | Paragraphs concerning Cargill's patterns and practices and class allegations in the complaint and amended complaints |
| Motions to dismiss | Research for and briefing and argument in opposition to motions to dismiss | N/A |
| Written discovery | Responses to Cargill's interrogatories and document productions requests | Responses to plaintiffs' interrogatories and document production requests, except for document production requests seeking information about comparables for plaintiffs |
| Non-expert depositions | Depositions of plaintiffs conducted by Cargill | Depositions conducted by plaintiffs; depositions of class members and third party witnesses conducted by Cargill |
| Factual analyses | Creation of database concerning plaintiffs and comparables for plaintiffs | Coding of documents produced by Cargill; Analyses of Cargill's HR practices; analyses of Cargill's business units |
| Expert discovery | Loading of HR data by plaintiffs' statistical expert and readying data to perform analyses[7] | All work by plaintiffs' stereotyping and HR experts;<br>all analyses performed and report prepared by plaintiffs' statistical expert;<br>all expert depositions; |

[7] This category applies only to expenses. S&L had no role in this work other than to pay the statistical expert for his time and expenses in performing this task.

| | | |
|---|---|---|
| | | briefing concerning *Daubert* motion against plaintiffs' experts |
| Discovery motions | Research for and briefing and argument concerning production of information on plaintiffs' comparables | Research for and briefing and argument concerning all other discovery motions |
| Cargill's motion for summary judgment | Research for and briefing and argument in opposition to motion for summary judgment and in support of motion for reconsideration | N/A |
| Plaintiffs' motion for class certification | N/A | Research for and briefing in support of motion for class certification |
| Communications with current and former Cargill employees | Communications with plaintiffs | Communications with non-plaintiffs |
| Website | N/A | Creation, updating and maintenance of website |

### C. S&L Has Calculated Appropriately the Value of Its Work and Expenses

In the context of cases brought under fee shifting statutes such as this one, a lodestar calculation provides a presumptively reasonable attorneys' fee award. *Blum v. Stenson*, 465 U.S. 886, 901 (1984) (citing *Hensley*, 461 U.S. at 435). Under the lodestar approach, the hours expended by an attorney (or other timekeeper) are multiplied by an hourly rate "so as to produce a fee amount, which can be adjusted, up or down, to reflect the individualized characteristics of a given action." *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244 (8th Cir. 1996).

S&L's calculations of the values of its lodestar fees and its expenses devoted to the individual claims in this case raise three legal issues. First, in calculating the number

of hours worked, has S&L properly identified work associated with legal tasks directed primarily at individual claims and eliminated other tasks directed primarily at class claims? Second, has S&L applied reasonable hourly billing rates to its compensable time? And third, has S&L properly identified advanced out-of-pocket expenses associated with the individual claims and eliminated other expenses incurred in connection with the class claims.

### 1. S&L Has Appropriately Identified and Allocated Time Between Work that Advanced Individual Claims and Work Directed Exclusively at Class Claims

S&L's time records reflect, for each attorney and staff member, the amount of time worked each day on each matter and descriptions of the work performed. (Lieder Decl., ¶ 18.) Those time records reflect that S&L lawyers and staff worked a total of over 28,400 hours on this case through September 24, 2004. (*Id.*, ¶ 19.)

Some of the timekeepers noted, when they performed multiple tasks on this case on a given day, the amount of time devoted to each specific task. It thus was easy to determine for those persons the amount of time devoted to work that advanced the individual claims, even if they also performed other tasks primarily directed toward the class allegations. (*Id.*, ¶ 24.)

Other timekeepers did not note the amount of time devoted to each task on a given day, only the total amount of time devoted to this case. If they worked on one or more tasks that day that advanced the individual claims and one or more additional tasks primarily directed toward the class claims, the face of their records did not generally allow an accurate allocation of time between individual and class matters. (*Id.*, ¶ 25.)

S&L makes no claim for compensation when there is no basis for reasonably accurate allocation. S&L thus has required of itself more precision than courts have done in considering attorneys' fee requests. *See, e.g.*, *Powers v. Commissioner*, 43 F.3d 172, 181 (5th Cir. 1995) (holding that district court abused discretion in denying all fees even though records did not contain any description of work performed); *Cadena v. Pacesetter Corp.*, 1999 U.S. Dist. LEXIS 9923, at *5 (D. Kan. Apr. 27, 1999) (holding that use of "block billing" or single entries of time for more than one task provided sufficient basis for fee award), *aff'd*, 224 F.3d 1203 (10th Cir. 2000). As one appellate court has explained:

> "It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought."

*Environmental Defense Fund v. Environmental Protection Agency*, 672 F.2d 42, 54 (D.C. Cir. 1982) (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980)).

Under three circumstances, quite rare compared to the number of times timekeepers performed tasks allocable to both individual and class matters on the same day without noting the time for each task, S&L has estimated the time allocable to individual matters:

- the records of another timekeeper permit accurate allocation, *e.g.*, they both attended the same meeting and the other timekeeper noted its length, in

which case S&L treats the first timekeeper as attending the meeting for the same length of time (Lieder Decl., ¶ 25);

- the great majority of the timekeeper's day was spent on tasks allocable to individual matters, *e.g.*, a lawyer defends the deposition of a plaintiff and at the end of the day answers accumulated emails, in which case S&L deducts a small amount of time, such as ½ hour, from the amount of time in the deposition (*id.*); and
- the timekeeper performs the same task several times on the same day, some of them allocable to individual matters and others to class matters, *e.g.* s/he interviews four persons, two who eventually became plaintiffs and two who did not, in which case S&L allocates half of the time to individual matters and half to class matters (*id.*).

As shown by Exhibit "A" to the Lieder Declaration, each time entry for which S&L is seeking compensation includes the date the work was performed, the name of the attorney or staff member who performed the work, a description of the work performed (except that names of non-plaintiffs have been redacted), the number of hours recorded, and the value of the hours for which S&L is seeking compensation. In addition, the value of the hours for which S&L is seeking compensation are collected under the categories in the table below, which correspond, with one small change, to the categories of work

included on Exhibit "A" to the Lieder Declaration.[8] The final column shows the value of the work eliminated from each time entry containing compensable time because the entry either also contains distinct work associated exclusively with the class claims or because the amount of work that advanced individual claims cannot be separated from the amount of work on class claims. In addition, S&L seeks compensation for only 1/3 of the work devoted to preparation of the complaint, based on its estimate that only about 1/3 of the time was devoted to obtaining and setting out allegations related to the individual plaintiffs.

At its applicable lodestar rates, the nearly 28,500 hours of work that S&L lawyers and staff recorded to the case through September 23, 2004 are valued at about $7.3 million. (Lieder Decl., ¶ 19.) After elimination of entries not properly allocable to individual matters, S&L has reduced the total by over 85%, as follows:

| | |
|---|---|
| Investigating the case | $ 71,274.25 |
| Preparing the complaints | $ 43,064.58[9] |
| Opposing motion to dismiss | $ 65,511.75 |
| Responses to written discovery | $ 303,573.46 |
| Defending plaintiff depositions | $ 345,896.30 |
| Performing factual analyses | $ 137,967.00 |
| Opposing summary judgment | $ 127,466.25 |

[8] The categories of "factual analysis" and "discovery motions" are combined because S&L seeks compensation for only one discovery motion, the successful motion that garnered the comparables data that provided the basis for the bulk of the factual analysis.
[9] The amount of $43,064.58 is 1/3 of the value of the work on the complaints shown in S&L's time records of $129,193.75. (Lieder Decl., ¶ 23).

| | |
|---|---|
| Communicating with employees | $ 54,613.90 |
| Total | $1,149,367.40 |

(Lieder Decl., Ex. A.)

In short, S&L has identified compensable work in a very conservative manner. If S&L wrongly has identified a few hours as compensable that properly should not be, such hypothetical errors are more than offset by the many hours for which S&L does not seek compensation because some of its attorneys and staff did not record the amount of time devoted to each task during the day.

**2. S&L's Applicable Hourly Billing Rates Are Set Based on Market Data and Are Supported by Applicable Precedent**

S&L has two sets of hourly rates: Rate 1, which is used for class actions filed in major metropolitan areas, and Rate 2, which is used for class actions filed in smaller metropolitan areas, the small number of individual cases that S&L prosecutes, and for hourly consultations. (Lieder Decl., ¶ 29.) These rates are established each year based on the Survey of Law Firm Economics, published by Altman Weil Publications, Inc. This publication includes a wide variety of market data based on the results of a survey of law firms. S&L generally establishes Rate 1 for the upcoming year between the median and upper quartile rates for the Washington, D.C. market (the location of the firm's principal office) for the just-completed year. (*Id.*) These rates should reflect the rates at major corporate law firms in the D.C. area. It is appropriate to peg the firm's rates to the rates at major law firms for three primary reasons. First, many S&L lawyers worked at major corporate law firms before moving to S&L, and all have the academic and other

qualifications to be employed at major corporate law firms. Second, major corporate law firms represent the defendants in almost all of S&L's cases, including this case. Finally, any justification for higher rates at major corporate law firms associated with higher overhead costs is more than offset by the substantially greater risk that S&L bears in prosecuting all of its cases on a completely contingent basis. *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (explaining that a lodestar award should compensate attorneys willing to take on risky cases on a contingent basis "either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so"). Based on the survey, S&L establishes a matrix of lodestar rates for number of years of experience. In some instances, lawyers' rates are adjusted downward to reflect years partly or wholly out of the practice or spent on legal matters unrelated to the firm's practice. S&L's Rate 2 is then set at roughly 15% below Rate 1. (Lieder Decl., ¶ 29.) S&L has applied Rate 2 to its time in this case.

S&L's Rate 2 billing rates are in line with the billing rates recently used by this Court and are otherwise supported by applicable legal precedent. In *West v. Border Foods, Inc.*, 2007 U.S. Dist. LEXIS 43423 (D. Minn. June 8, 2007), this Court considered a fee petition filed by Nichols, Kaster & Anderson following an $8,500 settlement of the claims of one plaintiff and four putative plaintiffs alleging overtime pay violations. The

table below shows that the Rate 2 billing rates of S&L's principal lawyers in this case are similar to those applied in *West*, which the defendant did not challenge, *id.* at **6-7:[10]

| **Yrs Out of Law School** | **NK&A** | | **S&L** | |
|---|---|---|---|---|
| | **Rate** | **Lawyer** | **Rate** | **Lawyer** |
| 36 | $550 | Nichols | | |
| 24 | | | $335 | Madsen |
| 19 | | | $450 | Schaefer |
| | | | $420 | Patton |
| 18 | | | $450 | Coler |
| 16 | $400 | Lukas | | |
| 14 | | | $305 | Stratton |
| 7 | $275 | Fisher | | |

(Lieder Decl., ¶ 30.) The hourly rates for S&L's attorneys also are consistent with the rates approved by this Court and affirmed by the Eighth Circuit in *Fish v. St. Cloud State Univ.*, 295 F.3d 849 (8th Cir. 2002), after reasonable adjustment for inflation.

Moreover, the use of S&L's Rate 2 is justified based on the factors that the Eighth Circuit has embraced in evaluating fee requests under fee shifting provisions. *See In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 992-93 (D. Minn. 2005) (identifying and applying factors in non-fee shifting case). First and foremost, S&L took very substantial risks in accepting the matter on a straight contingency basis, including the risk of expending millions of dollars of time and advancing more than $1 million in litigation costs without any recovery. Second, the case presented a number of difficult and novel legal questions, including whether summary judgment is appropriate against an individual when pattern or practice claims are pending and what is the appropriate

[10] S&L cannot meaningfully compare the rates for its staff against those of Nichols, Kaster & Anderson. *West* reflects that the firm primarily used law clerks to perform non-attorney work, while S&L primarily uses paralegals and legal assistants.

limitations period for the particular section 1981 claims asserted against Cargill in view of the Supreme Court's then-recent decision in *Jones v. R.R. Donnelly & Sons, Co.*, 541 U.S. 369 (2004). Third, except with respect to the matters leading to its disqualification, S&L demonstrated considerable skill and determination throughout this litigation. Fourth, S&L's acceptance of this case prevented the firm of roughly ten attorneys from taking on other matters. Finally, the case was not likely viewed as desirable by the vast majority of Minnesota attorneys.

**3. S&L Has Appropriately Identified the Expenses for Which It Should Be Reimbursed**

Just as S&L's time is recorded in Timeslips as work is performed, so too its expenses are recorded in Timeslips as they are incurred. The expense records reflect that S&L spent over $1,025,000.00 out-of-pocket (exclusive of electronic document management/storage charges and interest carrying charges) on this case. (Lieder Decl., ¶ 32.)

For the reasons described in Subsection A above, S&L has eliminated all expenses primarily directed toward the class issues and that, in the exercise of billing judgment, should otherwise be eliminated. This has meant elimination of major expenses, including all expenses associated with experts William Bielby and Ron Adler and expenses associated with the offensive depositions that S&L took, all of which were primarily directed toward the class claims. As shown on Exhibit B to the Lieder Declaration, this has reduced the total expenses to $781,066.98 (*id.*, ¶ 33):

| Expense Category/Type | Dollar Amount |
|---|---|
| External – court, service of process and witness fees | $150.00 |

| | |
|---|---|
| External – court reporter fees and transcript costs | $23,958.96 |
| External – expert/consultant fees (i.e., mediators, special masters, experts, trial consultants and investigators) | $527,916.29 |
| External – overnight mail and messenger costs | $6,445.43* |
| External – photocopying/OCR scanning costs/medical record costs | $131,606.60* |
| External – travel (e.g., parking, air fare, lodging and meals) | $26,043.76 |
| External – electronic research | $46.69* |
| Internal – photocopying and printing charges | $58,439.70* |
| Internal – fax charges | $230.94* |
| Internal – postage charges | $2,758.06* |
| Internal – long distance telephone charges | $3,470.55* |
| **TOTAL** | $781,066.98 |

It is impossible to allocate most of the categories of expenses – those marked by an asterisk – accurately between expenses that advanced the individual claims and expenses primarily directed at the class claims. Without becoming impossibly cumbersome, descriptions in S&L's records necessarily relate to such expenses as all documents copied on a given day or month, all postage or delivery charges paid in a given day or month, and all long distance telephone charges in a given month. S&L seeks to be paid for 50% of all of those categories of expenses. (*Id.*, ¶ 34.)

Expert/consultant fees present a unique issue. With the expenses associated with two of the three experts removed, all that are left are expenses to PeopleClick, the organization employing plaintiffs' statistical expert Dr. David Peterson. The statistical analyses that he performed prior to September 24, 2004, were exclusively directed at class issues. However, S&L is confident that Dr. Peterson assisted successor counsel in the settlement negotiations. Typically, plaintiffs' lawyers use statistical experts in individual cases to identify comparators and calculate damages. Unfortunately, Cargill

has prevented S&L from learning from successor counsel whether and, if so, how Dr. Peterson may have been used. (*Id.*, ¶ 35.)

If he was used to any substantial extent in the individual settlement negotiations, at least some of the work that Dr. Peterson did prior to September 24, 2004, had substantial value. The first huge task for any statistical expert in an employment class action like this case is to load the databases from the defendant, understand the use of the various fields and codes, recognize which fields have limited value because they are not fully populated, and otherwise become familiar with the databases. This part of the process often takes many months and costs many thousands of dollars, often over $100,000. (*Id.*, ¶ 36.)

The exact value of Dr. Peterson's pre-September 24, 2004 work to his support of the negotiation process is unknowable, and Cargill's position has made even a rough approximation very difficult. In the absence of any hard information, S&L seeks compensation for 1/4 of the amounts paid to Dr. Peterson prior to September 24, 2004.

With these adjustments, the total expense reimbursement sought by S&L is $283,630.76, divided among the expense categories as follows:

| **Expense Category/Type** | **Dollar Amount** |
|---|---:|
| External – court, service of process and witness fees | $150.00 |
| External – court reporter fees and transcript costs | $23,958.96 |
| External – expert/consultant fees (i.e., mediators, special masters, experts, trial consultants and investigators) | $131,979.07 |
| External – overnight mail and messenger costs | $3,222.71 |
| External – photocopying/OCR scanning costs/medical record costs | $65,803.30 |
| External – travel (e.g., parking, air fare, lodging and meals) | $26,043.76 |
| External – electronic research | $23.34 |

| | |
|---|---|
| Internal – photocopying and printing charges | $29,219.85 |
| Internal – fax charges | $115.47 |
| Internal – postage charges | $1,379.03 |
| Internal – long distance telephone charges | $1,735.27 |
| **TOTAL** | $283,630.76 |

(Lieder Decl., ¶ 38.)

### D. S&L's Compensable Lodestar Fees Should Be Reduced by a Maximum of 25% Under the Factors Set Forth in Minn. Stat. § 549.20, Subd. 3

Relatively few reported decisions address the impact of a breach of ethical rules on a lawyer's right to recover or retain attorneys' fees. When federal courts, including this Court, have considered the issue, they typically have looked to the state law of the forum for guidance. *See Bremer Bus. Fin. Corp. v. Dorsey & Whitney, LLP (In re SRC Holding Corp.)*, 364 B.R. 1, 49-50 (D. Minn. 2007) ("*Bremer II*"); *see also Sweeney v. Athens Reg'l Med. Ctr.*, 917 F.2d 1560, 1573-74 (11th Cir. 1990) (applying Georgia law and holding that if attorneys breached their ethical duties, then "some portion" of their fees should be forfeited); *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir. 1993) (in legal malpractice action, stating that "[u]nder New York law, attorneys may be entitled to recover for their services, even if they have breached their fiduciary obligations").

The Minnesota Supreme Court reviewed the issue of a fee forfeiture for breach of a lawyer's fiduciary duty to a client in three related cases: *Rice v. Perl*, 320 N.W.2d 407 (Minn. 1982) ("*Perl I*"); *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209 (Minn. 1984) ("*Perl II*"); *Gilchrist v. Perl*, 387 N.W.2d 412 (Minn. 1986) ("*Perl III*"). *See generally Commercial Assocs. v. Work Connection, Inc.*, 712 N.W.2d 772, 779-80 (Minn.

Ct. App. 2006) (discussing the three *Perl* cases). As summarized in *Commercial Associates*, the Minnesota Supreme Court in *Perl III*

> articulated two different rules: total fee forfeiture and scaled fee forfeiture. *[Perl III*, 387 N.W.2d] at 416-17. The court concluded that the total-fee-forfeiture rule addressed in *Perl I*, requiring forfeiture of all compensation received by a fiduciary, is appropriate when a fiduciary's breach of duties involves actual fraud, bad faith, and actual harm to the client. The supreme court acknowledged that total fee forfeiture serves a punitive function that "emphasizes the importance of strict fidelity to one's client[.]" *Id.* at 416.
>
> But the supreme court further held that a scaled-fee-forfeiture rule, allowing the amount of fee forfeiture to be scaled to the degree of fiduciary misconduct, is more appropriate when the breach involves no actual fraud or bad faith and when the client sustains no actual harm, particularly when there are multiple potential plaintiffs. *Id.* at 416-17. In so holding, the supreme court noted that a scaled fee forfeiture is more closely aligned with a punitive-damages award, which "should not exceed the level necessary to properly punish and deter." *Id.* at 417 (quotation omitted).

*Commercial Associates*, 712 N.W.2d at 779-80.[11]

The practicalities associated with a disqualified contingent-fee lawyer seeking fees under a fee shifting statute for work performed prior to disqualification (as in this case) are different from those associated with a client seeking disgorgement of fees paid to a lawyer before the ethical breach was discovered (as in the *Perl* and *Bremer* cases).[12] If

[11] Minnesota law is in accordance with the law in many jurisdictions. In what appears to be the most exhaustive collection of cases on the issue, the Texas Supreme Court collected 21 cases from jurisdictions all over the country declining to require complete fee forfeiture as inequitable and holding that the amount of forfeiture should be determined in light of the nature of the alleged ethical breach and the harm, if any, to the client. *Burrow v. Arce*, 997 S.W.2d 229, 242 n.45 (Tex. 1999). This nuanced approach also is consistent with the approach set forth in the *Restatement of the Law, Third, The Law Governing Lawyers* § 37 (2000).

[12] It is awkward to analyze *Bremer* in detail in this brief, because counsel for Cargill was the defendant in that case and this Court decided that case. However, analysis of *Bremer*

the ruling is against the lawyer, the adversary will hold onto the money in dispute in the former case, while the client to whom fiduciary duties were owed will recover the money in the latter case. Nonetheless, the standards established in *Perl III* provide the best guidance available under the circumstances of this case.

Those standards provide that a lawyer will suffer complete forfeiture (or no compensation) when his "breach of duties involves actual fraud, bad faith, and actual harm to the client," but is entitled to scaled forfeiture (or partial compensation) "when the breach involves no actual fraud or bad faith and when the client sustains no actual harm, particularly when there are multiple potential plaintiffs." *Commercial Assocs.*, 712 N.W.2d at 779. This case, like *Perl* but unlike *Bremer*, involved multiple plaintiffs. The existence of multiple plaintiffs counsels strongly for partial compensation, as in *Perl.*

More important, S&L's lawyers did not engage in any fraud or bad faith toward the plaintiffs, to whom their fiduciary duties lie. The lawyer in *Perl* did not have to forfeit all fees in large part because he did not engage in actual fraud against his clients, but only constructive fraud in failing to tell them that the adjuster for the insurer with whom the lawyer negotiated their settlements was employed by the lawyer on other matters. *Perl III*, 387 N.W.2d at 415. By contrast, the law firm in *Bremer* did have to forfeit all fees because its lawyers failed to disclose material information to their clients over several years, did so in order to protect the firm, and as a result the clients engaged in unnecessary, expensive, and time-consuming litigation. *Bremer II*, 364 B.R. at 49.

---

is necessary because it is the only post-*Perl* case of which S&L is aware that applies the *Perl* analysis to determine whether a fee forfeiture is appropriate.

This case presents a stronger situation than even in *Perl* for partial compensation: there is no suggestion that S&L's lawyers breached any ethical duties or acted in bad faith to the plaintiffs.

Although S&L's lawyers did have ethical duties to Cargill, they did not have any fiduciary duties to the defendant. In the absence of fiduciary duties that were violated, S&L should not be subject to a complete loss of fees. *See Bremer Bus. Fin. Corp. v. Dorsey & Whitney, LLP (In re SRC Holding Corp.)*, 352 B.R. 103 (Bankr. D. Minn. 2006) ("*Bremer I*") (suggesting that one of the claimants against the law firm did not have a claim for fees until it became a client of the firm's), *accepted in part and rejected in part by*, *Bremer II*, 364 B.R. 1. Even if violations of duties to an adversary were treated identically to violations of duties to clients, S&L's lawyers did not act fraudulently or in bad faith toward Cargill. Unlike the law firm in *Bremer*, S&L disclosed the fact that it had been in possession of copies of Cargill's privileged documents promptly after its personnel discovered them (Mem. Op. & Order Sept. 24, 2004 (Dkt. 380), at 19), and did so knowing that the disclosure would bring down a firestorm upon it (Lieder Decl., ¶ 11).[13]

Finally, other than through the disruption to the attorney-client relationships and through some delay while substitute counsel were located and brought up to speed, S&L's clients were not harmed by any ethical breaches. Upon the request of the clients,

[13] The Court found that statements made by Mr. Schaefer to Mr. Douglas that he might be able to benefit financially from the lawsuit were false. (Mem. Op. & Order Sept. 24, 2004 (Dkt. 380), at 14.) This conclusion should not alter the outcome as to fees. Cargill is not a third-party beneficiary of the obligations to Mr. Douglas.

S&L located highly respected successor counsel and devoted considerable resources to collecting the voluminous evidence in the case for review by Special Master Peter Thompson before it could be delivered to new counsel. As a result, the plaintiffs did not suffer monetary losses from the ethical breaches. This makes the plaintiffs in this case like those in *Perl*. *Perl III*, 387 N.W.2d at 416 & n.2. By contrast, in *Bremer*, where a complete forfeiture was upheld, the clients had to engage in unnecessary litigation that failed to make them whole. *Bremer II*, 364 B.R. at 49, 50 n.72.

The Court should decide the size of the reduction appropriate in light of these ethical breaches. According to *Perl*, it should consider the factors set forth in Minn. Stat. § 549.20, subd. 3 (relating to punitive damage awards). Subdivision 3 reads:

> Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct . . . .

Minn. Stat. § 549.20, subd. 3. Unfortunately, no reported Minnesota federal or state court decision applies these factors in deciding the amount of a fee forfeiture or the amount by which requested fees should be reduced.

The factors can be classified into two broad categories. How bad was the lawyer's conduct? What was the impact of the conduct, and what has been and will be the consequences of the discovery of the conduct, on the lawyer and others.

S&L has acknowledged the seriousness of the violations of ethical duties found to have been committed by one of its attorneys. We recognized from the beginning that adequate protections should be established to ensure that Cargill's privilege was not violated. Obviously, we failed to do so. This Court found that three different rules were violated, while the Board of Professional Responsibility concluded only that Mr. Schaefer had failed to adequately supervise the firm's support personnel working on the case. Either way, this conduct led to S&L's disqualification. However, we sought advice from the Board promptly after discovering the copies of the privileged documents in the files that had been delivered by Mr. Douglas 18 months ago and followed the Board's guidance by returning the documents to Cargill rather than trying to conceal our failures. (Lieder Decl., ¶¶ 11-12.) When the Court disqualified S&L, the firm acted responsibly: Mr. Schaefer self-reported to the Board; we notified the plaintiffs of the disqualification; when the plaintiffs requested assistance in locating replacement counsel, we provided it. We also devoted more than 100 hours of time to collecting and organizing our files so that Special Master Thompson could review the documents before they were delivered to our successors as counsel.

Neither S&L (nor plaintiffs) benefited from its actions before the Douglas documents were discovered and returned to Cargill. Indeed, Cargill has never identified one comment or question that S&L made or asked that it believes is attributable to information in the documents. The Special Master did not notice any document that appeared tainted by knowledge obtained from Mr. Douglas, although as a precaution he withheld from the turnover to successor counsel all correspondence mentioning Mr.

Douglas. (Order attaching Corrected In Camera Report of Special Master (Dkt. 430), at 12-20.)

The discovery led to S&L's disqualification, which was damaging to the firm in several ways. The disqualification was heavily publicized. The firm's partners believe the adverse publicity reduced the number of potential cases that potential clients or other lawyers have communicated to S&L. (Lieder Decl., ¶¶ 13-16.) The loss of expected revenue from this case and from potential future cases led the firm to alter its planned operations in Minnesota in several substantial ways. (*Id.*, ¶ 16.) Finally, one of the firm's three owners, Mr. Schaefer, left the firm as a result of the disqualification. (*Id.*, ¶ 13.)

The disqualification also has had at least one positive influence. The firm has designated an ethics partner, who has implemented several practices and raised the prominence of ethical concerns at S&L. (Lieder Decl., ¶ 17; Coler Decl., ¶ 6.) The firm hopes that, with these measures, S&L's lawyers and staff will never again violate applicable ethical rules. (*Id.*)

"The purposes of punitive damages are to punish the perpetrator, to deter repeat behavior, and deter others from engaging in similar behavior." *Jensen v. Walsh*, 623 N.W.2d 247, 251 (Minn. 2001). Given the impacts, both positive and negative, of disqualification on S&L, it is unnecessary to reduce the fee award by one dollar to deter S&L from committing similar ethical breaches in the future. However, some reduction is appropriate to punish the firm and to deter others. In light of all of the factors discussed above, S&L believes that a 25% reduction is appropriate. This reduction also will serve

another purpose not mentioned in the statute. It will compensate Cargill, in part or in full, for the time and expenses arising out of the discovery and motion practice associated with its efforts to disqualify S&L.

As set forth above, the amount of time for which S&L seeks compensation multiplied by the appropriate rates yields a total of $1,149,367.40 in fees. Reducing that product by 25% brings the total fee request to $862,025.55.

Neither *Perl* nor *Bremer* speaks of any disgorgement of money paid to reimburse a lawyer for out-of-pocket expenses that the lawyer, even one who has violated ethical rules, has incurred on the client's behalf. Thus, there should be no reduction in the expense amount calculated above because of the transgressions of one or more S&L lawyers.

## IV. CONCLUSION

For the above reasons, S&L respectfully requests that it be awarded attorney's fees in the amount of $862,025.55 and expense reimbursement in the amount of $283,630.76 for its representation of the plaintiffs in this action.

Dated: August 8, 2007

SPRENGER & LANG, PLLC

By: *s/Susan M. Coler*

Susan M. Coler (MN Bar No. 217621)
310 Fourth Avenue South
Suite 600
Minneapolis, MN 55415
(612) 871-8910
(612) 871-9270 [facsimile]

Michael D. Lieder (DC Bar No. 444273)
1400 Eye Street N.W.
Suite 500.
Washington, D.C. 20005
(202) 265-8010
(202) 332-6652 [facsimile]

## WORD COUNT CERTIFICATE

Pursuant to Rule 7.1 of the Amendments to the Local Rules for the United States District Court, District of Minnesota, Sprenger & Lang, PLLC hereby certifies that the Memorandum of Law in Support of Sprenger & Lang, PLLC's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses filed on August 8, 2007 does not exceed 12,000 words. The Memorandum of Law contains 7,667 words according to Microsoft Word 2003, the program used to prepare the memorandum. The word processing program has been applied specifically to include all text, including headings, footnotes, and quotations.

Dated: August 8, 2007

SPRENGER & LANG, PLLC

By: *s/Susan M. Coler*

Susan M. Coler (MN Bar No. 217621)
310 Fourth Avenue South
Suite 600
Minneapolis, MN 55415
(612) 871-8910
(612) 871-9270 [facsimile]

Michael D. Lieder (DC Bar No. 444273)
1400 Eye Street N.W.
Suite 500.
Washington, D.C. 20005
(202) 265-8010
(202) 332-6652 [facsimile]