UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| RODERICK ARNOLD, et al., on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>CARGILL, INCORPORATED,<br><br>*Defendant.* | Civil Action No. 01-CV-2086 (DWF/AJB)<br><br>**DECLARATION OF MICHAEL D. LIEDER IN SUPPORT OF SPRENGER & LANG, PLLC'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES** |

I, Michael D. Lieder, hereby declare and state as follows:

1. I am over the age of eighteen. Throughout the period covered by this declaration, I have been a member-partner of the law firm of Sprenger & Lang, PLLC ("S&L") in the firm's Washington, D.C. office. I have personal knowledge of the facts set forth herein (except where made clear otherwise) and am competent to testify hereto.

**<u>Investigations for and Proceedings in the Case</u>**

2. In the summer of 2000, Larry Schaefer, also a member-partner of S&L in the firm's Minneapolis office, and various employees of the firm, began communicating with current and former Cargill, Inc. ("Cargill") employees about their experiences of racial discrimination at Cargill. Mr. Schaefer kept me generally informed of the progress of the investigation over the next several months. S&L's time records reflect that lawyers, paralegals and legal assistants spent hundreds of hours interviewing and gathering information from these future plaintiffs and witnesses.

3. In the spring of 2001, Mr. Schaefer informed me by telephone that he had been reviewing documents produced by Bill Douglas, a former high-level HR employee at Cargill, and discovered a number of documents marked privileged. (In this declaration I refer to the documents as the "privileged documents," even though we do not know whether the documents were, in fact, privileged.) We discussed what to do with the documents. Mr. Schaefer told me that he had not read the privileged documents, but in segregating them from the unmarked documents had noted the dates of some of them. I reviewed an American Bar Association formal opinion that opined that, if privileged documents of an adversary are given to a lawyer by a third party during the course of litigation, they should be delivered to the adversary. Mr. Schaefer and I did not think that the rule applied in this situation. Cargill was not yet and might never become an adversary, and if litigation were never launched, we would be breaching our duties to maintain Mr. Douglas' confidentiality by sending the privileged documents to Cargill. We also realized that we could not maintain possession of the privileged documents. We decided to return them to Mr. Douglas. Subsequently, Mr. Schaefer informed me that the documents indeed had been returned to Mr. Douglas.

4. Shortly after the discovery of those documents, Mr. Schaefer presented the results of the Cargill investigation to me, Paul Sprenger, and several partners of the firm. In the course of discussing whether to offer representation to the Cargill employees, we discussed Mr. Schaefer's communications with Mr. Douglas. Research showed that, under Minnesota law, the firm could properly communicate with him, but that we had to make sure that we did not intrude into privileged matters. We believed that we had taken

care of the problem posed by the privileged documents that Mr. Douglas had given to us, and that we could otherwise make sure not to obtain any information from Mr. Douglas that intruded on privileged communications. After several discussions, we agreed to initiate a race discrimination class action lawsuit.

5. We had the clients in Cargill sign a retainer agreement. That agreement provided that the payment of fees would be contingent on recovery and that S&L would advance all litigation expenses.

6. Mr. Schaefer took the lead in preparing the complaint, which went through several revisions by Susan Coler, one of the firm's partners, and me before it was ready for filing. In part, these revisions were caused by the additions of plaintiffs and the need to determine and present their stories. After a pre-filing settlement overture to Cargill proved unavailing, we filed the suit on or about November 15, 2001.

7. In mid-2002, I received a telephone call from Ms. Coler. She explained that staff employees were gathering documents to respond to Cargill's document production requests and that she had directed a staff member to check any boxes in the office that may contain Cargill documents to make sure that they did not contain any documents responsive to the requests. Ms. Coler had been brought a box containing documents produced by Mr. Douglas. (I don't remember whether she explained how she knew the documents were produced by Mr. Douglas.) Some of the documents in the box were marked privileged. We decided that she would close the box until we could decide what to do.

8. I was disturbed by this information in light of the understanding reached during the spring of 2001 of the importance that we not intrude on Cargill's privilege in communications with Mr. Douglas. I called Mr. Schaefer. He had learned as well of the existence of the documents, and expressed puzzlement as to how they could still be in the office.

9. After the Court had disqualified S&L and Mr. Schaefer had self-reported to the Board of Professional Responsibility (see paragraph 12 below), I conducted an investigation to try to determine what had happened. I was not able to reconstruct with certainty, but believe that I know what happened. Sara Nelson, a legal assistant/case clerk, was in charge of documents as they came in from clients and witnesses. Her practice was to make, or have made, one set of copies of the incoming documents promptly after they arrived, presumably in case, when the documents were subsequently reviewed, persons misplaced or marked on them. She does not remember having copies of Mr. Douglas' documents made, but knows no reason why she would not have done so. As best as I can reconstruct, when the documents were returned to Mr. Douglas in the spring of 2001, nobody thought to ascertain whether a spare set of documents had been made and, if so, to return the privileged materials from those documents as well.

10. Regardless of the reason for our continued possession of the privileged documents, Mr. Schaefer and I understood that, if the ABA formal opinion that we had consulted in the spring of 2001 controlled, we were obligated to transmit the documents to Cargill. We had the issue whether Minnesota followed the ABA formal opinion researched, and when we found no definitive answer, contacted the ethics hotline of the

Minnesota Board of Professional Responsibility. We received guidance suggesting that the ABA formal opinion should be followed.

11. I had no doubt – and based on my communications with them Mr. Schaefer and other S&L lawyers had no doubt – that Cargill would pursue its rights aggressively if we turned over the documents, and would likely seek disqualification of S&L. Nonetheless, based on the Board's guidance and our own research, we sent the privileged documents to Cargill.

**The Disqualification of S&L**

12. Within a few days of the disqualification of S&L on September 24, 2004, Mr. Schaefer self-reported to the Board of Professional Responsibility that he had been found to have violated several Rules of Professional Responsibility. Shortly thereafter, Cargill also reported Mr. Schaefer's violations to the Board and became, in effect, the complainant. After an investigation that included written submissions from both parties and telephonic or in-person interviews of Mr. Schaefer and other current and former S&L personnel, the Board concluded that Mr. Schaefer had failed to adequately supervise S&L personnel. It did not find that he had violated Rules 4.1, 4.2, or 4.4.

13. The disqualification had several negative impacts on the firm and several of its people. We placed Mr. Schaefer on leave immediately after the disqualification so that he could deal with this threat to his professional career and to assist his wife, who had been diagnosed with a rare form of cancer in late 1999 or early 2000 and, as it would turn out, only had about four months to live. In light of the Court's findings, we did not believe that he could work on any of the firm's cases until the Board process ended, and

even after then that he couldn't be in a leadership position on a class case for several years. After being placed on leave, Mr. Schaefer never returned to the firm. For a small firm to lose a long-time leader was a major blow.

14. S&L also faced significant adverse publicity. The Tribune and the Pioneer Press both wrote significant stories, while the Minnesota Lawyer featured it prominently. It was a topic of discussion at several CLE seminars.

15. This adverse publicity has been damaging because of the means in which we get business. Most of our cases come through attorney referrals and co-counsel arrangements, with the minority coming through contacts directly from potential clients. I believe that some potential contacts, especially from attorneys, may have gone elsewhere because of the adverse publicity. We had been filing about one class case per year as a result of initial contacts to our Minnesota office. Since 2004, we have not filed one case as a result of such a contact.

16. Finally, the departure of Mr. Schaefer, the adverse publicity, and the loss of millions of dollars in expected fee income and expense reimbursement from this case combined to cause us to dramatically scale back operations in Minnesota. About two weeks before the disqualification, we had terminated the employment of two lawyers in Minnesota with the expectation of replacing them. After the decision, we elected not to fill those positions. In addition, we terminated the employment of three staff members. Finally, with the reduced staffing, we relocated our former offices to much smaller offices. Over the last year and a half we have built back our attorney level in Minnesota to what it was in early September 2004, but recovery has been a difficult process.

17. The disqualification also has had at least one positive effect on S&L. We established the position of ethics partner, currently filled by Ms. Coler. For the past year, an associate has assisted her in this role. Ms. Coler has called the attention of S&L's lawyers and staff to ethical issues at meetings and by emails. We have encouraged lawyers and staff to consult a member of the ethics team when they confront any issue that raises ethical concerns, and Ms. Coler has been consulted on numerous occasions. With the firm's approval, Ms. Coler has been and continues to be in the process of implementing standard practices designed to ensure that firm personnel act within the rules in situations that the firm regularly confronts. We hope that measures like these will ensure that S&L's lawyers and staff will avoid any future violations of ethical rules.

**S&L's Fees**

18. I have reviewed S&L's time records for this case. All attorneys and staff are expected to contemporaneously record their time and enter their time on a computerized program called Timeslips. The Timeslips records reflect, for each attorney and staff member, the amount of time worked each day on each matter and descriptions of the work performed.

19. There are over 6,900 separate entries in S&L's time records for this case (typically, each timekeeper makes one entry for each case each day on which the timekeeper worked on that case). These entries reflect that S&L lawyers and staff worked a total of over 28,400 hours on this case through September 24, 2004, which, at its applicable Rate 2 (see below) that the firm used on this case, were valued at over $7,300,000.

20. I reviewed each entry, attempting to identify tasks that advanced the plaintiffs' individual claims and tasks primarily directed toward issues arising from the class claims. The results of my review, using the procedures described below, are shown in Exhibit A attached to this Declaration.

21. In performing the review, I developed and applied the following distinctions between individual-oriented and class-oriented work:

| **Activities** | **Individual Work** | **Class Work** |
|---|---|---|
| Case investigation | Interviews with future plaintiffs;<br>damages questionnaires completed by future plaintiffs | Interviews with persons outside class or who chose not to become plaintiffs;<br>investigations concerning Cargill's corporate structure and practices |
| Preparation of complaint | Paragraphs dealing with individual plaintiffs and causes of action in the complaint and amended complaints;<br>motion for leave to file amended complaints | Paragraphs concerning Cargill's patterns and practices and class allegations in the complaint and amended complaints |
| Motion to dismiss | Research for and briefing and argument in opposition to motions to dismiss | N/A |
| Written discovery | Responses to Cargill's interrogatories and document productions requests | Responses to plaintiffs' interrogatories and document production requests, except for document production requests seeking information about comparables for plaintiffs |
| Non-expert depositions | Depositions of plaintiffs conducted by Cargill | Depositions conducted by plaintiffs; depositions of class members and third party witnesses conducted by Cargill |
| Factual analyses | Creation of database concerning plaintiffs and comparables for plaintiffs | Coding of documents produced by Cargill; Analyses of Cargill's HR practices; analyses of Cargill's business units |

| **Activities** | **Individual Work** | **Class Work** |
|---|---|---|
| Expert discovery | Loading of HR data by plaintiffs' statistical expert and readying data to perform analyses[1] | All work by plaintiffs' stereotyping and HR experts; all analyses performed and report prepared by plaintiffs' statistical expert; all expert depositions; briefing concerning *Daubert* motion against plaintiffs' experts |
| Discovery motions | Research for and briefing and argument concerning production of information on plaintiffs' comparables | Research for and briefing and argument concerning all other discovery motions |
| Cargill's motion for summary judgment | Research for and briefing and argument in opposition to motion for summary judgment and in support of motion for reconsideration | N/A |
| Plaintiffs' motion for class certification | N/A | Research for and briefing in support of motion for class certification |
| Communications with current and former Cargill employees | Communications with plaintiffs | Communications with non-plaintiffs |
| Website | N/A | Creation, updating and maintenance of website |

22. Some tasks indivisibly were both individual and class oriented. With one exception, in preparing Exhibit A I did not count that work as advancing the plaintiffs' claims because I did not know how much of the work advanced the individual claims and how much was primarily oriented toward the class claims. For example, over the years there were numerous team meetings. I did not know how much of the team meeting was

[1] This category applies only to expenses. S&L had no role in this work other than to pay the statistical expert for his time and expenses in performing this task.

oriented toward class issues and how much toward individual issues. Rather than guess, I did not count that task as advancing the individual claims.

23. The exception was for work on the initial complaint and amended complaints. Most entries describing work on the complaints did not identify the particular issues associated with a complaint on which the timekeeper was working. As a rough approximation, I counted 1/3 of all work on the complaints as oriented toward individual issues and 2/3 as oriented toward class issues.

24. Several employees noted, when they performed multiple tasks on the same day, the amount of time devoted to each task. If tasks could be identified as oriented toward individual or class issues, it was easy to determine for purposes of Exhibit A the amount of time devoted to work on individual as opposed to class issues on that day.

25. Other persons did not note the amount of time devoted to each task on a given day, only the total amount of time devoted to this case. If they worked on one or more tasks that day that advanced the individual claims and one or more additional tasks primarily directed toward the class claims, the face of their records did not allow allocation of time between individual and class matters. When preparing Exhibit A, I treated all of the time on that day as oriented toward class issues, except under three circumstances:

- the records of another timekeeper permit allocation, *e.g.*, they both attended the same meeting and the other timekeeper noted its length, in which case S&L treats the first timekeeper as attending the meeting for the same length of time;

- the great majority of the day was spent on tasks allocable to individual matters, *e.g.*, a lawyer defends the deposition of a plaintiff and at the end of

the day answers accumulated emails, in which case S&L deducts a small amount of time, such as ½ hour, from the amount of time in the deposition; and

- the employee performs the same task several times on the same day, some of them allocable to individual matters and others to class matters, *e.g.* s/he interviews four persons, two who eventually became plaintiffs and two who did not, in which case S&L allocates half of the time to individual matters and half to class matters.

26. I deleted from Exhibit A each time entry in which all tasks were class oriented or in which I treated all tasks as class oriented pursuant to the procedures described in paragraphs 21-25 above. I also deleted numerous entire entries that I did not believe were properly compensable in the exercise of my billing judgment. By these means, I reduced the dollar value of the time entries by about 85%.

27. Exhibit A reflects S&L's original time entries, except for the time deletions described above and typographical corrections.

28. S&L has two sets of hourly rates: Rate 1 and Rate 2. The firm uses Rate 1 rates for class action litigation in major metropolitan markets, and Rate 2 for class cases in smaller metropolitan markets as well as the small number of individual cases that the firm prosecutes and for its infrequent hourly consultations.

29. We set Rate 1 each year based on the Survey of Law Firm Economics, published by Altman Weil Publications, Inc. This publication includes a wide variety of information based on the results of a survey of law firms. We generally establish Rate 1 for the upcoming year between the median and upper quartile for the Washington, D.C. market (the location of the firm's principal office) for the just-completed year. We are

confident that these rates reflect the rates at major corporate law firms in the D.C. area. We believe that it is appropriate to peg the firm's rates to the rates at major law firms for three primary reasons. First, all S&L lawyers have the academic and other qualifications to be employed at major corporate law firms and several worked at such firms before moving to S&L. Second, major corporate law firms represent the defendants in almost all of S&L's cases, including this case. Finally, any justification for higher rates at major corporate law firms associated with higher overhead costs is more than offset by the substantially greater risk that S&L bears in prosecuting all of its cases on a completely contingent basis. Based on the survey, S&L establishes a matrix of lodestar rates for number of years of experience. In some instances, lawyers' rates are adjusted downward to reflect years partly or wholly out of the practice or spent on legal matters unrelated to the firm's practice. S&L's Rate 2 is set at approximately 15% below its Rate 1.

30. The table below sets forth S&L's 2007 billing rates for the timekeepers reflected on Exhibit A. (The symbol "Δ" indicates that the timekeeper is a former employee; the symbol "*" indicates that the timekeeper is/was resident in the firm's D.C. Office.)

| ATTORNEY | CERT/ GRAD YEAR | POSITION/CASE ROLE | 2007 RATE 2 |
|---|---|---|---|
| Michael Lieder * | 1984 | Managing Partner | $500.00 |
| Steve Sprenger * | 1988 | Managing Partner | $475.00 |
| Larry Schaefer Δ | 1988 | Managing Partner/Lead Counsel | $475.00 |
| Mara R.Thompson | 1988 | Partner | $450.00 |
| Susan M. Coler | 1989 | Partner | $450.00 |
| Teresa Patton Δ | 1988 | Associate | $420.00 |
| David Ramp Δ | 1976 | Associate | $390.00 |
| Cynthia Totten Δ * | 1997 | Associate | $350.00 |
| Sara Madsen Δ | 1983 | Associate | $335.00 |

| | | | |
|---|---|---|---|
| Lisa Stratton Δ | 1993 | Associate | $305.00 |
| David Shulman Δ | 1995 | Associate | $275.00 |
| Lori Buchheim Δ | | Law Clerk | $150.00 |
| **PARALEGALS** | **YEAR** | **POSITION** | **RATE 2** |
| Patty Zellman (Jones) | 1989 | Senior Paralegal | $190.00 |
| Carol Cesar Finck | 1990 | Senior Paralegal | $190.00 |
| **LEGAL ASSISTANTS** | **YEAR** | **POSITION** | **RATE 2** |
| Kelly Hemmelman Δ | | Senior Legal Assistant | $155.00 |
| Douglas Olson | | Legal Assistant | $140.00 |
| Leslie Rusnacko | | Legal Assistant | $140.00 |
| Shoshana Elana Δ | | Legal Assistant | $125.00 |
| Sara Nelson Δ | | Legal Assistant | $120.00 |
| Eleanor Sims Δ | | Legal Assistant | $120.00 |

31. In conformity with its practice of billing for class cases in smaller metropolitan areas, the value of S&L's work on this case is valued in our time records at Rate 2. At Rate 2, the time records for which S&L seeks compensation are valued at $1,149,367.40. The amount for each category of work is reflected in the last line on page 115 of Exhibit A.

**<u>S&L's Expenses</u>**

32. S&L's accountant records its expenses in Timeslips as they are incurred. The expense records reflect that S&L spent over $1,025,000 out-of-pocket on this case, exclusive of electronic document management/storage costs and interest carrying expenses.

33. I went through each of the over 1,300 Cargill expense entries in S&L's records, eliminating all expenses primarily directed toward the class issues and that, in the exercise of my billing judgment, should otherwise be eliminated. This has meant elimination of major expenses, including all expenses associated with experts William Bielby and Ron Adler and expenses associated with the offensive depositions that S&L

took. As reflected on Exhibit B, this has reduced the total expenses to $781,066.98, as shown below:

| **Expense Category/Type** | **Dollar Amount** |
|---|---|
| External – court, service of process and witness fees | $150.00 |
| External – court reporter fees and transcript costs | $23,958.96 |
| External – expert/consultant fees (i.e., mediators, special masters, experts, trial consultants and investigators) | $527,916.29 |
| External – overnight mail and messenger costs | $6,445.43* |
| External – photocopying/OCR scanning costs/medical record costs | $131,606.60* |
| External – travel (e.g., parking, air fare, lodging and meals) | $26,043.76 |
| External – electronic research | $46.69* |
| Internal – photocopying and printing charges | $58,439.70* |
| Internal – fax charges | $230.94* |
| Internal – postage charges | $2,758.06* |
| Internal – long distance telephone charges | $3,470.55* |
| **TOTAL** | $781,066.98 |

34. It is impossible to allocate most of the categories of expenses – those marked by an asterisk – accurately between expenses that advanced the individual claims and expenses primarily directed at the class claims. S&L's records calculate such expenses as all documents copied on a given day or month, all postage or delivery charges paid in a given day or month, and all long distance telephone charges in a given month. It would be impossibly cumbersome to identify by specific purpose, not just by case, each copy made or each long distance call made. In light of the mixed purposes of these expenditures, S&L seeks to be paid only for 50% of the amounts in the asterisked expense categories.

35. With the expenses associated with two of the three experts removed, all that are left are payments to PeopleClick, the organization employing plaintiffs' statistical

expert Dr. David Peterson. The analyses that he performed prior to September 24, 2004, were exclusively directed at class issues. However, I am confident that Dr. Peterson assisted substitute counsel in the settlement negotiations. Typically, in negotiations in which I have participated, lawyers have used statistical experts to identify comparators and calculate damages.

36. If he was used to any substantial extent in the negotiations, the work that Dr. Peterson did prior to September 24, 2004, had substantial value. The first huge task for any statistical expert in an employment class action like this case is to load the databases from the defendant, understand the use of the various fields and codes, recognize which fields have limited value because they are not fully populated, and otherwise become familiar with the databases. From conversations with several experts, I understand that this part of the process of dealing with large databases often takes many months and costs many thousands of dollars, often over $100,000.

37. S&L seeks compensation for ¼ of the amounts paid to Dr. Peterson.

38. With these adjustments, the total expense reimbursement sought by S&L is $283,630.76, divided among the expense categories as follows:

| **Expense Category/Type** | **Dollar Amount** |
|---|---|
| External – court, service of process and witness fees | $150.00 |
| External – court reporter fees and transcript costs | $23,958.96 |
| External – expert/consultant fees (i.e., mediators, special masters, experts, trial consultants and investigators) | $131,979.07 |
| External – overnight mail and messenger costs | $3,222.71 |
| External – photocopying/OCR scanning costs | $65,803.30 |
| External – travel (e.g., parking, air fare, lodging and meals) | $26,043.76 |
| External – electronic research | $23.34 |
| Internal – photocopying and printing charges | $29,219.85 |

| | |
|---|---|
| Internal – fax charges | $115.47 |
| Internal – postage charges | $1,379.03 |
| Internal – long distance telephone charges | $1,735.27 |
| **TOTAL** | $283,630.76 |

**Conference with Cargill**

39. After we received a copy of this Court's Order dated July 10, 2007, notifying us of the settlement of the plaintiffs' claims, I contacted Holly Eng, one of Cargill's counsel, on Tuesday, July 24. I told her that while we were strongly inclined to petition for some fees and expenses, we did not want to do so if the terms of the settlements or the course of the settlement negotiations precluded us from filing a motion. Accordingly, we sought a copy of the relevant language from the settlement agreements, from which names and amounts could be redacted. I told her that we also sought two types of information that would assist us in evaluating the amount of fees and expenses to seek, if the terms of the settlements did not preclude us from filing any such motion: the total amount of the settlements, and the right to ask successor counsel for information about the extent to which they used the information accumulated by S&L during the settlement negotiations. Ms. Eng informed me on Friday, July 27, that Cargill would not provide S&L any of the requested information. Although she gave me a short speech about why S&L should not seek any fees or expenses because of its wrongdoing, she did not even suggest that the terms of the settlements precluded such a motion.

* * *

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of August, 2007, at Washington, DC.

*s/Michael D. Lieder*
Michael D. Lieder



75514